JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams Street, Suite 201
Phoenix, Arizona 85007
Telephone:  (602) 382-2700

DEBORAH L. WILLIAMS, # 010537
MILAGROS A. CISNEROS, # 020410
Asst. Federal Public Defenders
Attorneys for Defendant
deborah_williams@fd.org
milagros_cisneros@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Dennis Mahon,<br><br>　　　　Defendant. | No. CR 09-0712-PHX-DGC<br><br>**DEFENDANT'S MOTION TO<br>SUPPRESS UNLAWFULLY<br>OBTAINED WIRETAP EVIDENCE<br>AND FOR A *FRANKS* HEARING**<br><br>**(Oral Argument Requested)** |

　　　　Dennis Mahon, through undersigned counsel, respectfully moves this Court, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C), *Franks v. Delaware*, 438 U.S. 154 (1978), and the Fourth Amendment to the United States Constitution, for a suppression hearing and to suppress evidence improperly seized from a Title III wiretap of various telephones.  Suppression is required because the affidavits supporting the Title III wiretap applications contain materially false and misleading statements, as well as material omissions of fact, without which the affidavits would have been insufficient to

support a finding of probable cause. This request is supported by the attached Memorandum of Points and Authorities.

Respectfully submitted: June 29, 2010.

JON M. SANDS
Federal Public Defender


*s/Milagros A. Cisneros*
MILAGROS A. CISNEROS
Asst. Federal Public Defender

## MEMORANDUM OF POINTS AND AUTHORITIES

### Background

After a multi-year investigation by the Bureau of Alcohol, Tobacco and Firearms (ATF) and other agencies, Dennis Mahon was charged with Conspiracy to Damage Buildings and Property by Means of Explosive, in violation of Title 18 United States Code, Sections 844(n) and 844(I) (Count 1); Malicious Damage of a Building by Means of Explosive, in violation of Title 18, United States Code, Section 844(I) (Count 2); and Distribution of Information Related to Explosives, in violation of Title 18, United States Code, Section 842(p)(2)(A) (Count 3). Daniel Mahon was charged only in Count 1. The investigation included evidence from a Title III wiretap, which was renewed six times over a seven month period.

On or about November 16, 2007, AUSA Keith Vercauteren filed an application with the United States District Court for the District of Arizona for an order authorizing the interception of the defendant's wire communications pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* ("Federal Wiretap Act"). This statute allows the government to conduct and control electronic surveillance with federal court approval. The government's initial application sought the authority to intercept wire communications from telephone number (815) 980-7337 ("T1"), located at 5794 N. Blackwood Rd., Davis Junction, Illinois, apparently subscribed to by Dennis Mahon. *See Exhibit A (wiretap application dated 11/16/07).* According to the application, the targets of this investigation were Dennis and Daniel Mahon, Tom Metzger, Charles Kountze, John McLaughlin, and Robert Joos. Interception was directed to the offenses enumerated in 18 U.S.C. § 2516, including 18 U.S.C. §§ 241 (Civil Rights Conspiracy), 371 (Conspiracy), 842 (Information Relating to Explosive Materials), 844(I) (Unlawful Use of Explosives, 924(c) (Unlawful Use or

3

Possession of Firearms), 2339A (Providing Material Support to Terrorists), and 26 U.S.C. §5861(d)(Unlawful Possession of Firearms). *Id.*, at 2.

On November 16, 2007, U.S. District Court Judge James A. Teilborg granted the Order Authorizing the Interception of Wire Communication from T1. *See Exhibit B (Order dated 11/16/07)*. Continuing interception of this and other related numbers was authorized six additional times. *See Exhibit C (Orders, dated 12/17/07, 1/17/08, 2/15/08, 3/17/08, 4/4/08, and 5/12/08, attached collectively).* A December 2007 Order authorized the continuing interception of T1 and the initial interception of cellular telephone numbers (815) 393-4626 ("T2"), apparently subscribed to by Dennis Mahon, and (815) 501-5260 ("T3"), apparently subscribed to by Daniel Mahon. A January 2008 order reauthorized the interception of T1, T2, and T3. February and March 2008 orders reauthorized the interception of T1 and T3. An April 2008 order reauthorized the interception of T1 and T3, and authorized the initial interception of residential telephone numbers (574) 267-5036 ("T4") and (574) 269-1081 ("T5"), both apparently having been utilized by Tom Metzger. Finally, a May 2008 order reauthorized the interception of T1, T3, T4, and T5. Monitoring began on November 17, 2007 and ended, almost seven months later, in early June of 2008.

