DENNIS K. BURKE
United States Attorney
District of Arizona

JOHN BOYLE
Assistant U.S. Attorney
Arizona State Bar No. 015640
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
john.boyle@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>Dennis Mahon,<br>Daniel Mahon,<br><br>　　　　　　Defendants. | CR-09-00712-PHX-DGC<br><br>**GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTIONS TO SUPPRESS FOR MIRANDA** |

　　　　The government hereby submits a consolidated response to Defendants' two motions to "Suppress for Violation of Miranda." (Documents 446 and 481.) The government requests the motions be denied. The Defendants had no expectation of privacy in the back of a patrol van, their statements were voluntary, and there was no interrogation of the Defendants. This response is supported by the attached Memorandum of Points and Authorities.

　　　　Respectfully submitted this 2nd day of September, 2010.

　　　　　　　　　　　　　　　　　　　　DENNIS K. BURKE
　　　　　　　　　　　　　　　　　　　　United States Attorney
　　　　　　　　　　　　　　　　　　　　District of Arizona


　　　　　　　　　　　　　　　　　　　　 *s/ John Boyle*
　　　　　　　　　　　　　　　　　　　　JOHN BOYLE
　　　　　　　　　　　　　　　　　　　　Assistant U.S. Attorney

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    FACTS**

On June 25, 2009, agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), deputies of the Ogle County Sheriff's Office, and inspectors of the United States Postal Service served a search warrant on the Defendants' residence at 5794 North Blackwood Road, Davis Junction, Illinois. At 6:10 A.M., sheriff's deputies knocked on the door and informed the Defendants there was a search warrant and a warrant for their arrest. The Defendants refused to comply and engaged in a half-hour standoff with the deputies. At approximately 6:45 A.M., the Defendants informed deputies they would comply, and shortly thereafter both were arrested. ATF agents, who had intentionally stayed away from the property to help diffuse the tension, then drove onto the property and took custody of the Defendants at approximately 6:50 A.M.

Between 6:50A.M. and 7:10 A.M., the Defendants were separately read their Miranda rights. ATF Special Agent Sabrina Hager advised Daniel Mahon of the search warrant, allowed him to review it, and then advised him of the arrest warrant. Special Agent Hager read Daniel Mahon his rights from a standard-issue form. Daniel Mahon was asked, "Do you understand this?" Daniel said "I understand." The entire contact was tape recorded. Daniel Mahon was not asked questions and he did not invoke his Miranda rights.

Special Agent Hager then advised Dennis Mahon of the search warrant, allowed him to review it, and then advised him of the arrest warrant. At 7:05 A.M., Special Agent Hager read Dennis Mahon his rights from a standard-issue form. The agent asked if the Defendant understood his rights, and Dennis Mahon nodded his head slightly. He then said, "The small talk is over, I can't say anything more, except for who is praying for the damn humidity to quit." He was offered a bottle of water. Agent Hager asked him if he wanted to take his diabetic medication (it was in his pocket), but Dennis declined and said he would take it at 10:00A.M.

1   At 7:11 A.M., the Defendants were placed in a police minivan together. They were given bottled water and the doors were closed. No one else was in the van, although agents were recording the Defendants as they spoke[1]. The first statement from the Defendants after the van doors were closed was Dennis Mahon saying "We're probably being recorded right now." Despite Dennis' warning, both Defendants engaged in conversation and made incriminating statements.[2]

    The Defendants sat in the minivan and spoke with each other until 8:28 A.M. when they notified agents that they wanted to use the bathroom. Dennis Mahon was escorted from the van to use the bathroom. Daniel Mahon did not use the bathroom, and declined an offer to get out of the van to stretch his legs.

    At 8:49 A.M., Daniel Mahon was escorted from the van so that ATF Special Agent Tristan Moreland could speak with him. Special Agent Moreland spoke with Daniel Mahon for six minutes during a recorded conversation. (See Attachment A, a transcript of this conversation.) Agent Moreland told Daniel Mahon that he was not interested in interviewing him right then, but instead he wanted Daniel Mahon to listen to him. The agent told Daniel Mahon of the indictment, the facts of the case, other witnesses, other suspects, the leader of WAR (Tom Metzger), the wiretap, and that other warrants were being served on other suspects that day. Agent Moreland told Daniel Mahon that he was interested in learning about a fugitive ("Timothy Coombs") and about other suspects if Daniel Mahon wanted to speak with him later. Agent Moreland told Daniel Mahon that Daniel would be appointed an attorney and that Daniel should talk to his lawyer about his options. Daniel Mahon never invoked his rights during this conversation. Daniel was asked if he wanted water or to use a restroom. Daniel declined and said he was fine. Daniel was placed back in the van at 8:57 A.M.

