Exhibit A

1   DANIEL G. KNAUSS
    United States Attorney
2   District of Arizona

3   KEITH E. VERCAUTEREN
    Assistant United States Attorney
    State Bar Number: 013439
    Two Renaissance Square
4   40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
5   Telephone (602) 514-7500
    keith.vercauteren@usdoj.gov



6

7              UNITED STATES DISTRICT COURT

8                  DISTRICT OF ARIZONA

9   IN THE MATTER OF THE              WT 07-24-PHX-JAT
    APPLICATION OF THE UNITED
10  STATES OF AMERICA FOR AN ORDER
    AUTHORIZING THE INITIAL
11  INTERCEPTION OF WIRE                APPLICATION FOR
    COMMUNICATIONS TO AND FROM:      INTERCEPTION OF WIRE
12                                      COMMUNICATIONS
    CELLULAR TELEPHONE NUMBER
13  (815)980-7337 WITH ELECTRONIC       (Filed Under Seal)
    SERIAL NUMBER (ESN) #
14  A100000014B63E, TARGET
    TELEPHONE 1.
15

16

17        Keith E. Vercauteren, Assistant United States Attorney, District of Arizona, under penalty

18  of perjury, hereby declares:

19        I am an investigative or law enforcement officer of the United States within the meaning of

20  Title 18, United States Code, § 2510(7), that is, an attorney authorized by law to prosecute or

21  participate in the prosecution of offenses enumerated in Title 18, United States Code, § 2516.

22        Pursuant to Title 18, United States Code, § 2516, the Attorney General of the United States

23  has specially designated the Assistant Attorney General, any Acting Assistant Attorney General in

24  charge of the Criminal Division, any Deputy Assistant Attorney General or Acting Deputy Assistant

25  Attorney General of the Criminal Division to exercise the power conferred on the Attorney General

26  by Title 18, United States Code, § 2516 to authorize this application.  Under the power designated

27  to him by special designation of the Attorney General, pursuant to Order Number 2887-2007 of July

28  3, 2007, an appropriate official of the Criminal Division has authorized this application.

                                                                          9

1   Attached to this application as Exhibit A, and incorporated by reference herein, are copies of the

2   Attorney General's order of special designation and the Memorandum of Authorization, signed by

3   Barry Sabin, Deputy Assistant Attorney General, Criminal Division, approving this application.

4        The attached Affidavit contains a full and complete statement of facts concerning all previous

5   applications which are known to have been made to any judge of competent jurisdiction for approval

6   of the interception of the oral, wire or electronic communications of any of the same individuals,

7   facilities, or premises specified in this Application.

8        This application is for an Order pursuant to Title 18, United States Code, § 2518, authorizing

9   the initial interception of wire communications over **Target Telephone (815)980-7337**, and for

10  global positioning system (GPS) information for GPS-capable target telephone, until the attainment

11  of the authorized objectives or, in any event, for a thirty (30) day period measured from the earlier

12  of the day on which the investigative or law enforcement officers first begin to conduct an

13  interception under the Court's Order, or ten (10) days after the Order is entered.

14       This application seeks authorization to intercept the wire communications of Dennis Mahon,

15  Daniel Mahon, Tom Metzger, Charles Kountze, John McLaughlin, and Robert Joos, hereafter

16  referred to as the **Target Subjects**, and others as yet unknown, concerning offenses enumerated in

17  Section 2516 of Title 18, United States Code, that being: offenses involving violation of Title 18

18  U.S.C. §§ 241(Civil Rights Conspiracy), 371(Conspiracy), 842(Information Relating to Explosive

19  Materials), 844(i)(Unlawful Use of Explosives), 924(c)(Unlawful Use or Possession of Firearms),

20  2339A(Providing material Support to Terrorists), and Title 26 U.S.C. § 5861(d)(Unlawful

21  Possession of Firearms) , which offenses have been committed, are being committed, and will

22  continue to be committed by the **Target Subjects** and others yet unknown.

23       Specifically, there is probable cause to believe the **Target Subjects**, and others yet unknown,

24  are utilizing and will continue to utilize the following instrument in furtherance of, in connection

25  with, to facilitate, to accomplish and to commit the above-enumerated offenses:

26

27

8

2

**Target Telephone # 1**, Cellular telephone # (815)980-7337, was issued by Sprint Nextel, bearing Electronic Serial Number (ESN) A100000014E63E. [1]     **Target Telephone # 1** is subscribed to by Dennis Mahon, at 5794 N. Blackwood Rd., Davis Junction, Illinois. **Target Telephone # 1** is utilized by Dennis Mahon.

There is probable cause to believe that **Target Telephone** (815)980-7337 is, or may be equipped with Global Positioning System (GPS) technology. The Bureau of Alcohol, Tobacco, Firearms & Explosives will obtain the GPS information sporadically through specific queries of the service providers, as opposed to continuous monitoring and receipt of the GPS information. Relevant information on the location and travel of **Target Telephone** (815)980-7337, and the respective user, and the respective user's co-conspirators will be obtained by the use of the GPS information and material to the on-going investigation being conducted by the Bureau of Alcohol, Tobacco, Firearms & Explosives.

I have discussed all of the circumstances of the above offenses with Special Agent Tristan Moreland of the Bureau of Alcohol, Tobacco, Firearms & Explosives, Phoenix, Arizona, who has directed and conducted the investigation herein, and have examined the affidavit of Special Agent Tristan Moreland, which is attached to this application as Exhibit B, and which is incorporated by reference. Based upon that affidavit, your applicant states upon information and belief:

That there is probable cause to believe that particular communications of the **Target Subjects**, and others as yet unknown or unidentified will be obtained through the interception of wire communications to and from **Target Telephone** (815)980-7337. These communications are expected to concern:

> a.     the nature, extent, and methods of the unlawful activities of the target subjects, and others as yet unknown or unidentified, including their use of explosives to damage a building used in interstate commerce, the possession of a destructive device and other firearms not registered in the National Firearms Registration and Transfer Record, and their conspiracy to injure, oppress, threaten, or intimidate any person in

---

[1]  An electronic serial number (ESN) is the unique identification number embedded or inscribed in the telephone instrument by the manufacturer.

3

11

any state in the free exercise or enjoyment of any right or privilege secured to him/her by the Constitution or laws of the United States, or because of him/her having exercised the same;

b.    the identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities;

c.    the locations and items used in furtherance of the illegal activities;

d.    the existence and location of records relating to those activities; and

e.    the location and source of money and resources used to finance the illegal activities.

In addition, these wire communications are expected to constitute admissible evidence of the commission of the above-described offenses.

That, as explained in greater detail in the affidavit of Special Agent Tristan Moreland, normal investigative procedures have been tried and have failed, or reasonably appear unlikely to succeed if tried, or are too dangerous, to achieve the goals of the investigation;

Except for the one prior wire interception of Dennis Mahon in 1990 described in the attached affidavit, the individuals making this application know of no other applications that have been made to any judge of the United States for authorization to intercept, or for approval of interception of wire, oral, or electronic communications involving any of the same persons, facilities, or places specified in this application; and,

That there is probable cause to believe that the **Target Telephone** described above has been used, is currently being used and will continue to be used by the **Target Subjects** in connection with the commission of the above-described offenses.

On the basis of the allegations contained in this application and on the basis of the attached affidavit of Special Agent Tristan Moreland,

**IT IS HEREBY REQUESTED** that this Court issue an Order, pursuant to the power conferred on it by Title 18, United States Code, § 2518, authorizing the Bureau of Alcohol, Tobacco, Firearms & Explosives, other authorized law enforcement officers and any individuals operating under contract with the government acting under authorized supervision, to intercept wire

communications of the above-described individuals to and from the above-described **Target Telephone** within the authorized period concerning the above-described offenses.

IT IS REQUESTED FURTHER, that pursuant to Title 18, United States Code, Sections 2703(c)(1)(B), 2703(c)(2) and 2703(d) because there are reasonable grounds to believe that such information is relevant and material to an ongoing criminal investigation, that Sprint Nextel, Cingular, T-Mobile Wireless, Nextel Partners, Verizon Wireless, Cellco Partners dba Verizon Wireless, AT&T Wireless, Southwestern Bell Telephone Company, General Telephone Equipment company (GTE), American Telephone and Telegraph Company (AT&T), Metrocall, Western Wireless, STPCS Joint Venture, MCI (MCI ONE, MCI Worldcomm), GTE Wireless, Air Touch Cellular, Max Tel Communications, Pacific Bell, Bell Atlantic, Nevada Bell, Verizon of Texas, Alltel Telephone Company, Cricket Wireless, and any other person or entity providing wire and/or electronic communications service in the United States whose assistance may facilitate the execution of the order, be ordered to supply the following subscriber information: (A) name; (B) address; (C) local and long distance telephone connection records, or records of session times and durations; (D) length of service (including start date) and types of service utilized; (E) telephone or instrument number or other subscriber number or identity, including IMSI and ESN, as well as any temporarily assigned network address; and (F) means and source of payment for such service (including any credit card or bank account number) of a subscriber to or customer of a wire communications service or remote computing service for published, non published, or unlisted dialing, routing, addressing, or signaling information, including post cut through digits,[2/] captured during the wire interception on **Target Telephone** (815)980-7337, within 24 hours of an oral or written demand

---

[2/] "Post cut through digits," also called "dialed digit extraction features," are any digits that are dialed from the Target Telephone after the initial call setup is completed. Some post cut through digits are numbers that are necessary to route the call to the intended party, identify the place or party to which the call is being made, and therefore are the type of information specifically authorized for capture by pen register. Post cut through digits also can represent electronic content in the form of an electronic message, such as when subjects call automated banking services and enter account numbers, or call voicemail systems and enter passwords, or call pagers and dial call-back telephone numbers. While interception of wire content is sought and supported by this application, the government is not seeking authorization to intercept the electronic communications of the Target Telephone. Accordingly, to the extent that additional digits that are electronic content are received, the government will not use such information for any investigative purposes.

5

1  by agents of the Bureau of Alcohol, Tobacco, Firearms & Explosives, and also be ordered to
2  disclose the location of cell site/sector (physical address) and/or geo location information at call
3  organization (for outbound calling), call termination (for incoming calls), and, if reasonably
4  available, during the process of a call for **Target Telephone (815)980-7337**.

5      **IT IS REQUESTED FURTHER** that, Sprint Nextel, and any subsequent provider of
6  electronic communication services as defined in Title 18, United States Code, Section 2510(15),
7  2703(c), 2703(d), and 3123, shall furnish the Bureau of Alcohol, Tobacco, Firearms & Explosives
8  with global positioning system (GPS) information on **Target Telephone (815)980-7337**.  Because
9  the GPS information will be used to identify locations used by the targets of the investigation in
10  connection with their illegal activities, the undersigned requests that the Court's Order authorize the
11  acquisition and use of the GPS information whether **Target Telephone (815)980-7337** is located
12  in a public place or on private property.  The Applicant further requests that the Order authorize that
13  monitoring agents, in the event that **Target Telephone (815)980-7337** travel outside the territorial
14  jurisdiction of this Court, be allowed to continue to obtain the GPS information in any jurisdiction
15  within the United States.

16      The United States has set forth specific and articulable facts showing that there are
17  reasonable grounds to believe that the requested subscriber-customer information and records are
18  relevant and material to the on-going criminal investigation of the listed targets as outlined in
19  Special Agent Tristan Moreland's affidavit.

20      **IT IS FURTHER REQUESTED** that the Court's Order provide that such interceptions not
21  automatically terminate after the first interception that reveals the manner in which the named
22  interceptees and other conspirators are conducting their illegal activities, but permit the interception
23  to continue until it reveals the identities of all confederates, their places of operation, and the nature
24  of the conspiracy involved, or for a period of thirty (30) days, whichever is earlier; and that the time
25  set forth in the Order for the initial interceptions run from the earlier of the day on which
26  investigative or law enforcement officers first begin to conduct an interception under this Court's
27  Order or ten (10) days after the Order is entered.

28      **IT IS FURTHER REQUESTED** that the authorization given apply not only to **Target**

1  Telephone (815)980-7337, but shall also apply to any changed telephone numbers subsequently
2  assigned to the instrument bearing the same ESN number as **Target Telephone (815)980-7337**,
3  within the (30) day period.

4      **IT IS FURTHER REQUESTED** that, in the event that the service provider changes during
5  the course of the interception, interception may continue with the new service provider without
6  further Order of this court. The United States will advise the court of the change of service provider
7  in the periodic progress reports submitted to this court.

8      **IT IS FURTHER REQUESTED** that, in the event **Target Telephone (815)980-7337** is
9  transferred outside the territorial jurisdiction of this Court, interception may take place within any
10  other jurisdiction within the United States, pursuant to Title 18, United States Code, Section
11  2518(3).

12      **IT IS FURTHER REQUESTED** that the Court's Order authorize interception of
13  background conversations which are heard over **Target Telephone (815)980-7337** when the target
14  telephone is off the hook or otherwise in use.

15      **IT IS FURTHER REQUESTED** that this Court issue an Order directing all interceptions
16  be minimized in accordance with Chapter 119 of Title 18, United States Code. Interception will be
17  suspended immediately when it is determined through voice identification, physical surveillance,
18  or otherwise that the named interceptees or any of their confederates, when identified, are not
19  participants in the conversation unless it is determined during the portion of the conversation already
20  overheard that the conversation is criminal in nature. Even if one or more of the named interceptees
21  or their confederates, when identified, participate in the conversation, monitoring will be suspended
22  if the conversation is not criminal in nature or otherwise related to the offenses under investigation.
23  Spot checks of such conversations will be conducted to determine if the conversation has turned to
24  a discussion of criminal activity.

25      **IT IS FURTHER REQUESTED** that this Court issue an Order directing monitoring be
26  conducted on a 24-hour basis. In addition, pursuant to Chapter 119 of Title 18, United States Code,
27  authorization is requested to permit after-the-fact minimization for communications should the
28  conversation be in code or foreign language, and an expert in that code or foreign language is not

7

15

1   reasonably available during the interception period.   In any event, minimization will be

2   accomplished as soon as practicable after such interception.

3   **IT IS FURTHER REQUESTED** that this Court issue an Order pursuant to Title 18, United

4   States Code, § 2518(4), directing that Sprint Nextel, electronic communications service provider as

5   defined in Title 18, United States Code, § 2510(15), and any subsequent service provider which

6   provides service to the target telephone, furnish and continue to furnish the applicant and Bureau

7   of Alcohol, Tobacco, Firearms and Explosives, forthwith all information, facilities, and technical

8   assistance necessary to accomplish the interceptions unobtrusively and with a minimum of

9   interference with the services that such provider is according the persons whose communications

10  are to be intercepted, and to ensure an effective and secure installation of electronic devices capable

11  of intercepting wire communications over the above-described telephones. The reasonable expenses

12  incurred through the furnishing of such facilities or technical assistance by Sprint Nextel are to be

13  compensated for by Bureau of Alcohol, Tobacco, Firearms and Explosives.

14  **IT IS FURTHER REQUESTED** that, to avoid prejudice to this criminal investigation, the

15  Court order the said provider of electronic communications service and its agents and employees

16  not to disclose or cause a disclosure of this Court's Order or the request for information, facilities,

17  and assistance by the Bureau of Alcohol, Tobacco, Firearms & Explosives or the existence of the

18  investigation to any person other than those of its agents and employees who require said

19  information to accomplish the services hereby requested. In particular, said provider and its agents

20  and employees should be ordered not to make such disclosure to a lessee, telephone subscriber, or

21  any interceptee or participant in the intercepted communications.

22  **IT IS FURTHER REQUESTED** that this Court direct that its Order be executed as soon

23  as practicable after it is signed and that all monitoring of wire communications be conducted in such

24  a way as to minimize the interception and disclosure of the communications intercepted other than

25  those communications relevant to the pending investigation in accordance with the requirements of

26  Chapter 119 of Title 18, United States Code.

27  **IT IS FURTHER REQUESTED** that the Court order the interception of wire communica-

18  tions authorized herein to terminate upon attainment of the authorized objectives or, in any event,

8

16

at the end of thirty (30) days calculated from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Court's Order or ten (10) days after the Order is entered for initial interceptions and thirty (30) days from the date of the Court's Order for continued interceptions.

**IT IS FURTHER REQUESTED** that the Court order that the applicant or any other Assistant United States Attorney familiar with the facts of this case provide to the Court a report on or about the fifteenth day following the date interception begins showing what progress has been made toward achievement of the authorized objectives and the need for interception. If any of the aforementioned reports should become due on a weekend or holiday, such report should become due on the next business day thereafter.

**IT IS FURTHER REQUESTED** that the Court order that no inventory or return of the results of the foregoing electronic surveillance and interception be required to be made, other than the above-required reports, before ninety (90) days from the date of the expiration of this Court's Order, or any extension of the order.

**IT IS FURTHER REQUESTED** that the Court order that, upon an *ex parte* showing of good cause to a judge of competent jurisdiction, the service of the above inventory or return may be postponed for a further reasonable period of time.

**IT IS FURTHER REQUESTED** that the Court order that its Orders, this application and the accompanying affidavit and proposed Orders, and all interim reports filed with the Court with regard to this matter, be sealed until further Order of this Court, except that copies of the Court's Orders, in full or redacted form, may be served on the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the service provider as necessary to effectuate the Court's Order as set forth in the proposed Order accompanying this application.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ , 2007.

