**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| United States of America, ) | CR-09-712-PHX-DGC |
| Plaintiff, ) | |
| vs. ) | **ORDER** |
| Dennis Mahon (1); and Daniel Mahon (2), ) | |
| Defendants. ) | |

Dennis Mahon and Daniel Mahon were charged in a three-count indictment on June 16, 2009. Doc. 3. A superseding indictment was issued on August 11, 2010. Doc. 476. Count one charges Defendants with conspiring, between September 2003 and January 2009, to damage buildings and property by means of explosives in violation of 18 U.S.C. § 844(n) and (i). *Id.* at 1-4. The alleged objects of the conspiracy were to "promote racial discord on behalf of the 'White Aryan Resistance' (WAR) by damaging and destroying buildings, facilities and real property of both the government and businesses whose activities defendants believed conflicted with their goals," and to teach "others [to] commit violent acts on behalf of WAR." *Id.* at 2. Count two charges Dennis with malicious damage of a building by means of an explosive in violation of 18 U.S.C. § 844(i). *Id.* at 5. That charge is based on the February 2004 construction and mailing of a package bomb to the City of Scottsdale Office of Diversity and Dialogue, resulting in personal injuries to Donald Logan and others. *Id.* at 2-3. Count three charges Dennis with distribution of information regarding explosives under 18 U.S.C. § 842(p)(2)(A). *Id.* at 4-5.

1    On November 16, 2007, the government filed a wiretap application pursuant to 18 U.S.C. § 2518. Doc. 388-1 at 3-11. That application sought authority to intercept communications to and from an Illinois telephone number belonging to Dennis Mahon. *Id.* at 4. The target subjects included Dennis and his brother Daniel, and the alleged criminal offenses were civil rights violations, unlawful use of explosives and firearms, distribution of information regarding explosives, and providing material support to terrorists. *Id.* Judge Teilborg granted the application initially and authorized continued interception of communications several times between November 2007 and May 2008. *Id.* at 12-73.

Defendant Dennis Mahon has filed a motion to suppress evidence obtained from the wiretap and for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Doc. 388. The motion is fully briefed. Docs. 433, 533. A hearing on that motion and others was held on September 22 and 23, 2010. For reasons stated below, the Court will deny the motion.

**I.    Legal Standard.**

Before a wiretap can be authorized under the federal wiretap act, 18 U.S.C. §§ 2510-2522, a judge must find probable cause to believe that an individual is involved in certain criminal offenses, probable cause to believe that particular communications concerning one of those offenses will be obtained through the interception sought, and necessity of the wiretap. 18 U.S.C. § 2518(3)(a)-(c). A defendant challenging the affidavit used to secure a wiretap is entitled to an evidentiary hearing if he makes a substantial preliminary showing that (1) the affiant intentionally or recklessly made false statements in or omitted facts from the affidavit, and (2) the false statements and omissions are material to the finding of probable cause or necessity. *Franks*, 438 U.S. at 155-56 (probable cause); *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985) (necessity). The wiretap affidavit is presumed valid, *Franks*, 438 U.S. at 171, and the defendant "bears the burden of proof and must make a substantial showing to support both elements," *United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th Cir. 2002).

**II.    Analysis.**

The affidavit used to secure the wiretap was prepared by ATF Special Agent Tristan

- 2 -

Moreland. Doc. 575-1 at 11-66. Defendant asserts that the affidavit contains numerous false and misleading statements, that it omits other material information, and that those statements and omissions were intentional or reckless. Doc. 388 at 7-20. The Court will address each purported misrepresentation and omission.

### A. Defendant's Relationship with the Confidential Informant.

The wiretap affidavit states that Defendant "will make incriminating statements on [the target phone] to his brother Daniel and the other target subjects because of the long-standing relationships and trust that these individuals have in each other." Doc. 575-1 at 16 (Aff. ¶ 12). The affidavit further states that Defendant "specifically told the CI that he does not trust her as much as he trusts his brother." *Id.*; *see id.* at 33 n.3, 53 n.13.

