**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | No. CR 09-712- PHX-DGC |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) | |
| Dennis Mahon (1), Daniel Mahon (2), | ) ) | |
| Defendants. | ) ) | |

Defendants Dennis and Daniel Mahon move to suppress statements made on the date of their arrest, June 25, 2009, because the statements allegedly were elicited by law enforcement in violation of the Fifth and Sixth Amendments to the United States Constitution as defined in *Miranda v. Arizona*, 384 U.S. 436 (1966). Docs. 446, 481. For the reasons stated below, the Court will deny Defendants' motions.

**I.    Background.**

The parties have provided the Court with law-enforcement video taken from 6:51 a.m. to 9:02 a.m. on the morning of June 25, 2009, along with three audio clips from the same day. The following is a summary of what the Court observed on the audio and video exhibits.

Following his arrest, Defendant Dennis Mahon was placed in a police van at 6:52 a.m., was removed from the van at 6:54:40 a.m., and was returned to the van at 6:56:33 a.m. The van had been wired for audio and video recording. Dennis was given *Miranda* warnings in the van by Special Agent Hager at 7:05 a.m., after he was shown the indictment and

warrant by Special Agent Green. After his rights were read, Dennis was asked "Do you understand?" He replied in a conversational tone: "The small talk is over. I can't say anything more – except for who is praying for the damn humidity to quit?" He continued engaging in "small talk" with law enforcement, but was not questioned by officers with regard to the issues in this case and did not volunteer information to the officers on those issues.

Defendant Daniel Mahon was given *Miranda* warnings at approximately 6:58 a.m., before he was placed in the van at 7:09 a.m. He responded, "I understand" when asked whether he understood his rights. He did not state that he was invoking his rights.

Defendants were alone in the van between 7:11 a.m. and 7:13 a.m., and after 7:14 a.m. Officers were present both inside and outside the van before 7:11 a.m. and between 7:13 and 7:14 a.m. The only encounter with officers in the van after 7:14 a.m. was when officers would open the door from time to time to check on Defendants, to escort Daniel out to talk with Agent Moreland, to respond to a request from Dennis to use the restroom, and to turn on the air conditioning at Daniel's request. Defendants did not request to be held outside the vehicle, nor did they complain of discomfort other than warmth, which appeared to be remedied immediately after Daniel requested that the air conditioning be turned on.

During these contacts with law enforcement while in the van, Defendants were asked if the house contained any explosive devices that might harm officers, to which Dennis said no. Defendants were also asked whether the barn was safe, to which both replied that there were no explosives but that there were bat feces that could be virulent and agents probably should wear gas masks. The tone of these brief encounters was not threatening.

The fact that the van was wired for audio and video recording was expected by Defendants. At 7:11:12 a.m., Dennis remarked to Daniel that they were probably being recorded, and later that they were probably being videotaped. Defendants nonetheless conversed freely, described what they saw outside the van windows, talked about their parents, expressed frustration with the raid, reviewed what items could have been on the computer and on the property that might be incriminating (e.g., soft porn, supremacist

1 literature, black powder for a pistol Dennis had owned, weapons and ammunition, etc.), 2 reassured each other multiple times that they had nothing to do with the Scottsdale bombing, 3 and the like. They also made statements of retribution against law enforcement for raiding 4 their property and expressed regret for not having had a "shootout."

5 Dennis instructed Daniel at least twice about what to do when interrogated: ask for 6 a lawyer and state that he has nothing to say, regardless of accusations. Shortly thereafter, 7 at 8:49 a.m., Daniel was retrieved from the van to talk with Agent Moreland. Upon 8 returning, Dennis asked Daniel if he uttered the words that Dennis instructed him to say. 9 Daniel mentioned that he did not ask for a lawyer because he was not asked questions; he 10 said he remained silent. The video excerpts provided to the Court do not show what 11 happened after Dennis talked with agent Moreland, nor any statements made by Defendants 12 after the van left the property.

