**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,          ) | No. CR 09-712 PHX-DGC |
|                                    ) | |
| Plaintiff,                         ) | **ORDER** |
|                                    ) | |
| vs.                                ) | |
|                                    ) | |
| Dennis Mahon (1); and Daniel Mahon, (2)) | |
|                                    ) | |
| Defendants.                        ) | |
|                                    ) | |

Defendant Dennis Mahon has asked the Court to dismiss portions of the superseding indictment on the basis of outrageous government misconduct. Doc. 467. Daniel Mahon joins the motion. Dennis Mahon has also filed a motion to dismiss Count 3 on the basis of entrapment as a matter of law. Doc. 479. The Court received evidence and heard oral arguments on September 22 and 23, 2010. For reasons explained below, the Court will deny both motions.

**I.      Background Facts.**

Defendants were investigated over the course of several years by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), along with other law enforcement agencies. Among other tools, ATF used an attractive younger woman to befriend Defendants, elicit incriminating statements, and involve Dennis Mahon in a fabricated plot to injure or kill a child molester. Defendants contend that the government's use of this confidential informant, as well as the government's fabrication of the alleged plot to injure a child molester, are sufficiently outrageous and entrapping to warrant dismissal of portions

1  of the superseding indictment.  Dennis Mahon asks the Court to dismiss Count 3, which
2  involves steps taken to injure the child molester, and both Defendants ask the Court to
3  dismiss overt acts 4 through 12, 14, and 15 related to the conspiracy charged in Count 1.

4  During the evidentiary portion of the hearing held on September 22, 2010, the Court
5  heard testimony from the confidential informant and from ATF supervising agent Tristan
6  Moreland. The Court has also reviewed exhibits submitted with the briefing (Docs. 467, 479,
7  524, 547, 576, 579, 602), videotapes of conversations between the informant and Dennis
8  Mahon on February 1 and 2, 2005, exhibits received in evidence during the evidentiary
9  hearing, and grand jury testimony included in a supplemental memorandum (Doc. 602). The
10 factual findings that follow are based on all of this evidence.

11 The confidential informant, Rebecca Williams, became involved in this case in late
12 2004 or early 2005.  ATF paid her approximately $400 per month for her work, which
13 spanned four or five years.  At the hearing she could not provide a precise estimate of the
14 money she has been paid by ATF, but she agreed that it could be $20,000 to $30,000 over
15 the course of several years.  ATF also promised her $100,000 if Defendants are convicted.
16 Ms. Williams has worked with ATF in one other case.

17 Ms. Williams is 20 years younger than Defendants.  She is now 40 years old, and
18 Defendants, who are twin brothers, are 60.  Ms. Williams' involvement with Defendants
19 began in early 2005 when ATF deliberately placed her in a campground in Catoosa,
20 Oklahoma, where Defendants were staying.  ATF provided her with a trailer and a truck and
21 encouraged her to befriend Defendants. The trailer was wired for video and audio recording.
22 Recognizing that Defendants were aligned with white supremacist groups, ATF encouraged
23 Ms. Williams to express similar views. ATF provided her with a confederate flag which she
24 displayed prominently in the trailer.  There is no question that the government intended to
25 entice Defendants into conversations by use of an attractive, younger woman.  As Ms.
26 Williams testified during the evidentiary hearing, she understood that "guys like to talk to
27 pretty girls."

28 Ms. Williams quickly succeeded in befriending Defendants at the campground.

1  Indeed, it is apparent that Dennis Mahon soon developed a strong physical and emotional
2  attraction to her.  During extended conversations that were videotaped in the trailer on
3  February 1 and 2, 2005, Dennis held her hand, stroked her arm, told her she was beautiful,
4  and told her he loved her.  Dennis suggested they lay down together and "hold each other,"
5  which she declined.  The relationship that started at the Catoosa campground continued for
6  the next four years.

