1      **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

   **United States of America,**              )

5                                             )
                                             )
6                          Plaintiff,         )
                                             )
7          vs.                               )   NO. **CR 09-712 PHX-DGC**
                                             )
8   **Dennis Mahon,**                         )   Phoenix, Arizona
   **Daniel Mahon,**                         )   February 1, 2012
9                                             )   8:33 a.m.
                         Defendants.          )
10  _____)

11

12              **REPORTER'S TRANSCRIPT ON APPEAL**

13                 **(Jury Trial - Day 13)**

14          **BEFORE THE HONORABLE DAVID G. CAMPBELL**

15

16

17

18

19

20
   Court Reporter:          Merilyn A. Sanchez, CRR
21                          Sandra Day O'Connor U.S. Courthouse
                           401 W. Washington Street SPC-37
22                          Phoenix, Arizona  85003-2118
                           (602) 322-7250
23
   Proceedings taken by stenographic court reporter
24  Transcript prepared by computer-aided transcription

25

1                              A P P E A R A N C E S

2

3    For the Plaintiff:          **John Zachary Boyle,** Esq.
                                  **Michael Morrissey,** Esq.
4                                 Assistant U.S. Attorneys
                                  Two Renaissance Square
5                                 40 N. Central Avenue, Suite 1200
                                  Phoenix, Arizona  85004-4408
6

7    For the Defendant           **Milagros Anais Cisneros,** Esq.
     Dennis Mahon:               **Deborah Williams,** Esq.
8                                 Assistant Federal Public Defenders
                                  850 W. Adams Street, Suite 201
9                                 Phoenix, Arizona  85007

10

11   For the Defendant           **Barbara Lynn Hull,** Esq.
     Daniel Mahon:               637 N. Third Avenue, Suite 3
12                                Phoenix, Arizona 85003

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          I N D E X

2    WITNESS:           DIRECT   CROSS   REDIRECT   RECROSS   VD

3    TRISTAN MORELAND
     By Mr. Boyle                        2581
4    By Ms. Williams                                2582
     By Mr. Boyle                                              2585
5    By Ms. Williams                                2586
     By Mr. Boyle                        2591
6
     LAWRENCE BETTENDORF
7    By Mr. Boyle       2596
     By Ms. Williams            2616
8    By Ms. Hull                2624
     By Mr. Boyle                        2633
9
     PATRICIA NORFLEET
10   By Mr. Morrissey   2636
     By Ms. Cisneros            2651
11   By Ms. Hull                2675
     By Mr. Morrissey                    2681
12
     GARY DEVLAEMINCK
13   By Mr. Morrissey   2683
     By Ms. Cisneros            2688
14   By Ms. Hull                2692
     By Mr. Morrissey                    2693

     RENITA LINYARD
     By Mr. Boyle       2695
     By Ms. Cisneros            2687
     By Ms. Hull                2691
     By Mr. Boyle                        2692

     JACQUE BELL
     By Mr. Boyle       2717
     By Ms. Williams            2726
     By Ms. Hull                2732
     By Mr. Boyle                        2734

