UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,       )
                                )
                                )
                    Plaintiff,  )
                                )
        vs.                     )   NO. **CR 09-712 PHX-DGC**
                                )
**Dennis Mahon,**               )   Phoenix, Arizona
**Daniel Mahon,**               )   February 7, 2012
                                )   8:33 a.m.
                    Defendants. )
_____)


REPORTER'S TRANSCRIPT ON APPEAL

(Jury Trial - Day 16)

BEFORE THE HONORABLE DAVID G. CAMPBELL


Court Reporter:          Merilyn A. Sanchez, CRR
                         Sandra Day O'Connor U.S. Courthouse
                         401 W. Washington Street SPC-37
                         Phoenix, Arizona  85003-2118
                         (602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

1                          A P P E A R A N C E S

2

3    For the Plaintiff:         **John Zachary Boyle,** Esq.
                                **Michael Morrissey,** Esq.
4                               Assistant U.S. Attorneys
                                Two Renaissance Square
5                               40 N. Central Avenue, Suite 1200
                                Phoenix, Arizona  85004-4408
6

7    For the Defendant          **Milagros Anais Cisneros,** Esq.
     Dennis Mahon:              **Deborah Williams,** Esq.
8                               Assistant Federal Public Defenders
                                850 W. Adams Street, Suite 201
9                               Phoenix, Arizona  85007

10

11   For the Defendant          **Barbara Lynn Hull,** Esq.
     Daniel Mahon:              637 N. Third Avenue, Suite 3
12                              Phoenix, Arizona 85003

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2     WITNESS:          DIRECT   CROSS   REDIRECT   RECROSS   VD

 3     JESSE SARTUCHE
       By Ms. Hull        3076
 4     By Ms. Williams    3100
       By Mr. Boyle              3115
 5     By Ms. Hull                         3147
       By Ms. Williams                     3186
 6
       DOUGLAS BARTOSH
 7     By Ms. Hull        3189
       By Mr. Boyle              3205
 8     By Ms. Hull                         3210

 9     HELEN GANDARA
       By Ms. Hull        3212
10     By Ms. Williams    3256
       By Mr. Morrissey         3258
11     By Ms. Hull                         3269

12

13

14

15                      E X H I B I T S

16     NO.      DESCRIPTION                       ID    EVD

17     545      USPIS report dated 8-9-06        3084
       559      E-mails dated 4-05               3078
18     559-A    Letter dated 4-4-05              3076
       562      USPIS case management report     3078
19     607      ROI dated 7-10-09                3078
       798      Memorandum dated 10-10-00        3247
20     813      MOI dated 4-13-04                3234

21

22

23

24

25
```

```
 1                        P R O C E E D I N G S

 2

 3              THE COURT:  Good morning, everybody.

 4              MS. HULL:  Good morning.

 5              MS. WILLIAMS:  Good morning, Judge.

 6              THE COURT:  The filings of the parties have touched on

 7    a number of things we talked about last week I think we ought

 8    to talk about briefly this morning.

 9              I had received the Government's response on the

10    Rule 29 motion, particularly the portion that deals with

11    whether I can strike overt acts or grant an acquittal on an

12    overt act or a portion of an indictment.

13              Do the defense intend to file anything on that issue?

14              MS. HULL:  Nothing additional, Judge.

15              THE COURT:  All right.  How about from Ms. Williams or

16    Ms. Cisneros?

17              MS. WILLIAMS:  I'm looking, Judge, to see if we have a

18    copy of the Government's filing.

19              THE COURT:  It was docket 1568.  It was filed on the

20    5th.

21              MS. HULL:  Your Honor, is this -- is this something

22    that can wait?  I don't know that we've had an opportunity.

23    I'm recalling my last position, just in that -- I don't know

24    that the issue is to surplus instances where I do stand at this

25    point.  That's just prior to the jury -- matter going to the
```

1    jury, if it's something perhaps we can address later.

2            THE COURT:  Well, yeah, we can address it later.

3    The -- but I think the way we left it on the Rule 29 was that

4    the parties, would over the weekend, address two questions.

5    One is whether there's any supplemental filings that were to be

6    done on Rule 29 that you made, Ms. Hull.  And the second was

7    this question of whether I can, in effect, grant a partial

8    judgment of acquittal, knock out a part of the claim as opposed

9    to the entire claim.  That's what the Government filed their

10   brief on.

11           It seems to me I could rule on your Rule 29 motion as

12   a whole and decide whether I'm going to dismiss offenses, if

13   you all want to reserve for later the of question whether I

14   knock out a portion of an offense.  But at some point, I need

15   to rule on them.

16           And so my question to the defense counsel is whether

17   you want -- whether you intend to file anything on the question

18   of whether there is such a thing as a partial judgment of

19   acquittal under Rule 29.

20           MS. HULL:  I do, Judge.  I retract my prior position.

21   I would like to reply.  I think I can do that for argument for

22   tomorrow morning.

23           MS. CISNEROS:  We don't have anything to add, Judge.

24           THE COURT:  All right.  It seems to me what we ought

25   to do is I will wait to get your document, Ms. Hull, on the

1  question of whether there's a partial judgment of acquittal.

2  Once I have that in hand, we can talk about it tomorrow morning

3  and I'll rule on the Rule 29 motion.

4          MS. HULL:  Thank you, sir.

5          THE COURT:  Now, Ms. Hull, you have also filed under

6  seal a motion to withdraw the sealing of a previous motion that

7  you filed for the purposes of giving it to the Government as I

8  understand it.

9          MS. HULL:  That was ex parte, Judge.

10          THE COURT:  Right.  But my understanding of what you

11  had filed under seal was to -- are you withdrawing the motion

12  or are you simply --

13          MS. HULL:  I'm withdrawing the motion that was filed

14  at the end -- at the close of the Government's case.

15          THE COURT:  You are withdrawing the motion altogether?

16          MS. HULL:  Yes.

17          THE COURT:  So you don't want me to rule on the

18  motion?

19          MS. HULL:  Correct.

20          THE COURT:  I'm sorry, I thought you were just

21  withdrawing the ex parte and sealed portion of it so that we

22  can argue it.

23          MS. HULL:  No, sir.

24          THE COURT:  But you are actually withdrawing the

25  motion?

```
 1              MS. HULL:  Yes, sir.

 2              THE COURT:  So the only Rule 29 issues to address

 3    would be whether I should grant a Rule 29 judgment of acquittal

 4    in general, number one.  And, number two, whether I should

 5    grant it in part and knock out specific overt acts or pieces of

 6    the Indictment.  And we will talk about that tomorrow morning.

 7              And I assume the Government saw Ms. Hull's

 8    supplemental motion to dismiss for Brady violations?

 9              MR. BOYLE:  Yes, I think we responded to it.

10              MS. HULL:  I have a copy of the response, Judge.

11              THE COURT:  I have not seen the response yet.

12              MR. BOYLE:  It would be 1584.

13              THE COURT:  Okay.  That's probably because -- did you

14    file it under seal?

15              MR. BOYLE:  Yes.

16              THE COURT:  That's why I didn't see it.  If you could

17    print that for me, Traci.

18              THE COURTROOM DEPUTY CLERK:  Will do.

19              (Please refer to the transcript of proceedings under

20    seal.)

21              THE COURT:  All right, the defense filed a joint

22    motion in limine to permit leading questions and also some

23    briefing on Rule 613.  The Government filed a response to that.

24              I've read both of them.  I don't think we need a lot

25    of argument on this.  I understand both parties' positions.  Is
```

1    there anything really critical somebody needs to say on this?

2              MS. CISNEROS:  I don't have anything to add, Judge.

3              MS. HULL:  Judge, I would note for the record, and I'm

4    not sure if it's something the Court's familiar with, but the

5    agents will, as a matter of course, will not speak to the

6    defense.  I -- by way of example, this morning we asked to

7    speak with Postal Inspector Curran, who we subpoenaed, and he

8    asked that Mr. Boyle be present.

9              Yesterday we asked to interview Ms. Helen Zavala and

10   she appeared with her City of Scottsdale counsel and asked that

11   Mr. Morrissey attend.

12             These are not -- obviously that's not the ideal

13   situation for the defense.  But I want it noted for the record

14   that these witnesses would not appear without having the U.S.

15   Attorney present and obviously none of the other witnesses that

16   have been called by the defense have made any such request that

17   I'm aware of.  It is only those who we hope to ask the Court to

18   invoke Rule 611.

19             MR. MORRISSEY:  Your Honor, the witnesses, all of

20   them, had the right to completely decline to speak to the

21   defense and yet they all chose to speak to the defense.  And

22   they exercised their right to speak to the defense with a

23   member of the prosecution team present.

24             Ms. Gandara, the assistant chief of police for

25   Scottsdale, is not our agent.  There's a paper trail in this if

```
1    it becomes necessary of her inviting the prosecution and
2    insisting that the prosecution be present.  And I've never seen
3    or I never heard an argument that the defense is being hampered
4    when law enforcement agents, who could refuse to talk, are in
5    fact agreeing to talk.
6            THE COURT:  They're not arguing that the defense is
7    being hampered.  They are arguing that the fact that they want
8    you present means that they are identified with the adverse
9    party for purposes of leading questions under 611.
10           MR. MORRISSEY:  And that's not borne out factually.
11   And it was not borne out by the testimony.  And that is not the
12   type of specific showing for each individual witness that would
13   be required for this Court to uphold their request under 611.
14           THE COURT:  All right.  Well, here are my thoughts on
15   this motion.  I continue to be of the view that it would be
16   inappropriate for me to conclude that every law enforcement
17   witness in this case, everybody who's employed by a law
18   enforcement agency is identified with an adverse party.
19           Clearly in my view Agent Moreland, Agent Bettendorf,
20   and the informant are.  Those are the three that were mentioned
21   in the motion, because they are clearly part of the prosecution
22   team.  So when they get called, I think it would be appropriate
23   to lead them.
24           I did not feel that Inspector Sartuche was being
25   evasive.  He clearly didn't have much of a memory, but I didn't
```

```
 1    feel there was evasiveness on this part.  And I didn't feel

 2    that the defense was hampered by not being able to ask leading

 3    questions.  I thought you were able to bring out everything you

 4    were seeking to by refreshing his memory.

 5            I can't conclude that the fact that a witness does not

 6    want to meet alone with the defense team means that I should

 7    conclude they are either hostile or that they are identified

 8    with the prosecution in this case.  That may become apparent

 9    during testimony, in which event, I'll allow leading questions.

10    But it hasn't happened so far with Inspector Sartuche.

11            So my view is we do have to take this witness by

12    witness with the exception of the folks who were clearly part

13    of the prosecution team:  The informant, Agent Bettendorf,

14    Agent Moreland.

15            As to others, we need to start without leading

16    questions.  If it becomes apparent or the defense believes it's

17    becoming apparent that they are either hostile or they are

18    clearly identified with the prosecution, then you can certainly

19    make the request under Rule 611, and I'll make the decision at

20    that point.

21            MS. HULL:  Your Honor, can the Court also include in

22    that list the victims, Mr. Logan, Ms. Linyard, Ms. Bell?

