1                    **UNITED STATES DISTRICT COURT**

2                    **FOR THE DISTRICT OF ARIZONA**

3                    _____

4

**United States of America,**        )

5                                     )
                                      )
6                    Plaintiff,       )
                                      )
7          vs.                        )    NO. **CR 09-712 PHX-DGC**
                                      )
8    **Dennis Mahon,**                )    Phoenix, Arizona
     **Daniel Mahon,**                )    February 14, 2012
9                                     )    8:34 a.m.
                     Defendants.      )
10   _____)

11

12             **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

13                  **(Jury Trial - Day 19)**

14         **BEFORE THE HONORABLE DAVID G. CAMPBELL**

15

16

17

18

19

20
Court Reporter:          Merilyn A. Sanchez, CRR
21                       Sandra Day O'Connor U.S. Courthouse
                         401 W. Washington Street SPC-37
22                       Phoenix, Arizona  85003-2118
                         (602) 322-7250
23

     Proceedings taken by stenographic court reporter
24   Transcript prepared by computer-aided transcription

25

1                         A P P E A R A N C E S

2

3    For the Plaintiff:          **John Zachary Boyle**, Esq.
                                 **Michael Morrissey**, Esq.
4                                Assistant U.S. Attorneys
                                 Two Renaissance Square
5                                40 N. Central Avenue, Suite 1200
                                 Phoenix, Arizona  85004-4408
6

7    For the Defendant           **Milagros Anais Cisneros**, Esq.
     Dennis Mahon:               **Deborah Williams**, Esq.
8                                Assistant Federal Public Defenders
                                 850 W. Adams Street, Suite 201
9                                Phoenix, Arizona  85007

10

11   For the Defendant           **Barbara Lynn Hull**, Esq.
     Daniel Mahon:               637 N. Third Avenue, Suite 3
12                               Phoenix, Arizona 85003

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS | VD |
|----------|--------|-------|----------|---------|-----|

MICHAEL CASADEI
By Ms. Hull        3757
By Ms. Williams    3822
By Mr. Morrissey          3836
By Ms. Hull                          3871

TIM LENZEN
By Ms. Williams    3883
By Ms. Hull        3896
By Mr. Boyle              3901
By Ms. Hull                          3905

TRISTAN MORELAND
By Ms. Williams    3910
By Ms. Hull        3926
By Mr. Boyle              3930
By Ms. Williams                      3936

REBECCA WILLIAMS
By Ms. Hull        3940
By Mr. Boyle              3943


E X H I B I T S

| NO. | DESCRIPTION | ID | EVD |
|-----|-------------|-----|-----|
| 538 | | 3775 | |
| 643 | Transcript dated 9-22-10 | 3941 | |
| 770 | Brown envelope | 3914 | 3915 |
| 801 | Handwritten notes | 3793 | |
| 812 | | 3882 | |
| 822 | Box | 3914 | 3915 |
| 823 | Box | 3914 | 3915 |
| 824 | Box | 3914 | 3915 |
| 825 | Box | 3914 | 3915 |
| 927 | Report | 3731 | |
| 929 | | 3822 | |
| 1002 | Report | 3773 | |

```
1                          P R O C E E D I N G S

2

3              THE COURT:  Thank you.  Please be seated.

4              All right, good morning, everybody.

5              MS. WILLIAMS:  Good morning, Judge.

6              MS. HULL:  Good morning.

7              THE COURT:  Welcome back.  I want to talk about a few

8    matters that have been filed by the parties.

9              I have reviewed the motion for reconsideration filed

10   by the defendants and the Government's response.

11             Do any counsel wish to say anything further on that?

12             MS. WILLIAMS:  You are referring to Rebecca Williams?

13             THE COURT:  Yes.

14             MS. WILLIAMS:  Judge, I really don't have anything to

15   add.  I laid out my position and my arguments in the motion.

16             THE COURT:  All right.  Any other counsel wish to

17   speak on that at all?

18             MS. HULL:  Judge, if I didn't join, I do.

19             THE COURT:  Okay.

20             MR. BOYLE:  Nothing else, thank you.

21             THE COURT:  Okay.  I have reviewed both, as I

22   indicated.  I am going to deny the motion for reconsideration.

23   The purpose for which the defense wants to introduce additional

24   evidence about Hot Hawaiian Nights, I believe, is to further

25   show that the informant and the ATF used sex appeal and
```

1  flirtation to befriend the defendants in this case and to

2  entice them to disclose incriminating information.

3          The defendants have already established this point at

4  length, I believe, in this case.  The defense has introduced

5  evidence of the informant's actions with respect to the

6  defendants, the immodest clothing that she wore, the fact that

7  she was an exotic dancer before she began working for the ATF.

8  Defense counsel used that employment to ask her and have her

9  agree that she learned how to use her body to get money from

10 men.

11         The defense has introduced evidence of the informant

12 grabbing Dennis Mahon's crotch, has extensively gone into

13 evidence about a night spent in a motel room, the fact that the

14 informant covered the camera.  It was allowed to introduce her

15 employment with an entity called Hot Hawaiian Nights, and has

16 further gone into issues with the informant about her criminal

17 record or lack thereof, her affiliation with biker gangs, even

18 her brother's work for the ATF.

19         I have been required in this case to draw lines

20 between sufficient evidence to allow a party to make a point,

21 and not so much that it would unfairly prejudice the other

22 party.  I've had to draw those lines with respect to evidence

23 of the defendant's racial views.  I've had to draw that line

24 with respect to Ms. Gandara-Zavala and how far we should go to

25 allow the Government to make an argument without unduly

1    prejudicing the defense.  I've had to draw that line with the

2    informant.

3         My view is that evidence of -- well, implied evidence

4    that the informant worked as a prostitute, which is really the

5    point the defense wishes to suggest to the jury, presents a

6    risk of unfair prejudice that substantially outweighs the

7    additional probative value of this point which would add to

8    many other pieces of evidence that the defense has used to make

9    the same point.

10        And so as I concluded previously, that evidence is

11   precluded under Rule 403.  And I will not reconsider that

12   decision.

13        I have also received the additional briefing on the

14   tax issue.  And I would like to ask a question of Ms. Williams

15   or Ms. Cisneros on this point.  I've reviewed the Government's

16   motion in limine to preclude further use of the tax records,

17   which is at docket 1607.  I've gone back and looked again at

18   the initial motion on this issue, which is docket 1529 and the

19   defense response at 1535.  In responding to the Government's

20   motion in limine, the defense makes no further arguments on why

21   it is legally permissible for the defense to have and to use

22   tax records in this case.

23        As a result of the Government's motion, I have

24   reviewed portions of 26 U.S.C. Section 6103.  When I printed

25   out that statute, the text of the statute was 44 pages long.

1    So I haven't read all of that statute.  But it does appear,

2    upon my review of the statute, that subsection I is the

3    relevant section for purposes of this case.  And the defense

4    hasn't cited any other section.

5          Subsection I(1)(a) states that tax returns may be

6    disclosed pursuant to and upon the grant of an ex parte order

7    by a Federal District Court judge or magistrate under

8    subparagraph B.

9          Subparagraph B then lists several categories of

10   individuals who may seek such an order from a judge.  They

11   include the Attorney General, the Deputy Attorney General, the

12   Associate Attorney General, any Assistant Attorney General, any

13   United States Attorney, special prosecutor, or any attorney in

14   charge of a criminal division organized crime strike force.

15   And those are the only categories that are set forth in Section

16   I(1)(b).

17         The question I have for Ms. Williams and Ms. Cisneros,

18   is why it is you think the Federal Public Defender falls within

19   that authorization?

20         MS. WILLIAMS:  Judge, I will -- I would like to start

21   answering that by starting at why I provided nothing more on

22   this point.  I spent way too much time this weekend reading

23   through that statute, and frankly had to flow chart it because

24   I got so confused by all the subparts and sub sub subparts.  I

25   came to an interesting section in the law that leads me -- I

1    spent a lot of time first on whether the Federal Public

2    Defender is a federal agency, because that seemed to be a big

3    issue.  And I found that while we have been called many, many

4    names over a period of many years, included in those names for

5    purposes of federal law, we are a subdivision, or an agency, we

6    are an adjunct.  We are an arm.  We are many different things.

7         I think that point is arguable in many different

8    directions.  It's very clear we are not a court, because we

9    can't do any of the functions of a court, nor could we be

10   appearing before this Court if we, too, were a court.

11        But when I then moved on to the Sections A and B that

12   the Court had just cited, and did a substantial amount of

13   research on that, I honestly could not find anything else to

14   contribute beyond what I had written in my initial motion or

15   response a week or so ago.  That's why I elected not to present

16   anything further, because I just couldn't find anything on

17   point.

18        We -- one of the things we are not, there's no

19   question, is a law enforcement agency.  There's no way to even

20   argue that.  We just aren't.

21        Having reached that point and agreeing that we are not

22   a law enforcement agency, I elected to stop there because I

23   just don't believe it's even necessary at this point to -- I

24   don't believe the issue now turns solely on this tax statute

25   because the case has shifted once again since the issue first

```
 1    came up, and that's why I turned the motion to Giglio because I
 2    believe that's the real issue now.
 3            And in a way, the tax statute doesn't matter.  Because
 4    now the Government has an obligation to obtain those records on
 5    its own and disclose them.  And so that's why I answered the
 6    motion as I did.  And that's why I have nothing more to give
 7    the Court.
 8            THE COURT:  Ms. Williams, do you have any authority
 9    for the proposition that Giglio requires the Federal Government
10    to disclose tax returns?
11            MS. WILLIAMS:  I think --
12            THE COURT:  Any case on point?
13            MS. WILLIAMS:  I don't have a case on point where the
14    Government has been ordered to disclose or file or a higher
15    court has found it should have disclosed tax records of an
16    informant.  However, when a case has reached the point that
17    ours now has where there -- and this is where Giglio and the
18    cases on which it's based started.  And I don't think anybody
19    in this room wants to get to the point where there has to be a
20    discussion of a retrial, which is where the court in Giglio
21    found itself, where a -- where false testimony has been
22    presented.  And it's clear that there is false testimony.  And
23    in this case with Rebecca Williams, it's an either/or.  Either
24    2010 was true or 2012 was true.  They can't both be true.
25            The Government now knows, as do we, that that problem
```

1    exists.  To allow the case to go any farther without clearing

2    that up and certainly to allow the Government to argue either

3    position, well, she's -- now she says she does, so that must be

4    true, and then argue it to the jury is to perpetuate that

5    falsity.  And that is patently unfair.  It's not allowed.

6          Then the case goes to the Ninth Circuit and the Ninth

7    Circuit is confronted with the Giglio issue of a new trial.

8    Nobody here wants that to happen.  I believe the Government has

9    a very clear obligation to correct this problem while they have

10   the opportunity, rather than be told by the Court of Appeals

11   you should have corrected that problem and it was improper to

12   let it go forward.

13         THE COURT:  Well, let's assume hypothetically,

14   Ms. Williams, that the Government did have an obligation under

15   Giglio to produce the tax returns.  What is it that you think

16   you should be permitted to do with them going forward in the

17   trial from today?

18         MS. WILLIAMS:  I believe I should be -- I should be

19   allowed to go through the documents with her, the documents

20   including the attachments, and to examine them in light of both

21   her previous denial of filing taxes and her changed testimony

22   of filing taxes.

23         THE COURT:  Are you going to seek to put them in

24   evidence?

25         MS. WILLIAMS:  Prior to now, I had not intended to do

1    that.  Now it depends on how she answers.

2            THE COURT:  So your point is you should be able to use

3    those returns to show, if you believe it's true, that she did

4    not pay taxes even though she testified in this trial that she

5    did?

6            MS. WILLIAMS:  Yes.

7            THE COURT:  All right.  Coming back to my first

8    question, and then I have a question for the Government.  In

9    light of the research you did and the statute you reviewed, do

10   you believe there is a provision in 6103 that authorizes the

11   Federal Public Defender's office to obtain tax returns, and if

12   so, what provision is it?

13           MS. WILLIAMS:  Judge, I do not have the specific

14   provision to point to.  I agree.  As I said, I agree with the

15   Court that under subsection B, which talks about law

16   enforcement agencies, we are not a law enforcement agency.

17           THE COURT:  Okay.  Who's going to address it for the

18   Government?

19           Here's my question, Mr. Boyle.  If 6103 is clear in

20   what it says, as you believe it is, why is it that the IRS

21   would produce documents in response to a subpoena from the

22   Federal Public Defender's office?  Why is it that they wouldn't

23   say under the statute that's not allowed and would seek a

24   motion to quash, which I am very confident the IRS seeks fairly

25   often.

1              MR. BOYLE:  I think you have to ask them, but my

2     belief is they made a mistake in thinking they were returning

3     it to an Assistant United States Attorney or to a United States

4     Attorney.  They did not realize this was going to a defense

5     attorney.

6              THE COURT:  Even though the subpoena said the Federal

7     Public Defender's office?

8              MR. BOYLE:  I don't know what the subpoena said.  But

9     you asked me --

10             THE COURT:  I want you to assume it did.  Why would

11    they -- if the statute is as clear as the Government is

12    contending, why would they not say the Federal Public

13    Defender's office isn't covered by the disclosure statute?

14             MR. BOYLE:  I don't know if they read the printed

15    subpoena.  But I'm telling you that the IRS, to our knowledge,

16    you know, we've been -- we've asked them about this.  They know

17    of -- at least it's our belief, they know of no case where

18    these have ever been released to the public defenders.  And we

19    believe that they thought they were disclosing it to a

20    prosecution agency, not defense attorneys.

21             I don't know why they made that mistake, but you want

22    my answer, and that's the answer, because I would be happy to

23    delve into this and we can bring them in.  I believe that what

24    will happen is they will say they thought they were giving it

25    not to defense counsel, but to an Assistant U.S. Attorney.

1          THE COURT:  All right.  Do you have -- what is your

2     response to what Ms. Williams said about the current state of

3     the record in this case and Giglio?

4          MR. BOYLE:  Well, my first thought is it seems odd

5     that the defense asks for these tax records and now says:

6     Well, we don't really know that we had authority to get them.

7     That's perhaps water under the bridge at this point.

8          But my second point is that what is clear is they are

9     never allowed to get them.  The statute does not allow defense

10    counsel to subpoena these through a court order.  The defense

11    never should have had them.

12          So at this point, you have to make a decision whether

13    or not the defense could have these and what do we do.  And the

14    statute is very clear that only certain individuals are allowed

15    to have these tax records, and it's conceded that they don't

16    satisfy that requirement.

17          The Ninth Circuit and the case law says you can't get

18    these from the IRS.  They have to go back.  So then you go to

19    the next question.

20          THE COURT:  The Ninth Circuit?

21          MR. BOYLE:  Well, we filed the Stokwitz case in our

22    brief which says he --

23          THE COURT:  Which brief are you referring to?

24          MR. BOYLE:  The Government's motion to preclude

25    further use of the tax records.  We cited the Stokwitz case and

1   it just says that 6103 is the only means by which a party can

2   acquire information from the IRS.

3           THE COURT:  Okay, it doesn't address records going

4   back?

5           MR. BOYLE:  Correct.

6           THE COURT:  Okay.

7           MR. BOYLE:  But I think you have to -- given the very

8   strict safeguards of this provision, that the defense was never

9   allowed to have these records, they -- so I mean, our position

10  is they need to go back to the IRS.  The defense was not

11  supposed to have these under the statute.  And the IRS, they

12  have to go back.  I don't have a case that says that, though.

13          THE COURT:  Well --

14          MR. BOYLE:  But --

15          THE COURT:  Go ahead.

16          MR. BOYLE:  The second issue, what do you do now,

17  okay, so this is a Giglio claim, we have this Brady issue.  My

18  response is we are not precluding the use of any of this

19  before.

20          Now that you've identified that this was improperly

21  obtained, we are not asking you to strike all of the testimony

22  that was introduced on this issue.  And I went through the

23  transcript of the informant, and the defense piece by piece

24  established how much income she earned each year.  And they

25  asked her questions about whether or not she declared the ATF

income on her taxes.  And the defense has even cited for you

her response in trial was -- and this is on page 2 of their

motion, that she -- she stated:  Did you declare income when

you were paid by the ATF?  She said, "I did."

Then she said that so at the time you testified under

oath that you had not paid your taxes on your income to the

ATF, her answer was it wasn't labeled under the ATF when I

filed.

So the defense has the income for each year.  They've

already asked these questions of the witness.  They've brought

out the fact that she perhaps made an inconsistent statement at

a prior hearing.  So it seems that everything they wanted to

accomplish about impeaching her prior testimony has been

accomplished.

Now what they want to do is go even further into the

tax records and establish specifically why it was under her tax

records she -- I think in this case, it will be shown under

that Schedule EZ form that she lumped everything under her

cleaning service.  Now they can certainly ask her all of these

questions.

I think my question to you at this point is they need

to call the witness, they need to ask these questions about her

memory, how she filed, what she filed, what she declared, and

then perhaps we would have to have another side bar as to

whether or not you think at that point they need additional

 1    evidence or if they have sufficiently asked her questions about

 2    this based upon her memory and how to answer.

 3          Because at some point our position will be they have

 4    thoroughly investigated the tax issue.  At some point, in a

 5    trial about the defendants and the bombing, the impeachment of

 6    the informant on tax records at some point has to have a limit.

 7    And we will probably say they've reached that limit.  But we

 8    don't think that they can continue to use these tax records if

 9    they weren't properly obtained.

10          THE COURT:  Well, it sounds as though you're saying,

11    Mr. Boyle, that you think that the defense can ask additional

12    questions about her tax filings.

13          MR. BOYLE:  Yes.

14          THE COURT:  Namely, how did she report the information

15    to the ATF.

16          MR. MORRISSEY:  Judge, I think you just said how did

17    she report to the ATF.

18          THE COURT:  I'm sorry, to the IRS.  And establish --

19    it sounds like you believe the defense can establish if she

20    says this is what she did, that the way she reported it was to

21    lump it into the income from her cleaning, her house cleaning

22    business without separating it out.

23          MR. BOYLE:  Agreed.

24          THE COURT:  And if she says:  No, I disclosed it

25    separately, and the returns clearly don't show that, what then?

1          MR. BOYLE:  We address the issue.  But her testimony

2    so far has been she did declare it, she just didn't list it

3    under ATF.  Your hypothetical perhaps raises a good point that

4    it may not be relevant to this case.  I think we've seen from

5    her answer she said she lumped it in here.

6          THE COURT:  Here is my problem.  This is not an easy

7    issue.  If we end up at a side with this issue, and I have to

8    decide in light of what's come out whether under the federal

9    statute I can allow them to ask her questions about the tax

10   return, that's not something I want to shoot from the hip on.

11   That's something that I think needs more consideration.

12         I take it, though, your position would be, at that

13   side bar, that if we get to the point where she is saying

14   something that appears clearly to be inconsistent with what is

15   on her tax return, the defense cannot use the tax return to

16   impeach her.  Is that correct?

17         MR. BOYLE:  I think that's our position.  Yes.

18         THE COURT:  All right.  What I think I need to do then

19   is -- I'm going to have a law clerk look at this issue and see

20   if there's anything that you all might have missed.  I doubt

21   that's the case, but I want to look independently and see if

22   there's any authority besides 6103(i) for the disclosure or any

23   authority suggesting the Federal Public Defender can get it

24   under that provision and look at the Giglio issue as well.  And

25   I'll get somebody going on that while we go forward with other

1  witnesses this morning.  So that hopefully by the noon hour,

2  I'll have the results of that research.

3       MR. BOYLE:  Let me make two points for the Government.

4  First is although it hasn't been asked by you of us, we don't

5  agree that she's given false testimony.  But we agree that

6  there's been a record back and forth.  We are not conceding

7  that she's lied.

8       The second thing I want to note is we do not agree

9  with the defendant's assertion about the amount of money that

10  was paid to the informant.

11       I have -- I don't want to use that word.  We don't

12  agree that the record shows in any effect that when the defense

13  says that she declared nearly $50,000 of informant income, that

14  is not a true statement.  The parties have all discussed this.

15  And when we discussed it as a group, it was established

16  initially that she received $45,000 in payment and 27,000 of

17  that was income.  18,000 was reimbursement.  Then we had an

18  additional payment of $3,000 from Missouri because of the Joos

19  investigation, so it went up to $48,000 and $30,000 of income.

20       So we don't want the record to show that we agree that

21  she received $50,000 of income, because we believe the defense

22  is well aware that her actual income was $30,000 from the

23  period of 2004 to 2012.

24       THE COURT:  All right.  Your position, I think, on

25  that is clear.

```
 1              MS. HULL:  May I be heard, Judge?

 2              THE COURT:  Pardon?

 3              MS. HULL:  May I make a point?

 4              THE COURT:  Yes, you may.

 5              MS. HULL:  My point only is that after she testified,

 6    the Government made the argument that all of that income was

 7    included in the cleaning source.

 8              THE COURT:  But they made it to me.  They didn't make

 9    it in front of the jury.  Right?

10              MS. HULL:  Correct.  And I believe that that argument

11    under the circumstances makes -- opens the door to us

12    cross-examining on the issue.

13              THE COURT:  Well, it sounds as though the Government

14    is not taking the position that the defense is foreclosed from

15    asking additional questions about how she reported her income.

16    The issue is whether the tax returns can be used as part of

17    that process.  And I just need to finish this legal research

18    before I decide that issue, which I will get my law clerk going

19    on that.

20              Ms. Williams?

21              MS. WILLIAMS:  And, of course, Judge, our position at

22    the end of the day is that whether or not 6103 encompasses the

23    Federal Public Defender, confrontation trumps all as a general

24    rule.

25              THE COURT:  Confrontation, what do you mean?  I mean,
```

1    the witness is here.  She's being confronted.

2         MS. WILLIAMS:  Well, the witness is here, Judge.  But

3    if we start cross-examining her and she takes a position that

4    we know is false but we can't use the -- the exhibit to impeach

5    her, then that's not exactly full and fair confrontation.

6         THE COURT:  Okay.

7         MS. WILLIAMS:  And the other thing, Judge, that I

8    think we can all see, there's a real tax law morass here that

9    it's just a little down the road, is when we start quibbling

10   about whether -- how much of $48,000 is income and what is

11   reimbursement taxable, I think that exceeds all of our scope of

12   expertise.  Maybe Your Honor's excluded, I don't know that, but

13   certainly all of ours at this table.  And I would assert that

14   it is taxable income.  But I would also seek expert guidance on

15   that.

16        THE COURT:  Well, we are not going to turn this into a

17   tax trial.  But the Government has said what it thinks you can

18   go into.  You can go into that.  I'm going to look at the issue

19   of whether the tax returns can be used.

20        We are at nine o'clock.  Let me ask one other quick

21   question.  The motion to continue trial that you filed,

22   Ms. Williams, after you got this letter from the fellow in

23   Missouri, I'm assuming I can deny that motion?

24        MS. WILLIAMS:  Yes, Judge.

25        THE COURT:  Okay.  All right, are there any other

1   matters you all wish to raise?  Ms. Cisneros?

2           MS. CISNEROS:  Yes, Your Honor, the joint motion to

3   strike.  There's been substantial back and forth on that.

4   There have been four pleadings filed since yesterday afternoon.

5           THE COURT:  Well, since 6:30 last night when I last

6   looked at the docket.

7           MS. CISNEROS:  That's correct, Judge.  And --

8           THE COURT:  I haven't read any of them.

9           MS. CISNEROS:  Okay.  The issue I'll tell you is -- is

10  very big and important for us, so to the extent that the Court

11  can take some time as soon as possible, I would urge the Court

12  to do so.  And it involves whether we rest our case today or

13  not.

14          THE COURT:  Ms. Williams, another question to you.  In

15  addition to the motion to continue trial that you filed, you

16  filed a motion for a Henthorn review based on the letter from

17  the fellow in Oklahoma.  I'm assuming I can deny that one as

18  well?

19          MS. WILLIAMS:  I'm not sure.  While I believe it is a

20  different person, Judge, I can't prove that a hundred percent.

21  So I would like the Government's response on it before the

22  Court rules on that part.

23          THE COURT:  Well, Henthorn review is an obligation

24  that's placed on the prosecution.

25          MS. WILLIAMS:  Right.

1          THE COURT:  You've made the request.  Is there more

2     that you want me to do on this motion where you ask me to do a

3     Henthorn review based on this Oklahoma letter?

4          MS. WILLIAMS:  We are asking for any additional

5     information the Government has that would fall under Henthorn,

6     including anything that they would seek to submit in camera for

7     review.

8          THE COURT:  Mr. Boyle or Mr. Morrissey?

9          MR. BOYLE:  There's nothing additional to submit to

10    you or the defense.  We've gone through it.  We've disclosed

11    redacted copies of the informant file.  There's no additional

12    Henthorn for either you or the defense to do.

13          And we wanted to make another issue that they had

14    about 1099s.  That's a different motion.  But let's finish this

15    and put our notes on the record for that.

16          THE COURT:  Well, I am going to deny this motion for

17    Henthorn review.  It sounds like the Government has looked on

18    the basis of the Oklahoma letter for additional information and

19    has not identified any.  So that's docket --

20          THE COURTROOM DEPUTY CLERK:  1550.

21          THE COURT:  1550.

22          MS. WILLIAMS:  Judge, I believe there is also an

23    outstanding motion filed by Ms. Hull and joined by Dennis Mahon

24    about disclosure of 1099s, W-2s or their equivalent.

25          THE COURT:  That's what Mr. Boyle just referred to,

1    right?

2              MR. BOYLE:  Judge, as we stated, we did follow up with

3    ATF supervision.  We talked to their in-house counsel.  He sent

4    an e-mail response, and he said miscellaneous payments from

5    agent cashier funds, there are no 1099 or other tax forms

6    issued by the ATF for tax year due, it is the CI's

7    responsibility for the payment of appropriate taxes.  So the

8    answer is they do not issue 1099s or equivalent forms regarding

9    informant payments that we have in this case.

10             THE COURT:  All right.  That seems to me to respond to

11   that issue, Ms. Williams.  Do you agree?

12             MS. WILLIAMS:  It seems to, Judge.

13             THE COURT:  Ms. Hull?

14             MS. HULL:  I join.

15             THE COURT:  All right.  I'm then going to deny the

16   motion dated February 9th for disclosure of 1099s since they

17   don't exist.  It's 1597.

18             All right.  We still have to address the partial

19   judgment of acquittal issue that I think we don't have final

20   briefing on.

21             MS. HULL:  Judge, the way I read that, I believe the

22   only issue remaining outstanding is the issue under Rule 7.  I

23   believe that that issue is not -- and will not be ripe until

24   the close of evidence.

25             THE COURT:  That's fine.  I just wanted to make sure

1    it's still on our radar.

2            MS. HULL:  Yes, sir.

3            THE COURT:  Anything else that we need to do before we

4    get started this morning?

5            MS. CISNEROS:  Your Honor, just how you would like

6    the -- and I don't know, maybe the discussion has already been

7    had with Traci, but how you would like the Morrison deposition

8    to be played.  Is there a specific --

9            THE COURT:  I assume you got my rulings on the

10   objections last night?

11           MS. WILLIAMS:  Yes, Judge.

12           MS. CISNEROS:  We did.

13           THE COURT:  And you now have a videotape?

14           MS. CISNEROS:  Yes, we do.

15           THE COURT:  It seems to me whenever you decide to call

16   her, we will play the videotape.

17           MS. WILLIAMS:  Judge.

18           MR. MORRISSEY:  Go ahead.

19           MS. WILLIAMS:  Okay, one thing we have done is we took

20   the deposition.  We synced it up to the tape.  We have provided

21   the Court and counsel separately with a transcript from the

22   court reporter and with an unsynced tape.  So it's just a bare

23   tape of the video.  There is a portion of the tape at the very

24   end, my understanding it's just a couple of minutes, where we

25   all left the room.  Then we went back into the room and then

1    the sound -- something happened in the equipment, there is no

2    sound.

3            What we did is on the synced version, we took the

4    deposition transcript and somehow -- and typed that in.  It

5    doesn't sync up perfectly with the lips, but we've reflected it

6    on the tape.

7            MR. MORRISSEY:  Okay.  I just want to make sure that

8    as with every other exhibit, what will actually go to the jury,

9    though, will be the unsynced tape.

10           MR. BOYLE:  No.

11           MR. MORRISSEY:  Okay.

12           (A discussion was had between counsel and not

13    reported.)

14           MR. MORRISSEY:  Right.  That we will play it for the

15    witness and that's it.  It's just like any other testimony.

16           MS. WILLIAMS:  There is no witness.

17           MR. MORRISSEY:  But the deposition, which the jury

18    will see and hear, is the testimony.

19           THE COURT:  Yeah, this is -- this is not an exhibit

20    that goes back to the jury.

21           MR. MORRISSEY:  Exactly.

22           THE COURT:  This is testimony.

23           MR. MORRISSEY:  Mr. Boyle's point.

24           THE COURT:  So we will play it for the jury and the

25    disk, with it on it, won't go back with the exhibits.  It will

1    be like one-time exposure to any other testimony in the case.

2            MS. WILLIAMS:  What I would suggest for ease of the

3    court reporter, if the Government has no objection, is that the

4    court reporter would not have to try and transcribe it while

5    playing, because there are sound issues, but there is an

6    official court reporter transcript that can be incorporated

7    into the record.

8            MR. MORRISSEY:  The Government agrees.

9            THE COURT:  Okay, then, what again, I will leave it to

10   you to put in the record, so you ought to file a notice with

11   the record of the Morrison transcript attached, because it

12   won't be an exhibit.  It will be in the docket as a record in

13   that fashion.  And that way Merilyn doesn't have to try to take

14   it down during the testimony.

15           MR. MORRISSEY:  Your Honor, the calling of Agent

16   Casadei for the two points -- there's three points you allowed

17   impeachment of Mr. Logan, but Agent Casadei only speaks to two

18   of them.  I just want to note that one of the impeaching

19   exhibits is handwritten notes that he didn't write and he has

20   no recollection of.  So if counsel actually goes down that road

21   and tries to use that Exhibit 929, I believe it is, to impeach

22   Mr. Logan on that point, I'll have a requested voir dire of the

23   witness at that point.

24           THE COURT:  All right.  Anything else we need to raise

25   before we get started with the jury?

1          MR. BOYLE:  The defense is calling Willie Mahon, which

2    is a relative, I think, of Daniel Mahon.  We -- obviously we

3    don't know what he is going to say.  We have two issues.  One

4    is, we are not sure how he's relevant.  We are worried that he

5    might introduce character evidence.  We will address that if

6    those questions come out.

7          The second is if he's trying to present alibi

8    evidence, there's been no evidence of alibi.  Again, we are

9    shooting in the dark here because we don't know what he is

10   going to testify to, but if alibi is an issue for this witness,

11   I think we need to address that with the Court before he

12   testifies because it's never been noticed by the defense.

13         THE COURT:  Is this an alibi witness?

14         MS. HULL:  No, Judge.

15         MR. BOYLE:  Thank you.

16         THE COURT:  Okay, we will bring the jury in.  No, we

17   won't?

18         All right.  Nancy tells me that one of our jurors is

19   stuck on the freeway.  She's on the 60.  She's about 10 or 15

20   minutes away.  Obviously we should wait in my opinion for her

21   to arrive.

