**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dennis Mahon, | No. CV-17-02031-PHX-DGC (JFM) |
|         Movant/Defendant, | No. CR-09-00712-PHX-DGC |
| v. | **ORDER** |
| United States of America, | |
|         Respondent/Plaintiff. | |

Dennis Mahon has filed an amended petition under 28 U.S.C. § 2255 to vacate his convictions and set aside or correct his sentence. Doc. 31. Judge James F. Metcalf issued a Report and Recommendation ("R&R") recommending the Court deny the petition. Doc. 49. Mahon filed an objection, and the government responded. Docs. 52, 55. The Court will accept the R&R and deny the petition.

## I.    Background.

On February 26, 2004, the director of Scottsdale's Diversity Office opened a package addressed to him, triggering a pipe bomb explosion. The director suffered severe trauma, required multiple surgeries and skin grafts, and nearly lost a finger. The blast injured two other employees, shattered windows, collapsed a wall and ceiling, and blew a hole in the counter where the package sat. Months before the explosion, Mahon had left a voicemail message with the Diversity Office, identifying himself as "Dennis Mahon of the White Aryan Resistance of Arizona." Mahon's message used racial epithets and complained about the Office's outreach efforts. He stated: "The White Aryan Resistance

is growing in Scottsdale. There's a few white people who are standing up. Take care." *See United States v. Mahon*, 793 F.3d 1115, 1117-18 (9th Cir. 2015) (Mahon's direct appeal to Ninth Circuit).

After a multi-year undercover investigation, law enforcement identified evidence of Mahon's participation in the bombing. He was charged with and convicted of three counts: (1) conspiracy to damage buildings and other real property by means of explosive in violation of 18 U.S.C. §§ 844(i), (n); (2) malicious damage of a building by means of explosive in violation of § 844(i); and (3) distribution of information related to construction of explosives in violation of § 842(p)(2)(A). He received a 40-year sentence on Counts 1 and 2, and a concurrent 33-month sentence on Count 3. Doc. 49 at 2-3.

Mahon asserted ten grounds for relief in his § 2255 petition (Doc. 31), but raises only four objections to the R&R, each asserting ineffective assistance of counsel (Doc. 52).

## I. Legal Standards.

### A. R&R Standard of Review.

The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "[T]he district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise." *United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc). District courts are not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *see also* 28 U.S.C. § 636(b)(1).

### B. Ineffective Assistance of Counsel.

"To establish ineffective assistance of counsel under *Strickland*, a prisoner must demonstrate both: (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced his defense." *Miles v. Ryan*, 713 F.3d 477, 486 (9th Cir. 2013) (citing *Strickland v. Washington*, 466 U.S. 668, 688-93 (1984)). Courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and attorneys are afforded "wide latitude . . . in making tactical

decisions." *Strickland*, 466 U.S. at 689. The reasonableness of counsel's performance is judged under an objective standard. *United States v. Davis*, 36 F.3d 1424, 1433 (9th Cir. 1994).

"A defendant is prejudiced by counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Clark v. Arnold*, 769 F.3d 711, 725 (9th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome' of a proceeding." *Id*. Mahon "need not prove 'counsel's actions more likely than not altered the outcome,' but rather he must demonstrate that '[t]he likelihood of a different result [is] substantial, not just conceivable.'" *Id*. (quoting *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011)). "[A]ppellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal." *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001).

## II. Discussion.

Mahon objects to Judge Metcalf's findings that: (1) appellate counsel was effective despite not appealing the Court's ruling denying his motion to suppress his statements and co-defendant's statements; (2) appellate counsel was effective despite failing to appeal the Court's denial of his motion to dismiss Count 3 based on entrapment; (3) trial counsel was effective despite withdrawing the jury instruction request on entrapment; and (4) appellate counsel was effective despite failing to appeal the Court's application of a 12-level enhancement for terrorism. Doc. 52 at 1-10.

### A. Ground 2A: Motion to Suppress Recorded Statements in Police Van.

Mahon argues that appellate counsel was ineffective for failing to appeal the Court's denial of his motion to suppress his and his co-defendant's statements recorded after their arrest. Doc. 52 at 2.

#### 1. Factual Findings.

In reviewing Mahon's pretrial motion, the Court observed the following events from

audio and video taken by law enforcement on the morning of defendants' arrest from 6:51 a.m. to 9:02 a.m., and three other audio clips that day. *See* Doc. 49 at 22-23 (citing the Court's order in CR-09-0712-PHX-DGC ("CR Doc.") at 613).

After his arrest, Mahon was placed in a police van at 6:52 a.m., removed from the van at 6:54:40 a.m., and returned to the van at 6:56:33 a.m. The van was wired for audio and video recording. Mahon was shown the indictment and warrant by Special Agent Green and then given *Miranda* warnings in the van by Special Agent Hager at 7:05 a.m. After his rights were read, Mahon was asked "Do you understand?" He replied in a conversational tone: "The small talk is over. I can't say anything more – except for who is praying for the damn humidity to quit?" Mahon made "small talk" with law enforcement, but no officers questioned him about the issues in the case and he volunteered no such information. Mahon's brother and co-defendant, Daniel Mahon, was given *Miranda* warnings at approximately 6:58 a.m. and placed in the van at 7:09 a.m. Asked whether he understood his rights, Daniel said "I understand." He did not state that he was invoking his rights.