Any aggrieved person in any trial, hearing or proceeding may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom. 18 U.S.C. § 2518. Both Dennis and Daniel Mahon are aggrieved persons as defined in the statute as, "a person who was a party to any intercepted wire, oral, electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). Dennis Mahon was recorded on this wiretap from its inception, until the last recording on approximately June 10, 2008.

4

1

### Argument

2

### I.   A Defendant Need Only Make a Limited Preliminary Showing to Obtain a *Franks* Hearing

3

4          A valid search warrant or wiretap order must be supported by probable

5   cause, a determination that is "based upon the totality of circumstances known" at the

6   time of the application.  *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001)

7   (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see also* 18 U.S.C. § 2518(3) (2000).

8   Of course, what is known by the reviewing court is "limited to the information and

9   circumstances contained within the four corners of the underlying affidavit."  *United*

10  *States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985) (citing *United States v. Taylor*, 716

11  F.2d 701 (9th Cir. 1983), *amended*, 769 F.2d 1410 (9th Cir. 1985)).  Because the court

12  must conduct its review of the application with "the affiant's good faith as its premise,"

13  it is imperative that the affidavit provide the "total story" so as not to "mislead [the court]

14  when making a probable cause determination."  *Stanert*, 762 F.2d at 781 (citing *Franks*

15  *v. Delaware*, 438 U.S. 154, 164 (1978)).

16

17          Under *Franks*, a defendant can challenge a facially valid search warrant

18  affidavit by making a preliminary showing that: "(1) the affidavit contains intentionally

19  or recklessly false statements, and (2) the affidavit purged of its falsities would not be

20  sufficient to support a finding of probable cause."  *United States v. Lefkowitz*, 618 F.2d

21  1313, 1317 (9th Cir. 1980) (citing *Franks*, 438 U.S. 154).  Defendants can challenge

22  affidavits for Title III wiretaps on the same grounds.  *United States v. Ippolito*, 774 F.2d

23  1482, 1485 (9th Cir. 1985) (citing *Franks*, 438 U.S. at 165).  "[C]lear proof of deliberate

24  or reckless omissions or misrepresentations" is not required.  *United States v. Gonzalez,*

25  *Inc.*, 412 F.3d 1102, 1111 (citing *Stanert*, 762 F.2d at 781), *amended*, 437 F.3d 1102 (9th

26  Cir. 2005).  Upon such a preliminary showing, the court must hold a "limited evidentiary

27

28                                                5

hearing" to determine whether the issuing court was misled by the contents of the affidavit, at which point "suppression is an appropriate remedy." *Stanert*, 762 F.2d at 780 (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)).

Since *Franks*, courts have expanded the scope of permissible challenges to cover omissions from affidavits that call into question the probable cause determination. The Ninth Circuit has expressly held that "the Fourth Amendment mandates that a defendant be permitted to challenge" an affidavit in support of a search warrant or wiretap application "when it contains deliberate or reckless omissions of facts that tend to mislead." *Stanert*, 762 F.2d at 781 (citing *United States v. Williams*, 737 F.2d 594, 604 (7th Cir. 1984)). The court explained that "[b]y reporting less than the total story, an affiant can manipulate the inferences [the court] will draw," and concluded that "[t]o allow a [court] to be misled in such a manner could denude the probable cause requirement of all real meaning." *Stanert*, 762 F.2d at 781 (citing *Franks*, 438 U.S. at 168).