---

[1] There is a clock displayed on the videotape recording. This clock is the reference for the times indicated within this motion.

[2] The conversation contained an array of statements. The Defendants professed innocence and ignorance numerous times. At other times they talked of fuses, black powder, hiding evidence, and eliminating evidence. They also made statements concerning other individuals in this investigation.

3

1    The two Defendants were still being recorded after Daniel Mahon was returned to the
2 van. The Defendants again made inculpatory and exculpatory statements.

3    At 9:24 A.M., Dennis Mahon was escorted from the van. (Daniel Mahon was asked if
4 he was comfortable in the van, and he said he was.)  After a two-minute wait, Agent Moreland
5 spoke with Dennis alone, and spoke with him regarding the same topics he had addressed to
6 Daniel Mahon earlier.  The context was similar because the conversation was primarily Agent
7 Moreland informing the Defendant that the agent knew almost everything about the Defendants
8 and the case.  The conversation was seven minutes long. (See Attachment B, transcript of
9 conversation.)    Near the end of the conversation, Agent Moreland said "I know today is
10 probably not the time that you're gonna wanna talk to me, okay?" Dennis Mahon replied, "No,
11 I'm not gonna say anymore unless I have an attorney." At the end of the conversation, Agent
12 Moreland asked the Defendant if he needed water, a bathroom, or food.  Dennis made no request
13 and was placed back into the van at 9:33 A.M. The Defendants' subsequent conversation was
14 still being recorded.

15    At 10:13 A.M., the Defendants were given more water and allowed to exit the van to
16 walk around.  Shortly thereafter the Defendants were placed back into the van and driven from
17 the scene to a county jail.

18 **II.    LAW AND ARGUMENT.**

19    This response concerns the statements of the Defendants made to each other while in
20 the back of a the police van in Illinois. The police did not question the Defendants at the scene
21 or elsewhere.

22    **A. There is no expectation of privacy in the back of a police van.**

23    The Defendants had no expectation of privacy in the back of the police minivan. "The
24 touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected
25 reasonable expectation of privacy.' " California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809
26 (1986)(quoting Katz v. United States, 389 U.S. 347, 360 (1967)). The constitutional question is
27 "whether the person invoking its [Fourth Amendment] protection can claim a 'justifiable,' a
28

4

1 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government
2 action." Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577 (1979). See also, Minnesota v.
3 Carter, 525 U.S. 83, 88, 119 S.Ct. 469 (1998)("The Fourth Amendment protects people, not
4 places. But the extent to which the Fourth Amendment protects people may depend upon where
5 those people are.").

6 Each Circuit that has addressed the issue has found no expectation of privacy in the
7 back of a police vehicle. "For the reasons already expressed by our sister circuits, we hold that
8 the back of a police car is not a place where individuals can reasonably expect to communicate
9 in private." United States v. Dunbar, 553 F.3d 48, 57 (1st Cir. 2009). See also, United States
10 v. Clark, 22 F.3d 799, 801-802 (8th Cir.1994) ("the general public has no reason to frequent the
11 back seat of a patrol car, or to believe that it is a sanctuary for private discussions....we conclude
12 that a person does not have a reasonable or legitimate expectation of privacy in statements made
13 to a companion while seated in a police car"; United States v. McKinnon, 985 F.2d 525, 527
14 (11th Cir.1993) (no "reasonable or justifiable expectation of privacy for conversations ... held
15 while seated in the back seat area of a police car"); United States v. Hernandez-Mendoza, 600
16 F.3d 971, 977 (8th Cir. 2010)("appellants had no reasonable expectation of privacy in a marked
17 patrol car, which is 'owned and operated by the state for the express purpose of ferreting out
18 crime.' [Clark, at 801].").[3]

19 The Defendants were arrested, handcuffed, and placed into a police minivan. They were
20 handcuffed to their seats inside the caged portion of the van. They were not interrogated, and
21 they chose to speak to each other. The Defendants did not expect that their conversation was
22 private, which was demonstrated when Dennis told Daniel that "we're probably being recorded

---

[3] See further, United States v. Turner, 209 F.3d 1198, 1201 (10th Cir. 2010)(finding no expectation of privacy in the back of a police car and noting that "[p]atrol cars bristle with electronics, including microphones to a dispatcher, possible video recording with audio pickup, and other electronic and recording devices"). At 8:27 A.M., Dennis Mahon used the patrol microphone/public address equipment in the van to tell agents outside the van that he wished to use the bathroom.

right now."