DANIEL G. KNAUSS
United States Attorney
District of Arizona

KEITH E. VERCAUTEREN
Assistant United States Attorney

17

DANIEL G. KNAUSS
United States Attorney
District of Arizona

Keith E. Vercauteren
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Arizona State Bar No. 013439
Telephone: (602) 514-7500
keith.vercauteren@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE INTERCEPTION OF WIRE COMMUNICATIONS OVER TELEPHONE CURRENTLY ASSIGNED TELEPHONE NUMBER (815)980-7337. | WT 07-   -PHX-<br><br>**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR THE INTERCEPTION OF WIRE COMMUNICATIONS** |

I.      **Introduction**

Tristan Moreland, Special Agent (SA), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, Phoenix, Arizona, being duly sworn, states as follows:

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice. I have been so employed by ATF since February 1989. I have participated in numerous investigations involving explosives and bombings throughout my career. Currently, I am assigned to the Arson and Explosives investigation group in Phoenix, Arizona. In 1997, I was provided advanced training by ATF and became a Certified Explosive Specialist with ATF and have since received hundreds of additional hours of advanced training in the area of explosive investigations. As a result, my primary duties are to investigate matters involving explosives, including bombings and the illegal use of explosives. Over my career, I have participated in hundreds of Federal investigations, including bombings, and I have been the lead investigator on many of these cases. I have previously led investigations of persons convicted in Federal court for illegally possessing, using, and making bombs. I have

23

1    worked in an undercover capacity and have purchased and sold explosive devices. I routinely

2    provide training on behalf of ATF and the Department of Justice to state, local, federal, and

3    foreign investigators on the subjects of explosives, bombs and bombings.

4    2.    I am an investigative or law enforcement officer of the United States within the meaning

5    of Section 2510(7) of Title 18, United States Code, and I am empowered by law to conduct

6    investigations and to make arrests for offenses enumerated in Section 2516 of Title 18, United

7    States Code.

8    3.    Your affiant makes this affidavit in support of an application for an Order authorizing the

9    interception of wire communications pursuant to Title 18, United States Code, Section 2518, for

10    a thirty-day period, to and from telephone number (815)980-7337 (hereafter referred to as **T1**),

11    a wireless telephone subscribed to and utilized by Dennis MAHON. As set forth herein, your

12    affiant believes that there is probable cause to establish that the offenses specified in Title 18

13    U.S.C. Section 2516, offenses involving violations of Title 18 U.S.C. §§ 241(Civil Rights

14    Conspiracy) [1/] , 371(Conspiracy), 842(Information Relating to Explosive Materials),

15    844(i)(Unlawful Use of Explosives), 924(c)(Unlawful Use or Possession of Firearms), 2339A

16    (Providing Material Support to Terrorists), and Title 26 U.S.C. § 5861(d)(Unlawful Possession

17    of Firearms) have been committed, are being committed, and will continue to be committed by

18    Dennis MAHON, Daniel MAHON, Tom METZGER, Charles KOUNTZE, John

19    MCLAUGHLIN, Robert JOOS (hereinafter referred to as "target subjects"), and others yet

20    unknown, and that these individuals are utilizing the target telephone in furtherance of their

21    criminal activities.

22    4.    I have participated in the investigation of the above offenses. As a result of my personal

23    participation in this investigation through interviews and with analysis of reports submitted by

24    other Special Agents of ATF, the U.S. Postal Inspection Service, and other <u>federal</u>, state or local

25    law enforcement officers, I am familiar with this investigation. On the basis of this familiarity,

26    and on the basis of other information that I have reviewed and determined to be reliable, I allege

27    

28    

---

[1/] Although Title 18 U.S.C. § 241 is not a predicate offense pursuant to Title 18 U.S.C. § 2516, your affiant anticipates intercepting calls regarding violation of this criminal offense.

1  the facts to show that there is probable cause to believe that particular wire communications of

2  Dennis MAHON, Daniel MAHON, Tom METZGER, Charles KOUNTZE, John

3  MCLAUGHLIN, and Robert JOOS concerning the above offenses will be obtained through the

4  interception of such communications to and from the telephone bearing the number (815)980-

5  7337 (**T1**). In particular, these communications are expected to concern the specifics of the

6  above offenses, including:

7      (a)  the nature, extent, and methods of the unlawful activities of the target subjects, and

8           others as yet unknown or unidentified, including their use of explosives to damage a

9           building used in interstate commerce, the possession of a destructive device and other

10          firearms not registered in the National Firearms Registration and Transfer Record, and

11          their conspiracy to injure, oppress, threaten, or intimidate any person in any state in the

12          free exercise or enjoyment of any right or privilege secured to him/her by the Constitution

13          or laws of the United States, or because of him/her having exercised the same;

14      (b)  the identities and roles of accomplices, aiders and abettors, co-conspirators, and

15          participants in their illegal activities;

16      (c)  the locations and items used in furtherance of the illegal activities;

17      (d)  the existence and location of records relating to those activities; and

18      (e)  the location and source of money and resources used to finance the illegal activities.

19      In addition, these wire communications are expected to constitute admissible evidence

20  of the commission of the above-described offenses.

21  5.     The goal of this wiretap investigation is to fully identify the members of this white

22  supremacist organization, specifically those responsible for the bombing of Don Logan and his

23  co-workers in 2004, as well as those involved in supporting, financing, or participating in the

24  intimidation and threats to persons. Additionally, this wiretap investigation seeks to identify the

25  locations used to store weapons, explosives, bomb making components, tools, and other illegal

26  items. Without electronic surveillance, these goals will not be achieved.

27  6.     Normal investigative techniques have been tried and have failed to achieve the goals of

28  the investigation, or reasonably appear unlikely to succeed if tried, or are too dangerous to

3                                   25

1   employ. A full and complete statement explaining why normal investigative procedures either

2   have been tried and have failed, or reasonably appear unlikely to succeed if tried, or appear to

3   be too dangerous if tried, is contained in the "Need for Interception" section of this affidavit.

4   7.      The statements contained in this affidavit are based in part on information provided by

5   Special Agents of ATF or other federal and state agencies, information provided by confidential

6   sources, as well as my experience and background as a Special Agent of ATF.  Since this

7   affidavit is being submitted for the limited purpose of securing authorization for the interception

8   of wire communications, I have not included each and every fact known to me concerning this

9   investigation.  I have set forth facts that I believe establish the required foundation for an Order

10  authorizing the interception of wire communications.

11  **II.     Persons Expected to be Intercepted**

12          1. Dennis MAHON, date of birth 8/29/1950.  No known current charges pending

13          2. Daniel MAHON, date of birth 8/29/1950.  No known current charges pending.

14          3. Tom METZGER, date of birth 4/9/1938.  No known current charges pending.

15          4. Charles KOUNTZE, date of birth 12/26/1954.  No known current charges pending.

16          5. John MCLAUGHLIN, date of birth 7/15/1950.  No known current charges pending.

17          6. Robert JOOS, date of birth 12/25/1952.  No known current charges pending.

18  **III.    Target Telephone**

19  8.      There is probable cause to believe that the target subjects have used, are using, and will

20  continue to use the target telephone (815)980-7337 (**T1**), in furtherance of, in connection with,

21  to facilitate, to accomplish, to discuss, and to commit the above-described offenses during the

22  periods of interception applied for herein.

23  9.      Telephone (815)980-7337 (**T1**), with ESN #A100000014E63E, serviced by Sprint Nextel,

24  is the telephone subscribed to by Dennis MAHON, 5794 N. Blackwood Rd., Davis Junction,

25  Illinois, and utilized by Dennis MAHON.

26  **IV.    Theory of the Case**

27  10.     On August 9, 2007, Dennis MAHON subscribed to, and is currently using, cellular

28  telephone number (815)980-7337 (**T1**).  Prior to that date Dennis MAHON has used other

4

1  telephones that are pertinent to this investigation. Beginning on April 9, 2005, through
2  approximately July 2007, Dennis MAHON utilized cellular telephone (918)313-5125, serviced
3  by Cingular, and subscribed to by Dennis MAHON, 1043 N. College Ave., Tulsa, OK.
4  Beginning on January 31, 2002, through approximately April 2005, Dennis MAHON utilized
5  cellular telephone (480)650-6720, serviced by Verizon, and subscribed to by Dennis MAHON,
6  1831 E. Apache Blvd., Tempe, Arizona.
7  11.   Daniel MAHON has also used telephones that are pertinent to this investigation.
8  Beginning on July 21, 2007 through the present, Daniel MAHON has utilized cellular telephone
9  (425)260-9282, serviced by Sprint Nextel, and subscribed to by Daniel MAHON, 17410 SE
10  Maple Valley Rd #A-9, Renton, WA. Beginning on September 16, 2006, through approximately
11  July 2007, Daniel MAHON utilized cellular telephone (918)344-5005, serviced by Cingular, and
12  subscribed to by his brother Dennis MAHON, 1043 N. College Ave., Tulsa, OK. Beginning on
13  November 21, 2005 through September 16, 2006, Daniel MAHON utilized cellular telephone
14  (303)304-6536, serviced by Cingular, subscribed to by Dennis MAHON, 17180 East 136th Ave.
15  #C22, Brighton, CO. Beginning on November 19, 2002 through approximately April 2004,
16  Daniel MAHON utilized cellular telephone (602)341-5814, serviced by Alltel, subscribed to by
17  Daniel MAHON, PO Box 4153, Mesa, Arizona.
18  12.   Dennis MAHON has used the above referenced telephones, including his current cellular
19  telephone (815)980-7337 (**T1**), to discuss illegal activities, including the possession of an AK
20  47, possession of a silencer, possession and use of explosives and destructive devices, and the
21  financing of illegal activities. Dennis MAHON is very knowledgeable about law enforcement
22  investigative techniques, and therefore, he is very cautious in his discussions with other people
23  regarding his illegal activities. Dennis MAHON has slipped on a couple of occasions during this
24  investigation and made incriminating statements. (See, e.g., paragraphs 51, 57, 61, 70, 80, 81,
25  86, 87, 90, 101, 104 and 105). Oftentimes, after Dennis MAHON has made an incriminating
26  statement to the confidential informant, MAHON will catch himself, backtrack and attempt to
27  clean up the statement. However, based on what Dennis MAHON and Daniel MAHON have
28  said and done in this investigation, your affiant believes that Dennis MAHON and Daniel

27

1   MAHON are responsible for a bombing that occurred in Scottsdale, Arizona, as well as other

2   criminal violations. Your affiant expects MAHON will make incriminating statements on his

3   cellular telephone (815)980-7337 ('T1) to his brother Daniel and the other target subjects because

4   of the long standing relationships and trust that these individuals have in each other. Dennis

5   MAHON has specifically told the CI that he does not trust her as much as he trusts his brother.

6   (See paragraph 73).

7   **V.    Prior Applications**

8   13.    A review of ATF, DEA, FBI, and ICE electronic surveillance (ELSUR) indices was

9   conducted on September 28, 2007, concerning the named interceptees, the target subjects, for

10  previous applications or approvals for orders authorization interception of oral, wire, or

11  electronic communications. The search revealed no prior applications for any of the subjects or

12  interceptees. However, based upon a check of the records of ATF, your affiant found that

13  Dennis MAHON was the subject of wire interception in 1990 in the Northern District of

14  Oklahoma. That investigation was not related to this investigation. However, evidence from

15  that intercept is contained in this affidavit and that affidavit alleged similar criminal violations.

16  Another individual was later convicted for the bombing investigated in that case.

17  **VI.    Facts and Circumstances**

18  14.    On February 26, 2004, a bomb, disguised in a cardboard box made to appear as a parcel

19  package, exploded at the Scottsdale Office of Diversity and Dialogue, located at 7575 E. Main

20  Street in Scottsdale, Arizona. The box was addressed to Donald Logan, a black male employee

21  who was in charge of the Diversity and Dialogue Office for the City of Scottsdale at that time.

22  As Donald Logan opened the box, the bomb exploded injuring Logan, his assistant Renita

23  Linyard and co-worker Jacque Bell. In addition, the explosion damaged the surrounding area

24  and destroyed office equipment. The details of this bombing will be covered in greater detail

25  later in the affidavit.

26  15.    Your affiant learned from ATF reports that in 1990, Dennis MAHON was the subject of

27  a Title III intercept in connection with the bombing murder of a Federal Judge and a civil rights

28  attorney. During the period of interception, Dennis MAHON boasted about disguising package

28

1   bombs with well-made, inconspicuous mailing labels to avoid detection and suspicion.
2   However, MAHON did not incriminate himself on the wiretap intercept, and ultimately, a case
3   was not presented against MAHON as the investigation revealed that another individual was
4   responsible for that bombing.

5   16.     Tom METZGER is the leader and founder of an American racist group called the White
6   Aryan Resistance (WAR). METZGER is known to your affiant as a former leader/organizer of
7   the "skinhead" movement in the United States and as a spokesperson on various white
8   supremacist and white separatist causes.

9   17.     Your affiant learned from ATF reports that in 1994 Dennis MAHON provided an ATF
10  cooperating source (CS) with bomb components and promised to teach the CS how to make
11  improvised grenades. During this same time period, MAHON exploded various improvised
12  explosive devices in the presence of the CS, in what MAHON called a "fragmentation test." The
13  ATF CS retrieved some of the exploded debris and turned it over to ATF.

14  18.     Your affiant read an article on the Internet in which Dennis MAHON told writer Ambrose
15  Evans-Pritchard of the *London Sunday Telegraph* in 1996 that he is a makeup artist and "the
16  master of all disguises." MAHON said, "I always deliver my bombs in person, in disguise."

17  19.     Your affiant reviewed a 2001 audio tape recording of Dennis MAHON speaking as a
18  guest on KFYI, a Phoenix radio station talk show hosted by Charles Goyette. During the show,
19  MAHON discussed his opposition to diversity and his belief that diversity and racial integration
20  are slowly destroying the white race. MAHON admitted during the show that he was recently
21  involved in preparing the WAR newspaper to be sent out to citizens and a City councilman in
22  Gilbert, Arizona. MAHON claimed on the show that he was retired from the Ku Klux Klan and
23  WAR, but continually discussed involvement in various ways in the White Separatist/Racist
24  movement. When asked about his possible involvement in the Oklahoma City bombing,
25  MAHON claimed to have once met Tim McVeigh at a gun show, but claimed that he did not
26  "case" any Federal buildings or have any part in that bombing. MAHON referred to McVeigh
27  as a soldier and as one who was standing tall for the movement.

28  20.     In 2001, WAR newspapers were distributed in the City of Gilbert and one specifically to

7                                                                                    29

a councilman in the City of Gilbert, Arizona. Your affiant later obtained a copy of the WAR paper delivered to the councilman and observed the handwritten text on the top of the newspaper. The text read, "To hell with your Yahweh Damned Diversity - Bravo Sierra." Another WAR newspaper was delivered to a Gilbert resident with a handwritten note. The note on this paper read "The proud, stand up people of Gilbert reject Diversity." Throughout ATF's ongoing undercover investigation of Dennis MAHON, MAHON has told an ATF CI that he frequently distributed the WAR newspapers.

21.     WAR, which recently became "The Insurgent," is made up of persons who subscribe to a racist ideology and tend to associate themselves as members of a group. WAR, like many other racist groups, does not appear to have an official roster or published hierarchy. To your affiant's knowledge, there is no specific membership charter, no required dues, and no regular meetings or gatherings. WAR has a website where individuals can read and listen to Tom METZGER. The WAR website also publishes racist materials, sells merchandise, recruits donations, and has links to other sites. WAR advocates the use of "Lone Wolf" style tactics, which is the concept that individuals must commit violent acts on behalf of the movement alone, without exposing the overall group.

22.     The bombing of diversity officer Logan, which also injured his assistant Jacque Bell, occurred on February 26, 2004. Five months before that date, on September 26, 2003, a male individual, identifying himself as Dennis MAHON, called the Scottsdale Office of Diversity and Dialogue and left a threatening message on the voice mail of Jacque Bell. Your affiant later reviewed a Scottsdale Police report of the incident and listened to a copy of the voice mail, which was preserved as evidence by the police department. The caller stated, "Dennis MAHON of the White Aryan Resistance of Arizona. You know I can't believe these hypocrites in, ah, Scottsdale. You know Scottsdale is about 98% white and you're going to have, ah, spic or (UI) heritage all week. (Laughter) You guys, you, you, rich white people you really, you really are something else. If, if I had my way I'd sic about hundred thousand illegal aliens right into Scottsdale and see how you like your damn heritage (UI) Hispanic heritage.(Laughter) Anyway, we've got lots of support. The White Aryan Resistance is growing in Scottsdale. There's a few

1    white people who are standing up.  Take care."  Investigation by the Scottsdale Police
2    Department revealed that the caller called from phone number (602)341-5814.  This number was
3    the cellular telephone used by Daniel MAHON (brother of Dennis MAHON); cellular telephone
4    records confirmed that this number was subscribed to Daniel MAHON during that same time
5    period.   After reviewing the tape of the September 26, 2003 call, your affiant has listened to
6    hours of recorded conversations of Dennis MAHON in addition to talking with MAHON on one
7    occasion in an undercover capacity.  It is your affiant's opinion that the caller, who identified
8    himself as Dennis MAHON, was in fact Dennis MAHON.