Defendant asserts that the clear implication from those statements is that the wiretap was necessary because he did not trust the CI. That implication is misleading, Defendant maintains, because in reality he trusted the CI "almost 100 percent and he explicitly put her on par with his brother." Doc. 388 at 8. But this fact was made clear in the affidavit. Paragraph 73 states that Defendant "told the CI that he trusted his brother 100 percent and that he trusted the CI almost as much as his brother." Doc. 575-1 at 42. Similarly, paragraph 77 states that Defendant "told the CI that he really doesn't trust too many people other than the CI, his brother (Daniel), [and] maybe Steve [Metzger]." *Id.* at 43. Given the inclusion of those statements in the affidavit, it cannot reasonably be said that the government misled Judge Teilborg by claiming that Defendant "told the CI that he does not trust her as much as he trusts his brother." *Id.* at 16.

Defendant further asserts that he was attracted to the CI, that she encouraged his adoration, and that her use as "sexual bait" to earn his trust and cause him to make incriminating statements was omitted from the affidavit. *Id.* at 8-9. This omitted information is material, Defendant contends, because it sheds light on his "motive for fabricating knowledge about the Scottsdale bombing and other activities in his conversations with the CI." *Id.* at 10. The Court concludes that details of the relationship between Defendant and the CI were not material to a finding of probable cause or necessity because the affidavit

1 explicitly stated that Defendant "trusted the CI almost a hundred percent" (Doc. 575-1 at 42), and because Defendant was expected to make incriminating statements not only to the CI, but also to his brother and others he trusted (*see id.* at 16, 36 n.6).

### B. Defendant's Statements on the Charles Goyette Show.

Defendant asserts that the wiretap affidavit misrepresents statements he made on a radio talk show. Doc. 388 at 10-11. He contends that while he did discuss his "views about racial integration and his participation in white supremacist organizations, it was misleading for [Agent] Moreland to claim that he 'discussed his opposition to diversity.'" *Id.* at 11; *see* Doc. 575-1 at 17 (Aff. ¶ 19). The Court does not agree.

During his radio interview, Defendant stated, among other things, that he "hate[s] the people that are out to destroy my race and my heritage" (Doc. 388-2 at 4), that there is "no such thing as equality . . . in the human species" (*id.* at 7), that he is a "separatist" who believes that "we work better if we are separated" (*id.* at 22), that "the only race that's not allowed to have pride and hang together is the white race" (*id.* at 24), that he will "always be a white separatist" (*id.* at 26), that integration "has not worked" and "will never work" (*id.* at 32), that a "multi-racial nation will never survive" (*id.* at 35), and that he is a racist and "proud of it" (*id.* at 36). While Defendant never used the term "diversity," he unequivocally stated that he is a white separatist opposed to racial integration. It was not misleading to state that Defendant "discussed his opposition to diversity and his belief that diversity and racial integration are slowly destroying the white race." Doc. 575-1 at 17 (Aff. ¶ 19).

### C. The Message for the Scottsdale Office of Diversity and Dialogue.

On September 26, 2003, an individual identifying himself as Dennis Mahon called the Scottsdale Office of Diversity and Dialogue and left a voice mail message for Jacque Bell regarding a planned Hispanic heritage event. Contrary to Defendant's assertion (Doc. 388 at 11), it was not misleading to describe the message as "threatening." Defendant identified himself as a member of the "White Aryan Resistance of Arizona" and stated that Scottsdale residents were hypocrites because "Scottsdale is 98% white and you're going to have [a] spic . . . heritage all week," that the "White Aryan Resistance is growing in Scottsdale," and that

1 "white people are standing up." Doc. 575-1 at 18 (Aff. ¶ 22). Defendant's message 2 reasonably can be construed as a veiled threat of violent resistance on the part of WAR 3 members and other white people in Scottsdale. The fact that Defendant concluded by saying 4 "take care" does not render the message non-threatening. Moreover, given that the affidavit 5 sets forth the message in its entirety (*see id.*), any mischaracterization on the part of Agent 6 Moreland, and Ms. Bell's view of the message as a "prank call" (Doc. 388-2 at 78), are 7 immaterial.