13 Two of the audio clips contain conversations between Defendants and Agent 14 Moreland. The conversations occurred separately for each Defendant, outside of the van. 15 Moreland informed Daniel and Dennis of the charges and evidence against them, told them 16 that they likely would not want to talk with him right away, told them about raids that were 17 occurring at the property of other individuals Defendants knew (including Tom Metzger, an 18 alleged white supremacist leader), informed Defendants that Metzger likely would abandon 19 them, and informed Dennis that he likely would not have any friends after this incident.

20 **II.   Alleged Violations of *Miranda*.**

21 Defendants do not dispute that they each received *Miranda* warnings. Defendants 22 were in custody while in the van. The issues before the Court are whether Defendants 23 invoked their rights to silence and counsel and whether the discussion between Defendants 24 in the van was the product of interrogation.

25     **A.   Invocation.**

26 A suspect has a right to remain silent and a right to counsel, but these rights must be 27 invoked unambiguously before police are required to terminate questioning. *Davis v. United* 28 *States*, 512 U.S. 452, 458 (1994) (holding that a "suspect must unambiguously request

counsel"); *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010) (holding that a defendant must invoke the right to silence unambiguously before officers are required to cease questioning). In the context of the right to counsel, a defendant must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. In *Thompkins*, the Supreme Court adopted the same standard for the right to silence – mere silence does not invoke the Fifth Amendment right. 130 S. Ct. at 2260.

To be unambiguous, an invocation does not need to be a "talismanic phrase such as 'I invoke my right to silence under the Fifth Amendment,'" but it must be an unequivocal expression that the defendant does not wish to talk with law enforcement. *Arnold v. Runnels*, 421 F.3d 859, 866 (9th Cir. 2005). "Ambiguity means 'admitting more than one interpretation or reference' or 'having a double meaning or reference.'" *Anderson v. Terhune*, 516 F.3d 781, 787 (9th Cir. 2008). Words such as "maybe" or "I think" can introduce ambiguity and can lead a "reasonable officer in light of the circumstances [to] underst[and] only that the suspect *might* be invoking his right to remain silent." *Arnold*, 421 F.3d at 866 (emphasis in original). This is insufficient to invoke either the right to silence or counsel.

Daniel Mahon argues that he invoked his right to an attorney by not objecting when officers commented that an attorney's business card had been found in the house, but he has cited no authority that treats mere silence as an invocation of the right to counsel. Nor has Daniel introduced evidence that he requested an attorney or invoked his right to silence before the recorded conversations. The Court finds that Daniel Mahon did not unambiguously invoke his right to counsel or his right to silence.

Dennis Mahon argues that he invoked his rights twice. His second invocation occurred in the discussion with Agent Moreland, where Dennis said: "No, I'm not gonna say anymore unless I have an attorney." This was an unambiguous invocation of rights.

Dennis's first alleged invocation is a closer question. Shortly after Dennis was placed in the van, Special Agent Hager read him the *Miranda* warning and asked: "Do you

- 4 -

1  understand?" Dennis replied: "The small talk is over. I can't say anything more – except
2  for who is praying for the damn humidity to quit?" Dennis then continued without pause to
3  engage in small talk with Agent Hager and later with officers whenever they came to check
4  on Defendants. Dennis's talkativeness notwithstanding, he did in fact say "I can't say
5  anything more," and *Miranda* teaches that if an individual "indicates in any manner that he
6  does not wish to be interrogated, the police may not question him." *Miranda*, 384 U.S. at
7  445. The Court concludes that Dennis's statement was sufficiently clear to constitute an
8  unambiguous invocation. Thus, Dennis's right to remain silent attached at 7:05 a.m.[1]

### B.   Interrogation.

*Miranda* applies to custodial interrogations, *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980), but it does not require suppression of voluntary statements made by a defendant in custody if such statements are not the product of post-invocation interrogation, *Michigan v. Mosley*, 423 U.S. 96, 102 (1975) (characterizing as "absurd" an interpretation of *Miranda* that would suppress "any statement taken after the person invokes his privilege . . . even if it were volunteered by the person in custody without any further interrogation whatever"). The term "interrogation" refers both to direct questioning and its "functional equivalent" – "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 229-301; *accord United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994) ("interrogation is defined not only as express questioning but its 'functional equivalent'"). Whether conduct is the functional equivalent of direct questioning is determined using an objective test. *Moreno-Flores*, 33 F.3d at 1169. The focus is on the "defendant's perceptions." *Id*. The officers' subjective intent is relevant but not dispositive. *Id.*

Informing a defendant about the charges or evidence against him, or of other

---

[1] The government does not argue that Dennis waived his invoked right to silence by continuing to speak with the officers after this invocation, and the Court therefore does not address that issue.