7  Ms. Williams encouraged Dennis' attraction to her.  Photos of Ms. Williams taken
8  during her encounters with Defendants show that she usually dressed in tank tops and tight
9  jeans or shorts.  Ms. Williams wore a shirt in the company of Defendants that read "Do Me,
10 I'm Irish."  She mailed Defendants a birthday card that included a photograph of her wearing
11 a leather jacket, fishnet stockings, and thong underwear.  The card included the words "love
12 ya" and "thought you'd love the butt shot!"  Doc. 467-1 at 11.  On another occasion, Ms.
13 Williams sent Defendants a photo of herself wearing a revealing bikini top with a hand
14 grenade hung between her breasts.  Ms. Williams is looking down in the photo, pointing at
15 her breasts and the hand grenade, standing in front of a Nazi flag.[1]

16 During videotaped conversations at the Catoosa campground on February 1 and 2,
17 2005, Ms. Williams presented Dennis with the fabricated story of a child molester.  She told
18 him of a man, living in California, who was married to her cousin and was sexually molesting
19 the couples' young children.  She said her cousin could not do anything about it because her
20 husband was wealthy and powerful.  Ms. Williams told Dennis she intended to stop the

21

---

[1] Defendants served Ms. Williams with a subpoena duces tecum for the hearing on September 22, 2010.  The subpoena directed her to bring the clothing she wore during her encounters with Defendants.  The government moved to quash the subpoena (Doc. 565), a motion the Court denied at the hearing.  Ms. Williams did not bring her clothing to the hearing.  When asked why, she said she did not know if she still owned the clothing.  The government explained that it did not instruct her to search for the clothing because it had filed the motion to quash.  The Court concludes that examination of the clothing is not necessary to decide Defendants' motions.  Defendants provided the Court with numerous photographs of Ms. Williams during her encounters with Defendants.  The photographs sufficiently depict the clothing she wore.  *See* Hr'g Exs. 122, 123A-123K; Doc. 467 Exs. B & C; Doc. 467-1 at 11.

1  molester by hurting him. Although Ms. Williams testified at the hearing on September 22,
2  2010, that the child molester is a real figure from her life's experience, the story of her
3  intention to hurt him was fabricated for purposes of this sting operation. Agent Moreland
4  testified that the story was created to induce Dennis Mahon to employ his alleged bomb
5  making skills to assist Ms. Williams.

6  Ms. Williams played her role well. The videotape shows her presenting the story to
7  Dennis through tears and anger. Dennis clearly believed what Ms. Williams was telling him.
8  Through most of the video clips provided by defense counsel (Doc. 467, Exs. B & C), Dennis
9  tried to discourage Ms. Williams from seeking to harm the molester. He repeatedly urged
10 her to speak with a lawyer he knew in order to learn what steps could be taken to stop the
11 molester. He repeatedly told her that she did not want to risk going to jail. He offered to call
12 and threaten the molester in order to discourage his activities. Only after Ms. Williams
13 persisted in her fictional determination to inflict harm on the molester did Dennis agree to
14 help. His subsequent actions provide the basis for Count 3 of the superseding indictment.
15 Count 3 alleges that Dennis taught Ms. Williams how to make explosive and destructive
16 devices, taught her how to blow up a house using tools and a propane tank, taught her how
17 to construct a package pipe-bomb, and mailed her literature on the use explosives, all for the
18 purpose of killing, injuring, or intimidating the fictional child molester. Doc. 476 at 5.
19 During the course of these events, agent Moreland purchased pipes, tape, a battery, and other
20 potential bomb components and supplied them to Ms. Williams as evidence of her alleged
21 intention to bomb the child molester. Doc. 602.

22 Over the ensuing four years, Ms. Williams and the Mahon brothers stayed in touch
23 and met from time to time. Defendants allege that the outrageous conduct continued during
24 these encounters. As examples, Defendants provided the Court with a video clip, taken
25 inside Ms. Williams' pickup truck, which shows her reaching over and grabbing Dennis
26 Mahon's crotch in response to his comment about the small size of his penis. *See* Hearing
27 Ex. 115. On the same occasion, Ms. Williams grabbed her own crotch in response to Dennis'
28 comment that "[y]ou got more balls than white men." *See* Hr'g Ex. 113.