     DON LOGAN
     By Mr. Morrissey   2735
```

E X H I B I T S

| NO. | DESCRIPTION | ID | EVD |
|-----|-------------|-----|-----|
| 139 | Photograph | 2768 | 2769 |
| 141 | Photograph | 2767 | 2769 |
| 142 | Photograph | 2690 | 2699 |
| 143 | Photograph | 2690 | 2699 |
| 166 | Fighting in the streets | 2596 | 2600 |
| 171 | Audio recording | 2720 | 2723 |
| 250 | Web page of the Office of Diversity and Dialogue | 2746 | 2747 |
| 508 | Interview dated 2-26-04 | 2729 | |
| 539 | MOI dated 3-12-04 | 2706 | |
| 540 | MOI dated 3-26-04 | 2707 | |
| 560 | News release dated 5-6-04 | 2623 | 2624 |
| 561 | Silent Witness reward flyer | 2623 | 2625 |
| 572 | Civic Center Library floor plan | 2656 | |
| 572-A | Same as 572 with notations | 2661 | 2662 |
| 947 | Supplement dated 3-8-04 | 2666 | |
| 953 | MOI dated 3-2-04 | 2703 | |
| 958 | Supplement dated 3-8-04 | 2689 | |
| 1014 | Agent notes | 2620 | |
| 1200 | Video clip | 2584 | 2585 |
| 1211 | Audio clip | 2584 | 2585 |

P R O C E E D I N G S


            THE COURT:  Good morning, everybody.

            MS. WILLIAMS:  Good morning.

            MS. HULL:  Good morning.

            MR. BOYLE:  Good morning.

            THE COURT:  Do you all have matters we need to talk

about before we get started this morning.

            MS. WILLIAMS:  Yes, Judge.  Mr. Morrissey seems to be

standing first.

            MR. MORRISSEY:  No, no, I'm just wandering around

getting organized.

            MS. WILLIAMS:  But you were standing first though.

            Judge, last night at the end of the day we were

talking about the -- the tape that Agent Moreland was

discussing when we broke for the day, and that is E-223.  I

forget the exhibit number.  And we had brought to the Court's

attention that we were concerned because the tape does not --

the agent had testified that he and Mr. Joos had talked

about -- "I said I was going to bomb for WAR specifically."

            We raised a concern because the tape does not say

that.  The Government informed us as we were leaving while the

Court was still on the bench that the agent had just listened

to that tape and verified that that was in fact what was said.

            The entire defense group went down to our office and

listened to the entirety of E-223.  That was not said.  What
Agent Moreland testified to and the impression the Government
sent the jury home with last night is not reflected on that
tape.  There is no discussion of WAR at all.  There is no
discussion of Agent Moreland saying he was going to bomb for
WAR at all.

        We are very troubled by this.  Not only has it sent
the jury home with an extremely misleading impression, but it's
just not true even more importantly.

        So we are going to -- we again request Jencks for
Agent Moreland.  We looked at the tape we were referred to.
It's not there.  If this statement is true, it certainly is not
supported by the tape we were referred to.  It's not supported
by the other tapes from his visitor visits with Mr. Joos.  We
would also ask for recross of Agent Moreland based on this
development.

        MS. HULL:  I would add, Judge, that I believe at the
end of the day Mr. Boyle confirmed and told the Court that
Mr. -- Agent Moreland stated it is on that tape.

        MR. BOYLE:  I did talk to the agent.  He has told me
that he has reviewed this prior to coming to court.  I don't
think it's our job to tell them in the discovery where the
evidence is.

        If they want to bring up these topics in
cross-examination, then we're allowed to address them on

redirect.  If they have a real discovery dispute or they really
want to challenge the witness, then they have the opportunity
to call him in their case during their case and ask him
questions about this.  And if they want to bring that topic up,
we will address it.

But I don't think it's our job to ferret through the
records and ferret through the tapes and tell them where he
said things or where it's documented.

So if they want to challenge that in court, they can
call the witness and ask him questions about that in their
case.  Until then, we don't have a responsibility to tell them
exactly what report the agent is reporting to me right now and
where this is located.  If they don't think it's truthful, let
them bring it out in court.

THE COURT:  Mr. Boyle, you did say at the end of the
day after this came up that it was on E-223 and that Agent
Moreland -- maybe Agent Moreland said that, somebody while I
was in the courtroom said:  I just listened to it in the last
day or two and it's on E-223.  And the defense is now asserting
they listened to all of E-223 and it's not there.

So to me the issue is not a simple matter of discovery
or having you do their work.  The question is, is it on E-223?

MR. BOYLE:  The agent told me that he thought it was
on E-223.  We -- you know, I can't speak for the agent and what
he's gone through.  But, yes, that is what he told me.  And he

is shaking his head yes now.

I don't know what else I can tell you.  I mean this came up with 30 seconds' notice.  I asked the agent on the side -- if I can have one second.

Let me be clear, there are apparently two issues here. One is the Mexican restaurant.  The defense is saying they can't hear "Mexican restaurant" anywhere.  The next issue is WAR.

THE COURT:  Wait.  Wait a minute.  Mexican restaurant?

MR. BOYLE:  Well, they said at the end of the day we brought up the fact that he told Mr. Joos that he was there to bomb next to a Mexican restaurant.

MS. WILLIAMS:  That's not what I said.

MR. BOYLE:  Hold on.  That's what I'm asking.  There were two points that were brought up.  So is it that point about the Mexican restaurant, or is it that he was there to bomb on behalf of WAR?  I want to be clear.

THE COURT:  It is the second, according to what Ms. Williams said a moment ago.

MR. BOYLE:  All right.  My understanding of the evidence is that Agent Moreland said he was there on behalf of Tom Metzger.  I mean you've heard that testimony about why he was there.  He is saying that when he was talking about the Mexican restaurant, he didn't use the term "WAR," he used the term "movement."

So I don't think that specific term came up at the end of the day yesterday. But our understanding of the evidence is that he presented himself as an associate of Tom Metzger and WAR, and when he was asked about whether or not he was doing regular demolition work or it was an actual bombing that he was receiving training for, the testimony was that he received training to bomb a building next to a Mexican restaurant.

So that is the status of the testimony on the stand. And the agent is telling me that when he was discussing the bombing of the Mexican restaurant, he didn't use the term "WAR" at that time, he used the term "movement."

MS. WILLIAMS: Your Honor, that's not the agent's testimony. The Government is now trying to backpedal on it. But it's not the agent's testimony under oath. He said he was going to bomb for WAR specifically. And that was where his testimony ended. We went back through. We listened for those words. They are not there. WAR, the word WAR, the acronym WAR is not spoken at all.

That's what I -- that's the problem I'm raising.

THE COURT: Well, it sounds like the problem you're raising, Ms. Williams, is that you think Agent Moreland has testified in a way inconsistent with the tape; is that right?

MS. WILLIAMS: Absolutely. I would go farther than that, but I'll go with inconsistent.

THE COURT: But if you think that is true, isn't the

answer for you to impeach him on that in front of the jury?

        MS. WILLIAMS:  Well, it is.  But the Government has
him on redirect.  So that's why we ask at the very least for
recross.  Because he has given the jury -- he's told the jury
outright something that is not true.  It's not in the tape.

        MR. BOYLE:  No objection to recross on that issue.

        THE COURT:  All right.  We will let you recross on
that issue.

        Are we still on redirect with the agent?  Is there
more you have, Mr. Boyle?

        MR. BOYLE:  Yeah, I have a couple.  Shall we just go
to cross so they can finish up his question and then -- do you
want me to finish redirect, and recross and then rebeddirect, or
do you want have them start now?

        THE COURT:  I don't know if we talked about how much
you have left on redirect.

        MR. BOYLE:  Two or three questions.

        THE COURT:  Let's have you finish that up.

        MR. BOYLE:  Okay.

        THE COURT:  And then you can do recross, Ms. Williams.

        MS. WILLIAMS:  Thank you.

        THE COURT:  Are there other matters we need to talk
about this morning?

        MS. HULL:  I have one, Judge.  Last evening I filed a
motion for reconsideration.  And I don't know if you've had an

opportunity to see it.  It is --

          THE COURT:  Hold on just a minute.

          THE COURTROOM DEPUTY CLERK:  It's not on the docket.

          THE COURT:  It hasn't been filed in the docket.

          THE COURTROOM DEPUTY CLERK:  I can't find it, but I

can print it off.

          MR. BOYLE:  It came across my ECF, I saw it.

          THE COURTROOM DEPUTY CLERK:  Let me keep looking for

it.  Maybe my system --

          MR. BOYLE:  It's 1533.

          THE COURTROOM DEPUTY CLERK:  Okay.

          THE COURT:  No, I haven't seen it.

          MS. HULL:  All right, Judge, it is something that I

ask you review prior to Agent Bettendorf's testimony.  It's

something that needs to be addressed, it's on the statements of

Daniel Mahon unrecorded.  Again --

          THE COURT:  I think this is our fifth shot at this

issue.

          MS. HULL:  Judge, I won't give up.  I have attached --

what I did is I attached for the Court the copies of the notes.

Instead of the notice, I filed a motion for reconsideration.  I

also quoted from Ms. Williams' testimony of September 22nd,

2010.  I pulled from the transcript where she said that my

client didn't tell her how to dress, in particular in that line

of questioning, for the gun show in Catoosa.  But I also asked

her specifically if my client ever told her how to blow up a car. She said no.

And the problem is that if the -- and this supposed off-record, unrecorded statement that Agent Bettendorf wants to testify to was supposedly, according to the notes, to Ms. Williams. And so in that context, Judge, then it is -- it's not only been denied by Ms. Williams, I think that that denial in particular supports my contention that he was talking about something in the past.

I ask you to read it. I believe it speaks for itself. But the notes are very clear that what the topic was during that time frame. I believe the words were "the Carroll Howell thing." And that that is discussed for, I forget the time frame from the notes. But it's about 20, 30 minutes. And those statements are all contained within that time frame. And even Ms. Williams' understanding was that my client was not telling her how to bomb a car.

And that's what the Government now wants to lead this jury to believe. The problem then will become if the Court allows the Government to present this to the jury, my only defense is to clarify that he wasn't talking about that. He was -- cross-examination, he was talking about Carroll Howell. That's the correct context.

And obviously I can't do that, Judge. That will be ineffective. So the -- it is misleading to the jury,

especially given the sworn testimony of Ms. Williams.  And it is -- it is unduly prejudicial.  It is misleading.  It is clearly 404(b).  They have no proof that my client ever did -- blew up a car.

        And in context also, they are trying to say if you look at the notes about the how -- the dressing and how to enter/exit, if you look at the actual notes, in that context, that's not what he was talking about.  And I ask you to refer to those specifically.  It's a very brief motion.  It's only three pages long.

        Judge, it's clear 403 in my mind, it is clearly misleading, and it prohibits the defense from effectively cross-examining the witness on this issue.

        THE COURT:  Well, we need to get this issue resolved this morning because Agent Bettendorf, I think, is next, isn't he, Mr. Boyle?

        MR. BOYLE:  Yes.

        THE COURT:  Or close to next.  And we have been trying to resolve these issues so he can get on.  I'll read it right now.

        MS. HULL:  Okay.

        THE COURT:  Ms. Hull, who is Carroll Howell?

        MS. HULL:  I'm sorry?

        THE COURT:  Who is Carroll Howell?

        MS. HULL:  Carroll Howell is the informant in the

Oklahoma City case.  And, Judge, if I may, I would also like to point out, Judge, if you refer to the Indictment, the Superceding Indictment, the Government crafted the Indictment to say that Daniel Mahon discussed how to bomb a vehicle or blow up a vehicle.  When they talk about Dennis Mahon, they say use the word "taught."  My client, as I stated yesterday, is not charged with teaching anyone.  In the Indictment it says that my client discussed it.

        And I think that is further evidence that we are talking about a past -- past event when they carefully used a different verb in the Indictment when they talk about Dennis Mahon teaching.

        MS. WILLIAMS:  Your Honor, may I be excused for just a moment?

        THE COURT:  Yes.

        MS. WILLIAMS:  Thank you.

        THE COURT:  Mr. Boyle, is there a report that you're relying upon that's in addition to these notes?

        MR. BOYLE:  Yes.

        THE COURT:  Do you have a copy?

        MR. BOYLE:  It's ROI 44.  I might --

        MS. HULL:  I do, Judge, except mine is marked on, Judge.

        THE COURT:  I take it it's not marked as an exhibit anywhere?

MS. HULL:  It might be.

THE COURT:  Do you mind me looking at a highlighted copy, Mr. Boyle?

MR. BOYLE:  No.

THE COURT:  Why don't I just do that.

THE PARALEGAL:  It's 967.

MR. MORRISSEY:  Your Honor, I would like to check on whether certain witnesses are here.  And Mr. Boyle is arguing this, so may I be excused for a minute?

THE COURT:  Yes.

All right, I have read all of the notes attached to the motion that is at docket 1533.  I've read all of ROI 44. And I've read the excerpts of the September 22nd, 2010 transcript that were quoted in the motion.

I have to say it's very frustrating to me to have to address this issue five times and to have never been presented with all of this material before.  It seems this argument has been made piecemeal, little pieces with different arguments, and I've never been asked to review all of this at once.  And we are now at 9:03 on the morning that the witness is going to testify.  And this information has been in the possession of the defense since September of 2010.

But I still need to make a ruling.  And, Mr. Boyle, here's the question I have for you.  When I read the notes and I then read Agent Bettendorf's report, they are pretty

consistent.  They could be read as saying that at 1822 hours, Daniel Mahon started talking about what he's done in the past with Dennis, that they do more than talk about it.  He could say more if the statute of limitations was up.  And then he says that they participated in drive-by shootings, blowing up cars and buildings, and he blew a desk through a second floor roof.

Seven minutes later at 1829, he's talking about the Carroll Howell thing and her asking Dennis to make grenades and the fact that they were wiretapped at some point.

And at 1852, which is about 30 minutes after he started the subject of past acts, he then says, "When I take someone's car out" -- he is apparently talking about a car bombing then -- "it wasn't anger, it's a sense of duty.  It's like a military operation.  You plan for it, you equip for it."

Then it says Daniel went on to explain the need to plan on how to dress for the operation, including camouflage and disguises and how to approach and depart your target area, which is a little bit different from the notes.  The notes say it's like a military operation.  You plan for it, equip for it. And then it says -- talks about how he would dress, enter/exit. So the notes suggest he's talking about he would do it in these past events.

It then says Daniel detailed one method of blowing up a car.  Daniel said that he would take phosphorus and put it in

a gas tank.

Yesterday I said the use of the word "would" doesn't necessarily refer to past events, which I don't think it does in the example I gave. But in this context, he's talking about -- he's made two previous references to blowing up cars. At 1822, he listed blowing up cars so among the things that he did.

And at 1852, he said when he would take out a car, it wasn't anger, it was a sense of duty. And then apparently immediately after that, he says he would take phosphorus and put it in a compound -- I'm sorry, put it in a gas tank.

In that context, it sounds as though he is describing how he blew up cars in the past. And it does appear, at least from the short excerpt that's quoted in the motion, that the special -- I'm sorry, the confidential informant testified on September 22nd, 2010, that he did not tell her how to avoid detection at the gun show, and he did not tell her how to blow up a vehicle, which would be consistent with a reading that what he was saying in these notes was a description of his past conduct, not teaching her how to do something.

In this context, I think that is a reasonable inference. I'm interested in your thoughts on, number one, is it not a reasonable inference, and if so, why.

MR. BOYLE: Regarding the informant's testimony, it is absolutely irrelevant. Her memory of what happened five years

ago over the course of two weeks cannot compare at all to an agent making contemporaneous notes while something is being said and quoting a person.

THE COURT:  It's not irrelevant.

MR. BOYLE:  Well, I'll tell you that for your determination to say you are going to base it on her memory, I'll say it is more powerful that we have notes that are written while this thing has happened.

THE COURT:  Well, let's talk about the notes.

MR. BOYLE:  Fine.

THE COURT:  Am I incorrect in inferring that all of this could be read as referring to past conduct?

MR. BOYLE:  I think some of it is past conduct.  And I think you're definitely wrong that it's all past conduct.  And I'll go through that with you because he jumps around from past to present throughout this whole report.  And I'm looking at ROI 44.

I think the report's a better indicator of what the notes say, because notes are always piecemeal.  The reports tend to flesh out some of the details.  And I gave you the example of:  She said you do more than just talk about your beliefs.  That's not in the notes.  But that's obviously in the report, and it gives a reference to the context of his response.  So I'm using the report.

He starts at 1820.  He's talking about past tense

Oklahoma City.  But then he jumps to present tense and he says:
We do more than talk about it.  He doesn't say:  We did more
than talk about it.  He says:  We do more than talk about it.
That's present tense.

Then he goes back to past tense and he says:  We did
drive-by shootings, blowing up cars, buildings.  He talks about
the grand jury in paragraph 4.  And then he jumps to present
tense, which is now he uses a radio frequency detector in order
to identify transmitting devices.

Then he goes to past tense again and he says:  In the
past, I used to take someone's car out, it wasn't in anger.  We
are not using that.

And then I've asked the agent, and he says it morphs
back into present tense where he begins talking to her about
when you do something, it's like a military operation.  And
this is where he comes into the present tense again.  He
explains how you need to plan on how to dress.  You need to --
how to approach and depart a target area.  He's not saying:
When I went in the past and went to these places, this is how I
approached and departed a target area.  He is saying:  When you
do this, you need to plan for it.  You need to camouflage.
Here's how you -- you need to think about approaching and
exiting your target.

And he says:  Here's one method of blowing up a car.
He doesn't say:  In 2001, I blew up a car by putting phosphorus

in a gas tank.

And the reason I think that's relevant is you see him jump back to past tense.  And he starts giving examples of what he did, specific examples of conduct where he says:  Well, we robbed a bank in Tulsa that employed three black females and then he jumps to present tense.  And he says it would be easy to rob that -- I'm sorry, I have to take that back.

On that paragraph he talks about a bank in Tulsa and how it would be easy to rob that bank.  That's present tense.

My point is that he jumps back and forth from present to past tense.  Because the quotes in that first paragraph is, "we do more than talk about it," that's not past tense.  He's not saying we did more than talk about it.

My point is, I think you can see in here that he jumps from present to past tense.  This is a conversation that begins at 1822 and ends sometime around 1900.  So I mean, these are just excerpts from a 40-minute discussion.  So I don't think this changes anything.  And I certainly don't think the informant's testimony changes anything.  Because maybe it's not irrelevant.  But she said yes to a lot of questions on cross-examination.  She was on the stand for two days -- three days.  We have the notes taken verbatim while these things were happening.  And they were -- I mean they are with the agent now.

I just don't think that she can have perfect recall.

And that -- it is unfair to say because she didn't remember it, we can't introduce other evidence.  They are allowed to fight the evidence with the testimony and we are allowed to introduce our evidence.  And then it's a jury question.  That's a question for the jury to decide.

        And I'll finally say --

        THE COURT:  What is the question for the jury to decide?

        MR. BOYLE:  The question is to determine whether or not -- this is actually the point I was going to make.  Whether Daniel Mahon, as the defense is suggesting, is a person who just goes home and works and sleeps and he doesn't do anything at all.  Or did he in fact in Catoosa have a discussion with the informant about giving her advice on if she's going to do something, what she should do.  Should she -- if she's going to undertake an activity, should she plan for it, should she dress for it.

        Those are the two competing theories that are going to the jury in this case.  And they want you just to throw out all the evidence that the jury can't consider any of it so that all they are left with is Daniel Mahon goes to bed and works and sleeps and he doesn't do anything at all.

        And we have evidence where he has statements, present tense statements about what he was doing at the time.  "We do more than talk about it," and present tense discussion about

what she should do if she's going to plan for illegal activity.

        THE COURT:  Well, that -- that is -- that is your
interpretation of it, and I understand that argument.  And you
would make the argument to the jury you just made to me, if the
jury was being asked to decide was Daniel Mahon talking about
the current setting and something the informant ought to
consider or was he just describing past acts.

        Part of Ms. Hull's argument is that she can't counter
that argument without putting in evidence, notes, that clearly
show past acts in order to argue that he wasn't talking about
the present, he was talking about the past.  So that if I allow
you to make your side of the argument, she's handcuffed and
can't make her side of the argument.

        What is your response to that?

        MR. BOYLE:  I absolutely disagree.  There's no other
side of the argument when Daniel Mahon says:  Here's how you
should plan for it, when he gives her the advice of how to blow
up a car using phosphorus compound.

        THE COURT:  Well, the other side of the argument is,
he wasn't telling her how to do anything.  He was describing
his past acts.  And if you look at it in context, there's a
reasonable interpretation of these notes that that's what he's
doing.

        But her point is she can't put these notes in front of
the jury because then she's forced to bring out past acts that

under 404(b) are inadmissible.

          MR. BOYLE:  The cross-examination is was he talking in

the present tense or past tense.  And if the agent says he's

talking in the present tense, I heard him and it was present

tense discussion, then there's nothing else to discuss.  She

can't try and then say, oh, no, no.  I believe it's past tense.

If the agent's testimony is he heard this and it was present

tense, then it's present tense.

          THE COURT:  Well, but she has no ability to challenge

that assertion with these notes.  Do you agree?

          MR. BOYLE:  Yes, she does.  She could say this

happened five years ago.  You don't remember it.  You know,

your notes are incomplete, it wasn't recorded.  She can do all

of that.  It's no different than she could do with any other

witness who was testifying about something that happened five

years ago.

          THE COURT:  If -- well, do you believe that if you

were to present evidence that Daniel Mahon said:  I blew up

cars in the past, I blew a desk through the roof an office

building, do you believe that would be admissible under 404(b)?

          MR. BOYLE:  Blowing a desk through the roof, unless

he's referring to Scottsdale bombing, wouldn't be 404(b).  I'll

tell you I think it's admissible to show the bona fides of an

individual, like when a person brags about what they've done.

The courts routinely let it because they say that's just the

person trying to prop themselves up as a legitimate operator so that a person will join their conspiracy.  We haven't tried to go that route because we don't think these two things are linked at all.

So, I mean, that's my answer to your question.  Is blowing a desk through a roof potentially 404(b)?  Yes.  Is it also not 404(b) because it's bona fide evidence?  Yes.

THE COURT:  Are you saying it's 404(b) or is it not?  I'm not understanding your argument.  404(b) allows evidence in for past acts.

MR. BOYLE:  To prove that he committed the act.

THE COURT:  Well, no, it doesn't allow that.  It doesn't allow propensity evidence.  But it does allow past act evidence to come in for other purposes.

MR. BOYLE:  Yeah, but --

THE COURT:  Are you arguing that it's not past act evidence or that it is and it's admissible because it proves something other than a propensity?

MR. BOYLE:  I'm saying that under 404(b) you prove the past act to prove motive, intent, et cetera, but you are actually proving the act happened.  And in this case we are not actually trying to present evidence that any prior act happened at all.  We are not saying that he blew up a motor vehicle in the past.  We are saying that he gave her advice on how to commit an untraceable bombing of a car by putting phosphorus in

a condom and blowing it up.

THE COURT:  I understand that point.

MR. BOYLE:  The discussion about blowing up cars was at 1822.  At 1852, a half an hour later, you are now --

THE COURT:  Look how it starts in the notes, 1852.

MR. BOYLE:  Yeah.

THE COURT:  "When I would take someone's car out, it wasn't anger."  That doesn't sound like present tense.  That's how he starts the 1852 discussion.

MR. BOYLE:  I agree.

THE COURT:  And then he apparently goes immediately into describing how he would do it, uses the word "would."  So to me, that's why there's a reasonable argument, a reasonable inference.

MR. BOYLE:  We are not --

THE COURT:  Let me finish my statement.

MR. BOYLE:  I'm sorry, I didn't know you weren't done.

THE COURT:  I stopped because you started talking.

MR. BOYLE:  All right.

THE COURT:  There is a reasonable inference that his discussion of the phosphorus in the gas tank is a description of how he would do it in the past when he was not acting out in anger.

I can understand your argument as well, that the agent heard something differently.  There's another inference that

can be drawn.

Go ahead with your point.

MR. BOYLE:  My point is we are not trying to prove
that he bombed a car in the past.  It's not relevant.  We are
not introducing 404(b) evidence to say he bombed a car in the
past, therefore, he knows how to bomb a car now.

We are saying that this discussion changes from I did
bomb a car in the past, and whether that's true or not is not
relevant.  I think that's the type of bona fide evidence that
when a person brags about what they've done it's not offered to
prove the prior act, it's the person propping themselves up so
the person will join them in the conspiracy.

But my main point is that the rest of that is -- I
understand what you're saying, that there's -- because he
begins this with taking someone's car out, the rest of it has
to be about that, but it isn't.  You can see that he -- it says
he went on to explain the need to plan on how to dress, the
need for camouflage, et cetera, one way that she can blow up a
car.

THE COURT:  Well, here is the issue, it seems to me,
that I have to decide.  If there are two reasonable
interpretations of evidence, one of which is that it does not
refer to a past act, and the other of which is it does refer to
a past act, it would be inadmissible.  Can the Government
introduce the evidence to make the first argument even though

the defense is unable to make the second argument because that
necessarily would force them to bring in the past act evidence
that is inadmissible under 404(b)?  That's seems to me to be
the issue.

And what you're suggesting is, yes, the Government can
introduce the evidence and make its argument even though the
defense is unable to argue the other inference because it can't
do so without bringing in the very evidence that 404(b)
precludes.

MR. BOYLE:  Give me a second.  I want to -- here's my
issue.  We have a jury waiting.  This is the fifth time we've
talked about this.  We are getting questions on -- I understand
what you're saying.  Despite the fact that we've had this for a
year, I'm now, just like the end of yesterday, look, we are in
this sort of time crunch where right now I have to give you an
answer to this not so easy answer on a topic that's been
discussed four times before.

I know that we have time issues, but I want a chance
to think about that.  Because I understand what you're saying.
I'm not sure that I agree with it.  But is there a way for us
to schedule this to give us a chance to at least look at some
cases and discuss this?

THE COURT:  Well, tell me what else you've got for
today besides Agent Bettendorf on this subject.

MR. BOYLE:  We are going to finish today.  We have two

City of Scottsdale library people and the three victims.  We
will be done today.

       THE COURT:  Well, I suppose one approach we could take
would be to take those witnesses, get them on, take the break
of tomorrow that we told the jury we would take, let you
address this issue and address it further in the defense and
put Agent Bettendorf on Friday morning.

       MR. BOYLE:  That's fine.

       THE COURT:  That way you've got a chance to think
about the issue, which has never been squarely framed until
this morning and it should have been.  But I would like to do
some research as well --

       MR. BOYLE:  I agree.

       THE COURT:  -- and see if there's case law on the
issue that I've identified.

       MR. BOYLE:  Agreed.

       THE COURT:  Let's do that.

       So do you need a minute to reorganize a witness or are
you ready to go with the next witness?

       MR. MORRISSEY:  Could we have a minute to talk amongst
ourselves?

       THE COURT:  Yes.  And we also have to get Agent
Moreland back on.

       MR. BOYLE:  Judge, there's one more thing.  I can put
on Agent Bettendorf for everything but this.  I don't know if

that will help you at all with the -- let me ask you, if we do more than talk about it, is that still --

THE COURT:  I think I had better deal with this all at once.

MR. BOYLE:  Do you want us to hold off on everything for Bettendorf?  We are trying to get everything --

THE COURT:  I would like to use time we've got today --

MR. BOYLE:  Agreed.

THE COURT:  You can put him on for everything other than Daniel Mahon.

MR. BOYLE:  Agreed.  Okay.  We have one issue for the -- for him then, which is Exhibit 167.  It's this Aryan resistance list that refers to the 1992 Canada issue.

THE COURT:  I don't know what you're referring to. But are you saying that you -- are you asking me to do something on that issue?

MR. BOYLE:  Yeah.  We -- we have Agent Bettendorf, who we intend to introduce Exhibit 167 through.  The defense at a side bar mentioned that they may have an objection to the last -- to one of the entries on the exhibit because it had to do with the Heritage Front.  So since we are keeping them waiting anyway --

THE COURT:  Is that the only other thing you are doing with Agent Bettendorf?

MR. BOYLE:  No.

THE COURT:  Let's not keep the jury waiting on that one then.  Let's hold that one along with Daniel Mahon --

MR. BOYLE:  Fine.

THE COURT:  -- off until Friday.

MR. BOYLE:  Fine, thank you.

THE COURT:  One other question, Counsel.  We need to come back tomorrow to argue the Rule 29 motion, which we are going to have to argue hypothetically with respect to Daniel Mahon, because I'm not going to take another break after Friday for that purpose, and to address any other issues.  It seems to me we ought to -- well, we need to set a time for tomorrow so the marshals know when to bring the Mahons over for that hearing.

I would suggest we do it at two o'clock tomorrow. Does that work for counsel?

MS. WILLIAMS:  I think the afternoon is a good idea, Your Honor.

MS. HULL:  Yes, sir.

MR. MORRISSEY:  Yes.

THE COURT:  So, Traci, we will have them bring them at two.

Okay, so are you ready to go with --

MS. HULL:  Judge, are you expecting that we will cross Agent Bettendorf today as well or wait until Friday, and are

you just going to do direct?