23            THE COURT:  Not yet.  I want to see how they testify.

24    I mean, certainly, I did not get the impression that Ms. Bell

25    and Ms. Linyard were doing anything other than telling what
```

1    happened to them.  I think that's true so far with Mr. Logan as

2    well.  But I'll make that determination as the testimony is

3    going forward.

4         With respect to Rule 613, I appreciate the defense

5    calling that to our attention.  We didn't talk about that at

6    side bar.

7         I went back and looked at the side bar transcript we

8    had for the side bar discussion we had about impeachment.  And

9    where we left things after the side bar was that I allowed the

10   defense to ask the witnesses about what were in previous

11   interviews that were inconsistent.  And the way we left it is

12   if the witness denies the inconsistency, and the defense

13   believes that it then needs to bring in extrinsic evidence, at

14   that point we will address the hearsay issue.  We never got to

15   that point.  The questioning specifically came up during Don

16   Logan's testimony and we didn't get there because I think the

17   way he answered didn't create that need.

18        That's the way we ought to go forward, I think.  If

19   you believe that there is a report or an interview of a witness

20   that is inconsistent with what they are saying, you can ask

21   them about it.  You can refresh their memory.  If you decide

22   that you want to try to address extrinsic evidence of it, then

23   we will have to introduce it under Rule 613 and Rule 801(d) if

24   you want to use it as substantive evidence.

25        But I think that's something that we will only have to

1    address if you get to the point of wanting to introduce the

2    document or call a witness to testify about an inconsistent

3    statement.

4         MS. WILLIAMS:  Your Honor, the only -- the problem

5    that poses for the defense is we have several agent witnesses

6    who are -- have been subpoenaed.  They are in other states

7    and/or retired.  Because of transportation issues, and in one

8    or two instances, this may be the only reason they would be

9    brought in to testify.  That's why we were seeking an advance

10   ruling under this rule.  These are not people we can say:  Hey,

11   we need you this afternoon.

12        THE COURT:  Well, but I can't -- I can't determine

13   that you can use 613 until I determine there's an inconsistent

14   statement, that it's relevant, until we address collectively

15   whether you want to use it for substantive purposes or clearly

16   impeachment, in which event, I need to give an instruction.

17        I mean, certainly you have to establish an

18   inconsistency before you can use 613.  I can't decide in

19   advance that's the case until we hear a witness testify

20   inconsistently.

21        MS. WILLIAMS:  Well, for example, Judge, and off the

22   top of my head, I can't tell you the agents.  But there were at

23   least two occasions on which Mr. Logan -- Mr. Logan was

24   interviewed at least nine or ten times by different agents.

25   There were at least two occasions during his cross where he

1    denied making statements or parts of statements on those

2    matters.  And they had to do with his thoughts on who might

3    have done this to him or -- something --

4         THE COURT:  Let me interrupt you for a minute,

5    Ms. Williams.  If you want to bring in a witness under 613, on

6    that issue, you need to identify what he said, you need to show

7    me why you think it's inconsistent.  I have to decide it's not

8    a mere collateral matter.  I have to go through those steps

9    before I can tell you in advance, yes, I will allow that

10   witness to testify.  I just can't say bring in anybody you

11   think will contradict Don Logan, because I haven't made a

12   determination of whether they can do it under 613.

13        MS. WILLIAMS:  Okay, I'll do that, Judge, because on

14   those matters, I definitely want to bring in witnesses.

15        THE COURT:  Okay.  And I think we just need to address

16   the specifics before I can decide whether 613 applies.

17        Okay, we are about five minutes over.  Is there

18   anything else we need to raise before the jury comes in?

19        MS. HULL:  Nothing.

20        MR. MORRISSEY:  No, Your Honor.

21        THE COURT:  Okay, bring them in.

22        MS. HULL:  Judge, can I move this?

23        THE COURT:  If you want, we can get this completely

24   out of the way.

25        MS. HULL:  Actually, it's helpful.

 1            THE COURT:  Okay.

 2            (The jury entered the courtroom.)

 3            THE COURT:  Good morning, ladies and gentlemen.

 4   Thanks for being with us this morning.

 5            Let me ask the question I do after any weekend break.

 6   Were any of you exposed to any information about this case over

 7   the weekend?

 8            I see no hands.

 9            Okay, we are going to continue with the testimony of

10   Inspector Sartuche.

11            You may proceed, Ms. Hull.

12

13                         JESSE SARTUCHE,

14   called as a witness herein, having been previously duly sworn,

15   was examined and testified as follows:

16

17                    DIRECT EXAMINATION (Continued)

18   BY MS. HULL:

19   Q.  Good morning, sir.

20   A.  Good morning.

21   Q.  Do you still have some of those exhibits in front of you

22   from last week?

23   A.  Yes, I do.

24   Q.  I am going to ask you to look at -- just pull at this point

25   Exhibit 559-A.  Do you have that, sir?

 1              Before you open it, do you recall your testimony last

 2    week when we were talking about the mailings from the informant

 3    to Dennis Mahon?  Do you remember that line of questioning?

 4    A.  Yes.

 5    Q.  And I asked you whether you participated in the drafting of

 6    those letters from the informant to Dennis Mahon.  Do you

 7    recall that?

 8    A.  I recall that question.

 9    Q.  Okay.  Let me back up, sir.  Over the weekend, did you have

10    any meetings with U.S. Attorneys?

11    A.  No.

12    Q.  Okay.  And with any other agents on this case?

13    A.  No.

14    Q.  All right.  So along that line of questioning, I believe I

15    asked you if you recalled participating in the drafting of the

16    motions (sic), and correct me if I'm wrong, I believe your

17    testimony was that you do not recall whether you actually

18    participated in the drafting of those letters?

19    A.  Right, I do not recall.

20    Q.  Okay.  Would review of a record in respect to that refresh

21    your recollection as to whether or not you participated in

22    that?

23    A.  Yes, ma'am.

24    Q.  All right.  And if you would, I'm going to ask you to open

25    559-A.  Look at it, read it, and tell me if -- when you're

1  done, tell me if that refreshes your recollection.

2          For the record, you have closed that now.  Does that

3  refresh your recollection?

4  A.  Yes, I have notes from the letter.

5  Q.  All right.  And do you recall exchanging correspondence in

6  this regard?

7  A.  As I recall, this is five years ago, I'm trying to think if

8  I received that from ATF, from Agent Moreland via e-mail.  I'm

9  not too sure how I got that correspondence, how we got this

10  letter.

11  Q.  How about Exhibit -- do you have Exhibit 559?

12  A.  No.

13          MS. HULL:  I apologize.  Can he be shown that.  Traci,

14  in case we don't, could I ask for 562 and 607 as well, please.

15  BY MS. HULL:

16  Q.  Okay, you have 559 in front of you?

17  A.  Yes.

18  Q.  Okay, would you look at that for the same purpose, sir.  Do

19  you recognize 559?

20  A.  Yes.

21  Q.  What is that?

22  A.  It is an e-mail addressed from me to Tristan Moreland.

23  Q.  Is it more than just one e-mail?

24  A.  Yes.

25  Q.  And is it a fair characterization that it is in fact an

1    exchange of e-mails between you and Agent Moreland?

2    A.  Yes.

3    Q.  Was this part of your contribution, if you will, to the

4    drafting of that letter?

5    A.  Yes.

6              MS. HULL:  Your Honor, I move Exhibit 559 into

7    evidence.

8              MR. BOYLE:  Objection, hearsay.

9              THE COURT:  What's your response on hearsay, Ms. Hull?

10             MS. HULL:  The case law, Judge, on the -- I believe

11   Agent Moreland already established the foundation from his

12   participation in the exchange.  The only other party to this is

13   Agent Sartuche.  He's recognized the documentation, and the

14   computer-generated data is not hearsay.

15             THE COURT:  But what is the hearsay exception for the

16   contents of the e-mails?

17             MS. HULL:  Well, Judge, I can -- I believe it talks

18   about -- it's not for the truth of the matter asserted, Judge.

19   It is evidence of the exchange that led up to the exhibit

20   that's already in evidence, which is 559-A.

21             THE COURT:  Your response, Mr. Boyle?

22             MR. BOYLE:  It's still hearsay.  There's too much

23   content in there for it not to be hearsay.  And if it's not

24   hearsay -- if it's not offered for truth of the matter, it has

25   no relevance.

1        THE COURT:  I think we need to have a bit of a more

2   detailed discussion about this, but I don't want to keep the

3   jury waiting while we do that.  Why don't we talk about this

4   during the break.

5        MS. HULL:  Absolutely.

6        THE COURT:  And we can come back to it.

7   BY MS. HULL:

8   Q.  Sir, so do you -- do you recall participating in the

9   crafting of letters from the informant to Dennis Mahon?

10  A.  Yes, from this exhibit, I do recall.

11  Q.  And what was -- what was your goal in -- in -- your choice

12  of words for these mailings?

13  A.  Just to elicit additional information regarding the

14  incident.

15  Q.  Regarding what?

16  A.  Regarding the incident.

17  Q.  You're talking about the Scottsdale bombing, correct?

18  A.  Yes.

19  Q.  And did you -- could you characterize for us what kind of

20  tone, perhaps, you were looking for, striving for in drafting

21  that letter?

22  A.  According to the exhibit here, I used the word

23  "aggressive," in my opinion, just to further elicit the

24  information that we needed to move forward.  As you can tell by

25  the exhibit, we went back and forth with Agent Moreland in the

1    drafting of this letter to see how ultimately he would have to

2    approve it.  But we were trying to be a little aggressive to

3    elicit that information.

4    Q.  And had you been aggressive in your drafting of letters

5    prior to that time?

6    A.  I don't recall having -- I can't remember the other letters

7    prior to that.

8    Q.  And you don't have a record of the prior letters prior --

9    that were sent before that; is that right?

10   A.  I don't recall.

11   Q.  Did you -- well, did you want more aggressive letters

12   because you hadn't gotten the desired results up until that

13   time?

14   A.  I can't recall what results we received up to that point on

15   the drafting of this particular letter.  I just know that we

16   were trying to obtain the needed information and I do remember

17   using -- in that e-mail that I just read, to be more aggressive

18   to get that information.

19   Q.  And again, I believe your testimony last week was that you,

20   on behalf of postal, did not keep copies of the letters sent

21   from the informant to Dennis Mahon.

22   A.  Without seeing the information, I can't recall if we did

23   that or not.

24   Q.  What would you have -- if you had kept the records, what

25   would you have -- or kept copies of the letters, what would you

1    have done with them?

2    A.  Entered -- given them an exhibit number, evidence number on

3    them.  That would be the procedure.

4    Q.  Okay.  And did you have an opportunity or have you had an

5    opportunity in preparation for testifying to look to see if

6    those letters exist in the evidence?

7    A.  I have not.

8    Q.  You testified earlier that postal took custody of the

9    evidence from the Scottsdale bombing on the date of the

10   bombing.  How long did that evidence remain in postal -- postal

11   evidence?

12   A.  I don't know.  I can't recall how long we kept the

13   evidence.

14   Q.  Would it be fair to say it was a matter of years?

15   A.  I think at the point that I left in October of '06, my best

16   recollection is that we still had the evidence.

17   Q.  Because I believe when you testified last week, you talked

18   about certain pieces of evidence and mailings that were coming

19   in.

20   A.  Right.

21   Q.  And you were still sending them to your Dulles lab for

22   comparison.  Do you recall that?  Mailings, for example, from

23   Dennis Mahon, statements in Catoosa.  Do you recall that

24   testimony?

25   A.  Yes, I do.  But I'm not sure if we are on the right page

1    regarding what I sent to the lab, the mailings.  I don't recall

2    sending any mailings to the lab.

3    Q.  Okay.  You may be right.  I believe you might have

4    testified, correct me if I'm wrong, that you got on the

5    phone -- okay, you got on the phone and talked to the folks

6    without actually sending the mailings on occasions.

7    A.  No, part of that is not true.  The only time I spoke to the

8    lab on the phone, we went over this, was regarding the

9    operation in Catoosa, I believe, when some components were

10   mentioned.  That's when I called them.  And we went over that.

11   There was no comparison.  But that's the only time I called

12   them.

13   Q.  All right.  In the -- you -- were you involved in the

14   search of the Mahon farm in June of 2009?

15   A.  Yes.

16   Q.  And what was your role in that search?

17   A.  I was part of the search team on that location at their

18   house.

19   Q.  Were you a finder?

20   A.  Yes.

21   Q.  And do you recall the use of the canine at the ranch, the

22   farm?

23   A.  I do recall a mention of the canine prior for the search

24   team and some of the agents going out to the property.  But I

25   wasn't there when it was being executed, I don't believe.

JESSE SARTUCHE - DIRECT EXAMINATION BY MS. HULL     3084

1    Q.  Oh, but it was your understanding that a canine would be

2    used?

3              MR. BOYLE:  Objection, leading.

4              THE COURT:  Overruled.

5              MS. HULL:  You can answer, sir.

6              THE WITNESS:  Yes.

7    BY MS. HULL:

8    Q.  And as part of your -- how long were you at the search at

9    the Mahon farm?

10   A.  All afternoon, from morning to afternoon until the search

11   was concluded.

12   Q.  Was your involvement such that if there had been results

13   from a canine search, that you would have been made aware of

14   that?

15   A.  Can you clarify that?  I'm sorry.

16   Q.  Was your involvement in the search of the farm such that

17   you would have been informed as to any results, positive

18   results of the canine search?

19   A.  Yes, I believe they would have informed everyone on the

20   site.

21   Q.  Sir, do you still have Exhibit 545 in front of you?

22   A.  Yes, I do.

23   Q.  We left off last week, we were talking about, as in a

24   moment ago, the statements made by Dennis Mahon in Catoosa in

25   2005.  Do you recall that?

1  A.  During the --

2  Q.  Catoosa?

3  A.  -- Catoosa event?  Yes.

4  Q.  And we were talking about, as in a minute ago, that you

5  would, on occasion, contact the lab to see if statements made

6  compared to the components in the Scottsdale bomb.  Do you

7  recall that line of testimony?

8  A.  Yes.

9  Q.  Okay.  Do you recall whether you requested any information

10  from the Dulles lab in regards to Dennis Mahon's statement in

11  Catoosa about the use of JB Weld to attach the pipe to the two

12  pieces of cardboard box?

13          MR. BOYLE:  Objection, asked and answered.

14          THE COURT:  Overruled.

15          THE WITNESS:  I do recall.

16  BY MS. HULL:

17  Q.  And what did you determine as a result of that part of your

18  investigation?

19  A.  I called the lab and they said that that particular

20  adhesive was not part of the components.

21  Q.  And as part of that part of your investigation as well, did

22  you inquire of the lab regarding his statements of using FFG

23  powder or black powder as the explosive filler?

24  A.  Yes.

25  Q.  And what did your investigation determine as to regards --

1   or regarding the use of that -- how that statement compared to

2   the Scottsdale bomb components?

3   A.  I believe the lab said that it wasn't the same type of

4   filler.

5   Q.  Would a review of your report indicate -- or help you

6   recall whether or not that was the result of that examination?

7   A.  Yes.

8   Q.  Okay, if you could please look at Exhibit 545.  And I

9   direct your attention to page 14, the bottom of the top

10  paragraph.  Please read it and then put it to the side, sir.

11          Okay, sir, does that refresh your recollection?

12  A.  Yes.

13  Q.  Do you recall at the conclusion of your investigation as to

14  whether or not Dennis Mahon's statement about using FFG powder,

15  black powder as the explosive filler compared to the Scottsdale

16  bomb?

17  A.  There was no comparison.  No match.  Those particular

18  components were not used in the device within the Scottsdale

19  City device.

20  Q.  Did you also ask your lab about Dennis Mahon's statement in

21  Catoosa about using duct tape?

22  A.  Yes.

23  Q.  And do you recall what you determined from your

24  investigation comparing Dennis Mahon's statement about using

25  duct tape as compared to the Scottsdale bomb?

JESSE SARTUCHE - DIRECT EXAMINATION BY MS. HULL    3087

1   A.  Yes, again, no -- that duct tape was not used in the

2   Scottsdale bomb.

3   Q.  Do you recall coming or being involved in that part of the

4   investigation regarding a laptop computer from Dennis Mahon

5   that was retrieved several years into the investigation?

6   A.  Yes, I do recall.

7   Q.  Do you recall whether, as part of your investigation,

8   asking that any tests be run on that computer?

9   A.  Yes.

10  Q.  Do you recall the results or do you recall what testing was

11  done?

12  A.  We had our computer forensic analyst conduct a search on

13  that for any type of -- regarding the components and the note

14  wording.  Came back with negative results.  We didn't get

15  anything from that computer.

16  Q.  As regards to -- did it yield any information at all about

17  the Scottsdale bomb?

18  A.  No.

19  Q.  Do you recall when you came to that conclusion or that

20  testing was done?

21  A.  I don't recall the exact date.

22  Q.  Would a review of your report help you?

23  A.  Yes.

24  Q.  Would you please look at page 16 of your report, Exhibit

25  545, paragraph 102.  Does that refresh your recollection?

JESSE SARTUCHE - DIRECT EXAMINATION BY MS. HULL     3088

1   A.  Yes, ma'am.

2   Q.  When was that testing done?

3   A.  April 8, 2005.

4   Q.  Sir, you previously talked about --

5           MS. HULL:  I'm sorry, is 559-A in evidence?

6           THE COURTROOM DEPUTY CLERK:  Yes, 559-A is in.

7           MS. HULL:  Okay.  One moment, please.  Permission to

8   publish 559-A, sir.

9           THE COURT:  You may.

10          THE COURTROOM DEPUTY CLERK:  It's coming on.

11  BY MS. HULL:

12  Q.  Inspector Sartuche, do you see that letter on the display?

13  A.  Yes, I do.

14  Q.  Do you recognize that -- well, was that a letter that was

15  the result of your exchange of e-mails we previously discussed?

16  A.  Yes.

17  Q.  And what is the date of that letter?

18  A.  April 4th, 2005.

19  Q.  And would that have been purposely dated in close proximity

20  to when it was actually mailed or sent out?

21  A.  Yes.

22  Q.  Thank you.

23          After that letter was sent, did you participate in

24  drafting another letter from the informant shortly after that

25  time?

1    A.  I don't recall.

2    Q.  Okay.  Would a review of your report assist?

3    A.  Yes.

4    Q.  Please look at Exhibit 545, page 16, paragraph 104.

5           After closing that, sir, does that refresh your

6    recollection?

7    A.  Yes.

8    Q.  Did you send a subsequent letter?

9    A.  Yes.  I don't recall that letter.  I can't remember the

10   letter.  But -- or the content of it.

11   Q.  All right.  Had you -- between the -- just prior to that

12   being sent out, had agents received this book "Forgive?  Forget

13   it!"

14   A.  I recognize the name.  I don't know what -- during what

15   date it came in.

16   Q.  Would the report refresh your recollection?

17   A.  Yes.  Yes.

18   Q.  Okay, same page, sir, page 16, the paragraph right before

19   that, 103.  Does that refresh your recollection?

20   A.  Yes.

21   Q.  When -- so correct me if I'm wrong.  The exhibit that we

22   looked at, the letter of April 4th, 2005, did that then cause a

23   mailing or did subsequently a mailing come in from Dennis

24   Mahon?

25   A.  I don't know if that really caused that mailing to come in.

1    But on that date, April 13th, 2005, that book came in.  I don't

2    recall if it was -- if it was because of the letter that we

3    sent out or not.

4    Q.  Okay.  But in any event, it came in after the letter was

5    mailed?

6    A.  Yes, ma'am.

7    Q.  And is that the book that we talked about last week that

8    you checked to see if there was a device similar in build,

9    structure, components to the Scottsdale bombing?

10   A.  I can't recall if I looked at it or ATF looked at it and

11   determined there was no information in there.  I just can't

12   recall how I came to determine that there was no information

13   on -- in that book regarding the device.

14   Q.  But however you came to that conclusion, did you come to

15   that conclusion?

16   A.  Yes.

17   Q.  Okay.  And then after that is when you sent another letter;

18   is that -- after reviewing your report?

19   A.  I don't know what -- we stopped on April 13th.

20   Q.  Okay.

21   A.  So --

22   Q.  Would you like to look at paragraph 104 again, the next

23   paragraph?

24   A.  Yes.

25   Q.  On page 14.  Does that refresh your recollection?

1    A.  There's a date in there, April 18th, that we sent another

2    letter.  Again, the content, I can't recall.

3    Q.  And you didn't keep a copy of it?

4    A.  I don't recall -- I don't know.  If it's in evidence, I

5    haven't seen it.  Like I said, it's been five years since going

6    through -- I haven't seen any document in five years.

7    Q.  You can't recite that letter after five and a half years,

8    is that what you're saying?

9    A.  No.  No.

10   Q.  We don't expect you to.

11          After that is when you received another -- did you

12   receive another mailing?

13   A.  I would have to review the report.

14   Q.  Same page, paragraph 105.

15          After closing that, sir, does that refresh your

16   recollection?

17   A.  Yes.

18   Q.  After that April 13th, 2005, letter, did you receive

19   another mailing from Dennis Mahon?

20   A.  Yes.

21   Q.  What did it contain?

22   A.  A book and three WAR newspapers.

23   Q.  And what was the name of the book?

24   A.  The James Bond Poor Man's Book.

25   Q.  And did you ask or come to a conclusion as part of your

1    investigation that either of those -- either the Poor Man's

2    James Bond or the WAR papers contained any information relating

3    to the Scottsdale bomb?

4    A.  Yes, I came to that conclusion either getting the

5    information again from ATF or I don't recall if I went through

6    that book or the newspapers.  But ultimately, that's what we

7    came up with saying there was nothing in there.

8    Q.  Related to the Scottsdale bomb?

9    A.  Correct.

10   Q.  Do you recall whether or not you sent any additional

11   letters from the informant to Dennis Mahon?

12   A.  I don't recall.

13   Q.  Would reviewing your reports assist you?

14   A.  Yes, ma'am.

15   Q.  Would you please look at page 21, paragraph 137.

16          Thank you, sir, does that refresh your recollection?

17   A.  Yes.

18   Q.  Do you recall sending a subsequent letter from the

19   informant to Dennis Mahon?

20   A.  According to the report, there's a letter.  I don't recall

21   the content.  I do recall the VHS tape that was included, but I

22   don't recall -- really recall the letter that was in it.

23   Q.  When was that letter sent?

24   A.  April 26th.

25   Q.  Of what year?

1    A.  2005.

2    Q.  Do you want to look again?

3    A.  I'm sorry.  Correction, April 27th.

4    Q.  Of what --

5    A.  2006.

6    Q.  There we go, thank you.

7         Do you recall what type of letter was sent at that

8    time?

9    A.  According to my report, I put in there again, trying to

10   draft an aggressive letter to elicit information regarding the

11   Scottsdale bombing.

12   Q.  What was included with that mailing?

13   A.  The VHS tape of Mr. Don Logan's interview.

14   Q.  Do you remember when the interview was?

15   A.  No, I don't, not the date.

16   Q.  Was it a personal video, a television video?

17   A.  Someone had conducted an interview with him.  I would have

18   to look in the report again to see what type of interview.

19   Q.  Can you, please.

20   A.  Yes.

21   Q.  Page 21, paragraph 137.

22         Does that refresh your recollection?

23   A.  Yeah.

24   Q.  Do you recall what type of recording it was?

25   A.  It was a television interview.  Don't know who conducted

1    the interview.

2    Q.  Do you recall during your investigation the Mahons filing

3    changes of address with the postal service?

4    A.  Yes, I do.

5    Q.  Do you recall how many times they filed a change of address

6    with the United States Postal Service?

7    A.  I don't recall the -- how many times they did it, but I

8    know they did.  I can't give you the number.

9    Q.  Well, let me put it this way:  Do you recall any moving of

10   residence from state to state at least by the Mahons during

11   this investigation where they didn't file a change of address?

12   A.  I don't recall.

13   Q.  Do you recall whether they filed a change of address in

14   November or December of 2004?

15   A.  No, I don't recall.

16   Q.  Would your report refresh your recollection?

17   A.  Yes, ma'am.

18   Q.  Did you reflect these in your report, change of address?

19   A.  The change of address, I know that I annotated the change

20   of addresses in the report.  There's some listed in there.

21   Q.  Okay, can you please look at paragraph 74.  Do you recall a

22   change of address being filed at that time?

23   A.  Yes, from the report.

24   Q.  And when was that filed?

25          Do you need to look again?

1  A.  Yes.  I didn't look at the date.  What paragraph was it?

2  Q.  It was paragraph 74.  I believe the other paragraphs

3  provide a time frame.

4  A.  74 does not have --

5  Q.  Yes, sir, I think if you look at the paragraphs surrounding

6  it, it will give you a time frame.

7  A.  December 8, 2004.

8  Q.  Do you recall if they filed yet another change of address

9  in May of 2005?

10  A.  Not right off the top of my head.

11  Q.  Paragraph, 106, if that will help.

12  A.  Yes.

13  Q.  Do you recall whether they filed a change of address on

14  May 23rd, '05?

15  A.  Yes, a temporary change of address.

16  Q.  And did they file another one shortly thereafter?

17  A.  I would have to look at the report.

18  Q.  Very next paragraph, sir, 107.  Does that refresh your

19  recollection?

20  A.  Yes.

21  Q.  And what was filed next and when?

22  A.  Permanent change of address in June 14th.

23  Q.  The very next month?

24  A.  Yes.

25  Q.  Do you recall a change of address in November of 2005?

JESSE SARTUCHE - DIRECT EXAMINATION BY MS. HULL    3096

1   A.  I don't.

2   Q.  Paragraph 125 if that will help you.  Yes?

3   A.  Yes.

4   Q.  And does that refresh your recollection as to another

5   change of address on November of 2005?

6   A.  Yes.

7   Q.  From where to where had they noticed a change of address?

8   A.  I think on that paragraph I just put they were going back

9   to Colorado, Brighton, Colorado.

10  Q.  And each of those are filed -- how are those filed, sir?

11  A.  They are filed at the post office.  There's a form that you

12  fill out either temporary or permanent move.  And then you just

13  submit it through the post office.

14  Q.  So that any mail coming to you would be forwarded.  Is that

15  the goal?

16  A.  That is the goal.

17  Q.  Do you recall another change of address in March of 2006?

18  A.  If I can refer to the report.

19  Q.  If that will help, paragraph 136 on page 21.

20  A.  Paragraph 136?

21  Q.  If I have that right.  Yes, sir, paragraph 136 on page 21.

22  A.  Yes.

23  Q.  Do you recall the change of address being filed at that

24  time?

25  A.  Yes.

1    Q.  From where to where?

2    A.  Going back to -- from Colorado, I believe, going back to

3    Tulsa.

4    Q.  Do you recall as part of your investigation that there were

5    DNA tests run in this case?

6    A.  Yes.

7    Q.  Do you recall as to where -- from which part of the bomb

8    components DNA was extracted?

9    A.  No.  I do not, without referring to some kind of

10   documentation.

11   Q.  All right.  In your report, would that refresh your

12   recollection?

13   A.  Yes.

14   Q.  Very last paragraph, 141.  Does that refresh your

15   recollection, sir?

16   A.  Yes.

17   Q.  And do you recall where the DNA was extracted from?

18   A.  From -- not from -- I don't think it is -- I would need to

19   review it again.  I just know it was send to Cellmark, and they

20   didn't get any DNA from the components.

21   Q.  Do you recall where on the bomb component that DNA was

22   extracted?

23   A.  I believe from a glue.  A suspected print from a glue.

24   Q.  Okay.  Inspector Sartuche, is it -- would it be a fair

25   characterization to say that -- well, did you have any

1    disagreements with other inspectors as to what course your

2    investigation should take in this case?

3    A.  I did not.

4    Q.  Did the course of your -- I'm sorry, strike that.

5            You testified that I believe it was in October of 2004

6    that you took over as case agent.  Is that -- do I have that

7    time right?

8    A.  Yes, October of 2004.

9    Q.  Okay.  And so from that point until October 2006, did you

10   remain the case agent?

11   A.  Yes.

12   Q.  And was it your ultimate decision as to how the postal

13   inspection would proceed?

14   A.  Yes.  As the case agent, yes.

15   Q.  Do you know who took over as case agent when you left in

16   October of 2006?

17   A.  Yes.  Inspector Tim Lenzen.

18   Q.  Did you continue to be involved?  You must have, because

19   you went to the search in 2009, right?

20   A.  Correct.

21   Q.  So did you remain involved in the case?

22   A.  They would call me with questions or if I knew about this

23   document, any other little questions, admin stuff, they would

24   call.  At least two occasions -- I guess they went up on the

25   Title III on this and I was out of the loop on this after I

JESSE SARTUCHE - DIRECT EXAMINATION BY MS. HULL    3099

1    left.

2    Q.  And by Title III, you mean wiretap?

3    A.  Yes.

4    Q.  Final question, sir, when you talked about the -- last week

5    about the pen and trap on Mr. Olsen's work phone, do you

6    remember that line of questioning?

7    A.  Yes.

8    Q.  When I believe you -- I believe you testified that that pen

9    and trap was set up first and then you went to interview

10   Mr. Olsen?

11   A.  Yes.

12   Q.  Okay.  Did -- well, let me ask you this:  Did, at the

13   conclusion of your -- well, who concluded your interview with

14   Mr. Olsen, was it you or Mr. Olsen?

15   A.  Who concluded?

16   Q.  Who finished?  Who ended it?

17   A.  On that date that we approached them, I believe he did.

18   Q.  Okay.  Was it -- would you characterize it as a brief

19   interview, long interview?

20   A.  I wouldn't even call it an interview.

21   Q.  Okay.  So it was -- you were in and out pretty quickly?

22   A.  Very quickly.

23          MS. HULL:  May I have a moment?

24          I have nothing further, sir, thank you.

25          THE COURT:  All right.  Thank you.

1          Ms. Williams?

2          MS. WILLIAMS:  Thank you, Your Honor.

3          MS. HULL:  I have too much baggage, excuse me.

4

5                    DIRECT EXAMINATION

6    BY MS. WILLIAMS:

7    Q.  Good morning.

8    A.  Good morning.

9    Q.  Agent Sartuche, are you familiar with something called a

10   six-pack?

11   A.  Yes.

12   Q.  What is it, please?

13   A.  It's a photo lineup, a photo array, different people in

14   like a photo lineup.  It's a photo lineup.

15   Q.  And how many photos are usually in an array?

16   A.  Six.

17   Q.  And in the -- when they are displayed, are names put under

18   the pictures?

19   A.  No.

20   Q.  Just blank photos -- photographs with no other information?

21   A.  Correct.  I think -- I think they are numbered, there might

22   be a number.

23   Q.  Okay.  Just sequentially, one, two, three, four, five, six?

24   A.  Yes.

25   Q.  Did you ever use one in this case?

1    A.  I don't recall.  I can't remember if I did or not, or if

2    another inspector used one.

3    Q.  During your -- while you were case agent, you don't recall

4    if one was used?

5    A.  I can't answer that.  I can't recall it.

6    Q.  Do you recall whether you directed that one be put together

7    while you were case agent?

8    A.  I can't recall.

9    Q.  If one had been used while you were case agent, you would

10   have known about it?

11   A.  Yes.

12   Q.  You would have been told?

13   A.  Yes.

14   Q.  And you would have reported it --

15   A.  Yes.

16   Q.  -- in your report?

17          You are aware that there was a note included in the

18   Scottsdale bomb?

19   A.  Yes.

20   Q.  And you were aware that the postal service, during the

21   course of their investigation, -- of course your investigation,

22   sent that note to a profiler?

23          MR. BOYLE:  Objection, leading.

24          THE COURT:  Sustained.

25   BY MS. WILLIAMS:

1    Q.  Are you -- are you aware of what was done with that note?

2    A.  The note was sent to the Secret Service for analysis

3    regarding the ink.

4    Q.  And are you aware of anything else that was done with it?

5    A.  I took the note -- I did this.  I took the note to a

6    scholar, Edmund Burke scholar for an interview and an opinion.

7    Q.  Obtaining what?

8    A.  Nothing.  Nothing came about it, but --

9    Q.  For obtaining information on Edmund Burke?

10   A.  Right.  And get additional information, any relevance

11   regarding the content to Edmund Burke.

12   Q.  And this was while you were the case agent?

13   A.  I have to look back at the year to see that.

14   Q.  This was during the course of the postal investigation; is

15   that right?

16   A.  Correct.

17   Q.  And would you have included it in your report?

18   A.  Yes.

19   Q.  I have to find the paragraph.  I'll come back to that.

20          Are you aware of -- and when you talked to this

21   scholar, do you recall his name?

22   A.  Last name Pocock, I believe.

23   Q.  Is there -- can you tell us the reason you went to him?

24   A.  He was considered an expert scholar in Edmund Burke

25   literary literature.

1  Q.  And you mentioned that it would -- it would help you to

2  help refresh your recollection if you looked at your report?

3  A.  Yes, ma'am.

4  Q.  Could you please take a look at page 11, paragraph 70.  And

5  71.

6       Does that refresh your recollection?

7  A.  Yes.

8  Q.  When you talked to -- Mr. Pocock was a professor; is that

9  right?

10  A.  Yes.