22         MS. CISNEROS:  Give you a chance to read this, Judge.

23         THE COURT:  I have in front of me three documents

24   filed by the defense, none by the Government.  I assume there's

25   one by the Government that's missing.  There's a joint motion

 1    to strike.  There's a reply to the Government's response, and a

 2    joinder and supplement to the reply.

 3            I assume there's a Government response in there

 4    somewhere?

 5            MR. BOYLE:  1633.

 6            THE COURT:  All right.  Traci, would you print that.

 7            Tell me when this issue needs to be addressed.

 8            MS. CISNEROS:  As soon as possible, Judge, because it

 9    impacts our scheduling.

10            THE COURT:  What does it impact specifically?

11            MS. CISNEROS:  Well, we filed a motion -- we filed our

12    motion asking you to strike Exhibits 214, 215.  The Government

13    has now changed positions to argue that those records pertain

14    to Dennis Mahon when it had been all along arguing for the past

15    two weeks that it pertains -- that they pertain to Daniel

16    Mahon.  So that is obviously a -- a huge issue for us.  And it

17    has impacted -- already impacted our witness decisions about

18    witnesses and the decision to not call our --

19            THE COURT:  Well, tell me, Ms. Cisneros, exactly when

20    it becomes an issue today.  What witness is it going to present

21    an issue for?

22            MS. CISNEROS:  Our expert witness, if we have to fly

23    him out here.

24            THE COURT:  Okay.  So it's a matter of you finding out

25    whether or not you need to have that fellow get on a plane, is

1    that it?

2              MS. CISNEROS:  Well, Your Honor, I mean, I think it's

3    deeper than that, and obviously the argument goes far beyond

4    that.

5              THE COURT:  Well, I'm trying to get a sense --

6              MS. CISNEROS:  But yes.

7              THE COURT:  -- what I need to do to help you.

8              MS. WILLIAMS:  Judge, scheduling wise, we may well --

9    we may otherwise finish up today or early tomorrow.  If we need

10   to fly our expert out here from Florida, obviously we've got to

11   get him on a plane today.

12             THE COURT:  Okay.

13             MS. WILLIAMS:  At a grossly inflated price.

14             THE COURT:  Okay.  I will go back and look at these

15   and get my law clerk going on that tax research, and then we

16   will bring the jury in as soon as we get our delayed juror

17   here.

18             MS. CISNEROS:  Thank you, Judge.

19             (A recess was taken.)

20             THE COURT:  Thank you, please be seated.  Good

21   morning, ladies and gentlemen.

22             THE JURY:  Good morning.

23             THE COURT:  Thank you for being with us this morning.

24   Same question I've asked after every break.  Were any of you

25   exposed to any information about this case over the weekend?

 1            I see no hands.

 2            Okay, we are going to continue with defense witnesses.

 3    Ms. Hull.

 4            MS. HULL:  Thank you, Judge.  Defendant calls Michael

 5    Casadei.

 6            (The witness, Michael Casadei, was duly sworn.)

 7            THE COURTROOM DEPUTY CLERK:  Please have a seat, sir.

 8    Please remember to speak into the microphone.  Water if you

 9    need it.

10

11                        MICHAEL CASADEI,

12    called as a witness herein, having been first duly sworn, was

13    examined and testified as follows:

14

15                        DIRECT EXAMINATION

16    BY MS. HULL:

17    Q.  Good morning, sir.  Please state your name and spell your

18    last name.

19    A.  Good morning.  Michael Casadei, spelled C-a-s-a-d-e-i.

20    Q.  How do you pronounce your last name?

21    A.  Casadei.

22    Q.  Casadei.  I apologize.  In your absence I've been

23    butchering that.

24            Sir, how are you employed?

25    A.  I'm retired.

1    Q.   From?

2    A.   I was a U.S. Postal Inspector for 33 years and I work part

3    time, if you're interested in that, but I've been retired from

4    the Postal Inspection Service since 2005.

5    Q.   And what do you do part time?

6    A.   I'm a baseball scout for the Tampa Bay Rays and also do

7    some contract work for the Government.

8    Q.   What kind of contract work for the Government?

9    A.   Background investigation work.

10          MR. MORRISSEY:  Your Honor, could the witness pull the

11   microphone a little closer and speak up?

12          THE COURT:  Sure.

13   BY MS. HULL:

14   Q.   Thank you, sir.

15          In your -- I think you said 33 years as a postal

16   inspector?

17   A.   Yes.

18   Q.   Okay.  What, sir, in your opinion is the difference between

19   an investigative lead and a suspect?

20   A.   Well, I think suspect is somebody that's targeted in an

21   investigation.  And an investigative lead could be anything

22   from an evidentiary lead to a person.

23   Q.   And a person investigative lead, how does one go from being

24   an investigative lead to becoming a suspect?

25   A.   Well, if there are indicators within the investigation that

 1    the investigative lead is somehow associated with the crime,

 2    then that person becomes a suspect.

 3    Q.  What kind of factors do you consider in determining --

 4    making that determination of someone going from an

 5    investigative lead to a suspect?

 6    A.  Well, if there's any testimonial evidence that comes forth

 7    that would link the person to the crime or physical evidence

 8    that would link the person to the crime.

 9    Q.  So once -- once someone is -- let me ask you this:  Is

10    there a policy within your department, within the Inspection

11    Service about formally naming someone as a suspect?

12    A.  I don't recall that being a policy, no.

13    Q.  Would you agree that there could be ramifications to an

14    individual if they were named as a suspect?

15    A.  Could you repeat that, please.

16    Q.  There could be ramifications to an individual named as a

17    suspect, would you agree?

18    A.  I guess there could be, but, you know, I think there are

19    times when somebody is a suspect and then they no longer become

20    a suspect.

21    Q.  How did you become involved in the Scottsdale bombing from

22    September -- I'm sorry, February of 2004?

23    A.  I was -- for many years, I was their bomb investigation

24    coordinator for the Inspection Service.

25    Q.  Tell us about that experience and what your job entailed.

1    A.  Well, beginning in about 1984, I started working bomb

2    investigations in Los Angeles and then got transferred to

3    Phoenix where I became the coordinator.  And basically I was on

4    a -- I responded to all bombings that occurred in the western

5    part of the United States as part of a regional task force.

6    Q.  And what were your duties once you responded?

7    A.  It varied whether -- if the bombings occurred in the states

8    that I was responsible for, I would be the lead investigator.

9    If not, I would assist other investigators in bomb

10   investigations.

11   Q.  And did you -- you were employed in that capacity when --

12   in February of 2004?

13   A.  I was, but I was transitioning out.  My partner and I

14   worked all the bomb investigations for the preceding 20 years.

15   We needed to get somebody else involved.  And we were both

16   retiring on exactly the same day.  So we needed somebody else

17   to work this case.  And generally bomb cases continue for quite

18   a bit of time.  So we needed somebody else to be in charge of

19   the investigation.  So he and I worked primarily as basic

20   investigators at that time rather than lead agents in the case.

21   Q.  Who was your partner?

22   A.  His name was Raul Vargas.

23   Q.  And did he -- well, did you respond to the Scottsdale bomb

24   in February of '04?

25   A.  Yes, I did.

1  Q.  And when you responded, did you -- do you recall what the

2  scene looked like when you arrived?

3  A.  Well, there were many officers standing outside the office

4  where the bombing occurred, if that's what you're interested

5  in.  And there was a lot of discussion going on as to how --

6  primarily what I do is I've been involved in lots of blast

7  scene and post-blast investigations.  So I'm usually the lead

8  person from our agency to do a post-blast investigation.

9         So I think a lot of discussion was going on about how

10 we were going to do the blast scene search and that's when I

11 arrived.  So I got there maybe 15 minutes, half an hour after a

12 lot of other people had responded.

13 Q.  And once you arrived, were you allowed immediately inside

14 the blast scene?

15 A.  No.

16 Q.  Can you describe -- tell us why and what you saw in -- what

17 prevented you from entering the scene?

18 A.  Well, I think there was discussion as to how we were going

19 to approach it and who was going to go into the blast scene to

20 initially survey the blast scene and kind of determine how much

21 help would be needed in the blast scene.

22         So there's a lot of those discussions.  You don't want

23 many people going in there because you can possibly walk out

24 with evidence on their feet and so forth.  And many people who

25 assist aren't really that experienced, so you try to keep the

1    blast scene as close to what it looked like after the

2    detonation as possible.

3           And after those discussions were held with Scottsdale

4    P.D., ATF, and I think maybe FBI may have been there also, then

5    we determined who would go in and take a look at the blast

6    scene.

7    Q.  So was it a group effort between these agencies?

8    A.  There were several agencies.  And I think in the blast

9    scene, I know there was Scottsdale P.D. and postal inspectors

10   and I don't recall exactly if there were ATF agents, but I'm

11   sure there were.

12   Q.  And what precautions did you take and what precautions did

13   you see taken in order to preserve the integrity of the blast

14   scene?

15   A.  Well, you know, as we went in, typically what you do is our

16   approach is you kind of work the blast scene from out and into

17   the seat of the explosion.  So you're finding evidence further

18   away from the explosion and you seal off areas where -- where

19   you've conducted the search and gathered all the evidence

20   necessary.  And then you work -- work toward the seat of the

21   explosion where you are picking up more and more evidence.  So

22   that's typically the way we do it.

23           And in that particular case, I know that people were

24   working different areas so there were different parts of the

25   building that people were working.

1   Q.  Was the scene secured when you arrived?

2   A.  Yes.

3   Q.  How was it secured?

4   A.  I think there were Scottsdale Police officers that would

5   not allow access to anybody that wasn't authorized.  And

6   then -- and there again, I can't recall specifically.  But

7   typically, a log is generated as to who goes in and out of the

8   blast scene, and I can't say for sure if that was done.  But

9   I'm assuming that it was.

10  Q.  Did you -- did you wear or see worn any protective clothing

11  by those that entered the blast scene?

12  A.  I just don't recall.  I don't know whether we did or

13  didn't.  I don't remember that.

14  Q.  Did your Inspection Service have a policy as to what, if

15  any, attire should be worn when entering a blast scene?

16  A.  Well, you know, it's basically what you're wearing.  So

17  I've been in blast scenes where I happen to be in a suit and

18  have been called to a blast scene, and also been prepared to

19  enter a blast scene.  And that would just be regular blue jeans

20  and shoes and so forth.

21          MS. HULL:  Excuse me one moment.

22  BY MS. HULL:

23  Q.  When you arrived at the scene, sir, I'm going to come back

24  to that in just a moment.  We have some photographs to show

25  you.

1          When you arrived on the scene, do you remember --

2    well, did you go on -- inside the blast scene alone or with

3    others?

4    A.  At that time, I only remember me being in there.  And that

5    could be just because I was really focused on looking for

6    things.  I don't remember -- you know, there could have been

7    other agents in there.  They could have gone in before me, you

8    know.  I just remember me being in there alone at the seat of

9    the explosion.

10          MS. HULL:  Judge, I believe 806 and 807 are in

11   evidence if I may publish.

12          THE COURT:  You may.  Do you need them from Traci?

13          MS. HULL:  I don't believe so.  Traci, I think I can

14   do it this way.

15          THE COURTROOM DEPUTY CLERK:  Would you like me to pull

16   them for the witness?

17          MS. HULL:  May I put them on the Elmo?

18          THE COURTROOM DEPUTY CLERK:  Okay.

19          MS. HULL:  Permission to publish 806?

20          THE COURT:  You may.

21   BY MS. HULL:

22   Q.  Sir, do you see the photograph on your screen?

23   A.  Yes.  Yes, I do.

24   Q.  Do you recognize anything in that photograph?

25   A.  I recognize Tristan and I see that they are wearing what

1    could be jumpsuits, possibly.

2    Q.  Sir, could you talk into the microphone?

3    A.  Yes, I'm sorry.

4           THE COURT:  You can actually pull it up a little and

5    bend it at the top so it's a little higher.  Thank you.

6    BY MS. HULL:

7    Q.  I'm sorry, could you answer that last question, you

8    recognized what?

9    A.  Tristan.  And it appears that people are wearing some sort

10   of jumpsuit, overall.

11   Q.  Do you recognize where he is standing?

12   A.  I'm guessing outside the general office complex there that

13   led to the offices within the building.

14           MS. HULL:  Permission to publish 807?

15           THE COURT:  You may.

16   BY MS. HULL:

17   Q.  Sir, do you recognize anything in that exhibit?

18   A.  That's the interior of the building.  I am -- I do

19   recognize that.  And then I know there were a series of offices

20   there.

21   Q.  And the attire that you see on the individuals in that and

22   the last photograph, did you see that type of attire being used

23   at that scene?

24   A.  I don't remember that specifically.  But I do see that in

25   the photo.

1  Q.  Did you have that type of equipment available to you?

2  A.  I may have.  I don't recall.

3  Q.  Have you used that type of equipment?

4  A.  In the past at blast scenes that I've entered?

5  Q.  Yes.

6  A.  I have not.  But I could have there.  If that was the

7  protocol for entering the blast scene, then I would have worn

8  that.

9  Q.  And what's your understanding of the purpose of an outfit

10 like that in a blast scene?

11 A.  It's basically to eliminate contamination and so forth.

12 And many times, you know, I'm looking at that.  If there is

13 hazardous fluids around, to protect yourself.

14 Q.  So to protect your scene as well?

15 A.  Yes.

16 Q.  Sir, when you investigated this case, do you remember how

17 long you were at the scene that day?

18 A.  Quite a while.  Typically when I go into the blast scene,

19 we are doing the blast scene for multiple days, not hours.

20 That particular day, I know it went into the evening and

21 possibly into the morning.  I don't recall.  But it's generally

22 you're there for quite a long time.

23 Q.  And as part of your -- did you continue in the

24 investigation of this case past the date of the explosion?

25 A.  Yes, I did.

1  Q.  And what was your involvement in the investigation?

2  A.  Well, I know I went back to the blast scene multiple times

3  looking, you know, there's lots of places that components and

4  parts of the bomb can fly.  And so I know we went up into the

5  ceilings and under walls and x-rayed doors to see if there were

6  possible components within doors.  So, you know, I would guess

7  that I was there multiple days before we cleared the scene.

8  Q.  Okay.

9  A.  And then after that, I took part of the investigation.  You

10 know, I went to -- spent time with the victim.

11 Q.  Okay.  If I can back you up just a second before you go

12 there.

13        On the date of the blast, were there other

14 investigators and inspectors, agents, who were also specialized

15 as you were in explosives?

16 A.  Well, not from our agency.  I don't -- there were -- my

17 partner and I were the only two experienced bomb people that I

18 can recall from our agency.  There might have been some

19 inspectors who came from other agencies who had prior

20 experience doing bomb investigations.  But my partner, Raul

21 Vargas, and I were the only ones that I was aware of who had

22 been to any prior blast scenes as part of an actual explosion,

23 not trained.  Some of the people there may have been trained at

24 our academy and maybe cross trained with other agencies.  But I

25 don't recall any of them being involved in any blast scenes

1  other than Raul Vargas and I.

2  Q.  Did you participate in any discussions with other law

3  enforcement at the scene as to what it is you were finding and

4  what it meant to you?

5  A.  Yes.

6  Q.  Okay.  Do you remember who you spoke with?

7  A.  I know that we had multiple meetings with ATF and

8  Scottsdale Police Department over the blast scene.

9  Q.  After the scene itself, the date of the explosion itself,

10  what was your next step in -- as your part of the

11  investigation?

12  A.  Well, like I said, I spent a lot of time, you know, I'm

13  really concerned about making sure we don't miss anything at

14  the blast scene.  So, you know, typically I always spend at

15  least three days at a blast scene just going back and forth to

16  see if I can see anything new.  And in between that, I know I

17  went to the hospital to interview Don Logan and also concerned

18  about getting evidence that Don may have had within his body or

19  in his clothing at the hospital.

20          When victims are taken away, there's a good

21  possibility that there could be some evidentiary material

22  relating to the bomb in the victim or in the victim's clothing.

23  Q.  Do you recall who was assigned as case agent from your

24  service?

25  A.  At that time I think it was John Curran, but I'm not sure.

1   Q.  After the date of the explosion, did you participate in an

2   investigation into persons of interest or investigative leads?

3   A.  Yes.

4   Q.  And with whom did you participate in this part of the

5   investigation?

6   A.  I think it was multi-agency interviewing lots of people.

7   So my primary responsibility was -- I dealt directly with Don

8   Logan and people close to him trying to identify potential

9   suspects and the reason for the bombing.

10  Q.  And as part of your investigation -- that part of your

11  investigation, did you also work with the Scottsdale Police

12  Department?

13  A.  Yes.

14  Q.  And how did you work with the Scottsdale Police Department?

15  A.  Well, I just know they were involved.  And we would have

16  multi-agency meetings, probably daily, to begin with to update

17  where we were going with the investigation.  I pretty much for

18  the -- if I remember correctly, the first, you know, week or

19  so, I spent a lot of time with -- with Don and Renita.  And

20  there was -- I can't remember the name of the other woman who

21  was -- worked closely with Don.

22  Q.  Jacque Bell?

23  A.  Pardon me?

24  Q.  Jacque Bell?

25  A.  Yes, uh-huh.  And trying to just talk to them to see if

1    they might have an idea of who might have done something like

2    this as well as talking to Don often.

3    Q.  As part of that process, and talking to these individuals,

4    did certain names keep coming up?

5    A.  Well, Don's background was so varied that, you know, we

6    looked at lots of things.  Generally in a mail bomb

7    investigation, based on my past experience and working mail

8    bomb investigations, at some -- there's a personal relationship

9    involved there.  So that's what I look at immediately, trying

10   to --

11   Q.  Why is that?  Why do you say that?

12   A.  Well, because a typical mail bomb explosion has something

13   to do with a very personal contact.  So it's people that many,

14   many times it has to do with love triangles and -- or bad

15   business relationships.  So probably more than 90 percent of

16   the mail bomb cases I've worked and have something to do with

17   that.

18         Other than the Ted Kaczynski case, it was very

19   personal.  And so that's what I was looking at.  I was looking

20   to see if there might be somebody who had dealings with Don

21   that would be, as an individual, very upset with him.  And it

22   could be on a personal basis or -- and I looked into his

23   basketball officiating, if he upset, you know, the other team

24   or his work as -- with the hearings that he conducted.  And

25   also I looked at people who were involved in civic

1    organizations that may disagree with what Don was doing.

2         So it went in a lot of different directions.  But

3    initially I was really focusing on personal relationships to

4    see if there could be something there.

5    Q.  And you speak of your experience for bombs.  How common or

6    uncommon is a pipe bomb?

7    A.  Very common.  It's the easiest bomb to build, so very

8    accessible to everybody, the material is readily available

9    and --

10   Q.  Materials?

11   A.  -- dangerous to build, but easy to build.

12   Q.  When you say the materials are readily available, what do

13   you mean?

14   A.  Well, you can go to any hardware store and pick up, you

15   know, the material and any gun shop or anyplace to get the

16   explosive filler.  So it's just pretty easy to do.

17   Q.  How about instructions or a recipe for that?

18   A.  Well, they are readily available on the Internet and, you

19   know, particularly for a number of years you -- any teenage

20   boy, you can ask him how to build a pipe bomb and he will know

21   how to do it.

22   Q.  Did you -- did you work with the City of Scottsdale to

23   develop a list of investigative leads?

24   A.  You know, I think we discussed lots of different

25   possibilities at that time.  I don't remember working

1    specifically, but there were probably discussions in our group

2    meetings.

3    Q.  As part of your job did you go through City of Scottsdale

4    personnel files?

5    A.  Yes.

6    Q.  And what was -- tell us about that process, please.

7    A.  I looked at a lot of personnel files.  And I think since we

8    didn't have handwriting, I just looked at many personnel files

9    just looking through them to see if I could find anything that

10   might relate to the case, and not looking for anything in

11   particular.  But I reviewed lots of files.

12   Q.  As -- as a result of reviewing those documents, did some

13   names come to your attention?

14   A.  Not that I can recall specifically.  I know there were lots

15   of names.  And, you know, it could have been hundreds of files.

16   I know I went through a lot of files.  And I don't recall ever

17   seeing anything in a file that really said this is somebody

18   that we -- we have to look at, anything in there that would

19   relate specifically to Don or his activities as a diversity

20   director.  So I just don't recall seeing anything that would

21   make me think we need to look particularly at that person.

22          Lots of people, once you get involved in an

23   investigation, one thing you try to do is eliminate people as

24   quickly as you can.  So you can say this person, we can move

25   this person aside, this person is not involved.  So then you

1    can focus on somebody that you have more direction that you're

2    leaning.

3    Q.  Did the name Steve Anderson come up?

4    A.  Yes.

5    Q.  And how did that come up?

6    A.  I'm really not sure.  I didn't do much work on Steve.  I

7    know that there were discussions about him and I believe he

8    worked in the crime lab.  But I had no dealings with Steve.

9    And I don't recall ever working that particular part of the

10   investigation.

11   Q.  Do you recall working with a Joe Leduc from the City of

12   Scottsdale?

13   A.  Yes.

14   Q.  And did you work together with him in developing names of

15   persons of interest?

16   A.  Yes.  Yes.  We worked together.

17   Q.  And as -- as a result of that, do you recall whether he

18   generated a report reflecting that information?  Your findings?

19   A.  I don't recall.  I don't know.

20   Q.  Would review of a report refresh your recollection?

21   A.  Yes.

22        MS. HULL:  Could the witness please look at Exhibit

23   1002.

24   BY MS. HULL:

25   Q.  Do you recognize that, sir?

1  A.  No, I do not.

2  Q.  If you would look specifically at page -- in the bottom

3  right-hand -- well, page 6 of 16 of that document, the bottom

4  of the top paragraph.

5          THE COURT:  And what is it you want him to do with

6  that?

7          MS. HULL:  Just read it to himself and see if it

8  refreshes his recollection of his involvement with this report.

9          THE COURT:  So you want him to read it and then set it

10  aside and wait for your question?

11          MS. HULL:  Yes.  Yes, please.

12          THE WITNESS:  I --

13          THE COURT:  Excuse me, what you need to do when you've

14  read it is set it aside, and Ms. Hull will have a question for

15  you.

16  BY MS. HULL:

17  Q.  Can you close the document, please, sir.  Thank you.

18          Does that refresh your recollection as to your

19  involvement with Mr. Leduc -- Inspector Leduc?

20  A.  Yes.

21  Q.  What was your involvement with him?

22  A.  In that particular case, there were so many files, and

23  there again, typically in mail bomb investigations, our

24  department can spend much more time on cases than local police

25  departments can.  So I continued looking at files and I -- Joe

1  would come in periodically and look at files with us.  And we

2  would discusses people.  And that's about all I remember.

3  Q.  Do you recall as a result of that if working -- when

4  working with Joe Leduc, you developed lists of names other

5  than -- in addition to Steven Anderson?

6  A.  I don't remember that at all.  And I'm -- if I recall

7  correctly, I don't think that Joe was working with me very

8  often.

9  Q.  Do you recall what the time frame was that you were

10 reviewing these internal employee records of City of Scottsdale

11 employees?

12 A.  I do not recall.

13 Q.  When did you retire, sir?

14 A.  In May of 2005.

15 Q.  Did you work this case until your retirement?

16 A.  No, I was -- I was a member of the Joint Terrorism Task

17 Force, so we were pretty busy with other things that were

18 happening at that time.  So early on I spent a lot of time on

19 this case.  And I'm guessing in early 2005, I -- I was probably

20 spending more time with the Joint Terrorism Task Force.

21 Q.  Sir, did you at any time -- I'm sorry, on or near the date

22 of the explosion of February of 2004, did you search the

23 contents of Mr. Logan's briefcase?

24 A.  I believe I did.  If it was left at the office, I believe I

25 did.

1    Q.  And do you recall what you found in that briefcase?

2    A.  I do not.

3    Q.  Would review of your report refresh your recollection?

4    A.  Yes.

5    Q.  If you would look, please, at Exhibit 538.  Do you have

6    that?  I'm sorry.

7         MS. HULL:  Can this witness please be shown Exhibit

8    538.

9    BY MS. HULL:

10   Q.  Sir, if you would look at that document at -- I'm sorry,

11   one moment.  I apologize, I have the wrong exhibit number.

12   Well, maybe -- I'll start with that and I'll shift my line of

13   questioning.

14        Do you recall meeting with Mr. Logan in January of

15   2005?

16   A.  I met with him often.  So many, many, many times after the

17   explosion.

18   Q.  Do you recall whether you generated a report as a result of

19   that interview?

20   A.  This is my memorandum of interview.

21   Q.  Okay, could you close that.  And this is just formality so

22   that the record is clear, you only look at that to refresh your

23   recollection.  So if I'm asking you to close it, it's just for

24   that purpose, all right?

25   A.  All right.

1  Q.  And if you did generate a report as a result of that

2  interview, would it refresh your recollection as to what the

3  contents were of that interview?

4  A.  Yes.

5  Q.  Okay.  And do you recall whether or not you told -- I'm

6  sorry, whether you discussed with Mr. Logan whether or not the

7  label on the bombing was correctly addressed?

8  A.  I don't recall discussing that.  I would have at some time.

9  I don't know if it was this meeting or a prior meeting.  I

10  couldn't say specifically which day, but we would obviously

11  discuss that.

12  Q.  And do you recall whether you had a discussion as to

13  whether the mailing label itself was correctly addressed?

14  A.  Yes.  I would have had that discussion.

15  Q.  Do you recall whether Mr. Logan indicated that the

16  address -- the label had been correctly addressed?

17  A.  I don't recall, no.

18  Q.  Do you recall having a discussion of the use of an

19  ampersand?

20  A.  I don't independently recall that, no.

21        MS. HULL:  Could I have one minute, Judge?

22        THE COURT:  You may.

23        MS. HULL:  Judge, I am requesting a side bar.

24        THE COURT:  All right.

25        (The following discussion was held at the bench

1   between Court and counsel:)

2          MS. HULL:  Judge, I believe I need a court ruling

3   before I go -- proceed to the next questioning under 611.

4   Mr. Logan testified that the address label was incorrectly

5   addressed.  He told this investigator that it was correctly

6   addressed.  I am requesting the Court's permission to proceed.

7          THE COURT:  The point to proceed with?

8          MS. HULL:  That Mr. Logan informed him that address

9   label was correctly addressed.

10         THE COURT:  You want to refresh his memory and have

11  him testify on that?

12         MS. HULL:  Yes.

13         MR. MORRISSEY:  Your Honor, that is in my view

14  extremely misleading.  He said the mailing label addressed to

15  Office of Diversity and Dialogue was the correct terminology.

16  He didn't say it was the correct address.

17         THE COURT:  Okay, hold on just a minute.  Well, this

18  report says --

19         MS. HULL:  At the very bottom.

20         THE COURT:  -- that Mr. Logan said that the mailing

21  address, the mailing label addressing it to the Office of

22  Diversity & Dialogue was properly addressed using the correct

23  terminology.  So your point is he was saying he got the

24  label -- he got the title of the office correct?

25         MR. MORRISSEY:  That's my point.

 1          THE COURT:  Your point, Ms. Hull?

 2          MS. HULL:  I think that that is -- I can see their

 3   argument for that.  But I also see that it was properly

 4   addressed and used the correct terminology.

 5          MR. MORRISSEY:  And I would also point out that asking

 6   this question about what Mr. Logan said would be eliciting a

 7   hearsay response about what Mr. Logan said.

 8          THE COURT:  Well, I think that's why Ms. Hull is

 9   suggesting it -- it can come in as impeachment under 611.  I

10   assume that's why you are raising it.

11          MR. MORRISSEY:  Okay.

12          THE COURT:  Is to deal with the hearsay issue.  So the

13   question is whether it's improper impeachment.

14          MS. HULL:  613?

15          THE COURT:  Yeah, that's right.

16          MS. HULL:  Sorry.

17          THE COURT:  I think this can be read both ways.  I

18   don't know what the witness' recollection of it will be.  If

19   the witness' recollection is consistent with the Government's

20   view, then it doesn't impeach.  If it's consistent with the

21   defense view, then it does impeach.  It seems to me she should

22   be permitted to ask the question, because it might be

23   impeaching under Rule 613.

24          MS. HULL:  Thank you, Judge.

25          THE COURT:  What I will do is if he supports your

1    view, then at some point I need to tell the jury that they are

2    considering it only for purposes of -- and then we need to

3    decide on that instruction.

4            MR. MORRISSEY:  May I also ask, didn't he just say

5    this does not refresh his recollection?

6            THE COURT:  I don't think on this subject he has been

7    asked that question.

8            MR. MORRISSEY:  Okay.

9            THE COURT:  The instruction I would give the jury is

10   that the statement of Mr. Logan to Inspector Casadei, if his

11   recollection is what the defense thinks it is, is not being

12   admitted for truth of the matter asserted, but only as a factor

13   for the jury to take into account in evaluating the testimony

14   of Mr. Logan.

15           Is that instruction acceptable?

16           MR. MORRISSEY:  Yes.

17           MS. HULL:  I -- I guess I -- I agree it's a little

18   confusing, but perhaps we can wait to see what his answer is.

19   I think that -- I think that it is --

20           THE COURT:  Well, it cannot come in for the truth of

21   the matter asserted under 613 unless there's another hearsay

22   exception that applies to it.  So its only purpose is

23   impeachment if it comes in.  And I need to instruct the jury

24   that it's not for the truth of the matter asserted.

25           Do you have any problem on the defense side with the

1    wording of the instruction I just suggested?

2         MS. HULL:  No.  No, sir.

3         MR. MORRISSEY:  Your Honor, may I ask, we had a

4    discussion last week and the Court ruled, I think on Friday,

5    about certain impeaching statements.  Counsel has identified

6    this one and we've had your ruling.  Are there further

7    impeaching statements counsel intends to elicit with this

8    witness that are not known to the Government at this point?

9         MS. HULL:  Not that I know of, no, sir.

10         THE COURT:  Okay.

11         MR. MORRISSEY:  Thank you.

12         THE COURT:  All right.

13         (The discussion at the bench concluded.)

14         THE COURT:  You may proceed, Ms. Hull.

15         MS. HULL:  Thank you, sir.

16    BY MS. HULL:

17    Q.  Sir, going back to the January 2005 interview you had with

18    Mr. Logan, do you recall whether Mr. Logan stated to you

19    whether the label on the bomb was properly addressed?

20    A.  Independent of my memorandums of interview, nothing that I

21    can recall.  I just don't remember that.

22    Q.  Would reviewing of your memorandum refresh your memory?

23    A.  It possibly could, yes.

24    Q.  If you would please look at Exhibit 538.  And the very

25    bottom of the very last paragraph, if you would read that,

1    close the document, and set it aside, please.

2    A.  Just the bottom of the first page?  That's it?

3    Q.  Yes, sir.  In particular, that last sentence, then if you

4    would -- and close the document.

5         Does that refresh your memory as to whether he told

6    you the address label was properly addressed?

7    A.  Again, I don't recall.  If it's in my memorandum, he did

8    say that.

9         MR. BOYLE:  Objection, move to strike the last answer.

10         THE COURT:  I will strike that last answer.  All the

11    question is calling for, Inspector Casadei, is your memory if

12    it's refreshed.

13         THE WITNESS:  What I do recall is Don was very precise

14    about many, many things and everything.  And the questions

15    regarding --

16         MR. MORRISSEY:  Objection, there's no pending

17    question.

18         THE COURT:  All right, next question, please.

19    BY MS. HULL:

20    Q.  Do you recall -- do you recall whether -- do you recall

21    whether you discussed -- I'm sorry, strike that.  Let us come

22    back to that if you would, sir.