Defendants were alone in the van between 7:11 a.m. and 7:13 a.m., and after 7:14 a.m. Officers were present both inside and outside the van before 7:11 a.m. and between 7:13 and 7:14 a.m. After 7:14 a.m., officers opened the door from time to time to check on Defendants, to escort Daniel out to talk with Agent Moreland, to respond to a request from Mahon to use the restroom, and to turn on the air conditioning at Daniel's request. Defendants did not request to be held outside the vehicle, nor did they complain of discomfort other than warmth, which appeared to be remedied immediately after Daniel requested that the air conditioning be turned on.

During the contacts with law enforcement while in the van, Defendants were asked if the house contained any explosive devices that might harm officers and Mahon said no. Defendants were also asked whether the barn was safe, to which they replied that there were no explosives but that there were bat feces that could be virulent and agents probably should wear gas masks. The tone of these brief encounters was not threatening.

Defendants expected that the van was wired for recording.  At 7:11:12 a.m., Mahon remarked that they were probably being recorded, and later that they were probably being videotaped.  Defendants nonetheless conversed freely, discussed their parents and what they saw outside the windows, expressed frustration with the raid, reviewed potentially incriminating items on the computer and the property (e.g., soft porn, supremacist literature, black powder for a pistol Mahon had owned, weapons and ammunition, etc.), and reassured each other multiple times that they had no involvement with the Scottsdale bombing.  They also made statements of retribution against law enforcement for the raid and expressed regret for not having had a "shootout."

Mahon instructed Daniel at least twice about what to do when interrogated: ask for a lawyer and state that he has nothing to say, regardless of accusations.  Shortly thereafter, at 8:49 a.m., Daniel was retrieved from the van to talk with Agent Moreland.  Upon returning, Mahon asked Daniel if he did as instructed.  Daniel said that he did not ask for a lawyer because he was not asked questions, and that he remained silent.  The video provided to the Court does not show what happened after Mahon spoke with Agent Moreland, nor any statements made by Defendants after the van left the property.

Two audio clips contained conversations between Defendants and Agent Moreland.  The conversations occurred separately for each Defendant, outside of the van.  Moreland informed Daniel and Mahon of the charges and evidence against them, told them that they likely would not want to talk with him right away, told them about raids occurring at the property of other individuals Defendants knew (including Tom Metzger, an alleged white supremacist leader), informed Defendants that Metzger likely would abandon them, and informed Mahon that he would likely have no friends after this incident.

### 2.    Analysis.

"A defendant who is in custody must be given *Miranda* warnings before police officers may interrogate him.  Once such warnings are given and the defendant invokes his right to remain silent, the admissibility of statements obtained thereafter depends upon whether the defendant's right to cut off questioning was 'scrupulously honored.'"  *United*

*States v. Moreno-Flores*, 33 F.3d 1164, 1168-69 (9th Cir. 1994) (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)). *Miranda* applies to custodial interrogations, *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980), but it does not require suppression of voluntary statements made by a defendant in custody if his statements are not the product of post-invocation interrogation, *Mosley*, 423 U.S. at 102. "Interrogation" refers both to direct questioning and its "functional equivalent" – "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *See Innis*, 446 U.S. at 229-301; *Moreno-Flores*, 33 F.3d at 1169. Whether conduct is the functional equivalent of direct questioning is an objective inquiry – the officers' subjective intent is relevant but not dispositive. *Moreno-Flores*, 33 F.3d at 1169.

The Court's order found that Mahon invoked his right to silence at 7:05 a.m. CR Doc. 613 at 5. The inquiry is then – as the R&R and Mahon agree – whether the totality of circumstances amounted to the functional equivalent of interrogation. Docs. 52 at 3; 49 at 32. Mahon asserts that appellate counsel was deficient under the first *Strickland* prong because a "reasonable probability exists" that the Ninth Circuit would have found the Court erred and held that the investigators' actions amounted to the functional equivalent of interrogation. Doc. 52 at 2. He points to three circumstances: (1) investigators "baiting" defendants and "priming the pump" with their statements; (2) officers placing defendants in a hot van for two hours; and (3) the fact that the van was wired. Doc. 52 at 2-4.

### a.    Officers' Statements to Defendants.

The R&R found that, under some circumstances, interactions with non-police third parties may arise to the functional equivalent of interrogation when police orchestrate the contact using compelling influences or psychological ploys. Doc. 49 at 45-49. The R&R based this finding on "the rule to be distilled" from *Arizona v. Mauro*, 481 U.S. 520 (1987), and other cited cases. Judge Metcalf then concluded that "a highly plausible argument" existed that Agent Moreland manipulated Mahon's co-defendant into acting as an interrogator, amounting to the functional equivalent of interrogation. Doc. 49 at 49-54.