Following a defendant's preliminary showing of "intentional or reckless inclusion or omission, and materiality," courts engage in a two-step analysis to determine whether a search warrant or wiretap order was supported by probable cause. *United States v. Bennett*, 219 F.3d 1117, 1124 (9th Cir. 2000). First, "[t]he threshold determination in a *Franks* hearing is whether erroneous statements or omissions...were made 'knowingly and intentionally, or with reckless disregard for the truth.'" *United States v. Senchenko*, 133 F.3d 1153, 1158 (9th Cir. 1998) (quoting *Franks*, 438 U.S. at 155-56). Recklessness can be inferred from the omission of facts that had the potential to play a significant role in the issuing court's probable cause determination, whether individually or in the aggregate. *See Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir.

1991); *see also Stanert*, 762 F.2d at 781 (recklessness inferred from omission of significant facts).

Second, courts then inquire into whether "the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause." *Stanert*, 762 F.2d at 782.

## II.    The Court Should Order a *Franks* Hearing on the Title III Wiretap Affidavit.

The Affidavit contains several intentionally or recklessly false or misleading statements, as well as material omissions. When these false or misleading statements are excised from the Affidavit and the omitted information is considered, there is no probable cause to justify the interception of T1. The Court should order a *Franks* hearing at which Mr. Mahon will establish that the Court must suppress all evidence obtained pursuant to the wiretap of T1 and the subsequent interceptions of T2, T3, T4 and T5 based upon it. Evidence obtained from subsequent wiretap investigations that relied on the initial wiretap investigation is "fruit of the poisonous tree" and may not be used at trial. *See United States v. Carneiro*, 861 F.2d 1171, 1182 (9th Cir. 1988) (holding that a wiretap extension order based on evidence derived from an original, invalid wiretap order is also invalid).

### A. The Affidavit Misrepresents Information Regarding the Amount of Trust that Mr. Mahon Had in the Confidential Informant (Affidavit ¶ 12) and It Omits Any Reference to the Fact that the Confidential Informant Was Used as Sexual Bait to Elicit Statements from Mr. Mahon. (*Exhibit A* ¶¶ 73 and 90)

The section of the Affidavit purporting to set forth the "Theory of the Case" expressed the expectation that Mr. Mahon would, in the future, use his cellular telephone to discuss illegal activities with his brother and others whom he trusted. *Id.* ¶ 12. The premise for seeking the wiretap, therefore, was that Mr. Mahon would be unwilling to discuss such matters with the confidential informant ("CI") who was already in place.

7

Indeed, as the Affidavit states, "Dennis MAHON has specifically told the CI that he does not trust her as much as he trusts his brother." *Id.* While this may have been technically true, it misstates what he <u>actually</u> told the CI. According to ¶ 73 of the Affidavit, on June 17, 2006, "MAHON told the CI that he trusted his brother 100 percent and that the trusted the CI <u>almost as much as his brother</u>." *Id.* (emphasis added). This is an important fact due to the intimate nature of the relationship between Dennis Mahon and the CI.

In addition, ¶ 77 describes a conversation that took place one month later in which Dennis Mahon told the CI that "he really doesn't trust too many people other than the CI, his brother (Daniel), maybe Steve." *Id.* ¶ 77. The clear implication in the "Theory of the Case" section of the Affidavit is that the wiretap was needed because Dennis Mahon did <u>not</u> trust the CI. In reality, however, he trusted her almost 100 percent and he explicitly put her on a par with his brother. That fact is amply demonstrated through the course of his video- and audio-taped discussions with the CI.

Paragraphs 73-74 describe a conversation between Dennis Mahon and the CI in which he discussed his level of trust in her. He then went on to state that he (and others) had done "some major shit from 81 to 93...some major bombings from 82 to 88." *Id.* at ¶ 73. Significantly omitted from ¶ 73 is the fact that, in this same conversation, he also told the CI that he was "very sexually attracted to her" and discussed "their future." *See Exhibit D (Report of Investigation No. 61), at Bates 2603.* Mr. Mahon wore his heart on his sleeve, and there was no question that he was completely smitten. That was the very reason for selecting this CI.