**B. The Defendants' statements were voluntary.**

There is no evidence the Defendants were coerced into making incriminating statements. "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515 (1986).  An admission is deemed to be coerced where the conduct of law enforcement officials was such as to overbear the accused's will to resist, thus bringing about a confession not freely self-determined. Beckwith v. United States, 425 U.S. 341, 347-48, 96 S.Ct. 1612(1976).  The taping of the Defendants was not coercion.  See Williams v. Nelson, 457 F.2d 376, 377 (9th Cir.1972) (concluding that the police recording of a defendant's conversation with his co-defendant-without the knowledge of either, by means of a concealed microphone-while the two were alone in an interrogation room did "not constitute coercion").

The Defendants were not placed in oppressive conditions that remotely suggest coercion. The Defendants were given water at 7:09A.M., 8:55A.M., 9:33A.M., and 10:13A.M. The doors of the police van were closed at 7:11A.M. to keep the air-conditioned van cooler. The Defendants were given opportunities for bathroom breaks at 7:09A.M., 8:55A.M., 9:33A.M., and 10:13A.M. They were able to notify agents when they needed something, in particular a bathroom break. Dennis Mahon declined an opportunity to take medication that was in his pocket. Daniel Mahon declined an opportunity to exit the van to "stretch his legs" at 9:24A.M. They were seated in normal seats of a police minivan.  They were informed at 7:11A.M. that their mother would be taken care of, likely by hospice personnel.  The evidence shows that agents were repeatedly inquiring if the Defendants were comfortable or if they had any requests.  The Defendants' statements were voluntary.

**C. Miranda**.

This Court must determine if the Defendants invoked their Miranda rights.  If they did, then the Court must determine if the government engaged in conduct reasonably likely to elicit an incriminating response, and if any statements made were the product of the government's

6

conduct.

Daniel Mahon never invoked his Miranda rights, therefore, all of his voluntary statements are admissible. Dennis Mahon invoked his rights at either 7:05 A.M. or 9:42 A.M. The government did not question either Defendant or engage in conduct that was reasonably likely to elicit an incriminating response. Dennis Mahon's statements to his brother were also not the product of government conduct. Dennis Mahon's voluntary statements are admissible.

### 1. Invocation.

**Daniel Mahon:** Daniel Mahon did not invoke his Miranda rights at any time on June 25, 2009. He was read and asked if he understood his rights. He said "I understand." Daniel Mahon cannot claim a violation of his Miranda rights because the law requires that he affirmatively invoke his rights. "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Berghuis v. Thompkins, 130 S.Ct. 2250, 2262 (2010). The agents tape recorded all of their interactions with him that day. The Defendant does not notice a single instance in Daniel Mahon's motion where Daniel Mahon invoked his rights. "The prosecution therefore does not need to show that a waiver of Miranda rights was expressed. An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." Thompkins, at 2261. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." Thompkins, at 2262. The government must show an implicit waiver by a preponderance of the evidence. Thompkins, at 2261.

**Dennis Mahon:** Dennis Mahon made two statements related to invocation. The first was after agents read him his Miranda rights. His response was: "The small talk is over, I can't say anything more, except for who is praying for the damn humidity to quit." (The "7:05 A.M. Statement.") Although this statement may pose a difficult question for the Court, the government asserts this statement does not rise to level of the requirement in Thompkins. The Supreme

Court requires that an invocation be unambiguous. "Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked ..... Here he did neither, so he did not invoke his right to remain silent." Thompkins, at 2260.[4]

The second time Dennis Mahon made a statement regarding invocation was to Special Agent Moreland after 9:42 A.M. Agent Moreland said "I know today is probably not the time that you're gonna wanna talk to me, okay?" Dennis Mahon replied, "No, I'm not gonna say anymore unless I have an attorney."(The "9:42 A.M. Statement.") The government agrees that this was an unequivocal assertion of the Defendant's Miranda rights.