9    23.    In January, 2004, various members of numerous white supremacists groups gathered in
10   the Fountain Hills, Arizona area for an event called "Aryanfest 2004."  Monitoring of the event
11   by several law enforcement agencies and the media established that attendees included members
12   of the Aryan Nations, Volksfront, and WAR.  Individual participants and speakers included
13   Dennis MAHON, Tom METZGER, and Richard Butler (the founder of the Aryan Nations).

14   24.    The *New Times* is a weekly newspaper in Phoenix, Arizona.  An article available via the
15   Internet on February 17, 2004, and published in the *New Times* and *East Valley Tribune*
16   newspapers on February 18 and 19, 2004, was highly critical of Aryanfest 2004 and the white
17   supremacist movement in general.  In the article Dennis MAHON claimed an association with
18   Oklahoma City bomber Tim McVeigh and was quoted as indicating that he had  prior
19   involvement with McVeigh in bombing activities.   Additionally, the article quoted a law
20   enforcement source referring to Dennis MAHON as a "drunken fool."

21   25.    In 2004, after the February 26, 2004 bombing of Don Logan, your affiant contacted one
22   of the reporters who contributed to the article written about the Aryanfest event.  Your affiant
23   learned that Dennis MAHON and Tom METZGER had contacted the *New Times* reporter, who
24   co-authored the article on "Aryanfest 2004."  The contacts by Dennis MAHON and Tom
25   METZGER occurred in the approximately seven day period between publication of the *New*
26   *Times* article and the bombing of Logan on February 26, 2004.

27   26.    The reporter advised your affiant that the article was published on the Internet on
28   February 17, 2004, and circulated in the Phoenix area on February 18 and 19, 2004.  On

31

February 20, 2004, the reporter received two voice mail messages from cell phone number (480)650-6720. Cellular telephone records confirmed that this number was subscribed to Dennis MAHON during that same time period. The caller identified himself as Dennis MAHON. MAHON advised that he wanted to speak with the reporter about the article. The reporter recalled MAHON sounding intoxicated. The reporter received another call and voice mail message on February 21, 2004. MAHON again expressed a desire to talk to the reporter and this time sounded sober. The reporter recalled MAHON saying that he sometimes says things when he is drinking.

27.     The reporter further advised your affiant that she had received two e-mails from Tom METZGER, the leader of WAR, about the Aryanfest article. These e-mails also occurred prior to the February 26, 2004, bombing of Don Logan. Your affiant subsequently received copies of these e-mails. In the first, METZGER told the reporter, "Amusing article. If you only knew. But you will. lol TM." This e-mail was sent to the reporter on February 19, 2004, at 8:11 p.m. The second e-mail was in response to the reporter offering to send METZGER a copy of the article. METZGER replied, "No thats ok I read it on the web. Thanks I guess. lol Security seemed that it was full of holes down there. I usually do strip searches so you can tell the cops the price of poker is going to rise sharply. By the way what are you folks going to do when the water goes away? TM."

28.     On February 20 and 21, 2004, there was heavy phone activity between METZGER (California) and Dennis MAHON (Tempe) (See call activity below). There were calls in sequence with attempted contacts with the reporter. In addition to the below toll information, the cell site information for Dennis MAHON's phone on the morning of February 21, 2004, revealed that MAHON's cellular telephone was making calls in the area of his primary residence at that time, which was 1831 E. Apache Blvd., Tempe, Arizona. There was no activity, or cell site information between 9:23 a.m. and 11:29 a.m. on February 21, 2004. As noted below, the package bomb addressed to Don Logan was found (but not opened or recognized at that time as a bomb) on February 21, 2004, between 10:00a.m. and 10:30a.m. The distance between MAHON's residence and the Scottsdale library is approximately five miles one-way, and would take approximately 30 minutes to drive round trip.

32

| Date | Time | Duration |
|------|------|----------|
| 2/21/2004 | 0611 | Dennis MAHON Outgoing Call to Robert JOOS (417-846-3054) 1 min 7 sec |
| 2/21/2004 | 0713 | Dennis MAHON Incoming Call from Daniel MAHON (602-341-5814) 4 min 40 sec |
| 2/21/2004 | 0713 | Dennis MAHON Outgoing Call to router (602-513-0906) 4 min 40 sec |
| 2/21/2004 | 0808 | Dennis MAHON Outgoing Call to Charles KOUNTZE (734-528-2064) 2 min 15 sec |
| 2/21/2004 | 0833 | Dennis MAHON Outgoing Call to router (602-513-0928) 38 sec |
| 2/21/2004 | 0833 | Dennis MAHON Incoming Call from Daniel MAHON (602-341-5814) 37 sec |
| 2/21/2004 | 0836 | Dennis MAHON Incoming Call from ATT CC (404-461-9978) 36 sec |
| 2/21/2004 | 0836 | Dennis MAHON Outgoing Call to router (602-513-0838) 37 sec |
| 2/21/2004 | 0849 | Dennis MAHON Outgoing Call to Edward Gerhardt (614-855-2868) 30 min 47 sec |
| 2/21/2004 | 0919 | Dennis MAHON Incoming Call from Daniel MAHON (602-341-5814) 2 sec |
| 2/21/2004 | 0919 | Dennis MAHON Incoming Call from Daniel MAHON (602-341-5814) 20 sec |
| 2/21/2004 | 0922 | Dennis MAHON Outgoing Call to Daniel MAHON (602-341-5814) 1 min 2 sec |
| 2/21/2004 | 0923 | Dennis MAHON Outgoing Call to Tom METZGER (760-728-9817) 7 min 44 sec |

*(A package, later determined to be the bomb opened by Logan, was found in the Scottsdale Library at approximately 10:00 to 10:30 a.m.)*

| Date | Time | Duration |
|------|------|----------|
| 2/21/2004 | 1129 | Dennis MAHON Outgoing Call to Charles KOUNTZE (734-528-5814) 1 min 38 sec |
| 2/21/2004 | 1135 | Dennis MAHON Incoming Call from Tina Higgins (315-479-8212) 26 sec |
| 2/21/2004 | 1136 | Dennis MAHON Incoming Call from Tina Higgins (315-479-8212) 55 sec |
| 2/21/2004 | 1139 | Dennis MAHON Outgoing Call to Charles KOUNTZE (734-528-5814) 5 sec |
| 2/21/2004 | 1139 | Dennis MAHON Outgoing Call to Charles KOUNTZE (734-528-5814) 27 sec |
| 2/21/2004 | 1211 | Dennis MAHON Outgoing Call to Tina Higgins (315-479-8212) 1 min 22 sec |

11

33

| | | |
|---|---|---|
| 1 | 2/21/2004 1231 | Dennis MAHON Outgoing Call to a *New Times* reporter (602-229-8440) 1 min 16 sec (See paragraphs 25 and 26). |

2
3 | | *(At approximately 1:10 p.m. on February 26, 2004, the package bomb exploded at the Diversity and Dialogue Office in Scottsdale, injuring Don Logan. This bombing incident received local and national media coverage. Your affiant later spoke with Patricia Armstrong, who is assigned to media relations for the U.S. Postal Inspection Service in Phoenix, Arizona, and was so assigned on February 26, 2004. Inspector Armstrong advised your affiant that she was on assignment in the Washington D.C. area on the day of the bombing and personally observed and noted that the national media coverage on the bombing began by no later than 7:00 p.m. eastern standard time, which would have been 5:00p.m. in Arizona at that time of year.)*

| | | |
|---|---|---|
| 8 | 2/26/2004 1757 | Dennis MAHON Incoming Call from Charles KOUNTZE (734-528-5814) 25sec |
| 9 | | |
| 10 | 2/26/2004 1757 | Dennis MAHON Incoming Call from Charles KOUNTZE (734-528-5814) 1 min 6 sec |
| 11 | 2/26/2004 1758 | Dennis MAHON Outgoing Call to router (602-513-0916) 15 sec |
| 12 | 2/26/2004 1758 | Dennis MAHON Incoming Call from Charles KOUNTZE (734-528-5814) 16 sec |
| 13 | | |
| 14 | 2/26/2004 2030 | Dennis MAHON Incoming Call from ATT CC (404-461-9978) 25 sec |
| 15 | 2/26/2004 2031 | Dennis MAHON Incoming Call from ATT CC (404-461-9978) 2 sec |
| 16 | 2/26/2004 2323 | Dennis MAHON Outgoing *86 (voice mail) 1 min 11 sec |
| 17 | 2/26/2004 2325 | Dennis MAHON Outgoing Call to Tom METZGER (760-723-8996) 5 sec |
| 18 | 2/26/2004 2334 | Dennis MAHON Outgoing Call to Tom METZGER (760-723-8996) 5sec |
| 19 | 2/27/2004 0522 | Dennis MAHON Outgoing Call to Tom METZGER (760-723-8996) 3 min 19 sec |

20    The above calls are all of the calls listed on Dennis MAHON's cellular telephone

21 (480)650-6720 toll records during these relevant time periods. When examining these time

22 periods, no other calls were made on Dennis MAHON's cellular telephone to other people or

23 businesses, which were normally made from this phone on other dates. These calls surround the

24 time that the Scottsdale bomb was delivered, and after it exploded, and were made to/from the

25 Target Subjects, the *New Times* reporter, and two other individuals involved in white

26 supremacist groups discussed in the next two paragraphs. Based on your affiant's investigation

27 to date, these series of calls on February 21, 2004, and February 26, 2004, were an aberrant

28 group compared to Dennis MAHON's usual call activity and contacts.

34

29. After learning that the above telephone number (315)479-8212 was subscribed to by Tina Higgins (DOB 12/16/1956) in Syracuse, New York, your affiant conducted further investigation of Higgins. Your affiant learned that Higgins is the founder of a white supremacist group in New York called "Central New York White Pride." Higgins' name appears on several white supremacist web sites and chat rooms, including the WAR/Insurgent website and is quoted as a movement person.

30. After learning that the above telephone number (614)855-2868 was subscribed to by Edward Paul Gerhardt (DOB 10/5/1953), your affiant conducted further investigation of Gerhardt. Your affiant learned that Edward Gerhardt and his brother John William Gerhardt (DOB 5/29/1951) have historically been involved in white supremacist causes. According to criminal history reports, police reports and other records, the Gerhardts were arrested and subsequently convicted of conspiring to bomb an Ohio elementary school in 1979 in retaliation for a court ruling in favor of racial desegregation. The Gerhardt brothers have been purported to be leaders of the American White Nationalist Party. The Gerhardts were eventually sentenced to six years in prison for conspiring to violate the rights of school children, six years in prison for attempting to damage an institution receiving federal funds, and one year in prison for attempting to interfere with a court order.

31. A review of phone toll and subscriber information for the phones used by Dennis MAHON showed that MAHON has maintained regular contact with associate John Roderick MCLAUGHLIN (DOB 9/7/1950) since the days prior to the bombing through the present. Dennis MAHON has told the CI in the past that MCLAUGHLIN is a "movement" guy and that he visits with MCLAUGHLIN in Illinois. MCLAUGHLIN has a long history of involvement in white supremacist groups to include association or membership with the World Church of the Creator (WCOTC)/Creativity Movement (CM), the American Nazi Party, Ku Klux Klan (KKK), and the prison gang Aryan Brotherhood (AB). According to ATF and criminal history records, MCLAUGHLIN was arrested by ATF in 1995 and ultimately convicted of the unlawful use of a weapon/silencer, the unlawful use of machine gun conversion kits, the unlawful possession of armor piercing ammunition, and the unlawful possession of a firearm/explosive bullets. The

35

1   records also show that MCLAUGHLIN was arrested for aggravated battery with a firearm, but
2   the disposition in that case was not reported.

3   32.    Several days after the Scottsdale bombing, United States Postal Service (USPS)
4   investigators interviewed Patricia Norfleet, a Scottsdale library security guard, and several other
5   library employees in regards to the package addressed to Don Logan that was found in the library
6   on February 21, 2004. During this and subsequent interviews, Norfleet advised that she found
7   an unattended package on Saturday, February 21, 2004, between 10:00-10:30 a.m. She related
8   that she remembered walking toward the windows right after opening the library. Norfleet
9   recalled that she always checked the study area next to the windows, because in her experience,
10  shortly after the library opened each day, transients would congregate in that area. As she was
11  checking that area, she found the package on a library study carrel by the north windows with a
12  "do not reshelf" tag laying on it. The box was ultimately moved to the outbound mail area for
13  pick up by the City of Scottsdale mail room employees.

14  33.    On February 25, 2004, all library mail including the parcel addressed to Logan was picked
15  up and taken to the City of Scottsdale mail room. Once inside the mail room the parcel was
16  processed as out-going mail. A postal meter strip in the amount of $3.95 was affixed to the
17  parcel. The postal meter strip was dated February 25, 2004, and bore a Pitney-Bowes meter
18  number 7078116, which is a unique number assigned to a specific meter machine. The meter
19  number 7078116 is located inside the City of Scottsdale's mail room.

20  34.    In an interview after the bombing, Michael Lukowski, mail services courier for the City
21  of Scottsdale, recalled picking up a parcel addressed to Logan on February 26, 2004. Lukowski
22  handwrote "HR" on the top of the parcel because he knew Logan worked in the Human
23  Resources building. The parcel was then placed with the other mail going to the Human
24  Resources building. The parcel was delivered by Michael Saavedra, another mail services
25  courier, to the Human Resources building between 11:30 a.m. and 12:00 p.m.

26  35.    On February 26, 2004, at approximately 1:10 p.m. the parcel address to Logan exploded
27  as Don Logan began opening the box. The bomb injured Logan, Logan's assistant Renita
28  Linyard and co-worker Jacque Bell. In addition, the blast damaged the surrounding area and

36

14

1  destroyed office equipment.

2  36.    On February 26, 2004, your affiant and other investigators responded to the scene of the

3  bombing located at the Human Resource Complex located at 7575 E. Main Street, Scottsdale,

4  Arizona. Upon arrival, your affiant conducted a post blast search of the blast area. The entire

5  building was evacuated and all business was stopped. Upon entering the front of the building,

6  your affiant observed blood stained clothing and other items laying outside the front door along

7  with a trail of bloodstains from the lobby of the building out to this area. Debris from the blast

8  was scattered throughout the building. A note was recovered in the bomb debris, and it

9  contained a message that accused the recipient of wrongdoing and told him to stop his actions.

10 [2/]   Additionally, various components and items that were originally part of the package bomb

11 were collected at the scene. Examination of these components and items revealed that the

12 original device consisted of a metal pipe bomb with an explosive filler. The bomb design

13 utilized an electrical circuit, which caused the device to explode when Logan opened the lid of

14 the box. Based on your affiant's training and experience, this device is a destructive device as

15 defined by Federal law.

16 37.    Sandra Rembrandt, a black female who is the founder of a non-profit organization called

17 Community Celebrating Diversity, was quoted in an *Arizona Republic* newspaper article

18 regarding the bombing of Don Logan. The newspaper article was published on March 5, 2004,

19 and was a follow-up article about the Logan bombing. In the article, Rembrandt was described

20 as someone involved in diversity issues and identified as a diversity program manager.

21 According to the article, Rembrandt said that she can't imagine who could do such a terrible

22 thing. The article also quoted Rembrandt saying, "Obviously someone is trying to make a point

23 and is upset about something." On that same day of March 5, 2004, Sandra Rembrandt received

24 a telephone call where the male caller stated, "I just wanted to hear what an anti-white bitch

25 sounds like. There are a lot of people like McVeigh, you better be careful." Ms. Rembrandt

26 answered this phone call and listened to the male caller, and therefore, there is no tape recording

27 of this call.

28

---

[2/] Your affiant does not want to disclose the contents of the note because it could compromise the investigation.                                            37

38.    In the course of this investigation,  Rembrandt was played a tape of the call received on the voice mail of Jacque Bell on September 26, 2003, in which the caller identified himself as Dennis MAHON and stated, "Dennis MAHON of the White Aryan Resistance of Arizona. You know I can't believe these hypocrites in, ah, Scottsdale. You know Scottsdale is about 98% white and you're going to have, ah, spic or (UI) heritage all week. (Laughter) You guys, you, you, rich white people you really, you really are something else. If, if I had my way I'd sic about hundred thousand illegal aliens right into Scottsdale and see how you like your damn heritage (UI) Hispanic heritage. (Laughter)  Anyway, we've got lots of support.  The White Aryan Resistance is growing in Scottsdale. There's a few white people who are standing up.  Take care." After listening to that call, Rembrandt told investigators, "If that's not him, it sounds like him."

39.    In the course of the investigation, the March 5, 2004, call to Sandra Rembrandt was traced to a pay phone at a grocery store down the street from MAHON's residence.  A witness who knows Dennis MAHON was interviewed in the summer of 2004, and told ATF agents that he had seen Dennis MAHON previously shopping at that same grocery store before they moved out of the trailer park. It must be noted that Dennis MAHON, prior to the Logan bombing, used his own phone and identified himself in the threatening call to Jacque Bell on September 26, 2003. In contrast, one week after the bombing of Don Logan, on March 5, 2004, an unidentified caller, who Rembrandt indicated sounded like Dennis MAHON, called Rembrandt and threatened her from a pay phone located approximately 1.5 miles from MAHON's residence.

40.    On June 1, 2004, Tempe Police Detective Chris Hoffman interviewed John and Tami McKibben, the managers of a trailer park located at 1831 E. Apache Blvd., Tempe, Arizona. During the interview, the McKibbens advised that Dennis MAHON and his brother, Daniel MAHON, were living in the RV Park for the past several years.  On March 10, 2004, only two weeks after the Scottsdale bombing, Dennis MAHON and Daniel MAHON unexpectedly left the RV park in Tempe, Arizona.