8        **D.    Defendant's Comments to *New Times* Reporter Susan Buchanan.**

9        On February 20, 2004, Defendant left two voice mail messages for Susan Buchanan 10 regarding a *New Times* article about statements he made at "Aryanfest 2004" that he had 11 associated with Timothy McVeigh. Doc. 575-1 at 19 (Aff. ¶ 24). Ms. Buchanan told Agent 12 Moreland that Defendant sounded intoxicated in those messages, and that in a message left 13 the next day he sounded sober and stated that "he sometimes says things when he is 14 drinking." Doc. 388-2 at 80-81 (6/17/2004 ROI). Agent Moreland recounts Ms. Buchanan's 15 statements in his affidavit. Doc. 575-1 at 20 (Aff. ¶ 26).

16        Defendant contends (Doc. 388 at 12) that the affidavit is misleading in that it omits 17 Ms. Buchanan's interpretation of what Defendant meant by "sometimes say[ing] things when 18 he is drinking," that is, that she "took this as a reference to some of the things [Defendant] 19 was quoted in the article as having said at the Aryanfest gathering" (Doc. 388-2 at 81). The 20 government argues, correctly, that Ms. Buchanan's subjective belief about the meaning of 21 Defendant's voice mail messages is not material to a probable cause determination. *See* Doc. 22 433 at 6. Defendant asserts that he was attempting to distance himself from statements he 23 previously made about his association with Timothy McVeigh (Doc. 388 at 12), but this is 24 not clear from the voice mail messages themselves or Ms. Buchanan's interpretation of those 25 messages. The "mere fact that [Agent Moreland] did not list every conceivable conclusion 26 does not taint the validity of the affidavit." *United States v. Burnes*, 816 F.2d 1354, 1358 27 (9th Cir. 1987).

28 / / /

1    **E.  The Phone Calls to Sandra Rembrandt.**

2    Susan Rembrandt founded the non-profit organization Community Celebrating
3    Diversity. Comments she made about the bombing of Donald Logan were quoted in the
4    *Arizona Republic* newspaper. Doc. 388-2 at 83-84. The wiretap affidavit states that this
5    article "was published on March 5, 2004," and that the same day Ms. Rembrandt "received
6    a telephone call where the male caller stated, 'I just wanted to hear what an anti-white bitch
7    sounds like. There are a lot of people like McVeigh, you better be careful.'" Doc. 575-1 at
8    25 (Aff. ¶ 37).

9    Defendant notes that the article actually was published on February 19, 2004
10   (Doc. 388 at 13), but does not explain why this is material. Defendant further notes the caller
11   never said "you better be careful," but instead said "there are a lot of people like McVeigh"
12   and hung up. Doc. 388 at 13; *see* Doc. 388-2 at 86. Defendant claims that it was misleading
13   for Agent Moreland to imply in his affidavit that Defendant made a threatening call to
14   Ms. Rembrandt. Doc. 388 at 12.

15   Timothy McVeigh murdered more than 100 people by detonating a truck bomb in
16   front of a government building. Ms. Rembrandt was involved in community affairs and
17   publicly commented on the bombing of Don Logan. The caller's statement to her that "there
18   are a lot of people like McVeigh" was threatening. The affidavit's erroneous inclusion of the
19   statement "you better be careful" was not material.

20   After listening to a tape recording of the voice mail message left for Jacque Bell on
21   September 26, 2003, Ms. Rembrandt stated that "the voice sounded a little like the call she
22   received," that the "caller was of the same character type," and that "if it is not him, it is real
23   close." Doc. 388-2 at 86. The affidavit quotes Ms. Rembrandt as stating, "If that's not him,
24   it sounds like him." Doc. 575-1 at 26 (Aff. ¶ 38). While Agent Moreland did not quote
25   Ms. Rembrandt verbatim, the discrepancy is minimal. Contrary to Defendant's assertion
26   (Doc. 388 at 13), Agent Moreland's characterization of what Ms. Rembrandt told
27   investigators was not misleading.