- 5 -

1  "circumstances which [might] contribute to an intelligent exercise of his judgment" after
2  invoking *Miranda*, is "attendant to arrest and custody" and not deemed "interrogation." *Id.*
3  at 1168-69 (citation omitted). Even if an officer's statements "may have struck a responsive
4  chord, or . . . constituted 'subtle compulsion,'" this is not enough to deem them the functional
5  equivalent of interrogation. *Id.* at 1169-70.

6  Defendants do not argue that the statements they made in the van were the product of
7  direct questioning by law enforcement. Instead, they argue that three conditions combined
8  to create the functional equivalent of interrogation: (1) the hot and cramped atmosphere in
9  the van, (2) the fact that the van was wired for audio and video recording, and (3) Agent
10 Moreland's independent discussion with each defendant, which "primed the pump" for
11 Defendants to talk after returning to the van. The Court does not agree.

12 Defendants have presented no evidence from which the Court could find that the
13 atmosphere in the van was designed to or did elicit incriminating statements from
14 Defendants. At no time during the video excerpts provided to the Court did Defendants
15 complain to each other or to officers that they were uncomfortably cramped, and the video
16 makes clear that they had ample room in the van. They were handcuffed, with their hands
17 resting on their laps, but they were seated in separate bucket seats, at least 18 inches apart,
18 and freely changed positions, crossed and uncrossed their legs, and turned to watch events
19 outside the van. They were provided bottles of water during their time in the van. Dennis
20 was removed promptly when he requested to use the restroom. Defendants did comment on
21 the heat, but officers started the air conditioning in the van as soon as Defendants requested
22 it. The video does not suggest that physical conditions in the van contributed to Defendants'
23 statements to each other about issues related to this case.

24 Nor can the Court conclude that the wiring of the van for audio and video recording
25 made it the functional equivalent of interrogation. Defendants clearly had no legal
26 expectation of privacy while handcuffed in the police van. *See On Lee v. United States*, 343
27 U.S. 747, 753-54 (1952). Nor did they have an actual expectation of privacy – Dennis twice
28 told his brother that they probably were being recorded.

Finally, Agent Moreland's statements to Defendants outside the van were not the functional equivalent of interrogation. Moreland told Defendants about the evidence against them and about other raids occurring that morning, but such statements are "normally attendant to arrest and custody." *Moreno-Flores*, 33 F.3d at 1168-69. Even if his comments struck a responsive chord with Defendants, that did not make their subsequent statements to each other in the van the functional equivalent of interrogation. *Id*. at 1169-70. Moreover, Defendants did not appear to interpret Moreland's statements as interrogation, nor did they appear to have been coerced into making incriminating statements. In fact, upon Daniel's return from talking with Moreland and recounting Moreland's statements to Dennis, they both reassured each other that they had nothing to do with the Scottsdale bombing and then returned to their previous banter. What is more, Agent Moreland specifically told each Defendant that he may not want to talk with Moreland at that time and that not talking was acceptable. The Court concludes that the van was not the functional equivalent of interrogation.

**III.   Conclusion.**

Daniel never invoked his *Miranda* rights. Dennis did invoke his rights, but his subsequent voluntary statements to Daniel were not made in response to custodial interrogation or its functional equivalent. Defendants' *Miranda* rights were not violated.

**IT IS ORDERED** that Defendants' motions to suppress (Docs. 446, 481) are **denied**. Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to commence on 8/5/2010 for a total of 56 days.

DATED this 29th day of September, 2010.

David G. Campbell
United States District Judge