1 On another occasion, the government rented a motel room for Ms. Williams and wired
2 it with audio and video equipment. Ms. Williams testified that the plan was to record her
3 conversation with Defendants when they came to visit. During the visit, Daniel announced
4 that Dennis would be spending the night with Ms. Williams, a turn of events that Ms.
5 Williams testified was not anticipated by her or the ATF. Nevertheless, Ms. Williams did
6 not protest when Daniel said Dennis would be staying. After Daniel left, Dennis showered
7 and emerged from the bathroom wearing only a towel. During the course of the night,
8 Dennis repeatedly encouraged Ms. Williams to lay down with him and let him hold her. She
9 declined, although at one point she did give him a back rub. At another point, Dennis stood
10 up and the towel fell to the floor. He made another comment about his small penis, and Ms.
11 Williams laughed. Dennis and Ms. Williams did not engage in physical sexual contact
12 during the night. Ms. Williams testified that she did not want such contact to occur, even
13 though it was evident that Dennis did.

14 Defendants also allege that the government knew Dennis had a drinking problem.
15 When he drank alcohol in Ms. Williams' presence, she did not discourage him. Some of the
16 allegedly incriminating statements were made when Dennis was drinking.

17 **II.    Outrageous Conduct Motion.**

18 The defense of outrageous government conduct is limited to extreme cases where the
19 government's actions violate fundamental fairness and are shocking to the universal sense
20 of justice mandated by the Due Process Clause of the Fifth Amendment. *United States v.*
21 *Fernandez*, 388 F.3d 1199, 1238 (9th Cir. 2004); *United States v. Gurolla*, 333 F.3d 944, 950
22 (9th Cir. 2003). The Ninth Circuit has recognized that the opportunity for dismissal of a
23 criminal indictment under this doctrine is "a most narrow one." *United States v. Bogart*, 783
24 F.2d 1428, 1434 (9th Cir. 1986) (citation omitted).

25 Generally, the defense of outrageous conduct can be established in two ways:
26 (1) where the government has engineered and directed a criminal enterprise "from start to
27 finish," and (2) in "that slim category of cases in which the police have been brutal,
28 employing physical or psychological coercion against the defendant." *Fernandez*, 388 F.3d

1 at 1238 (citations omitted).  Defendants argue that both circumstances exist here – the
2 government engineered and directed the child molester story from start to finish, and Ms.
3 Williams' sexual exploitation of Dennis Mahon amounted to psychological coercion.  The
4 Court will consider these arguments separately below.

5 Because Defendants have elected to file this motion before trial, the Court does not
6 have the benefit of a full trial record or a jury's verdict.  The Court instead will consider the
7 exhibits attached to and cited in the parties' briefing on this motion, testimony received at
8 the evidentiary hearing on September 22, 2010, exhibits presented at the hearing, and
9 allegations in the superceding indictment.[2]

10 **A.  Engineering of the Criminal Enterprise.**

11 An outrageous conduct defense is analyzed using a standard different from that
12 employed in considering an entrapment defense.  *Bogart*, 783 F.2d at 1433.  The entrapment
13 defense requires the Court to examine the Defendants' "subjective criminal disposition." *Id.*
14 The outrageous conduct defense views the government's conduct "objectively without regard
15 to [the defendant's] predisposition." *Id*.

16 "The outrageous government conduct defense involves a difficult area of the law.
17 Drawing a bright line with any degree of assurance is fraught with problems." *Id*. at 1439.
18 The Ninth Circuit has, however, provides this helpful explanation:

19 As a matter of general principle, we have recognized that, in order to
apprehend those engaged in serious crime, government agents may lawfully
20 use methods that are neither appealing nor moral if judged by abstract norms

---

[2] The parties have not addressed the standard to be applied in reviewing the evidence.
When reviewing outrageous government conduct claims post-trial, the Ninth Circuit
considers the evidence in the light most favorable to the government. *See United States v.
Struckman*, 611 F.3d 560, 573 (9th Cir. 2010); *United States v. Williams*, 547 F.3d 1187,
1199 n. 9 (9th Cir. 2008); *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003).  The
Court will not apply this standard pre-trial, when no jury has found the government's
evidence sufficient to establish the government's case beyond a reasonable doubt.  But the
Court will consider all evidence that the government might present at trial, including
allegations in the superseding indictment that the grand jury found to be supported by
probable cause.  If Defendants believe that such allegations are not established by the
evidence at trial, they can renew this motion after the government's case-in-chief or after
trial.