        MR. BOYLE:  They can cross on everything except for
Daniel Mahon.

        THE COURT:  I think we ought to get the cross done on
the stuff he's testified to.  You will get another opportunity
to cross him on Friday with respect to what he testifies on
Friday.

        MS. HULL:  Thank you.

        (The jury entered the courtroom.)

        THE COURT:  Thank you, please be seated.  Good
morning, ladies and gentlemen.

        We've done it to you again.  Maybe I ought to give up
and think that this happens every morning.  But when we start
at 8:30 every morning, I'm determined to finish by 9:00, but it
just hasn't been happening.  I'm sorry that it happened again.

        We are ready to go.  We are still of the view that we
will finish the evidence before four o'clock today with the
Government's case, and we will break tomorrow to address other
issues and resume on Friday.  We may have a bit more evidence
on Friday morning on the Government's case, but we will
basically get right into the defense case on Friday.

        We are going to continue now with the redirect
examination of Agent Moreland.

        You may proceed, Mr. Boyle.

        MR. BOYLE:  Thank you.

TRISTAN MORELAND,

called as a witness herein, having been previously duly sworn,

was examined and testified as follows:


REDIRECT EXAMINATION

BY MR. BOYLE:

Q.  Agent Moreland, yesterday you were asked questions about

the difference between conversing and training.  Do you

remember those questions?

A.  Yes, sir.

Q.  Do you agree or disagree with the statement that you can

converse with someone and learn from them?

A.  I agree with that.

Q.  Did you converse with Robert Joos back in January as you

described?

A.  I did.

Q.  And during that -- during those conversations did you

discuss explosives?

A.  Yes, we did.

        MS. WILLIAMS:  Objection, asked and answered.

        THE COURT:  Overruled.

BY MR. BOYLE:

Q.  And was a part of that discussion training by Mr. Joos to

you?

        MS. HULL:  Objection, leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

MR. BOYLE:  Permission to publish Exhibit 59, Your
Honor, that is in evidence.

THE COURT:  You may.

BY MR. BOYLE:

Q.  In this exhibit, there's the language you read earlier,
which was "Dennis would" like you -- would "really like you to
participate in what we are developing here."

Do you see that line?

A.  Yes, I do.

Q.  Was there ever a discussion that what you were developing
at the Joos property was legitimate demolition work?

A.  No, never.

MR. BOYLE:  No further questions, thank you.

THE COURT:  Ms. Williams, you had some brief
cross-examination, I believe?

MS. WILLIAMS:  Yes, Your Honor, thank you.


RECROSS-EXAMINATION

BY MS. WILLIAMS:

Q.  Agent Moreland, you recall yesterday you -- there was
discussion of the subject of demolition, correct?

A.  Yes.

Q.  There was a discussion of salvage, correct?

A.  Yes.

Q.  And you ended the day talking about WAR, correct?  A

statement you made about WAR?

A.  I understand what you're saying, yes.

        MS. WILLIAMS:  Your Honor, may I publish Exhibit 58,

which is in evidence?

        THE COURT:  Yes.

        MS. WILLIAMS:  Thank you.

BY MS. WILLIAMS:

Q.  And Exhibit 58 was a letter between Robert Joos and Becka,

correct?

A.  It was mailed to her.  It was intended to me.

Q.  But written to Rebecca Stevens, Rebecca Williams?

A.  I think it was just addressed to her, yes.

Q.  And it said "Dear Becka"?

A.  Yes.

Q.  And you see where the arrow is pointing?

A.  Yes.

Q.  That is a discussion that he's talking about demolition

work, right?

A.  That's the word he used.

Q.  His words?

A.  His words.

Q.  And he's talking about preferring to -- excuse me just a

minute.  Let me try that again.

Preferring to hand demolish buildings in order to save as much material as possible, correct?

A.  Yes.

Q.  And you testified -- you were played a couple of clips from exhibits -- excuse me, 61, 62, and 1055, all relating to a -- an audio exhibit that we know as E-223, correct?

A.  Yes.

Q.  Those are pieces from a larger tape, correct?

A.  Correct.

Q.  A larger tape from June 23rd of 2009?

A.  E-223, I believe, encompasses May 20th and June 23rd.

Q.  And June 23rd was -- June 23rd itself encompassed one conversation -- included one long conversation that was split in two because of a cell phone battery issue, correct?

A.  It's really two separate calls, but, yes, it was caused by the fact that a cell phone battery died.

MS. WILLIAMS:  Okay.  Your Honor, I move to admit Exhibits 1200 and 1211 which are the entire conversation from which Exhibit 61, 62 and 1055 were clipped.

MR. BOYLE:  If I can just voir dire the witness, I haven't had a chance to listen to the tapes, because we were given them this morning.  I just want to make sure we've heard them.

THE COURT:  That's fine.

VOIR DIRE EXAMINATION

BY MR. BOYLE:

Q.  Agent Moreland, did you listen to these tapes this morning?

A.  I did.

Q.  Are they a part of that exhibit?

A.  Yes.

Q.  And did you listen to each of these tapes from beginning to end?

A.  I did.

          MR. BOYLE:  Okay, no objection.

          MS. HULL:  No objection.

          THE COURT:  All right.  1210 and 1211 are admitted.

          MS. WILLIAMS:  Thank you, Your Honor.

          Permission to play.

          THE COURT:  The entire thing?

          MS. WILLIAMS:  Yes.

          THE COURT:  How long is it?

          MS. WILLIAMS:  Let's see, 1210 is close to 20 minutes long.  1211 is about five minutes long.

          THE COURT:  Any objection?

          MR. BOYLE:  No, Your Honor.

          THE COURT:  All right, you may.

          MS. WILLIAMS:  1210, please.

          (Exhibit No. 1210, an audio tape, was played.)

RECROSS-EXAMINATION (Continued)

BY MS. WILLIAMS:

Q.  And to be clear, that is your voice and Robert Joos,
correct?

A.  Yes, ma'am.

         (Exhibit No. 1210, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  Just to clarify, you heard the name "Jeff"?

A.  Yes.

Q.  Jeff is another man who lives on Mr. Joos' property?

A.  Yes.

         (Exhibit No. 1210, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  Agent, just to clarify something, the date of this call is
6-23-09, correct?

A.  Yes, ma'am.

Q.  And the letter addressed to Becka, which is Exhibit 58,
that was dated June 10 of '09?

A.  I don't have it in front of me, but, yes, it came in before
this call.

         MS. WILLIAMS:  Your Honor, may I show it on the Elmo?

         THE COURT:  You may.

BY MS. WILLIAMS:

Q.  So I have the date correct?

A.  Yes.

Q.  So this conversation is after the letter?

A.  Yes.

        (Exhibit No. 1210, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  Just to clarify, Agent Moreland, the little diagram

thing -- may I, Judge?

        THE COURT:  You may.

BY MS. WILLIAMS:

Q.  That was page 2 of Mr. Joos' letter addressed to Becka?

A.  Yes.

Q.  Okay, thank you.

        MS. HULL:  Exhibit number, Counsellor?

        MS. WILLIAMS:  I'm sorry, Exhibit Number 58.

        MS. HULL:  Thank you.

        (Exhibit No. 1210, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  Agent Moreland, to clarify, a minute ago there was a voice

talking about if you're working -- talking about private

property.  Was that Mr. Joos' voice?

A.  Yes.

        (Exhibit No. 1210, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  Agent, question, a couple of minutes ago you discussed

bringing out a washing machine for Mr. Joos.  Do you remember

that?

A.  Yes.

Q.  Was there any type of metal that Mr. Joos didn't salvage or reuse that you could see?

A.  Sure, I mean, I didn't see gold, bronze, titanium.  The washing machine wasn't about salvage.

Q.  There was washing machines, that you were talking about bringing him a washing machine, and he was talking about taking showers?

A.  Yes.

Q.  Okay.

        (Exhibit No. 1210, an audio tape continued playing.)

BY MS. WILLIAMS:

Q.  That call unexpectedly broke, correct?

A.  I knew it was coming, you could hear the beeping.

Q.  And the beeping was from a cell phone battery?

A.  Yes, ma'am.

Q.  And then you, a bit later, you called him back to finish the conversation?

A.  Yes.

        MS. WILLIAMS:  If we could play Exhibit 1211.

        (Exhibit No. 1211, an audio tape, was played.)

BY MS. WILLIAMS:

Q.  That was you referring to a machine gun tower.  Was that your voice?

A.  No, that was Mr. Joos.  He called it --

TRISTAN MORELAND - RECROSS-EXAMINATION BY MS. WILLIAMS 2589

Q.  And you -- back it up just a tiny bit.

        (Exhibit No. 1211, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  Gun tower, that was you speaking?

A.  I said "gun tower."

Q.  That's your voice, correct?

A.  I repeated what he said, yes.

Q.  And then that was just -- just now it was you saying "the
machine gun tower," correct?

A.  Yes.

        (Exhibit No. 1211, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  That's him laughing?  Yes?

A.  Yes.

        (Exhibit No. 1211, an audio tape, continued to play.)

        MS. WILLIAMS:  Back it up just a little bit.

        (Exhibit No. 1211, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  That's him saying "the bell tower"?

A.  Yes.

Q.  "Him" being Mr. Joos?

A.  Correct.

Q.  Continue.

        (Exhibit No. 1211, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  And that's you saying:  It's good to have a reputation,

even if it's not a good machine gun nest?

A.  Yes.

          (Exhibit No. 1211, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  The "lone fricking wolf ranger, that's me."  That's you,

right?

A.  Yes.

Q.  And Mr. Joos' response is laughter?

A.  Yes.

          (Exhibit No. 1211, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  And Mr. Joos' response to that statement is silence?

A.  Keep listening.  I don't recall.

          (Exhibit No. 1211, an audio tape, continued to play.)

BY MS. WILLIAMS:

Q.  Agent Moreland, do you agree that that -- the two calls we

just listened to were the call or calls, if you will, that you

had with Robert Joos on June 23rd, 2009?

A.  Yes.

Q.  What we heard was a fair and accurate representation of

Mr. Joos' responses?

A.  Yes.

Q.  And words during that conversation?

A.  Yes.

TRISTAN MORELAND - REDIRECT EXAMINATION BY MR. BOYLE  2591

Q.  I am going to ask you a "yes" or "no" question.  I would
repeat -- excuse me.  I would appreciate a response
accordingly.

        Did you hear the word or acronym "WAR" in that
discussion?

A.  No.

        MS. WILLIAMS:  Thank you, Your Honor, I have nothing
further.

        THE COURT:  All right.  Ms. Hull?

        MS. HULL:  I have nothing to add.

        THE COURT:  All right.

        MR. BOYLE:  Reredirect, Your Honor?

        THE COURT:  Yes.


                    REDIRECT EXAMINATION

BY MR. BOYLE:

Q.  Agent Moreland, if you'll go back to Exhibit 59.

        MR. BOYLE:  Permission to publish?

        THE COURT:  You may.

BY MR. BOYLE:

Q.  You heard recordings of your discussion with Mr. Joos on
recross?

A.  Yes.

Q.  So the questions I want to ask you are what it is that you
and Robert Joos are talking about.  My first question is, with

regard to 59, did you indicate to Mr. Joos when you met him in person why you were there?

A.  Yes.

        MS. HULL:  Objection, asked and answered, outside the scope.

        THE COURT:  Overruled.

BY MR. BOYLE:

Q.  When you met him in person, what did you say your reason for being there was?

A.  That I was with a small group, cell, in Arizona, that I was affiliated with Tom Metzger, that although I hadn't met Dennis Mahon, I knew of him.  My affiliations were with WAR, that I was a white supremacist.  I dealt guns.  I messed around with explosives.  I asked him a lot of questions about explosives and weapons and tactics and snipers.

        MS. WILLIAMS:  Objection to the narrative.

        MR. BOYLE:  That's fine.

BY MR. BOYLE:

Q.  Every time you have a conversation with Mr. Joos, do you repeat why you're there to meet him?

A.  No.

Q.  In an undercover capacity, do you think it would be a good practice to have people sign a contract with you?

        MS. WILLIAMS:  Objection, sorry.  Objection, relevance, exceeds the scope of recross.

TRISTAN MORELAND - REDIRECT EXAMINATION BY MR. BOYLE  2593

            THE COURT:  Overruled.

            THE WITNESS:  No.

BY MR. BOYLE:

Q.  Why not just say:  I would like to bomb on behalf of WAR.

I would like you to train me on behalf of WAR, signed Jimmy

Roberts.  Why not do that?

A.  Well, two reasons.  One, you're not going to get very far,

and, two, you may not survive it.

Q.  You were asked about, in this recording, some of the

statements that were made.  And I want to just go through some

of those first of all.

            The first is machine gun tower.  Who was the first

person to say the words "gun tower"?

A.  I said "gun tower."

Q.  Who was the first person to say "machine gun tower"?

A.  Mr. Joos.

Q.  You made a reference to a Mexican restaurant?

A.  Yes.

Q.  Was this topic of conversation something you had discussed

previously?

A.  Yes.

            MS. WILLIAMS:  Objection, foundation.

            MS. HULL:  Leading.

            THE COURT:  Overruled.

BY MR. BOYLE:

Q.  When was it you had that previous conversation?

A.  On starting around the 20th of May, that's when I first
told him that I was going to -- and I can't remember if I said
specifically bomb, but I discussed a -- a movement target in
that conversation, and that I wanted him -- and I'm sorry for
this answer, but it's really complicated.  There's a lot of
conversations.

Q.  We need to take them one at a time.  I'm discussing, I
guess -- and I do need to draw you one question at a time about
the Mexican restaurant.

       Did you have discussions about bombing targets rather
than just demolishing buildings?

A.  Yes, a cryptic conversation, yes.

Q.  In this recording, was there a reference to a Mexican
restaurant?

A.  In the 23rd there was, yes.

Q.  That we just heard?

A.  Right.

Q.  And then did you make a reference to something about
bombing at night -- or something at night?

A.  Yes.

Q.  What did you say?

A.  I said that I had been watching the place at night and I
knew --

       MS. WILLIAMS:  Objection, Your Honor, the tape speaks

for itself.

          THE COURT:  Overruled.

          THE WITNESS:  And I'm paraphrasing, but I knew when

people left or when it would be vacant, the building.

BY MR. BOYLE:

Q.  Did you feel a need to explain that in further detail on a

phone call?

          MS. HULL:  Objection, relevance, outside the scope.

          THE COURT:  Overruled.

          THE WITNESS:  No, I didn't.

BY MR. BOYLE:

Q.  In your experience in undercover operations, is talking to

someone in person different than your ability to talk to them

on the phone?

          MS. WILLIAMS:  Objection, relevance, Your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  Yes, considerably.

BY MR. BOYLE:

Q.  Okay, how is talking to someone in person different than

your ability to talk to them on the phone?

A.  Generally speaking, a person, people feel, in undercover

situations, like they have a better assessment of the person

and the situation, the environment.  Everybody in my experience

of undercover work understands that phones are a very dangerous

proposition with respect to conversation.  They can be

recorded, tapped, et cetera.  So --

Q.  Do you ever use code words when you're having phone
conversations?

A.  All the time.

        MS. WILLIAMS:  Objection, Your Honor, relevance,
foundation.  This goes far beyond even our case.

        THE COURT:  Overruled.

        MR. BOYLE:  One second.

        Nothing else, thank you.

        THE COURT:  All right.  Thanks, you can step down.

        MR. BOYLE:  Government calls Larry Bettendorf.

        THE COURT:  All right.

        MR. BOYLE:  May this witness be given 166, please.


                    LAWRENCE BETTENDORF,
called as a witness herein, having been first duly sworn, was
examined and testified as follows:


                    DIRECT EXAMINATION

BY MR. BOYLE:

Q.  Good morning.  Would you please tell us your name.

A.  Lawrence Bettendorf.

Q.  Where do you work?

A.  I'm a special agent with the Bureau of Alcohol, Firearms,
Tobacco and Explosives.

LAWRENCE BETTENDORF - DIRECT EXAMINATION BY MR. BOYLE 2597

Q.  How long have you been a special agent?

A.  For over 22 years.

Q.  And would you tell us a little bit about your training and experience as a special agent?

A.  Yes.  As part of being a special agent, we attend the criminal investigators school at the Federal Law Enforcement Training Center.  After that we attend --

        MS. WILLIAMS:  Your Honor, excuse me.  I am going to object to a re-recitation of his background and experience.  He previously testified.

        THE COURT:  Sustained.

BY MR. BOYLE:

Q.  You were a special agent working on this investigation?

A.  Yes, I am.

Q.  When did you start working on it?

A.  The day the bomb went off.

Q.  Have you been involved in the case since that date?

A.  Yes, I have.

Q.  How closely have you worked on this investigation?

A.  I've worked very closely on this investigation.

Q.  Have you traveled to different undercover operations?

A.  Yes, I have.

Q.  Did you work with evidence in this case?

A.  Yes, I have.

Q.  Have you been to the evidence room at ATF that has evidence

LAWRENCE BETTENDORF - DIRECT EXAMINATION BY MR. BOYLE 2598

in this case?

A.  Yes, I have.

Q.  Have you reviewed the reports in the case?

A.  Yes.

Q.  Have you listened to recordings?

A.  Yes.

Q.  Let me direct your attention first to mailings.  Are you familiar with mailings regarding the informant undercover mailbox?

A.  Yes, I am.

Q.  Without going through all of the details again, were you here when Agent Moreland testified about that?

A.  Yes.

Q.  Do you have personal experience regarding the informant's undercover mailbox?

A.  Yes, I do.

Q.  Have you been one of the individuals who was responsible for the chain of custody of mailings that went from the mailbox to ATF evidence?

A.  Yes, I was.

Q.  Drawing your attention to Exhibit 166.  Do you see that in front of you?

A.  Yes, I do.

Q.  Can you tell us where this item -- or what this item is copied from?

LAWRENCE BETTENDORF - DIRECT EXAMINATION BY MR. BOYLE 2599

A.  This item is copied from a book entitled "Fighting in the Streets, a Manual of Urban Guerilla Warfare."

Q.  Where is the original?

A.  The original is in ATF custody in evidence.

Q.  When was the last time you saw the original?

A.  This morning.

Q.  Is what is contained in Exhibit 166 a copy of part of what is in evidence right now?

A.  Yes, it is.

Q.  Is it a fair and accurate copy of what's in evidence?

A.  Yes, it is.

        THE COURT:  Mr. Boyle, when you say "in evidence," you mean in ATF's evidence possession, right?

        MR. BOYLE:  I do, right.

BY MR. BOYLE:

Q.  In ATF's evidence?

A.  Yes.

Q.  Would you tell us when it was acquired by law enforcement?

A.  October 11th of 2006.

Q.  Was it a mailing or was it something else?

A.  It was a mailing.

Q.  Who was the sender?

A.  The sender was D. Mahon.

Q.  And what city and state?

A.  Davis Junction, Illinois.

Q.  And who was it addressed to?

A.  Becka Stevens.

Q.  And did it have a P.O. Box?

A.  Yes, P.O. Box in Wickenburg.

Q.  And was it the informant mail box?

A.  Yes.

Q.  Was this item seized from that mailbox by law enforcement?

A.  Yes, it was.

Q.  And how did it -- did it get transferred from chain of custody through you to the ATF evidence room?

A.  Yes, it did.

        MR. BOYLE:  The Government moves to admit Exhibit 166.

        MS. WILLIAMS:  Objection, relevancy and foundation.

        THE COURT:  Overruled on relevancy -- I'm sorry, Ms. Hull, did you have anything?

        MS. HULL:  Nothing to add, sir.

        THE COURT:  Overruled on relevancy.

        What's the objection as to foundation, Ms. Williams?

        MS. WILLIAMS:  As to sender.

        THE COURT:  Overruled, Exhibit 166 is admitted.

BY MR. BOYLE:

Q.  Have you used confidential informants in your investigation in the past?

A.  Yes.

Q.  Were you aware of the use of a confidential informant in

this case?

A.  Yes, I was.

Q.  Did you participate in assisting, monitoring the informant

activities in the case?

A.  Yes.

        MS. WILLIAMS:  Objection, leading.

        THE COURT:  Overruled.

BY MR. BOYLE:

Q.  Were you the person who was responsible for the informant

as the handler?

A.  No, I was not.

        MS. WILLIAMS:  Objection, leading, Your Honor.

        THE COURT:  Sustained.

        MR. BOYLE:  He said no.  I'm sorry.

        THE COURT:  Well, the question was still leading.

        MR. BOYLE:  All right.

BY MR. BOYLE:

Q.  Were you -- did you have any knowledge if the informant was

paid money by ATF?

A.  Yes, I do.

Q.  And is that something that was unusual or was that standard

practice for the use of informants?

A.  It's very standard practice for the use of informants.

Q.  The total amount that was paid to Ms. Williams, did you

have a chance to add up all of the forms and come to a

conclusion?

          MS. WILLIAMS:  Objection, Your Honor, asked and

answered many times by many witnesses.

          THE COURT:  Overruled.

          THE WITNESS:  Yes, I have.

BY MR. BOYLE:

Q.  What was the number of total disbursements up to now,

today?

A.  Approximately $48,000.

Q.  And what was the amount that was for actual work as

compared to reimbursement?

          MS. HULL:  Objection, foundation.

          THE COURT:  Sustained.  I think there needs to be

foundation for that.

BY MR. BOYLE:

Q.  Did you go through the forms?

A.  Yes, I did.

Q.  Did you go through them individually?

A.  Yes.

Q.  Did you look to see what the entries were?

A.  Yes.

Q.  And were you able to distinguish between reimbursement

payments and payments for work?

A.  Yes.

Q.  Did you add those up separately?

A.  Yes.

Q.  What was the amount that was related to payment for work versus payment for reimbursement?

        MS. HULL:  Objection, hearsay, foundation.

        MS. WILLIAMS:  Join in the foundation and hearsay.

        THE COURT:  Overruled on the foundation.  Your response on hearsay, Mr. Boyle.

        MR. BOYLE:  I believe this was brought up with the informant by defense.  So I think we should make a clear record of what the amount is today.

        THE COURT:  Well, I understand why you are doing that. My question is what's your response on hearsay.

        MR. BOYLE:  I'll withdraw the question.  No problem.

BY MR. BOYLE:

Q.  Previously, Agent Bettendorf, we admitted 223 into evidence, just to confirm.  We need to publish a recording if it's been admitted.

        MR. BOYLE:  So, with the Court's permission, the Government intends to publish clips one, two, four, and five of this exhibit with the Court's permission.

        THE COURT:  All right, you may.

BY MR. BOYLE:

Q.  Agent Bettendorf, just so we have a reminder, who is the subject on this recording?

A.  Dennis Mahon.

Q.  And where was this recording seized?

A.  This recording was seized in Tom Metzger's residence.

        MS. HULL:  May I ask a date, Your Honor?

BY MR. BOYLE:

Q.  Previously you discussed the date, time frame that this was
recorded?

A.  Yes.

Q.  And what was the approximate year?

A.  That this was recorded?

Q.  Or -- yeah, the date of the recording?

A.  It was 1993.

        (Exhibit No. 223, a videotape, was played.)

        MS. WILLIAMS:  Objection, Your Honor, may we approach?

        THE COURT:  I'm sorry?

        MS. WILLIAMS:  May we approach?

        THE COURT:  This is already in evidence, Ms. Williams.
Right?

        MS. WILLIAMS:  The exhibit is in evidence.  I'm not
entirely sure about this particular clip.

        THE COURT:  Okay.  Well, we ought to clarify that.

        Why don't we go ahead and take the break at this
point, members of the jury.  We will resume at 20 minutes to
the hour.  Please remember not to discuss the case.  We will
excuse you at this time.

        (The jury left the courtroom.)

THE COURT:  Please be seated.

Ms. Williams, what is your point, please?

MS. WILLIAMS:  Your Honor, my concern is that this specific clip is going into Dennis Mahon saying:  I am a terrorist.  As we've discussed before, this statement is of serious concern to the defense, but of equal if not more concern is the material surrounding each of these smaller clips.

It's clear from jumping between them that there is more, and I'm also becoming more and more concerned about the overall exhibit having more than these clips.  I can tell that, for example, the so-called training tape is still there by virtue of Mr. Boyle maneuvering in Sanction from one clip to the next.  So I'm very concerned that we've got more in Exhibit 223 than was supposed to be there.

THE COURT:  What did you think was supposed to be there, Ms. Williams?

MS. WILLIAMS:  I believe, Your Honor, the Court entered an order, because we did litigate this issue.  I believe the Court entered an order that was very specifically directed to the Government's claim that it wanted a shot of Dennis Mahon wearing a WAR T-shirt, a shot of Dennis Mahon wearing a WAR T-shirt.  And there was -- I can't remember which motion it was now.  And another shot for a specific purpose.  I'm pulling a blank.

THE COURT:  It's motion in limine 1047, I believe.

MR. BOYLE:  Your ruling is at 1212.

THE COURT:  Right.  I'm looking at 1212.

Do you have it, Ms. Williams?

MS. WILLIAMS:  No.

THE COURT:  This is my ruling from 1212, beginning on page 7, paragraph 8 regarding the KARE videotape.  I'll just read you the paragraph.

The Government seeks to introduce portions of this videotape where Dennis Mahon states that the time for whites to become violent is overdue, and that he is, a quote terrorist, closed quote.  Dennis Mahon apparently was wearing a WAR shirt while making these statements.  Government does not seek to introduce other statements from the videotape such as Dennis Mahon's admiration for Adolph Hitler, his comments on guerilla tactics or his comments regarding a mock execution of an FBI agent.

Defendants contend that this statement is not relevant because it was made in 1994, almost ten years before the beginning of the conspiracy.

The Court does not agree.  As already noted, defendants will argue at trial that statements they made to the confidential informant were merely the bragging of old men and were not indicative of their true intentions.  Previous statements made by Dennis Mahon concerning the need for

violence and characterizing himself as a terrorist are relevant

to the allegations contained in the Superceding Indictment,

particularly to Dennis Mahon's intent as required in each count

of the Superceding Indictment.

        The Court does not conclude that Dennis Mahon's

expressions of belief or his own characterization of himself as

a terrorist are unfairly prejudicial, nor that the risk of

unfair prejudice would substantially outweigh the probative

value of these statements.

        The Court, therefore, will permit the Government to

present the evidence at trial.

        To the extent defendants wish to assert that the age

of the statements means they do not relate to Dennis Mahon's

true intentions during the scope of the conspiracy, they

certainly are free to make this argument to the jury.

        These arguments go to the weight not the admissibility

of the evidence.

        That's the ruling in docket to 212, which was a

October 5th, 2011 ruling.

        So in light of that, Ms. Williams, are you thinking

there's something in this videotape that shouldn't be there?

        MS. WILLIAMS:  Your Honor, I'm just concerned that the

tape that has now -- has been put into evidence exceeds the

scope of the Court's order which was supposed to be limited to

just a few discrete clips.

          If it does not, it's fine.  But definitely before it
goes to the jury, I think it needs to be reviewed one final
time.

          THE COURT:  Ms. Hull, did you want to say anything on
this?

          MS. HULL:  No, sir.

          THE COURT:  Mr. Boyle, does this exhibit just include
the individual segments that were allowed in my order?

          MR. BOYLE:  Yes, this is the portion where he's asked,
where we had to stop it, "Are you a terrorist?"

          And he says, "Yes, I'm a terrorist."

          And then in the final clip he says:  We need to, you
know, conduct violent action and blast a few of them at the
end.

          So I guess my second point is they've had these clips
since December 2nd.  They were admitted on January 12th.  It
seems --

          THE COURT:  All right.  Ms. Williams.

          MR. BOYLE:  And I'm only playing one, two, four, and
five just so it's clear.

          THE COURT:  All right.  I'm going to allow it to be
played.  You can look at it, Ms. Williams, obviously before it
goes to the jury.  And if you think there's something in there
that's inconsistent with my ruling, you can let me know.

          MS. WILLIAMS:  Thank you, Your Honor.

THE COURT:  Okay, we will see you in ten minutes?

(A recess was taken.)

THE COURT:  You may continue, Mr. Boyle.

MR. BOYLE:  Thank you.  Permission to resume publication of 223.

THE COURT:  You may.

(Exhibit No. 223, a videotape, was played.)

BY MR. BOYLE:

Q.  Agent Bettendorf, going back to the informant in this case, were you a part of the photo taking where a picture of the informant's breasts with the grenade on the bikini top was taken?

A.  Yes.

Q.  Were you there that day?

A.  Yes, I was.

Q.  Were you part of the process by which a decision was made to send that out to Dennis Mahon?

A.  Yes.

Q.  Did you concur in that process?

A.  Yes, I did.

Q.  I would like to move now to what work you did regarding the scene and the reconstruction.  So, first moving to the scene of the Scottsdale bombing incident, did you respond to that scene?

A.  Yes, I did.

Q.  Did you go into the offices where the bomb detonated?

A.  No, I did not.

Q.  What was your role regarding the pieces of evidence that were taken from the scene?

A.  On that day?

Q.  On that day first.

A.  My role that day was primarily just support outside.  I did everything from helping set up tables out of one of our equipment trucks, running to the store to get I think batteries and gloves and other supplies that were needed.  I did not, as I said, go into the building and collect any evidence that day.

Q.  Did you at some point come into contact with the evidence?

A.  Yes, I did.

Q.  The bomb?

A.  Yes.

Q.  When was that?

A.  That was probably, it was probably late 2009, I believe, when we took custody of that evidence from the postal service.

Q.  Prior to 2009, were you following how the bomb debris was reconstructed?  Even if -- well, let me go back.

        You're telling us that the bomb debris went into ATF custody in 2009?

A.  Yes.

Q.  Where was it before that?

A.  It was with the U.S. Postal Inspection Service.

Q.  Did you go and see the evidence yourself at the postal

service?

A.  Yes.

Q.  Was there a point at which people spread out evidence on a table, for example?

A.  Yes, there was.

Q.  All right.  Did you see some of those photos that we had here in court?

A.  Yes.

Q.  Were you part of that process?

A.  Yes, I was.

Q.  There's been a mock-up bomb as Exhibit Number 69.  Have you seen that?

A.  Yes, I have.

Q.  What was your role in relation to that exhibit?

A.  I assisted Agent Moreland in some of the details in putting that together.

Q.  Do you have training regarding bomb reconstruction?

A.  Yes.

Q.  Just generally, what is that?

A.  I'm a certified explosives specialist which means that I've had training in post-blast investigation.  I provide training in post-blast investigation.  And a lot of that is geared towards locating components from a scene, identifying them, and being able to determine how the device functioned.

Q.  Did you concur with the Exhibit 69 mock-up?

A.  Yes, I did.

        MS. WILLIAMS:  Objection, Your Honor, relevance.

        THE COURT:  Overruled.

BY MR. BOYLE:

Q.  And after the Scottsdale bomb incident, did you have

knowledge, based on the reconstruction, as to what might be

inside the package bomb?

A.  Yes.

Q.  I want to ask you about whether you have any information as

to whether or not that went out to the public.

        So beginning first with what kind of knowledge did you

have about how the Scottsdale bomb was constructed?

A.  I knew how it was constructed, that it was --

Q.  Referring you to just inside the box?

A.  Yes.

Q.  Go ahead, please.

A.  Okay.

Q.  What was your understanding of what was inside the box?

A.  Inside the box, there was a type of bomb inside the box

that was fired by means of an electrical circuit with a micro

switch and a battery.

Q.  And was the fact that there was a pipe bomb in this box,

based on your review of the whole case, released to the public

by public information officers?

A.  No, it was not.

Q.  Was it released in Silent Witness videotapes?

        MS. HULL:  Objection, foundation.

        THE COURT:  Sustained.

BY MR. BOYLE:

Q.  Did you see Silent Witness information in this case?

A.  I knew that it was on Silent Witness, that the case was

publicized.

        MS. HULL:  Same objection, Judge.

        THE COURT:  Overruled.

BY MR. BOYLE:

Q.  Did you have -- did you have information about what was on

Silent Witness?

        MS. HULL:  Objection, foundation.

        THE COURT:  Overruled.  You may answer that.

        THE WITNESS:  Yes.

BY MR. BOYLE:

Q.  And if you don't have information on Silent Witness, let us

know.  But from what you've seen regarding Silent Witness,

whatever depth that is, have you seen any indication that that

information contained a disclosure to the public regarding a

pipe bomb?

        MS. WILLIAMS:  Objection, hearsay.

        MS. HULL:  Foundation.

        THE COURT:  Overruled on hearsay.  I do think you need