11  Q.  And when you talked to Professor Pocock, was he able to

12  give you any information about Edmund Burke?

13  A.  Yes regarding the note and his past writings.  But no

14  information related to the note per se.

15  Q.  When you say "his past writings," you mean Pocock's or

16  Burke's?

17  A.  Burke's.

18  Q.  When you say Burke's past writings, was it your

19  understanding he was an author or --

20  A.  Yes.  A literary scholar.

21  Q.  Historical scholar or what?

22  A.  Yes.

23  Q.  What kind of scholar?

24  A.  Just in literature works, government works is my

25  understanding.

1  Q.  And was Professor Pocock able to, during the course of your

2  investigation, was Professor Pocock able to give you any other

3  leads from what he read in the note?

4  A.  As I recall from here, he just -- we asked him, you know,

5  look at the note, read it.  Does it --

6          MR. BOYLE:  This is nonresponsive and I would object

7  to hearsay.

8          THE COURT:  Sustained.

9  BY MS. WILLIAMS:

10  Q.  He did give you other information?

11  A.  Yes.

12  Q.  And did he give you information -- did he attempt to help

13  you with what kind of a person you might be looking for?

14  A.  Yes.

15  Q.  And did you follow up on the information he gave you?

16  A.  He gave an opinion.  That's what we asked for.

17  Q.  I'm sorry, I didn't hear you.

18  A.  He gave an opinion.

19  Q.  Okay.

20  A.  And that's what we asked him to do after reviewing the

21  note.  But your question to did we follow up, can you be more

22  specific?

23  Q.  Well, based on his -- did you do any investigation to --

24  into the opinions he gave you?  Did you use his opinions as

25  leads?

1    A.  No.  No.

2    Q.  Did he give you any opinions, for example, on what type of

3    a person might do this, might have written this note?

4    A.  He gave an opinion, and I think it's in the report.

5    Q.  And did he give you opinions on what type of groups might

6    be involved with writing such a note?

7    A.  I believe he mentioned a group.

8    Q.  Do you recall if he -- if he gave you any information about

9    religious groups?

10   A.  I believe I read it in the report.  It is mentioned.  He

11   mentioned some religious group.

12   Q.  Group or groups generally?

13   A.  I don't recall.

14   Q.  If you could refer -- refresh your recollection with your

15   report at page 11, paragraph 71.

16        Did he have opinions about whether there might be a

17   religious group involved?

18   A.  He mentioned --

19        MR. BOYLE:  Judge, objection, hearsay, Rule 702.

20        THE COURT:  Sustained on hearsay.

21        MS. WILLIAMS:  Your Honor, not offered for the truth

22   of the matter asserted, but rather as investigative leads which

23   were then reported in the agent's report.

24        MR. BOYLE:  The witness said they didn't follow up the

25   leads.

1           THE COURT:  The objection is overruled.  The jury

2   should consider what Professor Pocock told the agent not for

3   the truth of what Professor Pocock said, but merely for its

4   role in the investigation.

5   BY MS. WILLIAMS:

6   Q.  Did he suggest to you that there might be groups with a

7   religious background who would write such a note?

8   A.  He mentioned a group, the Edmund Burke Society.

9   Q.  And also groups with a religious background?

10  A.  I missed that if it's not in the report.  I'm sorry.

11  Q.  If you would like to refer back to your report, paragraph

12  71, fifth line from the bottom.

13          THE COURT:  You're asking if this refreshes his

14  recollection?

15          MS. WILLIAMS:  Refreshes his recollection, yes.

16          THE COURT:  Please review it.

17          THE WITNESS:  Yes, in the report it says with a

18  religious background.

19  BY MS. WILLIAMS:

20  Q.  And in the same fashion, did he suggest that such a note

21  might reflect a law enforcement or legal background?

22  A.  Yes.

23  Q.  Now, we were talking about what was done with the note in

24  the bomb.  You mentioned it was sent to a lab for analysis?  Is

25  that right?

1    A.   Correct.

2    Q.   And was the note -- you mentioned you took the note to

3    Professor Pocock?

4    A.   A copy of it.

5    Q.   And was it sent to anyone else for evaluation?

6    A.   Our lab sent it to Secret Service for the ink jet

7    comparison, the ink comparison on it.

8    Q.   And was it sent to anyone else for analysis?

9    A.   I don't recall.

10   Q.   Would your report refresh your recollection?

11   A.   Yes, ma'am.

12   Q.   If you could refresh your recollection by referring to

13   paragraph 7 on page 2, please.

14             Does that refresh your recollection?

15   A.   Yes, in the report -- I don't know who sent it to -- it was

16   sent to the FBI.

17   Q.   For what purpose?

18   A.   I believe their violent crime behavior unit.  I'm not sure.

19   I didn't send it to them.

20   Q.   Do you know what the behavioral unit is?

21   A.   I'm not with the FBI, so I can't determine that or answer

22   that.

23   Q.   Why would your agency send something to the behavioral

24   unit?

25   A.   I wasn't the case agent then.  I didn't send it to them.

JESSE SARTUCHE - DIRECT EXAMINATION BY MS. WILLIAMS    3108

1    Q.  Okay, that was Agent Curran?

2    A.  Yes.

3    Q.  You took -- I'm sorry, you took over when?

4    A.  October 2004.

5    Q.  Were you involved in the case at all before October of

6    2004?

7    A.  Yes, I was.

8    Q.  Did you attend any press conferences before you took over

9    as case agent regarding this case?

10   A.  I don't recall.  It's been a long time.

11   Q.  Would your -- might your report refresh your recollection?

12   A.  Yes.

13   Q.  If you would look at paragraph 30 on page 5, please.  Does

14   that refresh your memory about a press conference?

15   A.  About a press conference?  I remember that, but I don't

16   know if I was present there or not.

17   Q.  And that's during -- that would have been during Agent

18   Curran's tenure as case agent?

19   A.  Yes.

20   Q.  If there was another press conference in May of '04, that

21   would also have been under Agent Curran?

22   A.  Yes.  He was still the case agent.

23   Q.  You mentioned a few minutes ago that you were aware

24   evidence went out to a lab or labs for DNA work.

25   A.  Correct.

1    Q.  Do I have that right?

2    A.  Yes.

3    Q.  Do you know what lab the evidence went to first to start

4    the DNA work?

5    A.  To start the DNA work?

6    Q.  Yes.

7    A.  The process would have been -- it would have been just

8    admin processed through our lab, the Dulles, Virginia lab.

9    Q.  Do you know if it ever went to the DPS lab in Arizona?

10   A.  Yes.

11   Q.  And were you responsible for sending the evidence to the

12   DPS lab?

13   A.  Clarification, I wasn't the evidence custodian on that.  It

14   would have been the evidence, but I think John and I, I think

15   we ultimately we were -- we drove it down to them.

16   Q.  Okay.

17   A.  But I don't know the process of the chain of process on

18   that.

19   Q.  And do you recall when that -- when that transfer, the

20   process of taking it to DPS occurred?

21   A.  No, ma'am, I don't recall that date.

22   Q.  Would your report help with that?

23   A.  Yes.

24   Q.  If you could please refresh your recollection by looking at

25   paragraphs 45 and 63.

1              Do you recall when the evidence was taken there?

2    A.  Not exactly.

3    Q.  Approximately?

4    A.  In September of '04.

5    Q.  And subsequent -- were there initial lab preparations made

6    to transfer the evidence to DPS?  Or what -- I say "lab

7    preparations."  If you -- refer back to page -- or paragraph

8    45.  Tell me if that refreshes your recollection about initial

9    arrangements being made to transfer the evidence to the lab.

10   A.  I don't recall the specific preparations.

11   Q.  Okay.  But preparations were being made?

12   A.  Yes.

13   Q.  Okay.  And then in September of '04 you testified that the

14   evidence went to the lab and consultations began about DNA?

15   A.  Correct.

16   Q.  And did that involve both you and Agent Curran?

17   A.  Yes.

18   Q.  Were you involved in interviewing a variety of witnesses in

19   this case?

20   A.  Yes.

21   Q.  From -- did that begin even before you were the case agent?

22   A.  Yes, I participated in interviews.

23   Q.  By -- by summer of 2004, was it your understanding that

24   Mr. Logan had no idea who had sent him the bomb or why?

25   A.  What date?

1    Q.  Summer, maybe July.

2    A.  Yes.

3    Q.  And to the best of your recollection, had he made any

4    suggestion of white supremacist maybe being responsible?

5            MR. BOYLE:  Objection, leading.

6            THE COURT:  Sustained.

7    BY MS. WILLIAMS:

8    Q.  Are you aware as of the July of 2004, are you aware of

9    whether white supremacists had been suggested?

10   A.  By who?  I'm sorry.  More --

11   Q.  By Mr. Logan.

12   A.  By Mr. Logan?  I don't recall.

13   Q.  Would your report help refresh your recollection?

14   A.  Yes.

15   Q.  Directing your attention to paragraph 52.

16   A.  Five two?

17   Q.  Five two, yes, on page 8.

18           Does that refresh your recollection?

19   A.  Yes.

20   Q.  And does that refresh your recollection of whether

21   Mr. Logan had suggested white supremacists --

22   A.  No.

23   Q.  -- as the source of the bomb?

24   A.  He doesn't know who sent him the bomb.

25   Q.  Now I believe you testified on Friday about certain City of

1    Scottsdale employees.  Do I remember that correctly?

2    A.  Yes.

3    Q.  Of Mr. Olsen, Mr. Anderson and others?

4    A.  Yes.

5    Q.  You are aware of whether the postal inspectors followed

6    up -- well, did the postal inspectors get any search warrants

7    at that stage of the investigation?

8    A.  What stage?

9    Q.  When looking at Mr. Olsen and Anderson and others?

10   A.  We did not get search warrants.

11   Q.  Did the postal inspectors become aware of whether

12   Messrs. Olsen and Anderson had any property?

13   A.  I don't recall.

14   Q.  How about properties in Northern Arizona?

15   A.  I don't recall.  If another inspector obtained that

16   information, I don't recall that information myself.

17   Q.  Going back to the DNA testing we were just talking about,

18   are you -- were any other -- was anyone else's DNA tested by

19   the -- bad question, I apologize.

20          Was anyone else's -- was anyone DNA swabbed by the

21   postal inspectors while you were on the case?

22   A.  While I was the case agent, I don't recall.

23   Q.  If anyone had been DNA tested, you would have been

24   informed?

25   A.  Yes.

1    Q.  And you would have it in your report?

2    A.  Yes.

3    Q.  Did you direct that anyone be DNA swabbed?

4    A.  No.

5    Q.  For example, Mr. Olsen?

6    A.  I don't -- I can't recall.  I don't think I did.

7    Q.  Mr. Anderson?

8    A.  I don't recall.

9    Q.  You would have noted that if they had been?

10   A.  Yes.

11   Q.  Were you aware if Mr. Olsen or Anderson or the people you

12   talked about on Friday ever had their pictures included in any

13   six-packs?

14   A.  I don't recall the six-packs, as I stated before.

15            MS. WILLIAMS:  Excuse me just a moment.

16   BY MS. WILLIAMS:

17   Q.  Does the postal inspector, the postal inspection service

18   have the ability to obtain search warrants from Federal Court?

19   A.  Yes.

20   Q.  And would such search warrants include properties?

21   A.  Yes.

22   Q.  How about DNA swabs?

23   A.  Yes.

24   Q.  I believe -- I apologize.

25            I believe you discussed a letter that was written and

1    sent to Dennis Mahon by the informant in March of '05.  Do you

2    recall that?

3    A.  March '05.  I have to refer back to the report.

4    Q.  Okay.  Please do so if it would help refresh your

5    recollection.  It would be paragraph 97.

6          You recall that letter being sent?

7    A.  I don't know the contents.  But I do, if it's in here, if I

8    put it in here saying that it was sent, but I don't recall the

9    contents or --

10   Q.  And the purpose, was the purpose of the letter geared

11   towards getting more information about the Scottsdale bomb?

12   A.  Yes.

13   Q.  And getting Dennis Mahon to talk about that subject?

14   A.  Yes.

15   Q.  And that was on March 18; is that right?

16   A.  Yes.

17   Q.  Do you recall on March 24, about roughly a week later,

18   whether Dennis Mahon responded to that letter?

19   A.  I would have to refer back to the report.

20   Q.  Would it help refresh your recollection?

21   A.  Yes.

22   Q.  If you look at paragraph 98 and 99, please.  Did Dennis

23   respond to that letter?

24   A.  Yes.

25   Q.  In his response, did he say anything about the Scottsdale

1    bomb?

2    A.  No.

3    Q.  And after that letter, did he, about a week letter, write

4    yet another letter?

5    A.  Yes.

6    Q.  And did he talk about the Scottsdale bomb in that letter?

7    A.  No.

8    Q.  And those two letters, from March 24 and March 30th, those

9    were -- were those responding to the informant's letter asking

10   for information?

11   A.  They came after that letter that was sent.

12   Q.  And he was acknowledging that he got her letter?

13   A.  I believe so, yes.

14          MS. WILLIAMS:  Thank you, Your Honor, I have nothing

15   further.

16          THE COURT:  Cross-examination?

17

18                        CROSS-EXAMINATION

19   BY MR. BOYLE:

20   Q.  Following up with this discussion of Dennis Mahon and the

21   informant call, as a part of that process, he did ask her to

22   send an article about Don Logan, right?

23   A.  I would have to refer back to the report.

24   Q.  Go ahead.

25   A.  What page was that?

1  Q.  15.  Paragraph 95.

2          Go ahead and close that.

3  A.  Yes.  He did ask the CI to send him the articles.

4  Q.  And the reason he didn't discuss these things over the

5  phone is because Dennis Mahon specifically said, "I don't want

6  to talk about the Scottsdale bombing over the phone," right?

7  A.  Yes.

8  Q.  You were asked questions about this report you referred to

9  several times, but does this contain all the information from

10 the case?

11 A.  No.

12 Q.  It contains some of the information; is that fair?

13 A.  Yes.

14 Q.  Some of it's left out?

15 A.  Correct.

16 Q.  For example, do you recall whether or not Dennis Mahon sent

17 to the informant a book called a Manual of Urban Guerilla

18 Warfare?

19 A.  I don't recall.

20          MR. BOYLE:  Permission to publish 166, which is in

21 evidence, Your Honor.

22          THE COURT:  You may.

23          MS. WILLIAMS:  Object, beyond the scope.

24          THE COURT:  Overruled.

25          MS. WILLIAMS:  What was the number?

 1              MR. BOYLE:  166.

 2    BY MR. BOYLE:

 3    Q.  Do you recall seeing the cover of this book?

 4    A.  I don't recall that, sir.

 5    Q.  Do you recall seeing that anywhere in the report you've

 6    been referring to this morning and last week?

 7    A.  No.

 8    Q.  Does that mean the book wasn't sent?

 9    A.  No, that doesn't mean that.

10    Q.  It just means that's some of the investigation that wasn't

11    covered in the report?

12    A.  Correct.

13    Q.  Do you have specific knowledge of this book and when it was

14    sent?

15    A.  I do not.

16    Q.  Were you on the case in October of 2006?

17    A.  No.

18    Q.  There were still entries being made into this document you

19    referred to after October of 2006, weren't there?

20    A.  I'm not sure.  I would have to look at the last entry date.

21    Q.  Go ahead, paragraph 141.

22    A.  The last entry date was August 9, 2006.

23    Q.  So there were no more entries after that?

24    A.  No.

25    Q.  Let's follow up with some of the mailings we discussed.

1    You were asked about some mailings where videotapes were sent

2    back to Dennis Mahon from the informant.  Do you -- I don't

3    know if you already testified to this, but do you recall what

4    type of tapes, videotapes those were that were sent back to

5    him?

6              MS. HULL:  Objection, outside the scope.

7              THE COURT:  Overruled.

8    BY MR. BOYLE:

9    Q.  If you need to refer back to paragraph 91, page 14.

10   A.  They were VHS tapes.

11   Q.  And what was the subject matter of the tapes?

12   A.  They were WAR, WAR VHS tapes.

13   Q.  And WAR is the White Aryan Resistance?

14   A.  Yes.

15   Q.  So the informant had White Aryan Resistance tapes that were

16   given by Dennis Mahon and you mailed them back to him at a

17   later date?

18   A.  Correct.

19   Q.  You were asked questions about Exhibit 559-A in your

20   testimony about whether or not you used aggressive language.  I

21   would like to follow up on that.  Was that because you wanted

22   Dennis Mahon to give more information about how the Scottsdale

23   bomb was constructed?

24   A.  Yes, to elicit more information about the incident.

25   Q.  Because as a part of this case in Catoosa, Dennis Mahon had

1   made some statements about how the Scottsdale bomb was

2   constructed, right?

3           MS. WILLIAMS:  Objection, exceeds the scope.

4           MS. HULL:  And is leading.

5           THE COURT:  Overruled.

6   BY MR. BOYLE:

7   Q.  Let me refer you to paragraph 97.

8           MS. WILLIAMS:  Your Honor, as the defense did, is the

9   Government refreshing his recollection or --

10          THE COURT:  I think you need to establish lack of

11  recollection before you refresh it, Mr. Boyle.

12          MR. BOYLE:  That's fine.  Go ahead and close that.

13  BY MR. BOYLE:

14  Q.  Do you have a memory of whether or not Dennis Mahon made

15  statements about how the bomb was constructed in Catoosa?

16  A.  I do not.  The only statements that I made that the initial

17  ones that I overheard and saw the video of that he had helped

18  some people.  I don't recall the actual -- that statement about

19  construction -- constructing the device.

20  Q.  Were you there throughout the Catoosa investigation?

21  A.  Yes, I was.  We weren't in the control room listening.

22          MS. HULL:  I'm sorry, was it were or weren't?

23          THE WITNESS:  Were not.

24          THE COURT:  Could you just say the sentence again,

25  please.

1            THE WITNESS:  I was not in the control room.

2   BY MR. BOYLE:

3   Q.  You were asked questions about calling back to the Dulles

4   lab in relation to some statements that Dennis Mahon made about

5   specifically FFG powder, do you remember that?

6   A.  Yes.

7   Q.  That was statements from February 1 to February 3, right?

8   A.  Correct.

9   Q.  Not statements made on February 4th or 5th?

10  A.  I would have to go back and review the report of that.

11  Q.  Do you have a memory of those specific statements right

12  now?

13  A.  I remember the conversation of calling the lab and telling

14  them about the components that he had mentioned.

15  Q.  And do you remember the dates?

16  A.  Not right off the top of my head.

17  Q.  Go ahead and refer to page 13, paragraph 86.

18            Now that was regarding February 1 to February 3?

19  A.  Yes.

20  Q.  And that was your call back to the lab was about a package,

21  a padded envelope bomb that Dennis Mahon was describing, right?

22  A.  I'm not sure.  Just a component when I called the lab.

23  Q.  Do you remember on February 5th, 2005, whether Dennis Mahon

24  gave instructions on how to make a cardboard box bomb?

25  A.  It's in the report.  I would have to refresh my memory.  If

1   it's in the report, I could look at it.

2   Q.  Do you know if it's in the report?

3   A.  I don't recall.

4   Q.  Do you ever remember calling back to the lab and asking

5   about a cardboard box bomb?

6   A.  I don't recall.

7   Q.  Do you ever recall calling back to the lab and asking about

8   a statement about how to blow up a car -- a house with a

9   propane tank?

10  A.  Calling back to the lab with that information?

11  Q.  Yes.

12  A.  No.

13  Q.  Do you know if you did call back about whether or not a

14  propane tank and using -- blowing up a house?

15  A.  I wouldn't have called the lab on that.

16  Q.  Following up with Edmund Burke, was there ever found a

17  connection between Edmund Burke and Don Logan?

18  A.  No.

19  Q.  Was this Professor Pocock or whoever you spoke with, ever

20  given any information about the White Aryan Resistance?

21  A.  I don't recall.

22  Q.  The date that you talked to this person was in 2000 and

23  what year?

24  A.  I don't recall the year.

25  Q.  If I told you it was 2004 before the investigation in

 1  Catoosa began, do you know if that would refresh your memory?

 2  A.  Before the operation in Catoosa?

 3          MS. WILLIAMS:  Objection, Your Honor, that's improper

 4  refreshing of recollection.

 5          THE COURT:  Sustained.

 6          Mr. Boyle, we are at the 10:30 mark.  Members of the

 7  jury, we will take a 15-minute break.  Please remember the

 8  admonition.  I'll see you then.

 9          (The jury left the courtroom.)

10          THE COURT:  Please be seated.  Do you want to talk

11  about 559 now or shall we do that later?

12          MS. HULL:  I'm ready, Judge.

13          THE COURT:  All right.  Here is the issue I had,

14  Ms. Hull.  The back and forth reflected in the e-mail talks

15  about the letter.  They are exchanging thoughts on what should

16  be in the letter and how it should be written.  I'm not

17  understanding the relevancy of that if the jury doesn't

18  consider what is in the communications.  In other words, if

19  it's not admitted for the truth of the matter asserted, such as

20  a statement:  I made it aggressive, or I included this

21  particular phrase, what is the purpose for which you're seeking

22  to admit it?

23          MS. HULL:  The intricacy with which these people

24  considered the language used in the letter, that they went back

25  and forth, that they fed off each other ideas as to what

1    wording to use in the letter.

2            THE COURT:  How can -- how can the jury understand

3    that without assuming -- without reading what they were saying

4    back and forth and assuming that they were talking about

5    writing a letter, which means they are taking these statements

6    for the truth of the matter asserted?

7            For example, if the agent says:  I advised this for

8    this reason, and the other says I changed this for this reason,

9    if you want the jury to understand for that what the agents

10   were doing with respect to the letter, it seems to me they have

11   to consider the truth of those communications.  That's really

12   what they were doing with respect to the letters.  That's the

13   difficulty I'm having.

14           MS. HULL:  Well, Judge, I don't know, in fact, I

15   believe that a lot of these were not actually contained in the

16   letter.  It is --

17           THE COURT:  Well, during -- while we were going on, I

18   looked at what they were talking about and I looked back at the

19   letter.  And virtually everything they are referring to is in

20   the letter, so it seems to me it is contained in the letter.

21           MS. HULL:  But not the purpose.  The --

22           THE COURT:  All right.

23           MS. HULL:  The goal.

24           THE COURT:  But there's more in those communications

25   than the purpose.  There's lots of discussion about what they

 1  are or are not putting in the letter.

 2          MS. HULL:  Correct.

 3          THE COURT:  And if you want the jury to understand

 4  they were intricately crafting the letter, it seems to me they

 5  have to read these e-mails for the truth of what they are

 6  saying to each other.

 7          MS. HULL:  I don't think so, Judge.  It's -- they are

 8  offered for, and a limiting instruction, I believe, can be

 9  crafted if the Court has concerns, that this is -- the point of

10  this exhibit is to show the jury that this wasn't just

11  something, you know, just this -- this letter was not offhand.

12  It was carefully crafted, and that, in fact, it took -- it

13  looks like several days, at least two days of exchanges to come

14  to a decision as to -- as to what final wording to be used.  I

15  think that an instruction can be given for that purpose if the

16  Court has concerns that it is not being offered for the truth,

17  but merely for the fact that these people were exchanging

18  regular e-mails in that time period in order to -- because they

19  were -- it was done for a reason.  I mean, the language was

20  used on purpose and how that came about.

21          THE COURT:  Mr. Boyle?

22          MR. BOYLE:  It's all hearsay.  Everything she wants to

23  establish, I think she's already established through the

24  witness which is correspondence back and forth to draft -- or

25  draft an aggressive letter.  Everything inside is hearsay.  It

1   has no relevance if they are not to assume it's for the truth

2   of the matter.  Basically what she's saying is she wants to

3   show dates.  She would have to redact out everything in there

4   except for the dates back and forth to show that there was back

5   and forth.  But the content of the language is all hearsay.

6   Otherwise, it has no relevance.

7          MS. HULL:  Well, Judge, it is relevant and I --

8          THE COURT:  Well, I think it's relevant.  But I think

9   it's relevant if they read the e-mails and assume the truth of

10  what they are saying, namely that one agent was making some

11  changes and another came back and made other changes and it

12  went back and forth.  That to me requires the jury to consider

13  the truth.

14         And if you're going to argue to the jury that this is

15  an illustration of careful and intricate drafting of the

16  letter, they have to look at it and assume the truth that -- of

17  what they are communicating.  One made this change and the

18  other one made the next change.  That's hearsay.

19         So I'm going to sustain the hearsay objection to the

20  e-mails in 559.

21         MS. WILLIAMS:  Your Honor, if I may, I think there's

22  an additional nonhearsay purpose which is to show the effect

23  upon the reader of the letter.

24         THE COURT:  But the reader of the letter never saw the

25  hearsay -- never saw the e-mails, so it doesn't show what

 1    effect the e-mails would have had upon --

 2              MS. WILLIAMS:  It shows the intended effect upon the

 3    reader.

 4              THE COURT:  But that doesn't say what the effect was.

 5    I'm going to sustain the hearsay objection to these e-mails.

 6              Okay, let's take ten minutes.

 7              (A recess was taken.)

 8              THE COURT:  Counsel, would you approach, please.

 9              (The following discussion was held at the bench

10    between Court and counsel:)

11              THE COURT:  Juror Number 4, I think it is, it may be

12    5, it's the woman with the dark curly hair, has a rash that's

13    making her a bit uncomfortable.  She went down to the nurse.

14    The nurse gave her some cortisone cream that she put on.

15              She told Nancy that she was okay going forward and she

16    just wanted to make sure she wasn't contagious.  She might be

17    able to get something over the lunch hour.

18              She said she's fine to listen to the evidence.  I felt

19    we should go ahead and let her tell us if the problem gets any

20    more severe.  Are you okay with that?

21              MS. WILLIAMS:  Yes.

22              MR. BOYLE:  Yes.

23              THE COURT:  Okay, we will bring the jury in.

24              (The discussion at the bench concluded.)

25              (The jury entered the courtroom.)

1          THE COURT:  All right, Mr. Boyle, you may continue.

2   BY MR. BOYLE:

3   Q.  Inspector Sartuche, I was asking you about Edmund Burke and

4   Professor Pocock.  Do you have a memory now regarding what he

5   told you regarding the Edmund Burke Society?

6   A.  He had just heard about the name and the Edmund Burke

7   Society being out of Canada and that's it.  That's all I

8   recall.

9   Q.  What kind of group out of Canada?

10  A.  A right-wing group out of Canada.

11  Q.  And how familiar was he with the Edmund Burke Society?

12  A.  That was the only statement he made.  He wasn't too

13  familiar with that.

14  Q.  Did he indicate whether or not he had even read any of the

15  literature from that group?

16  A.  He did not indicate that.

17  Q.  To be more clear, did he indicate whether he had read

18  literature from the group?

19  A.  No.  No, he did not.

20  Q.  He did not read literature from the group?

21  A.  I don't recall.

22  Q.  Is that correct?

23  A.  Correct.

24  Q.  You were asked questions about that Exhibit 559-A, which is

25  a letter that had language regarding the Scottsdale bombing and

1   Dennis Mahon.  Do you remember 559-A?

2   A.  Yes.

3   Q.  Could you tell us if that was mailed?

4   A.  Yes, it was mailed.

5   Q.  How do you know that?

6   A.  Because it was sent -- it was sent to Dennis.

7   Q.  How do you know that?

8   A.  If I put it in the report that it was sent, it was sent.

9   Q.  And did you put in the report that it had been sent?

10  A.  I would have to look at the report and -- to verify that.

11  Q.  Do you know which -- well, go ahead.  Do you know when the

12  report -- in the report where it is that it says that you sent

13  that letter?

14  A.  I don't -- I don't see it in the report.

15  Q.  So do you know if it was sent?

16  A.  Positive 100 percent, I can't recall then if it was or was

17  not.

18  Q.  Were you the person sending the letters?

19  A.  Yes, myself or Tim Lenzen, who was available to do it.

20  Q.  And did the informant write out any of the letters?

21  A.  I don't recall.

22  Q.  If the informant wrote -- if the informant wrote out what

23  was typed in a letter, would you agree or disagree with that?

24          MS. HULL:  Asked and answered, Judge.

25          THE COURT:  Overruled.

1              THE WITNESS:  One more time, more specific.

2    BY MR. BOYLE:

3    Q.  559-A is what's copied in an e-mail between you and another

4    agent, Tristan Moreland, right?

5    A.  Correct.

6    Q.  You all are discussing what type of letter should be sent

7    to Dennis Mahon, right?

8    A.  Correct.

9    Q.  You are discussing what type of language you should use,

10   correct?

11   A.  Correct.

12   Q.  And this is a draft of a letter that you suggested should

13   be sent to Dennis Mahon, right?

14   A.  Correct.

15   Q.  After that, show me where it says:  We sent this draft of

16   this letter to Dennis Mahon.

17   A.  I don't think it's in the report.  I can't recall if it was

18   mailed -- if it's not in the report, I usually put everything

19   that was mailed would have been in the report if I mailed it.

20   Q.  Now, your report has a general summary of we mailed a

21   letter, right?

22   A.  Correct.

23   Q.  But it doesn't actually show a copy of the letter that was

24   mailed, does it?

25   A.  No.

1  Q.  That's because ATF was primarily responsible for handling

2  the informant contact with Dennis Mahon, right?

3  A.  Correct.

4  Q.  And so they were the agency that was responsible for

5  documenting which letters were sent and when?

6  A.  Correct.

7  Q.  So they wanted your input on what letters should be sent,

8  but ultimately it would have been Agent Moreland and the

9  informant who would have figured out what to send, right?

10 A.  It would be ultimately their decision.

11 Q.  Whether or not the informant should handwrite a letter out

12 and send it?

13 A.  If they chose that route, yes.

14 Q.  And whether they chose the draft of the letter that you

15 have in 559-A to be sent to the defendants -- or to the

16 defendant, Dennis Mahon?

17 A.  If they chose that route, yes.

18 Q.  You were asked questions about Don Logan and whether or not

19 he had any idea who sent the bomb to him.  Do you recall those

20 questions?

21 A.  Correct.

22 Q.  And his answer was:  I have no idea, correct?

23 A.  Correct.

24 Q.  He never said:  I think this person at the City of

25 Scottsdale bombed me, right?

1    A.  Right.

2    Q.  He said:  I have no idea?

3    A.  Correct.

4    Q.  You were asked questions about the DNA testing with DPS.

5    Do you remember some of those questions?

6    A.  Yes.

7    Q.  Let's -- I want to -- and I want to follow up the evidence

8    that you talked about.  You were asked questions about where

9    did the evidence go right from the scene, and I think you said

10   it went to the Dulles lab.

11   A.  Correct.

12   Q.  Then that's the postal service lab?

13   A.  Yes.

14   Q.  Then the evidence is brought back here to Arizona in postal

15   custody?

16   A.  Correct.

17   Q.  And then in what year did it go to DPS?

18   A.  I don't recall what year.  It should have been in the

19   report.

20   Q.  Can you -- would you have a memory now of what year?

21   A.  If I reviewed the report, that -- around 205 -- 2005 year.

22   Q.  Do you have a memory now without referring to your report?

23   A.  No.

24   Q.  Would it help to refresh your recollection?

25   A.  Yes.

1    Q.  Would you please look at page 11, paragraph 72.  I'm sorry,

2    let me take that back.  And page 7, paragraph 40 -- oh, no,

3    that's right, 72.

4    A.  Paragraph 72?

5    Q.  Yes.

6         At some point was the evidence sent to DPS for DNA

7    testing?

8    A.  Yes.

9    Q.  All right.  What year did that happen?

10   A.  2004.

11   Q.  And the DNA testing from DPS showed what?

12   A.  No -- no DNA was able to be collected from the components

13   that were submitted.

14   Q.  And then the evidence went back from DPS DNA testing to the

15   postal lab, or postal evidence, I mean?

16   A.  Postal evidence?  Yes.

17   Q.  And then later on, parts of that were sent to the Cellmark

18   company for testing?

19   A.  Yes.  That's my understanding.

20   Q.  Back to the postal evidence, correct?

21   A.  I don't know what date that year was.  If it was after I

22   left or before I left, I'm not sure.

23   Q.  But at some point, it was sent to someone, correct?

24   A.  Correct.

25   Q.  And then back to -- back to --

 1    A.  Postal.

 2              MR. BOYLE:  Do you mind if I wait?

 3              THE COURT:  Okay, go ahead.

 4    BY MR. BOYLE:

 5    Q.  Back to your Phoenix evidence, to postal?

 6    A.  Yes.

 7    Q.  And then it was transferred from postal to ATF custody?

 8    A.  Correct.

 9    Q.  Now let's follow up on the work that was done by the postal

10    agency -- service.  How many people, approximately, were

11    interviewed by the post office?

12    A.  I believe there were about 80.

13    Q.  And that's because when you received a lead, it was your

14    job to follow up on a lead?

15    A.  Correct.

16    Q.  You followed up on the good leads?

17    A.  Yes.

18    Q.  Did you follow up on the bad leads?

19    A.  Yes.

20    Q.  Regarding some of the work that you did, I would like to

21    walk through it.  You were asked about searching phone records,

22    right?

23    A.  Yes.

24    Q.  Some of those were for City of Scottsdale employees?

25    A.  Yes.

JESSE SARTUCHE - CROSS-EXAMINATION BY MR. BOYLE      3134

1   Q.  And to do that, did you go to the City of Scottsdale and

2   ask to look at their phone records?

3   A.  I believe we issued out subpoenas to obtain records.

4   Q.  From the City of Scottsdale?

5   A.  Yes.

6   Q.  And then they gave you the records?

7   A.  Yes.

8   Q.  You looked at phone records of numerous people, correct?

9   A.  Correct.

10  Q.  Connie Wyckoff was one of them?

11  A.  Yes.

12  Q.  Glenn Olsen was one of them?