23         I asked you earlier about whether you recall finding

24    documents in Mr. Logan's briefcase.  Do you recall that?

25    A.  Yes.

1        MS. HULL:  Could the witness please be shown Exhibit

2   927.  If you would -- well, wait before I ask you a question.

3   BY MS. HULL:

4   Q.  Do you recall -- do you recall what types of documents you

5   found in -- if any, in Mr. Logan's briefcase?

6   A.  I do not.

7   Q.  Would reviewing your report refresh your recollection?

8   A.  Possibly, yes.

9   Q.  Exhibit 927, if you would look down one, two -- the fourth

10  paragraph, starts with "Don again."  Read that paragraph, sir,

11  and set it aside.

12        MR. MORRISSEY:  Your Honor, I'm going to object to

13  this line of questioning as having previously been covered by

14  this Court's order on Friday, particularly number two of the

15  Court's order.

16        MS. HULL:  Judge, it is not as to anything stated in

17  that.  It's as to what his firsthand knowledge of what he

18  found.

19        THE COURT:  Okay.  On that basis, it's overruled.  So

20  you are asking what he remembers finding in the briefcase?

21        MS. HULL:  What he found, yes, sir.

22        THE COURT:  All right.

23  BY MS. HULL:

24  Q.  Does that refresh your recollection about what you found in

25  his briefcase?

1   A.  It does not, no.

2   Q.  Did you write any other reports about what it is that you

3   found in his briefcase that day?

4   A.  I may have.  I don't recall.

5   Q.  As part -- in the process of the investigation, did you --

6   you talked about meetings that were held with other agencies.

7   A.  Yes.

8   Q.  How often were those held?

9   A.  I couldn't say for sure, but they were fairly regular.  And

10  then as the -- we got into the investigation, I think that

11  the -- they were less frequent.

12  Q.  Do you recall having discussions with other inspectors as

13  to where in your opinion this investigation should go?

14  A.  Yes.

15  Q.  Did you -- would it be a fair statement to say that those

16  inspectors within your agency that were working on this case,

17  some were more experienced and some were less experienced?

18  A.  Yes.

19  Q.  And would you consider yourself -- which category would you

20  consider yourself, more or less experienced?

21  A.  More experienced.

22  Q.  Okay.  And were there others in your group that you would

23  consider more experienced than less experienced?

24  A.  Yes.

25  Q.  Did you -- between those groups, did -- was there ever

 1  discussions or even disagreements as to where this

 2  investigation should go next?

 3  A.  There were discussions.  I don't know if there were --

 4  within our agency, if there were disagreements.  We -- there

 5  were several directions to -- that we had to cover.  So we

 6  discussed all of those.

 7  Q.  Did you -- were your tasks in the investigation, did those

 8  come from the case agent or from elsewhere?

 9  A.  Pretty much I determined what I was going to look at.

10  Q.  And did you have your own thoughts as to the investigation,

11  where it should go, what certain evidence means?

12  A.  In the short amount of time that I was involved with the

13  case, on this bombing investigation, there were directions that

14  I wanted to look in more depth, yes.

15  Q.  When -- when did Inspector Curran leave as case agent, if

16  you recall?

17  A.  I don't recall.

18  Q.  At any time during your tenure on the case, roughly a year

19  or so, did a second case agent take over from Inspector Curran?

20  A.  I believe Jesse Sartuche and Tim Lenzen became the case

21  agents at some time, and that may have been after John was

22  promoted, I believe.  But I don't recall exactly when.

23  Q.  Do you -- without knowing the date, do you recall whether

24  the, shall we say, the path of the investigation changed when

25  Inspector Curran was promoted?

1   A.  I don't recall that.  No.

2   Q.  Did your part of the investigation focus inside or outside

3   the City of Scottsdale?

4   A.  My part of the investigation focused inside.

5   Q.  And whose decision was that?

6   A.  I think mine.

7   Q.  Okay.  And why is that?

8   A.  Well, I wanted to -- because of the uniqueness of the way

9   that the bomb was placed and circulated through the mailing

10  system within Scottsdale.  I was always of the opinion that

11  there had to be some inside involvement in Scottsdale.  And I

12  know they were looking elsewhere, but I wanted to continue

13  looking within the City of Scottsdale to see if there may have

14  been someone involved within the city.

15  Q.  And tell us what about this particular incident, what

16  factors entered into that decision.  What about the bomb?

17  A.  Well, what I looked at is -- there again, you have to look

18  at who's upset with Don.  And these hearings, I know that --

19  that the hearings, particularly with the police department, Don

20  felt that there were people upset with him being involved in

21  those disciplinary hearings.  So I continued to look in that

22  direction.

23  Q.  What about the delivery of the bomb?

24  A.  Well, and there again, I don't know what was discovered

25  after I was off the investigation, but based on what I knew at

1    the time, it was placed in the library and somehow got

2    delivered to the -- to Don's office.  And I don't know how you

3    could logically assume that placing the bomb in the library

4    would get to Don.

5            And also the address, if I remember correctly also,

6    the -- the physical address that was on the address label -- I

7    think the address -- either the number was on the wrong street.

8    Somehow it just didn't make sense.  And I can't recall exactly

9    what that was.  But the numbers reflecting the address of the

10   parcel may have been on the wrong street, something like that.

11           I know there was some confusion there, so I'm thinking

12   how -- if -- if you didn't -- if you weren't sure -- if you

13   weren't sure how this bomb was going to get to him, the address

14   didn't make sense to me for some reason.  And that's going

15   through my mind now.  I just can't recall what that was about

16   specifically.

17   Q.  Do you recall an event related to this investigation called

18   Authors and Appetizers?

19   A.  I recognize the name.  I don't know what it's associated

20   with.  I don't recall.

21   Q.  Do you recall where the package was originally found?

22   A.  Well, it was in the library, yes.

23   Q.  Okay.  And do you recall whether there had been a function

24   recently at the library?

25   A.  I remember them discussing that.  There again, I wasn't

1    involved in the library part of the investigation.  But I know

2    that -- possibly Jesse and Tim Lenzen were.

3    Q.  Do you recall -- what about that particular fact, if it

4    entered at all into your decision that somehow this was someone

5    inside the City of Scottsdale?

6    A.  I don't associate it.  I knew that based on what they had

7    determined, that the devices could have been placed in the

8    library at that time.  And I can't recall anything more than

9    that.

10        What I was more concerned with is possibly making sure

11    that we interviewed everybody that would have been there to see

12    if they would have remembered the parcel.  Of course, I was not

13    involved with that.  But there again, I'm involved in a

14    discussion on which direction we go and also whether there was

15    any possible surveillance cameras anywhere that would identify

16    anybody, you know, going into and out of the library.

17    Q.  Do you -- are you familiar with a photo array or a

18    six-pack?

19    A.  No, I'm not.

20    Q.  Photo lineup?

21    A.  Oh, I know what a photo lineup is, yes.

22    Q.  Okay.  And do you recall at any time making a

23    recommendation as part of the step in this investigation to

24    show photo arrays or photo lineups to people who attended that

25    function?

1   A.  I don't recall doing that specifically, no.  But I may

2   have.

3   Q.  Would you have seen utility in that?

4   A.  Oh, yes.

5   Q.  How so?

6   A.  Well, you know, if -- if there were any suspects, if

7   somebody would recall these people being present that day at

8   the library, and if I recall, was it on a Saturday when --

9   Q.  When it was found?

10  A.  When that event occurred, yeah.  Just trying to identify

11  anybody, whether it be within the City of Scottsdale or

12  somebody else who may have attended.

13  Q.  Did you, in the process of -- of these thoughts that you

14  had, did you -- did you take notes as to what concerns you had

15  about -- well, strike that.

16          At some point in the investigation did you -- or were

17  you advised that there was an investigation of individuals

18  outside the City of Scottsdale?

19  A.  I -- there were many people looking at all facets of Don's

20  life, whether it be again, related to his basketball activities

21  or the boxing venue or, you know, I remember us going up to

22  maybe their physical services where there was plumbing and

23  electrical fixtures.

24  Q.  Well, do you -- other than the general initial

25  investigation, did the investigation later on, while you were

1    still on the case, focus on Dennis Mahon and Daniel Mahon?

2    A.  Yes.

3    Q.  Do those names ring a bell?

4    A.  Oh, yes.

5    Q.  And did you -- do you remember when you learned that there

6    was -- well, who was -- who involved in the investigation was

7    looking at those people, if not you?

8    A.  Well, I -- I recall early on their names were mentioned

9    early in the investigation.

10   Q.  Do you remember by whom?

11   A.  It may have been from ATF.  We would be unfamiliar with

12   them as postal inspectors.  So --

13   Q.  Well, let me ask you this:  If at some point the

14   investigation, you learned that the investigation was focusing

15   on something surrounding race, is that something that you would

16   notify Mr. Logan?

17   A.  Could you repeat that, please.

18   Q.  Well, do you -- let me ask you this:  Do you recall the

19   note used in this case?

20   A.  Yes.

21   Q.  Okay.  And do you remember whether you had any thoughts as

22   to anything in that note having anything to do with race?

23   A.  No.  I -- I did not.  That -- the note was just a quote to

24   me.  I didn't associate it with anything racial at all.

25   Q.  And did you sometime after that tell Mr. Logan that you

1    were looking at someone, some individual or individuals who had

2    racial views?

3    A.  I'm certain I did when -- when we were considering all

4    suspects, including the Mahons, yes.

5    Q.  Do you recall when you informed Mr. Logan that you were

6    looking at the racial angle?

7    A.  I do not, no.

8    Q.  Would reviewing your report refresh your recollection?

9    A.  Yes.

10   Q.  If you would look, please, at Exhibit 538, which is the

11   first paragraph, if you would just read the first paragraph,

12   sir, and then close it.

13   A.  Okay.

14   Q.  Does that refresh your recollection, sir?

15   A.  Yes.

16   Q.  And when did you -- when did you talk to Mr. Logan about

17   this topic?

18   A.  When it appears and what I -- I remember happening is that

19   the -- I did not work the part of the investigation that

20   focused on the Mahons because, as I said, I wanted to -- I had

21   a different theory.  I wanted to -- not that they were not

22   involved, but that I wanted to eliminate any possibility of

23   anyone within the City of Scottsdale being involved.

24          So I knew there were enough people looking at them

25   that I didn't have to direct my attention.  And that discussion

1    would have been just -- I was the primary contact with Don.

2    And I'm not sure if any other agents or police officers had

3    direct contact with him regarding the investigation.  So I

4    always asked that whatever they wanted asked would go through

5    me and then I would approach Don so there weren't multiple

6    investigators approaching him.  And at that point, I may have

7    been requested to approach that subject with him.

8    Q.  Okay.  And do you recall when you did that?

9    A.  It indicates --

10            MR. MORRISSEY:  Objection.

11            THE COURT:  The question is whether you recall that.

12            THE WITNESS:  I do not recall independently, no.

13   BY MS. HULL:

14   Q.  Okay.  Once -- did you have any thoughts of your own as to

15   the -- the reasonableness or logic of what you knew about the

16   Scottsdale bomb versus the inspection into Dennis Mahon?

17   A.  I think there were, again, in our discussions, there were

18   reasons to look at the Mahons.  Just I was going in a different

19   direction with my part of the investigation.

20   Q.  Did you have questions as to how -- well, strike that.

21            Once you learned that ATF was looking at the Mahons,

22   did you have questions as to how it would be that the Mahons

23   could have been involved in particular to the elements that you

24   saw of the bomb itself and the delivery of the bomb?

25   A.  I know we had discussions.  I can't recall.

1    Q.  I don't mean discussions, your thoughts.  Do you remember

2    having concerns?

3    A.  Well, again, based on my experience, these are -- with mail

4    bombs, I wanted to eliminate the obvious personal conflict that

5    may have led to the mail bombing, whether it be again a

6    personal relationship that went bad.  So I was really

7    concentrating on that again, because mail bombs are a lot

8    different than place devices.  And the mentality of mail

9    bombers is quite different.  So --

10   Q.  Well, let me ask you this:  Did you take -- do you remember

11   writing down notes about your thoughts as the viability of the

12   Mahons and being involved in this particular bombing?

13   A.  I don't recall, no, I don't.

14   Q.  Do you have Exhibit 801 in front of you?

15        THE COURTROOM DEPUTY CLERK:  No.

16        THE WITNESS:  I do not.

17        MS. HULL:  Okay, could the witness please be shown

18   Exhibit 801.

19   BY MS. HULL:

20   Q.  Would you look at that, sir, and tell me if you recognize

21   that.

22   A.  That's my writing, yes.

23   Q.  Do you remember when you would have made that writing?

24   A.  I do not.

25   Q.  Well, then, if you will close the document, sir.  You --

1    this is your handwriting?

2    A.  Yes, it is.

3    Q.  Does it pertain to this investigation?

4    A.  Yes, it does.

5    Q.  Okay.  And so would it have been made sometime after the

6    bombing but before you retired?

7    A.  Yes.

8    Q.  Okay.  And did it, at the time, reflect your thoughts as to

9    how this bomb could be -- or vice versa, whether the Mahons

10   could be involved with this bomb?

11            MR. MORRISSEY:  Your Honor.

12            MS. WILLIAMS:  One second.

13            MR. MORRISSEY:  I don't dispute that the Government

14   has been given a copy of this.  I dispute that I have it.  I

15   apologize for interrupting counsel's presentation, but I would

16   like to see the document.

17            THE COURT:  That's fine.

18   BY MS. HULL:

19   Q.  All right.  So, were these your thoughts, your thought

20   processes in this investigation, some of them?

21   A.  I didn't -- I was just looking at the handwriting and

22   identifying that that was mine.  I didn't look at the contents

23   of what was written.

24   Q.  If you could look and see if you can further identify it,

25   please.  I think there should only be two pages.

1    A.  There's three, and I'm just not sure how the third is

2    associated to the first two.  But I'm look at the first two.

3           MS. HULL:  May I see that?

4           THE COURT:  There's three in my copy as well.

5           MS. HULL:  There's three?

6           THE COURT:  Yes.

7           MS. HULL:  Thank you.

8           MR. MORRISSEY:  Your Honor, I'm going to object if

9    this is being offered as expert testimony.  This witness has

10   not been offered as an expert and that appears to be where this

11   is going.

12          THE COURT:  Overruled.  I don't think this is calling

13   for expert opinion.

14   BY MS. HULL:

15   Q.  The last page, is that your writing or is that someone

16   else's writing?

17   A.  That is my writing.

18   Q.  It is yours, okay.  So these are notes of yours made during

19   the investigation?

20   A.  Yes.

21   Q.  Okay.  And without looking at -- at the document, do you

22   remember what thoughts you had as to the -- whether the

23   motive -- assuming if it was race, what that would have to do

24   with Don Logan?

25   A.  I don't know what you mean.

1  Q.  Well, did you have thoughts as to whether there, if it was

2  race motivated, that there were more prominent black

3  individuals that could be targeted?

4  A.  I had to look at that, yes.

5  Q.  Okay.  And what were your thoughts on that?

6  A.  That why Don as opposed to some other city officials,

7  whether it be Phoenix or the State of Arizona, were more

8  prominent black officials.

9  Q.  What individual names came to mind?

10  A.  I don't recall.

11  Q.  Would reviewing your notes refresh your memory?

12  A.  Yeah.

13  Q.  If you would look at 801.  The second bullet point.

14  A.  You want me to read that one part, and that's it, not the

15  rest of the document?

16  Q.  Yes, sir, that one.

17  A.  Yes.

18  Q.  You kind of had it sectioned off there with the bullet

19  point?

20  A.  Yes.

21  Q.  Have you read that?

22  A.  Yes.

23  Q.  Okay, can you close the document.

24      Do you recall what names came to mind as perhaps more

25  visible targets?

1    A.  Just Oscar Tillman, and there again, I don't recall the

2    other.  But people more prominent in the news in Phoenix than

3    Don.

4    Q.  Okay.  And did you -- did you have ideas as to if it was

5    race, then why target -- why target Don and not the office

6    itself?

7    A.  Yes.

8    Q.  And what were your thoughts on that?

9    A.  Well, there was always a question as to -- there again, I'm

10   looking at a personal contact with Don, who would have had face

11   to face or had -- who would have been personally affected by a

12   decision that Don may have been involved with as opposed to

13   just, again, targeting some prominent official within the City

14   of Scottsdale or the City of Phoenix.

15          THE COURT:  All right.  Ms. Hull, we are at the 10:30

16   point.  We are going to take a break.

17          Members of the jury, we will take a break at this

18   time.  Please remember not to discuss the case.  We will excuse

19   you.

20          (The jury left the courtroom.)

21          THE COURT:  Please be seated.  You can go ahead and

22   step down.

23          THE WITNESS:  Step down?

24          THE COURT:  Yes.

25          All right.  Counsel, I have read the documents that

1    were filed last night docketed 1631, 1633, 1634, and the last

2    one filed by Ms. Hull, I don't have that number because we

3    printed it off of the e-mail.

4         THE COURTROOM DEPUTY CLERK:  I think it's 1634, but

5    I'll double check.

6         THE COURT:  I have 1634 so it's probably 1635.

7         THE COURTROOM DEPUTY CLERK:  Yes.

8         MS. CISNEROS:  It's 1635, Judge.

9         THE COURT:  So I've read those.  It appears to me the

10   crux of the argument from the defense, for purposes of a motion

11   to strike 214 and 215, is that the Government said at side bar

12   that if the phone number reflected in those exhibits was not

13   linked up to Daniel Mahon through later evidence, then the

14   Government would withdraw the exhibit.  That seems to me to be

15   the critical point that the defense is focusing on.  And the

16   defense asserts that link hasn't been made and apparently won't

17   be made and, therefore, I should strike the exhibit because the

18   defense relied on that point.

19        Am I understanding the position correctly?

20        MS. CISNEROS:  Yes, Your Honor, not only 214, but 215

21   as well.  And I would say also that it wasn't simply that the

22   Government would withdraw the exhibit, but the assertion, I

23   believe is asserted several times, that those records were

24   Daniel Mahon's records.  I think there was reliance on that in

25   addition to simply that in addition to the assertion that they

1    would be withdrawn.

2         THE COURT:  One of the points that is made in italics,

3    Ms. Cisneros, at docket 1634 is that these exhibits were

4    admitted without proper foundation.

5         MS. CISNEROS:  Yes, Judge.

6         THE COURT:  But it seems to me what you are arguing

7    there is not foundation but relevancy.  It seems the foundation

8    you're talking about is the link to Daniel Mahon.  Am I right?

9         MS. CISNEROS:  Or to Dennis Mahon.

10        THE COURT:  Okay.  The foundational objections that I

11   recall ruling on at side bar were not the linking up to the

12   defendants, but the question of whether the witness, Jody

13   Citizen, laid foundation to authenticate the documents and to

14   explain what they did.  And I concluded that he was able to lay

15   that foundation on the basis of his personal knowledge.

16        I want to make sure that's not what you're talking

17   about in foundation.

18        MS. CISNEROS:  Well, not that specifically, Your

19   Honor.  But I do think that Ms. Hull raised the issue of who

20   these documents are connected to as a foundational question.

21        THE COURT:  Yeah.  I don't think that's a foundation

22   objection.  I think that's a relevancy objection.  I just want

23   to make sure I'm not missing some other foundation, what I call

24   foundation record.  Am I --

25        MS. CISNEROS:  No, you're not.

1          THE COURT:  And the relevancy is it hasn't been linked

2    to Daniel Mahon, correct, Ms. Hull?

3          MS. HULL:  To either defendant.

4          THE COURT:  Government has now shown us exhibits 200,

5    I think it is, where -- 256, which had been admitted that at

6    least showed Dennis Mahon using the telephone at a later date

7    in 2005 to call Robert Joos.  No, I'm sorry, they've introduced

8    200 to show that the informant called Dennis Mahon in 2005 at

9    this phone number.  And they've shown that Joos' phone number

10   was also in evidence at the time 214 and 215 came in or at

11   least were brought into evidence during the Government's case

12   in chief.

13         Now I understand your point that is not what was

14   talked about at side bar when 214 and 215 were at issue.  But

15   it seems to me that they have shown evidence from their case in

16   chief that Dennis Mahon was contacted with this phone after the

17   bombing.

18         I assume you're not disputing that fact.

19         MS. HULL:  I'm not disputing that, Judge.  My point

20   goes beyond that.  It's that, well, then what is the relevance

21   of this snapshot if -- if they are now saying -- and it's

22   unfortunate that they can't take a position on a piece of

23   evidence and stick with it, especially when the defense relies

24   to their detriment on that.  However --

25         THE COURT:  Let me interrupt you for a minute,

1    Ms. Hull.  How have you relied to your detriment?

2           MS. CISNEROS:  We've released witnesses, Judge.

3           THE COURT:  Who would do what?

4           MS. HULL:  About the calls.  They are trying to,

5    according to their -- their pleadings, that they are trying to

6    establish that there is, number one, that these phone -- for

7    some reason these two phones contacting each other on the

8    morning of February 21st, 2004, is somehow relevant.  And that

9    the longer exhibit, and I forget whether it's 214 or 215, which

10   spans a longer period of time establishes some sort of

11   communication or whether -- quite frankly, Judge, now that I

12   think about it, they may have conceded withdrawing the larger

13   exhibit, because they have shown in response no relevance to

14   the larger exhibit, whatever one covers a longer period of

15   time.  So I would -- I would submit that their failure to

16   respond to the relevance of that justifies striking it.

17          But, as far as the snapshot exhibit that shows the --

18   I think it goes through like the 20th through the 22nd of

19   February, 2004, they indicated at side bar that these were

20   Dan -- Dan's calls, and that those cell tower records, because

21   of the location were -- correct me if I'm wrong, the sequence

22   of events, Mr. Citizen testifies, side bar the Government says

23   that well, these cell tower records show where Daniel Mahon was

24   on that -- those particular days.  And then by way of defense,

25   we show that in fact he was working when those calls were made.

1    And now they are saying, well, in light of that, then those

2    cell tower records refer to Dennis Mahon.

3         And, Judge, there's -- there is no evidence that a

4    subscriber information, of possession, and there's been nothing

5    placed in evidence by the defense as far as phone records are

6    concerned and it's -- it's irrelevant.  It's irrelevant that

7    these two phone numbers that were perhaps used by certain

8    individuals at a later date have any significance.

9         THE COURT:  Okay.  I understand the relevancy

10   argument.  I want to come back with a question in a minute.

11        Mr. Boyle, I read the Citizen side bar on Friday

12   evening before I issued my order.  And my memory from reading

13   it, I will read it again before I rule on this, but my memory

14   is that the side bar focused on Daniel Mahon, and that you did

15   make the statement that if the Government was unable to link

16   this phone number to Daniel Mahon, it would withdraw this

17   exhibit.

18        It now appears from docket 1633 that the Government's

19   position is the phone relates to Dennis Mahon.  And no

20   additional evidence will come in about Daniel Mahon's

21   connection to the phone.

22        Aren't those inconsistent positions?

23        MR. BOYLE:  Well, we were talking about the cell site,

24   which is 214.  I believe that was the issue at side bar, if I

25   recall.  I haven't read the transcript.  But I think we are

1    talking about the cell site records, not the toll records.  So

2    I wanted to make those distinctions.

3           So regarding the cell site, I'm not sure exactly what

4    I said, but I -- I have understood the Government's position

5    either at side bar and certainly last week, that we have

6    attempted to connected both defendants to this phone.  I think

7    I made that point to you several times that we believe the

8    evidence shows both defendants used this.  Then the defense

9    said we never had notice of it.  We said there was an ROI 43

10   that they both used it.  In fact, I think you see from the

11   Rolodex part that Daniel Mahon did use this phone.  We

12   attempted to established what we believe the evidence does

13   show, that both defendants used this phone.

14          So if you're saying that our avowal at side bar is the

15   only time we ever said that Daniel Mahon was the only person

16   connected to this phone, I would have to see it, and I don't

17   think the Government has really said that we are only

18   connecting Daniel Mahon to these cell site records.  I mean,

19   that may have been the topic, because we were just talking

20   about it at the side bar.  But we have never taken the position

21   that this was just Daniel Mahon's money.  We have several

22   calls.  We have reports.

23          Everyone in this courtroom knows that both defendants

24   used this phone in applications and others.  I can give you 10

25   or 15 exhibits -- or examples in the reports where it shows

1    both defendants used these phones.  So we've never said, oh,

2    no.  No.  No.  This is just Daniel Mahon's phone.  That's just

3    not the case.

4           At side bar, I thought we were just talking about a

5    specific issue about the cell site locating Daniel Mahon.  But

6    to the extent that you're trying to bind us to our position in

7    this whole case that Daniel Mahon has only used this phone, I

8    just don't agree with that.

9           And the defense is correct.  They have prevented us

10   from introducing the Rolodex card that connects Daniel Mahon to

11   the phone.  But that doesn't mean that the records -- the cell

12   site records aren't relevant to Dennis Mahon.

13          THE COURT:  So you are asserting that both 214 and 215

14   are still relevant but only with respect to Dennis Mahon given

15   the state of the evidence as it has come in?

16          MR. BOYLE:  Yeah, given the state of the evidence, we

17   can only connect those two exhibits to Dennis Mahon.  And they

18   are different exhibits.  Because 214 was the cell site issue.

19   And that was the side bar.  That is different than the toll

20   records, which is -- they are two different exhibits.

21          And we have -- because we have shown here, connected

22   Dennis Mahon to the tolls.  He is the person who would have

23   called Robert Joos.  We think it's relevant that a

24   coconspirator in this case would have called and spoke with

25   Robert Joos for 50 minutes on the date -- or around the date

```
 1    that the bomb was delivered.  So the cell toll records in 215

 2    are separate from whether or not we can place Dennis or Daniel

 3    Mahon here in the Valley from the cell site location records.

 4    We do think those are two different exhibits.

 5              THE COURT:  And your position is they are both still

 6    relevant?

 7              MR. BOYLE:  Yes.

 8              THE COURT:  All right.  Let me come back.  We are

 9    almost at 15 minutes.  But let me come back, Ms. Hull, to ask

10    you a question.  Again, you said, a moment ago, and I think

11    Dennis Mahon's filings implied this as well, that you have

12    relied to your detriment on the Government's assertion that the

13    records relate to Daniel.  Please explain how you have relied

14    to your detriment on that.

15              MS. HULL:  I would have to defer more -- this is an

16    issue that Ms. Cisneros handled.

17              THE COURT:  Oh.

18              MS. HULL:  If I may, Judge, there's a distinction the

19    Government is missing.  They showed you a report last week

20    saying that Daniel Mahon had listed that number in a job

21    application in 2005.  They are saying that the only relevance,

22    the only possible relevance of the cell phone records is

23    possession.  Not use, not using it to say, you know, all I'm

24    saying --

25              THE COURT:  You are about to argue relevancy again.
```

1          MS. HULL:  Well, the point is, Judge --

2          THE COURT:  But you're going to say it's used in 2005

3    doesn't say anything about its use in 2004.

4          MS. HULL:  It's possession.

5          THE COURT:  Now, I'm not sure I agree with you on

6    that.  And we can talk more about this when I rule.  I guess my

7    point is that if -- if relevancy is evidence having any

8    tendency to make a fact in dispute more likely or less likely,

9    the fact that a defendant at some point used a cell phone that

10   earlier had been used to call an alleged coconspirator on or

11   about the date of the bombing to me clears the 401 threshold.

12   But I know that's one issue.

13          What I'm more interested in, and I'll be happy to hear

14   more on that if you all want to argue it, what I'm really

15   focusing on now for purposes of whether I strike 214 and 215 is

16   the argument that you've been unfairly prejudiced by what's

17   happened in the trial.  You've relied to your detriment on

18   that.  That's a separate issue.  And that's what I think I

19   understand the relevancy argument and I want to hear more on

20   that point and how is it that you relied to your detriment.

21          MS. HULL:  And the prejudice also, Judge, in addition

22   to the witness issues is that at the side bar, we were already

23   well into the defense case in chief.  And I just want that

24   noted for the record, this is not something that came up.

25          THE COURT:  No, the side bar occurred during Jody

1    Citizen.

2              MS. HULL:  I apologize, I apologize.  The argument

3    last Friday that they were going -- that this was all about

4    Daniel Mahon and the Rolodex came up, they were still on the

5    issue that this -- it wasn't just the side bar of Citizen, it

6    was the argument on Friday about the Rolodex that they were

7    still talking about through a week of the defense case in

8    chief, that that phone number related to Daniel Mahon.

9              THE COURT:  Well, I think the argument on Friday was

10   where the Government said it relates to both defendants.  I

11   remember that being the argument when we got to this late

12   Friday.

13             But that's when ROI 43 was mentioned for the first

14   time.

15             Ms. Cisneros, how has the defense relied to its

16   detriment?

17             MS. CISNEROS:  Your Honor, first I want to point out

18   quickly -- I just want to read from the transcript of the Jody

19   Citizen testimony.  The Court is asking Mr. Boyle --

20             THE COURT:  Ms. Cisneros.

21             MS. CISNEROS:  Yes, Your Honor.

22             THE COURT:  I'm going to read that entire side bar.

23             MS. CISNEROS:  Very well.

24             THE COURT:  Why don't you tell me what it is you want

25   me to pay attention to.

1          MS. CISNEROS:  Your Honor, there are several ways we
2     have relied to our detriment.  The first is calling off of our
3     expert.  Judge, we were going to have phone testimony here.
4     Two weeks ago we were told this is Daniel Mahon's phone.  We
5     didn't think that this was going to be an issue anymore.  That
6     is big, because our expert obviously is out of town, as you
7     know.  And we may or may not be able to get him here before the
8     close of our evidence.
9          THE COURT:  What would he say that's relevant to this
10    issue?
11         MS. CISNEROS:  Well, Your Honor, he -- and, you know,
12    I really don't want to give away, you know, possibly what our
13    expert, you know, would say.  But I can tell you that he would
14    make statements that are relevant to what kind of weight should
15    be given to looking at a snapshot of one day to determine -- to
16    determine that there is some kind of relevance to -- to one
17    call made on a particular day.  That, for one.
18         Any use patterns, anything of that nature.  We had --
19         THE COURT:  There's no evidence on use patterns that's
20    come in.
21         MS. CISNEROS:  There is no evidence on use patterns
22    that's come in, Your Honor.  But you also -- well, you
23    certainly haven't forbidden the Government from attempting to
24    argue it.  And during their -- close of -- during their
25    closing.

1          THE COURT:  I'm just not understanding this.  Let's

2    assume that the Government, if I don't strike this, stands up

3    and says 214 and 215 show two very relevant facts.  Number one,

4    that Dennis Mahon was in the Phoenix-Tempe area at the time of

5    the bombing.  And number two, it shows that this phone, that

6    the informant called him on, placed a phone call to Robert Joos

7    on the morning of February 21st for 50 minutes.  And that they

8    think is relevant because it shows him talking to a

9    coconspirator on the date that the bomb is delivered.

10          Assuming they make those arguments, I'm not sure those

11   are call pattern or use analysis arguments.  But those to me

12   are the arguments that they will make.  What is it your expert

13   would say that would allow you to say that's wrong?

14          MS. CISNEROS:  Your Honor, our expert -- we were

15   anticipating our expert would say was more to rebut any kind of

16   argument that the Government would make at closing regarding

17   those call patterns.

18          THE COURT:  Well, what I just articulated is what I

19   think the Government could argue fairly from the evidence.