Mahon does not object to the R&R's conclusion that Agent Moreland manipulated Mahon's co-defendant to act as an interpreter. But as discussed further below, Mahon objects to the R&R's finding that the Ninth Circuit would have nonetheless affirmed the Court's order under a clear error standard. The Court will accordingly review the R&R's finding and Mahon's arguments about his interactions with the agents.

As to the first circumstance which "prim[ed] the pump," Mahon points to agents confronting Defendants with evidence against them, mentioning other raids occurring, and posing questions aimed "to let the brothers know they were being accused of serious crimes, should be worried about their futures, and may want to discuss how to defend themselves." Doc. 52 at 3.

Agent Moreland informed Defendants about the charges and evidence against them, said that they would likely not want to speak with him right away, mentioned other raids occurring, and told them that Metzger and others would likely abandon them. The officers' statements did not amount to the functional equivalent of interrogation, and the Court disagrees with the R&R to the extent it found otherwise. "[W]hen an officer informs a defendant of the circumstances which contribute to an intelligent exercise of his judgment" including "the circumstances of his arrest," such statements are "exclude[d] from the definition of interrogation [as] words or actions 'normally attendant to arrest and custody.'" *Moreno-Flores*, 33 F.3d at 1169 (citing *Innis*, 446 U.S. at 301). "The standard for determining whether an officer's comments or actions constitute the 'functional equivalent' of interrogation is quite high." *United States v. Morgan*, 738 F.3d 1002, 1006 (9th Cir. 2013). Even if the officers' statements about the evidence, other raids, and other persons of interest "may have struck a responsive chord [with Defendants], or . . . constituted 'subtle compulsion,'" without more, such statements are "insufficient to find that they were the functional equivalent or interrogation." *Moreno-Flores*, 33 F.3d at 1169; *see also Morgan*, 738 F.3d at 1006 (citing *Innis*, 446 U.S. at 303).

Nor did the officers' questions about whether the house contained harmful explosive devices and whether the barn was safe constitute the functional equivalent of interrogation.

Mahon states that "[t]he questions were not purely 'directed at safety' just because the danger of bat guano was mentioned." The Court does not agree. Defendants' responses – about bat feces and that the officers should wear masks – were unrelated to any potentially incriminating evidence of the Scottsdale bombing, and indicate that they understood the questions to concern officer safety. The officers asked narrow questions about harmful devices in the barn and house. Such specific, safety-oriented questions demonstrate no knowledge that their inquiries would elicit incriminating responses and are the type of questions normally attendant to arrest and custody. *Cf. United States v. Reilly*, 224 F.3d 986, 990, 992-93 (9th Cir. 2000) (pre-*Miranda* warning question "Where is the gun?" as defendant reached for his waistband was not investigatory or designed to elicit incriminating evidence).

### b. Conditions of the Van.

Mahon asserts that the R&R "discounts the impact of the conditions and circumstances of being locked in a hot police van without water for an extended time." He also notes that Defendants were handcuffed for two hours and asserts the agents knew such conditions were likely to elicit incriminating responses. Doc. 52 at 3-4. The Court disagrees. As the R&R notes, Mahon's arguments about the van conditions are unsupported by the evidence. *See* Doc. 49 at 40-42. The video excerpts show that Defendants were seated in separate seats, at least 18 inches apart, freely changed positions, and were able to cross and uncross their legs and turn to observe events outside. Defendants did not complain to each other or the officers that they were uncomfortably cramped. The officers started the air conditioning as soon as Defendants complained about the heat and provided water bottles to them. Mahon was removed promptly to use the restroom when he requested. And Defendants being handcuffed for two hours is simply a condition normally attendant to arrest. Mahon's general objection cites no other evidence or authority showing that the van atmosphere was a "compelling influence[]" and "psychological ploy[]" designed to elicit incriminating statements. Doc. 52 at 3.

/ / /

### c. Wiring of the Van.

The R&R first finds that "[a]t most, the presence of [the van's] recording equipment permits an inference that the agents hoped to garner evidence," which is insufficient to constitute deliberate elicitation. It then concludes, however, that "the recording was expected by defendants, arguably making their time in the van a continuing 'interaction' with law enforcement." And that "[h]ad [Defendants] not been aware of the recording equipment, then from their perception . . . they would not have had the opportunity to respond to 'interrogation' while in the van." Doc. 49 at 42-43.

Mahon makes no clear objection to this portion of the R&R, and he mischaracterizes the R&R's conclusion on another issue as support. *See* Doc. 52 at 4 (citing Doc. 49 at 45 (R&R discussing whether Mahon's statements to Daniel constitute statements to the agents, citing *Mauro*)). In any event, the Court finds that the wiring of the van did not rise to the functional equivalent of interrogation and declines to adopt the R&R to the extent it concluded otherwise. As noted above, the officers engaged in no questioning or psychological ploys intended to elicit incriminating responses. *See Innis*, 446 U.S. at 528. Thus, the wiring of the van and mere hope that Defendants would make voluntary statements does not amount to the functional equivalent of interrogation, because "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." *Mauro*, 481 U.S. at 529; *see also United States v. Hernandez-Mendoza*, 600 F.3d 971, at 977 (8th Cir. 2010).