The Affidavit neglects to mention why the CI was selected. She was the bait, tailored to Mr. Mahon's taste in women, and she presented herself as a young racist who looked up to him and wanted to hear his "war stories." Whenever she wanted more

information, and at the direction of her controller (SA Moreland), she would turn up the heat through increasingly brazen sexual behavior.  Within days of  meeting the CI in 2005, Mr. Mahon was talking about having children with her and she did nothing to discourage his adoration.  In August 2005, she sent him a card containing a picture of herself wearing a leather jacket, fishnet hose, and thong bikini underwear that completely exposed her buttocks.  In 2007, he visited her in Tempe and during a videotaped drive to Scottsdale the CI reached between his legs and grabbed his genitals.  In 2008, she visited him in Rockford, IL and they spent the night together in the same bed in her motel room.  The videotape clearly shows that Mr. Mahon removed his clothing shortly after they returned to her room from dinner and he was completely naked when he climbed into their bed (the videotape conveniently ended after she joined him in bed).  During a subsequent recorded phone call, they mutually discussed how he had kept her up most of that night in the motel room.

Throughout the nearly five years that this CI was on the job, the recorded phone calls and videos chronicled the evolution of their relationship. Mr. Mahon was intensely  attracted to her, and she exploited that attraction for the express purpose of encouraging him to keep talking.  The more he talked, and the more self-aggrandizing his statements became, the more she led him on.

A voice mail message from Mr. Mahon to the CI recorded on February 24, 2008 corroborates the connection between his sexual interest in her and the level of trust he bestowed upon her.  *See Exhibit E ( Call 1615, recorded 2/24/08).*    Mr. Mahon begins the voice mail by stating, "You're already gone?  Man, I'm gonna take a bite out of your luscious bottom.  I'm gonna take a love bite out of your bottom, hard, if you don't call me back."  *Id.*  He continues by giving the CI contact  information for one of his old friends in Phoenix.  *Id.*  Mr. Mahon then tells the CI to tell his friend that Mr.

Mahon approves of the CI. *Id.* According to Mr. Mahon, his endorsement of the CI was necessary because his friend is a little paranoid. *Id.* He took a similar approach when introducing her to several of his friends around the country.

Over the course of nearly five years, the CI established and manipulated an intimate relationship with Mr. Mahon. He continually expressed his intense attraction to and love for her on many occasions, and she encouraged his overtures. This material information is completely omitted from the Affidavit. In particular, it sheds light on Mr. Mahon's motive for fabricating knowledge about the Scottsdale bombing and other activities in his conversations with the CI.

**B.    The Affidavit Misrepresents Mr. Mahon's Statements on the Charles Goyette Show.  (*Exhibit A* ¶ 19)**

This investigation came about as a result of the bombing of Don Logan, of the Office of Diversity and Dialogue of the City of Scottsdale ("Diversity Office"). The Diversity Office handles some human resources tasks for the City of Scottsdale. In such a context, the word "diversity" has to do with the hiring of a diverse workforce and with maintaining a respectful work environment. According to its mission statement,

> Diversity and Dialogue develops and sponsors trainings, services, programs, and events that create work and community environments where differences are valued respected, and embraced. This is achieved through a diversity initiative that addresses education, employee relationships, recruitment, hiring, procurement, community outreach, and deliberative dialogue.

http://www.scottsdaleaz.gov/HR/diversity/mission.asp (last accessed 5/20/10).

In 2001, Mr. Mahon was interviewed by Charles Goyette, a radio talk show host who had a live program on a popular talk-radio station in Phoenix. Mr. Mahon's interview with Charles Goyette did not include any discussion of Mr. Mahon's views on the issue of diversity. *See Exhibit F (Transcript of Goyette show).* Indeed, the word "diversity" was not mentioned at any point during the interview. Although the interview

did discuss Mr. Mahon's views about racial integration and his participation in white supremacist organizations, it was misleading for SA Moreland to state that Mr. Mahon "discussed his opposition to diversity." *Exhibit A* ¶ 19.