**2. The agents did not engage in conduct reasonably likely to elicit a response.**

The government read the Defendants their Miranda rights and placed them into a police minivan at 7:11 A.M.. There was no conduct by the government that was likely to elicit an incriminating response. These facts are similar to the numerous cases cited *supra* (Hernandez-Mendoza, McKinnon, Clark). In each of these cases, two defendants were placed into a patrol car where police had hidden a recording device. Placing individuals in a car together and hoping they might incriminate themselves is not a violation of Innis. "Officers do not interrogate a suspect simply by hoping that he will incriminate himself. In Miranda, and again in Innis, the Court emphasized: 'Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.'" Arizona v. Mauro, 481 U.S. 520, 529, 107 S.Ct. 1931(1987) quoting Miranda v. Arizona, 384 U.S. 436, 478 (1966).

Daniel Mahon did not invoke his Miranda rights, therefore, it is irrelevant to determine if agents questioned him or engaged in conduct reasonably likely to elicit an incriminating response. This analysis is relevant to Dennis Mahon after he was removed from the van and

---

[4] The analysis for invocation is no different for the Fifth or Sixth Amendments. (See Thompkins, at 2260)("...there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel at issue in [Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350(1994)]").

8

spoke with Agent Moreland at 9:42 A.M.

Prior to the 9:42 A.M. statement, Agent Moreland started the recording and stated, "Yeah, this is S/A Moreland,…this next conversation is going to be with Dennis Mahon, who has been Mirandized and not yet invoked and, …we're gonna be talking to him about ... the situation." During the course of speaking to Dennis Mahon, Agent Moreland said "I know today is probably not the time that you're gonna wanna talk to me, okay?" Dennis Mahon replied, "No, I'm not gonna say anymore unless I have an attorney." Over the next minute, Agent Moreland told Dennis Mahon not to make any statements, but then told him that agents were looking for a "Mr. Coombs." For his part, Dennis Mahon initiated conversation about a person named "April" and spontaneously told the agent that he did not trust the agent when they first met.[5] The government does not intend to introduce any of the statements made during this conversation with Agent Moreland that follow Dennis Mahon's explicit invocation.

Upon Dennis Mahon's invocation of his right to an attorney, Agent Moreland was clear that Dennis Mahon should not make any statements. Agent Moreland did not thereafter seek to elicit any incriminating responses, nor did Dennis Mahon make any incriminating statement. In discussing "Mr. Coombs" and whether Dennis Mahon had previously suspected that Agent Moreland was in fact an undercover agent, both Agent Moreland and Dennis Mahon engaged in irrelevant conversation. Dennis Mahon having invoked, and irrelevant conversation being pointless, Agent Moreland disengaged from this contact and Dennis Mahon returned to the police minivan. While in minivan, Dennis was not in the presence of Agent Moreland or any law enforcement agent; his brother Daniel was the only other person in the van. Dennis Mahon's conduct at that point – to choose to talk or not talk to his brother – in a vehicle in which he had no expectation of privacy but outside the presence of law enforcement – was his own choice and not a product of law enforcement having honored his invocation to an attorney.

---

[5] The informant and Agent Moreland, who was posing as a white-supremacist friend of the informant, had previously met with Dennis Mahon at the Defendant's home. On the date of his arrest, Dennis Mahon said he was suspicious because the agent and informant could not explain how they earned an income.

Dennis Mahon did in fact make certain statements to his brother at that time; there is no legal bar to the government's use of those statements at trial.

**IV.    CONCLUSION**

The government requests the Defendants' motions be denied.

Respectfully submitted this 2nd day of September, 2010.

DENNIS K. BURKE
United States Attorney
District of Arizona

*s/ John Boyle*
JOHN BOYLE
Assistant U.S. Attorney

Certificate of Service

I hereby certify that on September 2, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Deborah L. Williams
Assistant Federal Public Defender
850 W. Adams Street, Suite 201
Phoenix, AZ 85007
deborah_williams@fd.org

Barbara L. Hull
Law Office of Barbara L. Hull
637 N. 3rd Ave, Ste. 3
Phoenix, AZ 85003
blhull@q.com


By:   *S/ John Boyle*