41.    On June 15, 2004, ATF Special Agent Michael Hildick received a police report (DR 2003 2830427) from the Mesa Police Department documenting a phone call made by Dennis MAHON

38

to the *Arizona Republic* newspaper in Phoenix, Arizona. The call was made on October 10,
2003. The call was made in response to the *Arizona Republic*'s coverage of the trial of Frank
Roque. During that time period, Roque was convicted of the racially motivated murder of a Sikh
gas station owner. The murder occurred in Mesa, Arizona shortly after the September 11, 2001,
attacks. The phone message left by Dennis MAHON was summarized by a Mesa police
detective as follows:

> "I can't believe an idiot like you and the *Republic*"…
> "you make this big thing about this fucking Sikh"…
> "you know something"…
> "we're going to come to power"…
> "we're gonna have a hundred dollar reward for every time somebody shoots a Sikh"…
> "and if they bring in that blood-soaked diaper off their head we'll give 'em a hundred dollars"…
> "hundred dollar reward on every goddamn dead Sikh they bring in"…

42.    On October 14, 2004, your affiant initiated telephonic contact with Donna Hogan, a
reporter for the *East Valley Tribune* newspaper. A review of the phone tolls belonging to the
cell phone number of Dennis MAHON revealed that on March 27, 2004, MAHON called
Hogan's work telephone number (480)970-2338 at 8:18 a.m. According to the toll information
the call lasted 25 seconds. That day, Hogan had written an article entitled "Push for Tourism
Diversity Pays Off…Visitor's Group, Hotels book Variety of Groups." The article discussed the
successful recruitment of several groups to the valley including Hispanic organizations and gay
and lesbian organizations. When interviewed by your affiant, Hogan recalled getting a voice
mail from someone telling her words to the effect of, tourism leaders should be trying to get
these groups out of the city and not bring them to the area.

43.    On October 14, 2004, your affiant also contacted reporter Toni Laxson of the *East Valley
Tribune*, and requested Laxson check her records for any contacts she may have had with
someone who discussed racially charged issues or the Scottsdale bombing incident. Laxson did
not recall any specific contacts, but stated she was routinely contacted by readers, but did not
recall any specific contacts regarding an article she wrote about the bombing. According to the
phone tolls of Dennis MAHON for telephone number (480)650-6720, MAHON called Laxson
on February 27, March 5, and April 17, 2004. Laxson forwarded your affiant all the articles she
has written on the bombing and they are listed below in chronological order.

39

1    February 27, 2004 – Package bomb rips Scottsdale Office…City Diversity Chief injured
     in attack

2
     February 28, 2004 – Bomb was sent through U.S. mail…Explosion injured Director of
3    Diversity Office in Scottsdale

4    March 3, 2004 – X-ray will Scan City Mail for Bombs…Scottsdale plans to replace
     sniffing dogs with detectors.

5
     March 6, 2004 – Building the profile of a mail bomber…Authorities have ideas about
6    Scottsdale attack.

7    March 23, 2004 – Mail bomb probe continues…Inspector: Attack on official wasn't tied
     to race or job.

8
     March 31, 2004 – Package bomb victim back to work…Diversity director had suffered
9    injuries in blast.

10   April 1, 2004 – Victim talks of office mail bomb…Scottsdale official joked about
     suspicious box.
11   September 16, 2004 – Scottsdale workers discuss package bomb…City spokesman
     describes 'fog of crisis.'
12
     September 21, 2004 – City offices can scan packages…Scottsdale mailroom employees
13   detected a suspicious package last month within days of installing a new X-ray
     machine.
14

15   44.    On December 14, 2004, your affiant met with *East Valley Tribune* reporter Kim Smith.

16   Smith provided your affiant with two WAR papers that had been received by the *Tribune* and

17   that were originally addressed to reporter Bryon Wells. The first envelope was post marked

18   January 23, 2004, with return information, "Dennis Mahon P.O. Box 41534 Mesa, Ariz. 85274."

19   The WAR paper inside the envelope was the December 2004 issue. On page 2 of the paper there

20   was a cartoon that stated as follows: "WHY ARE THE KIKES ALWAYS PUSHING

21   "DIVERSITY PROGRAMS" WHICH ONLY BENEFIT THE SO-CALLED "MINORITIES"?

22   SIMPLE…BECAUSE DIVERSITY=DEATH TO ARYAN CULTURE AND PEOPLE…JUST

23   SAY "DIE" TO DIVERSITY! The second envelope was addressed to Byron Wells and

24   postmarked July 27, 2004, in Rockford, Illinois. The return information was "Dennis Mahon

25   P.O. Box 50571 Tulsa, OKLA. 74150." Inside the envelope was the July 2004 issue of WAR.

26   Hand written in black ink on the top of the front page of the paper was "How BAD is the

27   Drought? How low is Lake Mead + Powell? Call me (480)650-6720." Your affiant notes that

28   this was Dennis MAHON's cell phone number at the time.

40

45.    During the fall of 2004, your affiant decided to attempt to locate a cooperating individual who could infiltrate Dennis and Daniel MAHON. Your affiant received information through another agent that a possible person could work in this capacity to aid in this investigation. Your affiant met with this individual and conducted a background check on her. This cooperating individual (CI) did not have any prior arrests or convictions, and was willing to assist in this investigation. The CI has been paid approximately $400 per month, although she did make an additional $200 per day when required to personally appear and interact with the subjects of this investigation, including Dennis MAHON and Daniel MAHON. The CI has personally met with subjects in this case approximately 21 days thus far. Although no promises have been made to the CI, she is also aware of the possibility of other future rewards in this case. The CI has proven to be credible and reliable based on her statements in consideration of all of the other evidence in this investigation. The CI's statements have been corroborated through the use of pen register data, physical surveillance, as well as the monitoring and recording of many conversations between the CI and Dennis MAHON and Daniel MAHON.

46.    On January 26, 2005, an ATF undercover agent (UC) and the cooperating individual (CI) moved into a trailer park in Catoosa, Oklahoma. Dennis MAHON and his brother, Daniel MAHON, also lived in this same trailer park at that time. The UC and CI lived in this trailer park for approximately two weeks. The trailer of the UC and CI was equipped with surreptitious cameras and microphones which recorded video and audio conversations between the UC, CI, Dennis MAHON and Daniel MAHON. All of the conversations with the MAHONS and the UC or CI were recorded on audio and video tapes during this two week period, except for one conversation with Daniel MAHON on January 29, 2005, that will be noted below.

47.    On the first day the UC and CI had moved into the trailer park, January 26, 2005, Dennis MAHON and Daniel MAHON went to the trailer of the UC and CI and introduced themselves (This meeting was audio and video taped). During this meeting, Dennis MAHON brought over a photo album and showed the CI and UC photos of his past. During the conversations, Dennis MAHON showed the CI pictures of his Ku Klux Klan robe and other photos. Dennis MAHON discussed numerous issues including his involvement with various hate groups and terrorist organizations.

41

48.     On January 26, 2005, Dennis MAHON also discussed his ex-girlfriend Carol Howe and the fact that Howe had been an informant for the "BATF." (This meeting was audio and video taped). MAHON discussed Howe's testimony against him at a Federal grand jury. MAHON also told the CI about how he had made automatic weapons and bombs with Carol Howe.

49.     On January 26, 2005, Dennis MAHON discussed his involvement with the White Aryan Resistance and claimed that he had left the group 4 years ago. (This meeting was audio and video taped). When asked about WAR, MAHON said that WAR is anti-government and anti-tax, and that groups within WAR can bomb and kill.

50.     On January 26, 2005, Dennis MAHON then discussed how he was involved in several bombings in the early 1980's. (This meeting was audio and video taped). MAHON said that he bombed an abortion clinic, Jewish community center, IRS offices, and immigration offices. MAHON said he made his own "C-4, ANFO" by mixing ammonium nitrate and fuel oil and mixed powdered sugar into the ANFO to make the explosive more powerful. When asked if any of the buildings had people in them when he bombed them, MAHON said that he always bombed the buildings at 2 in the morning. MAHON stated that he had never killed anyone in his bombings and that he believed that you should warn people before killing them, like the IRA does. Your affiant notes that, as more fully developed below, on May 3, 2006, while specifically discussing the bombing of Don Logan with the CI, MAHON stated, "I just wanted, just wanted to teach the motherfucker a lesson the first time."

51.     On January 27, 2005, the CI and UC met with Dennis MAHON and Daniel MAHON in Catoosa, Oklahoma. (This meeting was audio and video taped). Both Daniel and Dennis MAHON discussed a survival area where they have 5 trailers parked on 240 acres. Dennis told the CI that he planned to take his "AK 47 assault rifle" there to shoot this weekend. Dennis then drew a map to Robert JOOS' property in Missouri and provided it to the CI. Also during the conversation on this day, Daniel MAHON mentioned a video of militia training that he and Dennis were involved in. Daniel also said that he did most of the dangerous stuff. Daniel appeared to be referring to their involvement in bombings and various actions related to their movement or cause. Your affiant notes that an AK 47 is a machine gun, and its possession is

42

1  in violation of Title 26 U.S.C. § 5861. Your affiant searched the National Firearms Registration

2  and Transfer Record maintained by ATF for any weapons registrations for the target subjects

3  with negative results. Therefore, all of the target subjects of this investigation may not legally

4  possess any machine gun, silencer, or any other firearm listed in Title 26 U.S.C. § 5861.

5  52.     On January 29, 2005, the UC and CI again met with Daniel MAHON in Catoosa,

6  Oklahoma. (Some of this meeting was not audio and video taped due to the tape running up.

7  However, the audio and video from the trailer could be seen and heard by other agents who were

8  monitoring the conversations nearby. An agent took simultaneous notes, including the below

9  referenced quotations). During this conversation, Daniel MAHON said that he did not think that

10  he and Dennis would live to age 45, with the bomb thing (Oklahoma City bombing) and the

11  Carol Howe thing. The CI asked Daniel if they do more than just talk about taking action for

12  their cause, referring to their white supremacist beliefs. Daniel said "we do more than just talk

13  about it, if I knew you better and the statute of limitations was up." Daniel went on to talk about

14  his participation in drive by shootings, blowing up cars, and buildings. Daniel said on one

15  occasion, he blew a desk through the second floor roof. Daniel did not provide any specifics as

16  far as location and time period for these acts. Daniel said that "Dennis did not do much of that

17  stuff, we thought we were doing the right thing, we were just trying to send a message." Daniel

18  said that "when I would take someone's car out it wasn't anger, it was a sense of duty. It is like

19  a military operation, you plan for it, equip for it." Daniel went on to explain the need to plan on

20  how to dress for the operation including camouflage and disguises, and how to approach and

21  depart your target area. Daniel detailed one method of blowing up a car to the UC and the CI.

22  Daniel said that he would take a phosphorus compound and place it in a condom, then place the

23  condom in the gas tank of the target vehicle. Daniel said that the gas would eat through the

24  condom and release the phosphorus, which would then ignite the gasoline. Daniel said that this

25  method of blowing up a car was not traceable.

26  53.     On February 1, 2005, the UC and the CI met with Daniel MAHON and Dennis MAHON

27  in Catoosa, Oklahoma. (This meeting was audio and video taped). The UC and the CI presented

28  a ruse "problem" to the MAHONS that the CI was having with a child abuser/molester. The CI

43

1  advised Dennis MAHON that she wanted to deal with the fictitious child molester in a violent
2  way.  Among other offers, Dennis MAHON advised the CI that he had people in the patriot
3  movement that could deal with the CI's problem.  Dennis MAHON advised that he was a "White
4  Separatist Nationalist" and that he could not discuss his past or the things that he has done in the
5  past.  Dennis MAHON then discussed a friend of his named Robert "JOOS" as a person that
6  knew everything about explosives.  Dennis MAHON then advised the CI that he (Dennis) had
7  bought $30,000 worth of explosives and ammunition.

8  54.   At this point in the February 1, 2005 recorded conversation, Dennis MAHON described
9  in detail to the CI how a pipe bomb could be made to blow up the car of an individual the CI had
10  a problem with.  MAHON described how to take a "4 by 8" pipe with end caps, with a hole in
11  the end cap.  Put the fuse through the hole in the end cap.  Fill the pipe with triple x black
12  powder and powdered sugar.  MAHON told the CI to mix that black powder and sugar together
13  with a wooden spoon and that this would give the powder the power of a plastic explosive.
14  MAHON discussed using "RTV" silicone seal when building the bomb.  MAHON advised the
15  CI to be very careful to not get any gunpowder on the threads of the end caps to avoid an
16  explosion when screwing the end caps on.  MAHON told the CI how to use gloves and purchase
17  each component from a different place or gunshow to avoid any trail.

18  55.   During the same February 1, 2005 recorded conversation, Dennis MAHON discussed
19  how his actions (bombings) were driven more by racism and nationalism than by personal issues.
20  MAHON also offered several times to go to a pay phone and threaten the child molester
21  described by the UC.  Additionally, Dennis MAHON and the CI discussed various Internet based
22  articles and stories about MAHON.  MAHON talked about the*New Times* article written about
23  him as a result of the Aryanfest gathering in Arizona.  MAHON told the CI that he had
24  attempted to contact the reporter to discuss the Oklahoma City bombing and how he had been
25  cleared by two Grand Juries.

26  56.   During the February 1, 2005 conversation, Dennis MAHON then discussed making a
27  bomb from a propane gas cylinder. (This meeting was still audio and video taped).  MAHON
28  told the CI that holes could be placed in the cylinder to allow gas to escape into a house.  When

44

1  someone turned the light switch on that a large explosion would occur. At numerous points in

2  the conversation, MAHON told the CI that he knew about terrorism and how to use it against

3  people. MAHON advised that terrorism was the fear of the unknown.

4  57.    During the same February 1, 2005 recorded conversation, MAHON said that he had a

5  silenced firearm, and later described a Ruger firearm that he owned that could be fitted with a

6  silencer. MAHON then described in detail how to build a silencer from PVC (a hard plastic)

7  pipe. MAHON then displayed what a silencer sounded like by clapping his hands together on

8  several occasions. MAHON said that he could build a silencer for $10 to $15 and that he has

9  built them and discarded them before. Your affiant notes that the possession of an unregistered

10  silencer is in violation of Title 26 U.S.C. § 5861.

11  58.    During the same February 1, 2005 recorded conversation, Dennis MAHON then told the

12  CI that the best method was to use a pipe bomb because they were so destructive. MAHON

13  described how one pipe bomb would blow up and destroy a trailer. MAHON then told the CI

14  that powdered sugar was not necessary to use in the pipe bomb. MAHON then talked about how

15  he doesn't do this anymore because he is so disgusted with the white race. MAHON advised

16  that we should be out killing Mexicans. [3]

17  59.    During the same February 1, 2005 recorded conversation, Dennis MAHON discussed in

18  detail how the CI could mail the child abuser a threatening letter or one filled with a white

19  powder. MAHON advised that she would have to be careful to use gloves and stick on stamps.

20  MAHON advised that licking the stamps would leave DNA. MAHON then said that he knew

21  terrorism, and this is terrorism. MAHON then repeated how he was not involved in doing this

22  kind of thing "much" anymore. [4]

23  60.    On February 2, 2005, Dennis MAHON went to the trailer of the UC and CI and had

24  further discussions. (This meeting was audio and video taped). The CI and Dennis MAHON

25

26  [3]  Although Dennis MAHON makes some exculpatory statements at times, he is either
minimizing his actions or he simply does not have complete trust in the CI. See Paragraph 12.
27  However, Dennis MAHON continues to use his cellular telephone to talk about possessing and
using explosives. See Paragraphs 104, 105 and 106.
28

   [4]  See Footnote 2 above.

45

1  again discussed the CI's ruse problem concerning a child abuser. In this discussion MAHON

2  told the CI how to make a package or letter bomb and conceal it.  MAHON discussed how a

3  victim-initiated device would work and discussed various components and designs.  MAHON

4  specifically discussed using a 9-volt battery, soldering connections, taping down or gluing down

5  components, and using newspaper to partially conceal the bomb in the package.  Your affiant

6  notes that the pipe bomb that injured Don Logan was a victim-initiated device using a 9-volt

7  battery, soldering connections, and glued down components.

8  61.    During the February 2, 2005 recorded meeting, the CI asked MAHON if he had ever

9  successfully used a package bomb to bomb someone or something.  The following is a

10  transcription of this segment of the conversation.

11  CI: So you've had some that worked? (*Referring to package bombs*)

12  Dennis MAHON: Oh yeah!

13  CI: Was it like similar too....

14  Dennis MAHON:   In Tempe Arizona...God damn diversity officer...Scottsdale Police
    Department had his fingers blown off.