28   / / /

1  **F.     The Hang-Up Calls to Ms. Rembrandt.**

2  Defendant notes that Ms. Rembrandt received five hang-up calls the same day she
3  received the threatening call and that this fact is omitted from the affidavit. Doc. 388 at 14.
4  But Defendant does not explain why hang-up calls would be relevant to a probable cause
5  determination. If anything, they could be viewed as threatening to Mr. Rembrandt.

6  **G.     Defendants' Departure from the RV Park in Tempe.**

7  Paragraph 40 of the affidavit states: "On March 10, 2004, only two weeks after the
8  Scottsdale bombing, [Defendants] unexpectedly left the RV park in Tempe, Arizona."
9  Doc. 575-1 at 26. Defendant does not dispute that he and his brother left their residence at
10 the park on March 10, 2004, nor does he dispute that their departure was less than two weeks
11 after the Scottsdale bombing on February 26, 2004. Instead, Defendant contends that the
12 affidavit mischaracterizes the departure as "unexpected." Doc. 388 at 14. When Agent
13 Moreland drafted the affidavit, according to Defendant, he was aware that Defendant had
14 written letters to an inmate in Missouri expressing his desire to leave Arizona, that his
15 brother Daniel had complained for years about the climate in Phoenix and had requested a
16 job transfer to Portland, Oregon, and that Daniel had written a resignation letter providing
17 April 16, 2004 as his last day of work. *Id.* at 14-15; *see* Doc. 388-2 at 89-95.

18 The government notes, correctly, that given that Daniel intended to work in Phoenix
19 through April, 16, 2004, his departure from the RV park on March 10, 2004 reasonably can
20 be construed as unexpected. Defendant's letters expressing a desire to leave Arizona do not
21 change this conclusion given that one of the letters identified a departure "target date [of]
22 April 15, 2004." Doc. 388-2 at 89.

23 **H.     Phone Calls to the *Arizona Republic* and the *East Valley Tribune*.**

24 Paragraphs 41 and 42 of the affidavit state that Defendant made certain phone calls
25 to local newspapers. Doc. 575-1 at 26-27. Defendant asserts that the only evidence linking
26 him to those calls is his phone number (Doc. 388 at 15-16), but Defendant does not explain
27 why it is unreasonable to conclude from that evidence that he was the person who made the
28 calls. Defendant has presented no evidence that the calls were made by someone else. He

- 7 -

has not shown that the affidavit misrepresents information regarding the calls to the *Arizona Republic* and the *East Valley Tribune*.

**I.     Defendant's Exculpatory Statements.**

The affidavit contains certain exculpatory statements. Defendant told the CI that he no longer uses pipe bombs (Aff. ¶ 58) and that it was the Scottsdale police who bombed Donald Logan (¶¶ 61, 69, 98). *See* Doc. 575-1 at 33-35, 40, 53. Agent Moreland notes that Defendant was merely seeking to "minimize his actions" (Aff. ¶ 58 n.3), that he was trying to "backtrack and clean up [an incriminating] statement by blaming the bombing on Scottsdale police officers" (¶ 61 n.5), that he was "attempting to conceal his involvement" by again claiming that police committed the bombing (¶ 69 n.8), and that he was either "diverting attention from his previous statement or he simply does not have complete trust in the CI" (¶ 98 n.13). Defendant asserts that Agent Moreland's comments are misrepresentations to the extent they constitute statements of fact (Doc. 388 at 17), but the comments, reasonably construed, constitute opinions, not verifiable statements of fact.