> of decency. Generally, agents may use artifice and stratagem to ferret out criminal activity. Specifically, the government may use informants and pay them. When working under cover, [the government] may supply contraband to gain the defendant's confidence. Agents may provide necessary and valuable items to further an existing conspiracy. The government may infiltrate a criminal organization. Government agents may approach people already engaged in or contemplating criminal activity.
>
> . . . [C]onstitutionally unacceptable are those hopefully few cases where the crime is fabricated *entirely* by the police to secure the defendant's conviction rather than to protect the public from the defendant's continuing criminal behavior.

*Id.* (emphasis in original, quotation marks and citations omitted).

### 1. The five *Bonnano* factors.

In *United States v. Bonnano*, 852 F.3d 434 (9th Cir. 1988), the Ninth Circuit identified five factors for evaluating whether the government has violated due process by engineering a criminal enterprise from start to finish:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendant to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

*Id*. at 437-38; *see also United States v. Williams*, 547 F.3d 1187, 1199-1200 (9th Cir. 2008).

Defendants contend that the government's fabricated story about the child molester amounted to the engineering of a criminal enterprise from beginning to end. They emphasize that the story was not true, that it was designed to induce Defendants to become involved in a plot to bomb the alleged child molester, that Dennis Mahon initially discouraged Ms. Williams from taking steps to harm the molester and urged her to contact a lawyer, that it was only through Ms. Williams' persistence that Dennis eventually agreed to help, that the government provided some raw materials that could be used in construction of a bomb, and that Defendants would have had no involvement in the conduct alleged in Count 3 or overt acts 4 through 10 in the absence of this fabricated criminal enterprise. Considering the five factors identified in *Bonnano* and the instruction provided in *Bogart*, the Court disagrees.

#### a. Defendants' involvement in continuing similar crimes.

The superseding indictment alleges that Dennis Mahon, using a telephone belonging

- 7 -

to Daniel Mahon, called the City of Scottsdale Office of Diversity and Dialogue on September 22, 2003, and left a voice message stating that "the White Aryan Resistance is growing in Scottsdale. There's a few white people who are standing up." Doc. 476 at 2. On or about February 21, 2004, Dennis Mahon participated in the construction of a bomb disguised as a parcel package that was delivered to the City of Scottsdale Civic Center Library. The box was addressed to Donald Logan in the Office of Diversity and Dialogue, and exploded on February 26, 2004, injuring Mr. Logan and Renita Linyard. *Id*. at 3.

The superseding indictment alleges that Dennis and Daniel Mahon conspired to promote racial discord on behalf of the White Aryan Resistance ("WAR") by damaging and destroying buildings, facilities, and real property of both government and business. *Id*. at 2. The government has provided additional evidence concerning Dennis Mahon's inclination toward violence. In an interview with National Geographic on January 14, 2007, Dennis stated that he supported Tom Metzger, a white supremacist leader of WAR. Dennis said "I've seen a lot of violence in my life," "violence is our only way," "unfortunately it's going to take violence," and "violence is the only thing the government understands." Doc. 524-1 at 2-3. He said that the rich and powerful "understand Tim McVeigh" – the Oklahoma City bomber – and that "violence is the working class white male's only option." *Id*. Dennis asserted during the interview that he was a leader of the Ku Klux Klan for about seven years in Missouri and Oklahoma, and ended the conversation by asking the interviewer "will you interview me in prison?" *Id*. at 8.