to establish foundation for the basis for his Silent Witness

knowledge.

BY MR. BOYLE:

Q.  What have you seen regarding Silent Witness?

A.  I'm aware that it's just a basic Silent Witness type
advertisement, you know, for information in reference to the
Scottsdale bombing.

Q.  Have you seen it?

A.  Yes, I have.

Q.  Does it have specific information regarding a pipe bomb in
that flyer?

        MS. WILLIAMS:  Objection, calls for hearsay, Your
Honor.

        THE COURT:  Overruled, it is not being asserted for
the truth of the matter.

        THE WITNESS:  No, it does not have that information.

BY MR. BOYLE:

Q.  Have you seen the flyer regarding post office reward of a
hundred thousand dollars?

A.  Yes, I have.

Q.  Have you seen anything in that flyer that indicates that
what was inside the package bomb was a pipe bomb?

        MS. WILLIAMS:  Your Honor, objection, calls for
hearsay, and it is calling for the truth of the matter
ultimately.

        THE COURT:  Well, are you asserting it's being offered

to prove that there was a pipe bomb?

          MR. BOYLE:  Are you asking me?

          THE COURT:  That's the truth -- no, I'm asking
Ms. Williams.  That's the truth of the matter asserted.

          MS. WILLIAMS:  The truth of the matter asserted, I
believe, Your Honor, is that he's testifying that he saw an ad.
It said certain things.  Those things were true.  Those things
were released.

          THE COURT:  I disagree.

          MS. WILLIAMS:  The release -- I'm sorry, I can't hear
you.

          THE COURT:  I disagree.  I don't think this is
hearsay.  Overruled.

          THE WITNESS:  No, there was nothing in the postal
reward.

BY MR. BOYLE:

Q.  Have you seen any indication in the case that the fact that
there was a pipe bomb in the package was released to the
public?

A.  No, I have not.

Q.  Prior to trial?

A.  Correct.

Q.  The dimensions of the pipe in this case were what?

A.  One by five.

Q.  And was that fact released in any public disclosure prior

to trial that you're aware of?

A.  No, it was not.

          MR. BOYLE:  Nothing else, Your Honor.

          THE COURT:  Cross-examination?

          MS. WILLIAMS:  Thank you, Your Honor.


                    CROSS-EXAMINATION

BY MS. WILLIAMS:

Q.  Agent, you're aware that there was a lot of publicity about
this bombing starting the day it happened, correct?

A.  Yes.

Q.  And you're aware that fairly soon after, it made it to the
news that there was a package bomb, correct?

A.  That was the extent of it, yes.

Q.  I'm sorry, say it again?

A.  That was the extent of it, that it was a parcel or package,
yes.

Q.  And you are aware that there were TV as well as press
interviews and at least one picture of Mr. Logan holding the
box or a copy of the box that exploded?

A.  I have seen that picture.

Q.  In the course of collecting evidence and doing follow-up in
this case, you subpoenaed Dennis Mahon's credit information
from at least one credit reporting agency; is that right?

A.  That is correct.

Q.  And you reviewed those files?

A.  Yes, I did.

Q.  You also subpoenaed Dennis Mahon's credit card records?

A.  Yes.

Q.  For various companies?

A.  Yes, ma'am.

Q.  And you reviewed those records?

A.  Yes, I did.

Q.  You -- in reviewing the various records that you subpoenaed, would it be fair to say that you were looking for unusual transactions?

A.  Yes.

Q.  And would unusual transactions include such things as, oh, pipes?

A.  Yes, any components.

Q.  Pipes, end caps, batteries, rocket ignitors, those types of things?

A.  Yes.

Q.  And you saw -- you found no unusual transactions, did you?

A.  I did not find any transactions for any component purchases.

Q.  Okay.  You found no transactions at all that struck you as unusual?

A.  No, I did not.

Q.  You also contacted a company -- you contacted a number of

credit card companies?

A.  Yes, ma'am.

Q.  Including a company called Hobby Surplus?

A.  I can't be sure of the name, but I know we went to -- it
was a hobby store, I think it was on Southern Avenue in Tempe.

Q.  Looking to see what kinds of things Dennis Mahon had
purchased there?

A.  Yes.

Q.  Looking, for example, for things such as remote-controlled
airplanes, correct?

A.  I don't recall remote-controlled airplanes.

Q.  Things that would take a rocket igniter?

A.  Well, a remote -- a model rocket would take that.  A
remote-control airplane is --

Q.  Anything that would take an igniter?

A.  Yes.

Q.  You were looking for such things, correct?

A.  Yes.

Q.  And you didn't find anything like that?

A.  They did not keep any kind of detailed records that were of
use to us, no.

Q.  You did get some records from them, however?

A.  I don't recall.

Q.  Okay.  And you got eBay records for Dennis, correct?

A.  I recall us looking into eBay records.

Q.   EBay/Paypal?

A.   Yes.

Q.   And you didn't find any transactions listed by Dennis --

A.   Well --

Q.   -- that you recall?

A.   Without reviewing the report, I don't recall.

Q.   Nothing springs to mind?

A.   Nothing springs to mind.

Q.   And no e-mails listed to Dennis?  That you recall?

A.   E-mails from whom?

Q.   Anybody.

A.   We were aware that he had an e-mail account, an e-mail
address.

Q.   But did you see any e-mails?

A.   No.

Q.   Okay.  You went to several different sporting goods stores
around the Phoenix metropolitan area?

A.   Yes.

Q.   Again, looking for anything that might seem unusual?

A.   Yes.  With the --

Q.   And when I say "looking for anything," looking for any
purchases that might seem unusual?

A.   Yes.

Q.   Or would stand out as related to this case?

A.   Yes, specifically smokeless powder.

Q.  And you didn't find any purchases of smokeless powder by
Dennis Mahon, did you?

A.  No, I did not.

Q.  You were in Catoosa participating in the surveillance?

A.  Yes, in 2005.

Q.  In 2005, and while you did your surveillance, you took
notes?

A.  Yes.

Q.  And have you seen those notes before trial?

A.  Yes, I have.

        MS. WILLIAMS:  Your Honor, could the witness please be
shown what's been marked for identification as Exhibit 1014.

BY MS. WILLIAMS:

Q.  Do you have that before you?

A.  Yes, I do.

Q.  Now, you took approximately five days' worth of notes;
would that be right?

A.  Yes.

Q.  I would like you to just -- you see at the beginning of --
well, let me back up.

        Do you recognize this as notes from that surveillance?

A.  Yes, I do.

Q.  And if you look at the writing in those notes, would you be
able to recognize those as yours or someone else's?

A.  This is my writing.  At least in the beginning of it.

Q.  And did you have -- when you took your notes, did you take
them together with another agent?

A.  Another agent was present, but I was doing the writing.

Q.  So did you ever do notes that you would label "SA
Bettendorf and Livingstone"?

A.  Yes, I put that on there so I could remember who was in the
trailer with me.

Q.  Okay.  But they are definitely your notes?

A.  Yes, they are.

Q.  You had a code that you were using during your
surveillance, a number of codes for different people?

A.  Codes or abbreviations, yes.

Q.  Okay, for example, S1 was designating Dennis Mahon?

A.  Yes, it was.

Q.  Now, as you look through your -- do you recall having
problems during your surveillance telling Dennis and Daniel
Mahon apart?

A.  There were some problems on the first day.

Q.  And that would be January 25th?

A.  January 25th, that was the first day I had seen either of
the individuals in person.

Q.  And you subsequently went back and changed your notes as
far as the S1, S2?

A.  There were several changes.  And that was made the day
those notes were taken.

Q.  You were still there on January 29, 2005?

A.  Yes, I was.

Q.  And were you present to see the Mahons -- well, let me back up.

     When they arrived, when the undercover trailer arrived, you recall seeing the Mahons go over to help them set up their hookups?

A.  Yes, I do.

Q.  And that was pursuant to a request by one of the women?

A.  I'm not sure if they requested it or if the Mahons just came over to help.

Q.  You don't recall seeing that?

A.  I -- I could probably see what was going on, but I couldn't hear if they are outside of the trailer and the broadcast range, I couldn't hear what was being said.

Q.  And on the 29th, the Mahons again worked on the sewer or water hookup for the women, correct?

A.  Yes, they did.

Q.  In their undercover trailer?

A.  Yes.

     MS. WILLIAMS:  Your Honor, may I have one moment?

     THE COURT:  Yes.

BY MS. WILLIAMS:

Q.  Was there a later date during your Catoosa surveillance that you had to go back in and reidentify S1 and S2?

A.  Yes, I believe that on January 29th, I misidentified one of them as well, and I went back and corrected it that day.

Q.  Okay.  And did you, in the days you had to change, did you uniformly misidentify S1 as S2, or S2 as S1, or both?

A.  I'm not sure I follow your question.

Q.  Okay.  Did you have any more difficulty identifying S1 or S2, or was it pretty much the same?

A.  It was -- it was kind of the same.  It was easier to identify them when they were both together.  But as the operation went on, you started to notice a little differences.

Q.  But initially, those first three days especially, you were having more problems?

A.  I would not say the first three days, no.

Q.  You're right -- and the days of your notes, 25th, 26th, 27th, so the first five days, you said the 25th and the 29th if I understood you correctly.

A.  Yes, that's only two occasions.  That's not all three days.

Q.  Okay.

        MS. WILLIAMS:  Your Honor, I have nothing further.
Thank you.

        THE COURT:  All right, Ms. Hull?

        MS. HULL:  Could the witness be shown please Exhibits 560 and 561.

CROSS-EXAMINATION

BY MS. HULL:

Q.  Agent Bettendorf, do you have in front of you Exhibits 560
and 561?

A.  Yes, I do.

Q.  And do you recognize, starting with 560, that that is the
press release from postal that you just referred to on direct
examination?

A.  Yes, it is a press release from the postal service.

Q.  Okay.  And you recognize that as one of the documents that
you reviewed for purposes of your direct examination?

A.  I -- I've reviewed postal news releases.  I don't know that
I've seen all of them.  They had numerous ones.

Q.  Does this one look similar to those?

A.  Yes, it does.

        MS. HULL:  Defense -- Daniel Mahon moves Exhibit 560
into evidence.

        MS. WILLIAMS:  No objection.

        MR. BOYLE:  No objection.

        THE COURT:  560 is admitted.

BY MS. HULL:

Q.  Agent Bettendorf, do you have 561 in front of you?

A.  Yes, I do.

Q.  You testified on direct examination that you reviewed the
Silent Witness reward accounts, and that no information was

contained in there about the bomb.  Do you remember that

testimony?

A.  Yes, I mean, I haven't reviewed this recently, but I have

seen this in the past, yes.

Q.  Okay.  So you recognize that as one of those postings?

A.  Yes.

        MS. HULL:  Defendant moves into evidence Exhibit 561.

        MS. WILLIAMS:  No objection.

        MR. BOYLE:  No objection.

        THE COURT:  Admitted.

        MS. HULL:  Permission to publish.

        THE COURT:  You may.

BY MS. HULL:

Q.  Starting, Agent Bettendorf, with 560, do you see that on

the Elmo?  I'm sorry, on the screen in front of you?

A.  Yes, I do.

Q.  And this is dated May 6, 2004, correct?

A.  Yes, it is.

Q.  And it talks about a letter and questionnaire being sent to

the attendees of the Authors and Appetizers.  Do you see that

start?

A.  Yes, I do.

Q.  Do you recall that being part of the investigation?

A.  Yes.  That there was an Authors and Appetizers event at the

library, yes, I do.

LAWRENCE BETTENDORF - CROSS-EXAMINATION BY MS. HULL    2626

Q.  The night before the bomb was found --

A.  Yes.

Q.  -- the package was found, correct?

A.  Yes, I do.

Q.  And it indicates that investigators have determined that a parcel similar to the mail bomb may have been seen at the library on the evening of that event, correct?

A.  That is what is written in this release, yes.

Q.  Okay.  And do you see the red writing towards the bottom of the page?

A.  Yes, I do.

Q.  Could you read that, please, out loud?

A.  "The United States Postal Inspection Service is offering a reward of up to $100,000 for information leading to the arrest and conviction of the individual or individuals responsible."

Q.  And the paragraph right above that indicated that when it talks about we are contacting attendees, you understand that to have been a postal press release, correct?

A.  Yes.

Q.  The caption at the top obviously United States Postal Inspection Service, correct?

A.  That is correct.

Q.  And they were assisting in the investigation of the Scottsdale bomb, correct?

A.  In the beginning, it was -- they -- they took the evidence

LAWRENCE BETTENDORF - CROSS-EXAMINATION BY MS. HULL   2627

and were processing it.  And they had a far more active role in

the beginning.

Q.  Is that a yes?

A.  What was the question?

Q.  That the postal service was assisting in the investigation

of the Scottsdale bomb?

A.  In the beginning, they were more the lead agency.

Q.  Okay.  So because it was believed, at least initially, that

the package had actually gone to the mail, correct, because it

had the postage meter stamp on it?

A.  That is correct.

Q.  Okay.  And you later determined it was not, did not

actually go through the mail?

A.  We did not believe that it was.

Q.  Okay.  But you did determine that it went through the

Scottsdale mail room, correct?

A.  Yes, through an internal city mail, yes.

Q.  All right.

        MS. HULL:  Permission to publish 561.

        THE COURT:  You may.

BY MS. HULL:

Q.  Agent Bettendorf, this is Exhibit 561.  Do you see at the

bottom where it is a Silent Witness publication or notice,

correct?

A.  Yes.

LAWRENCE BETTENDORF - CROSS-EXAMINATION BY MS. HULL    2628

Q.  And there is an additional reward separate and apart from the postal reward being offered by Silent Witness, correct?

A.  That is correct.

Q.  And this talks about Mr. Logan having opened a parcel delivered via the U.S. mail, correct?

A.  Yes, it does.

Q.  And it offers a reward of up to five -- I'm sorry, can you read the sentence that starts:  Silent Witness, Inc. is offering?

A.  I don't -- I think you need to move it down.  Okay, on the bottom there.

        "Silent Witness, Inc. is offering a reward of up to $6,000 for information leading to the arrest and/or indictment of the suspect or suspects responsible for this crime."

Q.  Do you have information as to whether or not either of those rewards have been paid out?

A.  To my knowledge, they have not been paid out.

        MS. HULL:  If I can have just one moment, please.

BY MS. HULL:

Q.  Agent Bettendorf, isn't it true that the month after -- following the Scottsdale bomb, you handled an investigation into an attempted suicide by pipe bomb?

A.  I did not handle it.  I was present and I opened up an ATF investigation just to document it.  Glendale P.D. was the agency responsible for the investigation.

MR. BOYLE:  May we have a side bar on this issue?

THE COURT:  Yes.

(The following discussion was held at the bench between Court and counsel:)

MR. BOYLE:  Judge, I make a Rule 403 objection to the Pappas incident.  I see no evidence whatsoever to connect this to this case.  Therefore, I believe it's a waste of time, confusing, and shouldn't -- and this line of questioning shouldn't be allowed to continue under 403.

THE COURT:  Ms. Hull?

MS. HULL:  Judge, I'm -- I can read into the record, and if the Court will recall the listed evidence that Agent Moreland listed in his search warrant affidavit of the Davis Junction farm in 2009, he listed very specific items that he expected to find there in both his affidavit and in the attachments.

Judge, the list of items taken found inside Mr. Pappas' apartment that day include miscellaneous papers showing bomb making plans.  Agent Moreland indicated he expected to find those.

Two notebooks with various notes on destructive devices.  He indicated he expected to find those.

Two packages of model rocket igniters, again on his list.

A utility bill though shows that was also there but I

don't need to go into that.  Alligator clips with wires.  Three nine.

Volt batteries.  And we have photographs that we showed you earlier that they are were Rayovac batteries.  A spool of solder, baling wire, wire with alligator clips and various colored wire.  The solder was also part of the things that Agent Moreland said he expected to find.

Light switch, electrical tape and roll of gray duct tape.  I don't recall if those were on his list, quite frankly.

Anti-American newspaper article written by Mr. Pappas.  A container of Pyrodex, a muzzle-loading propellant, was also found there.  And Mr. Hansen already testified that that is a smokeless powder.  This is the type of powder that Agent Moreland indicated in the search warrant affidavit he expected to find at the Mahons'.

Receipt for galvanized pipe and ends or end caps.  They found five end caps and a pipe nipple.

That's the list that I have for purposes of -- I think it's relevant not only that it comports almost to the letter with the items that Agent Moreland indicated in the search warrant that he expected to find at the bomber's, specifically the Scottsdale bomber's residence -- residence, not workplace, but residence, and it is, I believe, less than 30 days after the Scottsdale bomb.  It is dated -- the proximity March 29th, 2004.

MR. BOYLE:  I also need to object.  This is beyond the scope of direct.  So I'm going to ask that we discontinue this until we have a hearing about Agent Bettendorf's other issues unless you are prepared to rule now, but this is beyond the scope.

THE COURT:  Well, it is beyond the scope.  There's no doubt about that.  It seems to me that this is fair material for the rebuttal case, but it is beyond the scope of direct.

But I want to address 403 now.  What is your response as to why a risk of unfair prejudice or other 403 factor would substantially outweigh the probative value of this evidence?

MR. BOYLE:  It is -- I think it's a waste of time, because there's no probative value.  All of the items that she mentioned are in my house.  I'm sure they are in a lot of people's houses.  These are galvanized pipe, solder, batteries.  Absent some kind of a connection whatsoever to Don Logan or the Scottsdale bombing or anything, there's no connection whatsoever.

And I don't know that you're getting the full picture as well, because the defense may have interviewed Mr. Pappas.  And I think there's -- he has no -- they will have to tell you what their investigator found.  But I mean, is there -- do they have any other connection other than the fact that he's got hardware supplies in his house?

THE COURT:  All right, I understand the parties'

positions.  I think since we do need to take it up in the

rebuttal case, we ought to address this further tomorrow.

          MS. WILLIAMS:  Defense case?

          THE COURT:  Yeah, I'm sorry, I meant the defense case.

          MS. HULL:  I knew that.

          THE COURT:  I do think it's beyond the scope, and for

that reason, it ought to wait until you call Agent Bettendorf

in your case.

          MS. HULL:  All right, thanks, Your Honor.

          THE COURT:  Okay.

          (The discussion at the bench concluded.)

BY MS. HULL:

Q.  Agent Bettendorf, do you still have Exhibit 1014 before

you, sir?

A.  Yes.

Q.  And can you locate your notes about 15 pages in for January

27th, 2005?

A.  I've located two pages for January 27th.

Q.  And do you see on the first page of that you crossed out

twice S1, S2?  Do you see that?  At 1552 hours and 1600 hours?

A.  Yes.

Q.  And so you confused these two gentlemen also on the 27th of

January, correct?

A.  It appears that that may have been the case.

          MS. HULL:  I have nothing further, Judge.

THE COURT:  All right.  Redirect?


REDIRECT EXAMINATION

BY MR. BOYLE:

Q.  Agent Bettendorf, you looked at Exhibit 560?

A.  Yes.

Q.  Postal reward?

A.  Yes, sir.

Q.  Any information about the fact that it was a pipe bomb?

A.  No, there's not.

Q.  Any reference to a one-by-five?

A.  No, there's not.

Q.  Referring to Exhibit 561, did you see that exhibit?

A.  Yes, I did.

Q.  Any reference to a pipe bomb in that exhibit?

A.  No, there's not.

Q.  Any reference to a one-by-five?

A.  No, sir.

Q.  You were asked questions about correcting your notes
between S1 and S2.  Did you correct your notes?

A.  Yes.

Q.  How are you able to determine you made a mistake?

A.  After just -- just through watching them either outside the
trailer, in the trailer, you know, over the video, listening to
their speech, referring to another one, so it was -- sometimes

it would just take --

        MS. HULL:  I'm sorry, I didn't hear the last part.

        THE COURT:  All right, could you repeat that just a little louder please, Agent.

        THE WITNESS:  Yes, just, you know, reviewing the tape, listening to them speak.

BY MR. BOYLE:

Q.  And is it your practice to fix your mistakes?

A.  Yes, it is.

Q.  Do you -- did you have enough information to realize that you had made a mistake?

A.  Yes.

Q.  And the subsequent notes that follow the entries you've described, were they accurate?

A.  Yes.

Q.  Were you able to identify S1 and S2 after you made initial corrections in your notes?

A.  Yes.

Q.  You were asked about credit card records.  Do credit card reports reflect cash transactions?

A.  No, they do not.

        MR. BOYLE:  May I have one second, Your Honor, please?

        May we have one more side bar, Your Honor?

        THE COURT:  One more.  If you want to stand up, ladies and gentlemen, you may.

(The following discussion was held at the bench between Court and counsel:)

MR. BOYLE:  The reason I'm bringing this up is on cross-examination the defense asked, I think, if there were any unusual purchases on eBay.  And it's our understanding that there were purchases about bomb making materials on eBay.  But I didn't want to just go into that topic.  So --

MR. MORRISSEY:  If I could clarify.  The -- the answer by the witness was that there were no purchases of components.  But what we believe the witness will say was there anything connected to bomb making.  Yes, there were books on bomb making purchased prior to the Scottsdale bombing.  And that's what we didn't want to raise without the Court hearing it.

MR. BOYLE:  So what I'm asking for is permission to defer this until again we have a chance to look at the records, look at the question, and have you make a ruling on it rather than me just charging into it.

THE COURT:  All right, let's defer it.  We are going to have Agent Bettendorf coming back.  But I am going to leave it to you to raise it again.

MR. BOYLE:  I will.

THE COURT:  But before you bring it up in front of the jury.

MR. BOYLE:  I will.

THE COURT:  Okay.

(The discussion at the bench concluded.)

MR. BOYLE:  No other questions, Your Honor.

THE COURT:  All right, thanks, you may step down.

THE WITNESS:  Thank you, Your Honor.

MR. MORRISSEY:  Your Honor, the defendant calls
Patricia Norfleet.

THE COURTROOM DEPUTY CLERK:  Come on up.

If you will stand right here and raise your right
hand, please.

(The witness, Patricia Norfleet, was duly sworn.)

THE COURT:  Please come have a seat right over here,
just walk this way.  Just walk around and watch your step.


PATRICIA NORFLEET,

called as a witness herein, having been first duly sworn, was
examined and testified as follows:


DIRECT EXAMINATION

BY MR. MORRISSEY:

Q.  Ms. Norfleet, would you spell your name for the jurors.

A.  N-o-r-f-l-e-e-t.

Q.  Are you currently working?

A.  No.

Q.  Are you retired?

A.  Yes.

Q.  Was there a time when you worked at the -- I might get the
name wrong, the Scottsdale City Library?

A.  Civic Center Library, yes.

Q.  Civic Center Library, which is in Scottsdale?

A.  Yes.

Q.  Okay.  When did you work there?

A.  From 5-2002 until about 2006.

Q.  And when you worked there in that time period, what was
your job?

A.  Monitor.

Q.  And what -- what did you do as a monitor?

A.  Responsible for opening and closing the building, fire and
safety concerns, having the patrons follow the rules of conduct
at the library.

Q.  And how would you make sure that the patrons were following
the library rules?  And maybe as your answer, give us an
example of a rule that sometimes got broken.

A.  Well, back then you couldn't have a cell phone.  And you
couldn't eat in the library.

Q.  Okay.

A.  Which now is not the case.

Q.  So in your job, how much walking of the library did you do?

A.  I was there part time.  So I would say about 10,000 steps a
day.

Q.  Okay.  So you covered the whole of the library?

PATRICIA NORFLEET - DIRECT EXAMINATION BY MR. MORRISSEY 2638

A.  Yes.

Q.  You said you were part time.  What -- what were your hours?

A.  About 17 hours a week.

Q.  Okay.  I would like to take you to February 2004.  You were working then at the Civic Center Library?

A.  Yes.

Q.  Do you recall an event in February 2004, that was called Authors and Appetizers?

A.  Yes.

Q.  Was that on a Friday night?

A.  Yes.

Q.  Did you work as a -- did you work at that event?

A.  Yes.

Q.  As a monitor or something else?

A.  As a monitor, but at the door.

Q.  Okay.  First, could you describe that event for us.

A.  It was a catered function for authors to come in and pay -- it was a fund-raiser by the Friends of the Library.

Q.  So if -- could any member of the public attend?

A.  No, you had to have a ticket.

Q.  Had to have a ticket.  Were tickets for sale at the door?

A.  No.

Q.  So tickets had to be purchased in advance?

A.  Yes.

Q.  And give us a sense of how large the Civic Center Library

is.

A.  Oh, it's very large.  It's two stories.  I couldn't tell you.

Q.  Okay.  Let's not worry about square feet.

A.  Two football fields.

Q.  Okay, it's a large structure?

A.  Yes.

        MR. MORRISSEY:  Your Honor, Exhibit 237 is in evidence.  I would like -- and I'm sorry, Exhibit 241 is in evidence.  With the Court's permission, I would like to publish it at this point.

        THE COURTROOM DEPUTY CLERK:  Yes, it was admitted on 1-17.

        THE COURT:  You may.

        MR. MORRISSEY:  And is the Elmo enabled?

        THE COURTROOM DEPUTY CLERK:  Yep.

BY MR. MORRISSEY:

Q.  Ms. Norfleet, this may not be the greatest picture, but does this give you some idea of the size and volume of the library?

A.  That's just one small, small portion of the library.

Q.  Sure.  Describe what you see in this section.

A.  It looks like the computers.

Q.  Okay.

A.  And the book racks behind it.

Q.  And if somebody wanted to not be on the computer, but to

actually study at the library, where could they go?

A.  Well, there's several study rooms.

Q.  Okay.  And were those behind closed doors?

A.  They did have closed doors, yes.  And there are also

carrels all throughout the library that you could sit.

Q.  Okay, let's talk about carrels for a second.  What's a

carrel look like?

A.  It's like a wooden desk.

        MR. MORRISSEY:  Your Honor, this is Exhibit 237.

Permission to publish?

        THE COURT:  You may.

BY MR. MORRISSEY:

Q.  Do you see a carrel depicted in this photograph?

A.  Yes.

Q.  And is that roughly the size that -- were they all of a

uniform size?

A.  Yes.

Q.  If a patron was studying or using books and had to leave

their carrel and didn't want their books reshelved, was there

anything they could do?

A.  Yes.

Q.  What would they do?

A.  There was a little plastic, I believe it was red, that they

would put on it that would say:  Please do not reshelf the

books or these items.

Q.  And that "do not reshelf" placard was supplied by the library?

A.  Yes.

Q.  Let's go back to the Authors and Appetizers event.  You said you worked that night.  And you said it was a large event?

A.  Yes.

Q.  And I believe you said you worked the front door?

A.  Right.

Q.  Let me -- what time did that roughly -- did that event start?

A.  The authors came into the front door first.  And the patrons came in maybe an hour later.  Maybe seven.  You know, seven, perhaps.

Q.  Okay.  So -- and was the library itself closed to the public that night if you didn't have a ticket?

A.  Right.  At six o'clock, we had to get everybody out of the library.  And because that's the normal hours was ten to six, I believe.

Q.  When -- when it was six o'clock and regular patrons were being ushered out of the library, was it anybody's responsibility to walk the library and determine if anything had been left behind?

A.  Yes.  Each -- each room had a staff person that was responsible every night when I closed, they were responsible to

go through that area and make sure that there was nobody

sleeping in the rooms or in the chairs and turn off the lights

in that section if it was applicable.

Q.  And was that done the night of the Authors and Appetizers?

A.  Yes.

Q.  And did anybody, at the end of that process, come to you

and say:  Well, we found a package?

A.  No.

Q.  Was anything turned in to lost and found?

A.  Well, that wasn't -- that was not my area.  It would be

sent to the lost and found, which was at the circ department.

Q.  Okay.  So that -- for that one you would not have?

A.  No.

Q.  Okay.  You said that the event was catered, correct?

A.  Yes.

Q.  How did the caterers have access to the library?

A.  There's a dock in the back where they would bring in

trucks.  And it has a big gate, an automatic gate and a loading

area.  And so they would come through that loading area, and

then there's a back door that would open with steps.

Q.  Were the caterers, were you able to identify who were the

caterers versus who were the authors?

A.  Yes.  The authors had -- I mean, the authors were already

in the rooms by that time, giving -- reading their books,

giving readings.  And the caterers were dressed in --

Q.  Catering outfits?

A.  Yes.

Q.  Okay.  Did you, during the course -- how long did that

event go that night?

A.  I would say maybe until 10:00, 10:30.

Q.  So several hours?

A.  Yes.

Q.  What was -- during the course of that several-hour event,

did any of the -- did anybody present, whether author, caterer,

member of the public with a ticket, cause you any concern?

A.  I was at the front door the whole time of the library.  We

had patrons that were trying to get into the library, and I had

to tell them that -- people were leaving through that area,

too -- leaving and coming.  So I had to stay there and tell

them that this was a paid event, that the library wasn't open,

and there was a restroom down the hall or, you know, down the

Civic Center.

Q.  Okay.  From a security perspective, did you have any

security concerns that night?

A.  Yeah, there were -- there were people that were upset that

they couldn't come into the library.  And you know, there were

people -- there were some people that, you know, perhaps had

too much to drink that were insisting on coming in.

Q.  Were you able to manage those situations?

A.  Um-hmmm.

Q.  At -- I think you said um-hmmm.  Is that a yes?

A.  Yes.  Yes.

Q.  Okay.  At the end of the night, was -- was a sweep done of the library to prepare it for the next day?

A.  There's always a sweep of the library.  We had a problem with people sleeping in chairs and in the study rooms.  And so each staff member, every night, regardless if it was a party or not, had to do a sweep.  Because as a monitor, I had to stay at the door to usher people out of the door and so people wouldn't come in.  So every staff person always had to clear that area that they were assigned that night, whether it be a librarian or just a staff person.

Q.  Did anyone that night, in doing the sweep -- you were at the front door, I recall?

A.  At the side door.

Q.  Okay.  Did anyone bring to your attention that there had been a package found?

A.  I'm sorry, the front door, I was at the front door.

Q.  Okay.  Did anyone bring to your attention the fact that there had been a package found?

A.  No.

Q.  Did you work the next day, which would have been a Saturday?

A.  Yes.

Q.  What time did the library open on that Saturday?

A.  Ten o'clock.

Q.  That particular Saturday, do you have a memory of opening up on that day?

A.  Yes.

Q.  Okay.

A.  It was like any other Saturday.

Q.  Then let's talk about Saturday.  Is Saturday a busy day at the library?

A.  Yes.  Yes.

Q.  And what, as the library opens at ten o'clock, what is that process?  What gets unlocked?

A.  Well, there are two huge sliding glass doors, two sets. And so we open the outside set and then there's a -- an area that people can stand with some stairs.  And then usually there's about maybe 30 people that are waiting for the library to open -- when I was there eight years ago.

        And as soon as I would open one set of glass doors, people would rush in to go to the computers.  Because at that time, you had to sit at the computer and sign in.  And so they would rush in.

        And then I would go to the other side and a few people would come in that way.  But the majority would come in that left door.

Q.  So the Saturday after the Authors and Appetizers event, was it similarly as you have described?

A.  Yes.

Q.  Once the library had been opened and the rush of people had come in, what were your duties for the rest of that day?

A.  Well, I looked at the itinerary of what rooms had to be open, if we had anything going on downstairs.  There's a gallery that has a video machine.  And then I would proceed to walk around the library, just to do my rounds to make sure people weren't on cell phones, that they were adhering to the guidelines of not being so loud, not falling asleep, and not eating.

Q.  Okay.  When you were doing your rounds after the library opened, did you notice anything unusual?

A.  I don't really remember how I found the box.  I don't know if I walked past and saw it, or if a noise brought me over there.  I just really don't remember.  It was always so busy and there was always so much going on.