13  A.  Yes.

14  Q.  Steve Anderson was one of them?

15  A.  Yes.

16  Q.  Were there other people?

17  A.  I do believe so, but I don't know the names.

18  Q.  And then you looked at computers at the City of Scottsdale,

19  correct?

20  A.  Correct.

21  Q.  Let's start first with the mail room.  There were

22  individuals who worked at the mail room in the City of

23  Scottsdale; is that right?

24  A.  Yes.

25  Q.  And the package you suspected had gone through the mail

1   room because it had that meter stamp on it?

2   A.  Yes.

3   Q.  So I think you were asked questions about going to the mail

4   room and looking at, for example, a Uline box or a Uline box

5   catalog.  Do you remember those questions?

6   A.  Yes.

7   Q.  Because at that point, you thought, well, maybe if someone

8   in the mail room put a meter strip on it, they might have

9   something to do with the bomb, correct?

10  A.  Yes.

11  Q.  So you go there and you start looking through offices; is

12  that right?

13  A.  Yes.

14  Q.  You don't need a subpoena to do that, do you?

15  A.  No, we had an officer of the Scottsdale PD with us.

16  Q.  So you didn't have to make any showing, you just asked the

17  City of Scottsdale, they brought officers and started looking

18  in offices?

19  A.  Yes.

20  Q.  You also interviewed individuals in that mail room?

21  A.  Yes.

22  Q.  Do you remember their names?

23  A.  Just a few mail workers that I remember.

24  Q.  Who would they be?

25  A.  I think there was a Troy Brewer.  And then other -- I

1    forgot the other guy's name that I might have interviewed

2    there.

3    Q.  Do you know if Ronald Tatum was one of them?

4    A.  That name sounds familiar.  I don't know if I interviewed

5    him.

6    Q.  Do you know if he was one of the people who worked in the

7    mail room?

8    A.  Yes.

9    Q.  Was Mike Cevedra someone who worked in the mail room?

10   A.  Yes.

11   Q.  Michael Lukowski?

12   A.  Yes.

13   Q.  And you described that the postal service went through both

14   the mail room and the offices of these individuals?

15   A.  Yes.

16   Q.  You not only looked in the offices of these people, but

17   then you interviewed all of these people, correct?

18   A.  Yes.

19   Q.  And without discussing their interviews, they all agreed to

20   speak with you, right?

21   A.  Yes.

22   Q.  And then you took the next step of asking them if you could

23   go to their houses and do a consent search of their homes,

24   right?

25   A.  Yes.  I personally didn't, but during the course of the

1   investigation, another inspector would ask and they agreed to

2   it.

3   Q.  So starting with someone like Troy Brewer, who worked in

4   the mail room, you asked him for consent to search his home and

5   he agreed, right?

6             MS. WILLIAMS:  Objection, exceeds the scope.

7             THE COURT:  Sustained.

8             MR. BOYLE:  I would like to be heard on that at the

9   end of the break.

10             THE COURT:  All right.

11  BY MR. BOYLE:

12  Q.  Going back to the mail room, you also looked at the

13  computers in that mail room, right?

14  A.  Yes.

15  Q.  For all of these individuals, Ron Tatum?  Troy Brewer?

16  A.  Yes.

17  Q.  Mike Cevedra?

18  A.  Yes.

19  Q.  Mike Lukowski?

20  A.  Yes.  Anyone who had access to a computer there.

21  Q.  So you've now told us that you searched the area, searched

22  homes, searched computers, interviewed these people?

23             MS. HULL:  Objection, misstates the testimony,

24  searching homes.

25             THE COURT:  Overruled.

1   BY MR. BOYLE:

2   Q.  All on the mere possibility that just because the package

3   went to that mail room, they might have been involved, right?

4   A.  Yes.

5   Q.  And the net result of all of those searches, discussions,

6   was that you found absolutely no connection between any of

7   those four people and the Scottsdale bombing, fair or not fair?

8   A.  Fair.

9            MS. HULL:  Your Honor, request a side bar.

10           THE COURT:  Right now?  Does it concern this issue?

11           MS. HULL:  Yes.

12           THE COURT:  All right.

13           (The following discussion was held at the bench

14   between Court and counsel:)

15           MS. HULL:  Judge, the last question was that as a

16   result of those interviews, included as part of those

17   interviews, and the answer was that he found no connection.  He

18   just put the polygraphs at issue because these individuals were

19   polygraphed.  And I'm raising this at this time because the

20   Court, on the Government's motion, precluded any evidence on

21   polygraphs.  And they have just now made it an issue because as

22   part of their investigation that there was no connection was a

23   result of the polygraphs.  And that is part of his

24   investigation.  And it certainly comes into play when this

25   interview, December of 2005, was to ask Mr. Olsen again if he

 1   would submit to a polygraph, he refused.

 2           And it's my position, Judge, they have just opened

 3   this door, kicked it open in my mind, because we were very

 4   careful to steer clear.

 5           THE COURT:  Why are we raising this now, Ms. Hull?

 6           MS. HULL:  Well --

 7           THE COURT:  This isn't -- you aren't going to ask

 8   about this question now.  Is there a reason we have to take it

 9   up at this point?

10           MS. HULL:  I wanted to advise the Court now as opposed

11   to waiting.  I think that it is -- I apologize, I could have

12   waited.  I apologize now that I think about it.  But I wanted

13   to alert the Court at this time.

14           THE COURT:  All right.  It's on the record, we can

15   discuss this.  And I don't think we should keep the jury

16   waiting while we discuss this since it can wait a bit.

17           MS. HULL:  I apologize.

18           THE COURT:  Okay.

19           (The discussion at the bench concluded.)

20   BY MR. BOYLE:

21   Q.  Inspector Sartuche, did you -- do you have a memory of

22   whether or not an individual by the name of Matt Moric was

23   investigated?

24           MS. WILLIAMS:  Objection, exceeds the scope.

25           THE COURT:  Overruled.

1          THE WITNESS:  I don't recall the name.

2    BY MR. BOYLE:

3    Q.  Or Lawrence Gutos?

4    A.  I do not recall the name.

5    Q.  You were asked about Steven Anderson.  Do you remember

6    those questions?

7    A.  Yes.

8    Q.  An individual who was investigated by the postal service

9    because he had sued the City of Scottsdale?

10   A.  Yes.

11   Q.  It was a high-profile lawsuit?

12   A.  Yes.

13   Q.  The type of lawsuit where a person was suing his employer

14   for discrimination?

15   A.  Yes.

16   Q.  So his name came up a lot as you talked to people?

17   A.  Yes.

18   Q.  As a possible lead?

19   A.  Yes.

20   Q.  In the lawsuit, did he sue Don Logan?

21   A.  I don't think he was mentioned in the lawsuit.  I don't

22   remember reading the name.  But it's been a long time.

23   Q.  As part of the investigation, did you look to see whether

24   or not any of the individuals who had been sued by Steve

25   Anderson had been the subject of a bombing?

1    A.  One more time?

2    Q.  None of the people who Steve Anderson sued were bombed,

3    right?

4    A.  No.

5            MS. HULL:  Objection, outside the scope.

6            THE COURT:  Overruled.

7    BY MR. BOYLE:

8    Q.  And the one connection that you had between Steve Anderson

9    and Don Logan was that several years before the Scottsdale

10   bombing, five people, one of whom were Don Logan, authored a

11   report about an incident in the fingerprint lab, fair --

12           MS. WILLIAMS:  Objection, Your Honor, exceeds the

13   scope of direct and of this witness' knowledge.

14           THE COURT:  Overruled.

15   BY MR. BOYLE:

16   Q.  Fair or unfair?

17   A.  Fair.

18   Q.  Do you recall whether or not Don Logan made statements in

19   that -- in that paper about the incident?

20   A.  I don't recall.

21   Q.  The four other people on that letter, were any of them the

22   subject of a bombing at any point after the year 2000?

23   A.  No.

24           MR. BOYLE:  With the Court's permission, I would like

25   to use the Elmo to ask the witness questions.

1          THE COURT:  You may.  You mean with showing him

2   exhibits?

3          MR. BOYLE:  No, it's not an exhibit.  Instead of using

4   the easel, I would like to write on a paper on the Elmo.

5          THE COURT:  I'm not understanding what you are

6   suggesting, Mr. Boyle.

7          MR. BOYLE:  May I write on a piece of paper by using

8   the Elmo rather than using the easel?

9          THE COURT:  But write what?  Write your question to

10  him?

11         MR. BOYLE:  Write his answers.

12         THE COURT:  You mean take notes of his answers for the

13  purposes of showing them later rather than writing them down

14  on --

15         MS. WILLIAMS:  Objection, Your Honor, argumentative.

16  Just based upon the first line we see here and to the extent

17  they are going to be shown to the jury now as opposed to during

18  closing argument.

19         THE COURT:  Well, if you are going to make notes of

20  what the witness says, it seems to me that's all you should

21  make notes of.

22         MR. BOYLE:  Here's the first line, Judge.

23         THE COURT:  I think if you want to write them out, you

24  can write them out, Mr. Boyle, as the testimony is given.

25         MR. BOYLE:  Okay.

 1              THE COURT:  On a blank piece of paper.

 2              MR. BOYLE:  And may I display it?

 3              THE COURT:  Yeah.  Yeah, you can do it on the easel,

 4    or you can do it on the Elmo, either one is fine, on a blank

 5    piece of paper.

 6              MR. BOYLE:  I can't use this?

 7              THE COURT:  No.

 8              MR. BOYLE:  Permission to display a blank page?

 9              THE COURT:  You may.

10              THE COURTROOM DEPUTY CLERK:  To the jury?

11              THE COURT:  Yes.

12    BY MR. BOYLE:

13    Q.  Inspector Sartuche, let's go through some of the evidence

14    that was asked during your direct testimony.  You said you

15    looked at pen and trap records regarding Steve Anderson?

16    A.  Yes.

17    Q.  Did you find any connection between those phone records and

18    the Scottsdale bombing?

19    A.  No.

20    Q.  Regarding Steve Anderson, did you find any prior threats

21    from Steve Anderson to Don Logan?

22    A.  No.

23    Q.  You discussed a pole camera that was used to look at the

24    Anderson residence.  Do you remember that question?

25    A.  Yes.

1    Q.  Did you need any type of a warrant or any showing at all to

2    put a pole cam up in front of his house?

3    A.  I didn't do that part requesting that pole cam.  I don't

4    recall.

5    Q.  Have you done a pole cam in the past as a law enforcement

6    officer?

7    A.  I have not.

8    Q.  At the time of this investigation, how many years did you

9    have as an inspector?

10   A.  Less than two years.

11   Q.  You were a fairly new inspector at that point?

12   A.  Correct.

13   Q.  When you asked to speak to Steve Anderson, did he agree to

14   speak with you?

15   A.  Yes.

16   Q.  And after that interview, did you ask him if he would

17   allow -- if he would allow agents to look at his house?

18   A.  Yes.

19   Q.  And did he allow agents to go into his house and search?

20          MS. WILLIAMS:  Objection, Your Honor, exceeds the

21   scope, same as with respect to the mail room people.

22          THE COURT:  Overruled.

23          THE WITNESS:  The question one more time?

24   BY MR. BOYLE:

25   Q.  Did he give you consent to search his house?

1    A.  Yes.

2    Q.  Was a search done?

3    A.  Yes.

4    Q.  Was any evidence recovered connecting Steve Anderson to the

5    Scottsdale bombing?

6    A.  No.

7    Q.  Was a portion of that search the actual seizure of some

8    ammunition that might have powder in it?

9    A.  Yes.

10   Q.  And was that ammunition tested for comparison to the

11   Scottsdale bombing?

12          MS. WILLIAMS:  Objection, Your Honor, the contents of

13   the search, the results of the search was not gone into during

14   direct.  Exceeds the scope.

15          THE COURT:  Overruled.

16   BY MR. BOYLE:

17   Q.  Was it tested?

18   A.  Yes.

19   Q.  And what were the results?

20   A.  There was no comparison to the device.

21   Q.  Which means it was excluded?

22   A.  Yes.

23   Q.  Not the same stuff?

24   A.  Yeah, it was excluded.

25   Q.  Did you find any connection between Steve Anderson and

1    White Aryan Resistance?

2    A.  No.

3    Q.  Any connection between Steve Anderson to Edmund Burke?

4    A.  No.

5    Q.  At the end of the day, the inspection service stopped

6    investigating Mike Lukowski, right?

7    A.  Yes.

8    Q.  Stopped investigating Troy Brewer?

9    A.  Yes.

10   Q.  Stopped investigating Ron Tatum?

11   A.  Yes.

12   Q.  Stopped investigating Steve Anderson?

13   A.  Yes.

14   Q.  Because your investigation had concluded that you found no

15   connection between them and the Scottsdale bombing?

16   A.  Correct.

17           MS. HULL:  Same objection as before, Judge.

18           THE COURT:  Which is which?

19           MS. HULL:  At the side bar that I'm withholding until

20   later.

21   BY MR. BOYLE:

22   Q.  To be clear, that's based on the questions I asked you --

23           THE COURT:  Hold on just a minute.  The objection is

24   overruled.  Go ahead.

25   BY MR. BOYLE:

1   Q.  To clarify, I asked you about their interview, search of

2   the mail room, a search of the house, and their computer

3   searches.

4           MS. WILLIAMS:  Objection, asked and answered.

5   BY MR. BOYLE:

6   Q.  That's what I'm asking you.

7           THE COURT:  Overruled.

8   BY MR. BOYLE:

9   Q.  Correct?

10  A.  Correct.

11          MR. BOYLE:  Nothing else, thank you.

12          THE COURT:  Redirect?

13          MS. HULL:  Do we need to address the issue, Judge?

14          THE COURT:  Well, how much time do you have on your

15  redirect?

16          MS. HULL:  I'll press on.

17

18                      REDIRECT EXAMINATION

19  BY MS. HULL:

20  Q.  Inspector, you just testified that you didn't find any

21  information from the phone records of Mr. Anderson to link him

22  to the Scottsdale bomb.  Is that your testimony?

23  A.  Yes.

24  Q.  You testified on direct examination that what didn't even

25  constitute an interview with Glenn Olsen in December of 2005

1    culminated in him calling Mr. Anderson shortly after you left

2    and speaking for about half an hour.  Do you recall that

3    testimony?

4    A.  Yes, I do.

5    Q.  Do you recall the testimony about the pen and trap that was

6    set up in July of 2004 on the phones of Glenn Olsen, Steve

7    Anderson and Connie Wyckoff?  Do you recall that testimony?

8    A.  Yes, I do.

9    Q.  And that was -- that pen and trap was set up before you

10   conducted certain interviews of those people.  Do you recall

11   that?

12   A.  No, I do not recall that.

13   Q.  Would reviewing your report refresh your recollection?

14   A.  Yes.

15   Q.  If you would look at page 19, starting at paragraph 127

16   through 129.  According to that pen and trap, who did Mr. Olsen

17   call as soon as you left his interview in July of 2009 or 2004?

18   A.  Steve Anderson.

19        MS. HULL:  One moment, please.

20   BY MS. HULL:

21   Q.  Do you recall -- well, did you inform -- do you remember

22   the date of your interview of Mr. Olsen?

23   A.  December 21st, 2005.

24   Q.  Okay, I apologize.  The one in July.  Do you remember the

25   date in July of your interview with Mr. Olsen?

JESSE SARTUCHE - REDIRECT EXAMINATION BY MS. HULL    3149

1   A.  No, I don't.

2   Q.  Would reviewing your report refresh your recollection of

3   that?

4   A.  Yes.  Yes.

5   Q.  Paragraph -- page 7, paragraph 49.  Does paragraph 49

6   refresh your recollection --

7   A.  Yes.

8   Q.  -- as to what date you interviewed Mr. Olsen?

9   A.  Yes.

10  Q.  What date was that?

11  A.  July 13th, 2004.

12  Q.  And this is the longer pen and trap we were talking about

13  between July and what, September?

14  A.  Correct.

15  Q.  Of '04?

16  A.  I believe so.

17  Q.  Okay.  And you -- did you talk -- did you inform Mr. Olsen

18  what was the purpose of your interview?

19  A.  Yes.

20  Q.  And what was -- and was that in regards to the Scottsdale

21  bombing?

22  A.  Yes.

23  Q.  According -- and you already had the pen and trap on his

24  phone, correct?

25  A.  Correct.

1    Q.  Who did he call as soon as you left that interview?

2    A.  Steven Anderson.

3    Q.  When -- did you interview -- in the time frame of -- did

4    you pay close attention while you were -- I'm sorry, strike

5    that.  Strike that.

6            Do you remember when you then interviewed Mr. Steve

7    Anderson after the interview of Mr. Olsen?

8    A.  More specific?  Do I remember the interview?

9    Q.  The date, the date of the interview?

10   A.  The date of the interview, no.

11   Q.  Okay, would your report help you with that?

12   A.  Yes.

13   Q.  If you would look at page 8, paragraph 50.  Do you recall

14   the date of your interview now that you've reviewed the report?

15   A.  Yes.

16   Q.  When was the date of your interview of Steve Anderson?

17   A.  July 14th.

18   Q.  Of?

19   A.  2004.

20   Q.  This was all while the pen and traps were still in place?

21   A.  Yes.

22   Q.  And did you review the pen and traps surrounding the dates

23   of these interviews?

24   A.  Yes.

25   Q.  And what dates did you include in that review?

1   A.  I can't recall the dates.

2   Q.  Is it in your report?

3   A.  I hope so.

4   Q.  Okay.  Let's look at page 8, paragraph 51.  Does that

5   refresh your recollection of the time frame you were looking at

6   in particular?

7   A.  Yes.

8   Q.  What dates were those?

9   A.  July 9th through July 16th.

10  Q.  Which was shortly before and shortly after your interviews

11  of these two people?

12  A.  Correct.

13  Q.  And what did your review of the pen and traps for that time

14  frame indicate?

15  A.  They did communication, they did call between Steve

16  Anderson, Glenn Olsen and Steve Anderson and Connie Wyckoff.

17  Q.  And where was Mr. Anderson at this time?

18  A.  During that time, I believe he was still at the City of

19  Scottsdale.

20  Q.  Was -- did your -- did your investigation determine whether

21  or not Mr. Olsen was still under internal investigation?

22  A.  I don't recall.

23  Q.  If it's in your report, would that refresh your

24  recollection?

25  A.  Yes.  Yes.

1    Q.  Again, please, page 8, very top paragraph of the third line

2    down.

3            Does that refresh your recollection as to whether or

4    not Mr. Olsen was still undergoing internal investigation?

5    A.  Yes.

6    Q.  You spoke with Mr. Boyle about mailings and the

7    significance of mailings, correct?

8    A.  Correct.

9    Q.  And I think you specifically talked about -- if I could

10   have one moment.

11           You talked about conversations that were had -- I'm

12   sorry, strike that.  I'll back up a bit.

13           Mr. Boyle on cross-examination told -- asked you if

14   everything involved in your investigation was reflected in your

15   report.  And I believe your answer was no.  Do you remember

16   those questions?

17   A.  Yes.

18   Q.  Okay.  So you agreed with his account that there were

19   things outside -- in this investigation that were not reflected

20   in your report?

21           MR. BOYLE:  Objection, leading.

22           THE COURT:  Sustained.

23   BY MS. HULL:

24   Q.  Do you recall talking about whether or not you included

25   everything in your report?

1    A.  Yes.

2    Q.  Okay.  And he also talked to you about the conversations

3    that were on the phone, telephone conversations had between the

4    confidential informant and Dennis Mahon from the close of the

5    Catoosa event, do you recall that?  And leading up to your

6    first mailing?

7    A.  More specifically.

8    Q.  When did the Catoosa event end?

9    A.  Okay.

10   Q.  Do you remember what date?

11   A.  The exact date, no.

12   Q.  It was February 7th or 8th, does that sound about right?

13   A.  Of '04?

14   Q.  '05.

15   A.  I would have to look back in the report.

16   Q.  If you would at page 14, paragraph 91.

17   A.  91?

18   Q.  Yes, sir.  Paragraph 91 on page 14.

19   A.  Okay.

20   Q.  Does that refresh your recollection as to when these -- the

21   time frame is of these calls after Catoosa?

22   A.  February 8th through the 18th.

23   Q.  Okay.  And based upon your investigation, between that

24   time, was any relevant information about the Scottsdale bombing

25   provided?

1    A.  Not that I can recall.

2    Q.  Well, did you reflect in your report whether or not any

3    pertinent information was discussed?

4    A.  It's not, I don't think, listed in the report.  It's not

5    listed in the report.

6    Q.  If you would look again at that same paragraph, second

7    sentence.

8    A.  What paragraph again?

9    Q.  Same one, 91, page 14, second sentence.

10   A.  No relevant information was gathered.

11   Q.  That's based on your investigation?

12   A.  Correct.

13   Q.  Okay.  Again, Mr. Boyle asked you if everything was

14   reflected in your report.  Is your memory -- what is your

15   memory as to whether the exhibit that's 559-A, whether that was

16   mailed or sent?

17   A.  I don't recall.  I remember the e-mail.  I do remember

18   that.  And I do remember corresponding back with Tristan

19   Moreland.  I do not recall.  The preparation, if it was

20   prepared and mailed, sent, there would have been a copy of it

21   in evidence.

22   Q.  By whom?

23   A.  By us, or if I --

24   Q.  Who's "us"?

25   A.  The inspection service.  If I mailed it, I would have made

1    a copy of it and kept a copy of it as proof that I mailed it.

2    Q.  And where would those -- if the informant mailed something

3    to the Mahons, you have a copy of it?

4    A.  If the CI -- the informant mailed to Mahon?

5    Q.  Yes.

6    A.  We should have a copy.

7    Q.  And where would that be housed?

8    A.  The inspection service.

9    Q.  Is your -- okay, for purposes of maintaining evidence, do

10   you keep a separate -- collection of evidence separate and

11   apart from the evidence kept at ATF?

12   A.  No, everything was turned over to ATF, so if it was there,

13   if we had made a copy of it, it would have been there.

14   Q.  Where?

15   A.  With ATF.

16   Q.  Okay.  So if I -- correct me if I'm wrong.  But your

17   testimony is that every mailing that you sent to -- from the

18   informant to Dennis Mahon, you kept a copy?

19   A.  No.  The mailings that came in from Dennis I made a copy

20   of.

21   Q.  Okay, that's not what I meant.

22   A.  I'm sorry.

23   Q.  I'm trying to get them going the other way.

24   A.  The other way?  I can't recall if I made copies going out.

25   Q.  But if you had, they would have been transferred to ATF

JESSE SARTUCHE - REDIRECT EXAMINATION BY MS. HULL    3156

1    evidence?

2    A.  If there were copies, they would have been transferred over

3    to ATF evidence.

4    Q.  Do you recall copying any letters mailed from the informant

5    to the Mahons?

6    A.  I don't recall.

7    Q.  Leading up to this letter of -- well, do you have any

8    reason to believe that letter was not mailed at 559-A

9    specifically?

10   A.  I can't answer that, I don't recall.

11   Q.  When you talked -- when you talked or communicated with

12   Agent Moreland about the drafting of that letter, 559-A, did

13   you do so by e-mail?

14   A.  Yeah, there's communication in the e-mail about it.

15   Q.  Do you remember when you first communicated with Agent

16   Moreland about that?

17   A.  No.

18   Q.  Would reviewing the e-mails refresh your recollection?

19   A.  Yes.

20   Q.  Okay, please look at Exhibit 559 and tell me if that

21   refreshes your recollection.

22           Do you remember the dates of your exchanges?

23   A.  Yes, April 4, 2005.

24   Q.  And that is -- is that the same date as the letter?

25   A.  Yes, as I recall, it was April 4, 2005, that's stated on

1    the letter.

2    Q.  And what things did you tell Agent Moreland?  What was your

3    input, if you recall, to Agent Moreland as to what should be

4    included in the letter?

5    A.  The specifics, I can't recall.

6    Q.  Would review of the e-mail refresh your recollection?

7         MR. BOYLE:  Judge, object, this is beyond the scope

8    and it's been asked and answered.

9         THE COURT:  Overruled.

10   BY MS. HULL:

11   Q.  Go ahead, sir.  Is your memory refreshed after reading

12   that?

13   A.  From the e-mail, yes.

14   Q.  Do you recall who prepared the first draft of that letter?

15   A.  I don't.  But from reviewing the e-mail, I sent it to him

16   first.

17   Q.  Okay.  So do you recall if you drafted the first draft?

18   A.  From the e-mail --

19         MR. BOYLE:  Judge, I'm going to object.  He has to

20   testify from memory.

21         THE COURT:  Yes, we need to have you testify from your

22   recollection.

23         THE WITNESS:  Okay, I don't recall.  I can't remember

24   if I'm -- I sent him the letter first or called him to say:

25   Hey, this is what I'm doing.  Here you go.  I don't remember.

1    But I did send him that letter.

2    BY MS. HULL:

3    Q.   Okay.  And whether it was the first draft or not, did you

4    receive a response or include any edits from there?  What did

5    you do from there?

6    A.   Yes, I received a response back from him.  He had edited or

7    suggested some changes.

8    Q.   Okay.  And did you continue to engage him in further

9    drafting of the letter?

10   A.   I believe so.  I believe I made the changes and that's it.

11   Q.   You made the changes he suggested?

12   A.   Yes.

13   Q.   Okay.  And what -- what was the purpose of the language

14   that you were discussing or deciding to use, wanting to use?

15   A.   I was trying to get information about the Scottsdale

16   bombing.

17   Q.   And were there any -- did you express any theories as to

18   how the language -- what language should be used?

19   A.   Theories?  Explain.

20   Q.   Well, I believe earlier in testimony you talked about you

21   used the word "aggressive."

22   A.   Right.

23   Q.   Was this part of this letter as well?  That's the kind of

24   character I'm talking about as to what you're looking for.

25   A.   Right.  Just to be more specific in the letter, having the

1    objective, you know, of description of how the device was

2    built, and anyone that was associated in the City of

3    Scottsdale.

4    Q.  Okay.  And so based upon your input into the drafting of

5    this letter was -- did you come to an agreement with Agent

6    Moreland as to what language should finally be sent?

7    A.  I'm trying to recall.  It was ultimately his final approval

8    on the letter that resulted in the final draft version.

9    Q.  Did you suggest any specific target of the letter?

10   A.  Target?

11   Q.  As to what things to discuss, what things to elicit?

12   A.  Oh, as I mentioned earlier, the description of the

13   components, the device, and if anyone -- any names from the

14   Scottsdale PD.

15   Q.  Okay.  And did you make any other suggestions?

16   A.  I don't recall.

17   Q.  Did you then meet with Agent Moreland to discuss it?

18   A.  I don't recall the meeting.

19   Q.  Would review of the exhibit assist you?

20   A.  Yes.

21   Q.  Please look at Exhibit 559, bottom of the first page.  Did

22   you get your memory refreshed?

23   A.  No.

24   Q.  Okay.

25   A.  No.

1    Q.  Still not, okay.

2    A.  I don't remember the date.

3    Q.  Did you offer any suggestion to meet with any Scottsdale

4    Police?

5    A.  I don't recall.

6    Q.  Would reviewing the e-mails help you?

7    A.  Yes.

8    Q.  Top of the second page of Exhibit 559, there's a 434 in the

9    bottom right page.  Top paragraph.

10   A.  Okay.

11   Q.  Does that refresh your recollection?

12   A.  Of the meeting?

13   Q.  Well, of a goal of setting up a meeting.

14   A.  Yes.  Yes.

15   Q.  What was the goal?

16   A.  To finalize the letter.

17   Q.  To -- what meeting -- what meeting were you attempting to

18   set up?

19   A.  To discuss the letter, to finalize the letter with Agent

20   Moreland.

21   Q.  I apologize.  I apologize, not with Agent Moreland meeting,

22   I apologize.  Inside the letter, within the language of the

23   letter, were you trying to set up or request some sort of

24   meeting with law enforcement?

25   A.  Oh, God.  I don't recall.

1    Q.  Okay.

2    A.  I'm sorry.

3    Q.  With that question in mind, can you look at the top of the

4    second page.  It says 434 in the bottom right corner.

5    A.  Okay.

6    Q.  Does that refresh your recollection?

7    A.  Yes.

8    Q.  What were you attempting to achieve?

9    A.  Again, there was, I mentioned the components, if he was

10   going to talk about the components, again, a name in the City

11   of Scottsdale.  That was it.

12   Q.  Why were you looking for a name in the City of Scottsdale?

13   A.  Because of a statement he made in Catoosa.

14   Q.  About City of Scottsdale police or --

15   A.  Yes.  Yes.

16   Q.  When you talked to Professor Pocock, do you recall that

17   testimony?

18   A.  Yes.

19   Q.  In fact, now I believe your question or your answer when

20   talking to Ms. Williams was that he told you about some link

21   between the note and the Edmund Burke Society.  I'm not sure if

22   you cleared that up with Mr. Boyle that -- about whether

23   Mr. Pocock, Professor Pocock said anything about the Edmund

24   Burke Society in relationship to the note.

25   A.  I think he -- we asked him about Edmund Burke and the

1   Edmund Burke Society.  And he said he had just heard about that

2   society in Canada.  But no relation to the works of Edmund

3   Burke.

4   Q.  Or to the crafting of the note, correct?

5   A.  I'm not --

6   Q.  Let me rephrase, because I think that your testimony was to

7   the effect that Professor Pocock made some suggestion that

8   someone with the Edmund Burke Society had something to do with

9   the drafting of that.  But that's not correct, is it?

10  A.  Not correct.  I think he offered an opinion -- we asked him

11  for an opinion who would -- if the language here, who would fit

12  the language.  And he gave, I think, an opinion.

13          I don't know if we asked him about the Edmund Burke

14  Society and how it related, who brought that up.  But I think

15  it was just that he said it was a right-wing group out of

16  Canada.  I don't know if we mentioned it first or he mentioned

17  it first.  I don't recall.

18  Q.  Would reviewing your report refresh your recollection?

19  A.  Yes.

20          THE COURT:  We are at the noon hour, Ms. Hull, so we

21  are going to go ahead and break.

22          Members of the jury, we will plan to see you at

23  one o'clock.  Please remember the admonition.  We will excuse

24  you.

25          (The jury left the courtroom.)

1              THE COURT:  Please be seated.

2              All right, Ms. Hull, did you want to bring up the

3    matter you raised at the side bar?

4              MS. HULL:  Absolutely, Your Honor.  I would point out

5    for the record upon the continued examination by Mr. Boyle, he

6    then added Mr. Anderson into the lot of persons with whom there

7    was no connection based on his investigation.  This, as the

8    Court recalls, the Government filed a motion to preclude any

9    evidence adduced at trial, presented at trial about any of the

10   polygraphs, and we obviously objected to that.  It was at the

11   Government's request.

12             What Mr. Boyle has just done is he has opened the door

13   to the polygraphs.  First by asking Inspector Sartuche about

14   the mail room employees and the interviews of those mail room

15   employees.  The interviews included the polygraphs.  The

16   results of those interviews were, by Mr. Boyle's questioning,

17   that there was no connection with the Scottsdale bomb.

18             Then, after I made my record on the side bar,

19   Mr. Boyle included Steven Anderson in that.  And now the jury

20   is led to believe that as a result of the investigation,

21   there's no connection.  That is not true.

22             In fact, Mr. Anderson was polygraphed and initially

23   the first review was that it was found not to be the deceptive.

24   It was reviewed again and in fact it was -- I forget the

25   characterization, but inconclusive, or words to that effect

1    upon further review.

2            He was asked again to submit to a polygraph.  He did

3    not.

4            Mr. Olsen was questioned several times and requested a

5    polygraph.  He refused.

6            The Government has now placed this at issue.  And the

7    jury has the misconception that there was no link.  And that's

8    not true.  Based on their investigation, it's simply not true.

9            And I believe that I should be at this point -- I

10   wanted to raise it with the Court before proceeding, but they

11   have kicked open this door, Judge.  And it was closed at their

12   request.  They proceeded down this road at their peril.  The

13   defense should now be afforded an opportunity to go into those

14   issues.

15           As Court knows, we had an expert on polygraphs.  And I

16   mean, I don't -- we don't intend to go the full gamut, but I

17   think that whether the Court -- I think the results should come

18   in, quite frankly.  But at a very minimum, we should be able to

19   present evidence that people either were polygraphed and

20   failed, polygraphed and got inconclusive results, or asked to

21   be polygraphed and refused.

22           I will note for the record that at the December 2005

23   interview, I'm sorry, starting in the July, I think it was

24   13th, 2004 interview of Glenn Olsen, he was asked at that time

25   to take a polygraph.  He refused.  Immediately after that

1    interview is when he called Steve Anderson.  And they spoke

2    daily.

3           Mr. Anderson agreed to take one, but I've already

4    discussed the results.  When they went -- I'm not sure if they

5    went back.  I can't remember off the top of my head the

6    follow-up with Mr. Anderson.  But it was certainly suggested

7    and the reports reflected that it should have been followed up

8    with an additional polygraph.

9           Mr. Olsen was asked at least one more time the last

10   time as Inspector Sartuche reflected in December of 2005, they

11   went in and they asked him outright:  Will you take a

12   polygraph?  He refused and ended the interview.

13          For the Government to now be allowed, as they have, to

14   say, "Now, your investigation indicated that there was no

15   connection," is false.  It makes it sound like, number one,

16   these people were cooperative when they weren't.  Some refused

17   to take -- well, the mail room people agreed and they passed.

18   Mr. Anderson was not even asked again.  So it sounds like he's

19   been cooperative and they have exhausted their investigation

20   and found no link with the Scottsdale bomb.  And that's just

21   simply misleading.

22          And I'm asking that the Court grant the defense

23   permission to go into the matter of polygraphs.

24          THE COURT:  What exactly do you propose to do?

25          MS. HULL:  I propose that we be permitted to -- in

1    fact, as Agent Sartuche put it in his report about the

2    interviews about requesting polygraphs, also that, I believe