20          MS. CISNEROS:  Well, I think that there are other

21   calls that day that they may very well argue display additional

22   contacts with other coconspirators.  There are other calls.

23          THE COURT:  Let me ask, is there going to be such

24   argument during closing?

25          MR. BOYLE:  Judge, I haven't seen that.  I'll tell

1   you, I looked, obviously in preparing for this to see if there

2   were calls that we had established the phone numbers for.  And

3   I believe you'll see in our exhibit list that we had some phone

4   directories where the defendants, we presumed, had written out

5   numbers of coconspirators.  We never introduced that.  We never

6   went down that road of trying to link up other phone numbers.

7           So if the defense -- so I am aware of no evidence

8   right now that connects another phone number that's in evidence

9   other than Robert Joos.

10          THE COURT:  Are the two points that I said you may

11  argue the two points you intend to argue?

12          MR. BOYLE:  They are actually not that specific.

13  Because we won't say this is Dennis Mahon's phone, because we

14  actually know that's not true.  We will say that Dennis Mahon

15  had access to this phone.  We know that he used it in the past,

16  and we know --

17          THE COURT:  That's the way I characterized it, that

18  you will argue that a phone at which the informant contacted

19  Dennis Mahon was used on the morning of the 21st to call Robert

20  Joos.

21          MR. BOYLE:  Right.

22          THE COURT:  That's the argument you made?

23          MR. BOYLE:  Yes, but I'm just saying we can't say this

24  is Dennis Mahon's phone.

25          THE COURT:  Okay.  And then you will also argue that a

1    phone the informant contacted, according to these other

2    records, was in the Tempe-Phoenix area during the time

3    surrounding the bombing.  Are you going to make that argument

4    as well?

5              MR. BOYLE:  Yes.

6              THE COURT:  Anything else?

7              MR. BOYLE:  Just that the phone number that's

8    connected to Mr. Joos was called that morning for a period of X

9    minutes.

10             THE COURT:  Now, Ms. Cisneros -- if somebody has their

11   phone on, would you turn it off.

12             Ms. Cisneros, coming back then, I'm really trying to

13   understand the prejudice the defense has experienced.  How

14   would the expert address it -- now that we know those are the

15   only two arguments the Government is going to make, how would

16   your expert address them?

17             MS. CISNEROS:  Well, if those are the only two

18   arguments my expert wouldn't address them, but I can tell you

19   there were at least two other witnesses that we also --

20             THE COURT:  Tell me about them.

21             MS. CISNEROS:  -- elected not to call.

22             THE COURT:  Okay, who are they and what would they

23   have said so I can evaluate this detrimental reliance argument?

24             MS. CISNEROS:  Your Honor, I would prefer to do that

25   ex parte.  I think it does reveal our trial strategy.  At this

1    point we don't -- because -- we don't know whether you're going

2    to allow this in or not, we may in fact call those witnesses at

3    this point.

4          THE COURT:  Well, how can I -- how can I evaluate your

5    detrimental reliance argument without knowing how you

6    detrimentally relied?

7          MS. CISNEROS:  I'm happy to tell it to you ex parte,

8    because it is how we relied and it does not affect the

9    Government.

10          THE COURT:  What's the Government's response to that

11    proposal?

12          MR. BOYLE:  If she could still call these witnesses,

13    how can she detrimentally rely on them?  So it's hard for me to

14    speak about something we know nothing about.  It seems that --

15    that this is pretty simple.

16          THE COURT:  Well, the trouble I'm having,

17    Ms. Cisneros, is the idea that on a disputed evidentiary issue

18    in the middle of trial I can hear from one trial ex parte.  It

19    just sounds a bit unorthodox to me and probably inappropriate.

20          MS. CISNEROS:  You're asking us to reveal a trial

21    strategy when it's still in play.

22          THE COURT:  That's fine.  You don't have to.  But what

23    I have to understand is your detrimental reliance argument.

24    Because that seems to me to be the real crux of this.  It seems

25    to me that your assertion at side bar counsel said these relate

1    to Daniel Mahon.  You relied upon that to your detriment, and,

2    therefore, I should exclude the exhibits.

3              I have to understand how you relied to your detriment.

4    I understand your sensitivity about not revealing defense

5    strategy, but I don't know how else to evaluate that issue.

6              MR. BOYLE:  My point now is we are in the defense

7    case.

8              MS. WILLIAMS:  Could we have a minute, Judge?

9              THE COURT:  Hold on just a minute.

10             Let me raise this suggestion.  It seems to me in light

11   of what we just talked about, that the expert in Florida is not

12   needed to address the limited points the Government intends to

13   argue from this evidence.  So the need for me to make a

14   decision this morning so that you can know whether to tell your

15   expert to get on the plane is really not crucial anymore.

16             MS. CISNEROS:  Not in relation to that, Your Honor, I

17   would agree.

18             THE COURT:  Okay.

19             MS. CISNEROS:  But I do think that it still affects

20   whether we call these other witnesses.

21             THE COURT:  Well, I agree with that.  But what I was

22   going to suggest is, instead of trying to continue this now,

23   we've had the jury waiting 22 minutes, is let you all think

24   about it.  Whether you want to say more to me about the

25   prejudice, give me a chance to read the side bar again, and

1    then during the lunch break, I'll hear from you.  I'll hear the

2    points Mr. Boyle wishes to make, and I can make a decision at

3    that point rather than carrying on now.  Does that make sense?

4            MS. CISNEROS:  That makes sense, Judge.

5            MS. HULL:  Yes, Judge, I would just at this point

6    point out to the Court that the Government has just stated that

7    they know that's not Dennis' phone.

8            THE COURT:  Let's not argue it more now, Ms. Hull.

9    Can we move on to this issue at the lunch hour or do we need to

10   get it decided now?

11           MS. HULL:  I'm asking for the discovery that shows

12   that.

13           MR. BOYLE:  I'll address that right now.  It's at

14   Bates 2190 and it says this is Dennis Mahon's phone and it

15   lists that number.  So they were wrong in their pleading when

16   they said we didn't have that information and never disclosed

17   it.  We did give it to them at that Bates number.

18           THE COURT:  Do you see any reason this needs to be

19   decided now, Mr. Boyle?

20           MR. MORRISSEY:  No, and I'm just saying As well, I

21   didn't say this wasn't Dennis Mahon's phone.  I said they both

22   used the phone.

23           THE COURT:  Okay, I think we will continue this at the

24   lunch hour.  I will read the transcript of side bar over the

25   lunch hour and I'll hear from you again before I make a

1    decision.

2              Let's take ten minutes before the jury comes in.

3              (A recess was taken.)

4              THE COURT:  Thank you.  Please be seated.  Thank you

5    again for your patience, members of the jury.  We will

6    continue.

7              Ms. Hull?

8              MS. HULL:  Thank you, sir.

9    BY MS. HULL:

10   Q.  Before the break, sir, we were talking about your notes and

11   your ideas at the time.  Do you recall that?

12   A.  Yes.

13   Q.  Do you recall having any thoughts about in regards to

14   visibility, people being more visible than Mr. Logan?

15   A.  Yes.

16   Q.  Did you have any thoughts about a Velicia McMillan?

17             MR. MORRISSEY:  Objection, leading.

18             THE COURT:  Sustained.

19   BY MS. HULL:

20   Q.  Did you have any thoughts about any other individuals in

21   Mr. Logan's office?

22   A.  As being potential suspects within his office?

23   Q.  No, sir, as -- okay, let me back up.

24             Before we took a break, you were talking about why Don

25   Logan, if there were other more visible black leaders.  Do you

1   recall along those lines having any other thoughts about

2   being -- people being more visible than Mr. Logan?

3   A.  I don't recall that.  Just the names that -- as examples.

4   Q.  Okay.  Would reviewing your report refresh your

5   recollection?

6   A.  Yes.

7   Q.  If you could look at Exhibit 801, I apologize.  The first

8   page of that exhibit would be the third bullet point as you

9   have it.  If you would read that and then close the document.

10          Does that refresh your recollection, sir?

11  A.  Yes.

12  Q.  And what were your thoughts as to other individuals more

13  visible than Mr. Logan?

14  A.  At that time the name if Velicia McMillan, I felt she was a

15  far more visible person within -- far more visible that would

16  be a target.

17  Q.  And this is all if race were the motive?

18  A.  Yes.

19  Q.  Okay.  And did you have -- do you recall whether you had

20  any thoughts about this particular bomb?  Because you

21  previously testified, correct me if I'm wrong, that pipe bombs

22  are common?

23  A.  Yes.

24  Q.  And did you have thoughts about what made this bomb unique?

25  A.  The -- what made this unique was the note.  I have never

1    experienced anything like that.  And just the way it got into

2    the U.S. mail, being placed outside the mail stream and then

3    entering the mail stream, that that made it unique.

4    Q.  Do you -- did you determine whether or not it even actually

5    went into the mail?

6    A.  I did not.  But somebody determined that.

7    Q.  From its origin at the library?

8    A.  Yes.  From what I understand, it was placed in the mail

9    system after it was discovered at the library.  And then it

10   went to the Scottsdale post office and then returned back to

11   the City of Scottsdale.

12   Q.  So it wasn't a postal carrier who delivered it to

13   Mr. Logan, was it?

14   A.  I believe it was.  Well, a postal carrier delivered it to

15   the Scottsdale mail room, yes, or somebody from Scottsdale

16   picked it up from the post office.

17   Q.  How about the placement at the library, did that enter into

18   your --

19            MR. MORRISSEY:  Objection, leading.

20            THE COURT:  Let's finish the question.

21   BY MS. HULL:

22   Q.  Did its placement at the library enter into your -- this

23   consideration you're talking about of uniqueness?

24            MR. MORRISSEY:  Objection, Your Honor.

25            THE COURT:  Overruled.

1  BY MS. HULL:

2  Q.  You may answer, sir.

3  A.  Yes.  I, again, my question always was how does placing --

4  how does it get to Don Logan when it's placed in the library.

5  Q.  Did you have any -- did you come to any conclusions about

6  that?

7  A.  Well, that was always a question.  And, again, I was

8  thinking of somebody must be familiar with the interoffice mail

9  within the City of Scottsdale knowing that eventually it would

10 get to him.

11 Q.  How about the end caps, was there anything about the end

12 caps that entered into your decision or your consideration of

13 whether or not this pipe bomb was unique?

14 A.  Well, I thought it was awfully lucky the way Don opened it

15 that the end caps went laterally as opposed to vertically and

16 hit Don and Renita.

17 Q.  How about the type of end caps used, did that enter into

18 your decision or consideration?

19 A.  I don't recall them being extremely unique.

20 Q.  And again, and did you -- how about the address label

21 itself, did anything about the address label itself, how the

22 label was addressed, did that come into your consideration?

23 A.  Again, I don't recall it exactly.  I just -- what I do

24 remember is that I don't think that it was properly addressed

25 by number in order for it to get to the city -- to get to the

1    Office of Diversity.  And my thought was that somebody would

2    have to be driving down, I think it's 75th Street, but I'm not

3    sure, and see that number and just assume that that was the

4    correct address to address the bomb parcel.

5    Q.  To get it to the library?

6    A.  No.  No.  Just the way it was -- the address label, I -- if

7    I recall correctly, and I could be mistaken, but it appears

8    that I think the actual delivery address for the office is on a

9    different street.

10   Q.  How about, did the availability of information as to the

11   correct address of that office enter into your consideration?

12   A.  There again, my recollection is that the number that it was

13   addressed to was completely incorrect in that mail, that's not

14   the address associated with that office.

15   Q.  But did you determine how easy it would have been to find

16   out the correct address?

17   A.  I may have.  It may have been something that you could, you

18   know, look up in a directory.

19   Q.  How about -- did you have any thoughts about any results of

20   the undercover operation and information from that?  Did you

21   have any thoughts about the relevance to this bombing?

22   A.  The only thought that I had was -- and I listened to very

23   little of the -- the recordings.  And, again, at that point, I

24   was not very involved with the case.  But it was brought to my

25   attention that there was a comment about Scottsdale Police

1    Department officers in it.  And that's what I was most

2    interested in.

3    Q.  Did you have any opinions as to the level of familiarity

4    with Edmund Burke?

5    A.  No.

6    Q.  Do you recall that or -- are you saying --

7    A.  I know that there were discussions that is, it was

8    something very unique about the case, that note and Edmund

9    Burke.  But I just -- I had no thoughts on that being

10   associated with any particular group.  I was informed at

11   meetings that it was.  But I didn't know that independently.

12   Q.  Did you have any opinions as to -- did you listen to any or

13   were you provided any of the evidence or statements from the

14   Catoosa investigation in early 2005?

15   A.  I don't recall that, no.

16   Q.  Do you recall whether or not you had any reason to assess

17   statements attributed to Dennis Mahon about press-on letters?

18   A.  I do not.  I don't remember that.

19   Q.  Would reviewing your report refresh your recollection?

20   A.  Yes.

21   Q.  If you would look at 801, the very bottom of that first

22   page, that last bullet point.

23   A.  That's --

24   Q.  You have to close it.

25   A.  Oh, I'm sorry.

1    Q.  Does that refresh your recollection?

2    A.  You know, I am -- these notes probably reflect questions

3    that I had.  In this investigation, I was pretty much working

4    on my own.  And there were groups looking at other potential

5    avenues to investigate.  And when I would be there possibly

6    reviewing files or just thinking, you know, I'm writing down

7    thoughts and things that I needed -- that I -- questions that I

8    had and things that needed to be discussed at our group

9    meetings.

10   Q.  And did the issue of press-on letters come up?

11   A.  Obviously it did.

12   Q.  Okay.  Do you recall your thoughts on that?

13   A.  No, I do not, no.

14   Q.  Do you recall having any thoughts about the use of a lot of

15   stamps to be used?

16   A.  Well, it's very typical in mail bombs what we always --

17   what I've always done, particularly in giving presentations on

18   what to look for, is there's always an excessive use of postage

19   in mail bomb incidents.  So that's something that postal people

20   have to be aware of when they pick up something and they see

21   that.  And individuals, if they get something and they are

22   unfamiliar with the return address or they see a package that

23   they weren't expecting, if there's an excessive amount of

24   postage on it, that's a red flag.

25   Q.  That's assuming it was intended to go through the post?

1    A.  Yes.

2    Q.  And did this -- do you recall whether this package in the

3    Scottsdale bombing had any postage or any stamps on it?

4    A.  I do not recall that, no.

5    Q.  And just for frame of reference again, sir, I'm sorry, when

6    did you retire in '05?

7    A.  In May.  I worked the entire month of May, so May 31st,

8    2005, was my last day.

9         MS. HULL:  Okay, thank you.  I have no further

10   questions.

11        THE COURT:  Ms. Williams, or Ms. Cisneros, any

12   questions?

13        MS. WILLIAMS:  Yes, Your Honor, thank you.

14

15                    DIRECT EXAMINATION

16   BY MS. WILLIAMS:

17   Q.  Good morning, Inspector.

18   A.  Good morning.

19        MS. WILLIAMS:  Could the witness please be shown

20   what's been marked as Exhibit 929 and Exhibit 538.

21        Please don't open those yet.

22   BY MS. WILLIAMS:

23   Q.  Inspector, while you were working this case, you mentioned

24   that you had a lot of contact with Don Logan.

25   A.  Yes.

1    Q.  And it sounded like you were the primary contact; is that

2    correct?

3    A.  Yes.

4    Q.  Did you -- were you one of the people who interviewed Don

5    Logan many times?

6    A.  Yes, I was.

7    Q.  In -- do you recall interviewing Don Logan on November 1st,

8    2004?

9    A.  I was with him a lot.  So I don't recall specific dates.

10   Q.  Okay.  Do you -- do you recall talking to him about an

11   event called White Isn't Always Right?

12   A.  Yes.

13   Q.  Does that ring a bell?

14   A.  Yes, I do.

15   Q.  And do you recall this being a -- this discussion occurring

16   when you and a number of other investigators were present with

17   Mr. Logan?

18   A.  I do not.

19   Q.  Would it help you -- before I go there, when you interview

20   someone in the presence of other investigators, is it common

21   for someone to be taking notes?

22   A.  Yes.

23   Q.  While others talk to the person?

24   A.  That's very common that we could all be taking notes when

25   we are talking to someone.

MICHAEL CASADEI - DIRECT EXAMINATION BY MS. WILLIAMS  3824

1    Q.  Sometimes yes, sometimes no?

2    A.  Yes.

3    Q.  And if you have one person taking notes, it frees up the

4    other people to concentrate on what the -- on the discussion?

5    A.  Yes.

6    Q.  Okay.  Would you please take a look at what's been marked

7    as Exhibit 929.  Tell me if you recognize -- look at first at

8    the first page, tell me if you recognize that as a meeting you

9    attended.

10   A.  Yes.

11   Q.  Now, before I go farther, if you can just close that for a

12   minute.

13          Do you remember talking to Don Logan about the White

14   Isn't Always Right event and Mr. Logan telling you that none of

15   the Scottsdale -- nobody from Scottsdale P.D. showed up?

16   A.  I don't recall that independently, no.

17   Q.  Okay.  If you can please take a look again at what's been

18   marked Exhibit 929.  And then looking at the numbers in the

19   bottom right-hand corner, it would be page 1943-543, middle of

20   the page.

21   A.  Yes.

22   Q.  Does that refresh your recollection?

23   A.  It does not.  No.  These aren't my notes, no.

24   Q.  Do you recall Inspector Sartuche being at that meeting?

25   A.  Yes.

 1    Q.  And taking notes?

 2    A.  Yes.

 3    Q.  And he was taking notes while the discussion was going on?

 4    A.  Yes.

 5    Q.  So if his notes reflect --

 6            MR. MORRISSEY:  Objection, vouching.

 7            THE COURT:  What was that objection?

 8            MR. MORRISSEY:  Vouching, Your Honor.  Why don't I let

 9    counsel finish the question.

10            THE COURT:  Okay.

11    BY MS. WILLIAMS:

12    Q.  So if his notes reflect that comment and this was a

13    discussion in which you were participating, was -- do you

14    believe that comment likely would have been said?

15            MR. MORRISSEY:  Objection, vouching and speculation.

16            THE COURT:  Overruled.

17    BY MS. WILLIAMS:

18    Q.  You may answer.

19    A.  If -- if Jesse wrote the notes, then it was discussed.

20    Q.  Okay.  And does it appear that discussion occurred?

21    A.  Yes.

22            MR. MORRISSEY:  Objection, hearsay, move to strike the

23    last answer.

24            THE COURT:  Sustained.  I will instruct the jury to

25    disregard the last answer.

1    BY MS. WILLIAMS:

2    Q.  You mentioned that when you looked at -- when you look at

3    929, does it refresh your recollection that this meeting

4    occurred?

5    A.  I remember Jesse -- there were many meetings and other

6    inspectors attended.  I can't associate this with one in

7    particular.

8    Q.  Okay.

9    A.  But I know they were there for some meetings.

10   Q.  And you do recall the discussion about the White Isn't

11   Always Right event?

12   A.  I do remember that, yes.

13   Q.  And do you have any recall at all talking to Mr. Logan,

14   asking Mr. Logan about who, if anyone, from Scottsdale P.D.

15   attended?

16   A.  That would have been a question, yes.

17   Q.  Okay.  And do you recall what he said?

18   A.  I don't recall that, no.

19   Q.  This would have been something you were following up on as

20   part of your own investigation, correct?

21   A.  Yes.

22   Q.  And this was an angle you mentioned earlier you were

23   investigating?

24   A.  Yes.

25   Q.  Do you recall getting any -- any information from Mr. Logan

1   about Scottsdale P.D.'s attendance at his various functions

2   that he put on?

3   A.  I don't recall that.  Our discussions mainly involved his

4   participation in the disciplinary hearings.

5   Q.  When you did discuss the White Isn't Always Right event

6   with him, do you -- well, you recall that event being discussed

7   at some point?

8   A.  Yes.

9   Q.  And in your investigation, did you learn that it was a very

10  contentious event?

11  A.  I don't recall that.

12  Q.  Do you recall it had raised some concerns within the city?

13          MR. MORRISSEY:  Objection, leading.

14          THE COURT:  Overruled.

15          THE WITNESS:  I don't remember that, no.

16  BY MS. WILLIAMS:

17  Q.  When you say "I don't remember that," do you mean you don't

18  remember being told that or you just don't remember a

19  discussion about the event?

20  A.  I do remember a discussion about the event.  But I don't

21  remember that in particular.  I know that we discussed the

22  event.

23  Q.  Do you remember during your investigation learning that it

24  was an event that had caused people to protest?

25  A.  I may be confusing it with somebody else, but -- some other

1    event, but I do recall there being a discussion involving some

2    other individuals that may have been protesting.  And I don't

3    recall their names, but I may have interviewed them also.

4    Q.  And -- and that some of those people had actually filed a

5    written petition or complaint of some sort?

6    A.  Yes.  Yes.

7    Q.  Now, you -- do you recall interviewing Mr. Logan on January

8    24th of 2005?

9    A.  Not specifically.

10   Q.  One of many, right?

11   A.  But it probably did happen on that date, yes.

12   Q.  Okay.  Do you recall asking Mr. Logan about the wording of

13   the note?

14   A.  Yes, I do.

15   Q.  And what it meant to him?

16   A.  Yes.

17   Q.  And do you recall Mr. Logan, during your investigation,

18   telling you that he'd always felt the note was personal?

19   A.  I'm not sure about the note.  I think he indicated that

20   the -- the actual incident he felt was personal.

21   Q.  If you -- if I referred you to your report, would it help

22   refresh your memory?

23   A.  Yes.

24   Q.  Could you please take a look at what's been marked Exhibit

25   538.  And if you would take a look at the first page, middle

1    paragraph.  Read it to yourself and then close the document.

2         Does that refresh your recollection?

3    A.  It does, yes.

4    Q.  Okay, do you -- did you ask Mr. Logan about the note and

5    did he tell you he always felt the note was personal?

6    A.  I did ask him.  And I found it was difficult to relate

7    to -- now, again, I'm thinking of something personal.  So that

8    would have -- I'm thinking more along the lines of something

9    that would relate directly to another person that he had

10   contact with.  Again, that was my focus of the investigation,

11   but not the note standing alone.

12   Q.  But during that investigation -- during that interview,

13   excuse me, did Mr. Logan tell you he had always felt that the

14   note was personal?

15   A.  Yes.

16   Q.  And that he did not feel it related to the Office of

17   Diversity as a whole?

18   A.  Yes.

19   Q.  During the time you were working on this case, were you

20   ever asked for what's called a buccal swab?

21   A.  I -- what do you mean by that?

22   Q.  Where your mouth gets swabbed for DNA?

23   A.  Oh, yes.  Yes.

24   Q.  And what was your understanding of why this was being done?

25   A.  I think there was some DNA that was trying to be enhanced

1   on the -- from the device.  And basically it was eliminating

2   who may have had contact with the components of the device.

3   Q.  You weren't being viewed as a suspect, right?

4   A.  No.  No.  No.

5   Q.  Okay.  What's your understanding of why you in particular

6   were being swabbed?

7   A.  Well, there was obviously some identifiable or possibly

8   identifiable DNA and trying to determine who it belongs to.  So

9   if it's an investigator, we know that that's not a suspect.  So

10  if somehow DNA was transferred from an investigator or somebody

11  assigned to the case, then there's no reason to continue trying

12  to determine who the DNA belongs to.

13  Q.  So you were one of the people that they wanted to exclude?

14  A.  Pardon me?

15  Q.  You were one of the people they, the lab, wanted to

16  exclude?

17  A.  Yes.

18       MS. WILLIAMS:  Could the witness please be shown

19  Exhibits 652, 653, 654, 655, which -- yes, and 655, which are

20  in evidence.

21       Actually just 652 through 655, please.

22  BY MS. WILLIAMS:

23  Q.  Inspector, if I could direct your attention to Exhibit 652,

24  please.

25       MS. WILLIAMS:  Your Honor, could I show this to the

 1   jury?  This is in evidence, 652.

 2            THE COURT:  You may.

 3            MS. WILLIAMS:  On the Elmo.

 4   BY MS. WILLIAMS:

 5   Q.  If you're looking -- directing your attention over to the

 6   right-hand column where it says "suspects," do you see that?

 7   Up towards the top.  It says:  Subject, U.S. Postal Service,

 8   and then suspects?

 9   A.  Yes.

10   Q.  Okay.  There are some names there.  And disregarding the

11   label "suspects," okay.

12   A.  Yes.

13   Q.  Do you see your name there, Cassadei, Casadei?

14   A.  Yes, it's spelled incorrectly.

15   Q.  And the person John Curran, that's another inspector; is

16   that right?

17   A.  Yes.

18   Q.  And Raul Vargas you said was your partner?

19   A.  Yes.

20   Q.  And if you would turn -- if you would, turn to Exhibit 653

21   and look at the same part of the --

22            MS. WILLIAMS:  Oh, Your Honor, may I display it on the

23   Elmo?

24            THE COURT:  Yes.

25   BY MS. WILLIAMS:

1   Q.  Looking in the same area, you see your name, Curran and

2   Vargas, again?

3   A.  Yes.

4   Q.  And all three of you were postal inspectors?

5   A.  Yes, that's correct.

6   Q.  Now, you see right below it it says "eliminations"?

7   A.  Yes.

8   Q.  And there's a long list of names?

9   A.  Yes.

10  Q.  Would you please read those names to yourself and tell us

11  if you know -- if you can identify any of those names.

12  A.  I recognize many of the names as being investigators on the

13  case, some postal inspectors.

14  Q.  And who are the inspectors generally that you recognize?

15  Not just postal, but investigators?

16  A.  Well, Tristan Moreland, Richard Atwood and Jesse Sartuche.

17          And if the first one says John Bohi, that's Jake, then

18  I know him also as from Phoenix Police Department bomb squad.

19  Q.  Okay.

20  A.  Oh, and Andy Hopkins, also from Phoenix Police department

21  bomb squad.

22  Q.  And down at the bottom Jesse Sartuche?

23  A.  Yes.

24  Q.  Do you know who he is?

25  A.  He's a postal inspector.

1    Q.  And you said Atwood?

2    A.  Richard Atwood, yes.

3    Q.  How about Tracey Fife -- Fite?

4    A.  I don't know Tracey.

5    Q.  Fran Janowitz?

6    A.  Do not know.

7    Q.  Craig Chrzanowski?  I'm reading from the bottom now.

8    A.  Yes.  He might be a Scottsdale Police officer, if I

9    remember correctly.

10   Q.  Shearer, Neal Shearer?

11   A.  He -- I think he worked for the City of Scottsdale in some

12   form.

13   Q.  Tom Van Meter?

14   A.  Don't recall that name.

15   Q.  Ken Emerson?

16   A.  Do not recall that name.

17   Q.  Carpenter?

18   A.  I do not recognize the name.

19   Q.  Dilbeck or Williams?

20   A.  I don't know those names.

21   Q.  Kane or Larsen?

22   A.  I don't recall those names.

23   Q.  P. Salazar?

24   A.  I associate him with the Scottsdale Police Department also,

25   but I could be mistaken.

1    Q.   And Anthony May?

2    A.   I do not know that name.

3    Q.   Bettendorf?

4    A.   I recognize the name, but I'm not sure from what.

5    Q.   Waltenbaugh?

6    A.   I don't recall.

7    Q.   Okay.  Hopkins?

8    A.   And Andy was Phoenix Police Department, I believe.

9    Q.   And Hildick?

10   A.   I don't recall that name.

11   Q.   Okay.  So would it be fair to say that in the best of your

12   recollection, most of the people in this column appear to be

13   investigators of some sort?  From some agency?

14   A.   I'm not so sure about Neal Shearer.

15   Q.   Okay.

16   A.   I don't recall if he was an investigator.  I don't

17   associate him with the investigation, just somebody in the City

18   of Scottsdale.

19   Q.   Okay.  The others that you've identified are all

20   investigators?

21   A.   Yes.

22   Q.   And then if you look back to the very last -- the very last

23   page.  You see your name up at the top of the first large

24   paragraph over by the right?

25   A.   Yes.

1    Q.  You were excluded, correct?  If you look down at the last

2    line of that same paragraph.

3    A.  Yes.

4    Q.  Okay.  And you recognize, as you skim this page, these are

5    the names, these people being listed as also excluded are names

6    from the first list that we were going through?

7    A.  Yes.

8    Q.  Okay.  And if you would please take a look at Exhibit 654,

9    the first page, over on the right column, you see eliminations?

10   A.  Yes.

11   Q.  And you see you and Curran have now been moved down into

12   eliminations?

13   A.  Yes.

14   Q.  And you recognize that list as being the same list of names

15   as before?

16   A.  That's correct.  Yes.

17   Q.  And then if you would look at Exhibit 655, first page.

18           MS. WILLIAMS:  May I display it on the Elmo, Your

19   Honor?

20           THE COURT:  Yes.

21   BY MS. WILLIAMS:

22   Q.  Do you see the same grouping of names down to Jesse

23   Sartuche near the bottom?

24   A.  Yes.

25   Q.  With a few new names added, correct?

1    A.  That's correct.

2    Q.  Do you recognize any of those people?

3    A.  I'm thinking they are technicians from our crime lab, I

4    believe.

5    Q.  That would be postal crime lab?

6    A.  Yes.

7    Q.  And is that the lab in Dulles?

8    A.  Yes.

9    Q.  You don't -- postal at least at that time didn't have a

10   local lab, correct?

11   A.  No.

12          MS. WILLIAMS:  May I have just a moment, Your Honor?

13          THE COURT:  Yes.

14          MS. WILLIAMS:  Thank you.

15          I have nothing else, thank you.

16          THE COURT:  Cross-examination.

17

18                    CROSS-EXAMINATION

19   BY MR. MORRISSEY:

20   Q.  Agent Casadei?

21   A.  Yes.

22   Q.  I'll try.  I may goof it up.

23          You were asked about your arrival on the scene of the

24   Scottsdale bombing.  Do you recall that?

25   A.  Yes.

1   Q.  And the -- is it fair that the scene was chaotic?

2   A.  Yeah, there was a lot.

3   Q.  When you first arrived?

4   A.  Yes, when I first arrived.

5   Q.  And is it fair to say that law enforcement can't control

6   the scene prior to the time that law enforcement arrives?

7   A.  That's correct, yes.

8   Q.  So it was chaotic even when you arrived.  And by the time

9   you arrived, there were law enforcement personnel on the scene?

10  A.  Yes.

11  Q.  Now, you were asked about your theories with respect to

12  this bombing.  And I believe you testified to your past

13  experience in bombing investigations.  Do you recall that?

14  A.  Yes.

15  Q.  And how many -- how many blast scenes do you believe you

16  personally have inspected?

17  A.  Oh, at least 50.  It could be as many as a hundred.  So a

18  lot.

19  Q.  A lot.  Okay.  And is it -- did I understand your testimony

20  correctly that in the typical investigation for you, you found

21  that love or a business relationship or something like that

22  gone bad was the reason the person -- the bomber had sent the

23  bomb?

24  A.  That's correct, yes.

25  Q.  Is it -- but then you mentioned -- if that's typical, then

1    there are atypical situations, correct?

2    A.  That's right.

3    Q.  And you mentioned the Ted Kaczynski bombings?

4    A.  I did, yes.

5    Q.  Did you work on the Ted Kaczynski investigation?

6    A.  Yes, I did.

7    Q.  Ted Kaczynski was a bomber who bombed for reasons of

8    ideology?