Mahon's citation to *Mauro* is unavailing. In that case, the Supreme Court found no interrogation when an officer sat in a room with a tape recorder and listened to defendant speak with his wife. The officer asked no questions about the crime or defendant's conduct, and his allowing defendant to see his wife was not a psychological ploy that could constitute interrogation. *See* 481 U.S. at 527-30. The Supreme Court noted that the purpose of *Miranda* is to "prevent[] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Id.* at 529-30. The Court finds even less of a coercive police presence here

than in *Mauro*. No officer was present in the van, and Mahon was posed no questions. He spoke freely on a range of topics despite speculating repeatedly that Defendants were being recorded.

### 3.     Functional Equivalent of Interrogation Summary.

The R&R concluded that "based on the contacts by [Agent] Moreland with [Daniel], and the open video surveillance in the van," Mahon "was subject through [Daniel] to the functional equivalent of interrogation." Doc. 49 at 53-54. The R&R finds, however, that because the Ninth Circuit would have reviewed the Court's factual findings for clear error, Mahon's appellate counsel could have reasonably concluded the claim was not likely to succeed and was not deficient under the first *Strickland* prong. *Id.* Mahon objects that the Ninth Circuit would have reviewed the Court's ruling as a mixed question of law and fact. And he asserts that even under a clear error standard, it is reasonably probable the Ninth Circuit would have reviewed the facts differently.

Whether the "government's questioning was an 'interrogation' for *Miranda* purposes is a mixed question of law and fact," which the Ninth Circuit reviews de novo. *United States v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006). But the Ninth Circuit "review[s] the district court's underlying findings of fact for clear error." *Id.*; *see also United States v. Barnes*, 895 F.3d 1194, 1199 (9th Cir. 2018). As discussed, the Court finds that none of Mahon's objections and asserted coercive circumstances support a finding of the functional equivalent of interrogation as a matter of law or fact, and will not adopt the R&R's contrary conclusion. For this reason, appellate counsel was reasonable in deciding to not appeal the Court's ruling. And Mahon has failed to demonstrate "that 'the likelihood of a different result [was] substantial, not just conceivable,'" had appellate counsel appealed the Courts' order. *Clark*, 769 F.3d at 725 (quoting *Harrington*, 562 U.S. at 111-12).

### B.     Ground 2B: Motion to Preclude Daniel's Statements in Van.

Over Mahon's objection at trial, the Court admitted certain statements by Daniel which were recorded in the police van after arrest. Mahon asserts that appellate counsel

was ineffective for failing to appeal the Court's order denying his motion to suppress the statements as violative of the Sixth Amendment's Confrontation Clause. Doc. 52 at 5. The R&R found that Mahon's appellate counsel reasonably did not appeal the Court's order because Daniel's statements were non-testimonial and not barred by *Bruton*, and that any error would have been harmless because Daniel's statements were innocuous to Mahon. Doc. 49 at 55-66. Mahon objects, asserting that because the statements were not made in furtherance of a conspiracy a reasonable probability exists the Ninth Circuit's decision in *Larson* would have precluded the statements, and the Court's error was not harmless. Doc. 52 at 6.

The R&R and Mahon agree that the statements were non-testimonial, and neither the R&R nor the Court's prior order found that Daniel's statements in the van were made in furtherance of a conspiracy. *See* Docs. 49 at 55-66; 1300 at 3.[1] Thus, the sole issue is whether appellate counsel was prejudicially deficient in failing to appeal the Court's order and argue that *Bruton* – through *Larson* – precluded Daniel's non-testimonial statements under the Sixth Amendment.

The Supreme Court held in *Bruton* that a defendant's Sixth Amendment right to confrontation is violated by the admission of a non-testifying co-defendant's confession which implicates him. 391 U.S. 123, 135-36 (1968). Where such testimonial evidence is at issue, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

In *Crawford*, the Supreme Court acknowledged that the Sixth Amendment's "Confrontation Clause [applies] only to testimonial statements, leaving the remainder [of non-testimonial statements] to regulation by hearsay law." *Id.* at 61. The Court noted that its analysis cast doubt on a prior holding rejecting that notion, but stated that it did "not definitely resolve whether [the prior holding] survive[d]" *Crawford* because the statements

---

[1] To the extent the Court admitted at trial Daniel's non-testimonial statements made in furtherance of a conspiracy, Mahon has not objected to such evidence and has waived the issue.

at issue were clearly testimonial. *Id.* The Court went on, however, to conclude that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law – as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Id.* at 68.

In *Davis v. Washington*, the Court clarified the scope of the Confrontation Clause:

A critical portion of [the *Crawford*] holding, and the portion central to resolution of the two cases now before us, is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

547 U.S. 813, 821 (2006) (citation omitted). A year later, the Court again stated that "[u]nder *Crawford* . . . the Confrontation Clause has no application to [nontestimonial statements] and therefore permits their admission even if they lack indicia of reliability." *Whorton v. Bockting*, 549 U.S. 406, 420 (2007).