**C.    It Was Misleading to Characterize as "Threatening" the Phone Message Retrieved By Diversity Office Employee Jacque Bell in September 2003. (Affidavit ¶ 22)**

On September 26, 2003, an individual who identified himself as Dennis Mahon called the Diversity Office and left a message which was retrieved by Jacque Bell, who works at the office. *Exhibit A* ¶ 22. The message was left in response to advertisements and press releases about a Hispanic heritage celebration event, which listed the Diversity Office number as a contact number. *See Exhibit G (Interview of Velicia McMillan, dated 2/26/04)*, at Bates No. 946. The full text of the message is included in paragraph 22. *See id.* Unlike SA Moreland's characterization of the message, it cannot fairly be described as a "threatening" message. Indeed, at the end of the call, the caller even states "take care." *Id.* In an interview with law enforcement following the February 26, 2004 bombing, Ms. Bell herself characterized this same call as a "prank" call. *See Exhibit H (Interview of Jacque Bell, dated 2/26/04),* at Bates No. 882. It was materially misleading for Agent Moreland to characterize this call as a threat.

**D.    The Affidavit's Narration of Mr. Mahon's Comments to *New Times* Reporter Susan Buchanan Omits Material Information. (Affidavit ¶¶ 23-27)**

The Affidavit includes a discussion about an article published in the *New Times* about Aryanfest 2004, which took place in January 2004. *Exhibit A* at ¶ 23. In the article, Mr. Mahon claimed an association with Oklahoma City bomber Timothy

11

McVeigh, and was quoted as saying he was involved with McVeigh in bombing activities. *Id.* ¶ 24.

On June 16, 2004, SA Moreland interviewed Susan Buchanan, the *New Times* reporter who interviewed Mr. Mahon. *See Exhibit I (Report of Investigation, submitted 6/17/04).* According to the Affidavit, Ms. Buchanan advised that she had received two voicemail messages from an individual who identified himself as Dennis Mahon. *Exhibit A* ¶ 26. In both messages, the caller sounded intoxicated. *Id.* Ms. Buchanan later received a third voicemail message from the same caller, this time sounding sober, and expressing a desire to talk to the reporter because "he sometimes says things when he is drinking." *Id.*

Up to this point, the Affidavit faithfully reports what Ms. Buchanan apparently told SA Moreland. However, the Affidavit conveniently leaves out Ms. Buchanan's interpretation of what the caller meant by "sometimes say[ing] things when he is drinking." Ms. Buchanan "took this as a reference to some of the things Mahon was quoted in the article as having said at the Aryanfest gathering." *Id.,* at Bates No. 2216. In other words, the caller was attempting to distance himself from statements he previously made about his association with Timothy McVeigh and having been involved in bombing activities. Yet SA Moreland omitted this crucial information from the Affidavit.

**E.    It Is Misleading to Imply that Dennis Mahon Made A Threatening Call to Sandra Rembrandt. (** *Exhibit A* **¶¶ 37-39)**

On March 5, 2004, Sandra Rembrandt, the founder of an organization called Community Celebrating Diversity, received a "threatening call" from a male caller. *Exhibit A* ¶ 37. On February 29, 2004, the *Arizona Republic* printed an article regarding the bombing at issue in this case. *See Exhibit J (2/29/04 Arizona Republic*

12

*article)*.   In the article, Ms. Rembrandt was quoted as saying, "Obviously someone is trying to make a point and is upset about something." *Id.*  The Affidavit erroneously states that the article was published on March 5, 2004 and that, "on the same day," Ms. Rembrandt received the threatening call.

On March 9, 2004, Postal Inspector Michael Casadei interviewed and played for Ms. Rembrandt a tape of the September 26, 2003 telephone call to Jacque Bell purported to have been made by Mr. Mahon. *See Exhibit K (Memorandum of Interview, dated 3/9/04)*.  In his Affidavit, SA Moreland makes two erroneous statements in relation to this: (1) that Ms. Rembrandt stated that the caller said, "there are a lot of people like McVeigh, you better be careful"; and (2) that Ms. Rembrandt told investigators, "If that's not him, it sounds like him." *See Exhibit A* ¶ 37.  The Memorandum nowhere states that Ms. Rembrandt in fact reported that the caller stated "you better be careful."  Moreover, she did not state with any certainty that the voice purported to be Mr. Mahon's sounded like her caller. According to Postal Inspector Casadei, "Ms. Rembrandt stated the voice sounded <u>a little</u> like the call she received.  She said the caller was of the same <u>character type</u>.  She said if it is not him, it is real close." *Exhibit K* (emphasis added).  Ms. Rembrandt's statement cannot, in fairness, be boiled down to "[i]f that's not him, it sounds like him," as SA Moreland did in the Affidavit.  Moreover, Postal Inspector Casadei did not use quotation marks around any of Ms. Rembrandt's comments as she compared the two voices.  For SA Moreland to do so in his own characterization of what Ms. Rembrandt stated was misleading.