15  CI: The Diversity...

16  Dennis MAHON: Yeah.

17  CI: The Diversity Officer?

18
    Dennis MAHON: Scottsdale Police Department. I didn't do it.   [5]    But I advised a couple
19  Scottsdale white cops how to do it. They pulled it off and never got caught. This is what they
    do. They did it. I was there to show them how to do it. Eh, because see more and more white
20  cops are getting fed up, believe you me. A lot of them are assholes, but a lot of the older ones
    and the younger ones are pretty, you got to watch them.
21
    CI: So did it ever come back to anybody?
22
    Dennis MAHON: No. The guy resigned. BATF, they couldn't find any fucking suspects. They
23  had no suspects. What's really weird is they never came to me. I guess they thought I wouldn't
    be dumb enough to do something like that.
24
                                    ***********
25

26  _____

27      [5]  Dennis MAHON caught himself after he slipped up and told the CI of his involvement
    in the Scottsdale bombing of Don Logan. Dennis MAHON then tried to backtrack and clean up
28  the statement by blaming the bombing on Scottsdale police officers. However, Dennis MAHON
    still inculpates himself when he said he showed them how to do it. All leads, including possible
    Scottsdale police and employees, have been investigated, and no evidence has linked anyone to
    the Scottsdale bombing, other than the target subjects of this Affidavit.

46

1  CI:  So the diversity thing in Scottsdale that was um…

2  Dennis MAHON: That happened in 2000…, early spring 2003. It blew his desk up. Took some fingers off. He lived. But they never found out who did it. And then he quits. (Laughs) The
3  BATF, the FBI…

4  CI:  You got away with that one huh?

5  Dennis MAHON:  No I didn't do it. The cops did it.

6  Dennis MAHON:  *(Mouth moving, with inaudible sounds on the tape)*
          *(The video shows Dennis MAHON's hands moving in a descriptive manner).*
7          *(The CI was interviewed right after this conversation, and related that Dennis explained through these motions and in a whispering voice how the bomb was built).*
8
9  Dennis MAHON:  Needs perfect size, duct tape, and solder.

   CI:  So are they still working on the force?
10
   Dennis MAHON:  Oh, yeah yeah
11
   CI:  So then nothing ever came back to them.
12
   Dennis MAHON: Not in Scottsdale. 98% white. Mostly rich, and that…First of all they're not
13  my kinda whites, cause they have Mexicans do their work. They are pretty much assholes.

14

15  62.    On February 28, 2005, the CI called Dennis MAHON on telephone (480)650-6720. The

16  following is an excerpt from this recorded conversation.

17  Dennis MAHON:    So - so how's things going with you two.

18  CI:    Well I got an interesting ah bit of ah I guess you really don't get the paper there from Arizona but, figured you might have (UI) heard of us or not, in the *Arizona Republic* about ah,
19  ah about the Scottsdale Don Logan bombing and ah…

20  Dennis MAHON:    Oh, yeah Scottsdale the ah…

21  CI:    There's a bunch of press on that…

22  Dennis MAHON:    Yeah.

23  CI:    …right now.

24  Dennis MAHON:    Yeah.

25  CI:    Did you, did you hear about that?

26  Dennis MAHON:    Ah, I think I told you something about that (UI).

27  CI:    Well, yeah you did tell me something about that. That's in fact the reason…reason… I'm calling you cause what you told me and what this paper says kind of is contradictory and I'm a
28  little bit concerned with maybe you know some of the stuff that you told me and I'm just not real ah…

25

47

1   Dennis MAHON:    Well, I, I, I believe it was the cops ah. I talked to a couple of cops; they said they believed it was some of the cops so.

2

  CI:     Un-huh.

3

  Dennis MAHON:    I got no proof. I got no proof. I'm glad he got it whoever did it. Whoever
4   did it.

5   CI:     There's a hundred thousand dollar reward in there.

6   Dennis MAHON:    They're having a hard time finding clues, aren't they?

7   CI:     Ah, don't worry, I'm not going to turn you in or nothing. I'm just like a, I'm fuckin kind
  of a, concerned about the way, this package says that it was, uhm, uh, that it wasn't uhm,
8   mailed, that it was delivered to a library and ah that it was a box and not an envelope and I knew
  that it's like how in the fuck you could put, you know a pipe bomb in an envelope, so I'm just
9   trying to think of a way...

10   Dennis MAHON:    Cause this, this was, this was, a large envelope. Uh, yeah, it made big news
  down there. But, this was the diversity guy uh from Scottsdale and he ah, he ah got the cops'
11   asses real bad because the cops (UI) niggers and Mexicans, but anyway I'm not much concerned
  about that. I'm just trying to make a living right now. Even though I got some money saved up,
12   it's going pretty fast.

13   CI:     Yeah.

14   Dennis MAHON:    Hey I'm more concerned about taking care of myself now (UI) white race
  more than anything else. I think the white race is pretty much scum bags.
15

  CI:     Yeah (UI).
16

  Dennis MAHON:    I wouldn't worry too much about that thing; I think you're safe. Cops did
17   it, that's fine because uh this was a nigger who ah diversity, he discriminates against white men.
  He likes good looking white women though. Anyway, ah I've got plenty rattlesnakes I got to
18   kill in my backyard here right now. Like I said I think my brother may have lost another job I
  had here by something he said so.
19

  CI:     Now it says in here that police are looking at..
20

  Dennis MAHON:    I wish my brother (UI). He's done a lot of stupid things (UI) stupid jobs
21   because of his big mouth. But ah sometimes my brother just doesn't think before he does things,
  so.
22

  CI:     (UI) we all go through that at times in our life. This article says the police are looking
23   (UI) forensic evidence about the bombing. What do you think that they're looking for?

24   Dennis MAHON:    I don't want to talk about it (UI) talk about that stuff on the phone. [6/]   (UI)
  If they find evidence to arrest me then let them come and arrest me. If they don't, then ah (UI)
25   someplace else cause I don't talk to the cops.

26

27       [6/] Although Dennis MAHON claims he doesn't want to talk on the phone about his
  criminal activities, the facts contained in this affidavit indicate he has in the past, and will
28   continue to talk to his brother and other target subjects who he has a long standing relationship.
  (See paragraph 12).

48

1   CI:    Ah yeah. Friend of mine says they're probably looking like at fingerprints or some sort
of DNA or something.

2

3   Dennis MAHON:   They won't find my fingerprints on it. I guarantee that. Anyway I got to
let you go I got to go look for another job here. My brother (UI) job when I get back. Ah keep
me posted. (UI) If things don't work out here, I'm going to relocate probably go back to my folks

4   and help my mother out a little bit, get a job up there. Cause things aren't working out. I come
down here and I get sick right away and ah just a lot of things aren't happening; not happy there

5   or very good. Very good (UI) this year. Okay, I'm going to let you go. Keep me posted okay?

6   CI:    Yeah.

7   Dennis MAHON:   What was your number, I got your number in my book I think. Okay. I got
your number.

8

9   CI:    Yeah, and, you should have it on.

Dennis MAHON:   (UI)

10

11   CI:    And you should have it on your phone, too.

12   Dennis MAHON:   (UI) state tax, state test but some agency might file on me (UI). Okay,
thanks for, hey don't be afraid (UI) to me, okay.

13   Dennis MAHON: Hey do me a favor send that article out to me.

14   CI:    I will do that. Um.
Dennis MAHON:   I sure appreciate it.

15

16   CI:    I'm just really you know what you told me and what this does I mean there's some
contradictory in there and it's like I, I don't still doing other things.

17   Dennis MAHON:   (UI) so concerned about it.

18   CI:    Well, I'm concerned because I'm still going to go ahead through with what I, what I have
planned.

19   Dennis MAHON:   Oh, I hope you don't…

20   CI:    And I think…

21   Dennis MAHON:   you could easily. I don't want to talk about it over the phone[7/] and I think
you should get (UI), other ways you can do it without (UI) because if you get caught you're

22   looking at ten years in prison and I don't (UI). I know you (UI).

23   CI:    (UI) time and don't get caught if you do.

24   Dennis MAHON:   Do you mind if we just go ahead and get the Poor Man's James Bond (UI)

25   CI:    (UI) you (UI) pissed off about the way you told me to do this and then the way that this
thing.

26

27   Dennis MAHON:   I'm not telling you how to do anything. I'm telling you not to do it.

CI:    I know, right, right. But I…

28

---

[7/] See footnote 5 above.

49

1   Dennis MAHON:    I'm telling you not to it. It's time to end this nonsense. It's not against the
    law to have (UI) knowledge or about this (UI) it's when you go out, you can actually have (UI)
2   BATF class 2 license. You can practice with them (UI) it's all legal. But, but you know I, I think
    this..a lot of better ways to take care of this deal by the way (UI) you know I think, (UI)
3   harassment?

4   CI:    Yeah.

5   Dennis MAHON:    Getting you to talk one two and three, ah you go to the library maybe and
    get them. You got to harass somebody (UI) drive a person crazy. I don't think (UI)…There got
6   to be a different way of doing this then taking a chance of going to jail for 20 years. I got to let
    you go, you take care all right.
7
    CI:    Okay.
8

9   63.    In June 2005, a recorded telephone call was made between the CI and Dennis MAHON

10  on cellular telephone (918)313-5125. MAHON discussed with the CI a missing stainless steel

11  Rossi .357 caliber revolver and a Ruger bull barrel .22 caliber stainless pistol. The CI asked if

12  the .22 was the one he had the silencer hooked up to and MAHON replied that it was not, and

13  said the other one "was a little tougher to do."

14  64.    In July 2005, a recorded telephone call was made between the CI to Dennis MAHON on

15  cellular telephone (918)313-5125. Dennis MAHON told the CI that Tom METZGER was going

16  to be relocating to Indiana and that this information was confidential in nature. MAHON and

17  the CI discussed going up to Oregon for the Aryanfest 2005 meeting. MAHON advised that the

18  CI should be very careful because there are a lot of informants that attend these types of events.

19  MAHON then advised the CI that she should tell people that they know "Dennis MAHON" if

20  the CI attends the event. MAHON indicated that this would have some effect without being

21  specific. MAHON told the CI that his "racial struggle" and his survival came first. MAHON

22  discussed various books, including the "Turner Diaries." Your affiant notes that this is a book

23  that many extremist and anti-government types look to for inspiration as it has been widely

24  portrayed as the motivational book for Tim McVeigh's bombing of the Oklahoma City Federal

25  building in 1995.

26  65.    On July 24, 2005, a recorded telephone call was made between the CI to Dennis MAHON

27  on cellular telephone (918)313-5125(confirmed by pen register data). Dennis MAHON provided

28  the CI with telephone number (760)583-2085 for Tom METZGER. MAHON then told the CI

50

1    not to give the number out and that he will call METZGER. MAHON also told the CI not to tell

2    METZGER that she knew that METZGER was relocating to Indiana. MAHON advised that

3    Tom may want to do that (attend the Aryanfest) before he leaves (California) and that he will

4    call and vouch for the CI to METZGER.

5    66.    Also in July 2005, a recorded telephone call was made between the CI to Dennis

6    MAHON on cellular telephone (918)313-5125. Dennis MAHON told the CI that Charles

7    KOUNTZE had come by and tried to get him to shoot a .22 equipped with a silencer into a

8    phone book. MAHON claimed that this would give the Feds "probable cause" to raid the place

9    if they had the place "bugged." MAHON claimed that KOUNTZE was probably trying to make

10   a name for himself by turning in the "biggest domestic terrorist" in the country. MAHON

11   claimed that he did not believe that KOUNTZE could hurt him, stating "we did give him some

12   tidbits of information, but not enough." MAHON then made a comment that he did not need his

13   (KOUNTZE's) money.

14   67.    In August 2005, a recorded telephone call was made between the CI to Dennis MAHON

15   on cellular telephone (918)313-5125. Dennis MAHON had further discussions with the CI.

16   MAHON discussed how KOUNTZE was trying to get MAHON to do illegal things, including

17   major Federal felonies. MAHON told the CI that KOUNTZE tried to get MAHON to make a

18   silencer for him. MAHON said that KOUNTZE gave him the white car he was driving and

19   additional funding. MAHON said that KOUNTZE asked him, "Did you bomb this abortion

20   clinic here?  Did you bomb the diversity officer in Scottsdale, Arizona?"  MAHON said that

21   KOUNTZE is getting very specific with his questions. The CI then asked MAHON how he

22   (KOUNTZE) would know anything about that, referring to the Scottsdale bombing. MAHON

23   replied, "good question…how would he know since it would not have made the news up there."

24   MAHON then discussed how he was different from the average racist/separatist because he is

25   educated with a college degree.

26   68.    In August 2005, a recorded telephone call was made between the CI and Dennis MAHON

27   on cellular telephone (918)313-5125. In this conversation, the CI asked Dennis MAHON if he

28   ever read the articles. Your affiant had previously directed the CI to send articles about the

1  burning of a black church and claim responsibility for the fires. Dennis acknowledged that he

2  got the articles and told the CI that he loved it. MAHON said that next to corporations, churches

3  were the worst enemy and that whoever was doing it had his blessing. The CI then thanked

4  MAHON for the blessing. MAHON then again expressed his pleasure with the perpetrators.

5  69.     On May 2nd, and 3rd of 2006, Dennis MAHON left the CI two voice messages regarding

6  bombing victim Don Logan and the 2004 bombing of Logan. These calls were subsequent to

7  your affiant directing the CI to forward a copy of a video taped interview of Don Logan to

8  MAHON. In this interview, Don Logan discussed the bombing and the injuries he received from

9  the bombing. The following are excerpt transcripts of the calls.

10         Voice Mail Message from Dennis MAHON to the CI
           Date: Tuesday, May 2, 2006

11

12  Dennis MAHON (DM): Hello Becca. It's Dennis here. Um, It's about eh.., gosh it's very close
    to 1:45 my time. Which it would be about 12:30, 12:45 your time. Calling uh, uh Tuesday, I got

13  your stuff. Umm, Mr. Don Logan, umm..(laughter). Uh he must have a death wish. Umm
    believe you me, the Scottsdale Police, obviously didn't do the job right the first time. [8]   Now

14  that's my opinion. I, not gonna swear to it, you know. But the Scottsdale Police Department,
    the vast majority of the (UI) white officers hated that bastard's guts. So maybe next time, they'll

15  plaster his innards all across the hall, you know. Uh, next time if they make a bomb, if (UI),
    which I think they did. I can't prove it. And I won't testify that I helped them or know any of

16  them. (UI) calls again, bye.

17         Voice Mail Message from Dennis MAHON to the CI
           Date: Wednesday, May 3, 2006

18  DM: Uh Becca, Dennis again here, umm, uh…its Wednesday the 3 [rd], about 7:00 o'clock eh,
    7:00 o'clock your time, quarter to 7. I guess you're already out. Umm, yeah, uh…that Don

19  nigger Logan. Again, I think that uh…he is pushing it, and I think the Tulsa boys uh, Tulsa P.D.
    are gonna set him up. This time it's gonna be a real bad one for him. That's my opinion. Uh,

20  I was at the uh, uh Minute Man rally, big Minute Man rally here in Tulsa. Was there, almost 400
    white people showed up. I'll tell you about it, it's pretty wild. I'll catch you later.

21

22  70.     On May 4, 2006, a recorded telephone call was made from the CI to Dennis MAHON on

23  cellular telephone (918)313-5125(confirmed by toll records), and the two had a discussion

24  regarding Scottsdale bombing victim Don Logan.

25

    DM: Hello
26

    CI: Good Morning.
27

_____

28         [8]  Dennis MAHON again claimed police committed this bombing. Again, Dennis
    MAHON was attempting to conceal his involvement. See Footnote 2 above.

52

1 CI: Dennis?

2 DM: Who's this?

3 CI: It's Becca.

4 DM: Oh, Becca. You're calling from a different phone. I didn't recognize the phone.

5 CI: Yeah, umm. Well, I had to use a phone card cause I'm low on my minutes on my cell phone.

6 DM: Oh, O.K. I went to a Minute Man rally here, anti-illegal immigrant. About 400 people showed up, 400 white people.

7

8 CI: Yeah, Umm There was a couple, there was a bunch shit going on over here too, all over the place. People protested the Mexicans walking around and pretended to act like they are really going to do us some damage by not working and not buying products and so on.

9

10 DM: We didn't notice it, we didn't notice it all here. Tulsa has 250 thousand people and seventy thousand Mexicans.

11                                    ***********

12 DM: Your buddy there, ol' Don Logan.

13 CI: Yeah, very arrogant, very arrogant bastard he is. Go ahead, sorry.

14 DM: Well what's happening is he's, he's very. Uh, If it happen again. And he doesn't understand. They're not going to hit him where he works, they're going to get him where he

15 lives. You know their going, their gonna, their gonna tail pipe the son of a bitch, blow up his car when he's in it. I mean he's pretty stupid because, you know, I, I still believe, I totally believe

16 that uh the Scottsdale cops are the ones that are going after him. Because he's been fucking with the Scottsdale cops for ten, well for 5 years or more.

17

18 CI: Yeah

19 DM: So, he's, he's just looking, you know, Niggers aren't very smart. Umm..

20 CI: Why do you think they did that, Why, why do you think they didn't do it right the first time. I mean why, what do you think...fucked up...

21 DM: Hey, you know they don't deserve. They don't. They're, they're amateurs. They're

22 learning.

23 CI: Yeah

24 DM: Believe you me, they've got the same books I have.

25 DM: You know, I just wanted, just wanted to teach the motherfucker a lesson the first time. [9] You know and, and then he'll, he won't, there, there will be no lesson to learn the second time cause you know these guys learn pretty fast, these cops.

26

27

28

---

[9] This statement by Dennis MAHON was a clear slip up that he made to the CI admitting his involvement in the Scottsdale bombing. Dennis MAHON's tone during this portion of the call was angry and hostile, which caused him to inadvertently make this admission.