Defendant notes (Doc. 388 at 17) that the affidavit omits his statement to the CI that he "hasn't done anything wrong in seven years" (Doc. 388-2 at 103). But the affidavit includes numerous other exculpatory statements made during that same conversation and others. *See, e.g.*, Doc. 575-1 at 34-36 (Aff. ¶¶ 61-62, 76, 90, 98). Defendant's statement that he "hasn't done anything wrong in seven years" was cumulative of other exculpatory statements and therefore not material.

**J.     Investigative Leads.**

The affidavit states that "[a]ll leads, including possible Scottsdale police and employees, have been investigated, and no evidence has linked anyone to the Scottsdale bombing, other than the target subjects of this Affidavit." Doc. 575-1 at 34 (Aff. ¶ 61 n.5). The government stands by this statement, noting that Defendant has failed to present any evidence available when the affidavit was drafted directly connecting another person to the Scottsdale bombing. Doc. 433 at 9.

Citing an undated "investigative lead list" (Doc. 388-2 at 106-09), Defendant claims

1  that Scottsdale police had identified more than a dozen potential suspects. Doc. 388 at 17-18.
2  Defendant asserts that "[i]t appears that when ATF assumed the investigation and contracted
3  with the [CI], all or most other investigation ended." *Id.* Defendant presents no evidence in
4  support of this assertion. Nor has he shown that leads were left open or that there is evidence
5  directly linking others to the Scottsdale bombing. The statement regarding investigative
6  leads has not been shown to be erroneous or otherwise materially misleading.

### K. The Scottsdale Drive.

Defendant and his brother Daniel visited the Phoenix area in May 2007. During that trip, the Mahons accompanied the CI on a drive from a Tempe restaurant to downtown Scottsdale. The CI had claimed that she needed to pay a parking ticket in Scottsdale, but the ticket was fake and used as a ruse to get the Mahons in downtown Scottsdale near where the bombing occurred.

Paragraph 90 of the affidavit provides, in relevant part:

> Upon arriving in the area where the 2004 bombing of Don Logan occurred, the CI and the MAHONS traveled to the Scottsdale Police and Courthouse facility at 75th Street and 2nd Street in Scottsdale, Arizona. When driving down 75th Street south from Indian School, the CI stopped the vehicle at the intersection of 75th Street and Main Street. After stopping for a few seconds, the group began driving again south on 75th Street when Daniel signaled with his thumb as if pointing behind him and said, "That's 75th Street." The street he was pointing at was actually Main Street, not 75th Street as he indicated. Your affiant notes that the address label used on the bomb sent to Logan was misaddressed as 75th Street instead of Main Street, which was Logan's actual work address.

Doc. 575-1 at 49.

Defendant asserts that a video of the drive shows that the Mahons had only a vague idea of where they were at or where to go, that Daniel was reading directions from the fake ticket and looking around at the unfamiliar surroundings, and that the Mahons were debating back and forth on where things were and how best to get there. Doc. 388 at 19 & Ex. S. Defendant contends that the description provided in paragraph 90 of the affidavit "implies that Daniel Mahon spontaneously pointed out 75th Street" and thereby "misrepresents the clear facts documented on the video." Doc. 388 at 19. The affidavit accurately states that Daniel Mahon signaled with his thumb and said, "That's 75th Street." Defendant claims that

1  he and his brother were unfamiliar with the downtown Scottsdale area, but the affidavit does
2  not state otherwise. Agent Moreland did not materially misrepresent Defendant's actions.

### L. Other Investigative Techniques.

Defendant challenges the necessity of the wiretap by claiming that the affidavit omits facts regarding the exhaustion of traditional investigative techniques. Doc. 388 at 19. In order to satisfy the necessity requirement, the wiretap affidavit must provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" 18 U.S.C. § 2518(1)(c).