Dennis told Ms. Williams during a conversation on January 26, 2005, that he had used explosives such an ANFO (ammonium nitrate and fuel oil) and C-4 to destroy property in the past, including a Jewish community center. Hr'g Ex. 124. The superseding indictment further alleges that Dennis and Daniel took several violence-related actions independent of the child molester story: On or about October 11, 2006, Dennis mailed to Ms. Williams a book titled "A Manual of Urban Gorilla Warfare, Fighting in the Streets." Doc. 476 at 4. On or about October 20, 2007, Dennis directed Ms. Williams to travel to Missouri for the purpose of learning how to make improvised explosive devices and how to avoid law enforcement

detection. *Id.* On December 11, 2007, Daniel told Dennis that he was opposed to non-whites in his community and "that's why we've got to start getting violent." *Id.* On or about February 13, 2008, Dennis directed Ms. Williams to conduct violent action on behalf of the white supremacist movement and show the results by mailing him copies of newspaper articles reporting the violent acts. *Id.* On or about January 5, 2009, Dennis directed Ms. Williams to take action against the power grid in Arizona or Texas in the event that leaders of the white resistance, such as himself, were arrested. *Id.* On June 25, 2009, Dennis was found in possession of two M-80-type devices with ball bearings glued to the outside of the two inch explosive. *Id.*

This evidence shows that Defendants were involved in a continuing series of crimes. Although several of these events occurred after Ms. Williams approached Defendants about the child molester, the events were unrelated to the child molester story and show an ongoing pattern of violent activity. Although the violent activities were related to Defendants' white supremacist views and the child molester story was not, the Court concludes that the events are sufficiently similar to satisfy the first *Bonanno* factor. Defendants' ongoing activities in support of their white supremacist views included violence and the use of explosive devices. Indeed, Dennis engaged in the same conduct toward Ms. Williams with respect to his racist views – teaching her how to engage in violence using explosives – as he did with respect to the child molester.

In *Williams*, the Ninth Circuit affirmed the conviction of defendants who previously had planned to rob a bank, but who changed their plans and agreed to rob a fictional drug stash house at the suggestion of an undercover government agent. Applying the first factor of *Bonanno*, the Ninth Circuit explained:

> [T]he stash house robbery is sufficiently similar to the planned bank robbery that the government's substitution of a real bank robbery with a fictitious stash house robbery does not violate fundamental fairness or shock the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment. Both crimes required significant advance planning, the use of force to deprive persons of property, and the use of firearms, and both crimes required the participants' willingness to threaten or take human life. A stash house robbery differs from a bank robbery only in the type of property to be stolen and the likelihood that the innocent public will be injured during the crime.

1  547 F.3d at 1201 (brackets, quotation marks, and citations omitted).

2  The Court reaches the same conclusion here. Defendants' use of violence to promote
3  their white supremacist views is sufficiently similar to Dennis' assistance of Ms. Williams in
4  the fictional plot to kill the child molester that it does not violate fundamental fairness or
5  shock the universal sense of justice mandated by due process. Both types of crimes required
6  significant advance planning, the use of home-made explosive devices to kill or injure, and
7  a willingness to take human life. The motivations may have differed, but the means were the
8  same, and it is the means – teaching the use of explosive devices for violent ends – that is
9  charged in Count 3 of the superceding indictment.

### b. Ms. Williams was not necessary for continuing crimes.

11  As described above, the evidence suggests that Defendants were engaged in violent
12  crimes before they met Ms. Williams, that they recruited her into their white supremacist
13  organization after they met her, and that they provided considerable information to Ms.
14  Williams on how she could become involved in violent crimes. Defendants did not depend
15  on Ms. Williams to continue their criminal activity.

### c. The government used artifice and stratagem.

17  The government clearly used artifice and stratagem in this case. Ms. Williams posed
18  as an attractive woman with white supremacist views in order to win Defendants' confidence
19  and find evidence of criminal activities. Agent Moreland and Ms. Williams fabricated the
20  story about her intent to injure a child molester in order to enlist Dennis' participation, just
21  as the informant in *Williams* fabricated a story about robbing a stash house in order to enlist
22  the *Williams* defendants' participation. Artifice and stratagem does not violate due process.