Q.  Okay.  Let's talk about the box.  The box that you found, where was it?

A.  It was on a carrel.

Q.  And we've seen --

        MR. MORRISSEY:  Your Honor, may I republish Exhibit 237?

        THE COURT:  Yes.

BY MR. BOYLE:

Q.  This is a carrel.  So is it fair to say that it could

either be on the top ledge or on the larger part of the desk
underneath?

A.  Yes.  Yes, it was sitting there.  And that time it was just
a box.  I didn't really --

Q.  So as you sit here today, you know you found a box on the
carrel.  Exactly where on the carrel you don't know?

        MS. HULL:  Could we have an answer for the record?

        THE COURT:  Yes, there needs to be an answer.

        THE WITNESS:  Oh, no, I don't know exactly where it
was on the carrel.

BY MR. MORRISSEY:

Q.  You indicated that if somebody did not want something
disturbed, that they could leave a "do not reshelf" placard on
it, correct?

A.  Yes.

Q.  Do you recall whether or not there was anything on top of
this box?

        MS. CISNEROS:  Objection, leading.

        THE COURT:  Overruled.

        THE WITNESS:  I -- it just -- I think there was.  It
is --  you know.

BY MR. MORRISSEY:

Q.  Okay.  If -- don't guess.

A.  Okay.

Q.  If -- if you don't recall.

A.  I don't really remember.

Q.  Okay.  Would you describe this box you found?

A.  It was a brown cardboard box.  And when I -- it was about,
I guess, 10 -- 12 by 5 inches.  But, you know, it was just a
box.  I really didn't -- I mean, it didn't matter.  It
didn't -- you know.

Q.  All right.  So it's a box.  And can you describe any other
characteristics of the box besides its size?  Was it addressed
to anybody?

A.  Well, I remember when I picked it up, it felt like it was
empty, but it was sealed with tape.  And what struck me is that
it was just perfect, the tape was perfect.  And it did have an
addressee, and it had a sender, but I didn't really pay any
attention.

        I just thought it was an empty box.  That's what was
so odd about it.  And I was shaking it.  And that's what
just -- it just felt like it was an empty box.

Q.  And you said it was addressed to somebody?

A.  Yes.

Q.  Do you remember who it was addressed to?

A.  No.

Q.  Okay.

A.  But I took it over to the librarian in charge and I said
that there's something wrong with this box.  It feels empty.

        And she said -- I said:  Can I open it?

And she said:  No, it is addressed to Don Logan at the wrong address.

And I went:  But something is wrong.  It feels -- and I'm shaking it the whole time, it feels empty.

And Johanna told me to bring it over to the circulation department.

Q.  Okay, let's stop there for a second.  You've described the box being perfect and the tape, and having an addressee and addressor.  Do you recall whether the box had any postal meter signs on it?

A.  I don't remember.

Q.  All right.  You took the box and you, I believe you said to Joanna?

A.  Johanna.

Q.  Johanna.

A.  She's the librarian in charge.

Q.  What is Johanna's last name?  Does Morrison ring a bell?

A.  Yes, Morrison, that's it.

Q.  And where physically were you in the library at this time when you had the package and you brought it to Johanna Morrison?

A.  She was standing behind the reference desk.  It's a counter on the left side of the library.

Q.  Once you were told not to open it, what happened at that point?

PATRICIA NORFLEET - DIRECT EXAMINATION BY MR. MORRISSEY 2650

A.  Well, she said that -- no, you can't open it.  It's addressed to Don Logan.  And I didn't know who that was.  And she said it was the wrong address.

And I said -- well, she said to bring it over to the circulation department.  And I walked over to Jeff, who was sitting at the circulation department.  And I shook it again.  And he looked at me.  And I said:  Well, you know, she said to give it to you.

And I think he shook it.  And then he said, "This is odd."  And he put it behind him.

MS. CISNEROS:  Objection, Your Honor, to the narrative.

THE COURT:  Sustained.

BY MR. MORRISSEY:

Q.  Did you see, without telling me what Jeff said --

A.  Okay.

Q.  Did you see where Jeff put the package?

A.  Yes.  Behind him.

Q.  And --

A.  On the counter.

Q.  Okay.  Did the public have access to that portion of the counter?

A.  No.

Q.  Okay.  Did you ever see that box again?

A.  No.

MR. MORRISSEY:  No further questions.

THE COURT:  Cross-examination?


CROSS-EXAMINATION

BY MS. CISNEROS:

Q.  Good morning, Ms. Norfleet.

A.  Hi.

Q.  I want to talk to you a little bit about a couple things
you've said.  And please correct me if I'm wrong in any -- in
anything that I say to you.

        You indicated that individuals could not purchase
tickets at the door?

A.  Correct.

Q.  Is that your recollection at this time?

A.  Yes.

Q.  Would it surprise you to know that the event was advertised
as being able to purchase tickets at the door?

A.  No.  That's the library often made mistakes.  So I did not
sell any tickets, nor handle any money.

Q.  But there were other people, people from Friends of the
Library, who were there who were handling the entrance,
correct?

A.  True.

Q.  You were the monitor who was in charge of security,
essentially?

A.  Correct.

Q.  Now, you spoke with Mr. Morrissey also about at the end of the process of the Authors and Appetizers event.  You indicated that your area of responsibility was the door --

A.  Right.

Q.  -- correct?  And that was the area that you then -- I'm trying to find the word -- swept at the end of the day -- of the night, or did you sweep everything?

A.  No.  I didn't sweep anything.  Because you have the staff people that are responsible for each room to do a walk through.  Because it's a huge library.

Q.  Right.

A.  And I would have to stand there to make sure that the people didn't go into the bathroom or didn't go into the offices, because -- either went out the side door, when it was a regular library, and then that night a lot of people went out the front door.

Q.  Okay.  So you did not, just to clarify, you did not sweep anything?

A.  No.  No.

Q.  Your testimony is simply that nobody came to you to tell you they had seen a box?

A.  Correct.

Q.  You also indicated in response to Mr. Morrissey's question about the ability to identify caterers and authors.  Do you

remember that line of questioning?

        You stated that the caterers were dressed in catering

outfits, correct?  I presume --

        MS. HULL:  Your Honor, may I request an answer for the

record?

        THE COURT:  Yes.

        THE WITNESS:  Oh, yes.  Yes.

BY MS. CISNEROS:

Q.  I presume like with a uniform like an apron or some other

kind of --

A.  No.

Q.  How were they dressed?

A.  I think -- I think they had black pants and maybe white

tops.

Q.  Okay.

A.  I'm not sure.  But you could tell.

Q.  And so the people leading up to opening the doors for the

event, basically, that were milling about, walking around, were

caterers and authors, and library personnel, fair to say?

A.  And Friends of the Library, yeah.  I forgot about them,

yeah.

Q.  And I'm sorry, Friends of the Library, just to clarify for

the jury, is a -- it's just a nonprofit organization that's

associated with the library?

A.  Right.  And that's why they were having the Authors and

Appetizers.

Q.  It's a charitable organization?

A.  Right.

Q.  So there were authors that were there?  The authors were
not dressed in outfits, correct?

A.  No.

Q.  So somebody could have been there that you simply assumed
was an author, but may not have been an author; fair to say?

A.  Well, they came about an hour before the event started and
they came through the front door.  And most of them were
recognizable.

Q.  But is it fair to say that they were not wearing any
identifiable clothing?

A.  No.  No.

Q.  Now, you indicated that you arrived -- well, I don't know
if you indicated actually.

        When did you arrive at work on the Saturday, the 21st
of February of 2004?

A.  Well, the library opened at 10:00.  So I think I was either
9:00 or 9:30.

Q.  Okay.  Would it surprise you to know that you previously
stated that you came into work at 8:00 or 8:30?

A.  No, it's been eight years.  And I don't --

Q.  I understand.  But in any event, you would open that area
that you were talking about, just kind of like a -- between the

outside door and the inside door?

A.  Yes.

Q.  For patrons of the library to gather there before you actually opened the door to the library?

A.  Right.

Q.  So you had to have been there before that happened, right?

A.  Right.

Q.  Correct?

A.  The library opened at ten.  And I believe I was there around nine.

Q.  Well, let me ask you this:  When you arrived then, when you arrived, you indicated that there were a number of tasks you had to complete.

A.  Right.

Q.  Was one of those tasks kind of looking around, sweeping around?

A.  No.

Q.  Okay.  What were your tasks that morning?

A.  Seeing what had to be opened, there was a gallery downstairs, what movies were going to be run, making sure that all the study rooms were open.

Q.  And in doing so, you're walking around the library; is that fair to say?

A.  Yes.  Yes.

        MS. CISNEROS:  Your Honor, may I approach Traci with

some exhibits?

THE COURT:  Yes.  Can you share those numbers with defense counsel, Ms. Hull?

MS. CISNEROS:  Yes, Your Honor.  Yes, in fact I have them.

BY MS. CISNEROS:

Q.  Ms. Norfleet, you've been handed a number of folders that have numbers on them.  Those are exhibit numbers.  They are just made for reference.  Could you take a look at the folder that's labeled Exhibit 572.

A.  572?  Oh.  Okay, yeah.

Q.  Ms. Norfleet, do you recognize that?

A.  Yes.  Yes.  That's what the library used to look like.

Q.  Right.

MS. HULL:  I apologize, what exhibit are we --

MS. CISNEROS:  572.

MS. HULL:  572, thank you.

BY MS. CISNEROS:

Q.  And is that what the library used to look like, I'm sorry, back in 2004, to the best of your recollection?

A.  Yes.

Q.  Do you see some markings that appear to be written on like in the middle area?  They don't appear to be part of the -- the --

A.  Yes.  Uh-huh.

Q.  Okay.  Are those -- did you write these?  Is that your
handwriting?

A.  No.

Q.  Okay.  I just wanted to know if that was your handwriting.
Okay.  We will turn to this in a couple of minutes, just to
refresh your memory of what the library looked like.

        Okay.  So we've established that the library opens at
ten in the morning, correct?

A.  Yes.

Q.  Now, besides you, one of the library monitors, there are
other workers, library workers who come in early before the
library opens, correct?

A.  Yes.

Q.  And even before that, there are library pages who come in?

A.  Right.  And a cleaning crew, yeah.

Q.  Okay.  So between the time of Authors and Appetizers, would
you say there was likely a cleaning crew and library pages who
had also been at the library?

A.  Yes.  That's likely, yes.

Q.  Okay.  Now, the library pages, they come in around seven in
the morning or so?

A.  I don't -- I don't know.  I don't think that early.

Q.  Who are these individuals, the pages?  Do you know who?
Are they volunteers?  Do they get paid?

A.  No, they get paid, they are employees.

Q.  And what's their role?

A.  To check in the books and shelf the books and clean up the library.

Q.  Cleaning up things around the library?

A.  Yeah, books and trash.

Q.  Let's go back to the night of Authors and Appetizers.  You talked about with Mr. Morrissey the caterers being there.  And the caterers were coming in through a loading dock.

A.  Yes.

Q.  Okay.  And the loading dock was open?

A.  Yes.

Q.  And, in fact, you were concerned about that, correct?

A.  Yes.

Q.  And you mentioned it to somebody?

A.  I don't think so.

Q.  Do you remember having an interview in 2010 with an investigator?

A.  Yes.

Q.  Did you tell him that you were concerned enough that you mentioned it to somebody?

A.  I remember that I was concerned, but I was just a monitor.  And management -- I don't think I mentioned it to management.  Because they did what they felt that they had to do.  I might have mentioned it to another employee or staff person.  But --.

Q.  Okay.  But you may have mentioned it to somebody else?

A.  Yeah, but --

Q.  Now, there was no camera surveillance, correct, at the
library at this time?

A.  No.

Q.  Neither the front or at the loading dock?

A.  No.

Q.  And there were two entrances, the loading dock and the
front entrance; is that fair to say?

A.  Right.

Q.  But there were a bunch of exits as well?

A.  Oh, yes, there were exits that automatically lock behind
you, yeah.

Q.  Okay.  But if somebody had exited, somebody could have
walked in through that exit as well?

A.  Yeah.

Q.  Now, were you the only monitor there the night of Authors
and Appetizers?

A.  Yes.

Q.  And you indicated before that the authors came in through
the front door.  You saw them coming in.  They were coming in
with books?

A.  Perhaps some of them had books.

Q.  The purpose of the event was to highlight the authors,
correct?

A.  Um-hmmm.

Q.  And the purpose of the event was for the authors to talk to the public?

A.  Correct.

Q.  And to discuss their books?

A.  Correct.

Q.  And to sell their books?

A.  Correct.

Q.  So some of them had their books with them to sell?

A.  Right.  But I -- I was not in those rooms, because I was at the front door the whole time.  The only time I ever left to get something to eat or go to the bathroom, I had one of our couriers spot me at the front door.

Q.  And when you say "those rooms," do you say -- do you mean to say that they were all over the -- all over the library area?

A.  Yes.  Yes.

Q.  Were there also -- there's a -- an area in the library that is kind of to the left of the front entrance.  And it's -- it's beyond the staff desk.  Is that fair to say?

A.  You mean the open area, the adult reading room?

Q.  The adult reading room.

A.  Yeah, that's where the food was laid out, yes.

        THE COURT:  Ms. Cisneros, we are going to break for lunch at this time.

        Members of the jury, we will resume at one o'clock.

Please remember the admonition.  We will excuse you.

          (The jury left the courtroom.)

          THE COURT:  Please be seated.

          Counsel, anything we need to address before the lunch
break?

          MR. MORRISSEY:  No, Your Honor.

          MS. HULL:  No, sir.

          MS. WILLIAMS:  No, Your Honor.

          THE COURT:  Okay, see you at one.

          (The noon recess was taken.)

          THE COURT:  You may continue, Ms. Cisneros.

          MS. CISNEROS:  Thank you, Judge.

          Judge, could the witness be handed what's been marked
for identification as Exhibit 572-A.

          THE COURTROOM DEPUTY CLERK:  She has it.

          MS. CISNEROS:  She has it, wonderful.  Thank you.

BY MS. CISNEROS:

Q.  Ms. Norfleet, could you take a look at that folder, what's
in that folder.  And would you agree that it's similar to
Exhibit 572, which you saw earlier?

A.  It doesn't have the writing on it, Counsel.

Q.  Right.  So that is the difference between the two, correct?

A.  Yes, I believe so.

Q.  And you previously told us that, to the best of your
recollection, this is what the library looked like back in

2004, or it's a map of it in any event, or a diagram of it?

A.  Yes.

Q.  And this is a diagram of the first floor?

A.  Yes.

Q.  Okay.

        MS. CISNEROS:  Your Honor, move to admit
Exhibit 572-A.

        MR. MORRISSEY:  No objection.

        MS. HULL:  No objection.

        THE COURT:  Admitted.

        MS. CISNEROS:  Thank you.  Judge, may I publish it?

        THE COURT:  Yes.

        MS. CISNEROS:  Thank you.

        Okay, I need a little assistance here.

        MS. WILLIAMS:  Plus or minus.

        MS. CISNEROS:  She says "plus or minus," do I want
"plus" or "minus"?

BY MS. CISNEROS:

Q.  Ms. Norfleet, I think you have it on the screen, correct?

A.  Yes.

Q.  And I'll just advise you that if you touch the screen, it
will make a marking.  So if I ask you approximately where
something is located, then you can just touch the screen, okay?

        We discussed the adult reading room, right?

A.  Yes.

Q.  What was set up, to the best of your memory, in that area

on the night of Authors and Appetizers?

A.  The buffet table for the food.

Q.  And approximately where was that?

A.  (Indicating.)

Q.  And what else was located in that large area?  Do you

recall?

A.  No, I don't.

Q.  Do you recall a speaker by the name of Marshall Trimble?

A.  No.

Q.  Okay.  Do you recall whether there were chairs set up in

that area to watch speakers?

A.  No.

Q.  How about music?

A.  Yes, there was music.

Q.  Okay.  And that music was set up in that area as well?

A.  Yes.  I think it was right about here.

Q.  Okay.  Okay.  And the carrels that we've been talking

about, where are they typically located?

A.  The one with the box?

Q.  Sure, the one with the box.  Okay.  Great.  Thank you.

        Now, you've been interviewed -- or you were

interviewed back in 2004 by law enforcement in regards to this

case several times; is that fair to say?

A.  Yes.

Q.  And is it also fair to say that several of those times you
gave different times as to when you located the box?

A.  Yes.

Q.  Is that fair to say?  All right.  Is it also fair to say
that you do not remember when you found the box?

A.  Sometime after opening, within maybe ten to -- ten o'clock,
around there in the morning.

Q.  And the library opens at ten o'clock?

A.  I mean, around eleven o'clock, sorry.

Q.  Eleven o'clock is not a time that you've given to anybody
until today.

        THE COURT:  Is that a question?

BY MS. CISNEROS:

Q.  Is eleven o'clock a time you have previously given?

A.  It was after opening.  And it was before lunch.

Q.  Okay.  That's a big gap, though, correct?

A.  Um-hmmm.

Q.  Okay.  So you do not know precisely at what time you found
it?

A.  Between 10 and 12.

Q.  Okay.

A.  It just wasn't important.  It was just a box.

Q.  I understand.  And is it fair to say that your memory today
is not as fresh as it would have been back then?

A.  Eight years, no.

Q.  And your memory back then wasn't very fresh either, because you didn't pay very much attention to the time?

A.  No, it was just a box.

Q.  Okay.  Now, let's talk about the "do not reshelf" tag.  You indicated previously that there are these tags that are in the library around the carrels; is it fair to say?

A.  Yes.

Q.  Okay.  And those tags are used by people who don't want their items reshelved by the staff?

A.  Correct.

Q.  Now, you found a "do not reshelf" tag on this box, did you not?

A.  I believe so.

Q.  In fact, you told investigators, specifically Detective Furia.  Do you remember speaking with a detective?

        MR. MORRISSEY:  Objection, form.  This is impeachment on a point she's just said she remembers it that way.

        THE COURT:  Well, I don't know that it's impeachment.

        MR. MORRISSEY:  Then asked and answered is the objection.

        MS. CISNEROS:  I don't think --

        THE COURT:  I don't think it's been asked and answered either.  Overruled.

BY MS. CISNEROS:

Q.  Do you remember speaking with detective -- a detective on

the 26th, a Scottsdale detective on the 26th was the day of the

bombing?

A.  I spoke to several people.

Q.  Okay.

A.  Several law enforcement, ATF and --

Q.  Okay.  When you say "law enforcement," is that Scottsdale

Police Department?

A.  I believe so.

Q.  Okay.  Do you recall telling a detective that it had a --

that the box had a red "do not reshelf" tag on it?

A.  If that's what I told him eight years ago, that's what I

said.  I don't remember.  It's been eight years.  If I told him

that then, then that's what -- I should have written everything

down, perhaps, but I didn't know that this was going to happen.

So --.

Q.  I understand.  Would it refresh your recollection to look

at a transcript of your interview with the detective?

A.  Yes.

Q.  Okay.  Can you look at Exhibit 947, please.

A.  Okay.

Q.  Could you kind of take a general look at what it is so you

know what the exhibit is.  You don't have to tell me what it

is.  Just so you have a general idea of what it is.

A.  Say that again.

Q.  I was just indicating if you could just take a look at the

exhibit and get a general idea of what it is.

A.  Okay.

Q.  Okay?  Now, if you could turn to page -- there are pages in
the right bottom, 10087.  In the middle -- do you have 10087?

A.  What am I looking for?  Okay, I'm lost.  Okay.

Q.  At the bottom?

A.  I'm still looking at 947?

Q.  Yes.  947.

A.  Okay.  Okay.

Q.  At the bottom down here?

A.  Oh, okay.

Q.  Okay.  10087.

A.  Okay.  I was looking at all the other numbers.

Q.  No problem.

A.  Okay.

Q.  Okay.  So towards the middle, if you could take a look at
this -- and don't read it, please.  Don't read it out loud
rather.  If you could take a look at what it says for -- under
B, Saturday.  In kind of the middle, do you see what I'm
talking about?

A.  Yes, yes.

Q.  Just read it to yourself, please.

A.  Okay.

Q.  Read that answer and then a little farther down.

        Okay, does that refresh your recollection about

whether you found a "do not reshelf" tag on the box?

A.  Well, this is three days after it, so I would think that

what I said here --

        MR. MORRISSEY:  Objection.

        THE COURT:  Excuse, me.  Excuse me, just a moment.

        MR. BOYLE:  That's not responsive.  We need an answer

to whether it refreshed.

        THE COURT:  Sustained.

BY MS. CISNEROS:

Q.  Please answer the question as to whether it reminds you.

A.  Yes.

Q.  Did you in fact find a "do not reshelf" tag on the box?

A.  Yes.

Q.  Now, you indicated before that the box was strange to you

because it was so light, correct?

A.  Yes.

Q.  And it was very neat?

A.  Yes.

Q.  You can stop looking at the -- at the exhibit now.

A.  Okay.

Q.  That's fine.  And it was very neatly put together; is that

fair to say?

A.  Yes.

Q.  Now, you talked with a colleague of yours by the name of

Jeff Monteilh?

A.  Yes.

Q.  And who is Jeff Monteilh?

A.  He was in the circulation counter.

Q.  And he was there that morning?

A.  Yes.

Q.  Okay.  And is it fair to say you had some concerns about this box?

A.  Yes.

Q.  But you stopped being concerned at a certain point, correct?

        Let me open that up for you.  You seem a little confused.  Let me tell you where I'm going.

        You stopped being concerned when Jeff mentioned that the box might have been left over from the Authors and Appetizers event; is that fair to say?

A.  I remember -- I just remember that we were both concerned and he shook the box.  And we both looked at each other.  And he said, "This is kind of strange," or something to that effect.

Q.  Do you remember him mentioning Authors and Appetizers?

A.  No.

Q.  Okay.

A.  It wasn't important to remember.

Q.  That's fine.  That's fine.  Let's look again at Exhibit 947 then, okay, the one we were just looking at.  Could you look

at -- again looking at the bottom right at 10086 through '87,
sort of at the bottom of the page there.  If you could just
read sort of onto the next page.

        Did you read page 10087?

A.  Um-hmmm.

Q.  The top of the page?

A.  Um-hmmm.

Q.  Okay.

        MS. HULL:  Your Honor, could we have an answer "yes"
or "no," please, for the record?

        THE WITNESS:  Oh, yes.

        MS. CISNEROS:  Thank you.

        MS. HULL:  Thank you.

BY MS. CISNEROS:

Q.  Now, does that refresh your recollection about whether Jeff
mentioned to you that it might have been left over from Authors
and Appetizers?

A.  No.

Q.  I just want to make sure that you read 187, yes?

        Okay.

        Now, at some point you went over to talk with
Johanna -- Johanna and Don?

A.  Yes.

Q.  And you told Johanna and Don what Jeff had told you?

        MR. MORRISSEY:  Your Honor --

THE WITNESS:  No.

MR. MORRISSEY:  -- could we clarify Don's last name?

MS. CISNEROS:  I'm sorry.

BY MS. CISNEROS:

Q.  Don Heise, who is Don Heise?

A.  That's Don Heise, yes.  When I found the box, under the rules of the library, I'm to bring anything to the librarian in charge, and that was Johanna for that day.

Q.  Okay.

A.  And when I brought it to her, Don was standing there.  I don't remember what was said except that she said:  No, you cannot open that box.  And it's addressed and to bring it to Jeff.

Q.  Okay.  Let me stop you right there.  You remember your conversation with Jeff, correct?

A.  Not so much that we both thought it was an odd box.  He shook it, too.

Q.  Okay, fair enough.

     At some point you stopped worrying about this box, correct.

A.  Oh, once I gave it to Jeff, it was out of my hands and I went on to the 101 things that I had to do with the patrons at the Scottsdale Civic Center Library.

Q.  Ms. Norfleet, you were at the time -- you told us you are now retired.  But at the time in 2004, you were a monitor at

the library, correct?

A.  Right, part-time contracted monitor.

Q.  Okay.  And as a monitor, you would receive some training to be a monitor?

A.  No.

Q.  Okay.  Let me ask you this:  As a monitor, is it your responsibility to watch for everything that's going on?

A.  Yes.

Q.  Okay.  And so you had to learn, whether on your own or through training, to be an observant person; is that fair to say?

A.  True.

Q.  And to watch for suspicious people and things?

A.  Mostly it's to follow the rules of the conduct of the library.  And that was no cell phones at that time, no eating, no stealing, loud behavior, fights, you know.

Q.  But you found the box, though, correct?

A.  Right.

Q.  And the box seemed odd to you?

A.  Because it felt empty, yeah.

Q.  Now, one of the things that you would do at the library is clear out people who weren't supposed to be there, fair to say?

A.  Well, we had no sleeping.  We had a problem and we had to change the rules to no sleeping in the library, so yes.

Q.  Did you ever have a circumstance where somebody -- where

you found somebody at opening that had been asleep at the
library?  Did you ever find that?

A.  I've heard of it happening, but I never found anybody.

Q.  Okay.  Now, there had been some problems with some homeless
people coming into the library and leaving items, correct?

A.  There had been some problems with homeless sleeping.

Q.  Okay.

A.  Because they had been allowed to do that all day long.  And
we changed the rules.  And that was a problem.  But they
weren't leaving anything.

Q.  Okay.

A.  But and when I was on watch, yeah.

Q.  I understand.  Now, as you've already told us, as a
monitor, it was your job to observe people coming and going
from the library, fair to say, observe people?

A.  Not -- no, it's really to open and shut the building, to
follow -- have patrons follow the rules of conduct.

Q.  But you were observing things while you were doing this,
fair to say?

A.  Yes.  I was observing people, yes, so they weren't stealing
and, yeah.

Q.  Right.  Now, if somebody, for instance, had been casing the
library, you might notice that, if somebody was, you know,
looking at things strangely, you might notice that?

A.  No.  No.

             MR. MORRISSEY:  Object --

             THE WITNESS:  I was more -- the rules of conduct, I

was watching for porn on computers.  I was watching for

pedophiles.  We had a problem with that.  Even though it's

Scottsdale, it's a big problem at that library.

BY MS. CISNEROS:

Q.  Let me stop you.

A.  But no.

Q.  Okay.  Now, as we discussed you were interviewed several

times by law enforcement, correct?

A.  Yes.

Q.  And you were interviewed as late as December of 2004; is

that fair to say?

A.  Several times.

Q.  Okay.  In the course of the year 2004, correct?

A.  Yes.

Q.  Okay.  You know -- do you know what a photo lineup is?

A.  I've seen it on TV.

Q.  Okay.  You've seen it on TV.  Do you know -- has that been

on like police shows or detective shows?

A.  Yes.

Q.  Okay.  And a photo lineup is -- or a photo array would be

also known sometimes as a six-pack.  Have you ever heard that

term?

A.  No.

Q.  Okay.  And but there are six, generally six photos, three

on top, three on the bottom?  Does that seem --

A.  No.

Q.  Okay.  Have you ever been shown in this case by any of the

law enforcement officers that you've been interviewed by, shown

a photo lineup as you understand a photo lineup to be, have you

ever been shown a photo lineup in this case?

A.  I don't believe so.

        MS. CISNEROS:  Your Honor, may I take a minute,

please?

        THE COURT:  You may.

        MS. CISNEROS:  I don't have any further questions,

Judge.

        THE COURT:  All right.  Ms. Hull?


                    CROSS-EXAMINATION

BY MS. HULL:

Q.  Good afternoon, Ms. Norfleet.

A.  Hi.

Q.  Ms. Norfleet, I believe you stated on direct examination

that one of the things that struck you about this particular

box was how neat it was.  Do you recall that line of

questioning?

A.  Yes.

Q.  In fact, you repeatedly referred to it -- you described it

as being perfect.  Do you recall that?

A.  Yes, like a machine put it together.

Q.  Right.  The tape was perfect?

A.  Um-hmmm.

Q.  Is that a yes?

A.  Yes.

Q.  And -- that's all right.  I'll help remind you.  The tape
was perfect; is that right?

A.  Yes.

Q.  The box was perfect?

A.  Yes.

Q.  Okay.  It was very neat, clean, orderly, correct?

A.  Yes.

Q.  You --

        MS. WILLIAMS:  I'm sorry, was there an answer to that
question?

        THE COURT:  Yes, there was.

        MS. HULL:  Yes, there was.  I believe it was yes.

        THE WITNESS:  Yes.

        MS. WILLIAMS:  Thank you.

BY MS. HULL:

Q.  And your testimony also was that while you didn't recognize
the person on the address label, the -- the head librarian or
whatever, Ms. Morrison?

A.  Librarian in charge.

Q.   Yes.  She did and instructed you not to open it?

A.   Yes.

Q.   She was very --

A.   Adamant about it, yes.

Q.   She was very --

A.   Stern.  Yes, very stern, because I was -- I was like -- let me open it.  There's something -- something is wrong with it. She said:  No, it is addressed to Don Logan.  Put the wrong address.  You cannot open it.

Q.   Okay.  So -- and then from there, you took it eventually?

A.   No, straight -- immediately over to Jeff.

Q.   Immediately over to Jeff?

A.   Immediately, from my hands and on to the next problem.

Q.   In part because of how stern she was, is that fair?

A.   Yes.

Q.   Okay.

         MS. HULL:  If I may, Judge, 572-A, may I publish?

         THE COURT:  You may.

         THE COURTROOM DEPUTY CLERK:  Do you want that cleared off there?

BY MS. HULL:

Q.   Well, do I have that highlight about where it was before?

A.   Yes.

Q.   Okay.  And this area here, this yellow mark here, you said that was where the food table was set up, correct?

A.  Yes.

Q.  And the music was in about this area, correct?

A.  Yes, uh-huh.

Q.  And the carrel was about where this yellow mark is, correct?

A.  Yes.

Q.  In fact, for purposes of the Authors and Appetizers event, there was a great deal of moving of furniture and things in order to accommodate that event; is that fair to say?

A.  I didn't move any of the furniture, but I would think so, yes.

Q.  Okay.  Do you recall noticing that there was -- there were areas set up differently on the night of that event as opposed to what the library typically looked like?

A.  Oh, yes, uh-huh.

Q.  Okay.

        MS. HULL:  How do we clear that, please?

        Okay, thank you.

BY MS. HULL:

Q.  Looking still at this same exhibit, ma'am, this -- is this where the exit sign is, is that where you were for -- as you monitored the Authors and Appetizers, or where was it on this diagram?

A.  Okay, it's right there.

Q.  All right.

A.  Right there.

Q.  So where, for purposes of the record, where 572-A says "check out," there are two arrows to the right and left.  You marked the arrow to the right of the words "check out," correct?

A.  Yes.

Q.  Okay.  And when you -- can you mark for us, please, where again you found the box?

A.  Right there.

Q.  Thank you.

        And that area that you've marked where the box was found, that was an area that was being utilized for the Authors and Appetizers event, correct?

A.  No.

Q.  Where that carrel, was there any activity around that area for Authors and Appetizers?

A.  No, it was surrounded by book shelves, permanent book shelves.

Q.  The Authors and Appetizers event invitees, people who attended, were allowed to walk in that area of the library, correct?

A.  Yes.

Q.  So while there may not have been a particular setup there for that event, people who attended were welcome to browse around that area of the library, correct?

A.  Yes.

Q.  It wasn't blocked off or access denied?

A.  No.

Q.  Okay.  Isn't it also true that at the Authors and Appetizers event, there were a lot of book boxes at that event?

A.  Yes.

Q.  And they were similar in kind to the box that you found?

A.  I don't believe so.

Q.  How were they different?

A.  I remember seeing some that are about that size, but not small like that.  But there could have been.

Q.  Okay.  There were a lot of boxes at that event?

A.  Um-hmmm.

Q.  Isn't that right?

A.  Yes.

Q.  And they were from authors and other individuals bringing in books and other items, correct?

A.  Correct.

Q.  In cardboard boxes, correct?

A.  Correct.

Q.  Such that a cardboard box would not stand out at that event; is that fair to say?

A.  No, it wouldn't stand out.

Q.  You testified on direct examination that the Authors and Appetizers event was by invitation, correct?

A.  They had tickets.  Friends of the Library sold the tickets,

I believe.  I wasn't involved with the money or the tickets.

Q.  Okay.  Were you aware whether or not records were kept of

who was invited and who actually attended?

A.  No.  Not -- not part of my job.

        MS. HULL:  Nothing further, sir, thank you.

        THE COURT:  Redirect?


                    REDIRECT EXAMINATION