3    Agent Sartuche's report reflects that when they sent the

4    results, the initial results were -- I forget through which

5    agency, but then postal I believe sent it to Dulles and it was

6    Dulles, I think, who said:  You need to follow up.  It's not

7    conclusive, we recommend additional testing.

8            That was not followed up on.  By the records that we

9    have received, there's nothing to indicate that Mr. Anderson

10   was asked again to submit to a polygraph.  But I could be wrong

11   on that because I know that he left Scottsdale in, I think it

12   was October of '04, and went to the City of Glendale in a

13   similar position.

14           There were other polygraphs that were provided.  But

15   at a very minimum, Judge, we should be allowed to go into the

16   fact that polygraphs were used, that they were used as part of

17   this investigation, that they were used in an attempt to ferret

18   out any connection to the Scottsdale bomb, and there were

19   specific questions directed to the Scottsdale bomb that were

20   received -- evasive answers in some of these instances.

21           I don't -- I mean, I don't need to go into the mail

22   room people, because I concede that they -- they did all pass

23   and it doesn't seem to be any question as to the veracity of

24   that testing.  However, there were a lot of people who refused,

25   a lot of Scottsdale Police officers.  The two main suspects

1    refused.

2             I'm sorry, Mr. Glenn Olsen refused, Mr. Anderson

3    agreed, was found inconclusive and then there was no follow-up.

4             THE COURT:  All right.  Mr. Boyle?

5             MR. BOYLE:  I asked about the mail room people.  There

6    were four names that I listed for the mail room people.  And I

7    asked about four items:  Search of the mail room; search of the

8    computers; the pen and trap information; and their interviews.

9    Those are the four topics about the mail room people.  I never

10   discussed Glenn Olsen or other individuals.  So let's be clear

11   about the mail room people.

12            She's trying to say because I asked about the mail

13   room people, we should now open up the polygraph to everyone in

14   the case.  And that's not true.  She can cross-examine on the

15   interviews of all the mail room people.  She can cross-examine

16   on -- or redirect, I should say, on the searches of the

17   computers, the pen and trap, and the residences.

18            So I have not opened the door to anything that she

19   cannot already testify about.  What she wants to do now is

20   start getting into not the interviews of these people, but what

21   were the opinions of the polygraphers for these people.

22            So regarding the mail room people, which she's

23   perfectly conceded that they all passed, I haven't opened the

24   door for those people at all.  So there's no suggestion for

25   them.

1          And I was very clear as well that the four topics were

2    the search of the location, computers, homes, phone

3    information, and their interviews.  That's it.  And that's the

4    same for Steve Anderson.  And I do not agree with her

5    formulation about what happened with Steve Anderson.  The first

6    one was reflected in the report, which is he passed his

7    polygraph, then on paragraph 122 of this report that the

8    agent -- inspector keeps looking at it says, quote, no --

9    there's a new report issued a year later.  "No opinion can be

10   rendered with regard to this polygraph examination due to

11   incorrect question formulation."  And then they never went back

12   to Steve Anderson.

13          So what she would be left with at this point would be

14   because I asked if you had no information.  And he had no

15   information at that point because even the polygraph that he

16   had showed either Anderson passed, or the polygraph itself had

17   to be voided because the questions were wrong.

18          What they want to do now is then call in an expert

19   that this witness has never heard of to say:  Oh, no.  We don't

20   think he passed.  Now we think he failed.  But this witness has

21   no memory of that.

22          They are trying to drive a truck through a door that

23   hasn't even been opened.  And we object.

24          And then I would like to follow up.  I have another

25   issue about why I couldn't go into searches of homes.  But

1    let's do this first and then --

2            THE COURT:  You did go into that afterward.  After I

3    sustained the objection, you did go back into it and I didn't

4    sustain the objection.  There was one question on searches of

5    homes.

6            MR. BOYLE:  Well, let's just finish this.

7            MS. WILLIAMS:  Judge, if I may, Mr. Boyle did not just

8    confine himself to those four narrow issues with the specific

9    number of mail room people that he enumerated.  He specifically

10    then went on to talk about Steve Anderson, pen and trap, pole

11    camera, prior threats, no evidence, searching house, no

12    connection between Anderson and Edmund Burke, no connection

13    between Anderson and WAR.  Postal stopped the investigation of

14    the mail room and City of Scottsdale because there was no

15    connection.

16            He went quite a bit beyond what he is now saying was a

17    very narrow questioning.  And he went through the specific

18    reasons why they, quote, unquote, not his words, cleared these

19    people.

20            MS. HULL:  Judge, that is absolutely correct.  And

21    that was going to be my response that he said --

22            THE COURT:  Well, let me ask you some specific

23    questions.

24            MS. HULL:  Sure.

25            THE COURT:  We don't want to take the whole lunch hour

1    for this.  Do you agree that with respect to the mail room

2    employees, the polygraph doesn't contradict anything the

3    Government suggested because they didn't fail any of those

4    polygraphs?

5            MS. HULL:  As far as the mail room employees?

6            THE COURT:  Yes.

7            MS. HULL:  My recall is that those people did pass.

8    The four people named did pass.

9            THE COURT:  So there's no reason to go into their

10   polygraphs, do you agree?

11           MS. HULL:  Correct.

12           THE COURT:  Do you agree that Mr. Boyle did not ask

13   this kind of line of questions about Mr. Olsen?

14           MS. HULL:  No, he said "City of Scottsdale," Judge.

15   He didn't say --

16           THE COURT:  Do you believe he asked anything specific

17   about Olsen?  I can check it, but my notes don't show it.

18           MS. HULL:  No, not specifically of Olsen.

19           THE COURT:  With respect to Anderson, he did go

20   through that list of questions, you know, the pole camera,

21   et cetera, didn't produce any --

22           MS. HULL:  Yes.

23           THE COURT:  It sounds like what you want to put in

24   front of the jury is the fact that Anderson took a polygraph.

25   It was initially found to be not deceptive and it was later

1    found to be invalid because of incorrect question formulation.

2    What does that say about any connection between Anderson and

3    the Scottsdale bombing?

4              MS. HULL:  Well, Judge, it's -- if I may, the

5    characterization of the question was that the investigation was

6    stopped because there was -- of City of Scottsdale employees,

7    because there was no connection between Logan or the Scottsdale

8    bomb.

9              That's not true.  And that is the all-encompassing

10   statement that I believe brings in Olsen and everybody else.  I

11   don't necessarily need the fact of the specific findings from

12   Anderson, or Olsen other than that, from Mr. Olsen, he refused.

13   Mr. Anderson, according to Sartuche's report, they were

14   instructed to followed up with additional testing because it

15   was nonconclusive.

16             I don't -- whether -- and if the Court wants to

17   restrict the basis for it, but at least at a minimum, that

18   additional testing was recommended and not followed up on.

19             THE COURT:  But what you've been arguing, Ms. Hull, is

20   that there is a connection between these suspects and the

21   Scottsdale bombing.  How does the fact that the questions in

22   Mr. Anderson's polygraph were incorrectly formulated show any

23   kind of a connection between him and the Scottsdale bombing?

24             MS. HULL:  I don't believe I have to make that

25   connection in order to go into this, Judge.  I think that all I

1    need to show is that the Government placed in evidence in front

2    of this jury that the postal investigation was stopped because

3    there was no connection.  And that is not true.  That was the

4    testimony.  Mr. Boyle testified and Agent Sartuche responded

5    that that was correct.  He picked the words.

6         THE COURT:  I understand the parties' positions.  I

7    want to think about this and I'll give you my decision at

8    one o'clock.

9         MR. BOYLE:  Judge, this will come up with Inspector

10   Curran again.  I would again like to ask him about the consent

11   search of the mail room homes.

12        THE COURT:  Well, let me tell you my view on scope

13   because I've been getting objections on both sides of exceeding

14   the scope throughout trial.  My view is that scope is not

15   limited to specific questions asked by the other side.  It's

16   topical.  It goes into topics.  And what I ask myself when

17   somebody objects on scope is whether the question asked on

18   cross-examination is fairly responsive to the points and the

19   topics made during the direct.  And if so, I think it's within

20   the scope, even if it varies in terms of the specific facts

21   it's dealing with.  That's what I've tried to do and make a

22   judgment call whenever there's a scope objection made.

23        And obviously, whether or not I allow a particular

24   question with respect to Curran's cross-examination will depend

25   on what's covered in direct.  And I'll try to do the same thing

1      as I go forward.

2                MR. BOYLE:  All right.

3                THE COURT:  I think that's as much guidance as I can

4      give at this time.  And I'll look at this issue over the lunch

5      hour.

6                MR. BOYLE:  Thank you.

7                MS. HULL:  Thank you, Judge.

8                (The noon recess was taken.)

9                THE COURT:  Thank you, please be seated.

10               I've got to get my mic.  I'll come right back.

11               All right.  I want to give you my ruling on the

12     polygraph issue.  I went back and reviewed the transcript of

13     Mr. Boyle's cross-examination.  The exchange between him and

14     the witness just before we called the side bar for the first

15     time to talk about polygraph begins with a question, "Going

16     back to the mail room, you also looked at the computers in the

17     mail room."  So he's going back to the mail room.

18               And then he asks about the four individuals in the

19     mail room and confirms that they looked at their computers.  He

20     then says, "So you told us you searched the area, searched

21     homes, searched computers, interviewed these people, all on the

22     mere possibility that just because the package went to that

23     mail room, they might have been involved, right."

24               "ANSWER:  Yes."

25               And then this is the question just before we were

1    called to the side, "And the net result of all of those

2    searches, discussions, was that you found absolutely no

3    connection between any of those four people and the Scottsdale

4    bombing, fair or not fair?

5          "ANSWER:  Fair."

6          So that questioning was clearly limited to the mail

7    room personnel.  And I think we established before the break

8    that there's no reason to bring in the polygraphs of the mail

9    room personnel because they all passed their polygraphs.

10         The questioning that then occurred after we left side

11   bar included Mr. Boyle going through various questions about

12   the investigation of Steve Anderson.  And that's when he was

13   taking notes on the Elmo for the jury to see and the pole

14   camera, the consensual search of his home, et cetera.  And he

15   goes through that full list of investigative steps towards

16   Mr. Anderson.

17         And then as he summarizes before the second polygraph

18   objection was made, he says this, "At the end of the day, the

19   inspection service stopped investigating Mike Lukowski, right.

20         "ANSWER:  Yes."

21         "Stopped investigating Troy Brewer?

22         "ANSWER:  Yes."

23         "Stopped investigating Ron Tatum?

24         "ANSWER:  Yes."

25         "Stopped investigating Steve Anderson?

1          "ANSWER:  Yes."

2          "Because your investigation had concluded that you

3     found no connection between them and the Scottsdale bombing?

4          "ANSWER:  Correct."

5          That's when we had another objection based on

6     polygraph.

7          "QUESTION:  To clarify, I asked you about their

8     interviews, searching the mail room, a search of the house, and

9     their computer searches.  That's what I'm asking you.

10         "QUESTION:  Correct?

11         "ANSWER:  Correct."

12         So those questions were focused on Mr. Brewer,

13    Mr. Tatum, Mr. Lukowski and Mr. Anderson.  There's nothing that

14    opened the door on Glenn Olsen.  There was one mention of Glenn

15    Olsen during the entire cross, and that was when the witness

16    was talking about what phone records of City of Scottsdale

17    employees were obtained and Olsen was one of the individuals

18    there.  But there was no sort of follow-up summary of about no

19    connection between Olsen and the bombing.

20         So I don't see any reason to bring in anything about a

21    polygraph position of Mr. Olsen, because there wasn't that sort

22    of summary question/answer.

23         So the question I have to decide is whether the

24    questioning regarding Mr. Anderson and including him in the

25    summary question that there was no connection between him and

the Scottsdale bombing has opened the door to bringing in the

polygraph evidence related to Mr. Anderson.

The evidence that would come in would be that

Mr. Anderson took a polygraph initially and was found not

deceptive, that a year later, when the polygraph results were

reviewed, the reviewer said that they were not valid results

because of incorrect question formulation and suggested a

second polygraph.  And Mr. Anderson was never asked to take a

second polygraph.

That was precisely the evidence that I addressed in

document 1129 when I ruled on the polygraph issue.  And the

question I have to decide again now, and that was a ruling

based on 403 is whether the probative value of telling the jury

that he passed a polygraph that was later found to include

incorrectly formulated questions, and he was never again asked

to take a polygraph, whether the probative value of that

evidence is substantially outweighed by a risk of unfair

prejudice or prolonging the trial.

And I easily conclude again that it is substantially

outweighed for the reasons that I said in my order at docket

1129.  I won't repeat it.  I went on for a couple of paragraphs

about the problems that would be created if we went into that

area of the polygraph inquiry.

But I did say this:  I talked about the fact

Mr. Anderson wasn't asked to take a second polygraph.  I said:

1    Giving Mr. Anderson a second polygraph exam is only one step in

2    many of the Government -- in many the Government could have

3    taken.  But a second polygraph step can assume particular

4    importance in this case only if polygraph exams are considered

5    particularly probative, a view that has not been accepted by

6    the courts.  Because jurors generally may not be familiar with

7    the unreliability of such tests, they may unfairly conclude

8    that failing to administer a second test to Mr. Anderson was a

9    far greater flaw in the Government's investigation than in fact

10   is the case when one understand that polygraphs can be quite

11   unreliable.

12          Stated differently, the probative value of the

13   Government's failure to administer a second polygraph test to

14   Mr. Anderson becomes more important in the eyes of the jurors

15   to the extent polygraphs are viewed as a reliable method of

16   obtaining truthful information.

17          If the evidence were to be admitted, not only would

18   there be a risk that jurors would unfairly judge the

19   reasonableness of the Government's investigation, because they

20   overestimate the value of polygraphs in discovering the truth,

21   but there would likely be considerable time spent during the

22   trial debating the reliability of polygraphs as an

23   investigative tool, side litigation that would result in an

24   undue waste of time in this already complicated case.

25          And before doing that, before having that discussion,

1    I quoted from the Ninth Circuit's Cordova decision where it

2    says:  Polygraph evidence has grave potential for interfering

3    with the deliberative process.

4           So my conclusion today is that the probative value of

5    telling the jury that Mr. Anderson passed a polygraph, it was

6    later determined to have incorrectly formulated questions, and

7    that he wasn't given a second polygraph, the modest probative

8    value of that evidence is substantially outweighed by the risk

9    of unfair prejudice and prolonging the trial.  So I am not

10   going to permit polygraph questions to be asked.

11          All right.  We will bring in the jury.

12          (The jury entered the courtroom.)

13          THE COURT:  All right, Ms. Hull, you may continue.

14          MS. HULL:  Thank you, sir.

15   BY MS. HULL:

16   Q.  Inspector Sartuche, before the break, we were talking about

17   your interview with Professor Pocock.  Do you remember that

18   conversation?

19   A.  Yes.

20   Q.  And I believe you testified that he provided you certain

21   information about the note contained in the bomb.

22   A.  Correct.

23   Q.  And you talked about certain things, certain findings or

24   certain opinions that you obtained from him when you were

25   talking to Ms. Williams and Mr. Boyle.  Do you remember that

1    testimony?

2    A.  Yes.

3    Q.  And do you recall the level of memory or the extent of

4    Professor Pocock's memory about some -- about something you

5    called the Edmund Burke Society?

6    A.  Not very specific, I just remember him mentioning the

7    Edmund Burke Society.

8    Q.  Do you remember if you mentioned it or he mentioned it?

9    A.  Like I said earlier, I can't recall if I mentioned it first

10   or if he did.

11   Q.  All right.  And would your report refresh your

12   recollection?

13   A.  Yes.

14   Q.  If you would look at page 11, the bottom of paragraph 71.

15         Does that refresh your memory?

16   A.  Yes.

17   Q.  And who raised the issue of the Edmund Burke Society?

18   A.  He did.

19   Q.  And what was his level of recall about this person -- this

20   group?

21   A.  He vaguely remembers reading something about the Edmund

22   Burke Society.

23   Q.  Did he -- reading or hearing?

24   A.  Hearing, I'm sorry.

25   Q.  Okay, had he read anything about it?

1  A.  I don't recall that it's mentioned in the report.

2  Q.  Okay.  Would your report refresh your recollection?

3  A.  Yes.

4  Q.  Very last line of that paragraph 71.

5      Does that refresh your recollection?

6  A.  Yes.  He said he did not read any literature about that

7  group.

8  Q.  Okay.  And in addition to -- you talked also about the kind

9  of person.  With the other attorneys, you talked about the kind

10  of person he opined would have written this note.  I think you

11  said someone with a religious background, a legal or law

12  enforcement background.  Do you remember that testimony?

13      MR. BOYLE:  Objection, beyond the scope.

14      THE COURT:  Overruled.

15  BY MS. HULL:

16  Q.  Do you recall that?

17  A.  Yes.

18  Q.  Do you recall if he also gave you any information about the

19  education level of the writer?

20      MR. BOYLE:  Objection, beyond the scope.

21      THE COURT:  Overruled.

22      THE WITNESS:  Yes.

23  BY MS. HULL:

24  Q.  And what did he tell you?

25  A.  A master's level.  The person who authored or would have

1    authored in his opinion would have been at least a master's

2    level of education.

3    Q.  At least a master's level?

4    A.  Yes.

5    Q.  Okay.  You testified on cross-examination that -- I believe

6    your statement was that based upon the -- let me check my

7    notes.

8         That based upon the phone records of Steve Anderson,

9    whether there were prior threats and the search on his

10   residence.  Do you recall that testimony and Mr. Boyle drawing

11   on the Elmo?

12   A.  Yes.

13   Q.  Okay.  Did you request a search warrant for Mr. Anderson's

14   DNA?

15   A.  I don't recall.

16   Q.  Is that something that you would have then submitted for

17   testing?

18   A.  As the case agent at that point during that time frame when

19   I was the case agent or was it done after -- more specific.

20   Q.  Do you recall -- do you recall ever seeing DNA testing done

21   on Mr. Anderson during your involvement in this case?

22   A.  No.

23   Q.  Is that something you would recall?

24   A.  I would have recalled that, yes.

25   Q.  Okay.  You also on cross-examination talked about that you

1  talked about this note 559-A, the letter, as to whether or not

2  that was sent.  I believe your testimony on cross-examination

3  by Mr. Boyle was that ATF was responsible for keeping -- for

4  documenting and keeping copies of what was sent from the

5  informant to the Mahons.

6  A.  Their procedure -- I don't know their procedure regarding

7  documenting the CI.  But if they are controlling the CI passing

8  information, you would -- you would have that -- ATF would have

9  that documentation.

10  Q.  Right, you would expect them to keep records of those

11  mailings?

12  A.  Yes, if they mailed them.

13  Q.  When I talked a minute ago about DNA from Mr. Anderson, do

14  you remember if there was any DNA testing from Mr. Olsen?

15  A.  I don't recall.

16  Q.  Is that something you would recall?

17  A.  Yes.

18  Q.  Mr. Boyle also asked you about your line of questioning as

19  to your July 2004 interview with Mr. Donald Logan.  Do you

20  recall that questioning?

21  A.  Yes.

22  Q.  And I believe Mr. Boyle asked you if Mr. Logan -- I believe

23  the question was Mr. Logan didn't say anything about someone

24  from Scottsdale having done this.  Do you remember that

25  question?

JESSE SARTUCHE - REDIRECT EXAMINATION BY MS. HULL    3183

1    A.  No.

2    Q.  All right.

3    A.  I don't recall.

4    Q.  Correct me if I am wrong.  I believe Mr. Boyle asked you

5    about the interview in July of 2004 about where Mr. Logan said

6    that he couldn't think about -- think of who might have done

7    this.  Do you remember that?

8    A.  Yes.

9    Q.  Okay.  And you remember that interview?

10   A.  I don't recall the specifics on that interview.

11   Q.  Okay, but you do remember that questioning?

12           MR. BOYLE:  Objection, leading.

13           THE COURT:  Sustained.

14   BY MS. HULL:

15   Q.  Do you recall being asked those questions on

16   cross-examination?

17   A.  Yes.

18   Q.  By Mr. Boyle?

19   A.  Yes.

20   Q.  Okay.  And do you recall his question as to whether or not

21   Mr. Logan said anything in your July 2004 interview about

22   someone from Scottsdale having done this?

23   A.  I don't recall.  I would have to look at an MOI report on

24   that.

25   Q.  And if --

1          MS. HULL:  I don't know if that can be read back,

2     Judge, it can't?

3          THE COURT:  I think we should not take time to search

4     for that.

5          MS. HULL:  Okay.

6          THE COURT:  You can ask the question.

7     BY MS. HULL:

8     Q.  Do you have any dispute or do you have any dispute with my

9     notes that indicate that Mr. Boyle asked you that isn't it true

10    that Mr. Logan didn't say anything in that July '04 interview

11    about anybody from Scottsdale having bombed him?

12    A.  Correct.

13    Q.  And your response was he didn't say anything like that?

14    A.  Correct.

15    Q.  And were you aware that in fact, prior to that date, the

16    July interview, that three months prior, Mr. Logan in fact had

17    named Scottsdale people --

18          MR. BOYLE:  Objection, leading.

19    BY MS. HULL:

20    Q.  -- that he suspected?

21          THE COURT:  Sustained.

22    BY MS. HULL:

23    Q.  Were you made aware as part of your investigation as to the

24    interviews of Mr. Logan done in this case?

25    A.  Not specific details.

1    Q.  So when Mr. Boyle asked you if it was true that in the July

2    2004 interview that Mr. Logan hasn't said anything about

3    Scottsdale people having done this, you don't know if he had

4    said something contrary prior?

5            MR. BOYLE:  Objection, leading.

6            THE COURT:  Sustained.

7    BY MS. HULL:

8    Q.  Do you know what he said about Scottsdale people being

9    involved prior to your interview of July 2004?

10   A.  I don't recall, no.

11           MS. HULL:  One moment, please.

12   BY MS. HULL:

13   Q.  Also on cross-examination you talked about a connection or

14   lack of connection between the Scottsdale bomb and Steve

15   Anderson.  Did you look at all into the Operation Archangel?

16   A.  I don't recall.

17   Q.  Did you, in your investigation at any time learn that --

18   about an Operation Archangel that was a law enforcement group?

19   A.  I believe there was in the Internet -- did an Internet

20   search.  I can't remember what state that came back to law

21   enforcement, police department having done an Operation

22   Archangel before.  I just can't recall what state that was.

23           MS. HULL:  Okay.  One moment, please.

24           Nothing further.

25           THE COURT:  Ms. Williams?

1              MS. WILLIAMS:  Thank you, Your Honor.

2

3                        REDIRECT EXAMINATION

4    BY MS. WILLIAMS:

5    Q.  Agent Sartuche, on cross-examination you were asked some

6    questions about the letter that went out to Dennis Mahon that

7    you looked at.  Do you recall that question?

8    A.  Which letter?

9    Q.  The March of '05 letter?  Well, strike that.  Let me start

10   over.

11             There was a -- there was discussion about a letter

12   that went out to Dennis Mahon in March of 2005.  Do you recall

13   that?

14   A.  Without looking at the letter?

15   Q.  Pardon?

16   A.  Without looking at the letter or where it's mentioned in

17   the report?

18   Q.  I believe you might have been refreshing your recollection

19   with your report.  Would you like to do so again?

20   A.  Yes.

21   Q.  Okay.  Paragraph 97, if you would refer to that.  In fact,

22   it would be 97, 98, 99.

23   A.  Okay.

24   Q.  What was the request being made by the informant when she

25   wrote to Dennis Mahon?

1    A.  Just to collect additional information about the device or

2    help build a device.

3    Q.  She wanted him to tell her how to build a bomb like the

4    Scottsdale bomb?

5    A.  I don't know like it.  I'm not sure.

6    Q.  Would it help if you referred to your report?

7    A.  Sure.

8    Q.  Paragraph 97, fifth line in the paragraph.  Is that what

9    she was asking for?

10   A.  Yes.

11   Q.  And then did Dennis Mahon subsequently mention receiving

12   that letter?

13   A.  Yes.

14   Q.  And he did not want to talk on the phone about the subject

15   of the Scottsdale bombing; is that right?

16   A.  True, yes.

17   Q.  And did he promise to send her a letter after that?

18   A.  I believe he stated he would, but or called, he called.

19   Q.  And would it help if you referred to your report?

20   A.  Yes.

21   Q.  Paragraph 98, last line.  Did he tell her, did Dennis tell

22   her that he had sent her a letter?

23   A.  He called her and said that he received a letter and that

24   he would be sending another letter.

25   Q.  Okay.  And did he then send another letter?

1    A.  Yes, he did.

2    Q.  And did he say anything about the Scottsdale bomb in that

3    letter?

4    A.  No, he did not.

5            MS. WILLIAMS:  Thank you, Your Honor, I have nothing

6    further.

7            THE COURT:  All right.  Thank you, Inspector Sartuche,

8    you may step down.

9            MR. BOYLE:  Your Honor, is this witness excused?

10           MS. WILLIAMS:  Yes, Your Honor.

11           MS. HULL:  No objection.

12           THE COURT:  Yes.

13           MS. HULL:  Defendant Daniel Mahon calls Mr. Doug

14   Bartosh.

15           THE COURTROOM DEPUTY CLERK:  Mr. Bartosh, if you would

16   please come forward.

17           If you will please stand right here and raise your

18   right hand.

19           (The witness, Douglas Bartosh, was duly sworn.)

20           THE COURTROOM DEPUTY CLERK:  Please come have a seat,

21   sir.  If you would please speak up into the microphone.

22   There's water if you need it.

23           THE WITNESS:  Okay, thank you.

24

25

1                          DOUGLAS BARTOSH,

2    called as a witness herein, having been first duly sworn, was

3    examined and testified as follows:

4

5                          DIRECT EXAMINATION

6    BY MS. HULL:

7    Q.   Okay.  It's really difficult to hear unless you have that

8    microphone up close.  Thank you.

9            Sir, could you please state your name, spell your last

10   name?

11   A.   Douglas Bartosh, B-a-r-t-o-s-h.

12   Q.   And, sir, are you -- how are you currently employed?

13   A.   I'm city manager with the City of Cottonwood, Arizona.

14   Q.   And how long have you been the city manager of Cottonwood?

15   A.   Approximately four years.

16   Q.   And what did you do prior to that?

17   A.   I was the police chief in the City of Cottonwood.

18   Q.   And how long did you do that?

19   A.   Three years.

20   Q.   And where were you employed prior to that?

21   A.   I was the police chief in the City of Scottsdale.

22   Q.   And for what years were you police chief in the City of

23   Scottsdale?

24   A.   1998 to 2003.

25   Q.   When in 2003, sir, if you recall?

1   A.  It was January 2003 I left the department.

2   Q.  Okay, do you remember when in '98 you began as chief?

3   A.  It was right around January, February.

4   Q.  Beginning of the year?

5   A.  Yes.

6   Q.  Okay.  And prior to being chief of the City of Scottsdale

7   Police Department, what position did you hold?

8   A.  I was the executive assistant chief for the City of

9   Scottsdale Police Department.

10  Q.  And how long were you executive assistant chief?

11  A.  I want to say approximately three years.

12  Q.  So '95 to '98?

13  A.  That's correct.

14  Q.  And prior to '95, what was your employment?

15  A.  I was the deputy chief for the City of Scottsdale Police

16  Department.

17  Q.  For how long?

18  A.  From '92 until '95.

19  Q.  Where were you employed prior to '92?

20  A.  I was the police chief for Arizona State University

21  Department of Public Safety from 1985 to 1992.

22  Q.  And prior to 1985, where were you employed?

23  A.  I was -- I held various positions from officer to

24  lieutenant with the University of California Police Department

25  and also prior to that worked for a municipal agency in Oxnard,

1  California.

2  Q.  So what year did you begin your career in law enforcement?

3  A.  1975.

4  Q.  And you continued, if I recall correctly, until about three

5  years ago when you became city manager?

6  A.  That's correct.

7  Q.  Okay.

8  A.  Four years ago, I'm sorry.

9  Q.  Four years ago.  Help me with my math.  How many years were

10  you in law enforcement, 1975 to --

11  A.  It was actually a little over 30 years because I had some

12  breaks during that period of time.

13  Q.  And for purposes of law enforcement, did you receive any

14  particularized training as far as investigation, criminal

15  investigations?

16  A.  Yes.

17  Q.  What training did you receive?  Do you recall back that

18  far?

19  A.  There was quite a bit of training.  I mean, from basic

20  investigations to homicide investigations and narcotics

21  investigations.  Quite a bit, but that would have been early in

22  my career.

23  Q.  And when you started with the City of Scottsdale, this

24  would have been in about '95 you said?

25  A.  With the City of Scottsdale, it was '92.

1   Q.  '92, I apologize.

2           Once you became chief of police in 1998, were you

3   involved in the hiring of a woman, civilian by the name of

4   Helen Gandara-Zavala?

5   A.  Yes.

6   Q.  And who is she?

7   A.  She currently, I believe she holds the same position which

8   I hired her for, which is the director for administrative

9   services for the police department.

10  Q.  And when -- when did you hire her?

11  A.  I don't recall the exact date.  It was probably sometime in

12  '98, maybe early '99.

13  Q.  And when you -- was this at or about the time that the

14  diversity office was created?

15  A.  It was probably shortly after that time, yes.

16  Q.  Okay.  And what did you believe were -- what entered into

17  your decision to hire Ms. Zavala, Ms. Gandara?

18  A.  I'm sorry, I didn't hear that.

19  Q.  What factors entered into your decision to hire her?

20  A.  We had -- we had interviewed her previously, I think, in

21  about '96, '97.  And we were going to offer the job at that

22  time and she turned it down because she just had found out that

23  she was pregnant and she wanted to stay in El Paso.

24          So I was well aware of her qualifications.  And she

25  reapplied in '98.  And she essentially did the same job for the

1   El Paso Police Department and had great qualifications, great

2   education.  And she was clearly the best candidate for the job.

3   Q.  Was there anything about her personally that entered into

4   your decision to hire her?

5   A.  She was also female and Hispanic.  And ever since I had

6   arrived in the department in '92, we were -- we had made an

7   effort, both the chief and I, to further diversify the

8   department.

9   Q.  How -- once you hired Ms. Gandara, did -- were there any

10  issues within the department that arose as a result of her

11  hiring?

12  A.  There were issues and -- but not related to her

13  performance.  I mean, there were concerns from some people

14  about her background.

15  Q.  And these people were inside or outside the department of

16  police?

17  A.  I predominant -- well, I exclusively heard it from people

18  inside the department.

19  Q.  And was any -- was she the victim of any issues once you --

20  after she was hired, incidents?

21  A.  I do recall one incident where I believe it was a

22  department car was vandalized at her home, at her personal

23  home.

24  Q.  When was that?

25          MR. BOYLE:  Objection, 404(b).

1         THE COURT:  Overruled.

2         THE WITNESS:  I believe it was shortly after she was

3    hired.  I think '99.

4    BY MS. WILLIAMS:

5    Q.  And what happened?

6    A.  I just remember her car was vandalized pretty

7    significantly.  And actually, again, it was a department car.

8    Q.  How was it vandalized?

9    A.  I don't recall specifically, but you know, there was

10   indications, -- as you and I talked, you refreshed my memory

11   that there was swastikas that appeared on the car.  I know the

12   paint was damaged pretty significantly.