9    A.  That's correct, yes.

10          MS. HULL:  Your Honor, objection, beyond the scope.

11          THE COURT:  Overruled.

12          MS. WILLIAMS:  Objection, relevance and 403, Your

13   Honor.

14          THE COURT:  Overruled as to that question.

15   BY MR. MORRISSEY:

16   Q.  In -- from your own experience in atypical situations, a

17   bomber can bomb for reasons not related to love, business

18   relationships, or personality?

19   A.  Yes.

20   Q.  And those reasons not related to love and personal

21   relations can include ideology?

22   A.  That's correct.

23   Q.  Now it's -- is it fair to say that having had the career

24   you had in law enforcement and this level of involvement in

25   bomb scenes, that you personally went hard at the personal

1   angle?

2   A.  I did, very much so, yes.

3   Q.  Is it fair to say that in your going hard at the personal

4   angle, you never found a single thing that suggested that Don

5   Logan was bombed for personal reasons?

6   A.  I did not, no.

7   Q.  Never found that?

8   A.  No.

9   Q.  Now, in terms of the scope of the investigation, you just

10  saw the DNA reports that -- well, that listed you as a suspect.

11  A.  Yes.

12  Q.  Fair to say?  Fair to say that -- that that's incorrect,

13  you were never a suspect?

14  A.  No, I was surprised.  I've never seen that report before.

15  Q.  Okay, in your career in law enforcement, did you see lots

16  of paper?

17  A.  Yes.

18  Q.  Did you ever see stuff like that where somebody gets in the

19  wrong subject line?

20  A.  Of course, yes.

21  Q.  So you were not a suspect?

22  A.  No.

23  Q.  Other than you, did you treat almost anybody that you

24  looked into in this case as a suspect?

25  A.  As a potential suspect, yes.

1   Q.  Did you ever do a case with a wider net?

2   A.  Probably not because I can usually focus real early on in

3   the investigation as to who the primary suspect is.

4   Q.  And you were asked about what was unique in this

5   investigation and you were asked about the notes you jotted to

6   yourself, recall that?

7   A.  Yes.

8   Q.  What else was unique in this investigation as you tried to

9   solve it?

10   A.  Well, the -- again, the pipe within the parcel that

11   contained the note, I had never seen anything like that.  There

12   being a note in the device, particularly from paper, so some

13   obvious thought went behind it to protect that piece of paper

14   so it would survive the detonation.  And the placement of the

15   device in the library I thought was very unique.  And there

16   again, I come back to the way it was addressed.  And I don't

17   recall exactly, but I know that there was something unusual

18   about that also.

19   Q.  Okay.  Let's talk about that.

20          MR. MORRISSEY:  Traci, do we have those exhibits?

21          THE COURTROOM DEPUTY CLERK:  Yes.

22          MR. MORRISSEY:  May I have them?

23          THE COURTROOM DEPUTY CLERK:  Do you want 927?  He has

24   that up there.

25          MR. MORRISSEY:  I don't.

 1    BY MR. MORRISSEY:

 2    Q.  Agent Casadei, showing you what's been admitted as Exhibit

 3    574-A --

 4            MR. MORRISSEY:  Your Honor, may I publish?

 5            THE COURTROOM DEPUTY CLERK:  It's in.

 6            THE COURT:  Yes.

 7    BY MR. MORRISSEY:

 8    Q.  Do you see that address there?

 9    A.  Yes.

10    Q.  Assume for the moment that that address reflects an

11    invitation to the Authors and Appetizers event at the library.

12    A.  Yes.

13    Q.  Is that the correct address for the Office of Diversity and

14    Dialogue?

15    A.  I believe that it is, yes.

16    Q.  So the Office of Dialogue is at 7575 East Main Street?

17    A.  Yes.

18    Q.  Showing you what's been admitted as Exhibit 89 --

19            MR. MORRISSEY:  Which is in evidence, Your Honor.  May

20    I publish?

21            THE COURT:  Yes.

22    BY MR. MORRISSEY:

23    Q.  And that was the address on the actual bomb.  Do you recall

24    that?

25    A.  I do now, yes.

1    Q.  So the street address on the bomb was wrong?

2    A.  Yes.

3    Q.  Don Logan never told you that the street address on the

4    bomb was correct, did he?

5    A.  No.

6    Q.  Okay.  Now, and you mentioned, because you're familiar with

7    this area, that if you drove 75th Street, and you just looked

8    at the signs, what you would see is a big 3939 sign, correct?

9    A.  Yes.

10           MS. WILLIAMS:  Objection, foundation, exceeds the

11   scope.

12           THE COURT:  Overruled.

13   BY MR. MORRISSEY:

14   Q.  Now, if we've seen the address, the correct address from

15   the Authors and Appetizers event, doesn't that indicate that an

16   insider would have access to the correct address?

17   A.  Somebody within the City of Scottsdale would know the

18   proper address, yes.

19   Q.  Okay.  So the fact that the bomb has the wrong street

20   address indicates an outsider, right?

21   A.  Yes.

22   Q.  Now, you were asked about your thought that it was -- it

23   was at least a little bit odd that the -- that the bomb was

24   dropped off at the library.  Do you recall that?

25   A.  Yes.

1   Q.  Is it fair to say that as the crow flies, the library and

2   the human resources building may be 200 yards apart?

3   A.  Very close, yes.

4   Q.  So the bomb got pretty close to the Office of Diversity and

5   Dialogue?

6   A.  Yes.

7   Q.  In 2004 -- well, did you know that the weight of the bomb

8   was more than one pound?

9   A.  I probably did.

10          MS. WILLIAMS:  Objection, Your Honor, misstates

11   evidence, facts not -- well, facts not in evidence, calls

12   for --

13          MS. HULL:  And outside the scope.

14          THE COURT:  Well, sustained.  I think you should ask a

15   nonleading question on this, Mr. Morrissey.

16   BY MR. MORRISSEY:

17   Q.  Okay.  Part of the investigation -- well, let me come at it

18   this way.

19          In your experience as a postal inspector, you -- you

20   certainly had training on regulations for when a person would

21   have to go to the counter at a mailing station to mail a

22   package, correct?

23   A.  It's better known as the Ted Kaczynski regulation, yes.

24   Q.  Okay.  Okay.  But the answer to my question is yes?

25   A.  Is yes.

1  Q.  Would a package weighing more than a pound require the

2  individual to go to the counter and have a face-to-face

3  encounter with the postal person to mail it?

4         MS. HULL:  Objection, outside the scope.

5         THE COURT:  Overruled.

6         THE WITNESS:  It would if he wanted to place it into

7  the mail stream without a postage meter affixed to it.  If

8  there's a postage meter, then he doesn't have to go to the

9  counter.

10  BY MR. MORRISSEY:

11  Q.  And the Scottsdale bomb, as delivered to the Scottsdale

12  library, didn't have a postal meter on it, did it?

13  A.  I don't recall.  I think it had postage stamps, but I can't

14  picture it right now.

15  Q.  Do you recall whether or not the only postal meter run on

16  that was determined to have been at the City of Scottsdale mail

17  room?

18  A.  That's correct, yes.

19  Q.  And so that was after it was delivered to the library?

20  A.  Yes.

21  Q.  So the Scottsdale bomb as delivered to the library didn't

22  have a postal meter on it?

23         MS. WILLIAMS:  Objection, asked and answered.

24         THE COURT:  Overruled.

25         THE WITNESS:  No.

1    BY MR. MORRISSEY:

2    Q.  In your opinion then, is it a plausible or a reasonable

3    scenario -- I believe you were asked about on direct, is it a

4    reasonable scenario that the bomber could not have -- that the

5    bomber may not have been able to mail that package into the

6    mail stream of commerce as you stated?

7             MS. WILLIAMS:  Objection, argumentative, calls for

8    improper opinion and speculation.

9             THE COURT:  Overruled.

10            THE WITNESS:  The package weighing over 16 ounces

11   would have to be taken to a post office for mailing unless a

12   postage meter was affixed.

13   BY MR. MORRISSEY:

14   Q.  And so if the bomber didn't do that or if the bomber wished

15   to avoid the face-to-face encounter with the post office, then

16   is that in your opinion a possible explanation for the lack of

17   a postal meter on the package?

18            MS. WILLIAMS:  Objection, argumentative, calls for not

19   only speculation but also a conclusion.

20            THE COURT:  Sustained.

21   BY MR. MORRISSEY:

22   Q.  You testified that one thing to pay attention to in your

23   experience was whether or not there was lots of stamps on a

24   package, correct?

25   A.  That's correct.

1   Q.  Were there lots of stamps on this package?

2   A.  I don't recall.

3          THE COURT:  We are at the noon hour, Mr. Morrissey, so

4   we are going to break.

5          Ladies and gentlemen of the jury, we will see you at

6   one o'clock.  Please remember not to discuss the case.

7          (The jury left the courtroom.)

8          MR. BOYLE:  May the witness step down?

9          THE COURT:  Yes, you may step down.  The rest may be

10  seated.

11         Defense counsel, when are you going to be calling the

12  informant so that that tax issue could come up?

13         MS. WILLIAMS:  Probably this afternoon, Judge.

14         THE COURT:  Okay.  All right.  When do you need a

15  ruling on the 214 and 215 issue?

16         MS. CISNEROS:  Your Honor, probably this afternoon.

17  We are proceeding a little slower, I think, than maybe we had

18  anticipated.

19         MS. HULL:  Why are you looking at me?

20         MS. CISNEROS:  I'm not looking at you on purpose.

21         THE COURT:  I saw who you looked at when you said

22  that.

23         MS. HULL:  Yes.

24         MS. CISNEROS:  But in any event, probably by this

25  afternoon, by the break, Judge.

1          THE COURT:  Okay.  I've got two meetings over the

2    lunch hour.  We have found cases on point on the tax issue.  I

3    need to read them.  And I don't know if I will have time during

4    lunch.  I will do as much as I can around these two meetings.

5    But I don't know for sure if I will have a ruling when I come

6    back on these issues.  I'll do my best.

7          MS. CISNEROS:  Thank you, Judge.

8          MS. WILLIAMS:  Your Honor, one brief thing.  We have

9    been advised that the Government is going to call Steve

10   Anderson.  I believe as an officer the court, I need to ask

11   that the witness be given an attorney.  The Government --

12   Mr. Morrissey knows how to contact and who to contact at our

13   office to get an attorney appointed.  We believe that should be

14   done and certainly before he gets on the stand.

15         THE COURT:  And why do you believe that, Ms. Williams?

16         MS. WILLIAMS:  Because of the nature of the -- the

17   questioning, whether direct or cross, because of the nature of

18   the case, the allegations, the investigation.  And, Judge, I

19   would also add that by putting him up on the stand, I believe

20   the Government is also -- this might be a side issue, also

21   going to be opening -- also will open up mental health issues.

22         MS. HULL:  And polygraph.

23         MS. WILLIAMS:  And polygraph.

24         THE COURT:  Mr. Boyle, your thought on counsel for

25   Mr. Anderson?

1          MR. BOYLE:  I think every witness who testifies said

2     they found absolutely no connection to Mr. Anderson to the

3     Logan bomb.  We are aware of no evidence to connect him to the

4     Logan bomb.  They've investigated the motive angle because of

5     the lawsuit.  Other than that, every piece of evidence, based

6     on numerous agents looking at this person, found nothing to

7     connect him.  There's just no reason other than their

8     allegation to re -- to even think that he would need a lawyer.

9     And this is all designed just to make the jury feel that he

10    needs a lawyer, which there's no evidence to believe he does.

11         So if they say they can point to one connection or

12    enough connections of him TO the bomb other than the motive for

13    the lawsuit, I would be glad to hear it.

14         MS. WILLIAMS:  That would not be our burden, Judge.

15         THE COURT:  What I am going to ask, Ms. Williams,

16    since you are the one raising it, that you provide me case law

17    on the circumstances under which I should insist that a lawyer

18    be appointed counsel if you would, please.  Obviously not after

19    lunch, but since Mr. Anderson won't be called today, if you

20    could get me that.  The parties disagree on whether there's

21    anything incriminating that could occur with respect to him.

22    And I need some help on deciding what the standard is for that

23    issue.

24         Okay, see you at one o'clock.

25         (The noon recess was taken.)

1           THE COURT:  Please be seated.  Counsel, I want to talk

2    to you about the tax issue.  I'm having some difficulty getting

3    through this because there are lots of cases on point.  And

4    it's very frustrating to me that the parties have failed to

5    find and cite relevant case law.  I shouldn't say on point.

6    There are relevant cases talking about defense ability to get

7    documents under this statute, about the Government's ability,

8    about when the Government has to make disclosures.  And I have

9    done my best to try to glance at them, look at summaries of at

10   least half a dozen cases that my law clerks found in an hour of

11   research this morning that aren't cited anywhere in the briefs.

12          But I think I've been able to do enough to reach a

13   conclusion.  Clearly had I been given this material some time

14   ago, we could have looked at it more thoroughly.  But it wasn't

15   cited by the parties.

16          So I'm going to give you my conclusion on the tax

17   issue as best I've been able to reach it over the limited lunch

18   hour with the help of my law clerks.

19          It is clear, I believe, in the case law that

20   defendants cannot obtain tax returns under Section 6103.  There

21   is a case on point, United States versus Recognition Equipment,

22   Incorporated, 720 F.Supp. Page 13.  It is from the District

23   Court for the District of Columbia.  This was a case in which

24   the defendant filed a motion to obtain access to tax records

25   for purposes of a criminal case.  And the court ultimately

1    declined that request.

2         The Court noted, and I'm now looking at portions of

3    its opinion, that the rules governing the disclosure of tax

4    returns and return information are strictly construed.  It

5    cites a couple of cases for that proposition.  It talked

6    specifically about Section 6103(i)(1)(B), which is the section

7    we talked about this morning, and it says that section only --

8    under that section only specified federal prosecutors,

9    including United States Attorneys, may authorize an application

10   to this court for an order for the disclosure of tax returns or

11   return information.

12        It then goes on to say:  Accordingly, under the

13   statutory scheme, this court cannot order the disclosure of

14   such information pursuant to defendant's motion.  And it then

15   cites a Second Circuit case.

16        There were a number of other cases that seemed to be

17   relevant to this issue.  There's a Sixth Circuit case,

18   United States versus Lochmondy, L-o-c-h-m-o-n-d-y, which is at

19   890 F.2d 817.  It's a 1989 decision in which the defendants

20   request a disclosure of the informants' tax audits for

21   impeachment purposes.  The District Court initially ordered

22   them to be disclosed.  The IRS refused to produce them saying

23   it wasn't legally required.

24        And upon review of some Sixth Circuit law, the

25   District Court reversed its order and agreed that it wasn't

1        something that had to be disclosed.  On appeal, the Sixth

2        Circuit affirmed the District Court's order not disclosing the

3        tax audits for purposes of impeaching an informant.

4                It also went on to say that the disclosure was not

5        required under Brady because the prosecution, in the case, was

6        never in possession of the tax returns.  And the fact that they

7        are in another agency of the Federal Government, the IRS,

8        doesn't mean they are within the prosecutor's control for

9        purposes of Brady.

10               It refers to another Sixth Circuit case, the Bibby

11       case, and it says this specifically:  Here, as in Bibby, the

12       prosecutor never had possession or knowledge of the income tax

13       returns sought by the defendants.  As a result, the prosecution

14       was never required to disclose them to the defense.

15               There are other cases which have held that the

16       Government was not required to produce an informant's tax

17       returns upon a request from the defendant absent any knowledge

18       that the prosecutor had knowledge of and access to the tax

19       records.  That's a District Court case in the Ninth Circuit,

20       United States versus Colima, C-o-l-i-m-a.  I don't know how the

21       second name is spelled -- or pronounced, it is M-o-n-g-e.

22       That's at 962 F.Supp. 1337, a 1997 decision out of the District

23       of Oregon.

24               Now that was under Rule 16, not Brady, but it was an

25       affirmative request for relevant impeachment information.  And

1    the Court held that it's not required to produce tax returns of

2    an informant that are not in the possession of a prosecutor.

3            Other cases have done the same thing.  There's another

4    case from the Eastern District of California.

5            So, it appears there's plenty of law on this issue

6    that has never been cited by either side in this case to the

7    Court.  But on the basis of it, I reach the following

8    conclusions:

9            Number one, it does appear to me that the Federal

10   Public Defender's office is not authorized by Section 6103 to

11   obtain IRS tax returns for a witness in a case.  I base that on

12   my reading of the statute we talked about this morning and the

13   fact that it's very limited to prosecutors, plus cases such as

14   the one I referred to a moment ago from the District of

15   Columbia District Court, United States versus Recognition

16   Equipment, that specifically say defendants can't obtain tax

17   returns.

18           The second argument that the defense has made is that

19   if it can't obtain the returns under Section 6103, it should

20   get them under Brady and Giglio.  But it appears the cases have

21   held that tax returns that are not in the possession of the

22   prosecutors are not subject to Brady and Giglio requirements.

23   And I don't think I can conclude that because the prosecutors

24   now have access to them because the defense obtained them under

25   Section 6103 when it shouldn't have, that now the prosecutors

 1   have possession of them for purposes of Brady disclosure

 2   obligation.  That would be a back door around the case law that

 3   says that the prosecutors normally don't have the disclosed

 4   documents in the possession of the IRS.

 5          All of which leads me to the conclusion that the

 6   defense is not properly in possession of the tax returns and

 7   that the Government does not have an obligation under Brady to

 8   produce the tax returns.

 9          Another factor that I've considered, because it was

10   raised by the defense, is the assertion that this informant has

11   given false testimony in this trial.  But I don't think -- and

12   there are cases obviously that say the Government has an

13   obligation to correct knowing false testimony at trial.  But

14   the informant's testimony that she included the ATF information

15   on her tax return is not demonstrably false if she chose to

16   list it under her household cleaning business.  I don't know if

17   she did or she didn't.  And so I can't conclude that the

18   Government is in a position in this case where it knows a

19   witness has given false testimony in this trial and that that

20   knowledge somehow triggers a disclosure obligation.  Because I

21   just don't think I can conclude the Government knows there's

22   been false testimony given in this trial.

23          For all of those reasons, it seems to me that going

24   forward, what we should do is say that the defense cannot use

25   the tax returns.  The defense can ask the questions that the

1    Government agreed this morning can be asked of the informant as

2    to how precisely she claims to have disclosed the ATF

3    information.  But I don't see how the tax returns can be used

4    given this law.

5         Does anybody on the defense side have a basis for

6    disagreeing with that?

7         MS. WILLIAMS:  We accept your ruling, Judge.

8         THE COURT:  Okay.  Then that will be what we will do

9    going forward this afternoon.

10        MR. MORRISSEY:  Your Honor, before this was resolved,

11   there was a pleading by the defense that I guess preliminarily

12   sought to have these included in the record, and I just want

13   to --

14        THE COURT:  I have not ruled on the motion to seal

15   that document.  And I'm going to deny the motion to seal so

16   that those tax returns do not go into the docket in this case.

17   Because again, I think they are not properly in the possession

18   of the defense.  And we've got a clear record that they are the

19   informant's tax returns and we even have the years specified.

20   But I don't think they should be put into the docket.

21        MR. MORRISSEY:  Okay.  And the second issue was the

22   Government also asked for disgorgement.  Do you wanted to take

23   that up later?

24        THE COURT:  Yes.

25        MR. MORRISSEY:  And they are still subject to a

1   protective order?

2         THE COURT:  They are.  And I do want to take up

3   disgorgement later.

4         Now because of that and the number of cases that I had

5   to look at, I have had no additional time to look at 214 and

6   215, that issue.  I can't give you any further ruling on that.

7   I think we will just have to go ahead, get the jury in, and if

8   an issue comes up this afternoon that I need to address, we can

9   talk about it at side bar.

10         Okay, we are going to bring the jury in.

11         MR. MORRISSEY:  Your Honor, should Mr. Casadei retake

12   the stand?

13         THE COURT:  Please.

14         (The jury entered the courtroom.)

15         THE COURT:  Please be seated.  My apologies, ladies

16   and gentlemen of the jury, for keeping you waiting 25 minutes.

17   We weren't taking a long lunch.

18         Mr. Morrissey, you may continue.

19         MR. MORRISSEY:  Traci, is the Elmo on?

20         THE COURTROOM DEPUTY CLERK:  It is.

21   BY MR. MORRISSEY:

22   Q.  Agent Casadei, I wanted to show you Exhibit 88, which is in

23   evidence.  And it's going to relate back to a subject we talked

24   about before lunch.

25         One of the things I asked you about before lunch was

1  whether there had been any stamps or any postal meter on the

2  package when it was delivered to the Scottsdale library.  Do

3  you recall that?

4  A.  Yes, I do.

5  Q.  And over lunch did something jog your memory?

6  A.  Yes, it did.

7  Q.  Does this exhibit help jog your memory?

8  A.  Very much so, yes.

9  Q.  Can we clear that up for the jury whether there was postage

10  on this when it was found in the library?

11  A.  There was not.

12  Q.  Was it part of your investigation, in fact, to go to the

13  City of Scottsdale mail room and investigate how the meter

14  strip got on it?

15  A.  Yes, we went there to try to identify the meter that that

16  particular strip came from.

17  Q.  Okay.  And were you able to do this?

18  A.  Yes.

19  Q.  And where did it come from?

20  A.  The City of Scottsdale mailing room.

21  Q.  And is that sharp enough for you to determine what day the

22  meter was run on that?

23  A.  Yes.  February 25th, 2004.

24  Q.  Which is four days after Saturday, February 21st?

25  A.  Yes.

1  Q.  Now, you were asked on direct about your notes from a

2  conversation that you had with Don Logan on January 24th, 2005.

3  And your -- your notes of that conversation say that Mr. Logan

4  said that the note was personal --

5          MS. HULL:  Objection, improper impeachment.

6          MR. MORRISSEY:  Could I finish the question?

7          THE COURT:  Why don't you reask the question, if you

8  would, please.

9  BY MR. MORRISSEY:

10  Q.  Okay, I believe you were asked on direct about your notes

11  of that conversation.  Do you recall that?

12  A.  Yes, I do.

13  Q.  And you told us that your note reflected that Mr. Logan

14  that day said that the note was personal and accused him of

15  being unethical and corrupt.  Do you recall that?

16  A.  Yes.  Yes.

17  Q.  Fair to say you met with Don Logan more than a dozen times?

18  A.  A lot more, yes.

19  Q.  Okay.  You didn't always write a report every time you met

20  with him, right?

21  A.  I did not, no.

22  Q.  So you met with him, it sounds like dozens of times?

23  A.  Yes.

24  Q.  You met with him in the hospital after February 26th, 2004?

25  A.  I did.

1    Q.  There was a time -- there was a first time that you showed

2    him the note that was contained in the bomb, right?

3    A.  Yes.

4    Q.  Do you recall that the first time you showed him the note,

5    what his reaction was?

6            MS. WILLIAMS:  Objection, foundation.

7            THE COURT:  Overruled.

8    BY MR. MORRISSEY:

9    Q.  Well, okay, you can answer.  Do you recall what his

10   reaction was?

11   A.  I don't specifically recall, no.

12   Q.  Would reviewing your report of that contact refresh your

13   recollection?

14   A.  It might, yes.

15           MR. MORRISSEY:  May the --

16   BY MR. MORRISSEY:

17   Q.  Do you have in front of you Exhibit 927, what has been

18   marked as Exhibit 927?

19   A.  I do.

20   Q.  Okay.  Would you again review the second page of that

21   exhibit, again without reading it out loud, the last three

22   paragraphs, and when you're done with that review, if you would

23   put the exhibit away.

24           So you closed that up?

25           Was this interview on March 5th, 2004?

1  A.  Yes.

2  Q.  Is this the first time you showed Don Logan the note?

3  A.  Yes.

4  Q.  What was his reaction?

5          MS. HULL:  Objection, outside the scope.

6          MS. WILLIAMS:  Your Honor, and vouching, improper

7  impeachment.

8          THE COURT:  Well, overruled on outside the scope.

9          Is this intended to be under Rule 613, Mr. Morrissey?

10          MR. MORRISSEY:  No, it's not.  Where it's intended to

11  go is there's a statement made not offered -- not offered --

12  well, it may be 613.  It's not offered for its truth.  It goes

13  to comparison with what was elicited on direct.  So it's a

14  nonhearsay purpose for the statement.

15          THE COURT:  Well, it's not under 613 then.  It's not

16  impeachment.

17          MR. MORRISSEY:  Correct.

18          THE COURT:  Right?

19          MR. MORRISSEY:  And it's within the scope.

20          THE COURT:  Well, I've already overruled the beyond

21  the scope objection.

22          MR. MORRISSEY:  Okay.

23          THE COURT:  The objection is overruled.

24  BY MR. MORRISSEY:

25  Q.  What was Mr. Logan's reaction?

1   A.  He was pretty upset.  This was the first time, I think, we

2   got into real specifics about who possibly could be a suspect

3   in the investigation.

4   Q.  Did Mr. Logan tell you that he felt the bomb was directed

5   towards him and what he does?

6              MS. WILLIAMS:  Objection, hearsay.

7              THE COURT:  Sustained.

8              THE WITNESS:  Yes.

9              THE COURT:  Hold on just a second.  I sustained --

10             THE WITNESS:  Sorry.  Sorry.

11             THE COURT:  -- the objection.

12             MS. WILLIAMS:  Move to strike.

13             THE COURT:  I'll strike that answer.

14  BY MR. MORRISSEY:

15  Q.  You indicated that this was the first time Mr. Logan had

16  seen the note, correct?

17  A.  Yes.

18  Q.  And you and Mr. Logan in this conversation were discussing

19  possible suspects?

20             MS. WILLIAMS:  Objection, hearsay.

21             THE COURT:  Overruled.

22  BY MR. MORRISSEY:

23  Q.  Is that fair?

24  A.  This was an opportunity to talk to him about who would

25  intensely dislike him on a personal level to possibly identify

1   a direction.

2   Q.  As we discussed and as you talked about on direct, your

3   approach in these bombing investigations was always to look at

4   the personal angle?

5   A.  That's correct.

6   Q.  Did Mr. Logan have a different direction he wanted you to

7   take?

8          MS. HULL:  Objection, hearsay.

9          THE COURT:  Sustained.

10  BY MR. MORRISSEY:

11  Q.  Did Mr. Logan have a belief as to why he was bombed?

12         MS. WILLIAMS:  Objection, hearsay.

13         THE COURT:  Sustained.

14         MR. MORRISSEY:  Your Honor, even for a nonhearsay

15  purpose?

16         THE COURT:  Well, I don't know how it could be

17  anything else.

18         MR. MORRISSEY:  Than hearsay?

19         THE COURT:  Right.

20         MR. MORRISSEY:  Okay.  All right.

21  BY MR. MORRISSEY:

22  Q.  When you were asked on direct about your views as to why

23  Mr. Logan was targeted and not more prominent African-Americans

24  such as Mr. Tillman or Cody Williams, I believe were the names.

25  Do you recall that?

1   A.  Yes.

2   Q.  Had Don Logan been in the news?

3   A.  I believe he had been, but not as prominently as those two

4   gentlemen.

5   Q.  Sure.  And when he was in the news, he was identified as

6   the director of Office of Diversity and Dialogue, right?

7       MS. WILLIAMS:  Objection, foundation, calls for

8   hearsay.  Foundation as to time and place.

9       THE COURT:  Well, I don't think that's a proper

10  foundation objection.  Sustained on hearsay grounds.

11  BY MR. MORRISSEY:

12  Q.  In the course of your investigation, one of the things you

13  discussed on direct was you found certain articles in

14  Mr. Logan's briefcase, correct?

15  A.  Yes.

16      MS. HULL:  Objection, Your Honor, mischaracterizes the

17  testimony.  He could not recall.

18      THE COURT:  That's arguing the point.  Overruled.

19  BY MR. MORRISSEY:

20  Q.  And as part of your investigation, did you determine

21  whether or not Mr. Logan had been in the news?

22  A.  Yes.

23  Q.  Was it important to your investigation whether or not

24  Mr. Logan might have been targeted because of his position as

25  officer -- as director of Office of Diversity and Dialogue

 1   Office?

 2   A.  That was part of the investigation.  And there again, my

 3   part of the investigation was focusing on other relationships.

 4   Q.  Okay.  But part of what you tried to do was figure out

 5   Mr. Logan's profile, public profile versus Mr. Tillman and Cody

 6   Williams, correct?

 7   A.  Yes.

 8   Q.  So that was part of your investigation?

 9   A.  That's correct.

10   Q.  And you knew that -- you knew what Don's title was, right?

11   A.  Yes, I did.

12   Q.  What was his title?

13   A.  Director of diversity, City of Scottsdale.

14   Q.  So if the bomber hated diversity, wasn't Don Logan a more

15   prominent target than Mr. Tillman or Cody Williams?

16           MS. WILLIAMS:  Objection, argumentative.

17           THE COURT:  Overruled as argumentative.

18           MR. MORRISSEY:  You may answer.

19           THE WITNESS:  Can you repeat that, please.

20           MS. HULL:  Outside the scope, Judge.

21           THE COURT:  Overruled.

22   BY MR. MORRISSEY:

23   Q.  If the bomber hated diversity, wasn't Don Logan a more

24   prominent target than Mr. Tillman and Cody Williams?

25           THE COURT:  We can't hear you, Ms. Hull.

1          MS. HULL:  Objection as it goes to the ultimate issue.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes.

4    BY MR. MORRISSEY:

5    Q.  Now, you said on direct that one of your thoughts in the

6    course of the investigation was that Velicia McMillan was more

7    prominent, would have been -- was a more prominent target than

8    Mr. Logan.  Do you recall that?

9    A.  Yes, I do.

10   Q.  Given that she was not the director of the Office of

11   Diversity and Dialogue, how was she more prominent?

12   A.  I recall the name.  I'm -- I'm having difficulty what

13   position she had.  She -- if I am thinking of the correct

14   person, she was involved outside the City of Scottsdale in

15   affairs affecting diversity and those issues, if I'm correct.

16   Q.  Okay.

17   A.  I may be thinking of the wrong person, but --.

18   Q.  All right.  Had you heard the September 26th, 2003 phone

19   call from Dennis Mahon to the Office of Diversity and Dialogue?

20   A.  I did hear the phone call, the tape.

21   Q.  Now, that phone call was mailed specifically to the Office

22   of Diversity, correct?

23   A.  Yes.

24   Q.  And it had a complaint about celebrating Hispanic heritage

25   month, right?

1    A.  Yes.

2    Q.  That's a race issue, right?

3    A.  Yes.

4    Q.  And the phone call specifically mentions white people

5    standing up, right?

6    A.  I just remember it was a pretty racist call.  I don't

7    recall all the details of what was left in the message.

8    Q.  Okay.  Did you know at that time, shortly after the

9    bombing, did you know what the White Aryan Resistance stood

10   for?

11   A.  I did not.

12   Q.  Did you -- you were asked on direct about your level of

13   familiarity with the Edmund Burke Society.  Do you recall that?

14   A.  Yes.

15          MS. HULL:  Objection, that's outside the scope.  That

16   was not the question.

17          THE COURT:  Overruled.

18   BY MR. MORRISSEY:

19   Q.  Do you recall that?

20   A.  Yes.

21   Q.  Did you research whether or not the Edmund Burke Society

22   was a white supremacist group?

23   A.  I did not.

24   Q.  Okay.  So whether you were pursuing the race angle or not,

25   is it fair to say that race was always a factor in this

1    investigation?