The Supreme Court's precedent is clear. The Ninth Circuit has also repeatedly recognized that non-testimonial statements do not implicate the Confrontation Clause. *See*, *e.g.*, *Nelson v. Mcewen*, 593 Fed. App'x 688, 688 (9th Cir. 2015) ("Nontestimonial statements do not implicate the Confrontation Clause."); *United States v. Joseph*, 465 Fed. App'x 690, 694 (9th Cir. 2012) (same); *Valdivia v. Schwarzenegger*, 623 F.3d 849, 852 (9th Cir. 2010) (same); *Moses v. Payne*, 555 F.3d 742 (9th Cir. 2009) (same); (*Delgadillo v. Woodford*, 527 F.3d 919, 926-27 (9th Cir. 2008) (same); *United States v. Sine*, 493 F.3d 1021, 1035 n.11 (9th Cir. 2007) (same); *cf.* 5 J. Weinstein & M. Berger, *Weinstein's Federal Evidence*, § 802.05[3][c] (Matthew Bender 2d ed. 2011) ("If the hearsay statements in question are non-testimonial in nature, the Confrontation Clause does not apply at all.").

Mahon cites a footnote in *United States* v. *Larson*, 460 F.3d 1200 (9th Cir. 2006),

as support for his claim.  Doc. 52 at 5.  In dictum, the court stated that if a co-defendant's statements were not "by a coconspirator, most likely [*Bruton*] and its progeny [would] bar its use in the joint-trial setting."  *Larson*, 460 F.3d at 1212 n.10.  But the Ninth Circuit subsequently reheard *Larson* en banc and clarified its adoption of the previous panel's opinion, citing the governing Supreme Court precedent.

> The Supreme Court has since clarified, however, that *Crawford* "eliminat[es] Confrontation Clause protection against the admission of unreliable out-of-court non-testimonial statements" and that "the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability."  Adopting the portions of the three-judge panel opinion that concluded that the out-of-court statements by Komeotis and Laverdure were made in furtherance of the conspiracy and were nontestimonial, 460 F.3d at 1212-13, we hold that under *Crawford*, Defendants' Confrontation Clause rights were not violated by the admission of these statements.

*United States v. Larson*, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007) (citing *Whorton*).

Although *Larson* dealt with non-testimonial statements made in furtherance of a conspiracy, it recognized – as Supreme Court and numerous other Ninth Circuit decisions had – that *Whorton* clarified the scope of the Confrontation Clause after *Crawford*.  Nontestimonial statements do not implicate the Confrontation Clause, and Daniel's statements in the van were not testimonial.  Supreme Court and Ninth Circuit precedent entirely preclude any reasonable probability that appellate counsel would have been successful in appealing the Court's order.  *See Harrington*, 562 U.S. at 111-12; *Clark*, 769 F.3d at 725.  The Court declines accordingly to address Mahon's remaining arguments.

**C.    Ground 8: Motion to Dismiss Based on Entrapment.**

**1.    Background.**

Count 3 of the Superseding Indictment charged that Mahon had "taught and demonstrated the making and use of an explosive and destructive device, and distributed information pertaining to in whole and in part the manufacture and use of an explosive and destructive device."  *See* Doc. 49 at 83.  The following is the factual basis for Count 3.[2]

_____

[2] In deciding Mahon's motion before trial, the Court heard testimony from Rebecca

During the government's investigation of Defendants, it used an attractive younger woman, Rebecca Williams, as a confidential informant to befriend Defendants and elicit statements from them. Williams told Defendants a fabricated narrative in which her cousin's husband was sexually molesting the couple's children. Williams told Mahon that she intended to stop the molester by hurting him, expressed serious grief and anger about the situation, and Mahon clearly believed her story. CR Doc. 664 at 1-4. Through most of the video clips provided by defense counsel (Doc. 467, Ex. B & C), Mahon tried to discourage Williams from seeking to harm the molester and repeatedly urged her to speak with a lawyer about the situation. He told her she did not want to risk going to jail, and he offered to call and threaten the molester. Williams persisted in her determination to inflict harm on the molester, and only then did Mahon agree to help. Count 3 alleges that Mahon subsequently taught Williams how to make explosive and destructive devices, how to blow up a house using tools and a propane tank, how to construct a package pipe-bomb, and then mailed her literature on the use of explosives for purpose of killing, injuring, or intimidating the fictional molester. *Id.* at 4.

Before trial, Mahon moved to dismiss Count 3 based on entrapment. *See* Doc. 49 at 88; CR Docs. 479, 576, 579. The Court heard evidence over two days and denied the motion. CR Doc. 664 at 15-17. The Court held that "[e]ven if it could be concluded that Ms. Williams provided the inducement necessary for the first element of entrapment, the second element is subject to factual dispute." CR Doc. 664 at 16. Appellate counsel did not appeal the Court's ruling.