**F.    The Affidavit Omits Material Information About Additional Threatening Calls to Sandra Rembrandt During the Same Time Period that Were *Not* Traced to Mr. Mahon.  (*Exhibit A* ¶ 37)**

SA Moreland's Affidavit reports the incident regarding the threatening phone call to Sandra Rembrandt as if Ms. Rembrandt had received a lone threatening phone call and had practically identified Mr. Mahon as the caller. *See Exhibit A* ¶ 37. The Affidavit fails to report, however, that Ms. Rembrandt received five other calls on the same day. *Exhibit K.* They were all hang-up calls. *Id.* One call, which was placed at 10:12 p.m., was traced to an address in Scottsdale. *Id.* The Mahons lived in Tempe. The other calls, placed at 10:13 p.m., 10:14 p.m., 10:20 p.m., and 10:21 p.m. were traced to Jay Burris, a resident of Gilbert. *Id.*

**G.    The Affidavit Mischaracterizes the Departure of the Mahons from the RV Park in Tempe as "Unexpected."  (*Exhibit A* ¶ 40)**

The Affidavit includes the compelling statement that the Mahons left the RV Park "unexpectedly" just two weeks after the Scottsdale bombing. *See Exhibit A* ¶ 40.  That is not true, and the Mahons' departure from the RV park in Tempe was far from "unexpected." At the time SA Moreland authored the Affidavit, he was aware that Mr. Mahon had written letters (in April of 2003 and on January 10, 2004) to Missouri State Penitentiary inmate William Miller, in which Mr. Mahon expressed his desire to leave Arizona because it was too expensive and hot, and because he wanted to move to help his elderly parents at their farm in Illinois. *See Exhibit L (Report of Investigation, dated 6/18/04),* at Bates No. 2225-26.

Moreover, SA Moreland's Report of Investigation from a June 2004 interview with Lawrence Hough, the supervisor of the maintenance department at Alaska Airlines in Phoenix, shows that Daniel Mahon resigned from his job at Alaska Airlines

14

"due to chronic health concerns caused by the desert heat and excessively dusty and polluted air encountered...in the Phoenix area, plus some family issues." *See Exhibit M (Report of Investigation, dated 6/17/04)*, at Bates No. 2222.  Mr. Hough provided SA Moreland with Daniel Mahon's undated resignation letter, which nevertheless is styled as a "two week resignation letter" setting out April 16, 2004 as his last day of work. *See Exhibit N (undated resignation letter).*  Indeed, Mr. Hough told SA Moreland that Daniel Mahon "had complained *for several years* about the hot dry climate in Phoenix" and that "Daniel would suffer with [sic] dry cracking skin and had been requesting that Alaska Airlines transfer him to Portland, Oregon." *Id.* (emphasis added).  Daniel Mahon was not granted a transfer, because he did not have enough seniority. *Id.*

It was misleading for SA Moreland to characterize the Mahons' departure from the RV park as unexpected, when he knew that well before the bombing they had been expressing their intention to leave the Phoenix area and that Daniel Mahon had not quit his job until several months after the bombing.

## H.    The Affidavit Misrepresents Information Regarding Calls to the *Arizona Republic* and the *East Valley Tribune*.  (*Exhibit A ¶¶ 41-42*)

In October, 2003, the Mesa Police Department investigated a voice mail message left for *Arizona Republic* reporter James Walsh regarding the trial of Frank Roque, who was convicted of murdering a Sikh gas station owner. *Exhibit A ¶ 41.*  The Mesa Police Department report clearly states that the message was left by "an unknown caller." *See Exhibit O (Mesa Police Department Supplemental Report, dated 10/10/03).*  Subsequently, the Mesa Police Department determined that the phone used to leave the message was subscribed to by Mr. Mahon. *See Exhibit P (Mesa Police Department Supplemental Report, dated 10/14/03).*

15

Other than the fact that his phone was apparently used to call the *Arizona Republic* about Frank Roque's trial, there was no other link to Mr. Mahon. Paragraph 41 of the Affidavit fails to make this crucial distinction. Twice in ¶41 SA Moreland refers to a message left by Dennis Mahon, without knowing whether it was actually Dennis Mahon who left the voicemail message.