53

71.    Beginning on May 21, 2006, the CI and Dennis MAHON had several recorded telephone conversations regarding various topics. The CI talked to Dennis MAHON on his cellular telephone (918)313-5125 (confirmed by pen analysis and toll information). During these conversations, MAHON talked to the CI about the property in Missouri owned by Robert JOOS. MAHON discussed taking his guns out to the property and told the CI that he had 300 rounds of ammunition. MAHON told the CI that there were over 200 acres at the property and that there were many caves that could be used for guerilla warfare. The CI later talked to Robert JOOS who told the CI that Dennis MAHON and Daniel MAHON have a "place" that is paid for on his property. On May 28, 2006, MAHON called the CI from JOOS' property. MAHON told the CI that JOOS was becoming too much into the Church and mentioned "Nasserites." MAHON advised that JOOS is not registering cars and not getting a driver's license and that these are small battles and that the larger battle is coming. MAHON indicated to the CI that it was unwise to fight these small battles when the big battle is coming. MAHON told the CI that she would be welcome to live at JOOS' property because of her background and racist views.

72.    On June 10, 2006, the CI again contacted Dennis MAHON at (918)313-5125 . During this recorded call, the CI told MAHON that she had to return to Colorado for personal reasons. MAHON continued to plead to the CI to return and that he would take her out to the property. MAHON and the CI discussed trust and MAHON told the CI that you have to earn trust, not demand it.

73.    On June 17, 2006, the CI talked to Dennis MAHON at (918)313-5125 (confirmed by toll records). Dennis MAHON told the CI that Tom METZGER had a new hotline number and gave the CI telephone number (574)267-5036. MAHON told the CI that he trusted his brother 100 percent and that he trusted the CI almost as much as his brother. He doesn't trust his dad because he turned him in. He trusted Steve (Waddell) 80 percent. He then told the CI that he trusted her almost a hundred percent, but that she has to quit asking him about what he did in the past, claiming that it may hurt the CI more than him.

74.    In this same conversation, Dennis MAHON talked about Robert JOOS' property and his problems and how he thinks JOOS is "nuts" and needs to be eliminated. MAHON then talked

32

54

1  to the CI about the Missouri property and how the CI maybe could talk to JOOS. MAHON told

2  the CI that as long as she doesn't ask him what he has done illegally, he will trust her 100

3  percent. MAHON told her maybe someday (he will tell her) but that he doesn't want to tell her

4  this stuff in case she got arrested. MAHON told the CI that "we have done some major shit from

5  81 to 93." MAHON said, "we did some major shit and the only reason we haven't been caught

6  is that we have been smart. We done some major bombings from 82 to 88, we did some major

7  shit." (See also paragraph 50).

8  75.    In this same conversation, Dennis MAHON told the CI that he didn't want pressure to

9  be put on her. The CI told MAHON she is not Carol Howe. MAHON told the CI that he fell

10  in love with Carol Howe and she almost got him. Your affiant believes that this statement by

11  Dennis MAHON was in reference to Howe being an ATF informant. MAHON said that he will

12  never ask her (the CI) what she has done illegally.

13  76.    On June 26, 2006, the CI retrieved several recorded voice mails from Dennis MAHON,

14  who used (918)313-5125 (confirmed by toll records). In the first, MAHON told the CI "that

15  they will probably arrest me for something that happened in 1986, 85. Quite a few things

16  happened in those two years around the country. A lot of bombs went off and other things went

17  off. They're trying to put some stuff together, um, uh, we'll see what happens, they really don't

18  have too much evidence, but uh, I mean you know, they have no evidence because I didn't do

19  anything, but you know, they think I did." In a second voice mail, MAHON discussed and

20  laughed about the FBI and an arrest of several "young little punks." MAHON said that they

21  couldn't even make a pipe bomb without blowing themselves up.

22  77.    On July 19, 2006, the CI returned a phone call to MAHON at (918)313-5125 (confirmed

23  by toll records). During this recorded conversation, MAHON told the CI that he really doesn't

24  trust too many people other than the CI, his brother (Daniel), maybe Steve. MAHON said that

25  he has paid the price, his brother (Daniel) has paid the price, Tom METZGER has, and he thinks

26  the CI has.

27  78.    During this same call, Dennis MAHON talked about Robert JOOS' property again.

28  MAHON said that Dan always has extra beds and that Robert JOOS would do anything for her.

33

1    When asked why, MAHON said it's because she is beautiful. MAHON then claimed that JOOS

2    has all kinds of "revolutionary equipment" and then asked the CI if she gets his drift. MAHON

3    then said there are all kinds of places to shoot and everything. MAHON talked about JOOS

4    being strange with the driver's license and things and told the CI that maybe she can talk him

5    out of that. MAHON claimed that JOOS can show the CI the caves and how to live off the land.

6    MAHON then talked again about having put a half a million dollars into the struggle. MAHON

7    then told the CI that JOOS has about $30,000 in silver saved up. MAHON claimed that if JOOS

8    doesn't change his ways, he has got to be taken out. MAHON claimed that Dan and he put

9    $40,000 into JOOS' place when JOOS was in jail the first time. MAHON said that JOOS'

10   property is a survival zone and that he has brought all kinds of "heat" down on that place and

11   that no heat should be coming down on that place until the war starts. MAHON then said in the

12   meantime we need to find out where his silver is. MAHON then said that JOOS needed to tell

13   somebody where most of our "revolutionary devices" are where the (indiscernible) metals are.

14   These comments made by Dennis MAHON indicate his beliefs that a racial war/revolution is

15   inevitable in this country. Furthermore, MAHON believes that JOOS' property is going to be

16   critical for a successful white revolution to occur, and believes that JOOS' continuing battle with

17   local and state government over trivial regulations, such as driver's license and vehicle

18   registrations, are a distraction and brings unnecessary law enforcement attention ("heat") to the

19   property.

20   79.    Your affiant notes that Robert JOOS was convicted on April 4, 1997, in McDonald

21   County Circuit Court in Missouri of Unlawful Possession of a Machine Gun and sentenced to

22   33 months incarceration. Further research revealed that a search warrant had been issued on

23   JOOS' property in that case, and law enforcement officers found a quantity of dynamite, a

24   sawed-off shotgun, and a machine gun that he was convicted of unlawfully possessing.

25   80.    On November 5, 2006, the CI made a recorded call to Dennis MAHON at (918)313-5125

26   (confirmed by toll records). MAHON discussed the sale of two North Korean machine gun

27   replicas. According to MAHON, the machine guns will not fire and require $300 to $400 in

28   "gunsmithing" to make them operable. MAHON told the CI that the machine guns are North

1    Korean and World War II German MP-40 "burp guns." MAHON discussed the guns and how

2    they can be made very easily into real machine guns from what he has, but in their current

3    condition they do not fire. MAHON discussed some of the details on how these firearms can

4    be converted to fire. MAHON then told the CI that in his State (Illinois) you have to have a

5    firearm's identification card. MAHON then told the CI that Daniel has a firearm's card and

6    indicated that they (Dennis and Daniel MAHON) would just tell the police that the firearms all

7    belong to Daniel MAHON if law enforcement ever checked. Your affiant notes that any firearm

8    capable of being readily converted to a machine gun would be a regulated firearm, and the

9    possession of such unregistered weapon would be in violation of Title 26 U.S.C. § 5861.

10    81.    During this same call on November 5, 2006, Dennis MAHON told the CI that he had 500

11    pounds, and then told her maybe 800 pounds of ammunition, powders (explosive/gun), igniters,

12    detonators, and fuses. MAHON then said he took all of his detonators and distributed them off

13    to his neighbors. MAHON advised that he gave them to persons he went to high school with and

14    that they live within 5 miles of him. The possession and distribution of detonators by Dennis

15    MAHON to neighbors, would almost certainly be illegal pursuant to federal law, unless Dennis

16    MAHON and his neighbors had licenses or permits through ATF. A search of ATF records for

17    Dennis MAHON and Daniel MAHON revealed that neither has ever applied for or been issued

18    any license or permit to possess explosives. Therefore, the possession of detonators by Dennis

19    MAHON is in violation of Title 18 U.S.C. § 842.

20    82.    On November 7, 2006, the CI made a recorded call to Dennis MAHON at (918)313-5125

21    (confirmed by toll records). The CI told Dennis MAHON that she had recently found some

22    rockets and rocket igniters and asked MAHON if those are what he was talking about. MAHON

23    indicated that they are little electric matches and told the CI, "you're damn right, (laughing)

24    those will initiate anything." MAHON told the CI that they have a couple little wires going to

25    them and a little battery and they are made to initiate explosives and those little rockets.

26    MAHON said they are fun to do and that he used to have fun with them. The CI asked MAHON

27    if the rocket igniters were the same as what he had referred to in their conversation two days

28    prior. MAHON told the CI that basically they are electric matches and that they are used to set

1  off plastic explosives or gun powders and that they set off things using a small electric charge.

2  Many clandestine books on bomb making refer to these igniters for use in making improvised

3  explosive devices, including one often cited by MAHON, "The Poor Man's James Bond."

4  83.    On November 19, 2006, the CI made a recorded call to Dennis MAHON at (918)313-

5  5125 (confirmed by toll records).  The CI asked Dennis MAHON, "What's the difference

6  between an igniter and a detonator?"  MAHON told the CI not too much and that they kind of

7  interchange a little bit.  MAHON then began referring the CI to the Poor Man's James Bond

8  book, and a book called "Improvised Munitions."  MAHON then told the CI, "Those

9  (indiscernible) rocket things, they're pretty cool.  Those rockets go up pretty fast."  MAHON

10  began laughing.  The CI asked, "They go up pretty fast, but are they powerful enough, I guess

11  they're powerful enough to ignite anything?"  MAHON said, "They're pretty good.  If you read

12  the Poor Man's James Bond, you'll find out that those things do just about everything."

13  MAHON said, "I'm surprised the government hasn't outlawed it."  MAHON told the CI that you

14  have to time those (the rocket igniters) because they are electrical charges and you can't just hit

15  a button right next to it because it will go off.  MAHON talked to the CI about timing it for a

16  couple minutes by using a watch.  MAHON told the CI that you could use a watch, drill a hole

17  in the glass, and put a little stud in there.  MAHON then said, "There's a lot of little tricks of the

18  trade."

19  84.    On November 20, 2006, Dennis MAHON left the CI a recorded message regarding their

20  conversation the day before regarding detonators and explosives.  MAHON appeared to be

21  concerned about their conversation the day before.  MAHON told the CI that it is not against the

22  law to know about this stuff, but it is a Federal felony to experiment with this stuff.  MAHON

23  told the CI that he doesn't want her to get hurt with this stuff.  MAHON told the CI it is fun to

24  know this stuff, but told the CI not to make this stuff without getting permission from the ATF.

25  85.    On November 27, 2006, the CI called Dennis MAHON at (918)313-5125 and left him

26  a recorded message.  The CI told MAHON in the message that she got his message about getting

27  a permit from BATF and, in a sarcastic voice, told MAHON that she did not think she was going

28  to get any permits.  MAHON called back and left a recorded message with the CI and told the

1  CI that he does not expect her to be going to the BATF, but he told her to do so because he

2  believed white terrorists were going to be arrested in January. MAHON said, "you probably

3  won't do it, but the number one thing is if you get hurt you pay the price." "Remember,"

4  MAHON said, "if you do something wrong, you can blow your arms off, fucking killed."

5  86.     On December 24, 2006, the CI contacted Dennis MAHON by telephone at (918)313-5125

6  in a recorded call (confirmed by toll records). MAHON told the CI that he sold a couple of his

7  reproduction machine guns. MAHON advised that they don't shoot, but that he made a 300

8  percent profit. MAHON identified one of the guns as a German MP 40 reproduction that he

9  bought for $89 dollars in 1968 and sold for $500. As stated above, your affiant notes that any

10  firearm capable of being readily converted to a machine gun would be a regulated firearm, and

11  the possession of such unregistered weapon would be in violation of Title 26 U.S.C. § 5861.

12  87.     During that same call on December 24, 2006, MAHON told the CI that he found his old

13  .22 Ruger recently and that it was the gun he had a silencer made for years and years ago.

14  MAHON said that he found this gun in a gun case under the couch. MAHON referred to it as

15  an "LPS 30." MAHON again said that he had a silencer made for it and that the silencer is

16  "down at the property in (partially indiscernible) Missouri." MAHON told the CI that Daniel

17  will be coming up to Illinois in March or April and that he thought that it would be a good time

18  for the CI to visit and that they can go to the property and do some shooting. MAHON then said,

19  "I had these broken dreams last night. I had my AK 47; I was popping bunch of politicians in

20  the back of the head, watch their heads blow up." Your affiant again notes that an AK 47 is a

21  machine gun, and its possession, as well as the possession of a silencer, is in violation of Title

22  26 U.S.C. § 5861.

23  88.     On May 1, 2007, Dennis and Daniel MAHON came to the Phoenix area to visit. During

24  their stay in the Phoenix area, the CI met the MAHONS in Tempe for lunch. During lunch, the

25  three discussed various topics, including the MAHONS recent contacts with Tom METZGER

26  and various immigration issues. During lunch, Dennis MAHON received a phone call on his

27  cell phone (918)313-5125 from Charles KOUNTZE (Call confirmed by pen register data to a

28  Chicago hotel. Agents observed the phone call and could hear one side of the conversation via

1    an audio transmission from the wire worn by the CI). While Daniel MAHON answered the
2    phone and talked to KOUNTZE, Dennis MAHON told the CI that he thought it was very strange
3    that KOUNTZE had not called recently, but called when they were meeting with the CI. Daniel
4    MAHON spoke to KOUNTZE in the presence of the CI. Daniel MAHON's side of the
5    conversation with KOUNTZE was overheard by your affiant and other agents. Daniel MAHON
6    and KOUNTZE discussed the organized immigration gatherings the day before and a pending
7    immigration bill in Oklahoma. During the call, when Daniel was on the phone with KOUNTZE,
8    Dennis MAHON acknowledged to the CI that KOUNTZE bought the MAHONS the white car
9    they were driving. During the call, Dennis kept telling the CI to get on the phone with
10   KOUNTZE and tell him (KOUNTZE) that she (the CI) saved Dennis by keeping him from going
11   to the Los Angeles immigration rallies and killing illegal immigrants. The CI then got on the
12   phone and told KOUNTZE that she successfully stopped Dennis from going to the Los Angeles
13   Civic Center and bombing thousands of Mexicans and that she (the CI) was MAHON's favorite
14   terrorist. Eventually, Dennis MAHON got on the phone with KOUNTZE and said, "How is my
15   favorite Michigan terrorist doing?" Dennis was overheard talking to KOUNTZE in more detail
16   about the immigration rallies and then told KOUNTZE that the CI and some of the CI's friends
17   in Phoenix were not afraid to do things, telling KOUNTZE that the CI has "bigger balls" than
18   he (MAHON) does. At one point in the conversation, Dennis MAHON raised his voice to
19   KOUNTZE and said, "…dump that asshole; I've put my ass on the line way more than he has."
20   After they hung up the phone, Dennis MAHON referred to "putting his ass on the line" when
21   committing violent acts in furtherance of his causes. The two then discussed how KOUNTZE
22   might give him some money as a result of the CI's convincing comments to KOUNTZE on the
23   phone. Dennis MAHON said, "The one thing about Charles (KOUNTZE), he does believe in
24   the movement ……. he does believe in what we're doing." MAHON thanked the CI for talking
25   to KOUNTZE on the phone and told the CI how KOUNTZE gave Dennis a couple hundred
26   dollars every couple months or so.
27   89.    Over the next several minutes, the CI and the MAHONS drove from the restaurant in
28   Tempe to Scottsdale in the CI's vehicle. The group's conversation was audio and video taped.

60

1   Your affiant had provided the CI with a fake traffic citation as a ruse, and the CI was instructed
2   to state to the MAHONS that she needed to go to Scottsdale to pay it. The route that the CI and
3   the MAHONS took to pay the fake traffic ticket was adjacent to the Human Resources Complex
4   at 7575 East Main Street in Scottsdale, where the February 26, 2004, package bomb exploded
5   upon opening by Don Logan. As they drove toward Scottsdale, Dennis MAHON asked the CI,
6   "What were you doing in that rich, piece of shit, Scottsdale area," apparently referring to the CI
7   getting a ticket in Scottsdale.

8   90.    Upon arriving in the area where the 2004 bombing of Don Logan occurred, the CI and
9   the MAHONS traveled to the Scottsdale Police and Courthouse facility at 75th Street and 2nd
10  Street in Scottsdale, Arizona. When driving down 75th Street south from Indian School, the CI
11  stopped the vehicle at the intersection of 75th Street and Main Street. After stopping for a few
12  seconds, the group began driving again south on 75th Street when Daniel signaled with his thumb
13  as if pointing behind him and said, "That's 75th Street." The street he was pointing at was
14  actually Main Street, not 75th Street as he indicated. Your affiant notes that the address label
15  used on the bomb sent to Logan was misaddressed as 75th Street instead of Main Street, which
16  was Logan's actual work address. The group continued on 75th Street in order for the CI to pay
17  the fictitious traffic ticket that had been supplied to the CI by your affiant. The CI briefly
18  separated from the MAHONS for the purported purpose of paying the fake ticket. A few
19  minutes later, the CI returned to the CI vehicle where the MAHONS were waiting for her. The
20  three then departed and the following conversation occurred in the undercover truck driven by
21  the CI.