The stated goal of the wiretap was to "fully identify the members of this white supremacist organization, specifically those responsible for the bombing of Don Logan and his co-workers in 2004, as well as those involved in supporting, financing, or participating in the intimidation and threats to persons." Doc. 575-1 at 13 (Aff. ¶ 5). The wiretap also was sought to "identify the locations used to store weapons, explosives, bomb making components, tools, and other illegal items." *Id.* Agent Moreland avowed that "[w]ithout electronic surveillance, these goals will not be achieved." *Id.*

Defendant contends that a pole camera could have been used successfully at the Mahons' rural property and that the government's failure to try this investigative technique negates a finding of necessity. Docs. 388 at 19-20. The government states in its response that agents considered the use of a pole camera near the Mahon property, but rejected it as unlikely to succeed. Doc. 433 at 10. The Court concludes that Agent Moreland's affidavit contains sufficient facts to demonstrate necessity for the wiretap. The omitted pole camera explanation is therefore immaterial.

The necessity requirement should not be interpreted to require law enforcement to "exhaust every conceivable investigative technique before obtaining a wiretap," but to "ensure wiretaps are not used as the initial step in a criminal investigation." *United States v. Forrester*, — F.3d —, No. 09-50029, 2010 WL 2988822, at *12 (9th Cir. July 30, 2010). This requirement can be satisfied by a showing in the affidavit that "'ordinary investigative

procedures, employed in good faith, would likely be ineffective in the particular case.'" *United States v. Garcia-Villalba*, 585 F.3d 1223, 1228 (9th Cir. 2009) (citation omitted).

The Scottsdale bombing was investigated for more than three years before the wiretap was sought. Agent Moreland's 56-page affidavit extensively details relevant parts of that investigation, including, among other things, the target subjects and their backgrounds, the numerous sources of information, the nature of the alleged offenses, the post-blast search of the bombing area, review of ATF reports and National Firearms Registration records, the use of the CI, and the use of surreptitious recording devices. The affidavit describes the need for a wiretap and the inadequacy of other traditional investigative techniques. Doc. 575-1 at 11-66. This section, spanning eight pages, "explain[s] how the use of confidential informants and undercover officers, physical surveillance, pen registers, telephone [t]olls, search warrants, interviews, grand jury subpoenas, and trash searches had proven, [or would prove,] inadequate." *Forrester*, 2010 WL 2988822, at *11. The affidavit notes that Defendant "is very knowledgeable about law enforcement techniques, and therefore, is very cautious in his discussions with other people regarding his illegal activities." Doc. 575-1 at 15 (Aff. ¶ 12). While Defendant placed trust in the CI, this was conditioned on her not "ask[ing] what he has done illegally[.]" *Id.* at 43 (Aff. ¶ 74). The wiretap was sought primarily to record communications between Defendant and "his brother Daniel and the other target subjects because of the long-standing relationships and trust these individuals have in each other." *Id.* at 16 (Aff. ¶ 12). The affidavit explains why other investigative techniques would not capture those communications or the information contained therein.

"'The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy.'" *Garcia-Villalba*, 585 F.3d at 1228 (citation omitted). "An 'effective case' means 'evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment.'" *Id.* The affidavit of Agent Moreland explains why the wiretap was necessary to build an effective case against Defendant, and otherwise fulfills the requirements of 18 U.S.C. § 2518(1)(c). It was sufficient to allow Judge Teilborg to

determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). The necessity requirement is met. *See Garcia-Villalba*, 585 F.3d at 1228-31; *Forrester*, 2010 WL 2988822, at *11-12.

### III. Conclusion.

Defendant has not shown that any false statements or omissions are material to the finding of probable cause. Nor has he shown that the wiretap was unnecessary. His motion to suppress and for a *Franks* hearing will be denied.

**IT IS ORDERED** that Defendant Dennis Mahon's motion to suppress unlawfully obtained wiretap evidence and for a *Franks* hearing (Doc. 388) is **denied**.

Excludable delay pursuant to 18 U.S.C. § 3161(h)(1)(D) is found to commence on June 29, 2010 for a total of 91 days.

DATED this 27th day of September, 2010.

*David G. Campbell*
United States District Judge