### d. Ms. Williams infiltrated a criminal organization.

24  Dennis Mahon publicly proclaimed his allegiance with Tom Metzger and white
25  supremacist organizations. He asserted that he previously had been a leader of the Ku Klux
26  Klan. The grand jury found sufficient evidence to conclude that Dennis constructed the bomb
27  that was mailed to the Scottsdale Office of Diversity and Dialogue. Dennis and Daniel Mahon
28  recruited Ms. Williams to participate in ongoing white supremacist activities including

1 violence. The government specifically prepared Ms. Williams to appeal to Defendants white
2 supremacist sentiments, placing a confederate flag in her trailer and posing a photograph of
3 her standing before a Nazi flag with a hand grenade. This is not a case where Defendants had
4 no criminal involvement before they met Ms. Williams. They were self-proclaimed white
5 supremacists, and the evidence shows they used and advocated violence to promote their
6 agenda.

### e. Defendants were already engaged in criminal activity.

The facts set forth above show that Defendants previously had engaged in bombings, were actively involved in white supremacist organizations, and continued this contemplated criminal activity after they met Ms. Williams. Ms. Williams did not initiate Defendants' first involvement with violence or explosives.

In summary, the five factors identified in *Bonanno* suggest that the government did not engineer and direct of a criminal enterprise from start to finish. This conclusion is supported by relevant case law.

### 2. Case law.

In *United States v. Mayer*, 503 F.3d 740, 754 (9th Cir. 2007), the Ninth Circuit noted that it has only once dismissed an indictment because the government engineered a criminal enterprise from start to finish. The one example of dismissal is *Greene v. United States*, 454 F.2d 783 (9th Cir. 1978), where the government agent was involved for two years in the defendant's illegal still, offering to supply facilities, offering to supply an operator and location for the still, supplying sugar at wholesale prices, and acting as the sole purchaser of the still's entire output. In contrast to *Greene*, the Ninth Circuit has not dismissed indictments where the government supplied counterfeit credit cards to detect which merchants would accept them, where an FBI agent bribed a state senator, or where the government established fake bank accounts and wired money to Mexican banks suspected of money laundering. *Mayer*, 503 F.3d at 754.

In *Bogart*, the Ninth Circuit provided three examples of government engineering of a criminal enterprise. *See* 783 F.2d at 1436-37. The first was *Greene*, discussed above. The

second was *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), where an agent suggested setting up a laboratory to manufacture methamphetamine, provided the hard-to-obtain chemical ingredients for the drug, provided part of the glassware used in the lab, rented the farmhouse where the lab was set up and operated, operated the lab, and then arrested the defendant when he left the farmhouse for the first time with the completed product. The third was *United States v. Batres-Santolino*, 521 F. Supp. 744 (N.D. Cal. 1981), where "the government supplied all the drugs and defendants were not involved in a drug-related enterprise until the government agent came on the scene." *Id*. at 752.

This case is unlike the examples cited in *Bogart*. The government in this case placed an appealing confidential information in Defendants' path with a fabricated story, which, if believed, would potentially cause Defendants to use their pre-existing violent tendencies and bomb-making skills to assist in harming a child molester. The government did not actively participate in and direct actual illegal activities as in the cases described above. This case is more akin to *Williams*, where the undercover government agent induced the already-violent defendants to become involved in the robbery of a fictional drug stash house. Even though the robbery of the stash house was completely fabricated to catch the defendants in criminal activity, the Ninth Circuit held it was not inappropriate. 547 F.3d at 1199-1200. This Court likewise concludes that the government's fabricated story of seeking vengeance against a supposed child molester did not violate Defendants' right to due process of law. The Court will not dismiss portions of the indictment based on the ground that the government engineered criminal conduct from start to finish.

**B.    Coercion.**

A due process violation based on outrageous government conduct can also arise when the government engages in brutal physical or psychological coercion. *Bogart*, 783 F.2d at 1435. Defendants contend that the sexually enticing nature of Ms. Williams' approach to them amounted to psychological coercion. Defendants ask the Court to dismiss overt acts 11, 12, 14, and 15 on the basis of this coercion. None of these acts relate to the child molester story; all involve steps to assist Ms. Williams in performing violent acts in furtherance of the

white supremacist agenda. Doc. 476 at 4.