BY MR. MORRISSEY:

Q.  Ms. Norfleet?

A.  Yes.

Q.  You were asked on cross whether or not you'd given several

statements to law enforcement about the timing of when you

found the package.  Do you recall that?

A.  Yes.  Several.  Yes.

Q.  As you testify today, do you recall that you found it

between 10 and 12?

        MS. HULL:  Objection, leading.

        THE COURT:  Sustained.

        MR. MORRISSEY:  Okay.

BY MR. MORRISSEY:

Q.  As you testified today, can you remember when,

approximately, not to the minute, when you found the package?

A.  Well, between opening at ten and I would have thought noon,

you know, because I hadn't had lunch.  But, again --

Q.  Okay.  Was it after the library had opened?

A.  Yes.

          MS. HULL:  Objection, leading.

          THE COURT:  Overruled.

BY MR. MORRISSEY:

Q.  Now, the -- you described the scene on Saturday morning at

ten o'clock when people were waiting to come into the library.

Do you recall that?

A.  Yes.

Q.  Did people waiting to come into the library that Saturday

morning, did any of them have backpacks?

A.  Oh, yes.

Q.  When people come into the library on a Saturday morning, do

they have an ability to bring packages into the library?

A.  Yes.

          MS. HULL:  Objection, outside the scope.

          THE COURT:  Overruled.

BY MR. MORRISSEY:

Q.  I'm sorry, go ahead.

A.  Yes.

          MR. MORRISSEY:  No further questions.

          THE COURT:  All right.  Thanks, ma'am, you can step

down.

          MR. MORRISSEY:  Your Honor, is this witness excused?

MS. CISNEROS:  I think she can be excused, Judge.

MS. HULL:  No objection.

THE COURT:  All right.

MR. MORRISSEY:  The Government calls Gary Devlaeminck.

(The witness, Gary Devlaeminck, was duly sworn.)


GARY DEVLAEMINCK,

called as a witness herein, having been first duly sworn, was

examined and testified as follows:


DIRECT EXAMINATION

BY MR. MORRISSEY:

Q.  Sir, would you state your full name and spell your last

name for the jury.

A.  Gary Devlaeminck.

Q.  Before you even spell it, the court reporter is going to

need to take down what you say.  Could you pull up the

microphone and speak up?

A.  Speak up, okay.  Gary Devlaeminck.  Spelled

D-e-v-l-a-e-m-i-n-c-k.

Q.  Sir, are you currently working?

A.  No, I am retired.

Q.  When did you retire?

A.  Two years ago.

Q.  So about 2010?

A.  '10, yeah.

Q.  Did you work in any connection with the civic -- Scottsdale
Civic Center Library?

A.  Yes, I was there for 20 years, yeah.

Q.  Okay, focusing on your responsibilities in February 2004,
what was your position then?

A.  I was a circulation aide.

Q.  You were --

            THE COURT:  A little louder if you would, sir.

            THE WITNESS:  Okay.  My official title, I guess, was
circulation aide, library aide.

BY MR. MORRISSEY:

Q.  All right.  And what -- in February 2004, what did a
circulation aide do?

A.  Basically we are front line of the library.  We work two
desks, customer service and circulation, check books in and
out, do customer work, answer questions, et cetera.

Q.  Okay.  Do you recall an event in February 2004 called
Authors and Appetizers?

A.  Yes.

Q.  Was that held at the Civic Center Library?

A.  Yes.

Q.  Did you attend that event?

A.  No, I did not.

Q.  The -- do you recall what day of the week that event was

on?

A.  Friday.

Q.  Did you work the following week?

A.  Yes.

Q.  Did you work the following day?  Did you work that Saturday?

A.  I don't believe so.  I don't think -- I think I was off that weekend.  I don't think I came to work until Monday.

Q.  You think you came to work on Monday?

A.  Um-hmmm.

Q.  On Monday, when you came to work, did you -- did you do your job at the customer service desk?

A.  Yes.

Q.  Did you notice anything unusual at the customer service desk that Monday?

A.  Basically we would clean up the area, tidy the thing up, and there was a package there that didn't belong there, but --

Q.  Okay, let's talk about that package.  Can you describe that package?

A.  It was a box about yea, by yea, by yea (indicating).

Q.  Do you recall what color it was?

A.  It was like brown paper, craft paper.

Q.  And was it addressed to anybody?

A.  It was addressed to Don Logan.

Q.  Do you recall who the sender was?

A.  No.  I'm sorry, I don't.

Q.  Did you handle that package at all?

A.  Yes.

Q.  Tell us what you did with it.

A.  I -- it sat there for like several days.  And every morning
I would move it around.  Finally I got sick of it and picked it
up and put it in the outgoing mail crate.

Q.  Okay.  So you saw that package on Monday following Authors
and Appetizers?

A.  Yes.

Q.  Do you recall what day it was you put it in interoffice
mail?

        MS. CISNEROS:  Objection, leading.

        THE COURT:  Overruled.

        MS. CISNEROS:  Misstates his testimony.

        THE COURT:  Overruled.

        THE WITNESS:  I'm sorry.  What date did I put it in
there?

BY MR. MORRISSEY:

Q.  Yeah, you first saw it on Monday.  And then you did
something with it several days later?

A.  I'm thinking it was -- it was Thursday.

Q.  Okay.

A.  But perhaps it was Wednesday.

Q.  That week, the week you saw the package, do you recall that

there was an explosion at the Office of Diversity & Dialogue?

A.  Yes.

Q.  Can you tell us whether -- whether a lot of time passed between your putting that package in interoffice mail, or not much time at all?

        MS. CISNEROS:  Objection, vague.

        THE COURT:  Overruled.

        THE WITNESS:  I don't think much time.  I think it happened, you know, within a few hours.

BY MR. MORRISSEY:

Q.  Okay.  Can you describe the interoffice mail system that -- that was in place at the Civic Center Library?

A.  Okay, we kept a crate underneath the customer service desk. And anything that was going to other -- to another office in the city was put into that crate.  And then the couriers would pick it up and deliver it to the city mail room.

Q.  Okay.  And where was the city mail room?

A.  It's kitty-corner across the street from the library.

Q.  Okay.  Do you recall when you put that package in interoffice mail, whether or not when you last saw it, was there any postage on that package?

A.  I don't remember.  I don't know.

Q.  When -- when you put it interoffice mail, did you ever see that package again?

A.  No.

Q.  After the explosion, did you notify law enforcement of this package?

A.  Yes.

        MR. MORRISSEY:  No further questions.

        THE COURT:  Cross-examination?

        MS. CISNEROS:  Yes, Your Honor.

        Your Honor, may I approach Traci?

        THE COURT:  You may.


                    CROSS-EXAMINATION

BY MS. CISNEROS:

Q.  Good afternoon, Mr. --

A.  Devlaeminck.

Q.  -- Devlaeminck.  I think I may just call you sir.

        You -- you indicated that you cleaned up your area that Monday when you arrived, and that you saw a package that didn't belong.

A.  Yes.

Q.  That was not necessarily out of the ordinary, correct?

A.  No.

Q.  Sometimes you find packages or boxes?

A.  Right.

Q.  And --

A.  Things get left behind and they get put where they are supposed to go, yeah.

Q.  Is your area the lost and found area, or is that a
different part?

A.  Lost and found is there, too.

Q.  Okay.  So you expected Don Logan to come pick up the box;
is that fair to say?

A.  I assumed he would, yeah.

Q.  And when he didn't for at least a couple of days, you put
it through interoffice mail?

A.  Yes.

Q.  Okay.  Now you knew about the Authors and Appetizers party,
correct?

A.  Yes.

Q.  And you assumed that Don had left the package there on
Friday night; is that fair to say?

A.  Yes.

Q.  Can you just try -- well, let's talk about the package.  It
was a very nice, organized, neat box; is that fair to say?

A.  Yeah.  Yeah.

Q.  And it was crisp?

A.  Yes.

Q.  Clean?  Straight package?

A.  Yes.

Q.  And it was a brand new box as well; is that fair to say?

A.  Well, it was wrapped with paper, so I don't know what the
box looked like.  But the paper was new, yeah.

GARY DEVLAEMINCK - CROSS-EXAMINATION BY MS. CISNEROS  2690

Q.  Okay.  It didn't look like it went through the mail at all,
did it?

A.  Hard to say, but, no.

Q.  Could you take a look at Exhibit -- what's been marked as
Exhibit 958.  You have it right there among the things that you
were handed.  I think it says it on the side, 958.  Do you see
it, see a folder?

A.  958?

Q.  Yes, 958.  Could you open that, sir?  And if you could just
take a general look at it.  Let me ask you, you were
interviewed by law enforcement several times in relation to
this box, correct?

A.  Yes.

Q.  Okay.  And was one of those interviews the day of the --
the bomb went off?  Do you remember?

A.  I'm sorry, could you repeat that?

Q.  Was one of those days that you were interviewed the day the
bomb went off?

A.  I think so.

Q.  Okay.  Now, if you could take a look at that exhibit, and
look at generally what it says, if you could turn to the second
page of the exhibit, look towards the end.  And you indicated
that you didn't remember whether it had gone through the mail,
correct?  Or you couldn't -- you don't remember whether it had
gone through the mail?

A.  Yeah, right.

Q.  Okay.  So if you could go to the last sort of, I'd say six or seven lines, please don't read them out loud.  Read them to yourself.

        Does this exhibit refresh your recollection as to whether the box had gone through the mail at all?  And by refresh your recollection, I mean does it help you remember?

A.  Yeah.  Yeah.

Q.  Okay.  And so if I were to ask you now did the box go through the mail or appear to have gone through the mail at all?

A.  I would say I don't think so.

Q.  Okay.  Thank you.

        Do you know what a photo lineup is?

A.  Um-hmmm.

        MS. HULL:  Your Honor, I ask for an answer for the record.

        MS. CISNEROS:  Yes, please.  Could you say "yes" or "no."

        THE WITNESS:  Oh, yes, I'm sorry.

BY MS. CISNEROS:

Q.  Is it fair to say that a photo lineup is an array of people, faces, if you will, that is shown by law enforcement to find out whether somebody recognizes somebody on the photo lineup; is that fair?

A.  Yes.

Q.  Okay.  And that is your understanding of what a photo
lineup is?

A.  Yes.

Q.  In connection with this case, in the times that you spoke
with law enforcement about this case, were you ever shown a
photo lineup?

A.  No.

        MS. CISNEROS:  Your Honor, may I take a minute?

        THE COURT:  You may.

        MS. CISNEROS:  I don't have any further questions,
Judge.

        THE COURT:  All right, Ms. Hull?

        MS. HULL:  Yes, sir.


                    CROSS-EXAMINATION

BY MS. HULL:

Q.  Mr. Devlaeminck, good afternoon, sir.

A.  Yes.

Q.  On direct or cross, I don't recall which, you held your
hands up to describe the dimensions or the size of the box that
you found, that you've been talking about.

A.  Yes.

Q.  Do you recall that?

A.  Yes.

Q.  I don't want to say it for the record what measurements
those were, but can you tell us what your recollection is of
the dimensions of that box by inches?

A.  Oh, okay.  I would say probably about six inches by four
inches, maybe, and about four or five inches tall.

Q.  Okay, six by four by four or five?

        MS. HULL:  Okay.  That's all that I had, sir, thank
you.

        THE COURT:  Redirect?


                    REDIRECT EXAMINATION

BY MR. MORRISSEY:

Q.  Sir, you were asked on cross about your assumption that Don
Logan had perhaps left the package behind from the Authors and
Appetizers event.  Do you recall that?

A.  Yes.

Q.  Had anyone told you that Don Logan had even attended that
event?

A.  No.

Q.  You were asked about not believing that this package went
through the mail to get to the library.  Do you recall that?

A.  Yes.

Q.  I just want to clarify, when we say "the mail" there, you
mean the United States Postal Service?

A.  Yes.

Q.  And you put it in interoffice mail?

A.  Yes.

          MR. MORRISSEY:  Thank you.  No further questions.

          THE COURT:  You may step down, sir.

          MR. MORRISSEY:  Your Honor, may the witness be

excused?

          MS. CISNEROS:  Yes, no objection.

          THE COURT:  All right.

          MS. HULL:  No.

          THE COURT:  All right.

          MR. BOYLE:  The Government calls Renita Linyard, Your

Honor.

          (The witness, Renita Linyard, was duly sworn.)

          THE COURT:  Please come have a seat.

          MR. BOYLE:  May the witness be shown Exhibits 142 and

143, please.

          THE COURTROOM DEPUTY:  I'm sorry?

          MR. BOYLE:  142 and 143.

RENITA LINYARD,

called as a witness herein, having been first duly sworn, was
examined and testified as follows:


DIRECT EXAMINATION

BY MR. BOYLE:

Q.  Good afternoon.  Would you please tell us your name.

A.  Renita Linyard.

Q.  Ms. Linyard, are you currently working?

A.  No.

Q.  How old are you?

A.  60.

Q.  What did you do for a living?

A.  I worked for almost 27 years for the City of Scottsdale.

Q.  And would you describe for us what types of positions you
held there?

A.  I worked in the police department as records clerk, I
believe.  I worked in human resources as a human resources
representative.  I worked in the prosecutor's office as a
secretary.  I worked at the City of Scottsdale diversity and
dialogue office as an administrative secretary.  And then I
went to the downtown office as an administrative secretary.

Q.  Was the downtown office your last assignment?

A.  Yes, it was.  And at that time I was a citizen neighborhood
assistant or administrative associate.  I honestly don't

RENITA LINYARD - DIRECT EXAMINATION BY MR. BOYLE    2696

remember the title.

Q.  How long ago did you retire?

A.  In June of 2011.

Q.  I would like to draw your attention back to February of 2004 and ask you if you remember the day of the explosion.

A.  Yes, I do.

Q.  Were you working that day?

A.  Yes, I was.

Q.  Do you remember where in the building you were working?

A.  I was sitting at my desk in the diversity and dialogue office that was located in the human resources building.

Q.  How long had the diversity and dialogue office been in that building?

A.  A couple of years, I think.

Q.  Who did you -- did you have a supervisor?

A.  Don Logan.

Q.  How long had Don Logan been your supervisor?

A.  Since I started in the position for the diversity and dialogue office.  That was 1998 I started with him.  I believe it was February.

Q.  And what was your position in relation to Mr. Logan?

A.  I was the admin secretary for the position, for the department and for Don and for another person at that time.

Q.  On a day-to-day basis, how closely did you work with Mr. Logan?

A.  Extremely close.

Q.  Where was his office in comparison to your desk?

A.  In city hall or in the human resources offices?

Q.  In the human resources office.

A.  Directly across but kind of catty-corner.

        MR. BOYLE:  With the Court's permission, I believe 121 is in evidence.  I would request to publish 121.

        THE COURT:  You may.

        MS. CISNEROS:  No objection.

BY MR. BOYLE:

Q.  Can you see that screen well enough?

A.  Yes, thank you.

Q.  Can you tell us if you recognize what's in that photo?

A.  That was my office.

Q.  Is that the area that you worked in back in February of 2004?

A.  Yes, it was.

Q.  Moving to the day of the explosion, did you work a full day that day?

A.  Yes, I did.

Q.  Do you know if you went to lunch?

A.  -- until the explosion.  No, I did not.

Q.  So you did not go to lunch?

A.  I did not go to lunch.

Q.  Was it just work -- work items that kept you working

through lunch?

A.  Yes.  I was trying to get caught up on some items that I

had let go and get bills paid and --

Q.  Was there a point at which prior to the explosion you made

contact with Don Logan?

A.  I'm sure I was in contact with him throughout the day up to

that point, yes.

Q.  Was there a point in which you saw him with a box?

A.  Yes.

Q.  In comparison to the time there was an explosion, how long

before that did you see Mr. Logan with a box?

A.  He was standing in front of me with the box.

Q.  Was that the first time you had seen that box?

A.  Yes.

Q.  Were you standing or seated in your cubicle?

A.  I was sitting in my chair.

Q.  Was there anyone inside the cubicle with you?

A.  No.

Q.  Where was Mr. Logan?

        You can touch the screen if you would like.

A.  He was on the other side of the hole in the countertop.

Q.  Was he facing you?

A.  Yes.

Q.  Okay, what did you see him do in relation to the box?

A.  I was on the phone.  He motioned for me to hand him

something to open the box.  I handed him a pair of scissors.

Q.  Okay.  Who were you on the phone with?

A.  A coworker.

Q.  And who was that?

A.  Velicia McMillan.

Q.  Did you hand Don Logan the scissors?

A.  Yes, I did.

Q.  Did you see what he did with them?

A.  No.  I don't remember him opening the box.

Q.  What's the next thing you remember after handing him scissors?

A.  I remember seeing, which I believe was the long side of the box, and I was on the phone with Velicia.  And I was, I believe, writing something.  And that's why I don't believe I saw him open the package.

Q.  So what was the next thing you remember after you handed him the scissors?  You're talking on the phone, writing.

A.  Being blown back in my chair.

Q.  Physically, what did the explosion do to you?  It blew you backwards?

A.  It blew me backwards in my chair.

Q.  Does your chair have rollers?

A.  Yes.

Q.  Did you stay seated in your chair initially?

A.  Yes.

Q.  What did you do after you were blown backwards in your chair?

A.  I remember Jacque asking me if I was all right.  I said yes.  And then I said no.  No.  No.  And I believe she said she was going to come get me.

Q.  Okay.  Where was -- first of all, when you say "Jacque," who do you mean?

A.  I'm sorry, Jacque Bell, my coworker.

Q.  How long did you work with Ms. Bell?

A.  25 years.

Q.  Where was her -- where was she in relation to you at the time of the explosion?

A.  There's a partition just on the other side of this computer.  And she was on the other side of that partition in her office.

Q.  Did you see her when she was talking to you or could you hear her?

A.  No, I did not -- I did not open my eyes.

Q.  Was there a point at which you determined you might have been injured?

A.  Immediately.

Q.  Describe for us what you felt as far as an injury.

A.  I believed a piece of glass had gotten into my eye.

Q.  Were you wearing glasses?

A.  Yes, I was.

Q.  Were you wearing them at the time of the explosion?

A.  Yes, I was.

Q.  Later on, did you see your glasses?

A.  Yes, I did.

Q.  Were they damaged?

A.  No, they weren't.  But they did --

Q.  Pardon me?

A.  They did have a drop of blood on them.

Q.  When you said that you think something went into you, where did it enter your body?

A.  It entered the -- above my glasses, about my eyebrow.  And a piece is lodged in my head.

Q.  Were you bleeding?

A.  Yes, I was.

Q.  Could you see immediately after the explosion?

A.  I could see, but I did not open my eyes very often because when I did, as you move one eye, the other eye moves.  And that hurt.  So for the most part, I kept my eyes closed.

Q.  Describing just what happened physically, not what people said to you, at some point did anyone come to help you out of your chair?

A.  Yes.  Jacque and another coworker helped me get out of the building.

Q.  Did you leave the building?

A.  Yes, I did.

Q.  Where did you go after that?

A.  I was seated outside of human resources in the courtyard area, there's seats out front.

Q.  How long did you stay out there?

A.  Time wise, I honestly don't know.

Q.  Is there a point at which you went to a hospital?

A.  Yes.  The medical EMTs came.  An ambulance was there.  I was placed on a gurney.  They asked Don and I if we were willing to share an ambulance together to the hospital.  And at a later time, they took us both to the hospital.

Q.  When you were at the scene, and you were outside of the office, were you able to pay attention to who was going in and out of the building?

A.  No.

Q.  Were you still affected -- was your vision still affected when you were outside?

A.  Yes.

Q.  In front of you there are two folders, Exhibits 142 and 143.  Would you mind taking a look at those.

         Have you had a chance to look at those prior to coming to court?

A.  Yes.

Q.  Do you recognize them?

A.  Yes.

Q.  Who's in the photographs?

A.  Myself.

Q.  Where are they taken?

A.  At the hospital.

Q.  Is this a picture from the date of the explosion?

A.  Yes, it is.

Q.  Is it a fair and accurate representation of how you looked that day?

A.  I think so.

        MR. BOYLE:  The Government moves to admit 142 and 143.

        MS. CISNEROS:  Objection, Your Honor, 403.

        THE COURT:  Ms. Hull?

        MS. HULL:  Same, Judge.

        THE COURT:  Overruled.  Exhibits 142 and 143 are admitted.

        MR. BOYLE:  Permission to publish 142?

        THE COURT:  Yes.

BY MR. BOYLE:

Q.  Does this exhibit show an injury to your right eye?

A.  Yes, it does.

Q.  Did you sustain any other injuries?

A.  I have a scar on my cheek, or on -- I'm sorry, on my lip.

Q.  Let me stop you right there.  What caused, if you know, the scar?  Was it from the explosion?

A.  Yes, it was.

Q.  Some type of debris that hit you from the explosion?

A.  Yes, it was.

Q.  Did you bleed?

A.  Yes.

Q.  And any other injuries?

A.  Tinnitus.

Q.  Tinnitus?

A.  Ringing in my ears.  Constant.

Q.  Do you have that to this date?

A.  Yes.

Q.  On the date of the explosion, was there anything unusual in

your workplace prior to Don Logan opening that box?

A.  No.

            MR. BOYLE:  Nothing else, Your Honor.

            THE COURT:  Cross-examination?


                        CROSS-EXAMINATION

BY MS. CISNEROS:

Q.  Afternoon, Ms. Linyard.

A.  Good afternoon.

Q.  Now, you indicated during the direct examination that you

were helped out of the building by Jacque?

A.  Correct.

Q.  That's Jacque Bell, correct?

A.  I'm sorry, Jacque Bell.

Q.  I think you said Bell?

A.  Okay.

Q.  Now, there was another coworker.  Was his name Craig?

A.  Craig Sullivan.

Q.  Okay.  And he also helped you?

A.  Correct.

Q.  And that was pretty much right after the explosion,
correct?

A.  Truthfully, time I honestly don't know.  But I would have
to say probably.

Q.  Okay.

A.  Yes.

Q.  Fair enough.

        Now, you also indicated that the EMTs came to see you,
right?

A.  They were outside of the building, yes.

Q.  And the only time that you saw the EMTs was outside the
building, correct?

A.  Correct.  That's where I was after the explosion.

Q.  So when they arrived, you were already outside?

A.  Yes.

Q.  Okay.  Now --

A.  Now they may have been there prior to me getting out of the
building, but I didn't see any.

Q.  I understand.

        Now, you asked -- and I think this was in relation to

where your desk was located in relation to Don Logan's office.

You asked whether at city hall or at the human resources

office.  Do you remember that question?

A.  Yes.

Q.  Now, that is because diversity and dialogue, the office you

worked with with Don Logan since 1998, had been at city hall?

A.  Correct.

Q.  And when was the move from city hall to human resources

office?

A.  I'm going to guess two years prior to the explosion.

Q.  To the explosion?

A.  But I'll be honest, I really don't remember.

Q.  Okay.  Do you remember speaking with Michael Casadei, a

postal inspector, regarding this case?

A.  Yes.

Q.  And you spoke with him in March of 2004.  Do you recall?

A.  I remember talking to him.  I don't remember when it was.

Q.  Okay.  Now, you were -- after the explosion, you were at

the -- were you at the hospital?

A.  Until Sunday I was released.

Q.  Okay, so you went in on Saturday and you were released on

Sunday?

A.  Thursday.

Q.  I'm sorry.  You went in on Thursday and you were released

on Sunday.

Now, when you spoke with the postal inspector, he was interested in getting the names of people who might have concerns about Don Logan and your office; is that fair to say?

A.  Correct.

Q.  And you gave Mr. Casadei, or the postal inspector, you may not remember his name, several names; is that fair to say?

A.  Probably.

Q.  Okay.  You mentioned Larry Gootos, Gutos?

A.  I don't remember mentioning that name.

Q.  Okay.  Doug Offerman?

A.  That name doesn't ring a bell.

Q.  Matthew Moric?

A.  No.

Q.  How about Steve Anderson?

A.  No.

Q.  Okay.

        MS. CISNEROS:  May the witness be shown Exhibit 953.

BY MS. CISNEROS:

Q.  Could you take a look at that exhibit and sort of get a general idea of what it is.  Is it a report of an interview with you?

A.  Okay.

Q.  Okay.  Is it a report of an interview or does it appear to be a report of an interview with you?

A.  It does.

Q.  Okay.  And the date would be March 2nd of '04?

A.  Yes.

Q.  Okay.  Could you please -- there are page numbers at the
bottom.  There's a USPS number, USPS722.  Could you take a look
at the paragraph of that last page.

A.  I see it.

Q.  Does that reflect -- or refresh your recollection or help
you remember some of the names you may have given Inspector
Casadei about -- in his quest to find who might have concerns
about Don Logan in the office?

A.  I know the first name.  I honestly don't know the second
person.  I don't remember that second person's name.

Q.  Okay.  And the first person is Larry?

A.  Correct.

Q.  Okay.  What about Matteo or Matthew Moric?

A.  That name --

        THE COURT:  What's the question, Ms. Cisneros?

BY MS. CISNEROS:

Q.  The question is what about Matteo Moric, do you remember
that?

A.  It's written here, but I don't know the person.  I don't
remember who they were.  But the other person after that --

Q.  Yes.

A.  I -- the name is familiar.  I don't know if I know that
person.

Q.  Okay, and that would be Steve Anderson?

A.  Correct.

Q.  Who is Steve Anderson, to the best of your recollection?

A.  From what I remember, he worked at the police department.

Q.  And these questions that you answered, this question that you answered for Inspector Casadei, did it have to do with employee relations types of issues?

A.  Honestly, I don't remember.

Q.  Okay.  Now, do you remember telling Inspector Casadei again about other people?  We are going to move on in this exhibit. Other people, for instance, Sandra Rembrandt?

A.  Yes.

Q.  Do you remember mentioning her?  Who is Sandra Rembrandt?

A.  She was a woman who, from what I remember, started the MLK breakfast which turned into dinners at the City of Scottsdale. She was at the Scottsdale Community College.

Q.  And why would you mention Sandra Rembrandt in this context of people who might have --

A.  Generally, I remember her being angry.  And I don't know why at -- I believe the office.  For what reason, I never knew.

Q.  Okay.  What about Marion Murray?

A.  She was a human resources commissioner.  And I believe she was also on the budget committee.  She -- she was just angry.

Q.  How about Glen Olsen?  Do you remember mentioning him?

A.  No, I don't.

MS. CISNEROS:  Could the witness be handed Exhibit 539, please, Traci.

BY MS. CISNEROS:

Q.  Could you generally take a look at that exhibit.  It appears to be a memorandum of an interview with you and Inspector Casadei; is that fair to say?

A.  Yes.

Q.  Thank you.  Could you please take a look at the bottom of the first page, the last two full sentences.

A.  Okay.

Q.  Does that refresh your recollection about who Glen Olsen is?

A.  Oh, I know who Glen Olsen is.  I just don't remember saying that or anything.

Q.  Can you tell us why -- now, do you now remember that you said -- did say that?

A.  No.

Q.  Okay.  Did you work with Glen Olsen at one time?

A.  Yes, I did.

Q.  Do you remember --

A.  I worked with him when I was in human resources.

Q.  Okay.

A.  When he was in the police department.

Q.  And why -- in what respect?

A.  The person I worked with, they were in charge of the police

department recruitments.  And Glen at that time did the

training, I believe, and that's how I -- why I worked closely

with him in recruitments.

Q.  Okay.  Now, let me ask you about Andrea Balou.  Do you

remember mentioning Andrea Balou?

A.  No, I don't think so, but I know who Andrea Balou is.

Q.  Okay, and who is Andrea Balou?

A.  She was the person who had taken over for Sandra Rembrandt

in a department that I don't remember the name of at the

Scottsdale Community College.

Q.  Community celebrating diversity?

A.  Yes.

Q.  Okay.  And this was Sandra Rembrandt left and then Andrea

Balou?

A.  I believe that is the way it occurred.

Q.  Now, do you recall mentioning that -- and is the

abbreviation for community celebrating diversity, is that CCD?

A.  Correct.

Q.  Do you recall discussing Andrea Balou in the context of her

leaving in 2003 because members of the board were not happy

with her?

A.  I don't remember that.

        MS. CISNEROS:  Okay.  Can the witness be shown Exhibit

540, please.

        THE WITNESS:  Okay.

BY MS. CISNEROS:

Q.  Thank you.  Does that refresh your recollection about what you discussed with Postal Inspector Casadei about Andrea Balou?

A.  Not really, but, I mean, if it's written here, maybe I said it.

Q.  Okay.  Well, let me ask you this:  Was Don Logan on the board of CCD?

A.  I believe he was, yes.

Q.  And when Andrea Balou left, the board, including Don Logan, was not happy with her; is that fair to say?

A.  I would have to agree with that.

Q.  Who was Helen Zavala or Gandara-Zavala?

        THE COURT REPORTER:  I didn't hear the name, Your Honor.

        MS. CISNEROS:  I'm sorry, Helen Zavala or Gandara-Zavala.  G-a-n-d-a-r-a.

        THE WITNESS:  She worked at the police department and she was involved in the diversity advisory committees.

BY MS. CISNEROS:

Q.  And there was some controversy over Helen Zavala's hiring into a position; is that fair to say?  Into a position at the police department?

A.  Possibly.  I did not work at the city, I don't believe, when Helen was hired.

Q.  Okay.  Let me ask it -- ask you this question, though.  Did

you read about her situation in the newspaper?

A.  I don't know if I read about it in the paper or just heard
it after it had happened.

Q.  Could you take a look at Exhibit 539, please.  It would be
on the second page.

        Does that refresh your memory?

A.  Apparently, I read it in the paper.

Q.  Okay, all right.  And do you have any recollection of what
it was that you might have read in the paper?

A.  No, I don't.

Q.  What is the White Isn't Always Right program?

A.  From what I remember, it was the title of a cross
communicate -- cross-cultural-communication series that we had.

Q.  And people were upset by the name of the program; is that
fair to say?

A.  From what I remember, yes.

Q.  Okay.  And you got a -- you got complaints about this
program?

A.  I believe we did.

Q.  And people who were involved with this program, do you
remember Velicia McMillan being involved with the program?

A.  Yes.

Q.  And the city manager, Dick Bowers, as well?

A.  Possibly.

Q.  Now, we talked a couple of minutes ago about what you read

in the paper.  Is it fair to say that -- well, let me back up.

       Diversity and dialogue was located in the human
resources office, correct?

A.  After we moved from city hall, yes.

Q.  Okay.  And throughout its history, it dealt with, among
other things, personnel-type issues; is that fair to say?

A.  Don did.

Q.  Don did, okay.

       Now, in fact, Scottsdale personnel issues were
reported in the newspapers; is that correct?  Like the East
Valley Tribune?

A.  Probably.

Q.  The Arizona Republic?

A.  Probably.

Q.  Which papers did you read that would have reported these
issues?

A.  Normally I didn't have time to read the paper, to be honest
with you.

Q.  I understand.

A.  It would be probably at the time the Scottsdale Tribune,
I'm guessing it was back then.

Q.  Okay.

A.  Or it was hearsay.

       MS. CISNEROS:  May I take a minute, Your Honor?

       THE COURT:  You may.

          MS. CISNEROS:  I don't have any more questions of this

witness.

          THE COURT:  Ms. Hull?


                         CROSS-EXAMINATION

BY MS. HULL:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Do you recall Mr. Logan indicating to others that they

could send him mail or correspondence at city hall even after

you had moved from city hall?

A.  No.

Q.  Did you -- you talked about -- you talked about several

angry people.  I believe you described them as angry.

A.  I described one as angry.

Q.  Okay.  I apologize.  I -- my notes indicated you described

Sandra Rembrandt as angry; is that incorrect?

A.  No, that's probably correct.

Q.  How about Marion Murray?

A.  She was also angry.

Q.  Okay.  And how about Glen Olsen?

A.  I honestly don't remember any issues with Glen.

Q.  Do you know whether or not Mr. Olsen was also trying for

the job that was given to Ms. Zavala?

A.  I don't remember.

Q.  And how long had you been working?  When did you start
working with Mr. Logan?

A.  1998.

Q.  Okay.  So you were with him -- strike that.

        Before the bomb in February of 2004, do you recall a
lawsuit pending against the City of Scottsdale, a reverse
discrimination that involved your office?

A.  Could you repeat that, please?

Q.  Do you recall at the time of the bombing, which is in
February of 2004, do you recall at that time there was an
ongoing reverse discrimination lawsuit against the City of
Scottsdale by Steve Anderson?

A.  I remember the name Steve Anderson.  But I don't know
that -- I was -- I was informed of things strictly on a
need-to-know basis.  I didn't -- I wasn't privy to all of the
information and all of the work that Don was doing.

Q.  Did -- I'm sorry, finish?

A.  No, go ahead.

Q.  Okay, you finished your answer?  Okay.  I didn't want to
cut you off, I apologize.

        When Mr. Logan would -- as part of your duties, did
you prepare any written documents, memoranda, or other