13   Q.  And this is while -- was this a work car or a personal car?

14   A.  I seem to recall it was a -- it was a work car.

15   Q.  And how -- what kind of -- what kind of work cars were at

16   her disposal?

17   A.  Well, again, it probably at the time it would have been

18   a -- like a Ford Crown Victoria.

19   Q.  Okay.

20   A.  Something similar that we use.

21   Q.  Are there markings on it?  Does it show that it's a City of

22   Scottsdale vehicle, or --

23   A.  No, it would have been an unmarked car.  And I don't -- it

24   might have had a government plate on it, but maybe not.

25   Q.  Did you -- did you determine or did you investigate the

1   vandalizing of her car?

2   A.  Yes.  It would have been treated as a crime, a criminal

3   damage crime.  And it was investigated, but I don't recall that

4   we ever found any of the responsible parties for it.

5   Q.  Were there additional issues after that that Ms. Gandara

6   experienced, shall we say?

7   A.  Again, the only one that I recall was her background.

8   After I left the department in 2003, her background became not

9   only a department issue, but somebody had made it a public

10  issue as well.

11  Q.  And was there an internal investigation as a result?

12  A.  Again, I had left the department.  But I assume there had

13  been, yes.

14  Q.  All right.  Is that the kind of thing that would have, when

15  you were during your tenure, that would have prompted an

16  investigation?

17  A.  Well, again, I wasn't that privy to it.  But my knowledge

18  of it was that there had been some information leaked from her

19  background investigation or polygraph.  And that certainly

20  would have been inappropriate behavior.  And we certainly would

21  have investigated that internally.

22  Q.  How do you know Steven Anderson?

23  A.  When I arrived in the department in '92, he was working in

24  what we call the ID unit, which classified fingerprints and

25  entered them into the system.

1   Q.  And did you have internal issues with Mr. Anderson?

2   A.  I think he had issues with one of his employees.  And

3   they -- or not his employees, his coworkers.  And he and this

4   other worker would routinely battle back and forth.  And I

5   don't recall that I had specific issues with Mr. Anderson in my

6   role.  I mean, we would talk, but there was continual

7   disruption in the ID unit because of these two employees, their

8   inability to get along.

9   Q.  And Mr. Anderson is a white man?

10  A.  That's correct.

11  Q.  And what was the race and gender of the employee with whom

12  he had issues?

13  A.  Lupe Gutierrez.

14  Q.  A female?

15  A.  Female Hispanic.

16  Q.  And were you -- did you take any part in the decision as to

17  what sort of action should be taken as a result of this

18  discord, if you will?

19  A.  Yes.

20  Q.  And what was your part in that?

21  A.  Again, it was -- there was actually an investigation that

22  occurred that was conducted by our city human resources

23  department.  And I received recommendations following their

24  investigation.  And I felt that the investigation -- the

25  recommendations were good recommendations, and we proceeded

1  implementing those recommendations.

2  Q.  So it was your job -- was it your job to carry out the

3  recommendations given to you by human resources?

4  A.  That's right.

5  Q.  Did you participate in that investigation?

6  A.  I did not actively participate in it.  I was given updates,

7  briefings, but I did not participate in the investigation.

8  Q.  Did you participate in the decision as to what action

9  should be taken?

10  A.  I don't recall specifically.  But generally those kind of

11  recommendations I would hear about before they were finalized

12  and to make sure that we were in agreement with them.

13  Q.  What action was taken against Mr. Anderson?

14  A.  As I recall, he was moved to another assignment in the

15  department.

16  Q.  And was that a lateral promotion, demotion?  What were the

17  results of that transfer?

18  A.  Again, I don't recall specifically, but I believe the

19  intent was to move him into a position that was comparable in

20  pay to what he was making at the time.

21  Q.  And do you recall whether or not he took issue with that?

22  A.  As I recall, he wasn't happy about it.  He ended up suing

23  the city over the investigation and the move.

24  Q.  What about Ms. Gutierrez, what action was taken in respect

25  to her?

1   A.  I want to say, and again, I don't recall specifically, but

2   it seems to me that she was moved as well into another

3   comparable paying position.  And we ended up replacing both of

4   those positions in the ID unit.

5   Q.  Was Ms. Wyckoff involved in that?

6   A.  Yes, she was.  She was the immediate supervisor in the unit

7   at that time.

8   Q.  What action was taken, if any, against her?

9   A.  She was moved as well into another unit with -- I don't

10  know if she received comparable compensation or not.  She may

11  have actually been demoted.

12  Q.  Do you recall if Ms. Wyckoff sued the city over this event?

13  A.  Not that I recall.

14  Q.  How about Ms. Gutierrez, do you know whether she sued the

15  city over this event?

16  A.  Not that I remember, no.

17  Q.  Do you remember anyone other than Mr. Anderson suing the

18  City of Scottsdale over this event?

19  A.  No, I don't, ma'am.

20  Q.  Did you have other issues with Mr. Anderson?

21  A.  The only one I can think of is shortly after I arrived in

22  the department, we received information from a Tucson

23  prosecutor complaining that Mr. Anderson was acting as an

24  expert witness on his own time for pay for defendants in

25  criminal cases.  And we felt that was inappropriate and

1    potentially a conflict in what he was doing for the police

2    department.  So we asked him to not do that.  And as I recall,

3    he stopped doing it.  And I'm sure he wasn't happy about losing

4    that source of income, but I don't recall any issues other than

5    that.

6    Q.  Did he sue over that?

7    A.  No.

8    Q.  That you know of?

9    A.  No.

10   Q.  Tell us what is the NNZ.

11   A.  I would rather not.  It was a term that we became aware of,

12   and when I say "we," I was the executive assistant chief and

13   the police chief at the time became aware of during a -- a

14   trial involving a former Hispanic employee that we had

15   terminated during probation.  And one of the things he reported

16   to the jury was that there was a -- he had heard that there was

17   an NNZ or a no nigger zone in Scottsdale.  And so we

18   investigated that.

19   Q.  And when you say "we," you took part in the investigation,

20   or --

21   A.  I did play a role in it.  Although we had a unit that was

22   specifically designated for internal investigation, so they did

23   some of it as well.  But the -- what we found was that it

24   had -- it was a term that had been used, not in recent times,

25   back in the '70s and early '80s.  And that there was some

1   knowledge of it from the officers that had been around at the

2   time.  But there was no evidence or information that we could

3   find where we could hold any one person accountable or

4   determine that they had actually said that in the course of

5   their employment.

6   Q.  Okay, so your investigation revealed that it was more than

7   just Mr. Torres saying it?

8   A.  Yes.  There were officers that came forward and said, yeah,

9   I, you know, in my tenure here, I have heard that term.  And

10  they weren't able to say specifically it was this person or

11  that person or if they did, it was somebody who left the

12  department.

13          And so there really wasn't anybody that we could go to

14  and hold accountable for that.  But there were other actions we

15  took to try to correct that problem.

16  Q.  Okay.  Were you able to confirm that in fact then it had --

17  it was a term that had been used?

18  A.  I think I felt pretty assured that at some point in the

19  history of the police department, that term had been used.

20  Q.  And how was it used?

21  A.  It was used to describe an area of the city where the

22  officers would routinely get calls from citizens when they saw

23  somebody of color in their neighborhood, and they would call in

24  to complain that the person looked suspicious, that they didn't

25  belong.  And so the officers coined that phrase as, you know,

1    it's another one of those calls to that area of the city.

2    Q.   And it was the officers using the term NNZ?

3    A.   Yes.

4    Q.   Let me go back to the action taken against Mr. Anderson.

5    Do you remember what Mr. Logan's involvement was in that action

6    against Mr. Anderson?

7    A.   As I recall Mr. Logan, and there was one other HR person

8    that primarily conducted the investigation of the ID unit.

9    Q.   And did Mr. Logan's name appear on any documentation in

10   regards to that?

11   A.   Yes.

12   Q.   What was that?

13   A.   It was, I believe, it was the final report about the

14   investigation.

15   Q.   And is that the report that you acted on?

16   A.   Yes.

17   Q.   Were you interviewed about the Scottsdale bombing?

18   A.   Yes.

19   Q.   And do you remember who interviewed you about the

20   Scottsdale bombing?

21   A.   As I recall, it was two investigators from the U.S. Postal

22   Service.

23   Q.   Do you remember when that occurred?

24   A.   I don't precisely, but it was probably late 2003 or early

25   2004.

1    Q.  All right.  So did you hear -- had you heard about the

2    bombing when it occurred?

3    A.  Yes.

4    Q.  Okay.  And when -- when you talked to investigators or

5    inspectors, whoever you talked to, did you offer an opinion as

6    to your thoughts on the case?

7    A.  Well, I think they asked me if Don had created any enemies,

8    was there anybody that I thought would likely do this.  And so,

9    you know, I probably gave them a couple of names that I thought

10   they might want to -- people they might want to talk to as

11   potential leads.

12   Q.  And when -- before you gave those names, were these names

13   that -- of people that you knew personally?

14   A.  Yes.

15   Q.  Okay.  And what made you think -- well, who's the first

16   person you named?

17   A.  Again, I don't recall specifically the conversation, but I

18   know at that time, I was -- I wondered if Steve Anderson was

19   involved.

20   Q.  Did you express that to the investigators?

21   A.  Yes, I did.

22   Q.  And why did you -- why did you name Mr. Anderson?

23   A.  Well, at that time we had been sued by Mr. Anderson.  I

24   know the case was in process.  I don't know if it -- because I

25   think, as I recall, it was eventually dismissed.  And I don't

1    know if it had been dismissed by that time, which would have

2    probably incited some additional anger by Mr. Anderson.

3            But I also had interactions with him when I was the

4    chief there and before I was the chief.  And he just always

5    kind of struck me as a strange guy.  And I knew he was angry,

6    probably at Don in particular, over the investigation and the

7    outcome of the investigation.  And also because of his forensic

8    background, I thought he was somebody that may know how to make

9    a bomb, may know how to cover up his crime.

10           So he was probably my -- the first person who came to

11   mind for me.

12   Q.  Did you relay that information to the investigators you

13   spoke to?

14   A.  Yes, I did.

15   Q.  Do you know if you were interviewed again?

16   A.  Not that I recall, no.

17   Q.  Okay.  Did you name -- do you recall naming anyone else in

18   your interview?

19   A.  The only one that comes to mind is a woman named Marian

20   Murray who had a strong dislike for me and for Don, although

21   she might have disliked me more than Don.  But and she just

22   struck me as a very volatile person and somebody that could

23   potentially hurt somebody.

24   Q.  Who is she?

25   A.  She was a city activist who the police department had

1    investigated for a property crime that she finally ended up

2    giving back the property she had stolen and the case was

3    dropped.  But ever since that investigation, she had a lot of

4    animosity toward the police department and the city in general.

5    Q.  Do you know who else within the City of Scottsdale Police

6    Department had put in for the job that you eventually gave to

7    Ms. Zavala, Gandara-Zavala?

8    A.  The only one within the police department that I recall was

9    a gentleman named Olsen.  I can't remember his first name now.

10   Q.  Do you remember his job title at the time or how you knew

11   him?

12   A.  I believe he was doing background investigations for the

13   police department.

14   Q.  And how did you know him?

15   A.  He was one of the employees that worked for me, and his

16   first name was Glenn, Glenn Olsen.

17   Q.  As a result of hiring Ms. Gandara, did you get any sort of

18   flak from other police officers?  You personally?

19   A.  I know I talked to one of the officers, in fact, the

20   officer that was serving as the president of the FOP, which is

21   a police officer association.  And he expressed concern to me.

22   But, again, this was after I left the department, that, you

23   know, that he was concerned that I should have never hired her.

24   Q.  During your tenure as police chief, were there police

25   officers who held either prayer meetings or any sort of

1    religious meetings that you're aware of?

2    A.  Not that I was aware of.  But it wouldn't surprise me.

3    Q.  In December of 2003, I know you had left Scottsdale in

4    January of 2003.  Did you return at all for any awards given to

5    Ms. Zavala after you left?

6    A.  I may have, but I just don't -- I don't recall.

7    Q.  Were you ever deposed in the Steve Anderson lawsuit?

8    A.  Yes.

9    Q.  How many times were you deposed?

10   A.  I just recall one time.

11   Q.  All right.  You -- were you a named defendant in that case?

12   A.  I don't recall whether I was or not.

13            MS. HULL:  One moment, please.

14            I have nothing further, thank you.

15            THE COURT:  All right, Ms. Williams, or Ms. Cisneros?

16            MS. WILLIAMS:  I have nothing, Your Honor, thank you.

17            THE COURT:  All right, cross-examination?

18

19                        CROSS-EXAMINATION

20   BY MR. BOYLE:

21   Q.  Good afternoon.  When you were interviewed about suspects,

22   did you give any names that you could think of who might be

23   related to the Scottsdale bombing?

24   A.  I'm not sure I understood your question.

25   Q.  At some point inspectors told you:  We're investigating the

1   Scottsdale bombing, who do you think might have done this?

2   A.  Yes.

3   Q.  And then your response to that is to give them any names

4   that you can think of that might be related?

5   A.  That's correct.

6   Q.  Good leads or bad leads, any name that you can think of is

7   what you wanted to pass along, fair or not?

8   A.  I think that's probably true.  I mean, they were looking

9   for anybody who may have a bone to pick with Don Logan.

10  Q.  Now, Steve Anderson did sue the City of Scottsdale for

11  discrimination, correct?

12  A.  I believe that was the charge, yes.

13  Q.  When you were asked if you were named in that lawsuit, do

14  you recall being named as Douglas -- is L. Your middle initial?

15  A.  Yes, Bartosh.

16  Q.  And possibly Jane Doe Bartosh being named in that?

17  A.  I wouldn't surprise me.  I was named any time the

18  department got sued, so --

19  Q.  Okay, what about Diane Taylor, who is she?

20  A.  She was the executive assistant police chief under me.  So

21  she was the number two executive in the police department.

22  Q.  Do you recall if she was sued as well?

23  A.  I don't -- again, I don't recall specifically, but it

24  wouldn't surprise me if she was named in the lawsuit.

25  Q.  And finally, Alan Steve Garrett, do you know who he is or

1  was?

2  A.  Yes, I do.

3  Q.  Who was he at the time between 2005 and 2000?

4  A.  He was the manager of the forensic lab.  So he would have

5  been Steve Anderson's supervisor's supervisor.

6  Q.  Hearing those names now, does that refresh your memory?  Or

7  do you have any better memory of whether or not all of you were

8  sued in name?

9  A.  It certainly refreshes my memory.  And again, it doesn't

10  surprise me that all of those were named.

11  Q.  I say that because if you were sued personally, would that

12  mean that potentially you might be on the hook for some money?

13  A.  I guess, potentially personally.

14  Q.  How often were you sued back between let's say 1998 and

15  2003, by City of Scottsdale employees?

16  A.  By City of Scottsdale employees.  That's -- that would

17  really be hard to estimate.  It didn't happen that often.  It

18  was more likely the city or the department was sued by some

19  defendant, suspect, those kind of things.

20  Q.  You had mentioned that Steve Anderson was part of a process

21  by which the human resources department did an investigation.

22  Do you remember those questions?

23  A.  Yes, I do.

24  Q.  And then you said that Don Logan and one other person from

25  the human resources department were taking lead on that

1    investigation?

2    A.  That's correct.

3    Q.  When was the last time you saw the report on that

4    investigation?

5    A.  Just before the -- before I testified today.

6    Q.  Did you see -- actually, do you recall there being a

7    finding regarding whether or not Steve Anderson discriminated?

8    A.  I do recall that, yes.

9    Q.  And the report said that they found Steve Anderson did not

10   discriminate, right?

11   A.  That's correct.

12   Q.  And the recommendation was that the individuals be

13   transferred to other divisions within the City of Scottsdale?

14   A.  That's correct.

15          MS. HULL:  Objection, hearsay, counsel's testifying.

16          THE COURT:  Well, sustained on hearsay.

17   BY MR. BOYLE:

18   Q.  That was a recommendation to you, right?

19   A.  That's correct.

20   Q.  At the end of the day, it was your name on the line that

21   decided whether or not punishment would be or transfers would

22   be implemented?

23   A.  That's correct.

24   Q.  And when you made that decision to transfer people, would

25   your name have gone to those individuals as the chief of police

 1  or someone in his capacity are sending you to a new division?

 2  A.  They certainly would have known that I had approved that

 3  transfer or demotion, whatever.

 4  Q.  When you say "approve," you mean decided and approved?

 5  A.  Well, I wouldn't necessarily contact the employee

 6  personally and say:  Hey, I'm moving you this way or that way.

 7  It would usually be done by a subordinate, but they would know

 8  that the police chief had approved that move.

 9  Q.  They would know that you were the person who made the

10  decision?

11  A.  Absolutely.

12          MS. HULL:  Objection, that mischaracterizes the

13  testimony.

14          THE COURT:  Overruled.

15  BY MS. HULL:

16  Q.  You gave the name of a Marian Murray.  Again, was that just

17  a name that you possibly could think of that may have been

18  related?

19  A.  That's correct.

20  Q.  Then you also mentioned someone from the Fraternal Order of

21  Police who had comments about Helen Gandara-Zavala?

22  A.  That's correct.

23  Q.  When you were in the office in a capacity of deputy or

24  assistant executive, from '92 to '98, did you promote diversity

25  within the Scottsdale Police Department?

1   A.  I feel I did, yes.  I mean, that was certainly one of

2   our -- one of our objectives, one of our goals.

3   Q.  As a department?

4   A.  Yes.

5   Q.  And when you were chief from '98 to 2003, was that also a

6   goal of yours to publically promote diversity within the

7   Scottsdale Police Department?

8   A.  Absolutely.

9   Q.  Finally, the questions about NNZ.  Are -- was it your

10  testimony that these were rather old references, the NNZ

11  comments?

12  A.  Yes.  That was -- through our investigation, it appeared it

13  was a term that was use in the '70s, early '80s at the most

14  recent.

15          MR. BOYLE:  Nothing else, thank you.

16          THE COURT:  Redirect?

17

18                      REDIRECT EXAMINATION

19  BY MS. HULL:

20  Q.  Sir, you just were questioned about approved versus make a

21  decision.  In regards to Steven Anderson, who made the decision

22  as to what action should be taken?

23  A.  Well, ultimately it would have been my decision.

24  Q.  Okay.  And you approved of that?

25  A.  Yes.

1    Q.  And it came to you as the exact same action that you

2    actually carried out?

3    A.  Yes.  As I recall, we followed the recommendations of the

4    investigation.

5    Q.  So if you had disagreed with it, could you have done

6    something else?

7    A.  I probably could have.  I would have needed to, you know,

8    discuss it with Don Logan, discuss it with the city manager.

9    But I thought the recommendations were appropriate.

10   Q.  So if you wanted to alter the recommendation made by

11   Mr. Logan, you would have to discuss it with him?

12   A.  I think based on our relationship at the time, I would have

13   discussed it with him.

14            MS. HULL:  That's all I have, Judge.

15            THE COURT:  Thanks, you can step down.

16            MR. BOYLE:  Is the witness released, Your Honor?  No

17   objection.

18            MS. WILLIAMS:  No objection.

19            MS. HULL:  Move for release of Mr. Bartosh.

20            THE COURT:  Yes, he is released.

21            MS. HULL:  Thank you.

22            Judge, we need to step outside and see if a witness is

23   here.

24            THE COURT:  Okay.

25            MS. HULL:  May I be excused for a moment?

 1              THE COURT:  You may.  If the jury wants to stand up

 2    for a moment, they may.

 3              THE COURTROOM DEPUTY CLERK:  If you will please come

 4    forward.

 5              MS. HULL:  Your Honor, the defense calls Helen

 6    Gandara-Zavala.

 7              (The witness, Helen Gandara, was duly sworn.)

 8              THE COURT:  Please come have a seat.

 9              THE COURTROOM DEPUTY CLERK:  Just remember to speak up

10    and into the microphone.  Water if you need it.

11

12                          HELEN GANDARA,

13    called as a witness herein, having been first duly sworn, was

14    examined and testified as follows:

15

16                         DIRECT EXAMINATION

17    BY MS. HULL:

18    Q.  Good afternoon.

19    A.  Good afternoon.

20    Q.  Say your name and spell your last name, please.

21    A.  Helen Gandara, G-a-n-d-a-r-a.

22    Q.  Have you ever gone by Gandara-Zavala?

23    A.  Yes, so that would be G-a-n-d-a-r-a-Z-a-v-a-l-a.

24    Q.  Okay, Ms. Gandara, how are you employed?

25    A.  I currently am the assistant chief of police for the

1    Scottsdale Police Department.

2    Q.  How long have you had that position?

3    A.  I've been in that position since 1998.

4    Q.  Ma'am, where were you before joining Scottsdale in '98?

5    A.  Before coming to Arizona in 1998, I worked for the City of

6    El Paso, Texas, for 13 years.

7    Q.  In what capacity?

8    A.  I worked the last four of those years as the director of

9    administrative services for the El Paso Police Department.  And

10   prior to that I was a budget and management analyst out of the

11   mayor's office during the time that I did my internship as well

12   as the remaining of those years.

13   Q.  What were your qualifications in your mind for your current

14   position when you applied?

15   A.  When I applied for this current position, it was actually

16   very similar to what I had in El Paso.  Actually, to a smaller

17   scale.  In our law enforcement industry, there's very few

18   high-level positions that could be held by civilian employees.

19   I'm a civilian employee.  As the director of administrative

20   services for the El Paso Police Department, we transitioned

21   that position to where I eventually was a deputy chief

22   commensurate with all the sworn deputy chiefs and that gave me

23   the opportunity to oversee approximately 500 employees,

24   included all our major civilian divisions.

25              So when the opportunity came to apply in the City of

1   Scottsdale for -- actually it was a same -- similar title, I

2   applied for that.

3   Q.  And when you assumed your duties with the City of

4   Scottsdale, did you oversee civilian or sworn officers?

5   A.  With the City of Scottsdale, I oversaw civilian employees.

6   But with the City of El Paso, I had a combination of both.

7   Q.  So in Scottsdale, in other words, you did not directly

8   supervise any law enforcement officers?

9   A.  Correct.

10  Q.  Okay.  Who were the employees back in 2000 -- well, once

11  you started in 1998, who were your employees?  Who worked for

12  you and answered to you?

13  A.  I had several divisions and those have changed.  I'll see

14  if I can recall.  I had the division of budget and finance.  I

15  had our logistics section.  I had our communications, 911

16  center, our records, our crime analysis unit, our planning,

17  research and accreditation unit, our technology, our forensic

18  services.  I believe that's it.  I don't think I forgot

19  anybody.  I believe that's it.

20  Q.  Do you now supervise more divisions?

21  A.  Well, actually back then, I just recall, I had our

22  detention division as well.  So what's different from that to

23  now is our detention division went over to the uniform services

24  division.  That's a sworn counterpart.

25          At that -- at that time, I also transitioned into what

1    we call our teleserve unit, which were our phone reporting

2    individuals.  That has since transitioned into our records

3    division.  Our finance division now works directly for the

4    chief of police.  And I believe those are the only changes.

5    Q.  Okay.  So you still only supervise civilians though?

6    A.  Yes, ma'am.

7    Q.  Okay.  And at -- in 2004, were you supervising the crime

8    lab?

9    A.  Yes, ma'am.

10   Q.  Who -- who was in the crime lab that answered to you at

11   that time?

12   A.  My direct report was Steve Garrett.  He would have been the

13   director of the -- of that whole division.

14   Q.  And who in turn responded or answered to him?

15   A.  At that point it would have been our identification and

16   services supervisor, and I believe at that time we still had

17   all our criminalists.  It has since grown into a different

18   division.  I believe it would have been that supervisor, our

19   property and evidence supervisor and the criminalist, primarily

20   the professional scientists that work in the lab I believe at

21   that time reported directly to Mr. Garrett.

22   Q.  So am I correct that people who reported to you as, for

23   example, Mr. Garrett, you also supervised the people that

24   reported to him?

25   A.  Absolutely, yes, ma'am.

1  Q.  Okay.  Once you began with Scottsdale in 1998, did anything

2  occur after your hiring to your vehicle?

3  A.  Yes, it did.

4  Q.  What happened?

5  A.  I was actually out of town.  And my city assigned vehicle,

6  which was at my home at that time, got vandalized with

7  swastikas and etchings of swastikas on my car as well as some

8  sort of foam or powder.  I really didn't get to see it since I

9  was out of town, but pretty much vandalized in that manner.

10  Q.  And how long after you were hired did that occur?

11  A.  I'm not exactly sure what the date was.

12  Q.  1999?

13  A.  Perhaps.

14  Q.  Does that sound right?

15  A.  About a year, perhaps.

16  Q.  And do you remember when in 1998 you started?

17  A.  August, I believe, because it was pretty hot when I moved

18  here in July, so --.

19  Q.  Okay.  And it was about a year after that?

20  A.  About, yes, ma'am.

21  Q.  At -- in 2004, who was the manager of detention services?

22  A.  Mr. Glenn Olsen.

23  Q.  And who is Mr. Olsen?  How do you know him?

24  A.  Mr. Olsen would have been a direct report to me as the

25  supervisor in charge or manager in charge of detention

1   services.

2   Q.  Did you -- now, whether it began before the vandalism to

3   your car or after, did you run into issues inside the City of

4   Scottsdale Police Department based upon your hiring?

5   A.  I -- I don't know.  How would you define issues?

6   Q.  Okay.  I'll be more specific.  Who is -- who is Steve

7   Anderson?

8   A.  Steve Anderson is or was a fingerprint technician and

9   employee out of our identification and services unit that would

10  have reported to Mr. Steve Garrett.

11  Q.  And in turn to you?

12  A.  And through Mr. Garrett to me, yes, ma'am.

13  Q.  Okay.  Did you have any issues with Mr. Anderson over

14  running of the crime lab?

15  A.  I had several conversations with Mr. Anderson upon my

16  arrival in the context of I had an open door and met with many

17  employees coming in from out of state.  So that's how I had

18  officially the opportunity to meet with him.

19  Q.  Okay.  And what -- what issues did you -- or did

20  Mr. Anderson convey to you that he had?

21  A.  His -- his primary concerns, if I recall, when he initially

22  came to see me was related primarily to history, lots of

23  history that they had had in terms of employee issues,

24  employees not getting along, some concerns that he had about

25  his coworkers that he felt that as a new manager, I needed to

1    know.

2    Q.  Was it your understanding that Mr. Anderson blamed you for

3    anything?

4    A.  At the time that I met him, I wouldn't have thought that.

5    Q.  Any time after that?

6    A.  I -- perhaps.  I mean, it was a long period of between the

7    time I started, got to know what the operations were, to the

8    subsequent recommendations we made in that unit, which included

9    a lot of different pieces of that.  Is that --

10   Q.  Well, let's talk about that.

11   A.  Okay.

12   Q.  Did you at some point after you came to Scottsdale become

13   involved with some sort of disciplinary action involving

14   Mr. Anderson?

15   A.  Yes, ma'am, at the very tail end of -- I wouldn't say -- it

16   wasn't disciplinary in terms of what we would consider formal

17   discipline.  It was more of a resolution to what we thought was

18   a fair arrangement to a long history of employee issues in that

19   work unit.

20   Q.  And what were the issues in that work unit?

21   A.  Employees not getting along, concerns about -- actually,

22   the majority of it was about employees not getting along, not

23   being good team members.  We looked at work load.  We looked at

24   classification, some concerns with -- within the employees

25   about who was doing what, some concerns about treatment of the

1    first-line supervisor.

2    Q.  Who was --

3    A.  Connie Wyckoff, in terms of how she interacted with the

4    employees and how that might differ based on what the employees

5    or who the employees were.  That was a primary part of what

6    came to my attention.

7    Q.  And Ms. Wyckoff supervised whom at that time?

8    A.  It would have been Mr. Anderson and two other employees,

9    Lupe Gutierrez and Jill Heinrick.

10   Q.  Based on your involvement and investigation of that

11   situation, did you come to a conclusion as to what was

12   occurring in that workplace?

13   A.  My conclusion around that was that there was an incredible

14   amount of history that I -- that I couldn't change coming in

15   from out of state; and that there had been a significant amount

16   of work productivity plans; there had been organizational

17   assessments; there would have been team building; there would

18   have been a lot of interventions that were in place already

19   before I showed up at the door.

20   Q.  And by all these terms, I have to stop you.  Are these --

21   are these actions taken with the employees to try to make them

22   work things out?  What are you talking about?

23   A.  Yes.  Primarily team building exercises would have been

24   something like identify things that we have in common, how --

25   what are those things that we can do to get along better, how

1    do we become better coworkers, how do we become better team

2    players.

3            My recollection is that there was also an extensive

4    study on the work that they actually did to see if that kind of

5    get a better benchmark to assess if that was being -- the

6    process for which that was being done was being done

7    efficiently and effectively.

8            So those are the kind of things that had already

9    occurred before I came into play.

10   Q.  So how soon after you got there did this situation arise?

11   A.  Fairly soon, fairly soon.  This was in the scope of -- of

12   me learning about the organization.  So this would have been

13   one of those things that came before me in terms of you might

14   want to look at the history, you might want to look at all of

15   the things we have already done.  I had not just Mr. Anderson

16   come to talk to me, but some of the other employees.

17           So it was just -- it was an opportunity for me to kind

18   of put all of those pieces together about what was going on,

19   what was still apparent, and what was still going on and then

20   try to formulate a work plan to move the unit forward.

21   Q.  What was your first course of action to try to resolve

22   this?

23   A.  My first course of action was to actually meet with

24   employees, to meet with the supervisor, and to really rely on

25   Mr. Garrett, because, number one, he had been there before I

1  was, and had the history.  He had personally supervised

2  Mr. Anderson, I believe, when Mr. Anderson was hired as a

3  criminalist initially before he became a fingerprint

4  technician, and really rely on the city processes that were

5  already there, including those from human resources in terms of

6  what other things can we do here to improve the workplace.

7  Q.  And so what did you do?  What was your first task?

8  A.  Let me think.  If -- I'm thinking back.  If I could recall,

9  my first or my best attempt at this was to work through Connie

10  Wyckoff, who was the first-line supervisor, in hopes of trying

11  to get her, since that was her -- that's her job

12  responsibility, in terms of trying to assess what she thought

13  about the situation and in terms of trying to assess what

14  things she thought needed to be put in place.  Because I wasn't

15  the first-line supervisor.  I was two supervisors away.  I was

16  a director to a manager and a supervisor.  So I was not privy

17  so the day-to-day supervision.

18         So my goal was to work through the first-line

19  supervisor and try to get her to try to find remedies around

20  what would be the best outcome.

21  Q.  The first action that you took in this regard to these

22  particular employees, was that before or after the vandalizing

23  of your car?

24  A.  It probably would have been before.

25  Q.  Did those efforts resolve the situation?

1    A.  No.

2    Q.  What did you try next?

3    A.  We tried -- I -- I can't exactly remember -- pinpoint the

4    steps that we took.  It was just -- it was a work in progress.

5    But I do recall that eventually our human resources got

6    involved in a greater capacity to try to support the efforts we

7    were making as well as try to remedy some of the employee

8    concerns and discontent with each other.

9    Q.  Did you -- were you -- were you involved in the

10   investigation that eventually led up to this -- the moving of

11   people from that unit?