2    A.  Yes.

3           MS. WILLIAMS:  Objection -- sorry, foundation, calls

4    for speculation.

5           THE COURT:  Counsel, would you stand so the witness

6    knows you are objecting.  And if you see them stand, don't say

7    anything, okay.

8           State your objection, please.

9           MS. WILLIAMS:  Sorry, foundation, calls for

10   speculation.

11          THE COURT:  Sustained.

12   BY MR. MORRISSEY:

13   Q.  Agent Casadei, you were asked about whether or not there

14   were different theories being pursued in this investigation.

15   Do you recall that?

16   A.  Yes, I do.

17   Q.  And you were asked about whether or not you had

18   disagreements and participated in discussions with Scottsdale

19   P.D. and ATF.  Do you recall that?

20   A.  Yes.

21   Q.  And you were pursuing the personal angle, correct?

22   A.  I was.

23   Q.  Were you aware of the other angles of investigation?

24   A.  Yes.

25   Q.  Was one of the other angles of investigation whether race

 1   was a motivating factor in the bombing?

 2           MS. WILLIAMS:  Objection, foundation, calls for

 3   hearsay.

 4           THE COURT:  Overruled.

 5           THE WITNESS:  Yes.

 6   BY MR. MORRISSEY:

 7   Q.  Now, you were asked on direct about uniqueness, about this

 8   bombing.  And one of the things you talked about was the fact

 9   that the package ends up going through interoffice mail.  Do

10   you recall that?

11   A.  Yes, I do.

12   Q.  And you testified that one of your thoughts was, well,

13   maybe that means that the bomber was familiar with Scottsdale's

14   interoffice mail system?

15   A.  Yes.

16   Q.  Okay.  Is it equally likely that the bomber was familiar

17   with the rule that if a package weighs over a pound, to mail it

18   you have to go to the counter at the post office?

19           MS. WILLIAMS:  Your Honor, I'm going to object.

20   Argumentative, calls for speculation.

21           THE COURT:  Sustained.

22   BY MR. MORRISSEY:

23   Q.  You had a investigative theory that possibly the bomber was

24   familiar with the Scottsdale interoffice mail system.  Do you

25   recall that?

1    A.  Yes.

2    Q.  Were you aware of other investigative theories with respect

3    to why the package was found in the library and had not gone

4    through the mail?

5    A.  Yes.

6    Q.  Did you become familiar with those theories as part of your

7    work on the case?

8    A.  Yes.

9    Q.  Did you participate in discussions after the bombing with

10   members of the postal service?

11   A.  I did.

12   Q.  And with other law enforcement agencies on these theories?

13   A.  Everybody working on the case, yes.

14   Q.  Okay.  Was yours the only theory as to why the package went

15   through interoffice mail?

16   A.  No, it was not.

17   Q.  Would you tell us what other theories were.

18          MS. WILLIAMS:  Objection, Your Honor, calls for

19   hearsay.

20          THE COURT:  Overruled.

21          THE WITNESS:  Well, the other theories were whether

22   somebody, again, within the city, knew by placing it there, it

23   would eventually get into the interoffice mail system to be

24   delivered to Don.  Also that it may have been placed there

25   because the person was identified or the person may have been

1  seen with the device and it was a good way to get rid of the

2  parcel.  And also the theory that it could not be mailed

3  without approaching somebody in the U.S. Postal Service to

4  affix proper postage or getting an identifiable meter strip

5  attached to it.

6       So it was placed there thinking again that it would be

7  delivered to Don through the Scottsdale interoffice mail

8  system.

9       I don't think that one of the things that we discussed

10  is I did not feel that somebody would -- having it placed

11  there, would think that it would ever get into the U.S. mail

12  stream.

13  BY MR. MORRISSEY:

14  Q.  Right.  Now, in the course of your participation in the

15  investigation, there were times when materials from the bomb

16  were being sent back to the postal lab in Dulles, Virginia,

17  correct?

18  A.  Yes.

19  Q.  You were asked on direct about who you knew as postal

20  inspectors.  Do you recall that?

21  A.  Yes.

22  Q.  Was Robert Moberley an employee of the postal service?

23  A.  I believe he is one of our crime lab technicians, yes.

24       MR. MORRISSEY:  Your Honor, Exhibit 655 is in

25  evidence.  May I publish that exhibit?

1          THE COURT:  Yes.

2    BY MR. MORRISSEY:

3    Q.  Agent Casadei, would you read the sentence beginning

4    "however"?

5    A.  "However, Robert Moberley is included as a possible

6    contributor to this mixture."

7    Q.  So is it fair to say that a lot of exclusions were run with

8    postal employees, Scottsdale employees, ATF employees?

9    A.  Yes.

10   Q.  But Mr. Moberley, the lab employee, couldn't be excluded?

11   A.  Could not.

12   Q.  Okay.  You were asked on direct about statements -- well,

13   theories and ideas of the investigation and what -- what you

14   believed was the right road to go down.  Did your pursuit of

15   the personal angle indicate any view by you on whether or not

16   the investigation into the Mahons was the wrong road?

17   A.  No, I just knew that the investigation was extremely wide

18   ranging and that we all had to look -- we had our different

19   responsibilities.  And I knew that was going to be covered by

20   ATF and the agents working on that angle.  I really wanted to

21   eliminate the possibility of a personal encounter that caused

22   this to be mailed.

23   Q.  You were asked about your review of Catoosa tapes in this

24   investigation.  Do you recall that?

25   A.  Yes.

1    Q.  Did you ever review a tape in which Dennis Mahon described

2    the size of the Scottsdale pipe bomb as a one by five?

3    A.  I do not recall that.

4    Q.  If Dennis Mahon had described the exact size of the pipe

5    bomb used in the Scottsdale bombing, would that have been

6    significant to you?

7            MS. WILLIAMS:  Objection, Your Honor, calls for

8    speculation, exceeds the scope of direct.

9            MS. HULL:  Counsel is testifying.

10           MS. WILLIAMS:  And argumentative.

11           THE COURT:  Sustained.

12           MR. MORRISSEY:  One moment, Your Honor.

13           Nothing further.

14           THE COURT:  All right.  Redirect?

15           MS. WILLIAMS:  Your Honor, may I have just a moment

16   before we start?

17           THE COURT:  Sure.

18           MS. WILLIAMS:  Thank you, Your Honor.

19           THE COURT:  All right, Ms. Hull, do you wish to

20   redirect?

21           MS. HULL:  I do.

22

23                        REDIRECT EXAMINATION

24   BY MS. HULL:

25   Q.  Inspector, you were talking on cross-examination about -- I

1  believe that Mr. Morrissey characterized the scene of the

2  bombing as chaotic.  Do you remember that line of questioning?

3  A.  Yes, I do.

4  Q.  But it was -- any chaos was outside the secured area?

5            MR. MORRISSEY:  Objection, leading.

6            THE COURT:  Sustained.

7  BY MS. HULL:

8  Q.  Was the chaos outside the secured area of the blast site?

9  A.  Yes, outside the blast scene, of course.  And I don't know

10  if I would characterize it as chaotic, but there was an awful

11  lot going on.

12  Q.  Okay, so you wouldn't characterize it as chaotic.  What

13  would you characterize it as?

14  A.  It was very busy, trying to decide -- many things happen

15  right after detonation and people have many different

16  responsibilities.  And things tend to settle down pretty

17  rapidly.  But once you get there within an hour or so of the

18  bombing, everything is still pretty hectic.

19  Q.  Did you see medical personnel?

20  A.  I don't recall seeing medical personnel, no.

21  Q.  Did you see any civilians or nonlaw enforcement inside that

22  building when you entered?

23  A.  I don't recall any.  In my mind, I see nothing but police

24  officers and federal agents.

25  Q.  Sir, did you -- you testified about, for example, you

1  talked about the mail room and your investigation of the mail

2  room as to the meter strip.  Do you recall that?

3  A.  Yes.

4  Q.  You were talking also about the process that you went there

5  as part of your investigation to eliminate people who were

6  maybe potential suspects or people of interest.  Do you recall

7  that?

8  A.  I do.

9  Q.  And did you utilize that process in the mail room as well?

10  A.  Somebody else was in charge of the mail room.  So I was

11  just part of the investigative team that went in there looking

12  for any relatable possible components.  If it was someone in

13  the mail room involved, I was looking for that.

14       And I knew somebody else would be looking at all the

15  meters and getting meter strip impressions and so forth.  So I

16  was looking for other things that might be associated with the

17  bomb, paper, tape, and anything.

18  Q.  I'm sorry to interrupt.

19       Did you -- do you remember finding anything in the

20  mail room about -- that was a Uline box related to the box

21  used?

22  A.  That does ring a bell.  I remember the name Uline and being

23  a box.  And in a typical investigation, somebody is assigned

24  just to trace the box itself and determine its origin.

25  Q.  Was that you?

1    A.  No, it wasn't me.

2    Q.  Okay.  All right.  As part of your investigation, did you

3    attempt or seek to search a property in Northern Arizona?

4    A.  Outside the city?

5    Q.  Yes, sir.

6    A.  I was not involved in anything like that, no.

7    Q.  You also talked about -- well, let me ask you this:  As a

8    general proposition, you were talking about the fact that while

9    you were on the case, you did not establish any link between

10   Don Logan and certain individuals.  Do you recall that

11   testimony?

12   A.  Yeah, I did not establish anything.  No.

13   Q.  And was that in part because you left the investigation?

14          MR. MORRISSEY:  Objection, calls for speculation.

15          THE COURT:  Overruled.

16          THE WITNESS:  You know, it's possible -- up to that

17   point I did not have -- I know there were some areas that I

18   wished to investigate further, but I -- I did not.  So --.

19   BY MS. HULL:

20   Q.  Okay, because you left or because you were involved in this

21   other task force towards the end of your --

22   A.  Yes.

23   Q.  -- career with postal?

24   A.  Yeah, my career was ending and I had other

25   responsibilities, too, yes.

1    Q.  Did you want to continue to pursue that aspect of the

2    investigation?

3    A.  Yes.

4    Q.  And did you have concerns about with your departure, the

5    continuity of the investigation?

6    A.  I did, yes.

7    Q.  And what were your concerns?

8    A.  Well, that there would be no one working the case at the

9    time of the indictments that was associated with the case from

10   the beginning.  And the -- the body of the investigation, that

11   there were no more postal inspectors even in town that knew the

12   entire case.

13   Q.  How about at the point leading up to your retirement?

14   A.  Well, I was really comfortable with Jesse and Tim Lenzen

15   and Rich Atwood at the time, very, very good young inspectors

16   and very aggressive and knowledgeable.  And they didn't have

17   particular bomb experience, but they were very, very good

18   investigators, so I felt very good leaving.

19   Q.  And when you talk about what you would have liked to

20   continue with, what are you talking about then?

21          MR. MORRISSEY:  Your Honor, I object to the relevance

22   of this portion.

23          THE COURT:  Overruled.

24   BY MS. HULL:

25   Q.  You can answer, sir.

1    A.  Well, I would have just liked to continue with the case to

2    keep some continuity within, you know, the Phoenix field

3    office.  I knew that that would end if -- with these younger

4    inspectors being transferred.

5    Q.  Okay.  And you also talked about -- for point of

6    clarification, sir, when I was asking you earlier about what

7    documents you found in Mr. Logan's briefcase, do you remember

8    when I was asking you that line of questioning?

9    A.  Yes.

10   Q.  And reviewing your report did not refresh your

11   recollection.  Do you recall that?

12   A.  By -- for -- for specific documents, yes.  I could not

13   recall specific documents.  Documents, but not specific

14   documents.  Yes.

15   Q.  Okay.  Well, just on cross-examination, Mr. Morrissey asked

16   you about the news articles you found in his briefcase.  Do you

17   remember that question?

18   A.  I don't.  If he did ask that relating specifically to news

19   articles, I don't recall that at all, no.

20   Q.  Okay.

21   A.  So I may have been thinking of just documents inside his

22   briefcase in general, not anything specific.

23   Q.  Okay.  So when you talk about documents being found there,

24   you don't know if it was news articles or something else?

25   A.  No.  I don't -- I do not.

1   Q.  So along that line of questioning, I believe Mr. Morrissey

2   was asking if you used that -- the information contained in the

3   briefcase to tell us whether or not Mr. Logan had been in the

4   press.  Do you remember that?

5   A.  No.  I remember that there are articles, and I knew that he

6   was in the press.  I didn't associate them with anything coming

7   out of his briefcase.

8   Q.  Okay.  When you talked about people who were more

9   prominent, black leaders in the community, you named Oscar

10  Tillman --

11  A.  Yes.

12  Q.  -- as one on cross-examination.

13  A.  Yes.

14  Q.  Who is Oscar Tillman?

15  A.  You know, I know it's a name associated with the City of

16  Phoenix and the Phoenix area.  And there again, at our

17  meetings, we were trying to throw around different ideas.  So

18  why would Don be targeted, who is not as prominent a media

19  figure as someone like Oscar Tillman at that time.

20  Q.  Do you know if he's a member of NAACP?

21  A.  I do not know that for sure.  I just know the name.

22  Q.  You talked on cross-examination about this phone call from

23  September of 2003 that you listened to.  Do you recall that

24  line of questioning?

25  A.  Yes.

1   Q.  Did you have any thoughts about the fact that Mr. Logan was

2   not even mentioned in that call?

3   A.  No, I remember the call being discovered and hearing it.

4   And that's about -- I just remember basically what the content

5   was.  And I believe even at the time, there was some question

6   as to where it originated, who -- who had called.  Again --

7   Q.  So my question is, did you have thoughts at the time as to

8   whether -- why Don Logan's name was not mentioned in that call?

9   A.  No.  I do not.

10   Q.  Would reviewing your notes refresh your recollection?

11          If you would please look at Exhibit 801, sir.  If you

12   would look at the first page, the fourth bullet point down.

13   A.  Okay.

14   Q.  Does that refresh your recollection?

15   A.  Yes.

16   Q.  What were your thoughts, sir?

17   A.  Why, if it was directed at the office -- the question is,

18   and again, our group of investigators, why is Don's name not

19   mentioned.  Does anybody have a theory on that.

20   Q.  As having any relation to the bomb?

21   A.  Well, why in particular, why was his name not mentioned in

22   this phone call.  So was the -- was the bomb directed at him,

23   you know, again, this is early in the investigation, why is not

24   the message saying Don Logan.

25   Q.  Okay.  You also talked about the note -- or the address

 1   label.

 2            MS. HULL:  May I publish Exhibit Number 89, sir --

 3            THE COURT:  Yes.

 4            MS. HULL:  -- on the Elmo?

 5   BY MS. HULL:

 6   Q.  Sir, that address, you talked on cross-examination about

 7   the 3939 North 75th Street.  Do you remember that?

 8   A.  Yes.

 9   Q.  And you talked about your concerns about how it would be or

10   how someone would know that someone with -- that that package

11   addressed as it is would make it to interoffice -- through

12   interoffice to Mr. Logan.  Do you remember that line of

13   questioning?

14   A.  Yes, I do.

15   Q.  And the cross-examination centered around in part the fact

16   that the Government asked you:  Well, is it possible that

17   someone put this there because they didn't want it to go

18   through the mail?  Do you remember that line of questioning?

19   A.  Yes.

20   Q.  And the other theories that the Government presented to

21   you, would you agree that they all presume that the bomber

22   mislabeled this label?

23            MR. MORRISSEY:  Objection, leading.

24            THE COURT:  Sustained.

25   BY MS. HULL:

1   Q.  Do those other theories that you were talking about on

2   cross-examination by Mr. Morrissey -- do -- let me ask it this

3   way:  Do any of them not assume that this label was a mistake?

4   A.  I'm not quite sure what you're asking.

5   Q.  Well, let me ask you this:  You testified earlier on direct

6   examination that it was, in your recollection, it was fairly

7   easy to find out the correct address of diversity and dialogue

8   in Scottsdale.  Do you remember that questioning?

9   A.  If someone just looked up an address, they should be able

10  to find it, yes.

11  Q.  So if it's that easy to find, isn't it as easy to assume

12  that since that information is so readily and easily available,

13  that this label is not a mistake?

14          MR. MORRISSEY:  Objection, calls for speculation.

15          THE COURT:  Mr. Morrissey, please remember to stand.

16          MR. MORRISSEY:  I will, Your Honor, I'm sorry.

17          THE COURT:  Sustained.

18  BY MS. HULL:

19  Q.  If the label has -- that was not the address of the

20  library, was it?

21  A.  No, it wasn't.

22  Q.  And it wasn't the address to city hall?

23  A.  I'm not sure what the address was for.  I just know that it

24  was improperly addressed to -- for it to go to the director of

25  diversity.

1    Q.  Would you agree with the statement that -- well, again, you

2    were talking about uniqueness on cross-examination.  Do you

3    remember the uniqueness of this bomb?  Do you remember that

4    cross-examination by Mr. Morrissey about the unique

5    characteristics of this bomb?

6    A.  Well, of the -- the parcel and --

7    Q.  Yes, sir.

8    A.  Okay.

9    Q.  Yes, sir.  And you talked earlier about the note being

10   found.  You had never seen anything like that before?

11   A.  That's correct, yes.

12   Q.  Did it, based on your training and experience, did it

13   strike you as something -- a sophisticated delivery of the

14   note, or not sophisticated?

15   A.  Well, with that -- with the note being protected the way it

16   was, I would say some thought went into the placement of that

17   note within the pipe inside the parcel, yes.  So --

18   Q.  And based on your training and experience, would you expect

19   that someone who is sophisticated enough to package that note

20   as they did, that they would likewise be sophisticated in

21   creating the label on the package?

22   A.  I think they are two different things.  I would not agree

23   with that, no.

24   Q.  You would agree that it's very easy to find or would have

25   been very easy to find the address -- correct address?

1   A.  Yes.  And, but, if you happen to be -- if you just assume

2   that that's the address because you drive by that location,

3   then there would be no reason to look it up.

4   Q.  And if you didn't want to look it up, or could easily have

5   looked it up, wouldn't you deliver it to your proposed

6   destination?

7           MR. MORRISSEY:  Objection, calls for speculation.

8           THE COURT:  Sustained.

9           MS. HULL:  No further questions.

10          THE COURT:  Any redirect, Ms. Williams?

11          MS. WILLIAMS:  No, Your Honor, thank you.

12          THE COURT:  All right.  Thanks, you can step down,

13  Inspector.

14          MS. HULL:  May the witness be released?

15          MR. MORRISSEY:  Yes, Your Honor.

16          THE COURT:  Yes.

17          MS. WILLIAMS:  Defense calls Tim Lenzen.

18          MS. HULL:  Could we have Exhibits 651 through 655 and

19  812, please.

20          THE COURTROOM DEPUTY CLERK:  812?

21          MS. WILLIAMS:  Yes.

22          THE COURTROOM DEPUTY CLERK:  Okay.  Sir, if you would

23  please come forward.

24          If you would stand right here and raise your right

25  hand.

1          (The witness, Tim Lenzen, was duly sworn. )

2          THE COURTROOM DEPUTY CLERK:  Please remember to speak

3    into the microphone.  And there's water there if you need it.

4

5                        TIM LENZEN,

6    called as a witness herein, having been first duly sworn, was

7    examined and testified as follows:

8

9                      DIRECT EXAMINATION

10   BY MS. WILLIAMS:

11   Q.  Good afternoon.

12   A.  Good afternoon.

13   Q.  Would you please tell us your name and where you work?

14   A.  Good afternoon.  My name is Tim Lenzen.  I'm currently a

15   special agent with the Department of Homeland Security

16   Immigration and Customs Enforcement.

17   Q.  And where did you work before your current posting?

18   A.  I was a postal inspector here in Phoenix, Arizona.

19   Q.  For -- between what years?

20   A.  Between the year 2004 and 2009.

21   Q.  And while you were still a postal inspector, did you have

22   any involvement in this case?

23   A.  Yes, I did.

24   Q.  What was your involvement?  What was --

25   A.  My --

1    Q.  Did you have a title in the case?

2    A.  My involvement was, I was the co-case agent when Inspector

3    Jesse Sartuche was the case agent.  And then when Inspector

4    Sartuche left for another state, then I took over the case and

5    was working with Agent Moreland and Agent Bettendorf with ATF.

6    Q.  And so when you left the postal inspectors in 2009, were

7    you replaced as case agent by anyone else?

8    A.  I was.

9    Q.  Do you know who that is?

10   A.  I believe it was Inspector Keith Moore or Inspector James

11   Felton.

12   Q.  While you were case agent on this case, did you have any

13   involvement with the mailings --

14   A.  Yes, I did.

15   Q.  -- in relation to the informant, Rebecca Williams?

16   A.  Yes, I did.

17   Q.  Can you tell us what was your involvement?

18   A.  I would receive envelopes that were prepared either by

19   myself or with Agent Moreland and we would put a return stamp

20   or a return label on that showed that they were mailed from

21   Arizona.

22   Q.  So when you got something, you mailed it out?

23   A.  Correct.

24   Q.  And you got it from where?

25   A.  I either received it from -- I believe it was Agent

1    Moreland that I received it from.

2    Q.  Never directly from Rebecca Williams?

3    A.  No.

4    Q.  What about incoming?

5    A.  All incoming mail to her was sent to me.  And then that

6    information was also given over to Agent Moreland.

7    Q.  By you?

8    A.  Yes.

9    Q.  And did you keep a log of outgoing mail, things that

10   Rebecca Williams was sending to Dennis Mahon?

11   A.  I don't recall if I did or not, no.

12   Q.  You kept a log of incoming?

13   A.  I believe I did, yes.

14   Q.  And what was the time period in which you were in charge of

15   the mailings for postal?

16   A.  That's difficult to answer.

17   Q.  Sorry.

18   A.  It was over a period of time, but I can't tell you exact

19   dates, because I don't know when we began the mailings and when

20   those mailings had stopped.

21   Q.  Did you -- were you involved with this case the entire

22   period of '04 to '09?

23   A.  Yes.

24   Q.  Do you recall whether the mailings occurred during the

25   entire period of '04 to '09?

1    A.  They did not occur, no.  Not from 2004.

2    Q.  And when incoming mail arrived from Dennis Mahon, it came

3    to you first?

4    A.  Well, it was sent to the post office box.

5    Q.  Okay.

6    A.  And the postmaster would then send those mail pieces to me.

7    Q.  And then you would do what with them?

8    A.  They would be opened and turned over to Agent Moreland.

9    Q.  And the post office box that was being used was where?

10   A.  I don't recall the exact city.

11   Q.  Kingman, maybe?

12   A.  Yes.

13   Q.  Wickenburg maybe?

14   A.  Yes.

15   Q.  Okay.  And I believe you said -- I believe you talked about

16   letters.  Were there also boxes --

17   A.  Yes.

18   Q.  -- coming in?

19   A.  Yes.

20   Q.  How about going out?

21   A.  Yes, I do believe we did send a box.

22   Q.  And how many outgoing letters or parcels, shall we say,

23   letters, boxes, packages of any kind went out to Dennis Mahon?

24   A.  I don't recall.

25   Q.  And you're not sure whether there's a log of the outgoing?

1   A.  I don't remember if there was or not.

2   Q.  Who would have kept it, if not you?

3   A.  It would have been me.  And I -- I know that notes or some

4   type of document was prepared in reference to the mailings.

5   But I don't know if there was a specific spreadsheet that was

6   kept that would have logged each mailing.

7   Q.  Did you keep copies of the things that were sent out to

8   Dennis Mahon?

9   A.  I don't recall.

10  Q.  Shifting to another phase, were you involved in any way in

11  the DNA testing that was conducted in this case?

12  A.  Yes, I was.

13  Q.  In what way were you involved?

14  A.  I conducted the buccal swabs of Dennis and Daniel Mahon.

15  Q.  Did you -- were you involved in collecting buccal swabs

16  from anyone else?

17  A.  Yes, I was.

18  Q.  And who was that?

19  A.  I was involved in collecting buccal swabs from anybody and

20  everybody that we identified that was at the scene of the bomb

21  or any investigators that were at the scene of the bomb, or

22  anybody after the fact that would have had contact with it.

23  Q.  How did you do that?

24  A.  How did I do that?

25  Q.  Yes.

1    A.  Using buccal swabs.

2    Q.  How did you identify all of the people?

3    A.  Names were provided to me from the agencies that were at

4    the scene.  I reviewed police reports to identify the people

5    that were there based on their reports and just in discussions

6    with the agents that were at the scene at the time.

7    Q.  And was this gathering of names kind of an ongoing process

8    over a period of time?

9    A.  No.  I don't think the names changed.  I think what I

10   recall when I was speaking with our lab, we tried to do it in

11   phases to determine so we would first do the first responders

12   at the scene, and then we did the people that came in after the

13   fact or the laboratories that tested the items in order to do

14   it in phases as opposed to everybody at once.

15   Q.  Would you please take a look at what has been marked as

16   Exhibit 812 which is before you.

17           MR. BOYLE:  Is there a question?  The witness is

18   reviewing an exhibit.

19           MS. WILLIAMS:  Not yet.

20           MR. BOYLE:  Can he close the exhibit.

21           THE COURT:  Did you ask him to review it,

22   Ms. Williams?

23           MS. WILLIAMS:  I asked him to take a look at it and I

24   was going to ask him to identify it.

25           THE COURT:  All right.

1    BY MS. WILLIAMS:

2    Q.  Agent, could you please turn specifically to the page

3    marked in the lower right-hand corner.  It ends with number

4    000065.

5    A.  65?

6    Q.  Yes.  And then it continues to 66.

7    A.  Okay.

8    Q.  Do you recognize the document as pages 65 and 66?

9    A.  Yes.

10   Q.  And is that a document that you prepared?

11   A.  Yes, it is.

12   Q.  And did you prepare it as part of identifying the people

13   who needed to be buccal swabbed?

14   A.  Yes, it is.

15   Q.  And was one of your other sources also the entry log to the

16   scene?

17   A.  Yes, it was.

18          MS. WILLIAMS:  Your Honor, I would move Exhibit 812

19   into evidence.  And although it's marked all as one, I would be

20   fine with admitting these two pages as 812-A.

21          MR. BOYLE:  Objection, hearsay.

22          THE COURT:  Sustained.

23   BY MS. WILLIAMS:

24   Q.  Did you author this document, the pages 65 and 66?

25   A.  Yes, I did.

1   Q.  And can you, if you set it aside for just a minute, can you

2   tell us from memory who all of the investigators were that you

3   identified?

4   A.  I cannot.

5   Q.  Are the identified names all listed in 65 and 66?

6   A.  Those are the names that I received based on this document

7   from the entry log or from speaking with other agents that were

8   there.  If that includes all of them, I don't know if that is

9   all of them that were there, because I was not there.

10  Q.  You were, however, charged with identifying the people who

11  were there so they could be buccal swabbed; is that right?

12  A.  Yes.

13  Q.  If I could turn your attention to Exhibit 652 through 655.

14  Those documents are in evidence.

15  A.  Are they under the same exhibit?

16  Q.  I'm sorry?

17           THE COURT:  No, they are a separate exhibit.

18           MS. WILLIAMS:  No, they are in a separate folder.

19           THE COURTROOM DEPUTY CLERK:  I just need to get 655.

20  BY MS. WILLIAMS:

21  Q.  While we do that, do you have 652 in front of you?

22  A.  I do.

23           MS. WILLIAMS:  Your Honor, may I display this document

24  on the Elmo?  It is in evidence.

25           THE COURT:  You may, but hold on just a minute because

1    Traci needs to turn on the screen.

2            All right.

3            MS. WILLIAMS:  Thank you.

4    BY MS. WILLIAMS:

5    Q.  Directing your attention to the upper right-hand corner, do

6    you see where it says "U.S. Postal Service"?

7    A.  Yes.

8    Q.  And below it there are two, four, five, six names, seven

9    names?

10   A.  Six --

11   Q.  Five names?

12   A.  Yeah, five names.

13   Q.  Do you recognize those names?

14   A.  I do.

15   Q.  Okay.  Who is -- Mike Casadei is from postal, is he not?

16   A.  Yes, he is.

17   Q.  How about John Curran and Raul Vargas?

18   A.  John Curran is also from the postal inspector service.

19   Raul Vargas is also a postal inspector.

20   Q.  Turning to 653 if you would.

21           MS. WILLIAMS:  May I place this on the Elmo?

22           THE COURT:  Yes.

23   BY MS. WILLIAMS:

24   Q.  If you look at the same area of the report, do you see the

25   names just below Vargas, there's a list of names?

1    A.  Yes.

2    Q.  Would you please go down those names, starting with

3    eliminations, and tell us who those people are.  And if you

4    don't remember, stop and tell us you don't remember.

5    A.  Do you want me to name each of the names?

6    Q.  By name and agency.

7    A.  Michael Hildick, ATF; John Bohi, I don't remember or do not

8    know.

9    Q.  Okay, keep going.

10   A.  Danny Waltenbaugh, ATF.  Andy Hopkins, I do not know.

11   Larry Bettendorf, ATF.  Anthony May or Tony May, I don't

12   recall.  Tristan Moreland, ATF.  Pete Salazar, Scottsdale

13   Police Department.  Todd Larsen, I don't recall.  Tom Kane, I

14   don't recall.  Liz Williams, I don't recall.  Lisa Dilbeck, I

15   don't recall.  Mark Carpenter, I don't recall.  Kenneth

16   Emerson, I don't recall.  Tom Van Meter, I don't recall.  Neal

17   Shearer, I don't recall.  Craig Chrzanowski, Scottsdale Police

18   Department.  Fran Janowitz, I don't recall.  Tracey Fife or

19   Tracey Fite, I don't recall.  Richard Atwood, postal inspector.

20   Jesse Sartuche, postal inspector.

21   Q.  Now, as to the names that you said you didn't recall, would

22   it help your recollection to look at the list of names that you

23   compiled as investigators from the scene?

24   A.  Possibly.

25   Q.  If you could turn, please, to 812, which you were looking a

1  few minutes ago.  Would you just take a look at page 65 and

2  tell us if that, once you have a chance to review it, tell us

3  if that refreshes your recollection.

4          MR. BOYLE:  Judge, I have no objection to the witness

5  actually answering questions off -- off the list of names if it

6  makes it move more quickly.

7          THE COURT:  Great.  That will speed things up.

8          MS. WILLIAMS:  Thank you, Your Honor.

9  BY MS. HULL:

10 Q.  Sir, about halfway down the page you see a column labeled

11 "ATF"?

12 A.  I do.

13 Q.  Did you say you did not know who Anthony May was?

14 A.  I did not, no.

15 Q.  Is he listed under ATF?

16 A.  Yes, he is.

17 Q.  And how about, going down to the next set, how about

18 Larsen, Kane, Williams, Dilbeck, Carpenter, Van Meter, and

19 Shearer, are they listed under City of Scottsdale?

20 A.  They are.

21 Q.  And dropping down to the next group, Hopkins, is he

22 identified with City of Phoenix?  And Emerson, dropping down to

23 the next group, is he identified with DPS?

24 A.  Yes, he is.

25 Q.  So are the names on Exhibit 653 people you identified for

1   DNA collection?

2   A.  Yes.

3   Q.  People who you were able to ascertain were at the bombing

4   scene, right?

5   A.  Correct.

6   Q.  And the purpose of collecting buccal swabs from those folks

7   was what?

8   A.  Was to compare it to the DNA profile that was obtained from

9   the switch.