The R&R discussed in detail the communications between Mahon and Williams, and concluded that Mahon's entrapment claim would have failed and that appellate counsel was not ineffective. Doc. 49 at 84-88, 103. Mahon objects that "[m]ore than a reasonable probability exists" that the Ninth Circuit would have found the Court erred and vacated the

Williams and from Agent Moreland, and reviewed exhibits submitted with the briefing (CR Docs. 467, 479, 524, 547, 576, 579, 602), videotapes of conversations between Williams and Mahon on February 1 and 2, 2005, exhibits received in evidence during the evidentiary hearing, and grand jury testimony included in a supplemental memorandum (CR Doc. 602).

conviction on Count 3, specifically objecting to the R&R's analysis of the Ninth Circuit's factors for determining predisposition. Doc. 52 at 9-10.

### 2. Analysis.

An entrapment defense includes two elements: (1) government inducement of the crime, and (2) the absence of predisposition on the part of the defendant. *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir. 1994); *see also United States v. Poehlman*, 217 F.3d 692, 697 (9th Cir. 2000). The focus is on the defendant's subjective predisposition. Where the government has induced an individual to break the law and entrapment is at issue, the prosecution must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime before being approached by government agents. *Jacobson v. United States*, 503 U.S. 540, 548-49 (1992); *see also Peohlman*, 217 F.3d at 697-98.

The inducement element arises when the conduct of a government agent creates a substantial risk that an otherwise law-abiding citizen will be persuaded to commit a crime. *Davis*, 36 F.3d at 1430. The predisposition element considers whether the defendant was inclined to commit the crime before having any contact with government agents. *Poehlman*, 217 F.3d at 703. Courts generally review five factors to evaluate predisposition: (1) the character and reputation of the defendant, (2) whether the government made the initial suggestion of criminal activity, (3) whether the defendant engaged in the activity for profit, (4) whether the defendant showed any reluctance, and (5) the nature of the government's inducement. None of the factors controls, but "the most important is the defendant's reluctance to engage in criminal activity." *Davis*, 36 F.3d at 1430.

The issue of entrapment is generally left for the jury to decide as part of determining the defendant's guilt or innocence. *See Mathews v. United States*, 485 U.S. 58, 63 (1988); *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1248 (9th Cir. 1997); *Davis*, 36 F.3d at 1430 (citing cases). Before trial, "[t]o be entitled to acquittal as a matter of law on the basis of entrapment [a defendant] must point to 'undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act' by government agents." *United States v. Skarie*, 971 F.2d 317, 320 (9th Cir. 1992); *see also United States*

*v. Sandoval-Mendoza*, 472 F.3d 645, 649 (9th Cir. 2006).

### a. Mahon's Character and Reputation.

The R&R found that Mahon's lack of a criminal record was insufficient to show no predisposition and that it "may show nothing more than success at evading prosecution." Doc. 49 at 100. The R&R concluded that Mahon's character and reputation were "of a self-avowed bomber, who regularly encouraged others to employ violent means against their opponents. *Id.* In his objection, Mahon emphasizes his lack of a prior criminal record and asserts that he had no reputation as a bomber, "but as someone that encouraged others." He also asserts that no proof existed that "he truly committed any of the bombings about which he bragged to Williams." Doc. 52 at 8.

Mahon's assertions are unsupported. He cites no undisputed evidence with respect to his character and reputation. As the Court previously noted, the record included evidence of Mahon's alleged involvement in the Scottsdale Diversity Office bombing and his allegiance to groups that advocated violence. At a minimum, a factual dispute existed as to Mahon's character and reputation for developing plans to harm others and building bombs. *See* CR Doc. 664. This factor weighs in favor of a predisposition.

### b. Initial Suggestion of Criminal Activity.

The R&R noted that Williams initiated discussions about taking physical action against the fictional molester, but Mahon first suggested using a gas tank to cause an explosion to harm him. Doc. 49 at 100. The R&R also noted that while Williams continued to press a plan to cause the molester physical harm, it was Mahon who first suggested building a bomb. *Id.* Mahon does not specifically object to these findings nor cite a basis for a different conclusion. Doc. 52 at 8. He merely recounts the R&R's findings and asserts that the factor weighs in his favor because he was not the first to suggest criminal activity. True, it was Williams who first suggested criminal activity generally, but Mahon was first to suggest the activities for which he was eventually charged in Count 3 – teaching and providing information to Williams about constructing a bomb. The charged conduct was Mahon's idea, not Williams'. The Court agrees with the R&R that this factor weighs

in favor of predisposition.

### c. For Profit.

The R&R noted, and Mahon agrees, that the evidence does not show Mahon engaged in criminal activity for financial profit. Docs. 49 at 100-01; 52 at 8. Rather, Mahon appears to have been motivated by his romantic feelings for Williams and his racist views. This factor weighs against predisposition.

### d. Reluctance.

The R&R concluded the following. Mahon showed little reluctance, and his only reluctance was to using violence for personal problems rather than racial causes. He was cunning and careful not to incriminate himself. He was mistrustful of others, evidenced by couching his instructions to Williams about constructing a bomb as "hypothetical" and "for information" only. With very little response from Williams, Mahon progressed quickly from the idea of shooting the molester to – eight and a half minutes later – explaining how to blow up the molester's house with a gas tank and then to discussing bombs the next day. The R&R found that a jury could have reasonably concluded this fast-paced discussion was born of a predisposition to resort to explosive measures, and that any seeming reluctance was simply Mahon's wariness about exposure for the Scottsdale bombing or potential harm to Williams. Doc. 49 at 102.