In ¶42 of the Affidavit, SA Moreland again fails to make the same crucial distinction. Paragraph 42 refers to a call made by Mr. Mahon to *East Valley Tribune* reporter Donna Hogan on the day she published an article titled "Push for Tourism Diversity Pays Off: Visitors Group, Hotels Book Variety of Groups." *Exhibit A* ¶ 42. While it appears that the telephone subscribed to by Mr. Mahon was used to call Ms. Hogan's work number, there is no other evidence that Mr. Mahon was the person who placed the call. Moreover, there is no evidence as to what the content of the message may have been. The fact that Ms. Hogan remembered that someone left her a voice mail message disagreeing with her article does not mean that Mr. Mahon was the one who called, or that the caller's message was somehow illegal or impermissible.

**I.    The Affidavit Mischaracterizes the Nature of Mr. Mahon's Exculpatory Statements and Omits a Material Exculpatory Statement. (** *Exhibit A* **¶¶ 58, 61, 68 and 98, and Footnotes 3, 5, 8 and 13)**

Paragraphs 58, 61, 68, and 98 contain exculpatory statements but, in footnotes, they are qualified by statements of SA Moreland's *opinion* about Mr. Mahon's exculpatory statements "really" meant. Footnote 3 attempts to explain away Mr. Mahon's statement that he does not use explosives anymore, by stating SA Moreland's personal opinion that Mr. Mahon is "either minimizing his actions or he simply does not have complete trust in the CI." *Exhibit A* at fn. 3. Footnote 5 states: "Dennis MAHON caught himself after he slipped up and told the CI of his involvement in the Scottsdale

16

bombing of Don Logan.  Dennis Mahon then tried to backtrack and clean up the statement by blaming the bombing on Scottsdale police officers."  *Exhibit A* at fn. 5. But Mr. Mahon did not "catch" himself.  He simply stated that he did not do it. Moreover, just a few minutes later during the same conversation, Mr. Mahon clearly stated that he hadn't "done anything wrong in seven years."  *See Exhibit Q (Report of Investigation No. 49, submitted 5/11/05),* at Bates No. 2493.  This was a material statement, and it should not have been omitted from the Affidavit.  Footnotes 8 and 13 are statements by SA Moreland again expressing his opinion that Mr. Mahon's exculpatory statements are simply attempts to conceal his involvement in the bombing of Don Logan.  *Exhibit A* at fn. 8 and fn. 13.  Insofar as they are stated as fact, they constitute misrepresentations.

**J.    The Affidavit Misstates the Extent to Which the Investigation Had Exhausted All Other Investigative Leads. (*Exhibit A* ¶ 61, Footnote 5)**

Footnote 5 contains another significant material misrepresentation – that "[a]ll leads, including possible Scottsdale police and employees, have been investigated, and no evidence has linked anyone to the Scottsdale bombing, other than the target subjects of this Affidavit."  *Exhibit A* at fn. 5.  In fact, in the course of its investigation, the  Scottsdale Police identified more than a dozen investigative leads and suspects. Contrary to SA Moreland's assertion that no evidence had linked anyone else but the Mahons to the Scottsdale bombing, many of the initial suspects were City of Scottsdale insiders with specific and clear motivation to do harm to the City, the human resources department and/or Don Logan himself.

For instance, one Scottsdale employee reportedly made a comment about how he could mail a bomb to anyone in the city and no one would be able to figure out

17

who sent it. *See Exhibit R (Investigative Lead List)*, at Bates No. 999[1]. He also told a fellow employee that he had a "cookbook" that explained how to make bombs. *Id.* That person was known to make inappropriate comments and engage in discriminatory behavior, and Don Logan had filed a complaint about this. *Id.* Several city employees reported a second person (also a Scottsdale employee) as a likely suspect because of his temper, mental health problems and motive. *Id.* These and other suspects had specific motives to harm Don Logan, and the evidence strongly suggested that the bomber was a Scottsdale employee/insider. In contrast, Dennis Mahon was included in the list simply as someone who called the Diversity Office once in September of 2003, identifying himself as a member of the White Aryan Resistance, and using a racial slur. *Id.* at Bates No. 1000.