22  CI: Scottsdale fucking Police Department, Scottsdale assholes.

23  Dennis: I wish I remember that fuckers name so I could say, how you doing nigger. How do you
24  like those special letters you been getting in the mail? Ha Ha.

25  Daniel: God damn racist mother fucker.

26  Dennis: Scottsdale cops did that, guarantee it man. He's going to get it again too, believe you
    me. They'll wait a couple years and hit him again.

27  CI: Is that where he was at in there?

28          (*When driving north on 75th Street between the library and City Hall and looking west
          toward those buildings.*)

                                                                                                    61

                                        39

1  Dennis: Yeah, I think he was. He said it was where he was...That's the administration building.

2  Daniel: Mother Fucker. Pop a cap in his goddamn ass.

3  Dennis: I didn't plant the bomb, I helped make it. [10/]

4          (*In a low tone and whisper while turning to the CI in a manner appearing to keep Daniel
           from hearing what he said.*) *Note: Although the audio dropped off near the end of this
5          statement, your affiant confirmed the comment with the CI later that same day.*

6  CI:    Oklahoma?

7  Dennis: Oklahoma, Oklahoma (UI)...sister's there.

8  CI:  Were you talking about that one there?

9  Dennis: Oh, the nigger. I'm sure he knows it's gonna happen again.

10         (*Referring to Logan knowing he is going to get bombed again.*)

11  91.    On May 1, 2007, as the CI and the MAHONS continued to drive out of Scottsdale,

12  Dennis MAHON made comments about Charles KOUNTZE. Dennis MAHON stated, "When

13  are you going to go buy a gun, faggot?" referring to KOUNTZE. Dennis MAHON also said, "I

14  made my first bomb in 83 motherfucker or no, 82. How many years is that? I made a dozen

15  bombs I've used on the enemy. What have you done?"

16  **VII.    Recent Calls on Cellular Telephone (815) 980-7337 (T1)**

17  92.    On August 9, 2007, Dennis MAHON subscribed to, and is currently using, cellular

18  telephone number (815)980-7337 (**T1**) with ESN #A100000014E63E. On September 13, 2007,

19  your affiant was authorized through a Federal Court Order to cause pen register tracking of the

20  call activity on the new cellular telephone number obtained by Dennis MAHON, as well as a pen

21  register for Daniel MAHON's cellular telephone (425)260-9282. On November 5, 2007, your

22  affiant queried the pen register database for calls made to and from (815) 980-7337 (**T1**).

23  During this time period between September 13, 2007, and November 5, 2007, the phone number

24  subscribed to by Dennis MAHON, (815)980-7337 (T1), called/received telephone calls from the

25  cellular telephone number subscribed to by Daniel MAHON, (425)260-9282, 552 times. During

26  _____

27       [10/]  This is another instance when Dennis MAHON, even after just claiming it was
         Scottsdale police who bombed Logan, slipped up and admitted his involvement in the crime.
28  Based on the investigation to date, your affiant believes that Dennis MAHON made the
         Scottsdale bomb and Daniel MAHON delivered the bomb to the Scottsdale library.

1  this same time period, Dennis MAHON's cellular telephone (815)980-7337 (T1) called/received

2  43 telephone calls from two telephone numbers of Tom METZGER (one phone subscribed to

3  by METZGER at his address and the other phone subscribed to the address of METZGER), 20

4  telephone calls from one telephone number of Charles KOUNTZE (one phone subscribed the

5  address of KOUNTZE), and 35 telephone calls from one telephone number of John

6  MCLAUGHLIN (one phone subscribed to by MCLAUGHLIN at his address). [11]    The pen

7  register does not show any contact between Dennis MAHON's cellular telephone (815)980-7337

8  (T1) and the one phone number known at this time to your affiant to be associated with Robert

9  JOOS.  However, Robert JOOS talked to the CI on October 27, 2007, and JOOS told her that

10  he had been in jail the past 6 months and he had recently received a package and letter from

11  Dennis MAHON. (See Paragraph 106).

12  93.    During August and September of 2007, the CI has maintained regular telephone contact

13  with suspect Dennis MAHON on his cellular telephone (815)980-7337 (T1).  During these

14  contacts, Dennis MAHON indicated that he remained active in his white supremacist activity

15  and remained in regular contact with Tom METZGER.

16  94.    On August 1, 2007, the CI returned a call to Dennis MAHON on cellular telephone

17  number (815)980-7337 (T1) (confirmed by toll records).  During this conversation, MAHON

18  told the CI that Tom METZGER just got a new cell number and that his last four digits are

19  "0337."  Dennis then told the CI that Daniel's new phone number is (425)260-9282.

20  95.    On August 11, 2007, a neighbor of Dennis MAHON called police and said that Dennis

21  MAHON had called her (the neighbor), and MAHON said that he had his gun out and didn't like

22  the camouflage helicopter flying so close to his house. (The neighbor had hired a company who

23  was using a helicopter to spray pesticide over the neighbor's farm.)  Shortly after this phone call,

24  the neighbor went outside and heard gun shots fired from MAHON's residence as the helicopter

25  passed over MAHON's house, and the neighbor called police.  Police contacted Dennis

27    [11]  Pursuant to the query of the pen register database on November 5, 2007, the date of
28  the last call to Daniel MAHON was on November 5, 2007, Tom METZGER on November 5,
2007, Charles KOUNTZE on October 30, 2007, and John MCLAUGHLIN on November 5,
2007.



1   MAHON at his residence in Illinois. Dennis MAHON talked to the police and told the officer

2   that he fired two rounds into the ground to scare the helicopter off. MAHON was upset that the

3   helicopter was camouflage and marked with U.S. Army insignia.

4   96.    On August 12, 2007, Dennis MAHON contacted the CI and left a voice mail that was

5   retrieved and recorded by the CI. Dennis MAHON reminded the CI that his new cellular

6   telephone was (815)980-7337 (T1). Dennis MAHON told the CI that he was visited by a couple

7   Sheriff's deputies after he "had a little problem with helicopter that was buzzing us." "I think

8   I may have (indiscernible), may have scared them a little bit too much. Anyway, it was a full

9   (indiscernible) Huey attack helicopter. It had spray boots on ... and kept buzzing the house."

10  MAHON then told the CI that the Mexican invasion is continuing and that he has noticed that

11  a lot of people are getting really angry across the country.

12  97.    On a date between August 15 and 19, 2007, a recorded telephone call was made between

13  the CI and Daniel MAHON at (425)260-9282. The CI talked to Daniel about an article in the

14  paper involving Scottsdale bombing victim Don Logan supporting gay rights. Daniel told the

15  CI to send a copy of the article to Dennis so he could get it to Daniel for inclusion into the WAR

16  paper. Daniel then told the CI that Charles KOUNTZE visited Dennis today. Daniel referred

17  to KOUNTZE as the rich millionaire's son. Daniel said that Dennis MAHON told KOUNTZE

18  that if he was going to make a donation (to the cause), make sure it was $5,000 or above. Daniel

19  told the CI that KOUNTZE only gave Dennis $150. Daniel told the CI that he told Dennis, next

20  time just give it back to KOUNTZE and tell him, "You got 7 million dollars in the bank and you

21  can't come by and visit me and give me something bigger than that so I can keep the thing

22  going?" Daniel went on to say that the people that they are trying to influence and save are

23  cutting their throats. Daniel said that Dennis told him one time that you can't stop a group of

24  people from committing racial suicide and that's what the whole white race is doing. Daniel said

25  that he and Dennis put a lot of money and effort in the cause from around 1990 to 2000. Daniel

26  said he told Dennis, "we did our bit, we sacrificed, we (indiscernible) go really bad and then

27  we'll do what we have to do." Daniel then again told the CI to forward the article to Dennis so

28  he could get it to Tom.

42

64

98.   On August 23, 2007, Dennis MAHON called the CI and left a recorded voice mail at approximately 7:00 a.m. [12]   MAHON told the CI, "We really can't be involved in fighting battles in other people's states.  This asshole, nigger, human relations guy, can make a lot of enemies.  Cops down there might take action against him again.  I can't really be involved. Neither can Dan.  We've more or less fought our battles and, just for survival." [13]

99.   On September 2, 2007, Dennis MAHON called the CI and left a recorded voice mail and said that he thought that he was going to be arrested within the next month or two. [14]   MAHON said that the 30 and 40 year olds were going to have to pick up the slack.  MAHON told the CI that his health was not good and that he had done his best and fought the "son's of bitches for 25 years." [15]

100.   On September 18, 2007, the CI called Dennis MAHON at (815)980-7337 (**T1**) in a recorded call (confirmed by pen register data and toll records).  Dennis MAHON discussed getting Mexicans out of the United States, and MAHON said that he didn't think we could get rid of them unless we started shooting them.  MAHON said that he was scheduled to be on the Internet radio show that day with Tom (METZGER).

101.   On September 26, 2007, the CI called Dennis MAHON in a recorded call at (815)980-7337 (**T1**) (confirmed by pen register data and toll records).  Dennis MAHON and the CI discussed Charles KOUNTZE.  The CI asked Dennis if KOUNTZE had recently given any money toward the movement (the white racist movement that Dennis MAHON, Daniel MAHON, and the other target subjects are participants).  MAHON told the CI that KOUNTZE

---

[12]   The pen register started on September 13, 2007, and toll records for Dennis MAHON's cellular telephone have not been received yet for the date of this call.  Therefore, it has not been confirmed if this call was made from (815)980-7337 (**T1**).

[13]   Although Dennis MAHON makes some exculpatory statements at times, he is either diverting attention from his previous statements or he simply does not have complete trust in the CI. See Paragraph 12.  However, subsequent calls make it clear that Dennis MAHON is continuing his plan to injure people, obtain explosives and conduct bombing activities. (See Paragraphs 100, 103, 104, and 105).

[14]   See Footnote 11 above.

[15]   See Footnote 12 above.

65

1  recently gave him $150, but expressed disgust with the fact that KOUNTZE has a 9 million
2  dollar portfolio. This call is significant for two reasons. First, this call showed that Dennis
3  MAHON and Daniel MAHON discussed KOUNTZE helping finance the movement. (See
4  Paragraph 97). Second, this call is significant because Charles KOUNTZE knows that Dennis
5  MAHON is involved in terrorist activities, including bombings. Although it was not true,
6  KOUNTZE believed that the CI talked Dennis MAHON out of going to Los Angeles in late
7  April of 2007 to bomb thousands of Mexicans. (See Paragraph 88). Dennis MAHON told
8  KOUNTZE that he (MAHON) had put his ass on the line, and Dennis MAHON told the CI this
9  was in reference to committing violent acts in furtherance of his causes. Dennis MAHON
10 specifically discussed how KOUNTZE might give him some money as a result of the CI's
11 convincing comments to KOUNTZE on the phone. (See Paragraph 88). Dennis MAHON added,
12 "The one thing about Charles (KOUNTZE), he does believe in the movement ....... he does
13 believe in what we're doing." (See Paragraph 88). Then, in September of 2007, Charles
14 KOUNTZE provided money to Dennis MAHON to further the movement, including MAHON's
15 bombing activities, in violation of 18 U.S.C. § 2339A.
16 102.    On October 13, 2007, the CI called Dennis MAHON in a recorded call at (815)980-7337
17 (T1) (confirmed by pen register data). During this conversation, the CI asked Dennis if any
18 more helicopters had flown over his property, and Dennis told the CI that it wouldn't happen
19 again because he scared them good.
20 103.    On October 16, 2007, the CI called Dennis MAHON in a recorded call at (815)980-7337
21 (T1)(confirmed by pen register data). Near the end of the call, MAHON said, "Set your target
22 real high if you get my drift here. Don't just shoot some damn Mexican, we need to take on
23 these politicians, teach them a god damn lesson."
24 104.    On October 20, 2007, the CI called Dennis MAHON in a recorded call at (815)980-7337
25 (T1)(confirmed by pen register data). During this call, MAHON said, "I think these top
26 politicians, you know Federal Judges, and (UI) you should do this but, Senators and (UI). I think
27 some of these guys should be probably taken out and hung or shot through the balls. I'm not
28 saying you should do that, I am saying you shouldn't do that, but if you feel like it, I can't stop

66

1  you." Also during this call, MAHON told the CI that his friend Robert JOOS' property would

2  be the place to go to survive if the CI needed a place to go. MAHON said that the Feds would

3  never find her there. MAHON told the CI that JOOS could teach the CI all about survival and

4  explosives. MAHON talked about the caves on JOOS' property and how they were full of

5  "things that go bang in the night." MAHON said that JOOS could teach the CI how to use the

6  explosives by setting them up and how to explode them with timers. MAHON said that JOOS

7  has the "timers," the "explosive cord" and that there are "thousands of pounds in those

8  mountains."

9  105.    During this same call on October 20, 2007, the two then began discussing Charles

10  KOUNTZE. Dennis MAHON told the CI that he is going to "hit up" KOUNTZE for a hundred

11  thousand dollars. MAHON then went back to talking about JOOS' property. MAHON told the

12  CI, "JOOS has 240 acres," and "there is hundreds of thousands of rounds of ammunition, and

13  several tons of dynamite and C4." MAHON then said that he is going to get a hold of

14  KOUNTZE and give him the riot act and tell him to "come up with the money or get the fuck

15  out." MAHON then said (as if talking to KOUNTZE), "If you believe in what were doing then

16  give it (believed to mean money) up, give it up." MAHON then told the CI that maybe we

17  should cut his nuts off with a dull knife…take him to the property (JOOS property in Missouri)

18  and give him an opportunity he can't refuse. MAHON said, "I'm tired of the guy (KOUNTZE)

19  saying I believe in you a hundred percent." MAHON said (as if talking to KOUNTZE again)

20  "but you got all this money and you give me a hundred bucks once in awhile, god damn man."

21  While the CI and MAHON discussed JOOS' property, MAHON said that he has seen "300

22  pounds of TNT and 200 pounds of C4." MAHON told the CI that she could go out there, find

23  out where the silver was located, and then eventually "we'll put a bullet in his back." MAHON

24  said that he doesn't hate his guts, but he wished he would do something with the explosives and

25  silver he has. MAHON said "if he's (JOOS) not willing to use it, we're going to have to." The

26  possession of explosive cord, dynamite, TNT and C4 by Dennis MAHON or Robert JOOS,

27  would almost certainly be illegal pursuant to federal law, unless Dennis MAHON and Robert

28  JOOS had licenses or permits through ATF. A search of ATF records for Dennis MAHON and

67



1   Robert JOOS revealed that they have never applied for or been issued any license or permit to

2   possess explosives. Additionally, Robert JOOS is a convicted felon and could not legally

3   possess explosives, ammunition and firearms. Therefore, the possession of explosive cord,

4   dynamite, TNT and C4 by Dennis MAHON or Robert JOOS is in violation of Title 18 U.S.C.

5   § 842. Additionally, this call shows that Dennis MAHON is still planning to possess and use

6   explosives in his bombing activities. Dennis MAHON wants to conspire with Robert JOOS to

7   use the explosive cord, dynamite, TNT and C4 located at JOOS' property. However, if JOOS

8   was not willing to use it, Dennis MAHON said, "we're going to have to," indicating that he

9   would even be willing to kill JOOS and steal these items from him to conduct bombings.

10  106.   On October 27, 2007, the CI called Robert JOOS in a recorded call. During this

11  conversation, JOOS told the CI that he had just got a package from Dennis MAHON the day

12  before and acknowledged receiving a letter from Dennis MAHON. JOOS then told the CI that

13  he just got out of the "joint" after serving 6 months for resisting arrest and driving without a

14  license. JOOS discussed his battle with the government over driver's licenses and registration

15  of vehicles.

16  107.   On October 30, 2007, the CI called Dennis MAHON in a recorded call at (815)980-7337

17  (T1)(confirmed by pen register data). MAHON answered his phone and told the CI immediately

18  that he was going to be the first "Insurgent Suicide Bomber." MAHON said he could not really

19  get into it right now, but that "something happened in Seattle that..." The call was then

20  disconnected.

21  108.   On October 30, 2007, the CI called Dennis MAHON once again in a recorded call at

22  (815)980-7337 (T1)(confirmed by pen register data). MAHON again told the CI that he got into

23  a little trouble in Seattle and that because of it he has made up his mind what he's going to do

24  with the rest of his life once his mother dies.

25  109.   On October 30, 2007, the CI called Daniel MAHON in a recorded call at (425)260-9282

26  (confirmed by pen register data). During this contact, Daniel said, "I'm just hoping that nothing

27  catches up with me because I have a lot of skeletons in my closet." Daniel explained this by

28  saying that because of background checks at work, and "this new police state country we are

1  living in right now, you can think your safe as hell and the next thing you know, you are behind

2  bars for some conspiracy charge or some bullshit."

3  **VIII.  Need for Interception**

4  110.   Based upon your affiant's training and experience and based upon all of the facts set forth

5  herein, it is your affiant's belief that the interception of wire communications is a necessary

6  technique that has a reasonable likelihood of securing the evidence to prove beyond a reasonable

7  doubt that Dennis MAHON, Daniel MAHON, Tom METZGER, Charles KOUNTZE, John

8  MCLAUGHLIN, Robert JOOS, and others as yet unknown are engaged in the above-described

9  offenses.

10  111.   Your affiant states that the following investigative procedures, which are usually

11  employed in the investigations of this type of criminal case, have been tried and have failed,

12  reasonably appear to be unlikely to succeed if they are tried, or are too dangerous to employ.