The Court finds that the government deliberately chose to present Defendants with a younger, sexually attractive female to win their confidence. Ms. Williams knew that her attractiveness was a part of the plan to secure admissions, sought to appear friendly and attractive to Defendants, wore arguably immodest clothing around Defendants, mailed Defendants sexually suggestive photographs, and engaged in sexual banter with Defendants. The evidence does not show that Ms. Williams ever engaged in physical intimacy with either Defendant.

Although the Court does not doubt that Ms. Williams' attractiveness contributed to the success of her confidential informant efforts, and although the Court finds that sexual attractiveness was part of the government's intentional strategy in this case, such conduct does not violate due process. As the Ninth Circuit explained in *Bogart*, outrageous conduct bars prosecution of a defendant only in "that slim category of cases in which the police have been brutal, employing physical or psychological coercion against the Defendant." 783 F.2d at 1435. An example of such conduct is *Roachin v. California*, 342 U.S. 165 (1952), where police officers broke into the defendant's bedroom, attempted to pull drug capsules from his throat, and forcibly pumped his stomach. The Supreme Court found these methods "too close to the rack and the screw to permit a constitutional differentiation." *Id.* at 172. The Ninth Circuit reached the same conclusion in *Huguez v. United States*, 406 F.2d 366 (9th Cir. 1968), where Border Patrol officers forcibly removed narcotics packets from a defendant's rectum while he was handcuffed and held spread-eagled across a table by other officers. *Id.* at 381-82.

After recounting these examples, the Ninth Circuit in *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987), held that a confidential informant's intimate sexual relationship with the defendant did not rise to the level of a due process violation. The Ninth Circuit explained:

> We acknowledge that Simpson may have suffered severe emotional trauma and felt stripped of his dignity upon learning that [the informant's] apparent affection for him was contrived and designed to hasten his downfall. However, because Simpson's treatment by [the informant] falls short of the

- 13 -

> brutality and coercion underlying previously successful outrageous conduct challenges and the government cannot be assigned responsibility for his treatment as easily as it could in these successful challenges, we decline to find a due process violation on these unique facts.

*Id.* at 1466.

Providing further explanation for its holding, the Ninth Circuit explained that the government may use artifice and stratagem to ferret out criminal activity, and "to that end informants must be permitted to use deceit by 'assum[ing] identities that will be convincing to the criminal elements they have to deal with.'" *Id.* (quoting *United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir. 1984)). *Simpson* summarized with this explanation:

> We recognize that many people in our society may find the deceptive use of sex in law enforcement to be morally offensive. Nonetheless, in order to apprehend those engaged in serious crime, government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency, and therefore the due process clause does not give the federal judiciary a "chancellor's foot" veto over law enforcement practices of which it does not approve.

*Id.* (quotation marks, citations, and brackets omitted).

Other Ninth Circuit cases have reached similar conclusions. In *United States v. Slaughter*, 891 F.2d 691, 695-96 (9th Cir. 1989), the court rejected claims of outrageous government conduct where agents used a young, attractive female to befriend the defendant and ultimately obtain cocaine from him. More recently, the Ninth Circuit reached the same conclusion in *Mayer* where an undercover FBI agent used sexual enticements to assist in investigating sex tourism involving minors. 503 F.3d at 755. Other courts agree. *See United States v. Nolan-Cooper*, 155 F.3d 221, 228-35 (3d Cir. 1998) (single instance of sexual misconduct between undercover agent and defendant did not support claim of outrageous government misconduct); *United States v. Miller*, 891 F.2d 1265, 1267-69 (7th Cir. 1989) (rejecting claim of outrageous government conduct when agents used an informant who previously had a sexual relationship with the defendant).