correspondence on behalf of Mr. Logan?

A.  Most of what Don did, he wrote himself.

Q.  Okay.  Printed, printed out, that sort of thing?

A.  I may have gone and picked it up from the copier, but --

Q.  Okay, were you responsible for distributing that -- those

letters, correspondence, or memos?

A.  Maybe getting an envelope printed, and then getting it in

the mail.

Q.  And you were aware that in the time that you worked with

Mr. Logan, your office was involved in employee relations as

far as discipline?

A.  I was aware that Don did that.  But with whom, I did not

always know.

Q.  Did you know of -- about any disciplinary action that

Mr. Logan took or authored involving Steve Anderson?

A.  Not that I recall.

          MS. HULL:  Nothing further, thank you.

          THE COURT:  Redirect?


                    REDIRECT EXAMINATION

BY MR. BOYLE:

Q.  Ms. Linyard, would you look back on 953, that second page

that you were directed to.

A.  Okay.

Q.  All right.  The second paragraph from the bottom.  If you

could set it back down.  I just wanted to follow up on these

names that you were asked about.

          Starting with Sandra Rembrandt, do you remember how

old she was, approximately?

A.   50s.

Q.   Was she a female?

A.   Yes, she was.

Q.   You gave the name of -- did you give the name of Glen

Olsen --

A.   I guess so.

Q.   -- to Mr. Casadei?

         How many times were you interviewed by Mr. Casadei?

A.   I only remember him coming one time.

Q.   When you gave these names, what was your understanding of

what you were providing?

A.   We had just had somebody try to blow us up.  So I was

coming up with any names that I could think of as people who

you might be angry with us.

Q.   Was there a scale you used as far as how far fetched or how

reasonable your names would be?

         MS. HULL:  Objection, outside the scope.

         THE COURT:  Overruled.

         THE WITNESS:  I was including probably everybody I

could think of.

BY MR. BOYLE:

Q.   Were you asked as to whether or not you had a -- someone in

mind you thought might do this to Don?

A.   I honestly don't remember.

Q.  Could you think of -- do you have a memory at that time of

having a specific idea of anyone who would have done this?

        MS. HULL:  Objection, outside the scope.

        THE COURT:  Overruled.

        THE WITNESS:  Not really.

        MR. BOYLE:  No other questions, thank you.

        THE COURT:  All right.  Thank you.  You can step down.

        Members of the jury, we will go ahead and take a

15-minute break.  We will excuse you at this time.

        (The jury left the courtroom.)

        (The following discussion was held at the bench

between Court and counsel:)

        THE COURT:  So you have one more witness; is that

right?

        MR. BOYLE:  Yes.

        MR. MORRISSEY:  Two.

        MR. BOYLE:  Ms. Bell.

        MR. MORRISSEY:  Jacque Bell and Mr. Logan.

        THE COURT:  Are we going to have any problem getting

them on in an hour and 15 minutes and off?

        MR. BOYLE:  It's up to them.

        THE COURT:  We made a commitment to the jury here.

        MR. MORRISSEY:  Judge, I believe Jacque Bell is a very

short witness.  And my direct of Mr. Logan is certainly no more

than 30 minutes.  So I don't see that, depending on the cross,

we should finish.

MS. WILLIAMS:  I don't see myself being all that long.

MS. HULL:  I don't either.

THE COURT:  Okay.

MS. HULL:  I can't promise four o'clock.

MR. BOYLE:  Don't we have to potentially come back and finish with Agent Bettendorf?

THE COURT:  We do, but we also are going to have Rule 29 motions tomorrow.  So what I would like to do at the end of the day is I would like to get through these witnesses.  And then, so that they can craft their Rule 29, I am going to have you make a proffer of what it is that Agent Bettendorf would cover if I rule in your favor on those issues.  And that way you all can take it into account on Rule 29.

One other procedural thing we ought to do.  When we use documents from here on out to refresh memory, after the witness reads it, please ask the witness to close the exhibit and set it aside and then have them testify from their memory. We've just had a few witnesses, who, when they get a question, they start searching for the answer in the document, and that's I think what they're doing.  And it's really refreshed memory we want.

Okay, see you in 15 minutes.

(A recess was taken.)

MR. BOYLE:  The Government calls Jacque Bell, Your

Honor.

         (The witness, Jacque Bell, was duly sworn.)


                         JACQUE BELL,

called as a witness herein, having been first duly sworn, was

examined and testified as follows:


                     DIRECT EXAMINATION

BY MR. BOYLE:

Q.  Would you please tell us your name.

A.  My name is Jacque Bell, just like ding dong, ring a bell.

Q.  Are you working now?

A.  I'm retired.

Q.  Where did you work before you were retired?

A.  City of Scottsdale.

Q.  What year did you retire?

A.  2009.

Q.  How long did you work at the City of Scottsdale?

A.  35 years.

Q.  Did you work in the diversity and dialogue office?

A.  Yes.

Q.  For how many years did you work there?

A.  Nine.

Q.  Did you work there on the date of the explosion?

A.  Yes, indeed.

Q.  What was your title or position at the office at that time?

A.  Well, it changed our -- I was HR rep, senior rep.

Q.  Did you work in the human resources building?

A.  Yes.

Q.  In relation to Renita Linyard's cubicle, where did you
work?

A.  Right next to her, except there was a divider, it was a
cubbie.

Q.  What were your responsibilities at that time?

A.  I helped on all the programming, assisted Renita, did a
special program called the merits committee on the employment
appeal with people with disabilities.  A brochure called
"Sharing the Season."  We really were -- worked side by side, a
team.  And then we had individual things.

Q.  Did you have any responsibilities regarding phone lines?

A.  Yes.

Q.  Can you tell us if there were certain phone lines that were
dedicated to any events that were put on by either the City of
Scottsdale or the diversity and dialogue office?

A.  Yes, we had the Martin Luther King.  We had the call-ins
for that.

Q.  Let me stop that.  What does that mean, you had the
call-ins for Martin Luther King?

A.  Well, the city set up certain lines where the public called
us about instructions or directions or how they could buy

tickets or --

Q.  And was that advertised somehow?

A.  Yes.  It was in the newspapers, publications.  Hispanic heritage was another, any of our big public events that we coordinated.

Q.  Regarding the Hispanic heritage, was that a week-long celebration?

A.  No.  It was a one-day celebration.

Q.  Was a phone line dedicated to that event?

A.  Yes, there was.

Q.  Was it for people in the City of Scottsdale or the general public?

A.  No, this was open to the entire community.

Q.  Did people leave messages on that phone line?

A.  Yes.

Q.  As a part of your responsibilities, did you review the phone calls that came into that phone line?

A.  Yes, both Renita and I did.

Q.  Just so we can be clear, let me finish my question --

A.  Okay, I'm sorry.

Q.  -- so she can type it down --

A.  Oh, I'm sorry.

Q.  -- and not talk at the same time.

        Referring then to the phone line and phone messages, was there a time in the year 2003 in which you received a phone

JACQUE BELL - DIRECT EXAMINATION BY MR. BOYLE      2724

call that you have a memory of regarding the Hispanic heritage

week?

A.  Yes.

Q.  Prior to coming to court today, did you listen to the

recording of a call from beginning to end?

A.  I did.

Q.  And just before you testified during the break, did you

listen to what was identified as Exhibit 171?

A.  I did.

Q.  Can you tell us if you recognized that exhibit?

A.  Yes.

Q.  Was it a recording of a phone call?

A.  It was.

Q.  And what line was it retrieved on?

A.  I believe it was on the public line.  It -- you know, I'm

not quite sure.  My phone number was also published for

information.  But we had a dedicated line.

Q.  I would like to ask you a few questions about how this

certain call ended up being recorded and arriving here.

        So to begin with, did you listen to the phone call at

some point for the first time?

A.  Yes.

Q.  When was that?

A.  It would have been the last week in September, I think it

was the 26th.

Q.  Okay.

A.  Okay.

Q.  And what year?

A.  Pardon me?

Q.  Do you know what year?

A.  Well, that would have been the year before the bombing.  So in '03.

Q.  Did you hear the recording for the first time during that September 26th?

A.  Yes, that day.

Q.  Did you, after listening to it, without telling us what was said, decide to speak to other coworkers?

A.  Yes.

Q.  After speaking with those individuals, was a decision made?

A.  Yes.

Q.  What was the decision?

A.  To call the police.

Q.  Was that the normal procedure for strange phone calls?

        MS. WILLIAMS:  Objection, Your Honor, assumes facts not in evidence.

        THE COURT:  Overruled.

        MS. HULL:  Leading.

        THE COURT:  Overruled.

        THE WITNESS:  If it were something threatening, something unusual, yes, we would have called the police.

JACQUE BELL - DIRECT EXAMINATION BY MR. BOYLE        2726

BY MR. BOYLE:

Q.  How often did that happen?

A.  In my career, twice.  That time and back in the '70s.

Q.  So do you have a memory of this event?

A.  Of this event?

Q.  Yes?

A.  Oh, yes.

Q.  And again without telling us what you heard on that call,

was it the content of the call that caused you to call the

police?

A.  Yes.

Q.  Did they show up?

A.  I'm sorry?

Q.  Did the police show up?

A.  Yes.

Q.  And at some point, do you know if they made a recording?

A.  Yes.

Q.  Was Exhibit 171 a copy of the recording that you heard back

on September 26th, 2003?

A.  Yes, it was, yes.

        MR. BOYLE:  The Government moves to admit 171.

        MS. WILLIAMS:  Objection, foundation.

        MS. HULL:  Same objection.

        THE COURT:  What's the objection, Ms. Williams, the

foundation objection?

MS. WILLIAMS:  Witness' personal knowledge and chain of custody, Judge, as -- when I say "personal knowledge," I mean as to this exhibit, collection, maintenance, so forth.

THE COURT:  Overruled.  The foundation is sufficient under Rule 901(a).  Exhibit 171 will be submitted -- admitted.

MR. BOYLE:  Permission to publish?

THE COURT:  You may.

(Exhibit No. 171, an audio tape, was played.)

BY MR. BOYLE:

Q.  Ms. Bell, is that the phone call you heard in September of '03?

A.  Yes.

Q.  Drawing your attention now to the day of the explosion, were you working that day?

A.  Yes.

Q.  Were you in the area you described next to Ms. Linyard?

A.  Yes.

Q.  Were you doing normal work?

A.  Actually, we were getting ready to go to a committee meeting at the college.  And she had worked through lunch.  And I went around the corner and said:  Renita, we have to go, because if we are going to get lunch, we will grab something and get on out to the college.  It was a planning committee.

Q.  Okay.  But were you still in your area at the time of the explosion?

JACQUE BELL - DIRECT EXAMINATION BY MR. BOYLE        2728

A.  Yes, I was at the time.

Q.  Were you doing regular things you do at work?

A.  Actually, yes.

Q.  Did you see or feel or hear an explosion at some point?

A.  Yes.

Q.  What happened?

A.  I had -- had stood up and just sat down and it exploded
pretty much over her desk in the hallway.  I saw black powder.
I saw the ceiling come in.  My cubbie wall came forward.

Q.  What happened to you?

A.  Pardon me?

Q.  What happened to you physically?

A.  Physically, I got knocked out of my chair.  I was on the
phone and the phone hit my cheek.  And terrible, horrible
ringing in my ear.  I couldn't hear for a week and bruised up.

Q.  Where were you bruised?

A.  On my buttocks in back.

Q.  Were you able to get up and walk?

A.  Yeah.  I -- I pulled myself up by the desk.  And I called
Renita to see if she was okay.  And --

Q.  Let me stop you there.

A.  Okay.

Q.  Was anyone near Renita Linyard when you walked over there?

A.  Yes.  Another coworker came and helped me.

Q.  Who was that?

A.  His name was Craig Sullivan.

Q.  Was he someone who works in your area?

A.  He did.  He apparently left the building and heard me.

Q.  Hold on.

A.  Oh.

Q.  If you can just take this one step at a time.

        Is he someone who works in that area of the office?

A.  Yes.

Q.  How many people work in that general area of the office?

A.  Probably eight where we were.

Q.  And is there another adjoining hallway?

A.  The entire area, probably 16, 17 people in there that day.

Q.  After the explosion, you told us you went over to Renita.
Did Mr. Sullivan and you help her get out of the building?

A.  Yes.

Q.  Where did you stay outside when you left the office area?

A.  Well, there were benches outside our door.  And I sat her
down there and ran and got some towels and ice, because she was
bleeding very badly.  And we moved a little further up and that
is -- the fire department came and said:  You've got to get
away from the building, you've got to.

Q.  All right.

A.  And so --.

Q.  After the explosion, but before the fire department told
you to move away, describe the scene at this -- outside the

door of the office.

A.  Oh, it was utter chaos, just bedlam.

Q.  Describe that for us.

A.  Well, people -- there had been a big conference meeting in one of our satellite buildings right there on this little campus, and they came running out.  And people came from all over.  They heard it as far away as city hall.  And passersby.  By the time they were loaded in the ambulance, I kid you not, there were hundreds between spectators and medical personnel and police department.  It was -- it was very chaotic.

Q.  Did you go to the hospital?

A.  No.

Q.  Why not?

A.  Well, the ambulance was full.  And they literally were driving over people's lawns, because there was so many people out on the streets.  And I know it sounds crazy, but I was the last guy standing.  And we had people hysterical.  And I just decided I was going to show them that we were okay.  So that's what I did.

          MR. BOYLE:  Nothing else, thank you.

          THE COURT:  Cross-examination?


                         CROSS-EXAMINATION

BY MS. WILLIAMS:

Q.  Good afternoon.

A.  Hi.

Q.  Ms. Bell, my name is Deborah Williams.  And I would like to ask you a few questions, if I may.

A.  Sure.

Q.  You talked about when you went outside the building after the bomb there were a lot of people around; is that right?

A.  That's right.

Q.  Okay.  And when you talk about a courtyard, that's outside the office building; is that right?

A.  Yes.  It is --  yes.

Q.  And that's the first place you went when you left the building was into the courtyard?

A.  Yes.

Q.  And while you were in the courtyard, you saw the people pouring out of the building?  Or I think you made --

A.  Well, the people in our building were gone.  We were the last ones out of our building.

Q.  Oh, you were the last ones out, so when you left, the building was empty?

A.  I'm pretty sure, yeah.

Q.  It had been evacuated?

A.  They took care of that.  They got out of there, yeah.

Q.  And is that part of -- at that time, was that part of the standard office procedure, kind of like a fire drill?

A.  Absolutely.

Q.  If something happens, everybody gets out?

A.  They gather in one spot, yeah.

Q.  No choice, get out, right?

A.  Exactly.

Q.  And then when -- when the ambulance and police started arriving, was it at that time that you were moved even farther away?

A.  Yes.

Q.  And by then, as to your knowledge, by then, the building was completely empty?

A.  I --

Q.  As far as you know?

A.  I didn't go back in, so I'm assuming it was.

Q.  Okay.  The phone call that you were talking about and that was played here, when you first -- shortly after the bomb went off, you were interviewed by a detective, right?  Do you recall that?

A.  Yeah, I think so, yes.

Q.  Okay.  And do you remember when the phone call came in, you were -- you refer to it as a prank call?

A.  Maybe.  I may have said that.

Q.  Okay.  And when you were interviewed by Detective Green, do you remember telling him that it was a prank call?

A.  Possibly.

Q.  And would it help your -- would it help you recall if you

were to see a report of your conversation with Detective Green?

A.  If you want me to.  I probably could use a cheat sheet like

everybody else.

Q.  Fair enough.

        MS. WILLIAMS:  Could the witness please be shown

what's been marked as Exhibit 508.  Excuse me just a minute,

I'm trying to refer you to a specific page.  Okay.

BY MS. WILLIAMS:

Q.  Ma'am, if you open that up, you see some little -- some

small numbers down in the lower right corner?

A.  Yes.

Q.  Could you take a look at 882, please.

A.  Okay.

Q.  And if you look down at the bottom of the page, the last --

the last place where there's a B, and then conversation.  Do

you see that?

        Does that help refresh your memory.

        THE COURT:  Please ask her to set it aside if you

would, Ms. Williams.

        MS. WILLIAMS:  Pardon me?

        THE COURT:  Ask her to set it aside.

        MS. WILLIAMS:  Could you close the document.

        THE WITNESS:  I'm sorry, you said to look at it.

BY MS. WILLIAMS:

Q.  I know.  Did that help refresh your memory?

A.  Yes, it did.

Q.  Did you in fact describe it to Detective Casadei as a prank call?

A.  Yes.

Q.  And was -- the fact of calling the police officers when it came in was standard procedure if you had an unusual call?

A.  I wouldn't say unusual, I would say threatening.  And can I say something further?

Q.  Sure.

A.  Okay.  The reason I shared that phone call with Carly and we told Don is all I could think about is if this is for real, and we've got this huge event coming up that is geared toward families and children, it would be horrible to have some looney tune come and try to hurt them.  And it was sinister to me.  So I said I think we need to report it.  The fact that I called it a prank, in human resources, you get prank calls.

Q.  Okay.

A.  But I still took it very seriously.

Q.  Understandable.  And when you listened to the call, you've heard it several times now, right?

A.  Um-hmmm.

Q.  Oh, sorry, we have to make a record --

A.  Oh, yes.

Q.  Okay.  When you've listened to that call, even the first time, you noticed that the person left his name, right?

A.   Yes.

Q.   And he -- in that -- in that phone call, the person didn't make any threat to do anything, right?

A.   No.  But I'll tell you --

Q.   Okay, let me ask you another question.  It was just extremely odd; is that fair?

A.   It was more than odd.  It was sinister to me.

Q.   Sinister.  But not -- no overt threat made?

A.   No.  That's correct.

Q.   Okay, thank you.

         And, ma'am, you were with the -- you were part of the -- were you part of the diversity office when it moved out of city hall?

A.   No.

Q.   It was before your time?

A.   I was with human resources for many, many years.

Q.   Okay.

A.   When they moved over our way, they asked if I would like to become part of their unit.  So I simply moved down the hall and became a diversity.

Q.   So you were still in human resources?

A.   Correct.

Q.   In the same building when diversity moved into your building --

A.   That's correct.

Q.  -- from city hall?

A.  Correct.  Well, I was actually -- the building is kind of
an L.

Q.  Right.

A.  I was in a different L.  But it's all connected with their
courtyard.

Q.  And diversity moved into that --

A.  They moved into the long section.

Q.  -- a section of that building from city hall?

A.  That's correct.

        MS. WILLIAMS:  Thank you.  I have no further
questions, Judge.

        THE COURT:  Ms. Hull.

        THE WITNESS:  Hi.


                    CROSS-EXAMINATION

BY MS. HULL

Q.  Good afternoon.

        You said that Hispanic heritage day occurred the end
of September, 2003?

A.  Well, the month -- I have to remember.  I think it's
September 15th to October 15th is the Hispanic heritage.  It's,
you know, like you have breast cancer month and you have this.
That's a recognition of Latino culture.  And so the idea is to
have the event sometime during that time.

I honestly cannot remember if we had it the end of September or the first week or so of October that year.

Q.  Okay.  But it was a day though, correct?

A.  It's a day.  Our event is a day, yes.

Q.  And where was it held?

A.  El Dorado Park in Scottsdale.

Q.  And what kind of event, what kind of things happened there?

A.  Oh, we had all kinds of activities for the children.  And, of course, face painting, balloon bounces, and entertainment, games, just a tremendous family day.  And we actually were, pardon me, quite overwhelmed because people came from all over the Valley.  And we thought maybe we would have 500 people.  And they estimated about 4,000, 5,000 people came.

Q.  Outstanding turnout?

A.  It was a very nice turnout.

Q.  Okay.

A.  And uneventful, thank goodness.

Q.  Right, that would be my next question.  It went off without a hitch; is that right?

A.  That's correct.  And I will say that every available police officer in the City of Scottsdale was there on mounted police, and with dog patrol.  We were very cautious.

Q.  And nothing happened?

A.  And nothing happened.

            MS. HULL:  That's all I have.

          THE COURT:  Redirect.


                    REDIRECT EXAMINATION

BY MR. BOYLE:

Q.  How many years did you work at the City of Scottsdale?

A.  25.

          MS. WILLIAMS:  Objection, asked and answered.

          THE COURT:  Sustained.

BY MR. BOYLE:

Q.  Did you, during your 20 plus years at the City of
Scottsdale, how many times when you received a prank phone call
that came did you call the police?

A.  Once.

Q.  And when was that?

A.  The one I got.

          MS. WILLIAMS:  Objection, asked and answered, Judge.

          THE COURT:  Overruled.

          THE WITNESS:  September 26th.

BY MR. BOYLE:

Q.  Do you remember the call?

A.  Oh, yes.

Q.  Would you characterize it as a mere prank?

          MS. HULL:  Objection, Your Honor, asked and answered,
outside the scope.

          MS. WILLIAMS:  Join in that.

THE COURT:  Overruled.

THE WITNESS:  No.  I -- when I say "prank," unusual, yes.  In thinking, there was a name attached to it, how -- but -- I really, I'm sincere.  It really bothered me.  It bothered me because I knew this event was coming.  It bothered me that anybody that was that adamant about anybody else would have the guts to call up and say --

MS. WILLIAMS:  Objection to the narrative, Judge.

THE COURT:  Sustained.

MR. BOYLE:  Thank you, Judge.  That's all I have.

THE COURT:  Thank you.  You may step down.

MR. MORRISSEY:  The Government calls Don Logan.

(The witness, Don Logan, was duly sworn.)

THE COURTROOM DEPUTY CLERK:  Please remember to speak into the microphone.  Water if you need it.

THE WITNESS:  Thank you.


DON LOGAN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:


DIRECT EXAMINATION

BY MR. MORRISSEY:

Q.  Mr. Logan, would you spell your last name for the jury.

A.  L-o-g-a-n.

Q.  Who do you work for?

A.  Currently I'm employed by the City of Glendale.

Q.  And what do you do for the City of Glendale?

A.  I'm City of Glendale's diversity administrator.

Q.  Do you have any other jobs?

A.  I'm also -- the City of Glendale role is a part-time
responsibility.  I retired from Scottsdale in 2007.  I'm also
president, founder of my own consulting practice, Don Logan &
Associates.

Q.  Before -- you said you retired from City of Scottsdale in
2007?

A.  That's correct.

Q.  And when did you start with City of Scottsdale?

A.  November 1979.

Q.  Would you briefly relate your career with the City of
Scottsdale and tell us in relation to time periods, what
positions you held.

A.  I was hired as a traffic engineering technician in 1979.  I
held that position for, I believe, four years.  And I was
promoted to parking violation hearing officer.

            MS. WILLIAMS:  Objection, relevance, Your Honor.

            THE COURT:  Overruled.

            THE WITNESS:  After completing that role, I was
promoted to another position, the development services manager
in the planning department and held on to that position for

four or five years, and was promoted to the position of

assistant to the city manager, which served as chief of staff

between the mayor and the city manager and their executive

staff.

BY MR. MORRISSEY:

Q.  Let me ask you, your time as assistant to the city manager,

what years are these?

A.  That position was -- I was appointed to that position in

the early 1990s, I believe, 1993, and was in that position for

five years.

Q.  Then beginning in 1998, what was your responsibility?

A.  I was selected to head the newly created Office of

Diversity and Dialogue.

Q.  What led to the creation of the Office of Diversity and

Dialogue?

A.  The impetus for the creation of the office was the result

of a race incident where a former police officer was terminated

by the police department.  And in the course of a wrongful

termination lawsuit, this officer accused the department of

practicing institutional racism which generated community

response to that issue.  Scottsdale, by my definition, is white

homogenous and affluent, and it's also a tourist destination.

          MS. WILLIAMS:  Objection to the narrative.

          THE COURT:  Sustained.

BY MR. MORRISSEY:

DON LOGAN - DIRECT EXAMINATION BY MR. MORRISSEY    2742

Q.  Okay, there was an incident that led to the creation of the office?

A.  That's correct.

Q.  Once that office was created, what were your responsibilities in that office?

A.  Well, I was the central point of contact to both employees from an internal standpoint and externally to the community in addressing diversity issues.

The race incident that I talked about before, one of the criticisms that Scottsdale received is that in dealing with individual departments, they didn't feel that they had a voice to represent the community.  And as the ombudsman for the Office of Diversity and Dialogue, my role was to serve as point of contact in addressing and responding to diversity issues.

Q.  Your -- then your -- as a point of contact then, did that extend beyond city employees?

A.  Absolutely.

Q.  Did you interact with members of the public in this capacity?

A.  Yes.  I mean, as -- as the point of contact, if you contact, an example, what you believe is an unpleasant experience with one of our departments and you wanted to register a complaint related to that experience, and you didn't feel comfortable going directly to that department, the Office of Diversity and Dialogue was there to entertain your

DON LOGAN - DIRECT EXAMINATION BY MR. MORRISSEY     2743

complaint.

Q.  Did you engage in outreach to the business community?

A.  That was one of the -- if I were to describe the functions
of the office, if I could, the three-pronged approach.
Community relations -- or community outreach, I'm sorry,
employee relations, education, and training.

Q.  Okay, let me -- let me ask you of those three, community
outreach, tell us what type of outreach you did to the business
community.

A.  One of the goals of the office was to take responsibility
for framing our image as an organization and community that
valued diversity.  And in doing that, we took one of the
lessons from the race incident that we hadn't properly framed
our image externally as an organization that values diversity.

        So we had to step outside of the City of Scottsdale
organization to start cultivating those relationships with
organizations like the Chamber of Commerce.  As a tourist
destination community --

        MS. WILLIAMS:  Your Honor, object to the narrative.

        MR. MORRISSEY:  Your Honor.

        THE COURT:  Sustained.

        MR. MORRISSEY:  Okay.

BY MR. MORRISSEY:

Q.  Specifically what chambers of commerce?  Did you join any
of those?

A.  I was a member of the Scottsdale Chamber of Commerce, a member of the Black Chamber of Commerce, the Hispanic Chamber of Commerce, the Asian-American Chamber of Commerce, the Native American Chamber of Commerce.

Q.  And in that capacity, serving on those chambers of commerce, was that in your capacity as diversity and dialogue director?

A.  That's correct.

Q.  Did the office as part of outreach put on cultural events?

A.  The office, you heard some of that testimony today, cultural events, the MLK celebration, we partnered with a nonprofit organization called Communities Celebrating Diversity, that's internationally known by the acronym CCD, that's a nonprofit that serves as hosts.

Q.  Let me ask you there, that partnering on the MLK celebration, was that part of your responsibilities?

A.  I served on the board.  I'm the past chair.  As I sit here today, I'm still a member of the board of CCD.

Q.  And in the time period, you began as diversity director in 1998?

A.  That's correct.

Q.  Did you hold that position until you retired from the City of Scottsdale?

A.  In 2007, yes.

Q.  For each of those years, was there an MLK celebration?

DON LOGAN - DIRECT EXAMINATION BY MR. MORRISSEY    2745

A.  That's correct.

Q.  Were you active in the Hispanic heritage celebration?

A.  Yes, I was.

Q.  What was your role with respect to that Hispanic heritage celebration?

A.  As the director of the Office of the Diversity and Dialogue, we provided budget support for that event.  I was the chair of the diversity advisory committee which was an employee function, and also served as staff liaison to the Human Resources Commission.

        And in those capacities, we worked with the diversity advisory committee and the HRC in hosting the Hispanic heritage celebration.

Q.  And let me ask, what's the HRC?

A.  I'm sorry, it's the Human Resources Commission.  We have two components that we sought out direction and I'm trying to identify what types of events we wanted to do in Scottsdale. The Human Resources Commission represented the citizens.  The diversity advisory committee represented the employees. Between the two, they basically helped us form our programming.

Q.  Let me take you then away from outreach and back to internal meetings within the City of Scottsdale.  As diversity director, did you have standing meetings that you attended each week?

A.  That's correct, I did.

Q.  Would you give us an example of those meetings?

A.  Well, one of the meetings, I served as head of the department, I was a member of the leadership executive team.

        MS. WILLIAMS:  Objection, relevance.

        THE COURT:  Overruled.

        THE WITNESS:  And each week, we as department heads and assistant city managers and leaders in the organization, we met with the city manager.

        One of the things that we learned with the race issue is that the community and employees felt that in some cases, we had disparate treatment in terms of how discipline was determined in the organization.

        So we created a employee relations team that included representatives from human resources, diversity and dialogue, and our city attorney's office in evaluating, assessing the level of disciplines that apply across the organization.

BY MR. MORRISSEY:

Q.  Let me ask you, did you have any standing meetings that involved the police department?

A.  Yes, we did.

Q.  Tell me about that.

A.  One of the things that we took from the citywide employee relations team meetings is that the police department felt that they could benefit from the same type of model in their department.  And how that came to surface is we had an issue

shortly after the office was established where we had three

employees who had inappropriately accessed --

Q.  Let me, before we go there, let me ask you, who else -- you

attended meetings with the police department on behalf of

Diversity and Dialogue?

A.  Yes.

Q.  What other components were at that meeting?

A.  The department head for human resources.  The employment

law attorney from our assistant -- city attorney's office.  And

a representative from our risk management department as well as

the command staff and the internal affairs staff.

Q.  Was discipline within the police department one of the

topics of that meeting?

A.  For the most part, that was the primary topic.

Q.  Would you describe what role you and the other component

heads had with respect to discipline within the police

department.

A.  And again, as I started to say earlier, the impetus for

this meeting came on the heels of this potentially disparate

treatment in terms of discipline related to two police officers

who had inappropriately accessed the Internet and the level of

discipline that internal affairs was recommending for those two

officers who we always feel we hold to a higher standard.

       That compared to three employees who were front-line

employees in our parks department who had the same infraction.

Both had violated the technology policy on using the computer.
And the police department was recommending a letter of
reprimand for the two police officers, but the department head
in the parks department wanted to terminate the three
front-line employees.

          So --

Q.  Let me ask, were you and the other members of that standing
meeting able to develop a more consistent response to that
issue?

A.  We were.  And that's where we came with a team concept.  By
meeting with the internal affairs staff, and bringing in
outsiders, the diversity and dialogue, myself, human resources,
the attorneys, and risk management, we developed a process
where we talked about the infractions, the recommended level of
discipline that came from internal affairs, and we left the
meeting with a consensus that the level of discipline was
consistent with that that was being applied citywide.

Q.  Were you the sole voice in deciding matters of discipline
at that committee?

A.  No.