12   A.  I wasn't an investigator.  Human resources was the

13   investigator for that very same reason so that they could

14   reinterview the employees.  They could get a fresh look at what

15   was going on.  They could really get a better handle at the

16   past as well what was currently working.  So I was the

17   recipient of that report.  Other than they interviewed me and

18   talked to me as well, but I was the recipient of the report.

19   Q.  And this was the report that human resources and Mr. Logan

20   put together?

21   A.  Yes, yam.

22   Q.  And did -- were you eventually provided a copy of that

23   report?

24   A.  Yes, ma'am.

25   Q.  Did you follow the recommendations?

1    A.  To the best of my -- yes, ma'am.  I haven't seen the report

2    in a while, but the -- from what I recall, the end result was

3    that they get transferred and those pieces, so, yes, that would

4    have been it.

5    Q.  Okay.  And do you recall the reaction of the people

6    involved to that moving, if you will?

7    A.  Yes, I do.  It was very significant in terms of being

8    emotional and being what they viewed very destructive in their

9    eyes.  It wasn't a favorable thing for any of them.  So -- yes.

10   Q.  How would you describe Ms. Gutierrez's response?

11   A.  Ms. Gutierrez's response was of the -- I've been in this

12   unit for a significant number of years.  This has been my

13   trade.  This is what I know, being very uncomfortable about

14   being moved to a work unit that she wasn't familiar with, that

15   she wasn't sure she had the skill level for, that she wasn't

16   sure she was going to be successful in, a lot of uncertainty

17   for her in terms of kind of at the latter part of her career

18   starting over.

19   Q.  Do you recall where she was moved?

20   A.  She was moved to our crime analysis unit.

21   Q.  And was that a lateral move, promotion, or demotion?

22   A.  That was a lateral move.

23   Q.  Did she receive equal, more, or less pay as a result?

24   A.  I believe it would be the same.

25   Q.  Okay.  How about Ms. Wyckoff, what happened to her?

1    A.  Ms. Wyckoff was transferred to our planning, research and

2    accreditation unit as a police analyst.

3    Q.  And did she receive a promotion, demotion, or lateral move?

4    A.  I'm not sure about the money part.  But in terms of

5    classification position-wise, she went from being a first-line

6    supervisor to a professional level staff person, someone who

7    does research.

8    Q.  So is that a demotion?

9    A.  I personally wouldn't consider it a demotion.  I'm not sure

10   about the pay.  I -- I see it more as a change of function.

11   Q.  And what was her response to that?

12   A.  She was also very unhappy with the transition.

13   Q.  Okay.  What was done with Mr. Anderson?

14   A.  Mr. Anderson was transferred to our detention unit as a

15   detention officer.

16   Q.  And was that a promotion, demotion, or lateral move?

17   A.  It was -- like, again, I'm not sure about the money.  My --

18   I'm not sure.  I can't verify that.  But he was also moved to a

19   different type of work from being in an office fingerprint

20   technician to being a detention officer in uniform at our jail

21   doing similar work, but obviously in a different setting.

22   Q.  And what was his response?

23   A.  Pretty upset.

24   Q.  And how do you know that?

25   A.  I recall having conversation -- I actually met with each

1    individual to let them know about the move.

2    Q.  Oh, so you personally notified them of the action being

3    taken?

4    A.  Yes, ma'am.

5    Q.  Okay.  Please proceed.

6    A.  I recall that he wasn't happy, didn't think it was fair.  I

7    don't recall that he said much other than I -- he -- I knew

8    that based on what he said, that he didn't think it was a fair

9    move for himself or any of the other members as well.

10   Q.  Do you -- is it your understanding that Mr. Anderson ever

11   blamed you for what was happening in the crime lab?

12   A.  I would say that Mr. Anderson didn't appreciate that I took

13   a very direct role in intervening into something that I frankly

14   had inherited and putting together a plan to -- what I thought

15   would be a successful transition for each and every employee

16   who had already demonstrated that they frankly couldn't get

17   along.

18          THE COURT:  Ms. Hull, we are going to take a break at

19   this point.

20          Members of the jury, we will take a 15-minute break.

21   Please remember the admonition.

22          (The jury left the courtroom.)

23          THE COURT:  Please be seated.

24          MR. BOYLE:  We have one issue based on -- well, she

25   has to leave.

1              THE COURT:  Why don't you go ahead and step out.

2              MR. BOYLE:  Judge, I made a 404(b) objection.  And I

3    am going to renew that again, because the defense then followed

4    up with the swastika issue and asked did that ever precede

5    these efforts regarding Steve Anderson and these disputes in

6    the crime lab.  Is there any other implication here other than

7    Steve Anderson or someone like him might have been involved in

8    this clear racial incident involving the swastikas?

9              THE COURT:  When you made the 404(b) objection, there

10   had been no individual identified.  404(b), the purpose of it

11   is to prevent the jury from concluding that somebody acted in a

12   particular way because it was their propensity to act that way.

13   And there was no person mentioned at any point in connection

14   with the 404(b) objection you made.  That's why I overruled it.

15             MR. BOYLE:  Well, I am -- the Government now moves

16   to -- two things:  To preclude any further implication that

17   Mr. Anderson was involved with that by referencing the time

18   line involved in this implicates him; and secondly, to have the

19   Court rule that the defense can't now argue in front of the

20   jury that Anderson was involved in the swastika incident

21   because there's been no showing.  And I think for them to argue

22   that, they would need a showing by this Court that he was

23   connected to this incident.  So is there any objection to that

24   by the defense?

25             THE COURT:  I don't know, what's the first point?

1          MR. BOYLE:  The first one is no more questions about

2    whether or not Steve Anderson, on the time line, could have

3    been connected to the swastika incident.

4          THE COURT:  What's the defense response on that,

5    404(b) objection to connecting Anderson to the swastika

6    incident?

7          MS. HULL:  Judge, I don't -- I don't think there is a

8    404(b) issue.

9          THE COURT:  Well, but if you are bringing it in,

10   Ms. Hull, to suggest that Steve Anderson had racial issues that

11   were carried out when he performed the bombing, I think that's

12   the argument, that that would be 404(b), because it would be --

13   the swastika evidence would be introduced to show that he has a

14   propensity to act in a racial manner as in the bomb.

15         MS. HULL:  I'm not really sure how to respond to that,

16   Judge, other than that I think my line of questioning was the

17   timing, merely of the timing.  As to what argument I could have

18   on that, I hadn't anticipated any argument on that.  But I -- I

19   had also had no intention of going further into the swastika on

20   the car.

21         THE COURT:  All right.  So we've heard everything we

22   are going to hear on that issue you think?

23         MS. HULL:  I believe so.

24         THE COURT:  Ms. Williams, Ms. Cisneros?

25         MS. WILLIAMS:  I would agree with that.

1          THE COURT:  Does the defense intend to argue that

2   Anderson was the perpetrator of that vandalism?

3          MS. HULL:  I don't think -- I hadn't planned on it,

4   Judge.

5          THE COURT:  Okay.

6          MS. HULL:  But I hadn't --

7          THE COURT:  Does that resolve your concerns,

8   Mr. Boyle?

9          MR. BOYLE:  Well, just if they intend to argue that,

10  they need to ask you first.

11         THE COURT:  Yeah, I think clearly if you decide to

12  argue that, we ought to address it under 404(b).

13         MS. CISNEROS:  We can do that.

14         MR. BOYLE:  Thank you.

15         THE COURT:  We will see you in ten minutes.

16         (A recess was taken.)

17         THE COURT:  You may continue, Ms. Hull.

18         MS. HULL:  Thank you, Judge.

19  BY MS. HULL:

20  Q.  Ma'am, before the break we were talking about the actions

21  taken against three individuals and their response, their

22  reactions.  I believe when we left off you were talking about

23  Mr. Anderson's response.  Do you recall that?

24  A.  Yes, ma'am.

25  Q.  Okay.  And I -- did you -- well, did you agree -- let me

1    ask you this:  Talking about the recommendation from human

2    resources, did you agree with the recommendation made?

3    A.  Given the circumstances of the long history and all the

4    things that we did, I thought it was a fair solution.

5    Q.  We were also talking before the break that --

6    Mr. Anderson's opinion of your handling of the crime lab, do

7    you remember that?

8    A.  Um-hmmm.

9    Q.  You need to say "yes" or "no" for the record.

10   A.  Yes.

11   Q.  Thank you.

12          And did you ever get the impression that he blamed you

13   for that?

14   A.  He never told me directly that he blamed me for that.  We

15   had a conversation about the recommendations.  We had an honest

16   conversation about what the issues were.  I was always open and

17   clear about my expectations for work, not just work product,

18   but also behavior.

19          And so we -- he didn't necessarily disagree with that.

20   We always had -- I found it actually fairly easy to have a very

21   consistent, clear conversation with him every time I met with

22   him.

23   Q.  Okay.  And so was it your impression that he blamed you for

24   the demise of the crime lab?

25   A.  I don't know that -- that he would have blamed me solely.

1   Q.  Okay.  But did he blame you for that?

2   A.  He never told me that.

3   Q.  Okay.  Did you tell anyone -- any one of the investigators

4   that interviewed you that you believed he blamed you for the

5   demise of the crime lab?

6   A.  I believe I did, in my investigation.

7   Q.  Do you remember how many times you were interviewed about

8   the Scottsdale bombing?

9   A.  Not exactly.  More than once, maybe twice, maybe three

10  times.

11  Q.  And do you remember who interviewed you?

12  A.  I couldn't tell you who that is today.

13  Q.  Do you remember what agency they were with?

14  A.  Postal.  Postal inspector.

15  Q.  Do you remember how soon after the bombing you were

16  interviewed?

17  A.  I'm going to say within a week, maybe two weeks, fairly

18  soon.

19  Q.  And if you were interviewed after that, do you remember how

20  long before you were interviewed again?

21  A.  Not really.

22  Q.  Okay.  Who is Joyce Lira?

23  A.  Joyce Lira would have been the employee relations manager

24  for human resources at that time.

25  Q.  And what, if any, role do you think she had in the issues

1    with Steve Anderson's movement, if you will?

2    A.  Joyce was actually the -- that was actually her primary job

3    for all city employees relative to employ relations issues.  So

4    Joyce would have been the principal investigator in the

5    investigation for that work group.

6    Q.  When -- during your investigation of the problems with that

7    work group, did you make any determination as to the

8    relationship between Connie Wyckoff and Steve Anderson, other

9    than he answered to her?

10   A.  Um-hmmm.  Yes.  That Connie had a very favorable opinion of

11   Steve Anderson, both as an employee, and she -- and as a

12   person.  I mean they had had a long work history together.

13   So -- excuse me.

14   Q.  Take your time.

15   A.  So I found that Connie had a very favorable opinion of

16   him -- of Mr. Anderson.

17   Q.  If there were disputes -- do you need a drink of water?

18   A.  I'm fine.

19   Q.  Help yourself.

20   A.  Yes.

21   Q.  When there were disputes within that unit, did Connie

22   Wyckoff side with anyone?

23   A.  If -- yes.  Most definitely sided with Mr. Steve Anderson.

24   Q.  Do you know if they had a relationship outside of work?

25   A.  I couldn't tell you that.

1    Q.  Did you have an impression as to whether they were friends?

2    A.  They seemed cordial with each other.  Like I said, they had

3    a long work history together.  So I -- I just assumed that that

4    was a long-time relationship based on work.

5    Q.  In your discussions with Mr. Anderson, did you determine

6    whether there was an issue of race involved with the discord

7    with the employees?

8    A.  I never determined that race was involved in any of that.

9    I saw that as strictly a work-performance,

10   employees-not-getting-along situation.

11   Q.  Did Mr. Anderson ever express to you that he thought that

12   Ms. Gutierrez was receiving preferential treatment?

13   A.  Mr. Anderson did express to me that he thought that Lupe

14   Gutierrez had been preferred in the past because of her

15   ethnicity being Hispanic.

16   Q.  How, then -- strike that.

17          After the move that you've described, who then became

18   Mr. Anderson's supervisor?

19   A.  Mr. Glenn Olsen, our detention manager.

20   Q.  And what department was that?

21   A.  Detention services.

22   Q.  And did you find over the course of time that he became in

23   a similar situation with Mr. Anderson that Ms. Wyckoff had

24   been?

25   A.  I didn't really find that.  I mean, I never had the

1   impression that was the case.  I had many a conversation --
2   Mr. Glenn Olsen was very well aware of the history with the
3   employees.  He was very well aware of why the employees were
4   being transferred.  So I saw Mr. Olsen as a person who made
5   sure that all that fit and gave Mr. Anderson a good starting
6   opportunity in a new job.
7   Q.  Did you render an opinion as to whether or not Mr. Olsen
8   would protect Mr. Anderson?
9   A.  Not in -- not initially.  That -- that was never --
10  frankly, after Mr. Anderson was moved to detention services,
11  there was very little conversation about him, because he moved
12  on in terms of work product, that Mr. Olsen and I had -- we
13  didn't have a need to have to discuss that piece of it except
14  for the work piece of it, not from an employee-issue
15  perspective.
16  Q.  Did you inform the investigators that interviewed you on
17  this case that Mr. Olsen protected Steve Anderson?
18  A.  I don't -- I don't recall saying that.  At the point that
19  we transferred him, I don't know that Mr. -- Mr. Olsen knew
20  much about him.  So at the time we transferred him, I wouldn't
21  have -- I wouldn't have known that or said that.
22  Q.  Well, after time, did that occur?
23  A.  It became, I guess, clear or -- I -- I might have drawn
24  that conclusion after -- I guess after a given period of time.
25  But at this point, I can't really give you an example of that.

1    That's not coming to mind.

2    Q.  Okay.  So you don't recall if that type of relationship

3    developed?

4    A.  Not -- not at the time, like I said, that we transferred

5    him.  Subsequent years -- if you're talking about subsequent

6    years?

7    Q.  Yes.

8    A.  I would have drawn that conclusion.

9    Q.  Okay.  That what conclusion?

10   A.  That Mr. Olsen and Mr. Anderson had a very close working

11   relationship.  But at that time, I'm not -- I'm actually not

12   sure if they were actually already working for me or not.  But

13   I would -- as time went by, I understood that Mr. Olsen and

14   Mr. Anderson became closer.

15   Q.  And did Mr. Olsen protect Mr. Anderson?

16   A.  I don't -- I would say no, because there wasn't anything to

17   protect him from.  There wasn't any adverse employee actions

18   that were taken on him or -- I mean, at that point, he was

19   already situated in a different work unit.

20           MS. HULL:  One moment, please.

21           Can the witness please be provided Exhibit 813.

22           MR. MORRISSEY:  Your Honor, are we refreshing

23   recollection?  There's no pending question.

24           MS. HULL:  That's what I'm getting to, thank you.

25           THE COURT:  Well, she's just being handed the exhibit

1    at this point, Mr. Morrissey.

2           MS. HULL:  Ma'am, don't open it yet, I have to ask you

3    some questions first.

4    BY MS. HULL:

5    Q.  Do you recall talking to an inspector or inspectors about

6    this case in April of 2004, about the Scottsdale bombing?

7    A.  This would have been right after the actual bombing?  Yes.

8    Q.  Okay.  And would reviewing that report refresh your

9    recollection as to the relationship between Mr. Anderson and

10   Mr. Olsen?

11   A.  Yes, ma'am.

12   Q.  Okay, if you would please look at what's been marked as

13   Exhibit 813 --

14          MR. MORRISSEY:  Your Honor, I object.  The witness has

15   not testified to a lack of recollection.  She characterized the

16   relationship between Mr. Olsen and Mr. Anderson.  I don't know

17   what question we are saying she could not answer.

18          THE COURT:  Ms. Hull?

19          MS. HULL:  613, Judge.

20          THE COURT:  What memory are you refreshing?  This is

21   613?

22          MS. HULL:  It's a prior -- yes.

23          THE COURT:  Overruled.

24   BY MS. HULL:

25   Q.  Go ahead, ma'am, if you could look at the second page of

1    that document, the third paragraph down starts with "Helen said

2    she."

3    A.   Um-hmmm.

4    Q.   Read that paragraph, please.

5             THE COURT:  You want her to read it to herself?

6             MS. HULL:  To yourself, to yourself, not out loud.

7             THE WITNESS:  Oh.

8    BY MS. HULL:

9    Q.   And then close that document when you've had that

10   opportunity, please.

11            Does reviewing that refresh your recollection as to

12   your characterization of that relationship?

13   A.   I would say that what is in here is consistent with what I

14   would -- with what I said, yes.

15   Q.   Did you -- well, did you believe that Mr. Olsen protected

16   Mr. Anderson?

17   A.   Well, I think in the context of my interview, if I can

18   speak to that whole paragraph, was that what I was saying is

19   that when I moved Mr. Olsen over -- Mr. Anderson to Mr. Olsen,

20   that Mr. Olsen was open and amenable to bringing him under his

21   wing, teaching him, mentoring him, and from that perspective,

22   was a supporter, if that's too strong of a word, meaning that

23   he brought him in and made him an employee just like all of the

24   other employees.  So in that context, I said that he was a

25   supporter of him, meaning that it worked well, the relationship

1  worked well.

2  Q.  And in that interview, did you tell inspectors that Glenn

3  Olsen protected Steve Anderson?

4  A.  Yes.  That's what -- that's what my interview says.

5  Q.  Thank you.

6         How would you characterize -- how would you describe

7  Steve Anderson?

8  A.  I didn't ever see Mr. Anderson -- well, very intense.

9  Intense in that he was passionate about his viewpoint.  He was

10  passionate about getting people to hear his voice.  I didn't

11  see him associate much with anyone else.  An average employee.

12  Q.  Did you ever describe him as a loner?

13  A.  In the context that I just spoke about, given that I never

14  saw him going out to lunch or pretty much staying in his place,

15  not knowing that he really had a widespread of network or

16  association with many employees, at least I never witnessed

17  that, so from that context, yes, ma'am.

18  Q.  Would you characterize him as self-righteous?

19         MR. BOYLE:  Objection, leading.

20         THE COURT:  Sustained.

21  BY MS. HULL:

22  Q.  Do you recall characterizing Mr. Anderson in more detail

23  than a loner?

24  A.  No, ma'am.

25  Q.  Do you recall the interview of April 13th, 2004, with

1    inspectors, postal inspectors?

2    A.  Is it this one?

3    Q.  Yes.

4    A.  Oh, well.

5    Q.  Do you recall that interview?

6    A.  Yes, ma'am.

7    Q.  Okay.  Do you recall whether or not you provided any

8    additional description of Mr. Anderson for the inspectors?

9    A.  No, ma'am, other than what I just told you.

10   Q.  Okay.  Would reviewing that report refresh your

11   recollection?

12   A.  Yes, ma'am.

13   Q.  Okay.  If you would please look at that exhibit and the

14   second page.  In fact, it's the paragraph just below the last

15   one you read.

16   A.  Um-hmmm.

17   Q.  Read that, please, and then close the document.  Begins

18   with "Helen described."

19           Does that refresh your recollection as to any

20   additional description you provided of Mr. Anderson?

21   A.  Yes, ma'am.

22   Q.  What is your recollection as to what additional

23   descriptions you provided?

24           MR. BOYLE:  Objection, hearsay.

25           THE COURT:  Overruled.

1    BY MS. HULL:

2    Q.  You may answer.

3    A.  That he was not a person that was willing to compromise.

4    That my interview says that I would have called him

5    self-righteous.

6    Q.  Anything else?

7    A.  Those are the two things that I remember.

8    Q.  Would looking at that report closer help you?

9           MR. MORRISSEY:  Objection, Your Honor, the witness has

10   just testified to the extent of her refreshed recollection.

11          THE COURT:  Overruled.

12   BY MS. HULL:

13   Q.  Go ahead and look, same paragraph, next sentence.  Two

14   sentences.

15   A.  Yes, ma'am.

16   Q.  Does that refresh your recollection as anything else you

17   used, words you used to describe him?

18   A.  Yes, ma'am.

19   Q.  And how else would you describe him?

20   A.  That he feels that there is a conspiracy against him and

21   that he feels he is always right.

22   Q.  Do you -- what is your opinion as to his willingness to

23   compromise?

24   A.  He was pretty steadfast in -- in what he wanted.

25   Q.  So would you say --

1    A.  So I would say that he was unwilling to compromise.

2    Q.  During -- after this -- the action was taken in regards to

3    this particular unit, are you aware whether Mr. Anderson filed

4    a lawsuit against the City of Scottsdale?

5    A.  Yes.

6    Q.  And how did you become aware of that?

7    A.  I don't recall at this point.  Frankly, I don't recall at

8    this point.

9    Q.  Do you remember if you were named in that lawsuit?

10   A.  Yes, I was.

11   Q.  And were you deposed?

12   A.  Yes, I was.

13   Q.  Do you remember how many times?

14   A.  Once that I remember.  So definitely once.

15   Q.  And did you -- because you were named -- you were named in

16   that lawsuit, did you maintain an ongoing understanding of the

17   status of that lawsuit?

18   A.  Yes, I did.

19   Q.  Okay.  And in approximately the end of 2003, latter part of

20   2003, how would you characterize the status of that case?

21   A.  I can't tell you that.  That's really been a long time.  I

22   don't recall the sequence of events.

23   Q.  Well, if -- if we put in the time frame and the context of

24   what I will call leaking of confidential or personal

25   information.

1   A.  Um-hmmm.

2   Q.  Do you know what I'm talking about?

3   A.  Yes, ma'am.

4   Q.  And do you recall when that occurred?

5   A.  I'm not -- I know I would have done my deposition.  I'm not

6   exactly sure where the case would have been in terms of the

7   legal process.

8   Q.  Do you recall having an opinion as to how the case was

9   going shortly before leaking of information about you?

10  A.  I'm not remembering that.  I mean, the sequence of events,

11  I'm not.  It's been a long time.

12  Q.  Would your interview refresh your recollection in that

13  regard?

14  A.  Yes, ma'am.

15  Q.  Okay.  If you would look again, please, at 813.  Top of

16  page 2.  Or I'm sorry, on page 2, the next paragraph begins "we

17  then discussed."  If you would read that, please.

18  A.  Okay.

19  Q.  Does that refresh your recollection?

20  A.  Yes, ma'am.

21  Q.  And just prior to this leak of information, what was

22  happening with the Anderson lawsuit?

23  A.  Like I said, I don't recall exactly where it was in the

24  legal process, but by then it -- we would have -- we as a city,

25  would have been successful -- at some point we were successful

1    in the first, I guess, the first go around of the legal

2    process.  And so the city would have been doing well in terms

3    of fighting the allegations in the court process.

4    Q.  Which conversely would mean it was going how for

5    Mr. Anderson?

6    A.  Not well.

7    Q.  Okay.  How -- what connection, if any -- well, strike that.

8         Did you make a connection between the progress of that

9    suit and the timing of the leaking of the information, your

10   personal information?

11   A.  Did I personally make a connection?

12   Q.  Yes.

13   A.  Yes, ma'am.

14   Q.  And is that what you related to the inspectors?

15   A.  Yes, ma'am.

16   Q.  As a result of this information being leaked, was there an

17   internal investigation conducted?

18   A.  Yes, ma'am.

19   Q.  All right.  And who were the people that were investigated

20   internally in that issue?

21   A.  I believe because I wasn't privy to the investigation, I

22   believe it would have been our polygraph examiner, Mr. Tom

23   McMahon, and our detention manager, Glenn Olsen.

24   Q.  And you supervised ultimately Mr. Olsen, correct, at that

25   time?

1    A.  I'm not sure if at that time I was still his supervisor,

2    but I have been subsequent to that.

3    Q.  Okay.  So you may have taken over that position after?

4    A.  No.  He might have already transferred to a different

5    bureau.  Mr. Olsen.

6    Q.  From under your supervision?

7    A.  Yes, ma'am.

8    Q.  Okay.  Do you remember when, approximately, how long before

9    the bombing that this incident with the leaking of information

10   occurred?

11   A.  It seemed like a short while.  It might have been four to

12   six months.

13   Q.  All right.  And was this covered in the press?

14   A.  Yes, ma'am.

15   Q.  And the -- when -- I'm sorry.  Was the investigation,

16   internal investigation still ongoing at the time of the

17   Scottsdale bombing, February, 2004?

18   A.  I believe so.  I'm not entirely sure of that.

19   Q.  Okay.  In any event, did you receive some sort of award in

20   December of 2003?

21   A.  Yes, ma'am.

22   Q.  I apologize, if I can back up.  Do you recall relating to

23   the inspectors the timing of this information being leaked?

24   A.  I recall having a conversation with him about what I --

25   what my perception, yes, ma'am.

1   Q.  Okay.  And would review of the report you've been looking

2   at refresh your recollection as to when this leak occurred?

3   A.  Yes, ma'am.

4   Q.  Okay, if you would please look at page 2, the very bottom

5   of that page, about -- hang on.  Second to the last line on

6   page 2.

7   A.  Yes, ma'am.

8   Q.  And does that -- does that refresh your recollection as to

9   when this leaking to the media of your information occurred?

10  A.  Yes, ma'am.

11  Q.  When was that?

12  A.  October of 2003.

13  Q.  And do you recall how quickly after that occurred that the

14  internal investigation began?

15  A.  I wasn't privy to that.  But I would think, I'm going to

16  say within the 30 days.  It's typically what we would do with

17  any investigation, about 30 days at the most.

18  Q.  And do you recall -- does this review of that report

19  refresh your recollection as to whether or not you received an

20  award in 2000 -- December of 2003?

21  A.  If it was in December of 2003, I do recall that.

22  Q.  And what was -- what was the nature of that award?

23  A.  That would have been the city manager's award of

24  excellence, the Bill Donaldson Award, and it would have been

25  for my work in the larger group called our diversity advisory

1    committee.  And that would have been for the efforts we did in

2    the citizen employee group.  So diversity, our efforts in

3    diversity.

4    Q.  And who else received an award?

5    A.  It would have been our entire employee group, so about 20

6    people would be what I am -- what it typically would be.

7    Q.  Did you have an opinion as to what two individuals were

8    most identified with that award?

9    A.  I don't understand your question.

10   Q.  Do you have an opinion as to whether or not there were

11   certain individuals within your department that were identified

12   with that reward?

13   A.  No, ma'am.

14   Q.  Would review of the report interview refresh your

15   recollection?

16   A.  Yes.

17   Q.  Okay, if you could please look at the very top of page 3 of

18   that report.  Does that refresh your recollection?

19   A.  Yes, ma'am.

20   Q.  And do you have an opinion as to what people were most

21   identified with that award?

22   A.  That would have been myself and Don Logan.

23   Q.  And why do you say that?

24   A.  Well, Don Logan was the director of our diversity, so he

25   was the initiator and creator of our diversity program.  So Don

1    was a leader in that initiative.

2    Q.  Did -- were you aware of whether Mr. Logan -- did his name

3    appear on the report that you received to implement the

4    actions, if you will, against the unit of Wyckoff, Anderson,

5    and Ms. Gutierrez?

6         MR. MORRISSEY:  May we have a time frame for that

7    question?

8         THE COURT:  Could you set it in a time frame, please.

9    BY MS. HULL:

10   Q.  The report that we talked about previously that came out of

11   the investigation into that unit, do you remember talking about

12   that report?

13   A.  Yes, uh-huh.

14   Q.  Do you recall if Mr. Logan would have been involved in that

15   process?

16   A.  I believe he was.  Yes, ma'am.

17   Q.  And even though you delivered the news to these people, do

18   you know if there was an understanding as to who would have

19   made that decision?

20   A.  By the employees?

21   Q.  Yes.

22   A.  I probably conveyed to them that this was as an outcome of

23   a human resources investigation, yes, ma'am.

24   Q.  And who was the head of that group at the time?

25   A.  I think -- I think it was actually Neal Shear would have

1   been the manager, general manager, if I recall.

2   Q.  Do you recall who authored that report we are talking

3   about?

4   A.  Joyce Lira for sure, because I recall that was her

5   position.

6   Q.  What was her position?

7   A.  Employee relations manager.  So I do recall Joyce Lira.  I

8   haven't seen that report in quite a while.

9         MS. HULL:  If the witness could please be shown

10  Exhibit 798.

11  BY MS. HULL:

12  Q.  Ma'am, can you -- if review of that report -- would review

13  of that report help you recall whose -- whose name appeared on

14  it and when it was issued?

15  A.  Yes, ma'am.

16  Q.  Okay, would you please look at what's been marked as

17  Exhibit 798.

18  A.  Okay.

19  Q.  And what's the date of that report?

20  A.  October 10th, 2000.

21  Q.  And is that the report that we've been talking about?

22  A.  Yes, ma'am.

23  Q.  Okay.  And the "from" line, who is the first name listed?

24  A.  Don Logan, diversity and dialogue officer.

25  Q.  You were not -- this was directed to you; is that right?

1    A.  Yes, ma'am.

2    Q.  Okay.  And do you recall who made the initial complaint

3    that led to this investigation?

4    A.  I actually didn't recall that, but I just saw that on the

5    first line of this report.

6    Q.  Okay, does that report refresh your recollection?

7    A.  Yes, ma'am.

8    Q.  As to -- as to who complained to start this investigation?

9    A.  Yes, ma'am.

10   Q.  Who would that be -- who that was?

11          MR. MORRISSEY:  Your Honor, would the witness put the

12   record away.

13          THE COURT:  Yes, this is refreshed recollection.

14   BY MS. HULL:

15   Q.  Is your recollection refreshed on that issue from looking

16   at the report?

17   A.  Lupe Gutierrez.

18   Q.  And if the report -- how soon after the October 10th, 2000

19   date of the report would you have taken the action where you

20   sat and basically gave these employees the news?

21   A.  I'm thinking within the next few weeks, not much

22   thereafter.  Again, I don't really recall, but that probably

23   would be a typical response.

24   Q.  Okay.  And was -- in these three moves, did any of the

25   other -- any of the employees have to move from police

1    headquarters to downtown Scottsdale?

2    A.  Yes, ma'am.

3    Q.  Who was that?

4    A.  Steve Anderson.

5    Q.  So the other employees did not have to make that move?

6    A.  Correct.

7    Q.  When you spoke to investigators about the Scottsdale bomb,

8    did you discuss why -- your thoughts on why someone would

9    target Mr. Logan as opposed to you?

10   A.  In the context of our, I guess, of our conversation or of

11   our interview, I believe I said that given the sequence of

12   events that had occurred, that I would have been an easier

13   target than Mr. Logan.

14   Q.  Did you suspect anyone in the Scottsdale bombing?

15   A.  I had my -- I guess I had my opinion.  I had an opinion to

16   that, yes, ma'am.

17   Q.  Okay, what was your opinion?

18   A.  That it could have been individuals involved with the same

19   circumstances that had occurred to me in terms of leaking my

20   information, confidential information to the newspaper.

21   Q.  And what names were those?

22   A.  Steve Anderson was my opinion.

23   Q.  Anyone else?

24   A.  I believe that's what I told the investigator.

25   Q.  Would reviewing -- I'm sorry, strike that.

1          Did you express this opinion to investigators?

2    A.  I believe, yes, ma'am.

3    Q.  And do you recall -- or did you -- do you have an opinion

4    as to why Mr. Anderson would target Mr. Logan instead of you?

5    A.  I guess --

6          MR. MORRISSEY:  Your Honor, I object, this is improper

7    opinion testimony under Rule 701.

8          MS. HULL:  Judge, I believe the Government was

9    permitted to elicit the same type of opinions.

10          THE COURT:  The objection is overruled.

11   BY MS. HULL:

12   Q.  Go ahead, ma'am.

13   A.  Can you repeat your question, please?

14   Q.  Okay.  Do you recall having an opinion or do you have an

15   opinion as to why, if you suspected Steve Anderson, Mr. Logan

16   would be targeted instead of you?

17   A.  Other than I thought I was an easy target.

18   Q.  Did you believe that your relationship with Donald Logan

19   had anything to do with that?

20   A.  I guess in my thoughts, I would have hoped that that wasn't

21   the case.  But we were working colleagues.  So he had been part

22   of the investigation.  So in that context was what I would have

23   told the investigators.

24   Q.  Do you have any opinion as to whether -- well, does -- does

25   Donald Logan protect you?

1   A.  I was of the opinion that Donald Logan protected me.

2   Q.  Did you express to investigators that you think that might

3   have played a part in this?

4   A.  I personally didn't believe that.  I would have expressed

5   to the investigator that that might have been a perception of

6   others, but not my personal perception.

7   Q.  Was Mr. Logan responsible for hiring you?

8   A.  No, ma'am.

9   Q.  Was there a perception that that was the case?

10  A.  I didn't have that perception.

11  Q.  Did you believe others had that perception?

12          MR. MORRISSEY:  Objection, speculation.

13          THE COURT:  Overruled.

14          THE WITNESS:  Perhaps.