10  Q.  And were you yourself buccal swabbed?

11  A.  I was not.

12  Q.  Oh, you weren't at the scene, right?

13  A.  No, I was not.

14  Q.  Did you say that you do or do not know who Fran Janowitz

15  is?

16  A.  I do not know who that is.

17  Q.  Okay.  If you could again refer to 812, do you see Fran

18  Janowitz listed under City of Scottsdale?

19  A.  I do.

20  Q.  And was that 654 we were just looking at?  I'm sorry.

21          THE COURT:  653, I believe is what you were looking

22  at.

23          MS. WILLIAMS:  Thank you, Your Honor.

24          May I go back to the Elmo with the document?

25          THE COURT:  Yes.

1    BY MS. WILLIAMS:

2    Q.  Looking at 653, if you would turn back to -- you see down

3    in the lower right-hand corner there's an RWS?  Very bottom.

4    Well, just count back to the third page.

5            MR. BOYLE:  Judge, can I object to the relevance to

6    the witness reading the results again?  This witness reading

7    the results?

8            THE COURT:  Overruled.

9    BY MS. WILLIAMS:

10   Q.  Do you see the documents?

11   A.  I'm on page 3 of 4 with "RWS" on the bottom.

12   Q.  If you would quickly scan under "conclusions," do you see

13   that all of the people you've identified were excluded?  And if

14   you would -- if it would help you to look at the screen in

15   front of you, the lines are here, here, and here.

16   A.  I'm sorry, do you want me to read the whole paragraph?

17   Q.  No, can you tell us were all the people that we've just

18   talked about excluded?

19   A.  This report says that -- has a list of names and it says

20   are excluded as possible donors to this mixture.

21   Q.  Okay.  And then those exclusions continue on over to the

22   very last page, correct?

23   A.  Yes.

24           MS. WILLIAMS:  May I have one moment, Your Honor?

25           THE COURT:  Yes.

1          MS. WILLIAMS:  Thank you.

2          Your Honor, I have nothing further, thank you.

3          THE COURT:  All right, Ms. Hull?

4

5                    DIRECT EXAMINATION

6    BY MS. HULL:

7    Q.  Good afternoon.

8    A.  Good afternoon.

9    Q.  As part of your investigation, did you search any

10   properties in Northern Arizona?

11   A.  In Northern Arizona?

12   Q.  Yes, sir, in Happy Jack?

13   A.  No, I did not.

14   Q.  Were you aware, as part of your part in the investigation,

15   of any search conducted in this investigation either by postal

16   service or another agency of a property in Happy Jack?

17   A.  In Happy Jack, Arizona?

18   Q.  Yes.

19   A.  No.  I'm not aware of that.

20   Q.  For clarification, did you tell Ms. Williams that you did

21   not keep copies of mailings from the informant to Dennis Mahon?

22   A.  I don't recall if I kept copies or not.  I believe copies

23   were kept, but I'm not positive.

24   Q.  If they were kept, who were they kept by?

25   A.  They would be kept by ATF.

1    Q.  Is that something that you would turn over to ATF once it's

2    copied or how would that be carried out?

3    A.  Yes.  Yes.  It would have been turned over to them.  They

4    would have brought me the mailings, in general that would have

5    happened, or I would have received them and they would be

6    mailed off and copied so we would know what was mailed off.

7    Q.  Would you send them to ATF to be copied -- to be copied, or

8    would you assume it was copied by the time you get it?

9    A.  I would have either copied them, or they would already

10   otherwise have been copied, but a copy would have been most

11   likely made.

12   Q.  And if you copied it, would you then turn it over to ATF?

13   A.  Yes.

14   Q.  Okay.  You talked about buccal swabs and the exhibits

15   showing elimination of individuals who are at the scene.  Did

16   you gather any buccal swabs from any City of Scottsdale

17   employees other than the law enforcement individuals listed in

18   that report?

19   A.  Other than the ones listed in that report, no, I did not.

20          THE COURT:  We are at the 2:30 point, Ms. Hull, so we

21   are going to take a break.

22          Members of the jury, we will take a break at this

23   point.  Please remember not to discuss the case.  We will see

24   you after the break.

25          (The jury left the courtroom.)

1          THE COURT:  All right, Agent Lenzen, you may step

2     down.

3              (A recess was taken.)

4          THE COURT:  You may continue, Ms. Hull.

5          MS. HULL:  Thank you, Judge.

6     BY MS. HULL:

7     Q.  Before the break, sir, I think we were going over whether

8     or not you had taken any buccal swabs from any City of

9     Scottsdale employees.  Had you?

10    A.  Other than those listed, no, I don't believe so.

11    Q.  In the report generated by Inspector Sartuche, have you had

12    a chance to review that?

13    A.  I don't know what you're referring to.

14    Q.  Do you have in this investigation -- does the postal

15    service have a summary that basically is a chronology of the

16    events of the investigation in this case?

17    A.  Yes, they do have a form like that.

18    Q.  Okay.  And have you had an opportunity -- did you

19    contribute to the information contained in that report -- in

20    this investigation?

21    A.  No, I did not.

22    Q.  You didn't write it, but did you provide any information

23    for that purpose?

24    A.  I don't know.  I did not write any of the -- I believe it's

25    a form 2029 that you're referring to.

TIM LENZEN - DIRECT EXAMINATION BY MS. HULL      3899

1    Q.  Yes, sir.

2    A.  And I did not make any entries into that form.

3    Q.  Did you -- have you reviewed the form?

4    A.  I have not.

5    Q.  Okay.  Did you participate in an interview or an attempted

6    interview in December of 2005 of Glenn Olsen?

7    A.  I don't recall.

8    Q.  Did you -- if I could have one moment.  Would it be safe to

9    say that -- strike that.

10           Did you participate at all or review any of the pen

11   and trap information that was obtained in the summer of 2004?

12   A.  I remember a pen and trap, but I did not -- I think -- I

13   believe Inspector Sartuche was handling it.  I may have looked

14   at it, but I didn't analyze or do anything further with it.

15   Q.  You already testified that you didn't actually go to the

16   scene of the Scottsdale bomb --

17   A.  Correct.

18   Q.  -- is that correct?

19           When did you begin to participate in this

20   investigation?

21   A.  In August -- I'm sorry, around August of 2004.

22   Q.  Okay.  So well into the investigation and shortly before

23   Inspector Curran turned the reins over, if you will, to

24   Inspector Sartuche?

25   A.  It may have been around that time.  I don't remember.  I

1    know Inspector Curran had it and then Inspector Sartuche had

2    it.  I was new to the office at that time, so I didn't know

3    much at that time.

4    Q.  Okay.  And when you started in or about August of 2004, did

5    you have any prior law enforcement experience?

6    A.  Yes, I did.

7    Q.  What was your prior law enforcement experience?

8    A.  I was a police officer in the State of Colorado for 13

9    years.  My last assignment was a homicide detective.

10   Q.  So after you came into the investigation, at that time, did

11   you -- you said that you were co-case agent with Inspector

12   Sartuche when he -- whenever it is that he took over as case

13   agent?

14   A.  Correct.

15   Q.  Okay.  And does October of 2004 sound about right?

16   A.  It could be.  I -- I don't know.

17   Q.  Do you remember about how long you'd been with the postal

18   service when you started as case agent or cocase agent?

19   A.  I -- as soon as I came out of the academy, based on my

20   training, they assigned me to help out with the investigation.

21   I didn't know the postal forms that were being used, and it was

22   different than how obviously I had done it in my past.

23           I don't know when Inspector Curran had it or when

24   Inspector Sartuche had it or what time that got passed on, I

25   just don't know.

1  Q.  Did you participate at all in the pen and trap that was set

2  up on Mr. Olsen's work phone in December of '05?

3  A.  I don't recall.  I don't remember who Mr. Olsen is, so

4  that's why I can't answer that.  I don't know who Mr. Olsen is.

5  Q.  Okay.  Did you, during your participation in this

6  investigation, did any names in the investigation develop

7  into -- inside the City of Scottsdale as suspects?

8  A.  Not that I recall, no.

9  Q.  If it's reflected in the report, it's not something you

10 participated in?

11 A.  I'm not saying I didn't participate in, I just don't

12 remember participating.  But in December of 2005, I would have

13 been there, I'm sure I would have been part of it.  I just

14 don't remember doing it.  That was quite a while ago.

15         MS. HULL:  May I have one second, Judge?

16         THE COURT:  Yes.

17         MS. HULL:  I have nothing further, thank you.

18         THE COURT:  All right.  Cross-examination?

19

20                      CROSS-EXAMINATION

21 BY MR. BOYLE:

22 Q.  You described working on a case from 2004 to 2009.  During

23 that period, did you work as an inspector with the postal

24 service?

25 A.  Yes, I did.

1    Q.  And did you work with ATF on the Mahon investigation?

2    A.  Yes, I did.

3    Q.  Did you speak with Agent Moreland about the mailings that

4    you discussed on direct examination?

5    A.  Yes, I did.

6    Q.  To follow that up, were you responsible for contacting the

7    informant?

8    A.  No, I was not.

9    Q.  Who was that person who was contacting the informant?

10   A.  Agent Moreland was the contact.

11   Q.  You, I think, described that if there was outgoing mail,

12   you would place the mail within the U.S. mail stream?

13   A.  Correct.

14   Q.  But it was Agent Moreland who would give you the letter or

15   package to be mailed?

16   A.  Yes.

17   Q.  Would you agree then that it was Agent Moreland who would

18   have written reports about what was being mailed and sent out?

19   A.  Yes.

20          MS. HULL:  Objection, speculation.

21          THE COURT:  Overruled.

22   BY MR. BOYLE:

23   Q.  Did you work on the case aside from mailings?  Without

24   going into too much detail, did you travel to Catoosa?

25   A.  Yes, I did.

1    Q.  Did you travel to other locations?

2    A.  Yes.

3    Q.  Following up on the swabs that you took, you obtained a

4    list that you described from the crime scene entry log?

5    A.  Correct.

6    Q.  And that's a list of people that law enforcement lets into

7    a scene after they secure the scene; is that fair?

8    A.  Yes.

9    Q.  Can you tell us whether or not there were -- there was five

10   people in the scene before law enforcement showed up?

11   A.  I cannot tell you that.

12   Q.  Can you tell us if there were 20 people walking around that

13   area before law enforcement showed up?

14   A.  I cannot tell you that either.

15   Q.  So could you go and take swabs from people who may have

16   entered a scene before law enforcement showed up?

17           MS. HULL:  Objection, argumentative, speculation.

18           THE COURT:  Overruled.

19           THE WITNESS:  No, I cannot.

20   BY MR. BOYLE:

21   Q.  What about the pieces of the bomb, could -- did you try and

22   go to manufacturers of the bomb parts and see if people in the

23   plant would submit to swabs?

24   A.  I did not follow up with that, no.

25   Q.  And you described the buccal swabs from the people at the

1    scene.  What about the people afterwards who might have tested

2    it, were you involved in getting buccal swabs of any of them?

3    A.  Not of the lab personnel at both the postal service or at

4    DPS.  I was not involved in obtaining those.  They did their

5    own.

6    Q.  Did you -- hold on one second.

7          You were shown an exhibit that gave exclusions on DNA.

8    Do you remember seeing that on direct?

9    A.  I do.

10   Q.  Do you ever recall seeing one that had a person who could

11   not be excluded?

12   A.  I did.  I do remember one.

13   Q.  Robert Moberley?

14   A.  Correct.

15   Q.  A person who worked at the lab?

16   A.  Correct.

17   Q.  Did you attempt to find any of the people he might have

18   touched during his investigation to swab them?

19   A.  No, I did not.

20          MR. BOYLE:  Nothing else, thank you.

21          THE COURT:  Any redirect?  Ms. Williams?

22          MS. WILLIAMS:  Not for me, Judge.

23          THE COURT:  Okay.

24

25

1                        REDIRECT EXAMINATION

2      BY MS. HULL:

3      Q.  Inspector, you just talked about with Mr. Boyle about

4      whether or not you went to any of the manufacturers of the bomb

5      components and asked for buccal swabs of employees.  Do you

6      remember that question?

7      A.  Yes.

8      Q.  Okay.  Were any of those people ever a suspect in this

9      case?

10     A.  No.

11     Q.  Okay.  How about City of Scottsdale employees, any of those

12     suspects in this case?

13     A.  No.

14     Q.  Did your postal service list individuals as suspects in

15     this 2029 form?

16     A.  I don't know.  I never -- I remember the form, but I don't

17     remember what it had in it.  I did not add to that form.

18     Q.  So if individuals were named as suspects in that report,

19     did you request any DNA samples from those people?

20     A.  I don't know who was listed in the report.

21     Q.  Do you have --

22            MS. HULL:  Can this witnesses please be shown Exhibit

23     545.  Give me one second, please.

24     BY MS. HULL:

25     Q.  I'm sorry, do you recognize that, sir?

1    A.  Yes, I do.

2    Q.  Is that the 2029 we were talking about earlier?

3    A.  Yes, it is.

4    Q.  Could you look at paragraph 23, please, and tell me if it

5    refreshes your recollection.

6    A.  My recollection of --

7    Q.  As to whether or not there were suspects named.

8            MR. BOYLE:  Judge, is this beyond the scope?

9            THE COURT:  No, overruled.  Let's follow the

10   procedure.

11           MR. BOYLE:  And objection, hearsay.

12           THE COURT:  I'm sorry, what was that?

13           MR. BOYLE:  And objection, hearsay.

14           THE COURT:  There's no question pending.

15           MR. BOYLE:  Thank you.

16   BY MS. HULL:

17   Q.  Okay, I'm sorry, can you close that document just a second.

18   Here's what we are going to do.  I'm going to ask you a

19   question, and when I instruct you, if you could please open it,

20   I'll direct you to a specific paragraph and ask you to close it

21   again, okay?

22   A.  Okay.

23   Q.  Do you recall whether as part of your investigation, postal

24   inspectors involved in the same investigation identified any

25   suspects inside the City of Scottsdale?

1   A.  I know that they discussed names of employees there.  I'm

2   not trying to sidestep the issue, but what I'm getting at is

3   when they talk about it, they just mentioned it or whatever

4   they had.  I was new to the case when I got there.  So whether

5   they say suspect or when they have this, I have no idea why

6   they are identifying this person as a suspect.

7   Q.  Okay, I'm not asking you why they were identified as a

8   suspect.  I'm asking you if you recall if individuals were

9   identified as suspects inside the City of Scottsdale by your

10  agency.

11  A.  And I can't answer that because I wasn't part of those

12  discussions at the time that they were talking about it.  And I

13  don't know if this paragraph that you're wanting me to refer

14  to, if that will refresh my memory.  I know there were several

15  names that were discussed.  But in an investigation like this,

16  there's many names that are discussed, because we are trying to

17  identify people that may or may not have been involved.  But to

18  identify somebody as a suspect, simply because they work for

19  the City of Scottsdale, I don't know how they came to that

20  conclusion.

21  Q.  Okay.  And again, I'm not asking you how that came to that

22  conclusion, but do you remember names identified as suspects in

23  the investigation by the postal service?

24  A.  Yes.

25  Q.  Okay.  And do you recall the names of the City of

1   Scottsdale -- any of the City of Scottsdale employees

2   identified as suspects?

3   A.  I do not.

4   Q.  Would review of that report refresh your recollection?

5   A.  Possibly.

6   Q.  Okay.  If you could open that exhibit and look at

7   paragraph -- it's on page 4, paragraph 23.  Would you just read

8   it and close the document.  Let me know when you are done.

9          Is your memory refreshed after reviewing that

10  paragraph?

11  A.  Yes.

12  Q.  And can you name any names that were identified by your

13  service as suspects inside City of Scottsdale?

14  A.  Steve Anderson was identified by whoever wrote that as a

15  suspect, yes.

16  Q.  Okay.  How difficult was it to -- for you to obtain buccal

17  swabs from the individuals that you eliminated from -- on those

18  documents that you've been looking at?

19  A.  From the law enforcement personnel, Mr. Logan, it wasn't

20  very difficult at all.

21  Q.  What was the process?

22  A.  The process for me to obtain them?

23  Q.  Yes.  Did you -- did you have to get a warrant to get any

24  of the city -- any of the law enforcement individuals to

25  provide you a buccal swab?

1  A.  No.  Their commanders, managers were contacted, advised as

2  part of this investigation what we needed.  That was discussed

3  above me.  And then once it was okayed through their chain of

4  command like at the City of Scottsdale, then I made a time and

5  I met with those detectives or those people that were listed on

6  the list and obtained the buccal swabs from them.

7  Q.  Okay, without any sort of legal process, without

8  authorization from their supervisors?

9  A.  Correct.

10 Q.  And did you make any such attempt to contact City of

11 Scottsdale, any departments, including the City of Scottsdale

12 police department to obtain buccal swabs?

13 A.  Yes.

14 Q.  And did you get -- other than the individuals that you've

15 already listed on those documents?

16 A.  No, I did not.

17         MS. HULL:  That's all I have, Judge, thank you.

18         THE COURT:  All right.  Thanks, you can step down.

19         THE WITNESS:  Thank you.

20         MS. WILLIAMS:  May this witness be released?

21         MR. BOYLE:  No.

22         THE COURT:  All right, subject to recall.

23         MR. BOYLE:  Yes.

24         MS. WILLIAMS:  Your Honor, the defense calls Tristan

25 Moreland.

1          THE COURT:  Agent Moreland, you are still under oath

2     for purposes of the trial, so you can come directly back to the

3     witness stand.

4          THE WITNESS:  I understand.

5          MS. WILLIAMS:  Could the witness please be shown -- I

6     have a list of exhibits.

7          THE COURTROOM DEPUTY CLERK:  Okay.

8          THE COURT:  Why don't you -- can you bring it to her?

9          MS. WILLIAMS:  They are up here.  They're the ones

10    right behind you on the floor.

11         THE COURTROOM DEPUTY CLERK:  Oh, do you want me to

12    just give them to him now?

13         MS. WILLIAMS:  Please.

14         Could we also pull 88 through 95.  I believe they are

15    photographs and they are in evidence.  Thanks.

16

17                    TRISTAN MORELAND,

18    called as a witness herein, having been previously duly sworn,

19    was examined and testified as follows:

20

21                    DIRECT EXAMINATION

22    BY MS. WILLIAMS:

23    Q.  Agent Moreland, the first thing I would like to talk about

24    is the cardboard box in which the bomb was delivered.  Sorry,

25    we are starting to barricade you in there.

1    A.  It's all right.

2    Q.  You made a mock-up, correct?

3    A.  Yes, ma'am.

4    Q.  And then there have been a number of pictures taken of the

5    various pieces of cardboard that were found on the scene,

6    correct?

7    A.  That's correct.

8    Q.  And are those pieces bundled into -- is it Exhibit 70?

9    A.  That's correct, yes.

10   Q.  Now, if you could take a look at the bigger pieces within

11   Exhibit 70.  Do you see -- can you identify a piece in there

12   that was the box top --

13   A.  Yes.

14   Q.  -- to which the labels were attached?

15   A.  I can, yes.

16   Q.  Could we pull that out, please.

17   A.  Pull that out of the bag?

18   Q.  Out of the bag, you have that -- it probably would be

19   easier if you show it out of the bag.

20   A.  Okay.  That's probably the biggest section.

21   Q.  Okay.  And that's the section to which on one side or the

22   other to which the labels were attached when it was found?

23   A.  That's correct.  Even though they were separated after the

24   explosion, and now you can see there's a little scotch tape

25   kind of putting them back together that we did of a

1   reconstruction.

2   Q.  These are two pieces that have been laid against each other

3   and taped, correct?

4   A.  Yes, ma'am.

5   Q.  And on the back of that, is there any markings -- sorry, it

6   is the front.  There's an "HR" on front?

7   A.  Yeah, the R is visible, the H is obviously not.  But there

8   is just a remnant of the H.

9   Q.  Now, that R and what used to be HR was on the box -- on

10  that piece of cardboard when it was found at the scene; is that

11  right?

12  A.  That's correct.

13  Q.  And written directly on the cardboard?

14  A.  Yes, ma'am.

15  Q.  There was no brown paper wrapper between the writing and

16  the cardboard?

17  A.  That is correct.

18  Q.  And in all of the various pieces of cardboard, and you can

19  feel free to put it back in the bag if you want.  On all of

20  pieces of cardboard that are in Exhibit 70, they are all just

21  bare cardboard, are they not?

22  A.  As they sit here right now?

23  Q.  They are sometimes partially charred?

24  A.  Well, I mean, general speaking, yes, except there is some

25  scotch tape that's been placed on them for reconstruction

1    purposes.  The micro switch -- glued micro switch -- excuse me,

2    the glued micro switch is in this bag now attached to that

3    section of the cardboard.  I don't know if the jury can see

4    that.  And without going through it in great detail, those are

5    the most two significant things other than just plain

6    cardboard.

7    Q.  And as to that large piece we were just looking at, the

8    labels were attached to the bare cardboard, correct?

9    A.  That's correct.  The Pitney Bowes label was just attached

10   to bare cardboard.  The address label was attached to the

11   cardboard but covered in box tape to the box --

12   Q.  Okay.

13   A.  -- when we found it.

14   Q.  There was no brown paper wrapper between the labels and the

15   box?

16   A.  No, ma'am, there was not.

17   Q.  So you have no evidence that suggests the box was wrapped

18   in brown paper at the time it was detonated?

19   A.  That's correct.

20   Q.  Or at the time -- nor do you have evidence to believe it

21   was covered in brown paper before the meter strip was attached?

22   A.  I have no evidence of that or knowledge of it.

23   Q.  Now if we could move to, let's start with the back that's

24   in front of you, the square bag.  I believe is that 770?

25   A.  It is, 770.

1    Q.  If you could just pull out the brown envelope.

2           Could you identify that, please.

3    A.  I can.

4    Q.  And how do you recognize it?

5    A.  I recognize it as one of the envelopes that we received in

6    the mailings as part of the undercover ongoing exchange of mail

7    between the informant and the Mahons.

8    Q.  That came into the post office box that had been

9    established for Rebecca Williams?

10   A.  Yes, this came into the Kingman box earlier in the

11   investigation, or at least early in the undercover part of the

12   investigation.

13   Q.  And then after it arrived in the box, it was forwarded to

14   you?

15   A.  That's correct.  Eventually through the system as we've

16   discussed before it, it came to ATF, yes.

17          MS. WILLIAMS:  Your Honor, I move 770 into evidence.

18          MR. BOYLE:  Is that in the envelope?

19          MS. WILLIAMS:  Yes.

20          MR. BOYLE:  No objection.

21          THE COURT:  Ms. Hull?

22          MS. HULL:  No objection.

23          THE COURT:  770 is admitted.

24          MS. WILLIAMS:  And if you could, as we previously

25   discussed, just leave the envelope out of the packaging.

1                And, Your Honor, for the record, it is the brown

2     envelope itself which is the exhibit.  It has an exhibit

3     sticker on the back of the brown envelope.

4                THE COURT:  All right.

5                THE WITNESS:  Set that aside?

6                MS. WILLIAMS:  Yes, please.

7     BY MS. WILLIAMS:

8     Q.  Now, if you could turn your attention to the larger empty

9     boxes in front of you.  I believe they are 822, '3, '4, and '5.

10    A.  Correct.

11    Q.  Could you identify -- do you recognize those four boxes?

12    A.  I do.

13    Q.  How?

14    A.  These are boxes that were received as part of the

15    undercover mailing series.

16    Q.  And they were -- when you say "received," does that mean

17    came in to the mailbox for Rebecca Williams?

18    A.  That's correct.

19    Q.  And then they were forwarded from the mailbox to you?

20    A.  Yes.

21    Q.  As previously discussed?

22    A.  That's correct.

23    Q.  And you -- those boxes, as with the broken envelope you

24    were just looking at, have been maintained at ATF in evidence;

25    is that right?

1  A.  Yes, they were maintained originally at the postal service,

2  transferred to ATF where they have been maintained since and

3  are now.

4         MS. WILLIAMS:  Okay, Your Honor, move 822, 823, 824,

5  825 into evidence.

6         MR. BOYLE:  No objection.

7         MS. HULL:  No objection.

8         THE COURT:  Admitted.

9  BY MS. WILLIAMS:

10  Q.  Now, I would like to turn to an interview you had with --

11         THE COURT:  Ms. Williams, do we need to keep the boxes

12  up there?

13         MS. WILLIAMS:  We do not.

14         THE COURT:  Maybe we could move those.

15  BY MS. WILLIAMS:

16  Q.  Do you recall interviewing Don Logan on April 22, 2004?

17  A.  I do.

18  Q.  And during that interview, do you recall discussing with

19  him the note that was found inside the bomb?

20  A.  I do.

21  Q.  And you had a conversation back and forth about that note?

22  A.  We did.

23  Q.  And did he tell you that the language in the note was

24  paramilitary like a cop would say?

25  A.  Yes.

1    Q.  And you put the word "cop" in quotations, correct?

2    A.  I did in my report, yes.

3    Q.  When you wrote a report?

4    A.  Yes.

5    Q.  And you wrote that report after the interview?

6    A.  Yes.

7    Q.  To represent -- and the quote marks would represent a

8    direct quote?

9    A.  I wouldn't have done it otherwise, yes.

10   Q.  Okay.  There's been -- there's been a fair amount of

11   testimony about a -- a log-in sheet from the scene.  You've

12   heard that?

13   A.  I have.

14   Q.  And is ATF in possession of that log?

15   A.  I don't believe we are, ma'am.  I -- as I testified

16   earlier, I recall seeing a gentleman do it at the door that

17   night, but I don't think I've seen it since that night.  And I

18   believe I've gone through everything in ATF custody on more

19   than one occasion.  I just don't recall ever seeing that log

20   again.

21   Q.  Would it be something that would normally be maintained and

22   turned over to your agency in a bombing case?

23   A.  Not necessarily, no.

24   Q.  Were you -- you -- you on behalf of your agency have become

25   the person who has collected all the evidence from other

1    agencies, correct?

2    A.  We have.  To some degree.  I -- I still don't know if

3    there's anything out there I don't have, but to the extent I'm

4    aware of stuff, I believe we have it.

5    Q.  You've reached out to Scottsdale Police?

6    A.  We have.

7    Q.  And postal?

8    A.  Yes, ma'am.

9    Q.  And requested all the evidence that both agencies have?

10   A.  I have.

11   Q.  And any other agencies that might have had evidence?

12   A.  Anybody that I could think of that may have something that

13   was potentially evidence in the case, I've asked for, yes.

14   Q.  And despite that, no sign-in log?

15   A.  I -- I don't recall seeing it.  I -- if I missed it, I

16   would be surprised, but I just don't recall seeing it in my

17   possession.

18   Q.  Well, you specifically looked for it, right?

19   A.  I've not specifically gone looking for it.  But I've at

20   some point or another looked through everything that I can

21   think of.  And I just don't recall seeing it.  For one purpose

22   or another, I've been looking for something, and I just don't

23   recall coming across that log sheet.

24   Q.  Well, during the -- you've been involved in an extensive

25   pretrial process in this case, have you not?

1    A.  Yes, ma'am.

2    Q.  And in the various flow of information back and forth

3    between the parties?

4    A.  Yes.  I'm sorry.

5    Q.  What we lawyers call the discovery process?

6    A.  Yes, I have.

7    Q.  And you have at some point been specifically asked to look

8    for the log sign-in sheet, have you not?

9    A.  I know it's come up.  I don't recall being asked to go look

10   for that sheet in the discovery process.  Having said that, I

11   was asked to recover everything from Scottsdale, everything

12   from postal.  So I guess it would be my -- my take on things is

13   if I've asked the agencies that I know would have had it or

14   created it and it hasn't been turned over, then I don't know

15   where it is.

16   Q.  And if in the same respect if the lawyers, be they the

17   defense lawyers or the prosecutors have said:  Hey, where's the

18   scene log-in sheet, you've looked for it?

19   A.  If I had been asked that, I would have looked for it.  I

20   just don't recall being asked that specifically.

21   Q.  How many times have you gone through the entirety of the

22   evidence in this case?

23   A.  I have been through -- which evidence are we talking about,

24   ma'am?

25   Q.  Everything.  Everything.

1  A.  I have only briefly been through some of the evidence that

2  was turned over very late by postal.  We've discussed the ten

3  boxes, if you will.

4       The Scottsdale stuff that may have been turned over

5  directly, I don't recall going through it item by item unless I

6  was looking for something I was asked to look for.  So outside

7  of those two groups, everything else I can say that I've been

8  through multiple times with great detail.

9  Q.  And if the Government had asked you to verify that there's

10  no scene log, you would have done so, right?

11  A.  Not exactly in that terminology.

12  Q.  Sign-in sheet, entrance log, however it may be referred to.

13  A.  If I understood that the defense or anybody else was

14  looking for a particular item, I would turn over everything

15  that I think would have it in if it existed.  So, for instance,

16  when Scottsdale said:  You have everything that we have, I take

17  them for their word at it and I would then not go looking for

18  every particular item unless I was asked to go through and look

19  for it.  However, if it was in that group of stuff, I would

20  assume anybody looking for it would have found it.

21  Q.  Well, without belaboring the point too much more, you have

22  been instructed and have specifically gone out to all these

23  different agencies, making sure that you have everything,

24  haven't you?

25  A.  Correct.  But I don't recall somebody saying:  Then go

1    through it and look for this log, is all I'm saying.

2    Q.  Okay.  This question was just you've gone to --

3    A.  I understand.

4    Q.  -- every other agency and said:  Give me everything you've

5    got?

6    A.  I have done that, yes.

7    Q.  How about the -- there was previously discussion of a

8    sign-in sheet for the wiretap room.  Have you ever located

9    that?  I believe that came up in your previous testimony.

10   A.  I haven't gone looking for it.

11   Q.  Have you ever seen it?

12   A.  Yes.

13   Q.  Was it ever produced during the pretrial phase of the case?

14           MR. BOYLE:  Objection, speculation.

15           THE COURT:  Overruled.

16           THE WITNESS:  I don't recall producing that.

17   BY MS. WILLIAMS:

18   Q.  Do you recall being asked when you previously testified to

19   locate it?

20   A.  No, I don't.  I recall it being discussed, but I don't

21   recall being asked to locate it.

22   Q.  So you haven't looked for it?

23   A.  That's correct.

24   Q.  There is -- have you, on behalf of ATF, maintained copies

25   of everything that Rebecca Williams has ever sent to Dennis?

1  Dennis Mahon.

2  A.  Not really, no.

3  Q.  Have you ever kept a log of every piece of anything that

4  Rebecca Williams has sent to Dennis Mahon?

5  A.  There has been documenting of everything that was sent out

6  in one form or another.  I don't know that I would characterize

7  it as a log per se.  However, everything that was sent was

8  noted.

9  Q.  Assuming it went through you --

10  A.  It went --

11  Q.  -- correct?

12  A.  It went through me period.

13  Q.  Well, hypothetically speaking, if she mailed something out

14  on her own and didn't tell you, it obviously wouldn't go

15  through you, right?

16  A.  If something was mailed to the Mahons in this case without

17  my knowledge, I would not know about it, that's correct.

18  Q.  Can you tell us what is WNTA?

19  A.  It's not ringing a bell.

20  Q.  Okay, do you recognize the call letters WNTA as a Rockford

21  radio station that Dennis Mahon used to call?

22  A.  I can't say those -- I recall a radio station.  I just

23  don't right now, as I sit here, recall if it's WNTA.