Mahon objects to the finding that he demonstrated only little reluctance. He cites his repeated attempts to talk Williams out of using violence, telling her to contact a lawyer, to notify the police, or to let him call and threaten the molester. He asserts that caution about incriminating himself is not relevant to a finding of reluctance. And although he mentioned the gas tank early in his relationship to Williams, he states that "many months of inducement" passed before he gave her information to build a bomb, which is the conduct charged in Count 3, not merely discussing the idea. Doc. 52 at 8-9.

At various times in the video excerpts, Mahon expressed hesitation about helping Williams for reasons other than reluctance to commit crimes. He stated: "I get involved in the racial causes, not personal problems like yours. But nothing bothers me more than a

. . . child abuser. I hate him. I just wanna kill him. They need to be killed." *See* Doc. 49 at 84. And he also expressed concern about Williams being apprehended and imprisoned beyond her child bearing years. *See id.* at 85 (discussing their conversation). Mahon's "fear of apprehension . . . does not constitute lack of predisposition to become involved in criminal activity." *United States v. Brandon*, 633 F.2d 773, 778 (9th Cir. 1980). A factual dispute existed as to whether Mahon's caution and his alternative solutions posed to Williams were due to reluctance to engage in criminal activity or merely mistrust, fear of apprehension, or concern for Williams' safety. Mahon has not shown, as a matter of undisputed fact, that his caution was based solely on reluctance to engage in criminal activity.

Moreover, "[d]espite the fact that [Mahon] sometimes displayed reluctance to go through with the plan" at the beginning of his conversation with Williams, "the jury could well have concluded that his reluctance was not sufficiently strong to warrant a favorable finding on the third factor." *United States v. McClelland*, 72 F.3d 717, 723 (9th Cir. 1995). Once Mahon began describing setting up a propane gas bomb and constructing a package bomb, he discussed his suggestions in detail and "with relish and expertise, providing technical advice . . . while boasting of his abilit[ies]" in such a way that supports lack of reluctance. *United States v. So*, 755 F.2d 1350, 1354 (9th Cir. 1985).

Mahon asserts he was "subjected to many months of inducement before capitulating to what Williams" and the government wanted him to do. Doc. 52 at 9. And perhaps "[h]e equivocated and waffled and hesitated" in his initial conversations with Williams. *McClelland*, 72 F.2d at 723. But he was not subjected to two and a half years of inducement like in *Jacobson v. United States*, 503 U.S. 540, 549 (1992), where the government could not prove that defendant's "predisposition was independent and not the product of the attention that the Government had directed at [him]" over two years. Rather, a jury could have interpreted Mahon's early and detailed suggestion of constructing a bomb as demonstrating a predisposition to such ideas, and found that he posed the idea and eventually taught Williams how to construct explosive devices with little reluctance for

engaging in criminal activity. *See United States v. Jones*, 231 F.3d 508, 518 (9th Cir. 2000) (jury may draw reasonable inferences to determine explanation for defendant's reluctance). A factual dispute existed and "[t]he credibility of [Mahon's] explanations [was] a matter for the jury to determine." *United States v. Gurolloa*, 333 F.3d 944, 956 (9th Cir. 2003). This factor weighs against Mahon.

### e. Nature of Government's Inducement.

The R&R found that the government "purposefully, thoughtfully, and resourcefully plied [Mahon] with an attractive, sympathetic, and flirtatious younger woman with similar life views, and a sad story designed to appeal to [Mahon's] heroic self image." But the R&R concluded that the inducement was not extreme and the weight of this factor was limited because Williams only invited and did not discourage Mahon's interest, and did not engage in or promise sexual or romantic conduct. Doc. 49 at 102-03. Mahon objects that the inducement was extreme, citing Williams' exotic dancing background, "revealing" clothing, suggestions of forthcoming sexual conduct, and her spending the night in the same motel room with him. Doc. 52 at 9.

"Analysis of the fifth factor – the nature of the inducements – is the most difficult." *McClelland*, 72 F.3d 717. "The pressure employed by [Williams] was [arguably] more serious than mere solicitation" to the extent Williams used Mahon's romantic interest in her to initiate conversations which resulted in the charged conduct. *See id.* But the frequency and effect of Williams' inducements on Mahon were factual determinations that a jury could have reasonably resolved against Mahon, finding that he was predisposed regardless of his interest in Williams. Moreover, Williams employed no threats or cash incentives, and "'[s]uggestions and solicitations do not appear to constitute the sort of inducement that satisfies this element of the entrapment defense.'" *Id.* (citation omitted). The record supports that Mahon was sincerely taken by and sympathetic to Williams. But the fact that he was willing to assist her in harming another individual "leads to the inference that [Mahon] was willing to" take extreme measures to gain her approval and progress towards a relationship, supporting an inference of predisposition. *See Reynoso-*

*Ulloa*, 548 F.2d at 1338. "The defense of entrapment, while protecting the innocent from Government creation of crime, is unavailable to a defendant who, [concerned with his own motivations and] unconcerned about breaking the law, readily accepts a propitious opportunity to commit an offense." *Id.* Williams played her part well, but given the evidence as a whole, the Court cannot find as a matter of undisputed fact that the government's inducements were so strong that a reasonably jury could not have found predisposition under this factor.