By May 3, 2004, ATF had focused its investigation on Dennis Mahon and Tom Metzger. *Exhibit I*, at Bates No. 2215. It appears that when ATF assumed the investigation and contracted with the confidential informant, all or most other investigation ended. There is no evidence that ATF continued to pursue any of the investigative leads that were developed by the Scottsdale Police Department or the U.S. Postal Service. Instead, all efforts focused on Mr. Mahon. Therefore, to state that all leads were investigated and cleared is not correct, and this is material information.

**K.    The Affidavit Materially Misrepresents the Circumstances of the May 2007 Drive Around Downtown Scottsdale. (*Exhibit A* ¶ 90)**

In May 2007, when a visit to Arizona, the Mahons rode along with the CI when she drove to Scottsdale to pay a fictitious traffic ticket. According to the Affidavit,

When driving down 75th Street south from Indian School, the CI stopped the vehicle at the intersection of 75th Street and

---

[1]Exhibit R has been redacted for reasons of privacy and possible ongoing investigation.

Main Street.  After stopping for a few seconds, the group began driving again south on 75th Street when Daniel signaled with his thumb as if pointing behind him and said, "That's 75[th] Street."  The street he was pointing at was actually Main Street, not 75th Street as he indicated.  Your affiant notes that the address label used on the bomb sent to Logan was misaddressed as 75th Street instead of Main Street, which was Logan's actual work address.

*Exhibit A* ¶ 90.  This description implies that Daniel Mahon spontaneously pointed out 75th Street.  To the contrary, the video shows that the Mahons had only a vague idea of where they were at or where to go.  *See Exhibit S (video clips of 5/07 trip to downtown Scottsdale).*  Daniel Mahon was reading directions from the fake traffic ticket and looking around at the unfamiliar surroundings, and the brothers were debating back and forth on where things were and how best to get there.  *See id.*  There was no hint of recognition of the area on their part.  To imply otherwise misrepresents the clear facts documented on video.

> **L.    The Affidavit Omits Material Facts Regarding the Exhaustion of Traditional Law Enforcement Techniques Such As Physical Surveillance.  *(Exhibit A ¶113)***

SA Moreland states in his affidavit that "physical surveillance is very difficult to conduct at this location due to the remote area, and Dennis MAHON could easily identify law enforcement if they attempted further surveillance at this location." *Exhibit A* ¶ 113, at Bates 70.  Other  modes of physical surveillance are not addressed. For example, the use of surveillance cameras is a common law enforcement tool that is used when addressing surveillance in a rural situation such as this.  Pole cameras, where a camera is disguised in an electrical canister on a utility pole near the residence, are frequently used to capture activities in real time and then feed the images to a secure offsite location such as an ATF field office.  There were numerous utility poles near the

residence.  Nevertheless, there is no evidence that this surveillance was even attempted.

**Conclusion**

For all the foregoing reasons, Mr. Mahon has met his burden of showing that the Affidavit contains material misstatements and omits material facts.  Accordingly, this Court should order a *Franks* hearing at which the government must establish that probable cause existed for the wiretap, even with the exclusion of the materially false and misleading statements and the inclusion of the material omissions.

Respectfully submitted:    June 29, 2010.

JON M. SANDS
Federal Public Defender


 *s/Milagros A. Cisneros*
DEBORAH L. WILLIAMS
MILAGROS A. CISNEROS
Asst. Federal Public Defenders

20

I hereby certify that on June 29, 2010, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

MICHAEL MORRISSEY
JOHN BOYLE
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central, Suite 1200
Phoenix, Arizona  85004-4408

BARBARA HULL
637 N. Third Ave. #3
Phoenix, AZ 85003-0001
Attorney for Co-defendant Daniel Mahon

Copy of the foregoing mailed to:

DENNIS MAHON
Defendant


  s/ *S. B.*
S. B.

21