13         **A.   Physical Surveillance**

14  112.   Physical surveillance has been attempted on numerous occasions during this investigation.

15  Law enforcement agents have conducted physical surveillance of Dennis MAHON and Daniel

16  MAHON during this investigation.  Although it has assisted in identifying and corroborating

17  some statements, activities and associates of Dennis MAHON and Daniel MAHON, physical

18  surveillance, if not used in conjunction with other techniques, including electronic surveillance,

19  is of limited value. Dennis MAHON, Daniel MAHON and Tom METZGER have individually

20  and collectively published and broadcast instructional writings and videos on how to avoid

21  detection and infiltration by law enforcement.  Dennis MAHON and Daniel MAHON are

22  knowledgeable about law enforcement investigative techniques, including physical surveillance.

23  For example, when the CI and the MAHONS drove from Tempe to Scottsdale on May 1, 2007,

24  an ATF airplane was following their vehicle conducting surveillance.  During the drive back to

25  Tempe, Daniel MAHON pointed out a small, single engine Cessna aircraft and told Dennis the

26  plane appeared to be following them.  Dennis acknowledged this statement, knew the type of

27  aircraft, and said that it was the same aircraft that circled over head in Scottsdale as they waited

28  for the CI.  Dennis MAHON became extremely paranoid and angry over the presence of the

1   aircraft over the next couple minutes and told the CI that if it made one more turn with them he

2   would know for sure that they were being followed. The aircraft discontinued the surveillance

3   at that time. The MAHONS continued to discuss the plane with the CI on this day and in the

4   future and were overheard on the telephone telling someone else that they were followed by a

5   plane.

6   113.    Physical surveillance alone, even when highly successful, has not and will not likely

7   succeed in gathering sufficient evidence of the criminal activity under investigation. Physical

8   surveillance of Dennis MAHON and Daniel MAHON has been difficult not only because of

9   their knowledge of investigative techniques, but also due to their current living situations. Law

10  enforcement agents have conducted physical surveillance at the current residences of Dennis

11  MAHON and Daniel MAHON. On September 18, 2007, your affiant conducted surveillance

12  at the current residence of Dennis MAHON. Dennis MAHON currently is living on a rural farm

13  in Davis Junction, Illinois. Physical surveillance is very difficult to conduct at this location due

14  to the remote area, and Dennis MAHON could easily identify law enforcement if they attempted

15  further surveillance at this location. As stated above, a neighbor called police after hearing

16  gunshots at MAHON's residence on August 11, 2007. Dennis MAHON was questioned by

17  police and he stated he fired two shots into the ground to scare the pilot of a camouflage U.S.

18  Army helicopter that was flying low above MAHON's property. Additionally, physical

19  surveillance was attempted at Daniel MAHON's trailer park in Renton, Washington. On August

20  21, 2007, as your affiant drove through Daniel's trailer park, Daniel exited his trailer and stared

21  at your affiant as he drove past Daniel's trailer. Physical surveillance of these target subjects is

22  not only extremely risky, but continued physical surveillance is not expected to enlarge upon

23  information now available; rather, such prolonged or regular surveillance of the movements of

24  the target subjects would most likely be detected, causing them to become more cautious in their

25  illegal activities, to flee to avoid further investigation and prosecution, to cause a real threat to

26  the safety of the CI, or to otherwise compromise the investigation.

27

28

**B.    Plan to Tickle the Wire**

114.    It is your affiant's belief through experience and knowledge in this investigation and others, that numerous actions by law enforcement, including use of the CI, and other techniques, will stimulate and illicit evidentiary conversation over target telephone (815)980-7337 (T1) regarding the 2004 Scottsdale bombing of Don Logan and other criminal activity alleged in this affidavit. (See Paragraph 3).  In fact, the majority of the significant evidentiary conversation gathered to date has been the direct result of stimulus in different forms provided by your affiant to the MAHONS through the ATF CI.  These techniques, and others, to include statements by the CI to the target subjects, overt and undercover law enforcement contact with the target subjects and their associates, physical surveillance, and search warrants may be used to illicit responses by the target subjects over target telephone (815)980-7337 (T1).  At present, here is a non-exclusive list of some options that your affiant is considering to tickle the wiretap in this case: First, law enforcement may interview KOUNTZE regarding the Scottsdale bombing which your affiant believes will cause a telephone call from KOUNTZE to Dennis MAHON on target telephone (815)980-7337 (T1).  Second, Your affiant may use a local law enforcement officer in Illinois to pretend to be a dirty cop and "tip off" Dennis MAHON of a possible pending investigation which your affiant believes will cause Dennis MAHON to make telephone calls on target telephone (815)980-7337 (T1).  Third, law enforcement may interview METZGER regarding some names used in the Scottsdale bombing note which your affiant believes will cause a telephone call from METZGER to Dennis MAHON on target telephone (815)980-7337 (T1).  Fourth, law enforcement may interview associates of the target subjects regarding cold case bombings, not including the Scottsdale bombing, which your affiant believes will cause a telephone call from these associates to Dennis MAHON on target telephone (815)980-7337 (T1), and believe that MAHON may ask the associate if the police asked about the Scottsdale bombing of Don Logan.

**C.    Grand Jury Subpoenas**

115.    Based upon your affiant's training and experience, your affiant's use of additional Grand Jury subpoenas would be unsuccessful in achieving the stated goals of this investigation.  To

1   date, Grand Jury subpoenas have been used to obtain evidence. However, if the target subjects

2   or their co-conspirators were called to testify before the Grand Jury, they would most likely be

3   uncooperative and invoke their Fifth Amendment privilege not to testify. Dennis MAHON,

4   Daniel MAHON and Tom METZGER have promoted the use of their "5 word" rule, "I have

5   nothing to say." This "5 word" rule has been listed on the WAR website, and was also discussed

6   by Dennis MAHON and Daniel MAHON with the CI. This phrase, according to Dennis

7   MAHON, Daniel MAHON, and Tom METZGER, is the only response one should give to law

8   enforcement when questioned about any subject, whether involved or not. It would be unwise

9   to seek any kind of immunity for these persons, because the granting of such immunity might

10  foreclose prosecution of the most culpable members of this conspiracy and could not ensure that

11  such immunized witnesses would provide truthful testimony. Additionally, the service of Grand

12  Jury subpoenas upon the target subjects or their co-conspirators would only alert them to the

13  existence of this investigation, causing them to become more cautious in their activities, to flee

14  to avoid further investigation or prosecution, to potentially threaten the lives of the informant

15  or undercover agent, or to otherwise compromise this investigation. Finally, if Dennis MAHON

16  found out he was the target of this investigation, there would be an additional potential for

17  violence. Dennis MAHON told the CI on November 19, 2006, "As long as I have my gun and

18  my ammunition, my final act will be a total, complete, violent act against the government. I'm

19  not going to be putting out literature if I have a heart attack. I'm going to be dying with a gun

20  in my hands."

21      **D.    Confidential Informants and Cooperating Sources**

22  116.  As stated throughout this affidavit, a reliable, confidential informant/cooperating source

23  has been developed and used in regard to this investigation. As also stated throughout this

24  affidavit, the CI has been able to make numerous consensual, recorded telephone calls with

25  Dennis MAHON and Daniel MAHON. However, this CI has been specifically told by Dennis

26  MAHON that he cannot tell her everything. As stated above, Dennis MAHON told the CI on

27  June 17, 2006, that MAHON trusted his brother 100 percent and that he trusted the CI almost

28  as much as his brother. He then told the CI that he trusted her almost a hundred percent, but that

1    she has to quit asking him about what he did in the past, claiming that it may hurt the CI more
2    than him.  Therefore, the CI has a limited ability to illicit evidentiary conversation from the
3    MAHONS.  In addition, based on other specific comments made by the targets in this case, the
4    MAHONS are hesitant or unwilling to discuss specific facts about certain acts that are still
5    within the statue of limitations, especially with persons that they do not have a long and trusted
6    history of prior contacts.  In any event, your affiant does not believe Dennis MAHON will
7    discuss with the CI any more specific details regarding the Scottsdale bombing.  However, your
8    affiant does believe that Dennis MAHON will discuss the Scottsdale bombing with the target
9    subjects on target telephone (815)980-7337 (T1), especially after the wire is tickled.

10        **E.    Undercover Agents**

11    117.    As stated previously in this affidavit, an ATF undercover agent (UC) has met with Dennis
12    MAHON and Daniel MAHON. (See Paragraph 46).  On January 26, 2005, this UC and the CI
13    moved into a trailer park in Catoosa, Oklahoma.  Your affiant decided that the CI was in a better
14    position than the UC to continue to have contact with Dennis MAHON and Daniel MAHON in
15    a deep undercover, long-term assignment that was necessary in this case.  Additionally, your
16    affiant has deployed approximately five other ATF undercover agents for limited contact with
17    the MAHONS to further aid in the investigation.  However, the MAHONS have continuously
18    resisted meeting new people for fear of exposure to law enforcement.  The CI has developed the
19    undercover role as well as could have been expected based on your affiant's experience and
20    investigation of these target subjects.  A UC most likely would have encountered the same
21    roadblocks as the CI, and therefore, your affiant does not believe the additional use of UC
22    personnel would advance the investigation in a timely manner.

23        **F.    Interviews of Subjects or Associates**

24    118.    Based upon your affiant's experience, interviews of the subjects or their known associates
25    would produce little or no information as to the identities, roles, and specific acts of the persons
26    involved.  Your affiant does not believe that Dennis MAHON, Daniel MAHON, or Tom
27    METZGER would disclose to law enforcement the source of explosives, bomb components, and
28    other evidentiary items, the location of acts and records related to the acts, and other pertinent

73

1  information regarding the alleged crimes.  As stated above, this group of suspects has
2  individually and collectively published and broadcast instructional writings and videos on how
3  to avoid detection and infiltration by law enforcement and routinely promotes the use of their
4  "5 word" rule, "I have nothing to say."  This phrase according to Dennis MAHON, Daniel
5  MAHON, and Tom METZGER, is the only response one should give to law enforcement when
6  questioned about any subject, whether involved or not.  As stated above, the CI had a phone
7  conversation with Dennis MAHON on February 28, 2005, and Dennis stated, "I don't talk to the
8  cops." Additionally, any interviews of the target subjects or their associates would also have the
9  effect of alerting other potential members of the conspiracy, thereby compromising the
10 investigation and resulting in the possible destruction or concealment of evidence, and the
11 possibility of harm to the CI, whose identity may become known or whose existence may
12 otherwise be compromised.

13     **G.    Trash Cover**

14 119.   During this investigation, your affiant has explored the possibility of obtaining abandoned
15 trash from the MAHONS and other target subjects in this investigation.  However, there are
16 many reasons why collecting trash from the target subjects would not be successful.  First,
17 investigators have been unsuccessful in determining when and how the trash is being discarded
18 by some of the suspects.  Second, investigators have determined that some of these individuals
19 do not discard trash for typical curbside pickup.  Third, some of the target subjects live in trailer
20 parks where trash is discarded into community dumpsters. Last, the target subjects have
21 effectively used counter-surveillance, and would likely discover the attempts of law
22 enforcement.  Your affiant has determined this tool too risky and unlikely to produce valuable
23 evidence.  Additionally, the nature of evidence sought in this investigation would likely not be
24 found in the trash.  For example, silencers, AK 47s, bomb components, or written admissions
25 by the target subjects would likely not be found in the trash.

26     **H.    Search Warrants**

27 120.   The execution of search warrants has been considered at Dennis MAHON's residence,
28 Daniel MAHON's residence, Tom METZGER's residence, Charles KOUNTZE's residence and

52

74

1   the property of Robert JOOS. However, use of such warrants would be premature at this point
2   in the investigation, and law enforcement may not locate all of the evidence to prove guilt
3   beyond a reasonable doubt. It is unknown at this time whether there are any illegal items
4   contained at Dennis MAHON's residence, or Daniel MAHON's residence. Robert JOOS'
5   property has been described by Dennis MAHON as a survival area on 240 acres with many caves
6   (See Paragraphs 51 and 71). Without additional information, it may be difficult for law
7   enforcement to locate all of the illegal items currently being stored at JOOS' property. Search
8   warrants may yield evidence of conspirators and associations, but your affiant would likely be
9   unsuccessful in developing this information into useful evidence. Additionally, searches would
10  not likely reveal the total scope of the illegal activities being investigated and the identities of
11  other possible co-conspirators or their roles in this conspiracy. Search warrants executed at this
12  time would be more likely to compromise the investigation by alerting the target subjects to the
13  investigation and allowing other unidentified members of the conspiracy to insulate themselves
14  further from successful detection.

15      **I.**    **Pen Registers and Telephone Tolls**

16  121.    As stated previously in this affidavit, pen register information has been used in this
17  investigation, including a pen register on the target telephone. The pen register information has
18  verified frequent telephone communication between the target telephone and other telephones
19  used by the target subjects. Pen registers, however, do not record the identity of the parties to
20  the conversation, cannot identify the nature or substance of the conversation, or differentiate
21  between legitimate calls and calls for criminal purposes. A pen register cannot identify the
22  source or sources of the explosives, bomb components, financing, etc., nor can it, in itself,
23  establish proof of the conspiracy. Telephone toll information, which identifies the existence and
24  length of telephone calls placed to and from the target telephones, has the same limitations as
25  pen registers, does not at times show all calls, and is generally available only on a monthly basis.

26      **J.**    **Other Limitations**

27  122.    Unlike numerous other groups and individuals previously investigated by your affiant,
28  this particular group of individuals and their organizations in general have been the targets of

1    numerous, previous investigations over the past two decades. They have been subjected to
2    almost every tool at law enforcement's disposal at one time or another and are extremely familiar
3    with these tools. Because of this, these individuals are well versed and self-trained at how to
4    insulate themselves from law enforcement to avoid detection when committing crimes.
5    Additionally, necessity for this wire interception is also supported by an absence of physical
6    evidence. The lack of physical evidence from the Scottsdale bombing makes it necessary to
7    pursue more specific admissions regarding details only the bomber would know.

8    123.    Based on the foregoing, the interception of wire communications is an essential
9    investigative means of obtaining evidence of the offenses in which the target subjects and others
10   as yet unknown are engaged.

11   **IX.    Minimization**

12   124.    All interceptions will be minimized in accordance with the minimization requirements
13   of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this
14   Court's Order will terminate upon attainment of the authorized goals or, in any event, at the end
15   of thirty (30) days measured from the earlier of the day on which investigative or law
16   enforcement officers first begin to conduct an interception under this Court's Order or ten (10)
17   days after the Order is entered. Monitoring of conversations will terminate immediately when
18   it is determined that the conversation is unrelated to communications subject to interception
19   under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately
20   when it is determined through voice identification, physical surveillance, or otherwise, that none
21   of the named interceptees or any of their confederates, when identified, are participants in the
22   conversation, unless it is determined during the portion of the conversation already overheard
23   that the conversation is criminal in nature. Intermittent spot monitoring will be utilized to ensure
24   that a minimized conversation has not become criminal in nature. Interceptions of a privileged
25   nature (e.g., attorney/client, priest/penitent, etc.) will also be immediately suspended upon
26   discovery of the nature of those conversations.

27
28

## X.    Period of Interception

125.    On the basis of the facts contained in this affidavit, it is believed that the target subjects described herein are engaged in the criminal offenses described above, and that the evidence sought will be intercepted on a continuing basis. Therefore, your affiant requests that the Court issue an Order authorizing the ATF to intercept wire communications over the aforementioned target telephones until all communications are intercepted that reveal the full scope of the enterprise, including the identities of all the participants, their places and methods of operation, and the various criminal activities in which they are engaged in furtherance of this enterprise, not to exceed a period of thirty (30) days. Pursuant to section 2518(5) of Title 18, United States Code, the applicant requests that the term set forth in the Order run from the earlier of the day on which the investigative or law enforcement officers first begin to conduct an interception, or ten (10) days from the date of this Order.

126.    It is requested that the authorization given be intended to apply not only to the target telephone numbers listed above, but to any changed telephone numbers with the same ESN numbers, or to the same telephone numbers if the ESN numbers change, within the thirty (30) day period. It is further requested that the authorization be intended to apply to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

## XI.    Technical Assistance

127.    Pursuant to Section 2518 (5) of Title 18, United States Code, it is requested that, if necessary, Government personnel or other individuals operating under a contract with the Government and acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception, be authorized to assist in conducting this electronic surveillance and to receive disclosure of intercepted communications.

128.    Your affiant further requests that pursuant to the provisions of Title 18, United States Code, Section 2518 (4), the Court direct Sprint Nextel to furnish the applicant all information, facilities, and technical assistance necessary to accomplish the interceptions unobtrusively, with a minimum of interference with the services provided. The furnishing of such facilities and

77

1 | technical assistance by Sprint Nextel will be compensated by the ATF, United States Department
2 | of Justice, at a reasonable rate for expenses incurred in providing such facilities or assistance.
3 | Said service provider, their agents, and any employees are not to disclose or cause the disclosure
4 | of the existence or subject matter of this Order to any person other than the persons who require
5 | said information to accomplish the interception of communications as ordered.

6 | 129.    Wherefore, your affiant respectfully requests that this application and affidavit be ordered
7 | sealed by the Court pursuant to Title 18, United States Code, Section 2518(8)(b).

TRISTAN MORELAND
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me this _16_ day of _NOV_, 20_07_.

JAMES A. TEILBORG
United States District Court Judge



56

78