Given these authorities, the Court cannot conclude that the government's use of Ms. Williams as a younger, attractive female, dressed somewhat immodestly, who engaged in sexual banter with Defendants and occasionally touched them and allowed them to touch her,

rises to the level of a constitutional violation necessitating dismissal of overt acts in this case. Defendants have presented no evidence that Ms. Williams and Defendants ever engaged in an intimate physical relationship. The evidence also clearly suggests that Dennis was the one suggesting greater sexual intimacy. During videotaped conversations he frequently touched Ms. Williams' hands and stroked her arm. He told her she was beautiful. He told her that he loved her. He suggested they lay down together and hold each other. Daniel told Ms. Williams that Dennis would be spending the night in her motel room. Dennis showered and emerged from the bathroom wearing only a towel. Dennis repeatedly suggested that Ms. Williams lay down with him on the bed. Dennis dropped the towel and joked about his body. All of this suggests that Dennis, more than Ms. Williams, sought to initiate an intimate sexual relationship. The Court cannot conclude that these efforts on his part were the result of coercion, nor that Ms. Williams' toleration of his advances, while withstanding his invitations for greater sexual intimacy, constituted outrageous conduct. Nor does the Court conclude that the stratagem and deception involved in the use of Ms. Williams as an informant was so far beyond the bounds of decency as to warrant dismissal under the due process clause.

### III.   Entrapment.

The defense of entrapment includes two elements: (1) government inducement of the crime, and (2) the absence of predisposition on the part of the defendant. *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir. 1994); *see also United States v. Poehlman*, 217 F.3d 692, 697 (9th Cir. 2000). As noted above, the focus is on the defendant's subjective predisposition. Where the government has induced an individual to break the law and the offense of entrapment is at issue, the prosecution must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime before being approached by government agents. *Jacobson v. United States*, 503 U.S. 540, 548-49 (1992).

The inducement element of entrapment arises when the conduct of a government agent creates a substantial risk that an otherwise law abiding citizen will be persuaded to commit a crime. *Davis*, 36 F.3d at 1430. Inducement can include persuasion, fraudulent

representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship. *Id*.

The second element of entrapment considers whether the Defendant was inclined to commit the crime before the government's inducement. Courts generally review five factors in evaluating predisposition: (1) the character and reputation of the defendant, (2) whether the government made the initial suggestion of criminal activity, (3) whether the defendant engaged in the activity for profit, (4) whether the defendant showed any reluctance, and (5) the nature of the government's inducement. *Id*. Although none of these factors controls, the most important is the defendant's reluctance to engage in criminal activity. *Id*

Generally, the issue of entrapment is for the jury to decide as part of its function of determining the guilt or innocense of the defendant. *Mathews v. United States*, 485 U.S. 58, 63 (1988); *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1248 (9th Cir. 1997); *Davis*, 36 F.3d at 1430 (citing cases). In this case, however, Defendants contend that they are entitled to acquittal before trial on the basis of entrapment as a matter of law. To obtain such relief, Defendants "must point to 'undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act' by government agents." *United States v. Skarie*, 971 F.2d 317, 320 (9th Cir. 1992) (quoting *United States v. Hart*, 963 F.2d 1278, 1283 (9th Cir. 1992)). Dennis Mahon has not made this showing.

Even if it could be concluded that Ms. Williams provided the inducement necessary for the first element of entrapment, the second element is subject to factual dispute. As described above, the government has presented evidence of Dennis' predisposition to commit violent crimes. This evidence includes his alleged involvement in the bombing of the Scottsdale office, his allegiance to groups that advocated violence, and his efforts to recruit Ms. Williams into white supremacist violent activities. Given these factual assertions by the government, the Court cannot conclude as a matter of undisputed fact that Dennis had no predisposition to commit the crimes alleged in Count 3 of the indictment. The jury must resolve this factual dispute.

**IT IS ORDERED:**

1. Defendants' motion to dismiss portions of the indictment on the basis of outrageous government conduct (Doc. 467) is **denied**.
2. Defendant Dennis Mahon's motion to dismiss Count 3 on the basis of entrapment as a matter of law (Doc. 479) is **denied**.
3. The government's motion to quash the subpoena of Ms. Williams (Doc. 565) is **denied**.

Excludable delay pursuant to 18 U.S.C. § 3161(h)(1)(D) is found to commence on August 9, 2010 for a total of __ days.

DATED this 13th day of October, 2010.

_____
David G. Campbell
United States District Judge