Q.  Were -- were the issues that came up with that committee in
regards to police discipline, were they -- were they ever
racially based?

A.  Some.

Q.  Were they always racially based?

A.  Absolutely not.

Q.  Can you give us an example in a time period from 2003, 2004, of some of the employee police department issues that were addressed?

A.  It can be something as simple as an officer losing their badge, failing to appear for a court hearing, failing to show up on an off-duty assignment that would result in various levels of discipline.  Or it could be something as egregious as a termination.

        So both ends of the spectrum, whether something as minor as losing something, or doing something that was against policy, there was a myriad of ranges that we discussed in those meetings.

Q.  In the time period -- well, from the time you became diversity director and started in that office in 1998, were your activities covered in the media?

A.  Yes, they were.

Q.  Was that part of your job to be in the media?

A.  As I understood it, we -- when we established the office in 1998, we were the first office for a municipality in the State of Arizona and one of the first in the country.  So basically everything what we did was scrutinized through the media.

Q.  Did you ever give interviews to the media?

A.  It wasn't uncommon for the media to call and call me direct to inquire about a specific topic.

Q.  And would you agree to talk?

A.  It depends on what the topic was.

Q.  Okay.  Taking the period from 2000 through 2004, was your picture ever in the media with respect to interviews and your job?

A.  Yes.

Q.  Was that a frequent occurrence?

A.  Probably more frequent than I liked.

Q.  We talked a little bit about the outreach.  Did the diversity and dialogue office have a web page?

A.  We did.

Q.  Did you have a role in approving the web page?

A.  I had the ultimate decision to approve the web page.

Q.  Prior to coming to court today, have you reviewed the office's web page as it existed in 2003?

A.  Yes, I have.

        MR. MORRISSEY:  Your Honor, may the witness, but not the jury, see what's been marked for identification as Exhibit 250?

        THE WITNESS:  Excuse me, did you say 250?

BY MR. MORRISSEY:

Q.  Actually, just look at your screen.  You don't have to -- sorry.

        Mr. Logan, without describing the content of this exhibit yet, do you recognize this?

A.  Yes, I do.

Q.  Is this the web page for the Office of Diversity and
Dialogue as it existed in approximately 2003?

A.  It looks like it, yes.

Q.  Prior to the explosion?

A.  Yes.

Q.  And you had approval authority for -- before this website
was created?

A.  That's correct.

        MR. MORRISSEY:  Your Honor, the Government moves for
the admission of Exhibit 250.

        MS. WILLIAMS:  No objection.

        MS. HULL:  Objection, relevance.

        THE COURT:  Overruled.  Exhibit 250 is admitted.

BY MR. MORRISSEY:

Q.  Mr. Logan --

        MR. MORRISSEY:  May the jury monitors be enabled?

        THE COURT:  Yes.

BY MR. MORRISSEY:

Q.  Mr. Logan, up at the top where it says "Diversity &
Dialogue," what was the practice with respect to whether the
word a-n-d was spelled out or was that symbol used?

A.  It was a pet peeve of mine.  If the symbol wasn't there, I
often took issue with it.

Q.  Okay.  And I think that's an ampersand?

DON LOGAN - DIRECT EXAMINATION BY MR. MORRISSEY    2752

A.  I've never been able to pronounce that.

Q.  Okay.  And that is what was on the web page?

A.  That's correct.

Q.  Is the address of the Office of Diversity and Dialogue, was that on the web page?

A.  I believe it would have been.

Q.  Do you see it in this exhibit?

A.  No, I do not.  If I could, Mr. Morrissey, I think the reason we did not put the address is for the very reason that when we relocated from city hall to the human resources location, we didn't have to amend our web page.

Q.  Okay.  So if -- then the Exhibit 250 you just saw then is a fair portrayal of how the web page showed your office?

A.  Because we could relocate without having to amend the web page, that's correct.

Q.  Okay.  I asked you about your -- your role in the media. In the period from 2000 up until the time of the bombing, were there times when you were asked in the media about discipline incidents within the police department?

A.  There was only one time that I can recall.

Q.  Was the discipline incident concluded at that time?

A.  Yes.  Otherwise, we had a policy that we didn't talk about active cases.

Q.  Okay.  So the instance that you're speaking of, that was after the case was concluded?

A.  That's correct.

Q.  And you were quoted in the paper?

A.  Yes, I was.

Q.  Was the police -- what -- what happened to the police personnel in that incident?  What was the result?

A.  The -- Sergeant Krue was accused of excessive force.  And ironically the complaint that we received came from --

        MS. WILLIAMS:  Objection, relevance.

        MR. MORRISSEY:  Your Honor, it goes to motivation and coverage in the media and connection to other evidence.

        THE COURT:  Do you have an objection, Ms. Hull?

        MS. HULL:  I join in the objection, Judge.

        THE COURT:  All right.  Overruled.

BY MR. MORRISSEY:

Q.  Go ahead.

A.  This officer was accused of using excessive force as he -- as it was explained to me, they had taken a prisoner who had been placed in the rear of a patrol car.  And this officer showed up on site as a sergeant and for some reason jumped in the back seat of the car and started assaulting this prisoner.

Q.  Okay.  Let me just ask, the -- did this incident come before the standing meeting that you have told us you were a part of with the police department and the other component heads?

A.  That's how I found out about it, yes.

Q.  Did you participate in the discipline in that situation?

A.  I weighed in on the decision to recommend demotion of this

employee.

Q.  And was that a consensus decision?

A.  This was a consensus.

Q.  Was this incident the -- the single time that you were

asked in the media about a police discipline situation?

A.  That's correct.

Q.  Did you give an interview on the subject?

A.  I did.

Q.  After you gave the interview, was there any response from

the officer?

A.  I -- the interview wasn't the traditional interview.  It

was a phone interview that inquired about what information I

had with regard to this officer's level of discipline.

        Subsequent to that, I received a phone call from my

superior at the time, who is the city manager, who informed me

that Sergeant --

        MS. WILLIAMS:  Objection, hearsay.

        THE COURT:  Sustained.

BY MR. MORRISSEY:

Q.  Don't tell us what your city manager said.  Was there a

complaint by the officer about this being covered in the media?

A.  There was a complaint by the officer.

Q.  Okay.  Going to 2003, where was the office located at that

time?

A.  7575 East Main.

Q.  You've mentioned some of the work with outreach to the

business community.  Did the Office of Diversity and Dialogue

receive any rewards that year?

A.  Yes, we did.

        MS. WILLIAMS:  Objection, relevance.

        MR. MORRISSEY:  It again goes to presence in the media

and knowledge to the public.

        THE COURT:  Overruled.

        THE WITNESS:  Yes, we did.

BY MR. MORRISSEY:

Q.  And what award was that?

A.  The City of Scottsdale received the 2003 Diversity in the

Workplace Best Practice Award.

Q.  Did you personally receive any recognition in 2003?

A.  Yes, I did.

Q.  From who?

A.  I was recognized by the NAACP with the Roy Wilkins Public

Service Award.

Q.  For -- for the years -- each year that you worked as

diversity director, for the cultural events, were you involved

in obtaining the financial support for those events from

businesses?

A.  I was.

Q.  Would you be able to characterize financially what -- well,
take just the MLK celebration each year, what the level of
business support was for those events?

        MS. HULL:  Objection, cumulative.

        THE COURT:  Overruled.

        THE WITNESS:  As the chair of the MLK committee, and
also working with the sponsorship committee, my role was to go
out and solicit sponsorships for the event.  There are various
levels.  APS has consistently served as a title sponsor.

        MS. HULL:  Your Honor, object to the narrative.

        THE COURT:  Sustained.

BY MR. MORRISSEY:

Q.  Let me ask you to cumulate, not just APS, can you aggregate
what the level of business support was financially for the MLK
event each year?

A.  If I -- totally on memory, we had one title sponsor, ten
thousand and above.  We had a diversity level, which I believe
was 7500 and above.  We had a third level, which was five
thousand.  A fourth level, 2500, and anything below that were
considered friends of CCD.

Q.  Okay.  And that's -- so certainly in the tens of thousands
of dollars?

A.  Tens of thousands of dollars easily.

Q.  In 2003, was there a dedicated phone line for the public to
call the Office of Diversity and Dialogue?

A.  There was.

Q.  Was that phone number one listed in advertisements for diversity and dialogue events?

A.  Yes.

Q.  Did you hear the September 26, 2003 phone call that was just played in court?

A.  I did hear the phone call.  I thought the date was the 23rd, though.

Q.  Oh, okay, you may be right.  September of 2003?

A.  The event was the 26th.  The call was on the 23rd.

Q.  Thank you.  Did you have a role in making a decision as to what to do as a result of that phone call?

A.  I did.

Q.  And what was your decision?

A.  I instructed staff to contact the police department.

Q.  Did you know what the -- at that time, did you know what the White Aryan Resistance was?

A.  No.

Q.  Had you ever heard of WAR?

A.  Only as a music group.

Q.  Okay.  In February 2004, do you recall an event called Authors and Appetizers held at the Scottsdale Civic Center library?

A.  I'm familiar with the event.

Q.  Were you invited?

A.  I get invited to a lot of things.  As a member of the

leadership team, you get invited to everything.

Q.  Did you attend?

A.  No.

Q.  That following week, do you recall February 26th, 2004?

A.  I do.

Q.  Do you know what day of the week that is or was?

A.  That was Thursday.

Q.  On that day, what did you do in the morning hours of your

workday?

A.  I began the day with our regular employee relations

meeting.  And I had a -- a second meeting that followed shortly

before lunch.  I took a phone call from my basketball

commissioner.  I'm a basketball official, and at that time I

was officiating on the college level, had a conversation with

my commissioner.  Then I called my wife, who also works for the

city, and to see if she wanted to join me for an impromptu

lunch.

          MS. WILLIAMS:  Objection, narrative and relevance.

          THE COURT:  Overruled.

          THE WITNESS:  Seeing that she was not available, I ran

out to lunch, my favorite Mexican food restaurant, had lunch,

and came back.

BY MR. MORRISSEY:

Q.  Okay.  Let me -- let's get a time frame.  After lunch,

roughly what time is it?

A.  Well, I knew I had a meeting in Tempe that would require

that I commute over to Tempe.

Q.  And what time was that meeting in Tempe?

A.  Shortly before one o'clock.  The meeting was at 1:30.

Q.  Okay.  So it is -- you've had your lunch and it's about

one o'clock?

A.  Close to it.

Q.  And where did you go?

A.  I came back to the 7575 East Main on the way to my office

and took a route through the main lobby.  I may have been

headed to the city store.  My wife always have errands for me

there, so the city store is in close proximity to the main

lobby.  And I began to engage in some casual conversations with

some staff members who work in the area.

Q.  Let me ask you, do you -- do you recall an individual named

Craig Sullivan?

A.  I -- I do know Craig very well.

Q.  Did Craig Sullivan become a part of the conversation on

that day?

A.  Yes, he did.

Q.  Tell us what Craig Sullivan said to you at that time.

A.  As we are standing there --

        MS. WILLIAMS:  Objection, hearsay.

        MR. MORRISSEY:  It's not offered for its truth, Your

Honor.

        THE COURT:  All right, the jury should not consider
this for the truth of what was said, just for the effect upon
the listener.

        MR. MORRISSEY:  Go ahead.

        THE WITNESS:  There were four or five of us standing
there talking.  Craig walked up and says to me, in the presence
of those four or five others:  Hey, Don, there was a box over
in the mail room, the mail room meaning the human resources
complex area.  And he handed me the box and said:  It is
addressed to you.

BY MR. MORRISSEY:

Q.  And did you say anything at that time?

A.  I obviously said thank you and looked at the box and was
somewhat intrigued by the fact -- the labeling on the box and
the way that it was wrapped.

Q.  Would you describe the box, please.

A.  Cardboard box.  I can't remember the exact dimensions.  But
I do know that it had a return address.  And it was addressed
to me.  In my full name.  And it -- the way it was taped got my
attention.

Q.  You said it was addressed to your full name.  Donald Logan?

A.  Yes.

Q.  In your interactions with your entire career in the City of
Scottsdale, how -- how were you known?  What name did you use?

A.  Informally, I'm known as Don Logan.  But my formal business name is Donald R. Logan.

Q.  And in your interaction with other city employees, would you ever introduce yourself as Donald?

A.  No.

Q.  But this was addressed to Donald Logan?

A.  That's correct.  I don't mean anything to disrespect -- my mom's out in the audience.  I don't want her to think that I don't like my name, but Don is easier to spell.

Q.  All right.  You said, I think, you were intrigued by the package?

A.  I was.

Q.  Why was that?

A.  Well, the return address was Arizona State Retirement System.  And the fact that it was addressed to my full name, that would make sense, because as a member of Arizona State Retirement System, they would have me listed by my full name.

Q.  Let me make sure I clarify that.  You were in fact a member as a City of Scottsdale employee of the Arizona State Retirement System?

A.  Every full-time employee is mandated to be a member of that pension plan.

Q.  Were you expecting anything from the Arizona State Retirement System?

A.  No, I wasn't.

Q.  Okay.  You said you were intrigued and I believe you said
that package was taped?

A.  Yes.

Q.  What else do you recall about the package?

A.  In terms of -- well, it seemed lighter, light for the size.
I mean, it seemed like a pretty decent-sized box that was
heavily taped, that was addressed to me in my formal name that
was sent from ASRS, Arizona State Retirement System.  And I
thought it was a trinket of some sort.

Q.  What type of trinket did you think it was?

A.  I didn't know.  It's -- you know, telemarketers send you
things and they are trying to sell their product.  This seemed
like an awfully large box that was taped and addressed to me
personally as opposed to just the office or occupant.  It had
my name on it.  So it -- it garnered my attention.

        MR. MORRISSEY:  Your Honor, Exhibit 89 is in evidence.
Permission to publish it to the jury?

        THE COURT:  You may.

BY MR. MORRISSEY:

Q.  Mr. Logan, this address, at the time you looked at the box,
did you notice whether the street address was correct?

A.  No, I did not.

Q.  Is that -- was that the correct street address for
diversity and dialogue?

A.  No, it is not.

Q.  And if you could tell us one more time what the street address was for diversity and dialogue?

A.  7575 East Main Street.

Q.  Were you still in the city store as we are discussing this event right now?

A.  Yes.

Q.  You were intrigued.  Was there any other conversation by the people you were talking with about the box?

A.  One of the -- one of my colleagues mentioned in response to my comment, because I commented:  Oh, gee, someone sent me a gift.

    And one of the individuals responded:  Well, they sent you a gift, it's got to be a bomb.

Q.  What did you do when one of your colleagues said it's got to be a bomb?

A.  Well, we all laughed, and I shook the package.

Q.  Could you -- was it a vigorous shaking or could you illustrate how you shook it?

A.  I had it in my hand, if I can recall.  I could hold it in one hand, and I looked at my colleagues, laughed, and I shook it.  I said:  Well, I don't hear anything ticking.

Q.  Did you feel any movement inside the box?

A.  Not that I can recall.

Q.  What happened then?

A.  Well, we concluded our conversation.  And I looked at the

box again and realized that there's no way I can open it

without some type of help.  So I left that part of the

building, went out through the courtyard, entered in the south

lobby area, which is the access to our -- our area in the

building, walked down the hall to Renita's work station, and

realized that she was on the phone.  And I knew that Renita

would have a better sense of where her scissors were than for

me to try to find mine.  So I motioned to her.

            MS. HULL:  Objection to the narrative, Judge.

            THE COURT:  Overruled.

            THE WITNESS:  I motioned to her for her scissors.  And

I've worked with her long enough, she understood that.  She

handed me her scissors.  And I proceeded to open the box,

package.

BY MR. MORRISSEY:

Q.  Mr. Logan, do you have in front of you Exhibit 69, which is

in evidence?  It's the --

A.  I do.

Q.  You should have the bomb mock-up in front of you, the

physical box.  Oh, okay, sorry.

A.  It says "mock-up."

            Thank you.

            THE COURTROOM DEPUTY CLERK:  You're welcome.

BY MR. MORRISSEY:

Q.  Mr. Logan, is that mock-up a reasonable approximation of

the box that you opened on that day?

A.  It's a box, yes.

Q.  Could you use that box and illustrate for us physically how you opened the package that day that was addressed to you.

A.  If I could stand.

         MR. MORRISSEY:  Your Honor, may the witness stand?

         THE COURT:  Yes.

         THE WITNESS:  As I'm standing in front of Renita's work station, I took the box and the scissors and I went down one side of the box, the shorter side.  I turned it around, went down the other end, and then I turned it the long way. And as I started to go down the center, I thought about the conversation we had across the hall that what if this is a bomb.

BY MR. MORRISSEY:

Q.  Did you stop at that point?

A.  I literally stopped for a brief second.  And I thought, well, gee, why are you being so paranoid?  No one -- why would anyone send you a bomb?

         So I proceeded to open the box.  So I finished with the scissors.  I think I set the scissors down on the counter. And as I reached in to open the lid, things changed.

Q.  Okay.  When you opened the lid, and things changed, physically what happened?

A.  Well, first thing I noticed was I heard a pop that sounded

like a gunshot.  And everything seemed to slow down as I recount what happened.  But I couldn't get over the stinging sensation that I was feeling in my finger.  And I looked in front of me, there was a window that was suspended from the floor up to the ceiling that appeared to be totally shattered.

          And I glanced down at my torso, because what went through my head was this window is right adjacent to a street.  And the only explanation that I can conclude is that someone fired a shot through the glass based on the fact that it was shattered.

Q.  So you felt a stinging sensation?

A.  It was unbearably painful.  And the ceiling -- the alarm engaged.  The lights went out.  I mean, so it is -- it's dark.  The room filled with smoke.  There's debris falling from the ceiling.  And all I knew is I need to get this parcel away from me.  So as I pulled my hand out, I pushed the box away from me and I ran down the hall.

Q.  That -- that sensation of pain, where did you first notice that you were in pain?

A.  My finger.

Q.  And did you look at your hand at that time?

A.  As I ran down the hall, I took a knee and I asked the secretary to call 911.  And that's when I realized to me that I'd opened a bomb.

          And I can hear Renita screaming down the hall, like

she was in severe pain.  And as I stood up to go and render aid
for Renita, I realized that my -- from the sleeve of my jacket
all the way down to the inseam of my coat had literally split.
And as I pulled my arm down, I saw blood running down my arm
onto the carpet.

        And at that point, I thought, well, you know what?
You're losing blood.  You've taken a hit on your arm.  You
can't help anyone.

Q.  Okay.  So you're still inside at this point; is that fair?
When you realized you could not help anyone, you were still
inside the building?

A.  Yes.

Q.  Did help come for you?

        Sir, Mr. Logan.

A.  Yes, yes.  I'm okay.

Q.  There is water there.

        Who came to help you?

A.  I can't remember his name.  But he was one of our field
staff who was attending a training workshop across the way.
And I remember I always spoke to him, because that's part of my
nature, to speak with everyone.  And he came over and he said:
Don, you're injured.  Your arm is in bad shape, but I'm a
trained EMT.  And he says, we need to get you out of this
building.  Can you walk outside?  To which I responded yes.
And he assisted me to the fountain area, which was immediately

DON LOGAN - DIRECT EXAMINATION BY MR. MORRISSEY    2768

outside of our building and I laid there until the emergency

crews arrived.

Q.  Did --

        THE COURT:  Counsel, let's have you approach for a

minute.  We are almost to four o'clock.

        (The following discussion was held at the bench

between Court and counsel:)

        THE COURT:  We are obviously not done as we told the

jury we would be.

        MR. MORRISSEY:  I'll be done within five minutes.

        THE COURT:  Well, we don't have any cross.

        MS. WILLIAMS:  Well, we won't.

        MR. MORRISSEY:  I thought it was still useful

information.

        THE COURT:  Do any of you see a problem with us

breaking until Friday morning and going ahead with the Rule 29

tomorrow?  If not, we are going to be in trial tomorrow,

because I'm not going to take a break for a day unless we are

going to use it the way we already described.  And I really

don't want to do that to the jury after we've told them they

get tomorrow off.

        MS. HULL:  The problem I have, Judge, is that -- the

problem I have, Judge, is that if we are going to go in trial

tomorrow, I think that we would still need a day's time to

prepare and address our Rule 29 motions and the other motion we

are planning.  It's just -- it's --

        THE COURT:  Well, if we go tomorrow, the defense will
need to begin after the prosecution rests tomorrow.  I'm not
going to give up two days.  So it seems to me our choice is,
given the fact that we've run over today, is to break now, have
the Government make a proffer on what other evidence it will
put in during its case in chief so you can argue your Rule 29s.
We then hear the argument on the Rule 29s tomorrow.  I
obviously won't rule on it until we actually hear the evidence
that comes in from the Government.  And we start Friday morning
and finish the Government's case and start with the defense
case.

        MS. CISNEROS:  Your Honor, I've been doing a little
bit of research on the Rule 29 issue.  And I do think that it
will be necessary for the Court to evaluate whatever additional
information comes from Mr. Logan.

        But I think that what we could do is we could do the
big argument tomorrow, perhaps supplement after -- after the --
finish the -- conclude the testimony and possibly Agent
Bettendorf, supplement a brief argument after that.

        THE COURT:  Well, I don't want to interrupt the
evidence on Friday to do that.  So what we would have to do is
go right into the defense case.  And then we could talk at the
end of the day or you could file something over the weekend.

        MS. CISNEROS:  That is fine, acceptable, Judge.

THE COURT:  What I don't want to do is lose more than a day of the trial.

MS. CISNEROS:  That seems reasonable to me.

MR. MORRISSEY:  We agree.

MS. HULL:  It's an unfortunate series, but yes, I do agree.

THE COURT:  So you're in agreement, Ms. Hull?

MS. HULL:  Yes, Your Honor.

MR. MORRISSEY:  Your Honor, now that we have consensus on that, I would ask that I be given the five minutes to finish my direct.  This has obviously been difficult for Mr. Logan. What I need to finish is I need to put in only two photos, but they are photos of his injuries.  I don't get the sense that counsel are objecting.  And I will -- you can hold me to five minutes.

THE COURT:  Any objection from the defense?

MS. HULL:  I thought it was one picture.

MR. MORRISSEY:  The fingers.

MS. WILLIAMS:  That's okay.

MS. HULL:  If you hold him to five minutes, Judge.

THE COURT:  All right, you have five minutes, Mr. Morrissey.

MR. MORRISSEY:  Thank you.

(The discussion at the bench concluded.)

THE COURT:  Members of the jury, we are going to run

five minutes over just so we can finish the direct of Mr. Logan
before we break until Friday morning.

BY MR. MORRISSEY:

Q.  Mr. Logan, you were taken outside and medical personnel
responded; is that accurate?

A.  That's correct.

Q.  Did you require hospitalization?

A.  That event happened on Thursday.  I had two surgeries and
was released from the hospital Sunday afternoon.

Q.  You've identified at least two areas of injuries.  Did you
have surgery on your hand?

A.  I did.

Q.  Tell us what that surgery involved.

A.  The first surgery was to remove shrapnel from my hand, my
fingers and my arm.  And they waited a couple of days for the
swelling to go down so they can go in and repair the nerve
damage and ultimately do a skin graft onto my forearm.

        The -- I had two subsequent surgeries because the
surgeon was concerned that they would have to amputate my
finger.

Q.  Let me --

        MR. MORRISSEY:  Your Honor, may the witness but not
the jury monitor be enabled?  This is what's been marked as
Government Exhibit 141.

        THE COURT:  It is.

BY MR. MORRISSEY:

Q.  Mr. Logan, looking at Exhibit 141, it should be up on your

screen as well.  Is that a fair and accurate depiction of the

injuries to your hand?

A.  Yes.

        MR. MORRISSEY:  Your Honor, I move for the admission

of Government's Exhibit 141.

        MS. WILLIAMS:  No objection.

        MS. HULL:  No objection.

        THE COURT:  Admitted.

        MR. MORRISSEY:  May Exhibit 141 be published to the

jury?

        THE COURT:  Yes.

BY MR. MORRISSEY:

Q.  Mr. Logan, were the surgeons able to save your finger?

A.  They were.

Q.  Was it covered in the media whether your fingers would have

to be amputated?

A.  It was.

Q.  You also indicated a source of injury to your forearm.  May

we shut off the jury monitors?

        Showing you what's been marked as Government's Exhibit

139, Mr. Logan, do you see that on your screen?

A.  I do.

Q.  Is that a photograph of the injury to your forearm after

you opened the bomb?

A.  Yes.

          MR. MORRISSEY:  Your Honor, I move the admission of

Government's Exhibit 139.

          MS. HULL:  No objection.

          MS. WILLIAMS:  No objection.

          THE COURT:  Admitted.

          MR. MORRISSEY:  Your Honor, may the jury monitors be

enabled?

          THE COURT:  Yes.

BY MR. MORRISSEY:

Q.  Mr. Logan, how many surgeries were there on your forearm?

A.  There were a total of two surgeries on my forearm.

Q.  Including skin grafts?

A.  Yes.

Q.  Have you ever retained full use of your fingers?

A.  No.

Q.  What -- what can't you do?

A.  If I can illustrate with my opposite hand, if you look at

your finger the very tip joint, we all are able to bend those

down.  With my finger, it stays straight, I can't bend the tip.

That's as far as -- as far as I can go.  And that was the

optimum goal of the surgeon to get it to this point by

insertion of screws and some -- the rehab work.

Q.  Mr. Logan, after you recovered from your injuries, did you

go back to the City of Scottsdale?

A.  Yes, I did.

Q.  In what capacity?

A.  As the director of the Office of Diversity and Dialogue.

Q.  And you continued to do that for how many more years?

A.  Three more years.

Q.  And that's still your work today?

A.  In another agency, but, yes.

          MR. MORRISSEY:  No further questions.

          THE COURT:  All right, members of the jury, we are going to break.  Remember we are not in trial tomorrow.  We will begin Friday morning.  Please remember the admonition not to view anything related to the case.  And we will plan to see you Friday morning at nine o'clock.  Thank you.

          (The jury left the courtroom.)

          THE COURT:  Counsel please be seated.  Everybody please be seated.

          All right, Counsel, I have notes on five things we are going to cover tomorrow.  One is the continued argument on the admissibility of Agent Bettendorf's testimony about Daniel Mahon's statements we left off on this morning.  Will Agent Bettendorf be at the hearing tomorrow?

          MR. BOYLE:  Yes.

          THE COURT:  The second is the Government's 403 motion with respect to the Pappas evidence.

The third is the Rule 29 motion that the defendant will make or the defense will make. And I would like you and Mr. Boyle or Mr. Morrissey to make a proffer when I am done about what the additional evidence will show so that the defense can address that as fully as possible.

The fourth is the Brady motion that is still outstanding and needs to be addressed.

And the final one, which was raised today that I have in my notes is the eBay purchase of books that was raised at side bar.

MR. MORRISSEY: Your Honor, I don't know if this is ripe for tomorrow, but there's also a sealed motion that I believe the defense has now responded to. And at the appropriate time, that should be on our list.

THE COURT: Right. Thank you. Anything else that I'm missing?

MR. BOYLE: Was Exhibit 167, the Aryan video lists, on your list? Whether or not the entry about the --

THE COURT: No, you all were going to talk about that. Is there an issue?

MR. BOYLE: We will talk about it and let you know.

THE COURT: Okay. Anything from the defense?

MS. WILLIAMS: Our tracker is reviewing, Judge.

MS. HULL: Nothing on behalf of Daniel Mahon, sir.

MS. WILLIAMS: Nothing.

THE COURT:  Now, Ms. Cisneros you talked about this Rule 29 motion.  You said at one time it was going to be written.  Are you planning to file a written 29 motion?

MS. CISNEROS:  Your Honor, that is the plan at this point.  I was hoping to do that tomorrow morning.

THE COURT:  All right.  Obviously the earlier, the better, but whenever you can get it to us I will try to read it before.

MS. CISNEROS:  Yes, sir.

THE COURT:  We will plan to get together at two o'clock.  Mr. Boyle and Mr. Morrissey, will you proffer what you think the rest of the evidence will show, if anything?

MR. MORRISSEY:  You want that proffer now?

THE COURT:  Yes, because I want them to have the ability to take it into account for the purpose of Rule 29.

MR. MORRISSEY:  To be clear, this is what we would show regarding the eBay and the Catoosa, et cetera?

THE COURT:  Well, whatever -- whatever additional evidence you intend to present if I --

MR. BOYLE:  Rule --

THE COURT:  -- if I permit it, right.

MR. BOYLE:  Regarding Catoosa, it's those -- all the items that are listed in the Government's motion regarding the statements, regarding exhibit --

THE COURT:  When you say "in the Government's motion,"

you mean in the Government's response to the defendants'
motion?

        MR. BOYLE:  Yes, thank you.

        THE COURT:  Okay.

        MR. BOYLE:  We intend to introduce Exhibit 167 as it
is in the Court's book.  We will confer with the defense, but
I'm pretty sure the defense is going to object to the entire
inclusion.  It's the last entry on the third page.  We will
talk about it, but I am sure their position is going to be we
want it all out.

        Regarding eBay, we have to check our notes.  But we
believe the defense asked whether or not there was any
information retrieved from eBay regarding the Mahon's eBay
account.  And we believe the answer would be that there was
previous purchases of bombing-related periodicals.

        And that might be the eBay/credit card question, but
that's what we would put in.

        THE COURT:  Anything else?

        MR. BOYLE:  I think that's three sets of items.

        THE COURT:  Right.

        MR. BOYLE:  So and then the other two are the Brady
and the Pappas.  And those aren't related.  So I think we've
covered it, thank you.

        THE COURT:  Okay.  Anything else the defense wishes to
raise?

MS. WILLIAMS:  The one of note I would add, Judge, is with respect to the eBay credit card, as the Government reviews its notes, it should note that I was very specific in my questioning of Agent Bettendorf to specifically refer to Dennis Mahon as to all credit cards, eBay, et cetera, et cetera, et cetera.  I was very tailored in my questions.

MS. HULL:  That's correct, Judge, there was no questioning about Daniel Mahon's accounts or eBay or anything.

THE COURT:  Okay.  We will plan to see you all at two o'clock tomorrow.  Thank you.

MS. HULL:  Thank you.

(The court stood in recess.)

*     *     *

C E R T I F I C A T E

        I, MERILYN A. SANCHEZ, do hereby certify that I am
duly appointed and qualified to act as Official Court Reporter
for the United States District Court for the District of
Arizona.

        I FURTHER CERTIFY that the foregoing pages constitute
a full, true, and accurate transcript of all of that portion of
the proceedings contained herein, had in the above-entitled
cause on the date specified therein, and that said transcript
was prepared under my direction and control.

        DATED at Phoenix, Arizona, this 30th day of July,
2012.

                            S/Merilyn A. Sanchez

                            MERILYN A. SANCHEZ, CRR