15  BY MS. HULL:

16  Q.  Okay.  Do you recall discussing that with investigators?

17  A.  I -- yes, ma'am.

18  Q.  Okay.  And would your memory be refreshed in reviewing your

19  report as to what you discussed on that topic?

20  A.  Yes, ma'am.

21  Q.  Okay, if you could please look at that report, the last

22  page, page 3.  And it would be the first full paragraph at the

23  top of that page.

24  A.  Okay.

25  Q.  Does that refresh your recollection as to the opinion you

1   provided?

2   A.  Yes, ma'am.

3   Q.  Okay.  And what is that?

4   A.  That the perception by others is that Don protected me --

5   protected me.

6   Q.  And did you have an opinion as to whether or not he had

7   anything to do with promoting you?

8   A.  That was not my perception.  I think I spoke to the

9   investigators about what others might have thought, but not me

10  personally.

11  Q.  Okay, do you remember telling the investigators that that

12  perception existed?

13  A.  Yes, ma'am.

14  Q.  Okay.  And did you express -- strike that.

15          Did you express to -- did you have an opinion as to

16  how the leak of information, I believe you said was in October

17  of 2003?

18  A.  Yes, ma'am.

19  Q.  And then the awards in December of 2003.  Do you remember

20  expressing an opinion as to what people might think about the

21  fact that you received an award so shortly after this?

22  A.  Yes, ma'am.

23  Q.  And what opinion is that?

24  A.  That -- that individuals who -- who weren't my supporters

25  might not think kindly of me getting an award.

1   Q.  And people -- you're talking about the people who leaked

2   the information?

3   A.  Specifically, yes, ma'am.

4   Q.  Did you have, as part of your discussions with Mr. Anderson

5   and his associates, did you have an opinion as to whether or

6   not they believed that Mr. Logan was responsible for a lot of

7   their problems?

8   A.  I don't -- I don't recall having specific conversations

9   about Mr. Logan.  You mean with my -- with the employees who

10  worked for me?

11  Q.  No.  I'm just asking for your opinion as you sit here

12  today.  Do you have an opinion, and -- as to that?

13  A.  Can you ask me again, please?

14  Q.  Well, we were talking a moment ago about perceptions.

15  A.  Uh-huh.

16  Q.  I'm not saying that they are your perceptions, but was it,

17  I guess, if you will, your understanding that there were

18  perceptions by Mr. Anderson and his associates that Don Logan

19  was responsible for their problems or a lot of their problems?

20          MR. MORRISSEY:  Objection, both Rule 701 and

21  speculation beyond the witness' knowledge.

22          THE COURT:  Overruled.

23          MS. HULL:  You may answer.

24          THE WITNESS:  It -- I would -- I guess I would

25  reiterate that the perception -- my perception was that others

1    thought that I didn't think that.

2    BY MS. HULL:

3    Q.  No, I understand that.

4    A.  So I'm affirming that, that that was the perception of

5    others.

6    Q.  Of Mr. Anderson and his associates.  Are they included in

7    those others?

8    A.  Yes, ma'am.

9    Q.  During your -- well, you're still with the City of

10   Scottsdale, right?

11   A.  Yes, ma'am.

12   Q.  When did Mr. Anderson leave the employ of the City of

13   Scottsdale?

14   A.  I'm not sure, a few years ago.

15   Q.  Was it the same year as the bombing?

16   A.  I don't recall that exactly.

17   Q.  Do you know where he went?

18   A.  I believe he went to the City of Glendale.

19   Q.  Okay.  And, Mr. Olsen, are you aware of his level of

20   education?

21   A.  I can suspect, but not exactly.  I know --

22   Q.  Do you know if he has a master's degree?

23   A.  I don't exactly remember.  He might.

24   Q.  Your -- did you participate or have any involvement in the

25   pen and trap?  Do you know what a pen and trap is?

1    A.  No, ma'am.

2    Q.  Okay.  Are you -- did you have -- take any part in the

3    postal service putting any sort of device to trace calls going

4    in and out of the offices of Glenn Olsen, Steve Anderson and

5    Connie Wyckoff?

6    A.  I had no idea that occurred until you just told me right

7    now.

8    Q.  Oh, all right.  If -- what is the process, if you know, if

9    you have an employee who has to provide a DNA sample, is that

10   something that would come to your attention?

11   A.  If it's a request from an outside agency in a criminal

12   matter for another jurisdiction, maybe as a courtesy.  I mean,

13   certainly if it's an internal investigation that we are asking

14   that for, or a criminal investigation in our own city, I would

15   probably know that.  But I wouldn't know that otherwise.

16   Q.  If in the City of Scottsdale bombing in February of 2004,

17   are you -- is that something in that investigation, if DNA

18   samples were requested of City of Scottsdale employees in the

19   police department, is that something you would be made aware

20   of?

21   A.  I did not know that.

22   Q.  Is that something that you would be --

23   A.  On a typical matter?  Probably not.  It's a criminal --

24   it's a criminal investigation.  I wouldn't be part of that -- a

25   regular process, if you will, to be part of that discussion.

1    Q.  Is it something you would be made aware of?

2    A.  No, ma'am.

3    Q.  If -- are you aware whether any -- any of your employees

4    have provided DNA tests in this -- in the investigation of the

5    Scottsdale bombing?

6    A.  No, ma'am.

7    Q.  Are you aware of any other employees in the City of

8    Scottsdale Police Department providing DNA samples in the

9    Scottsdale bombing?

10   A.  No, ma'am.

11   Q.  Has anybody made a request of you that your employees

12   submit to DNA testing in connection with the Scottsdale

13   bombing?

14   A.  No, ma'am.

15           MS. HULL:  If I may have one minute, please.

16           Nothing further.

17           THE COURT:  Ms. Williams, anything?

18           MS. WILLIAMS:  Very briefly, Your Honor.

19

20                        DIRECT EXAMINATION

21   BY MS. WILLIAMS:

22   Q.  Ma'am, I just wanted to clarify one thing.  In the last

23   series of questions Ms. Hull was asking you, she was asking you

24   if you were aware whether anybody in -- any employees of the

25   City of Scottsdale have been swabbed for DNA or have been

1  requested to give swabs.  Do you remember those questions?

2  A.  Yes, ma'am.

3  Q.  When she was asking are you aware, and you were answering

4  no, are you answering no, I'm not aware, or, no, it hasn't been

5  done as far as I know?

6  A.  No, I am not aware.

7  Q.  Okay.  And would you -- would you normally hear of such

8  requests?

9  A.  Like I guess I would -- it would depend.  It really would.

10  If -- if it's a criminal, like I said, if it's an internal

11  criminal investigation, and depending on what the nature of

12  that was, I may or may not know.  So it really would depend on

13  the nature of the request and the circumstances around that.

14  Q.  If it were -- maybe you could help me distinguish between

15  an internal criminal investigation, and an external.

16  A.  I mean internal to City of Scottsdale.

17  Q.  Okay.

18  A.  Something that occurred in our city.

19  Q.  Okay, so for example, if it were the city -- the bombing

20  that occurred in Scottsdale, and employees of Scottsdale had

21  been requested to give DNA samples, would that be an internal

22  or an external criminal investigation?

23  A.  Well, that would be a federal -- it goes to a it depends.

24  It really is -- it really is a circumstances it depends.  So I

25  would consider that something that occurred in our city.  But

1    that was a federal investigation, so I almost consider that

2    external.

3    Q.  But are you aware of whether Scottsdale Police Department

4    was also involved in that investigation?

5    A.  I -- I would believe so, since we were the primary -- I

6    mean first responders to that.

7    Q.  So does that mean it would be both internal and external?

8    A.  Initially, yes, ma'am.

9    Q.  Okay.  And to date, are you aware of whether any Scottsdale

10   employee, City of Scottsdale employees have been swabbed or

11   have been requested to give swabs?

12   A.  No, ma'am.

13   Q.  Okay.  You're not aware?

14   A.  I'm not aware.

15          MS. WILLIAMS:  Okay, thanks.

16          THE COURT:  Mr. Morrissey?

17

18                      CROSS-EXAMINATION

19   BY MR. MORRISSEY:

20   Q.  Ms. Gandara, the swastika incident damaging your city car,

21   do you recall that?

22   A.  Yes, sir.

23   Q.  That was in 1999, correct?

24   A.  Yes, sir.

25   Q.  Okay.  So if the report dealing with the need to separate

HELEN GANDARA - CROSS-EXAMINATION BY MR. MORRISSEY    3259

1    the three employees in the -- in the unit was October 2000, you

2    saw that report, right?

3    A.  Yes, sir.

4    Q.  Then am I correct that the swastika incident had nothing to

5    do with the disciplining or the moving of those three

6    employees?

7            MS. WILLIAMS:  Objection, foundation.

8            THE COURT:  Overruled.

9            THE WITNESS:  It -- it would have -- it had no bearing

10   in us making any form of decision.

11   BY MR. MORRISSEY:

12   Q.  Oh, no.  Let me be clear.  The -- the moving of the three

13   employees happened sometime after October 2000, right?

14   A.  Correct.

15   Q.  The swastika incident happened in 1999?

16   A.  Yes, sir.

17   Q.  Okay.  Therefore, the October 2000 moving of the employees,

18   which happened later in time, could not have been the

19   motivation for the 1999 swastika incident?

20   A.  Correct.

21   Q.  Now, you were asked about who you thought might have done

22   the Scottsdale bombing.  Do you recall those questions?

23   A.  Yes, sir.

24   Q.  When you were interviewed by Inspector Casadei, is it fair

25   to say that one of the first things you told Inspector Casadei

1  was, well, there was this phone call to the diversity office

2  that was upset with the Hispanic Heritage month?

3  A.  Yes, sir.

4  Q.  And you identified the person who made that phone call as a

5  suspect?

6  A.  I -- I said that that might be something that they would

7  want to look into, absolutely.

8  Q.  Had you ever heard that phone call?

9  A.  No, sir.

10  Q.  But you were aware of it?

11  A.  Yes.

12  Q.  Now, you've been assistant chief of police since 1998,

13  correct?

14  A.  Yes, sir.

15  Q.  But you're not knowledgeable about pen and traps, right?

16  A.  Correct.

17  Q.  Is it correct that a lot of your -- a lot of your job and

18  your responsibilities go to the civilian side of the police

19  force?

20  A.  Yes, sir.

21  Q.  And I think you said you may be the highest ranking

22  civilian within the police force; is that right?

23  A.  Yes, sir.

24  Q.  In your capacity as the highest ranking civilian within the

25  police force, have you kept up with the investigation of the

1    Scottsdale bombing with respect to have you reviewed reports of

2    the investigation?

3    A.  No, sir.

4    Q.  Have you read interviews that -- that agents have -- have

5    had with different subjects?

6    A.  No, sir.

7    Q.  Have you reviewed any scientific evidence?

8    A.  No, sir.

9    Q.  Then given that you have not reviewed that type of

10   material, is it fair to say that your opinion as to Steve

11   Anderson's possible role in the bombing is speculation?

12   A.  Yes, sir.

13   Q.  Would any opinion you have as to Glenn Olsen's involvement

14   be similar speculation?

15   A.  Yes, sir.

16   Q.  Would any opinion as to Connie Wyckoff's involvement be

17   speculation?

18   A.  Yes, sir.

19   Q.  Now, the October 2000 report that laid out the pathway by

20   which the employees would be separated, do you recall that?

21   A.  Yes, sir.

22   Q.  And I believe -- well, let me just ask you this:  You were

23   asked whether or not that report was from Don Logan.  Do you

24   recall that question?

25   A.  Yes, sir.

1    Q.  Was that report also from four other people?

2    A.  Yes, sir.

3    Q.  Including Joyce Lira?

4    A.  Yes, sir.

5    Q.  Including Pam Muir?

6    A.  Yes, sir.

7    Q.  Including Lisa Angelini?

8    A.  Yes, sir.

9    Q.  And Rita Sandoval?

10   A.  Yes, sir.

11   Q.  The report was to you and at least two other people,

12   correct?

13   A.  Yes, sir.

14   Q.  And then some other people were cc'd on the report, right?

15   A.  I -- yes.

16   Q.  If you don't recall.

17   A.  I don't recall.

18   Q.  Okay.  Would it refresh your recollection to look at that

19   report to see whether or not you recall whether anybody was

20   cc'd?

21   A.  Okay.

22   Q.  Could you look at Exhibit 798.

23   A.  Okay.

24   Q.  Okay.  Were -- was anybody else cc'd on that report?

25   A.  Yes, sir.

1    Q.  Who was cc'd?

2    A.  Doug Bartosh would have been our chief of police.  Neal

3    Shear would have been our general manager of human resources.

4    And Dan Schmidt would have been our human resources director.

5    Q.  So on the front page of that document, is it fair to say

6    there are 11 names associated with that report?

7    A.  Yes, sir.

8    Q.  And you were the one who sat down with the employees --

9    well, I'm sorry, let me ask this:  You were the one who sat

10   down with at least Mr. Anderson to explain what the outcome was

11   going to be, right?

12   A.  Yes, sir.

13   Q.  Did you similarly sit down with Lupe Gutierrez?

14   A.  Yes, sir.

15   Q.  Did you also sit down with Connie Wyckoff?

16   A.  Yes, sir.

17   Q.  So there's 11 people on that report, but you were the one,

18   is it fair to say, who was the messenger for the decision that

19   had been made?

20   A.  Yes, sir.

21   Q.  Is it fair to say that you never indicated to any of those

22   employees:  This was Don's call, Don Logan's call, and this is

23   the way it's going to be?

24   A.  Yes, sir.

25   Q.  That did not happen?

1    A.  That did not happen.

2    Q.  Now, in speaking about Mr. Anderson, you stated you had an

3    open door policy, right?

4    A.  Yes, sir.

5    Q.  And Mr. Anderson used that open door, right?

6    A.  Yes, sir.

7    Q.  So -- and I think you said that you had consistent

8    conversations with Mr. Anderson?

9    A.  Several, yes, sir.

10   Q.  Okay.  Were those productive conversations between you and

11   Mr. Anderson?

12   A.  In the -- productive in the context of -- of him

13   identifying what his concerns were and me listening, yes, sir.

14   Q.  And so did Mr. Anderson have an outlet for any complaints

15   he had with City of Scottsdale?

16   A.  Yes, sir.

17   Q.  Eventually, though, Mr. Anderson used a lawsuit as an

18   outlet, correct?

19   A.  Yes, sir.

20   Q.  And he sued -- he named you?

21   A.  Yes, sir.

22   Q.  But he didn't name Don Logan?

23   A.  Correct.

24   Q.  Now, when -- when you told Mr. Anderson that he was going

25   to be moved, he said he didn't think that was fair for anyone,

1    right?

2    A.  Correct.

3    Q.  So he was sticking up not only for himself, but for Connie

4    and Lupe, right?

5              MS. WILLIAMS:  Objection, foundation, that calls for

6    speculation.

7              THE COURT:  Overruled.

8              THE WITNESS:  Yes, sir.

9    BY MR. MORRISSEY:

10   Q.  Now, when -- your testimony, I believe, was that

11   Mr. Anderson was a bit of a loner, correct?

12   A.  Yes, sir.

13   Q.  But his -- his supervisor, Connie Wyckoff, thought well of

14   him as an employee, correct?

15   A.  Yes, sir.

16   Q.  And except for his lonerness, and we'll say rigidity, did

17   you -- what did you think of him as an employee?

18   A.  He was an average employee.  I didn't have much interaction

19   with him, so --

20   Q.  Did he get the job done?

21   A.  He got the job done, yes.

22   Q.  And then he was transferred to Glenn Olsen's supervision,

23   right?

24   A.  Yes, sir.

25   Q.  And Glenn Olsen thought well of Mr. Anderson's performance,

1    right?

2            MS. WILLIAMS:  Objection, calls for hearsay.

3            THE COURT:  Overruled.

4            THE WITNESS:  Yes, sir.

5    BY MR. MORRISSEY:

6    Q.  And okay.  Now, in terms of the release in, I believe we

7    established it was -- you think it was about fall of 2003, of

8    personal information about you, do you recall those questions?

9    A.  Yes, sir.

10   Q.  There was an internal investigation, and I believe you

11   identified Mr. Olsen and Mr. McMahon as people who were

12   investigated with respect to that, right?

13   A.  Yes, sir.

14   Q.  So are you suggesting that Steve Anderson had anything to

15   do with the release of personal information of yours?

16   A.  I can't substantiate that, nor have I ever read the formal

17   internal investigation.

18   Q.  And so as we sit here today, there's not a shred of

19   evidence that Mr. Anderson had anything to do with that?

20           MS. WILLIAMS:  Objection, misstates testimony.

21           THE COURT:  Overruled.

22           THE WITNESS:  I don't know that.  I don't know who did

23   that for certain.  Correct.

24   BY MR. MORRISSEY:

25   Q.  And so if you don't know who did it, you don't have any

1    evidence that Mr. Anderson did it?

2    A.  Correct.

3    Q.  And he wasn't even investigated for it.  The people

4    identified as people who should be investigated for it were

5    Mr. Olsen and Mr. McMahon, right?

6    A.  I believe so.  Yes.

7    Q.  Now, when you talked to Inspector Casadei, your statement

8    was that Steve Anderson blamed you for the demise of the crime

9    lab, correct?  That's what you told Inspector Casadei?

10   A.  Okay.

11   Q.  Well, do you recall stating that to Inspector Casadei?

12   A.  Not verbatim.

13   Q.  Okay.  Would -- would looking at the report possibly

14   refresh your recollection?

15   A.  Yes, sir.

16   Q.  Would you look at Exhibit 813, which I believe is in front

17   of you.  And if you could look at the fourth paragraph.

18   A.  I'm not seeing that on the first page, fourth paragraph.

19   Q.  With the -- if you could read the paragraph that begins "we

20   then discussed."

21   A.  On the first page?

22   Q.  Yes.

23        THE COURT:  Then you want her to set it aside and

24   testify from her recollection.

25        MR. MORRISSEY:  I do, once we have identified the

 1  correct paragraph.

 2          THE WITNESS:  Yes, sir.

 3  BY MR. MORRISSEY:

 4  Q.  Do you recall telling Inspector Casadei that Steve Anderson

 5  blamed you for the demise of the crime lab?

 6  A.  Yes, sir.

 7  Q.  You didn't tell Inspector Casadei that Anderson blamed Don

 8  Logan?

 9  A.  Correct.

10  Q.  Now, in fact, you told Inspector Casadei that you and Joyce

11  Lira would be more likely targets of Steve Anderson than would

12  Don Logan?

13  A.  Correct.

14  Q.  You have been with the City of Scottsdale for a long time

15  as an employee, correct?

16  A.  Yes, sir.

17  Q.  The -- the swastikas on your car, that was certainly

18  vandalism, right?

19  A.  Yes, sir.

20  Q.  But you were not in the car at the time?

21  A.  Correct.

22  Q.  Okay.  So in the entire time that you have been an employee

23  of the City of Scottsdale, have there been any acts of violence

24  personally directed against you?

25  A.  No, sir.

1  Q.  Would it be fair to say, though, that at least in the time

2  period we've spent most of our time talking about, from 1998

3  through the Scottsdale bomb going off in February of 2004,

4  there was a lot of controversy within Scottsdale?

5  A.  Yes, sir.

6         MR. MORRISSEY:  One moment.

7         Nothing further, Your Honor.

8         THE COURT:  All right, thank you.

9         Redirect?

10

11                    REDIRECT EXAMINATION

12  BY MS. HULL:

13  Q.  Ms. Gandara, you said that the swastika on

14  cross-examination was placed on your car before this report

15  came out from Mr. Logan's office?

16  A.  Yes, ma'am.

17  Q.  Okay.  But you had started your investigation into that

18  unit of Ms. Wyckoff, Mr. Gutierrez and Mr. Anderson prior to

19  that, correct?

20  A.  Prior to the report?

21  Q.  To the swastika event.

22  A.  I'm not exactly sure on the time.  Presumably, yes.  I

23  mean, they worked for me, so -- so presumably I would have been

24  involved in what I earlier testified in terms of looking at the

25  concerns that they had, yes, ma'am, from that perspective, yes.

1    Q.  Okay.  And I believe your direct testimony was that you

2    started that investigation before the swastika event.

3            Do you recall that on direct?

4    A.  Yeah.

5    Q.  When I first talked to you?

6    A.  Um-hmmm.

7    Q.  And so these individuals would likely have been aware by

8    that time that you were looking into their work environment?

9            MR. MORRISSEY:  Objection, leading.

10           THE COURT:  Sustained.

11   BY MS. HULL:

12   Q.  Well, Mr. -- Mr. Morrissey asked you about what you

13   consider speculation, what you considered speculation as to

14   Mr. Anderson and Mr. Olsen, why Mr. Anderson would target

15   Mr. Logan instead of you.  Do you recall that questioning?

16   A.  Yes, uh-huh.

17   Q.  Your information about a phone call from September of 2003

18   that you had never heard, was that also speculation?

19   A.  No, I knew that occurred.  I didn't listen to the phone

20   call.  But I knew that occurred because --

21   Q.  I'm sorry, perhaps I misphrased the question.  You were

22   asked on cross-examination if your opinion that Steve Anderson

23   had something to do with the bombing, that he targeted Don

24   Logan instead of you for whatever reason, that you were just

25   speculating.  Mr. Morrissey asked you if you were just

1    speculating?

2    A.  Yes, ma'am.

3    Q.  Do you recall that?

4    A.  Yes, ma'am.

5    Q.  Were you also speculating when you talked about -- raised

6    the issue of the September '03 call when you talked to the

7    investigators?

8    A.  I wouldn't -- I wasn't speculating that the call occurred

9    if that's what you're asking me.

10   Q.  No, I'm not asking if you were speculating as to whether

11   the call occurred.  I'm asking you whether you were speculating

12   as to it having any relationship to the Scottsdale bombing.

13   A.  Oh, yes, ma'am, uh-huh.

14   Q.  And you -- Mr. -- Mr. Morrissey also asked you about

15   talking about the timing of the swastika on your car in 1999,

16   when you came on board in 1998, you were aware that there were

17   already problems involving Steven Anderson; is that true?

18   A.  Yes, ma'am.

19   Q.  Okay.  And the fact it had dated years prior to your coming

20   to Scottsdale?

21   A.  No, ma'am.

22            THE COURT:  Ms. Hull, how much longer do you think you

23   have on redirect?

24            MS. HULL:  15 minutes.

25            THE COURT:  Okay.  We will go ahead and break.

 1              MS. HULL:  Okay.

 2              THE COURT:  All right.  Members of the jury, we are at

 3      four o'clock.  We will break for the day.  Please remember not

 4      to expose yourself to any information about the case.

 5              And I want to remind the jurors of one other thing

 6      that I mentioned last week, which is that Thursday of this

 7      week, I have to be in court administration meetings, so we

 8      won't be in trial on Thursday.  We will be tomorrow.

 9              We will see you at nine o'clock.  Thank you.

10              (The jury left the courtroom.)

11              THE COURT:  All right.  Thank you.  You may step down.

12              Counsel, do you have anything you would like to

13      address this evening?

14              MR. BOYLE:  We have a couple.  Can we start?  First we

15      are getting right back into this 404(b).  The last question

16      that was asked --

17              THE COURT:  No, Mr. Boyle, but Mr. Morrissey was very

18      deliberate about suggesting a lack of a connection.  It seemed

19      to me that on redirect, it's fair to respond to that.

20              MR. BOYLE:  I didn't realize the witness was here.

21              So what they are saying is they can now try to make a

22      link between Steve Anderson and the swastika incident.  This is

23      precisely what they said they would ask a ruling for you on.

24              THE COURT:  Well, but in the interim what happened was

25      you very clearly delinked them in font of the jury.

1          MR. BOYLE:  Right.

2          THE COURT:  So redirect presumably can go into what

3    you covered on cross.  That's the only reason I didn't go in

4    and say this is 404(b), because they were responding directly

5    to a point that you made on cross.

6          MR. BOYLE:  But the -- well, I mean, we had to clear

7    that up, because we were left with the connection of Steve

8    Anderson to the swastika.  But my point was your ruling, if

9    they want to try to link Steve Anderson back up to the

10   swastika, they had to ask you.  Isn't that what they were

11   doing?

12         THE COURT:  It seems to me that they were responding

13   to what you did on cross.  And there was no objection as well

14   at the time they went into it.  I did note that.

15         So, I mean, mind you, it is still the same.  If they

16   are going to argue to the jury or try through other witnesses

17   to make the link, they have to raise it with me.

18         MR. BOYLE:  All right.

19         THE COURT:  But when they are responding to what you

20   did on cross and you are not objecting, I didn't think I should

21   interrupt the cross-examination.

22         MR. BOYLE:  We are not understanding the Rule 701, her

23   objections.  We had objected several times about her opinions

24   as to whether or not Glenn Olsen and Steve Anderson could have

25   linked up the Scottsdale bombing to the discipline issue.  And

1    we don't understand your ruling on why that it isn't her

2    opinion under 701.

3                THE COURT:  It is her opinion.  I don't remember it

4    being about that specific issue.  I remember the question being

5    her perception of something and Rule 701 specifically says that

6    lay opinion testimony can be based on the perception of the

7    witness if it's not expert testimony, and it would be helpful

8    to understanding some issue related to the facts in dispute in

9    the case.

10               So I felt each of the questions they were asking were

11   based on the witness' perception formed while she was involved

12   within these incidents and, therefore, were appropriate 701

13   opinion statements.

14               MR. BOYLE:  Well, we will keep that in our --

15               THE COURT:  Object again if you think it's

16   inappropriate.  If you want to ask for a side bar, I'll explain

17   it right at the time.  But every time one of those objections

18   were made, what I asked myself was is this based upon a

19   perception of this witness based on what she was actually doing

20   and is it relevant to some larger issue in the case.  And it is

21   not expert testimony which were the three steps for 701, and it

22   seemed to me that each time those steps were met.

23               MR. BOYLE:  We will do a side bar on that next time.

24               We wanted to make a ruling -- ask the Court to make a

25   ruling about the Pocock testimony.  We objected to the

1    introduction of his testimony, actually, his expert opinion to

2    the inspector that he thought that the author of the note was

3    someone who had a master's education, and the other pieces of

4    that that were objected to, we objected under 702.  You allowed

5    it in, presumably under the -- I think it was under the idea to

6    explain why the agents did what they did.

7         THE COURT:  I'm not sure.  That was my thought.  They

8    were trying to present to the jury an expert opinion in my view

9    on behalf of Professor Pocock.  They were trying to explain

10   what the agents heard him say.

11        MR. BOYLE:  Well, we -- we -- you've seen now on the

12   cross-examination or the redirect of this witness, or maybe it

13   was the direct, does Mr. Anderson have a master's level

14   education.  You can already see that their reason for trying to

15   introduce this wasn't actually the reason they wanted to

16   introduce it.  The only reason to follow up with this witness

17   as to whether or not Steve Anderson had a master's level

18   education was to link it back to the opinion of this Pocock

19   professor that the writer of the note had a master's impression

20   (sic).

21        So my ruling is -- my request for your ruling is this:

22   In cross-examination, they may not argue that Pocock told this

23   inspector that the writer of the note had a master's in

24   education, et cetera, and argue, therefore, you can conclude it

25   is not Dennis Mahon, because all of that was offered not as to

1    opinion testimony under 702, but presumably is not for the

2    truth of the matter and not hearsay.

3              THE COURT:  Your response?

4              MS. HULL:  Judge, my recollection of what the Court

5    instructed and the ruling was that as far as the information

6    from Professor Pocock was how that affected the investigation.

7    And -- and the -- well --

8              THE COURT:  Well, let me ask you this:  Were you

9    intending to put in his opinion under 702 as expert opinion?

10             MS. HULL:  Mr. Pocock?

11             THE COURT:  Yes.

12             MS. HULL:  No, sir, not without him.  We -- no.

13             THE COURT:  Okay.  I didn't think you were.  But are

14   you now going to argue to the jury that an expert has said --

15             MS. HULL:  No.

16             THE COURT:  -- that the author of the note had a

17   master's degree and Olsen does and Mahon doesn't?

18             MS. HULL:  No, sir.

19             MR. BOYLE:  All right.

20             THE COURT:  If you think that comes up again, object,

21   Mr. Boyle.  I agree, my view is that you can't use Professor

22   Pocock as an expert in this case.  You weren't intending to.

23   You didn't notice him as a 702 expert, so you are not going to

24   argue to the jury that they should rely on his opinions about

25   the source of the note in making their determinations.

1          The relevancy of his opinions is whatever leads that

2    gave the investigation.  It sounds like you agree.

3          MS. HULL:  Yes, sir.

4          THE COURT:  Okay.

5          MR. BOYLE:  Well, okay.  We will -- this may come up

6    again.  Just to tell you our concern is this 103(c) allowing

7    all this hearsay in for almost no value.  For example, on this

8    specific question the witness said no, we didn't use any of

9    Pocock's information in following up the investigation.  And

10   yet subsequent questions were allowed to introduce his opinions

11   about the master's level education.  So it didn't really seem

12   to tie at all into what the agents did, what they did because

13   he said we didn't use this at all.

14         So it looks like the defense is arguing, yeah, it

15   really is for this purpose, but in reality under 403, it -- our

16   concern is the jury just really hears, oh, expert said a

17   master's level of education, person hears this and I know these

18   are difficult decisions.  And we will ask for a side bar.

19         THE COURT:  It seems to me if that's your concern,

20   Mr. Boyle, the proper objection is either a relevancy or a 403

21   objection.  I think the objection you made was 702.  And I

22   didn't view this as being admitted as an expert opinion.

23   That's why I overruled it.

24         MR. BOYLE:  Okay.

25         THE COURT:  But I -- I think we understood everybody's

1    view of Pocock.  If you think the issue comes up again, by all

2    means raise it.

3              MR. BOYLE:  All right.  Thank you.

4              MS. HULL:  Judge, I would just like to point out for

5    the record that when Ms. Williams was asking Inspector Sartuche

6    about his conversation with Mr. Pocock, there was no objections

7    to introduction of the characteristics, his opinion as to the

8    characteristics.  It wasn't until I raised the issue later that

9    there was an objection.

10             THE COURT:  Well, whatever, there was an objection and

11   I ruled on it at some point.  I can't remember where it is.

12             I do -- I do have a question that we've never talked

13   about before that I sort of made an assumption on today.  I'm

14   assuming if Daniel Mahon calls a witness and Dennis is calling

15   as well so what you are doing is direct examination.

16             MS. WILLIAMS:  Funny you should say that, Judge,

17   because we have been trying to figure that out among ourselves

18   for quite a while.  We issued -- for a number of reasons

19   relating to administration, we -- we, my office, did the

20   service of all of -- almost all of the subpoenas and so we

21   jointly issued them.  But there are some witnesses that Daniel

22   Mahon is calling and I'm not.  And there are some witnesses

23   that I may be calling and Daniel Mahon is not.

24             THE COURT:  The reason it's relevant is if you are not

25   calling the witness, what you are doing is cross, then you're

1    confined to the scope of what Ms. Hull covers and you don't get

2    redirect.  Today you picked up and went into new scope when you

3    questioned Agent Sartuche and you stood up and took redirect.

4    So I was assuming -- and you didn't ask leading questions.  So

5    I was assuming you were treating this as a witness for both

6    defendants.

7         MS. WILLIAMS:  And actually, Judge, the reason I

8    didn't ask leading questions is because there had been an

9    objection -- there were some objections to my leading and you

10   sustained them.  So I just processed that, oh, I guess I'm on

11   direct.

12        THE COURT:  Well, but you did go on to new subjects.

13   You weren't confining it to the scope of what Ms. Hull covered,

14   so it didn't look like cross.  And you did stand up for

15   redirect.  So it looked like you were viewing yourself as -- I

16   think we need to clear that up.  If -- if the position is the

17   witness they call you're not calling, then we have to treat you

18   as cross and confine you to the scope and you don't get

19   redirect, et cetera.

20        And I think you all ought to talk that out if you

21   think there's going to be an issue.  But I started thinking

22   about that as I was watching what was happening today and kind

23   of came to the assumption that it's a witness for the defense

24   that's been called.

25        MS. HULL:  We've been trying to figure that out among

1    ourselves the two of us -- or the three of us for quite a

2    while.

3              THE COURT:  Any thoughts from the Government on that

4    issue?

5              MR. BOYLE:  No.  You're right.  They just need to tell

6    you, I think we will assume that it's called by the defense

7    unless we hear otherwise.

8              THE COURT:  All right.  Anything else we need to

9    address?  Okay.

10             MS. WILLIAMS:  Nothing.

11             THE COURT:  See you at 8:30.

12             (The court stood in recess.)

13                              *    *    *

14

15

16

17

18

19

20

21

22

23

24

25

3281

1                       C E R T I F I C A T E

2

3

4

5

6           I, MERILYN A. SANCHEZ, do hereby certify that I am

7    duly appointed and qualified to act as Official Court Reporter

8    for the United States District Court for the District of

9    Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 8th day of August,

18   2012.

19

20

21                           S/Merilyn A. Sanchez

22                           MERILYN A. SANCHEZ, CRR

23

24

25