24  Q.  In any event, there was a radio station in Rockford --

25  A.  Yes, ma'am.

1    Q.  -- that Dennis called?

2    A.  Yes.

3    Q.  Fairly often?

4    A.  Yes.

5    Q.  On numerous occasions?

6    A.  That's fair, yes.

7    Q.  And it was a -- the part that he called on numerous

8    occasions was a talk radio show?

9    A.  Or he attempted to.  Sometimes he would call and talk to

10   behind-the-scenes people asking to talk to somebody with the

11   talk show.

12   Q.  So sometimes he would get on the radio.  Occasionally, he

13   would not?

14   A.  That's correct.

15   Q.  And when he would get on the radio, it would be in the

16   context of whether a talk radio show or calling the DJ to get

17   on the air and chat?

18   A.  That's maybe one way of characterizing it, yes.

19   Q.  And during -- you've previously testified that you've

20   listened to the recordings that were made in this case both

21   telephone and with video, correct?

22   A.  Yes.  That's correct.

23   Q.  And there were in fact a number of those calls recorded --

24   oh, I should add, also through the wiretap, correct?

25   A.  Yes, ma'am.

1  Q.  And there were a number of such calls between Dennis and

2  this radio station captured in those recordings, correct?

3  A.  That's correct.

4  Q.  And would you agree that there was a pretty wide array of

5  topics discussed by Dennis when he would call?

6  A.  In part, yes.  I would agree with that.

7  Q.  Weather, politics, potholes, any number of things?

8  A.  Shootings, yes, all kinds of things.

9  Q.  In the -- shootings in the area, correct?

10  A.  Yes.

11  Q.  Okay.  And you have listened to those recordings?

12  A.  I believe I've listened to them all, yes.

13  Q.  Okay.  You have never heard -- well, on one occasion did

14  you in fact hear a call where they refused to let him on, they,

15  the radio show?  Do you recall that?

16  A.  I recall a call or two where he did not get on the air.

17  And I'm trying right now to recollect if there was something

18  said specifically by the other party that you're not going to

19  be put on the air, or if it was just a matter of we can't get

20  you on the air right now, or some -- I'm trying to recall the

21  other side of the call.  But there were times where he did not

22  get on the air.

23  Q.  Okay.

24  A.  And I can at least answer in that way right now.

25  Q.  In any event, this -- his being on the radio was something

1    he liked to talk about with the informant, wasn't it?

2    A.  They talked about it.  I recall, yes.

3    Q.  It was something he would bring up with Rebecca Williams?

4    A.  Yes.

5    Q.  Right?

6    A.  Yes.

7    Q.  Okay.  Exhibit 770, this was the single flat brown envelope

8    that I think we -- I think it was moved.  Would you agree that

9    this exhibit is not the only such envelope you gathered during

10   the mail -- the mailings?

11   A.  I would agree that there were many envelopes generally

12   matching.

13   Q.  Okay.  And including in that universe all envelopes, all

14   boxes, no matter what the size, what the color, would you agree

15   with me that there were a lot?

16   A.  Over a four-year period, I mean, I'm not sure what you

17   would call a lot, more than 20, yes.

18   Q.  50 plus?

19   A.  I'm saying maybe not 50, but 20 to -- I would say 25 to 45

20   is probably a pretty good number.

21   Q.  And currently those mailings are in this building in

22   another office, correct?

23   A.  They are.

24   Q.  And they came in one or two big Tupperware tubs; is that

25   right?

1    A.   That's how we brought them here, yes.

2    Q.   And there's also a large clear plastic bag with a bunch of

3    envelopes stuffed in it?

4    A.   Right.  But there's other persons' mailings in there, not

5    the Mahons, right.

6    Q.   Would -- would you agree that if we went with the number 20

7    to 45, it may be -- it may lean closer to the 45?

8    A.   That are just from the Mahons?

9    Q.   Yes.

10   A.   Can you ask me the question again, about what all -- are

11   you including every box and every envelope and every other type

12   of envelope, in other words, every mailing of any kind?

13   Q.   Every mailing that Dennis sent to Rebecca Williams.

14   A.   I would agree it's closer to 45 than 25.

15   Q.   Okay.

16   A.   About -- the best I can do for you.

17   Q.   That will work.  Thank you.

18            MS. WILLIAMS:  I have nothing further, Judge.

19            THE COURT:  Ms. Hull?

20

21                       DIRECT EXAMINATION

22   BY MS. HULL:

23   Q.   Agent Moreland, I don't know if this was covered

24   previously, but I think that when you talked about the contents

25   of that clear plastic bag, are those all of the components that

1    were gathered and pieces that were gathered from the Scottsdale

2    bomb?

3    A.  All of the components of the bomb?

4    Q.  Yes.

5    A.  No.  This bag here?

6    Q.  Just the cardboard.

7    A.  This is primarily just the cardboard.  The micro switch

8    with some wires is in here.  I would have to go through it, see

9    if there was anything else.  Like I said, the scotch tape we

10   added.

11   Q.  Yes, sir.

12   A.  So in this bag is primarily cardboard and micro switch glue

13   area with the wires.

14   Q.  Okay.  But the micro switch that was tested for DNA is in

15   that box --

16   A.  Yes.

17   Q.  -- bag?

18   A.  Yes.

19   Q.  And would you agree that the -- well, you were present for

20   testimony from the DNA expert, Mr. Staub, do you recall that?

21   A.  I do, generally speaking, yes.

22   Q.  And as part of your investigation, you reviewed the report

23   that was generated by his office as to the DNA?

24   A.  I recall reviewing some DNA reports.  I don't specifically

25   recall which ones and how many of them pertained to him.

1  Q.  Okay.  But you would agree that the testing that he did and

2  the profiles obtained, at least one came from an impression or

3  suspected fingerprint in the adhesive on the switch?

4  A.  No, I wouldn't agree with that at all.

5  Q.  Okay, was -- did you -- do you disagree with his testimony?

6  A.  I believe his testimony, which is what my understanding is

7  that that he swabbed the entire switch and glue, front, back,

8  and everything on there.  You asked me about a couple

9  fingerprint issue details or something.  That's -- that would

10  be the tiniest part of that overall thing.  My understanding is

11  they swabbed the whole switch and all the glue and everything.

12  Q.  Okay.  So would you agree that the report indicated where

13  the test was -- where on the switch the test was run?

14        Let me ask you this:  Did you look at the report to

15  see the exact area where Mr. Staub in his lab drew DNA from?  I

16  believe he called it a suspected partial fingerprint in the

17  adhesive.

18  A.  I don't recall looking at the report.  I recall being told

19  what they did.

20  Q.  Okay.

21  A.  But I don't recall exactly looking at a report that -- that

22  documented what they did.

23  Q.  Okay.  So regardless, you would -- you would take his --

24  his test and testing over your recollection of what they did.

25  Would you agree with that?

1   A.  I recall his testimony that they swabbed the switch area.

2   And that's what I understood, not -- not just the little tiny

3   area that I was once briefed on, which was maybe one-one

4   hundredth of what we are talking about in what they actually

5   swabbed in area.

6   Q.  Okay, did you hear him testify about the two areas that he

7   swabbed, or did you not hear the testimony?

8   A.  I heard he swabbed the switch and the glue here.  That's

9   what I recall hearing.  But I may be mistaken.

10  Q.  Do you recall seeing the impression in the switch that he

11  talked about that was -- he characterized as a suspected

12  fingerprint?

13  A.  I recall seeing that or at least a photographic depiction

14  of it in a briefing I attended at the Department of Public

15  Safety lab.

16  Q.  Okay.  So you've seen that print in the adhesive?

17  A.  Well, I've seen two ridge lines or two lines that are

18  somewhat half circled that are -- I'm not even sure if they are

19  visible to the eye.  But what I saw was a blown-up photograph

20  that I believe one of the labs took of that area of the glue of

21  the switch.

22  Q.  Are you the person that informed Mr. Staub that this was a

23  suspected partial fingerprint he was testing?

24  A.  No.

25          MS. HULL:  No further questions.

1          THE COURT:  Cross-examination?

2

3                    CROSS-EXAMINATION

4   BY MR. BOYLE:

5   Q.  This issue about the suspected area where they swabbed,

6   let's follow up on that and ask what you wanted them to swab.

7   A.  I didn't think they were swabbing anything is maybe a

8   better characterization of what I was -- what I understood that

9   they were doing.  What I okayed as the case agent for them to

10  do was that they were going to extract.

11          MS. WILLIAMS:  Objection, Your Honor, calls for

12  hearsay and also lacking foundation.

13          THE COURT:  Overruled.

14          THE WITNESS:  They were supposed to extract what was

15  possibly three or four cells of material out of the glue, very

16  much like and we often talked about the Jurassic Park syndrome

17  of DNA being trapped beyond the surface area of a particular

18  material that had become hardened.  That's what I thought the

19  lab was doing.  That's what we okayed them to do.  I only later

20  learned that they swabbed the exterior of the switch to come up

21  with the sample.

22  BY MR. BOYLE:

23  Q.  And what was the problem with doing the exterior in your

24  view?

25  A.  The problem was the exterior -- first of all, the exterior

1    was grossly contaminated when the bomb exploded.

2           MS. WILLIAMS:  Objection, Your Honor, foundation,

3    there's no foundation that this witness has the DNA background

4    to testify about this.

5           THE COURT:  Sustained.

6           MS. WILLIAMS:  Move to strike.

7           THE COURT:  I'll grant the motion to strike that last

8    answer.

9    BY MR. BOYLE:

10   Q.  In your mind, were there problems with having the lab just

11   swab the exterior of the switch?

12          MS. WILLIAMS:  Same objection, Your Honor.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yes.

15   BY MR. BOYLE:

16   Q.  And in the request that you made for the testing, did you

17   have concerns about the contamination regarding the exterior

18   swabbings of the switch area?

19          MS. WILLIAMS:  Objection, leading.

20          THE COURT:  Overruled.

21          THE WITNESS:  I did.

22   BY MR. BOYLE:

23   Q.  Going back to some of the questions that were asked about

24   the boxes, I don't know if you have one there.  If I --

25          MR. BOYLE:  Can I walk up, Your Honor, and just take a

1    look?

2            THE COURT:  You may.

3    BY MR. BOYLE:

4    Q.  Start first with Exhibit 825.  Can you see here there's a

5    meter strip on this exhibit?

6    A.  Yes, I can.

7            MR. BOYLE:  May I use the Elmo, Your Honor?

8            THE COURT:  Yes.

9    BY MR. BOYLE:

10   Q.  And publish 825.  Can you see that there's a ten dollar

11   meter strip on the right and a dollar and 30 cents on the left?

12   A.  Yes, I can.

13   Q.  Is that consistent with Dennis Mahon going to the post

14   office and getting a meter strip from the post office to mail

15   this item?

16           MS. HULL:  Objection, Your Honor.

17           MS. WILLIAMS:  Objection, speculation.

18           MS. HULL:  Go ahead.

19           MS. WILLIAMS:  Objection, speculation.

20           MS. HULL:  And foundation, Judge.

21           THE COURT:  Overruled.

22   BY MR. BOYLE:

23   Q.  And the return address is DWM, right?

24   A.  Yes.

25   Q.  And again, showing you Exhibit Number 822, does it also

1    show a meter strip?

2    A.  It does.

3    Q.  Did the bomb that was sent to Don Logan have a U.S. postal

4    meter strip on it?

5    A.  When it was delivered to the library, no.

6    Q.  And that would evidence that the person who dropped off the

7    box did not go to a postal counter and drop off the box, right?

8           MS. WILLIAMS:  Objection, argumentative.

9           THE COURT:  Overruled.

10           THE WITNESS:  It absolutely suggests that they had not

11    obtained a meter strip through a post office prior to placing

12    it in the library, if that's what you're asking me.

13    BY MR. BOYLE:

14    Q.  Whoever went to the library didn't go to a teller at the

15    post office and leave the box there, right?  They dropped it

16    off at the library?

17    A.  That's correct.

18    Q.  These boxes have a return address with Dennis Mahon on

19    them?

20    A.  They do, or at least D.W. Mahon, or D. Mahon, yes.

21    Q.  And they were mailed to the informant who was acting under

22    the ruse as if she was friendly toward him?

23    A.  Yes.

24    Q.  The person who made the box delivered to Don Logan went to

25    lengths to disguise first who it was sent by, correct?

1         MS. WILLIAMS:  Objection, Your Honor, argumentative.

2         MS. HULL:  And outside the scope.

3         THE COURT:  Sustained on scope.

4    BY MR. BOYLE:

5    Q.  Is there a return address on the bomb?

6         MS. HULL:  Objection, outside the scope.

7         THE COURT:  Sustained.

8    BY MR. BOYLE:

9    Q.  You were asked questions about mailings that went through

10   you on this case and asked whether you logged everything that

11   went out.

12   A.  Yes.

13   Q.  Did you write a report when you would send things to Dennis

14   Mahon?

15   A.  Yes.

16   Q.  Now in this case one of the items that was asked about

17   previously was Exhibit 559-A, which was a letter that may or

18   may not have been logged by you as going to Dennis Mahon.  So

19   let me follow up on that.  Were there occasions where letters

20   were drafted by you but not sent to Dennis Mahon?

21   A.  Yes.

22         MS. WILLIAMS:  Objection, exceeds the scope.

23         THE COURT:  Overruled.

24         THE WITNESS:  Yes.

25   BY MR. BOYLE:

1  Q.  And would you have a report if you did not send a letter to

2  Dennis Mahon?

3  A.  No, I would not draft a report saying I didn't do something

4  like mail a letter, I didn't mail a letter, or didn't mail a

5  package.

6  Q.  So based on your review of the case, was 559-A sent to

7  Dennis Mahon?

8         MS. WILLIAMS:  Objection, Your Honor, it exceeds the

9  scope.

10         THE COURT:  Sustained.

11  BY MR. BOYLE:

12  Q.  Regarding the WNTA radio shows, you heard Dennis Mahon's

13  voice on those recordings?

14  A.  Yes, I did.

15  Q.  He identified himself as Dennis the insurgent?

16  A.  That's correct.

17  Q.  And he espoused anti-diversity views; is that fair?

18         MS. WILLIAMS:  Objection, foundation.

19         THE COURT:  Overruled.

20         THE WITNESS:  All of his conversations were -- had

21  either a racial or anti government type tone or rhetoric, if

22  you will.

23         MR. BOYLE:  Nothing else, Your Honor.

24         THE COURT:  Redirect?

25         MS. WILLIAMS:  Yes, Your Honor.

1

2                        REDIRECT EXAMINATION

3   BY MS. WILLIAMS:

4   Q.  Agent Moreland, you just said that all of Dennis Mahon's

5   conversations when he called WNTA were either racial or anti

6   government rhetoric.  In fact, there were times when he called

7   about a Christmas toy gathering, wasn't there?  Being -- toy

8   drive being run by the radio station?

9   A.  I don't recall that conversation.

10  Q.  That one is not sticking out in your mind?

11  A.  At least that part of the conversation, I don't -- recall,

12  we had to minimize during the wire, call -- parts of calls that

13  were not deemed evidentiary.  So whether I heard that part, I

14  just don't recall.

15  Q.  Well, though you talk about minimization, there were in

16  fact a lot of calls that went into all sorts of things not

17  directly related to this case, were there not?

18  A.  Yes, ma'am.

19  Q.  Such as substantial conversation about the state of their

20  mother's health, they, the Mahons?

21  A.  There were many of those calls, yes.

22  Q.  And her bodily functions?

23  A.  That subject came up, yes.

24  Q.  And grocery shopping?

25  A.  Yes.

1  Q.  Calls between the Mahons about pick up this, pick up that?

2  A.  Yes.

3  Q.  Those -- all of those matters were -- were collected on the

4  tapes, weren't they?

5  A.  No, I would say not all of them.

6  Q.  A substantial number?

7  A.  There were many conversations like that that were captured

8  on the wire, yes.

9  Q.  So when Dennis Mahon called WNTA, those conversations were

10  not all minimized?

11  A.  That's correct.

12  Q.  Those conversations, in fact, weren't particularly long

13  because they were -- they were ongoing radio programs which

14  move somewhat fast?

15  A.  For the most part, yes.

16  Q.  Okay.  And Dennis Mahon, in addition to talking about toy

17  drives, he called about potholes?

18  A.  I just don't recall the toy drive.  I do recall potholes.

19  Q.  He called about weather?  Snow, rain?

20  A.  I don't know -- you're asking what he called about, or what

21  was discussed potentially.

22  Q.  Well, that's fair.  When he called, when he got on the air,

23  he discussed such things as potholes?

24  A.  Yes.  Discussed, yes.

25  Q.  He discussed such things as weather?

1    A.  Yes.

2    Q.  He discussed such things as very mundane issues in addition

3    to --

4    A.  I would agree with that, yes.

5    Q.  The boxes that we were looking at, when they came in to the

6    Rebecca Williams mailbox, how did they get to you?

7    A.  Well, there was primarily one way.  There was a person at

8    the post office, whether in Kingman or Wickenburg, usually the

9    postmaster or somebody filling in for them, but a management

10   position that would retrieve the item.  They would place

11   usually some other U.S. mail postage off -- sometimes they

12   would repackage in another envelope and mail it to us.  Other

13   times, they might just stick another postage label on it.  And

14   then it would be mailed through the mail system down to the

15   main post office.  And that's where they would be received

16   primarily by Tim Lenzen, sometimes Jesse Sartuche and others.

17   And then they would eventually be turned over to me.

18   Q.  So they are being mailed down to you?

19   A.  Yes, ma'am.

20   Q.  And to mail them down to you, additional postage and at

21   times labels would be required, correct?

22   A.  That's correct.

23   Q.  And, for example, on Exhibit 822, which we had previously

24   looked at, there's an express mail sticker?

25   A.  I can see that from here, yes.

```
 1   Q.  Across the cover of it.  And is this an example of a

 2   package where it says to U.S.P.I.S. from PM Wickenburg, is this

 3   an example where an express mail sticker has been put over the

 4   original mailing information?

 5   A.  I would need to look at it a little more carefully to be

 6   able to answer that.

 7            MS. WILLIAMS:  May I, Your Honor?

 8            THE COURT:  Sure.

 9   BY MS. WILLIAMS:

10   Q.  And I believe you can partially pull down the sticker on

11   the lower flap and partially see beneath it.

12   A.  Yes, this is an example of another label being put over an

13   original address label or something.

14   Q.  So the original writing label, whatever, is still under the

15   top label?

16   A.  It is, ma'am.

17            MS. WILLIAMS:  Thank you.  I have nothing further.

18            MS. HULL:  Nothing, thank you.

19            THE COURT:  Okay, thanks.  You can step down.

20            MS. HULL:  Defense calls Rebecca Williams.

21            THE COURT:  All right.

22            MS. WILLIAMS:  Your Honor, may I step out for a moment

23   to deal with a witness situation?

24            THE COURT:  Sure.  We can carry on without you,

25   Ms. Williams?
```

1          MS. WILLIAMS:  Absolutely.

2          THE COURT:  Okay.

3          MS. WILLIAMS:  Your Honor, apparently she's on another

4   floor and somebody has called to have her come up.  That's what

5   we are waiting on.

6          THE COURT:  Okay.

7          Ms. Williams, you're still under oath for purposes of

8   the trial, so you can come directly back to the witness stand.

9          THE COURT:  All right.  Ms. Hull, you may proceed.

10          MS. HULL:  Thanks, Judge.

11

12                          REBECCA WILLIAMS,

13   called as a witness herein, having been first duly sworn, was

14   examined and testified as follows:

15

16                          DIRECT EXAMINATION

17   BY MS. HULL:

18   Q.  Ms. Williams, isn't it true that in Catoosa, in 2005, that

19   my client, Daniel Mahon, did not tell you anything about how to

20   dress to avoid detection at the gun show?

21   A.  I don't recall.

22   Q.  Isn't it true that he never told you how to blow up a

23   vehicle?

24   A.  I don't recall.

25   Q.  Would reviewing prior testimony refresh your recollection?

1          MR. BOYLE:  Then I'll object, asked and answered.

2          THE COURT:  I'm not understanding your objection,

3    Mr. Boyle.

4          MR. BOYLE:  If she's going to ask her about testimony

5    she's already testified to.

6          THE COURT:  No, not in the trial, I don't believe.

7          You can respond to the question, Ms. Williams.

8          THE WITNESS:  Can you please reask the question?

9    BY MS. HULL:

10   Q.  Well, let me phrase it -- let me phrase it another way.  Do

11   you recall testifying in this case previously in September,

12   2010?

13   A.  Yes.

14   Q.  Do you recall being under oath?

15   A.  Yes.

16   Q.  Do you recall stating, when I asked you that my client

17   didn't tell you anything about how to avoid detection at the

18   gun show, do you recall saying that he had not?

19   A.  I do not recall what my testimony was.

20   Q.  Do you recall stating that when I asked you if he -- and he

21   didn't tell you, talking about Daniel Mahon, he didn't tell you

22   how to blow up a vehicle, do you recall your response?

23   A.  I do not.

24   Q.  Would review of your testimony refresh your memory?

25   A.  I imagine it would.

1    Q.   Okay.  Do you have Exhibit 643 in front of you?

2    A.   Yes, ma'am.

3    Q.   Okay.  And looking at the first page, would you agree that

4    is a transcript of your testimony from September 22nd, 2010?

5    A.   Where would it say that it's my testimony?

6    Q.   If you would look at the third page, top of the third page.

7    A.   Okay.

8    Q.   Okay.  And if you would please turn to the page 61, which

9    would be in the top right corner of the page, if you would turn

10   to that page.  61.

11           Once you find that page, would you read lines 10

12   through 15.

13           Have you had an opportunity to read that?

14   A.   Yes, I have.

15   Q.   Isn't it true that Daniel Mahon did not tell you how to

16   avoid detection at the gun show in Catoosa in 2005?

17   A.   That's what this testimony says.

18   Q.   And isn't it true that he didn't tell you how to blow up a

19   vehicle?

20   A.   That's what the testimony says.

21   Q.   Were you telling the truth when you testified to that?

22   A.   I was telling the truth to the best of my knowledge,

23   recollection, yes.

24           MS. HULL:  Thank you.  No further questions.

25           THE COURT:  Ms. Williams?

1         MS. WILLIAMS:  I have nothing, Your Honor.

2         THE COURT:  Cross-examination?

3

4                    CROSS-EXAMINATION

5   BY MR. BOYLE:

6   Q.  When you testified in 2010, how good was your memory about

7   every individual statement that was made to you in Catoosa?

8   A.  Not very good.

9   Q.  Did you write down notes as you were speaking to Dennis and

10  Daniel Mahon?

11  A.  No.

12  Q.  Did you have a pad of paper and a pen every time they said

13  something, you would write a note right in front of them of

14  what they said?

15  A.  No, sir.

16        MR. BOYLE:  I need one second, Your Honor.

17  BY MR. BOYLE:

18  Q.  And prior to your testimony in 2010, did you watch all the

19  Catoosa tapes, videotapes?

20  A.  No.

21  Q.  Did you read reports or notes of what other people had

22  written?

23  A.  No.

24        MR. BOYLE:  That's all.  Thank you, Your Honor.

25        THE COURT:  Redirect?

1          MS. HULL:  No redirect.

2          THE COURT:  All right.  Thank you, you may step down.

3          All right, members of the jury, we've reached four

4     o'clock.  We will plan to begin at nine in the morning.  Please

5     remember not to look at any information about the case, and we

6     will see you tomorrow morning.

7          MR. BOYLE:  Is the witness released?

8          (The jury left the courtroom.)

9          THE COURT:  Please be seated.

10         Defense counsel, is this witness released?

11         MS. WILLIAMS:  On behalf of Dennis, yes.

12         MS. HULL:  Yes, sir.

13         THE COURT:  All right.  I had a sentencing scheduled

14    to start in ten minutes and then a civil hearing, a civil case

15    hearing, but I want to ask each side one question on the

16    Exhibit 214 and 215 issue.

17         First, Ms. Cisneros, do you have any other thoughts

18    you wish to share with me on the question of the defendants'

19    detrimental reliance upon the Government's assertion that the

20    cell phone was Daniel Mahon's?

21         MS. CISNEROS:  No, Your Honor, we will not be

22    disclosing our strategy.

23         THE COURT:  Anything further you wanted to say on

24    that, Ms. Hull?

25         MS. HULL:  I am unable to add anything, Judge.

1          THE COURT:  Okay, question to you, Mr. Boyle.  I went

2     back and looked at the transcript of the side bar.

3     Incidentally, the side bar concerned Exhibit 214.  Exhibit 215

4     had already been admitted at that point.  And it was admitted

5     without objection from Dennis Mahon and with a foundation

6     relevancy objection by Ms. Hull that we didn't have a side bar

7     at that point.  The side bar was then 214.

8          The question I have for you, Mr. Boyle, is this:  We

9     were talking about relevancy at side bar.  And your answer as

10    to why it was relevant is that this cell phone was Daniel

11    Mahon's cell phone and combining it with the records from the

12    phone company would show a location on the relevant days.

13         When you said the relevancy was Daniel Mahon's phone,

14    Ms. Hull said there's no evidence of that.  I then turned to

15    you and said:  How are you going to establish that?

16         And you made this statement:  Through the witnesses

17    that will be called later.  At the end of the day, if we don't

18    prove that it's Daniel Mahon's phone, we will agree to withdraw

19    the exhibit.

20         So my question is why shouldn't the Government be held

21    to that agreement?

22         MR. BOYLE:  You are talking about 214?

23         THE COURT:  214.

24         MR. BOYLE:  I would have to -- I haven't seen what

25    preceded that.  I told you, as I stated last week, that we've

1    always believed that both defendants used the phone.  And I

2    don't know if I was responding to Daniel Mahon specifically by

3    saying we -- by saying we are only connecting Daniel Mahon.  I

4    mean, I know you've reviewed it, so I leave that to you.

5              THE COURT:  The only defendant discussed during that

6    side bar by name was Daniel Mahon.  In fact, earlier when I

7    asked you what is the relevancy of 214, you said it shows that

8    for the phone call that made the -- the phone number to one of

9    the defendants was here in the Valley on the date of February

10   21st.  That was in Tempe, in Mesa.  And there was some very

11   brief back and forth and you went on to say:  So that just puts

12   them in here and at least -- at least the phone, which is

13   attributed to the defendants Daniel Mahon, here in Phoenix on

14   the 21st, the day the bomb was delivered.

15             MR. BOYLE:  Does it say defendants?

16             THE COURT:  The transcript says defendants Daniel

17   Mahon.

18             MR. BOYLE:  Yeah, I -- I don't know if I was trying to

19   respond specifically to Ms. Hull when we started talking about

20   Daniel Mahon.  But I mean, it sounds like I tried to reiterate

21   the same position there that I have said in court which is we

22   connected the defendants to the phone.  And when we were at

23   side bar, I don't know if I just started then discussing Daniel

24   Mahon specifically to address Ms. Hull.

25             But so that -- I mean, that's all I can tell you.  I

1   just never thought that we were promising that Daniel Mahon was

2   the only person who used the phone, and I cannot tell you that

3   would be a fair accounting of the evidence that we all know to

4   be true which is both defendants used the phone at different

5   points.

6           So I -- I'll tell you in response as well that when

7   you talked about this, when I said this is Dennis Mahon's

8   phone, in closing I -- in candor, I don't think I can say this

9   is only Dennis Mahon's phone.  I can tell you in closing, but I

10  can tell the jury that Dennis Mahon made a phone call on this

11  phone and go no further, because I do believe the evidence,

12  even if it's not in front of the jury, is that they both used

13  it.  So I can't say he was the exclusive person and, therefore,

14  he is absolutely here in the Valley.

15          THE COURT:  Well, my understanding is the only

16  evidence that you have in the record in this case about either

17  defendant is that the informant called Dennis Mahon at that

18  number on one occasion.

19          MR. BOYLE:  True.

20          THE COURT:  Okay.  Okay.  I will review these briefs

21  tonight in light of what we've talked about today.

22          MS. CISNEROS:  Your Honor, just for the record, at the

23  beginning of trial, you indicated that the -- that the

24  objections will be -- would be attributed to both -- any

25  objection would be attributed to both defendants, so I just

1    wanted to put that on the record.

2         THE COURT:  Well, I did, but you specifically said "no

3    objection" to Exhibit 215.  It wasn't just a failure to object.

4    You said "no objection."  So that's why I noted that.

5         Okay.  Okay.  Thanks very much.

6         MS. WILLIAMS:  Judge, Judge, we are -- the defense is

7    likely to rest tomorrow.  So we request a list of witnesses for

8    tomorrow.

9         THE COURT:  What's your best estimate as to when

10   you'll rest?

11        MS. WILLIAMS:  By noon -- definitely by noon.

12        THE COURT:  All right.  Mr. Boyle, Mr. Morrissey,

13   what's your best estimate as to how long your rebuttal evidence

14   will go?

15        MR. BOYLE:  We will be done by Thursday at five, which

16   brings me to a question for you.

17        THE COURT:  You mean you are going to go all day

18   Wednesday and Thursday?

19        MR. BOYLE:  We have the afternoon on Wednesday.  I

20   mean, my best guess is we will probably finish by noon on

21   Thursday.  But --

22        THE COURT:  Okay.

23        MR. BOYLE:  I'm just saying that we will certainly --

24   I would think we will certainly be done by the end of Thursday.

25        THE COURT:  All right.

1           MR. BOYLE:  I just don't know about the cross, though,

2      which brings up a question.  Given that we have the jury

3      instruction issue that we have to decide on on Saturday,

4      there's no way we are doing closings on Friday.  You are not

5      telling us if we finish Thursday at 5:00, we are going to

6      closings on Friday?

7           THE COURT:  I'm not telling you that, no.

8           MR. BOYLE:  Are you saying we could do closings on

9      Friday?

10           THE COURT:  No, I'm saying if we finish the evidence

11      tomorrow, then we will probably do closings Friday.  If we

12      finish the evidence Thursday midday, I will -- well, if you

13      finish -- your specific question was if you finish Thursday at

14      5:00, will we do closing on Friday?  Answer to that is no.  If

15      we go on Friday if we end earlier, I think we need to talk

16      about that when we get to it.  I do recognize that you need

17      time to assimilate all this before closings.

18           MS. WILLIAMS:  I think both sides agree, Judge, that

19      we are going to need a good half day or close to it to argue

20      instructions.  I'm pretty sure both sides.

21           THE COURT:  A half day to argue instructions?

22           MS. WILLIAMS:  A substantial portion of it.

23           THE COURT:  No, we don't need a half day to argue

24      instructions.  We will have argument, but we are not going to

25      take a half day on instructions.

 1              MS. WILLIAMS:  I'm making a record, Judge.

 2              THE COURT:  The record is made.

 3              MS. WILLIAMS:  But also, could we get a list of

 4   witnesses for tomorrow?

 5              THE COURT:  Sure, yeah, 24-hour notice.  That's fair.

 6              Okay, thanks, if you all would clear out as quickly as

 7   you can, we've got a sentencing.  Thank you.

 8              (The court stood in recess.)

 9                              *     *     *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5

6          I, MERILYN A. SANCHEZ, do hereby certify that I am

7    duly appointed and qualified to act as Official Court Reporter

8    for the United States District Court for the District of

9    Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 14TH day of August,

18   2012.

19

20

21                         S/Merilyn A. Sanchez

22                         MERILYN A. SANCHEZ, CRR

23

24

25