### 3. Entrapment Conclusion.

The R&R concluded that lack of profit motive and the nature of inducement weighed in favor of Mahon, but that viewing the evidence in a light most favorable to the prosecution, the Ninth Circuit would have had no basis for reversing the Court's order. Doc. 49 at 103. As discussed above, while the record does not support that Mahon had a profit motive, the other four factors weigh against him. Mahon cites and the record reveals no "undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act by government agents" – the standard for pretrial dismissal based on entrapment. *Skarie*, 971 F.2d at 320. Mahon has not demonstrated that the likelihood of a different result on appeal is substantial, not just conceivable. *Harrington*, 562 U.S. at 111-12.

### D. Ground 7: Withdrawal of Jury Instruction on Entrapment.

Mahon's § 2255 motion argued that trial counsel was deficient for withdrawing the request for a jury instruction on entrapment. Doc. 52 at 10. The R&R concluded that trial counsel made a reasonable tactical decision because an entrapment defense would have allowed the prosecution to introduce adverse evidence of Mahon's predisposition, including materials from his farm, evidence of his connection to other bombings, and evidence of his military service. The R&R found this decision especially reasonable given that the entrapment defense pertained to Count 3, where the evidence was stronger and a conviction more likely notwithstanding the defense. The rebuttal evidence might have been "particularly damning" as to Counts 1 and 2, for which there was less evidence, a

higher chance of acquittal, and a risk of higher sentences if Mahon was convicted. The R&R further concluded that even if trial counsel erred in withdrawing the instruction, there was no reasonable probability that the result would have been different because the evidence strongly supported Mahon's predisposition. Doc. 49 at 108-09.

Mahon objects to the R&R's conclusion that "the possibility of introduction of rebuttal evidence made the decision to forego the jury instructions a reasonable tactical decision." Doc. 52 at 10. But he fails to explain why trial counsel's decision was unreasonable.[3] Mahon's objection is not sufficiently clear or specific for the Court to determine which part of the R&R's reasoning he objects to. *See Thomas*, 474 U.S. at 149. In any event, the Court concludes that trial counsel was not ineffective. When reviewing a *Strickland* ineffective assistance claim, the Court must give counsel "wide latitude . . . in making tactical decisions." *Strickland*, 466 U.S. at 689. Counsel could have reasonably weighed the benefit of an entrapment defense to Count 3 against the risk of adverse rebuttal evidence for Counts 1 and 2, and determined that the risk outweighed the benefit. Trial counsel's representation did not "amount[] to incompetence under 'prevailing professional norms,'" *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690), and Mahon has not shown a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### E. Ground 10: Sentencing Enhancement.

At sentencing, the Court applied a 12-level enhancement for terrorism under U.S.S.G. § 3A1.4. Appellate counsel did not appeal the enhancement. The R&R found that counsel could have reasonably concluded that the Ninth Circuit would have joined the Fifth Circuit in finding that "[a]ll that section 3A1.4 requires for an upward adjustment to apply is that one of the enumerated offenses was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,'" and that an intent to influence municipal government is sufficient. *See* Doc. 49

---

[3] Mahon also asserts generally that he was not predisposed so counsel's error was prejudicial, but as discussed above, sufficient evidence existed of Mahon's predisposition and trial counsel could have reasonably found the defense futile.

at 117-19 (citing *United States v. Harris*, 535 F.3d 767, 773-74 (5th Cir. 2005); *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987) ("absent a strong reason to do so, we will not create a direct conflict with other circuits"); *United States v. Alexander*, 287 F.3d 811, 819-20 (9th Cir. 2002) (analyzing whether "government officer or employee" in U.S.S.G. § 3A1.2 was limited to federal employees and finding the term unambiguous, giving the term its plain meaning – "the officials collectively comprising the governing body of a political unit and constitute the organization as an active agency" – and affirming defendant's enhancement for crimes against state employees)).

Mahon objects, but he asserts only that the "issue was ripe for appeal, and . . . a reasonable probability exists that [the Ninth Circuit] would have agreed that it is [] not federal terrorism to attack a municipal or state building under the statute." Doc. 52 at 10. Mahon fails to clearly object to specific portions of the R&R's reasoning. And his general assertions fails to meet his burden of showing ineffective assistance of counsel and prejudice by demonstrating that a substantial likelihood exists that the Ninth Circuit would have concluded differently. *Strickland*, 466 U.S. at 694.

**IT IS ORDERED:**

1.      Judge Metcalf's R&R (Doc. 49) is accepted as set forth in this order.

2.      The Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 31) is **denied**.

3.      The Clerk of Court shall terminate this action.

Dated this 10th day of April, 2019.


David G. Campbell
Senior United States District Judge

- 22 -